FILED
2017 Jul-12  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

# SOUTHERN ENVIRONMENTAL LAW CENTER

Telephone 205-745-3060        2829 2ND AVENUE SOUTH, SUITE 282        Facsimile 205-745-3064
BIRMINGHAM, AL 35233-2838

June 29, 2016

Garry N. Drummond, Chairman and Chief Executive Officer
Drummond Company, Inc.
P.O. Box 10246
Birmingham, Alabama 35202

> **Re:** **Notice of Intent to File Citizen Suit for Violations of the Clean Water Act and the Resource Conservation and Recovery Act at the Maxine Mine near Praco, Alabama**

Dear Mr. Drummond:

This letter is to notify you that Black Warrior Riverkeeper, Inc. ("Riverkeeper") intends to file a lawsuit against Drummond Co. ("Drummond") under § 505 of the Clean Water Act ("CWA"), 33 U.S.C. §1365, for violations at Maxine Mine, as more fully set out below. Riverkeeper further intends to file claims against Drummond under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6872, for violations at Maxine Mine, as more fully set out below. Riverkeeper provides this notice pursuant to 40 C.F.R Pt. 135, Subpart A, and 42 U.S.C. § 6972(b)(2)(A). Unless the violations described herein are fully redressed, Riverkeeper will file a lawsuit asserting its CWA claims and RCRA claims after the applicable notice periods have expired.

Drummond, which is the owner of the Maxine Mine site, is in violation of § 301(a) of the CWA, 33 U.S.C. § 1311(a), because it is currently discharging pollutants from point sources at Maxine Mine into two unnamed tributaries of the Locust Fork, and to the Locust Fork of the Black Warrior River, without a National Pollutant Discharge Elimination System ("NPDES") permit. Section 1311(a) of the CWA prohibits the discharge of pollutants by any person into waters of the United States except in compliance with the terms of an NPDES permit issued pursuant to § 402 of the CWA, 33 U.S.C. § 1342.

Drummond is also in violation of 33 U.S.C. § 1311(a) by having discharged fill material and continuing to do so without the permit required by § 404 of the CWA, 33 U.S.C. 1344, which requires a permit issued by the U.S. Army Corps of Engineers for the discharge of fill material into waters of the United States. Drummond has placed or allowed mining waste and sediment to fill an unnamed tributary of the Locust Fork, and has constructed and/or maintained dams in a water of the United States at the Maxine Mine site, despite not having the required permit(s) to do so. On information and believe, erosion from the waste pile continues to fill this tributary.

Finally, Drummond is in violation of 42 U.S.C. § 6972(a)(1)(B) of RCRA, because it is allowing and causing mining waste (geological overburden or "GOB") to accumulate at and around Maxine Mine and enter tributaries of the Locust Fork, and the Locust Fork; and allowing discharges from the former underground works of the mine itself, in a manner that may present an imminent and substantial endangerment to health and the environment.

## I.    PERSONS GIVING NOTICE

Pursuant to 40 C.F.R. § 135.3(a) and 40 C.F.R. § 254.2, notice is hereby provided that the name, address and telephone number of the persons giving notice of intent to sue is as follows: Black Warrior Riverkeeper, Inc., 712 37th Street South, Birmingham, AL 35222, Tel: (205) 458-0095. Riverkeeper is an entity organized under the laws of the State of Alabama that seeks to protect and restore the Black Warrior River and its tributaries.  It is a membership organization with over 4,000 members, many of whom live, work and/or recreate in the area of the violations discussed herein, and who are harmed by those violations. Furthermore, these injuries or risks are traceable to Drummond's violations alleged in this notice letter, and eliminating those ongoing violations will redress the members' injuries or risks.

## II.    FACTUAL BACKGROUND

### A.    Site Description

Maxine Mine is a single-pit underground mine in Jefferson County, Alabama that was last mined in 1983.[1]  Drummond is listed as the controller of the mine as of May 11, 1978. *See id.*  The mine was formerly owned and operated by Alabama By-Products Corporation ("ABC"), which merged into Drummond on December 31, 1985.[2]  It has been known as the ABC Coke Division of Drummond ever since.[3]  The mining permit for Maxine Mine was formally transferred from ABC to Drummond in March of 1986.  Maxine Mine currently consists of old underground mine works and abandoned piles of GOB on the surface. (*Figure 1*).

Maxine was mined both before and after Congress enacted the Surface Mining Control and Reclamation Act ("SMCRA") of 1977. *See, e.g., June 11, 1985 Letter from ABC Manager of Land and*

---

[1] http://mines.findthedata.com/l/98/Maxine-Mine, last accessed November 4, 2015;   Gadsden Times, Drummond Announces Closure of Mine (August 19, 1983) https://news.google.com/newspapers?nid=1891&dat=19830819&id=Up8fAAAAIBAJ&sjid=HNYEAAAAIBAJ&pg=1408 ,3188038&hl=en, last accessed November 4, 2015. *See also* August 19, 1983 Letter from ABC Vice-President Douglas R. Cook to the Alabama Surface Mining Commission.

[2] http://arc-sos.state.al.us/cgi/corpdetail.mbr/detail?corp=106565&page=name&file=M. , last accessed November 4, 2015. *See also* http://www.drummondco.com/about/history/, last accessed November 4, 2015 (Drummond purchased ABC Coke in 1985)

[3] http://www.loc.gov/pictures/item/al0916/.

*Forestry James W. Darden to the ASMC.*  Historic photographs show that ABC caused major disturbance to the surface of the mine site between 1946 and 1965.  Documents from the ASMC permit file (P-3254) clearly delineate the spoil areas where GOB was piled.  Of particular interest is a map (prepared in December 1981) by P. E. LaMoreaux and Associates ("PELA"), for ABC.  (*Figure 2, PELA map*).  The PELA map depicts the large refuse area which Riverkeeper terms as "the GOB pile."

The PELA map also shows a dam at an unnamed tributary's confluence with the Locust Fork, ("Tributary 1"), as well as a second dam on Tributary 1 upstream of the first dam.  The area between the two dams, which was at one time a slough off the Locust Fork (shown in the U.S. Geological Survey's National Hydrography Dataset), was converted to use as a sediment basin (basin 1) for runoff from the GOB pile.  (*See Figure 2*)  The area upstream of the second dam was also used as a sediment basin (basin 2). An inset in the PELA map depicts a third sediment basin (basin 3) upstream of the other two basins, built adjacent to the stream, which received runoff from another area of the GOB pile via diversion ditch.  The PELA map illustrates that the mine operators designed and constructed four or more diversion ditches, which channeled and carried the runoff from the GOB pile into the three sediment basins (which eventually discharged into the Locust Fork). Over time, Tributary 1 completely filled with GOB that washed down from the GOB pile.

Engineering plans submitted by ABC to the ASMC further reveal ABC's plan to channel, retain and treat surface water runoff from the disturbed area in the three sediment basins.   According to ASMC records, this system was designed and implemented in response to ASMC's concerns about water quality.   Specifically, the Commission was sufficiently concerned about the GOB pile and the low pH of the effluent leaving the site to initiate an enforcement action (Docket No. R78-82-134), which resulted in a corrective action plan consisting of the system of the diversion ditches and sediment basins. Upon information and belief, at least one of the man-made diversion ditches – once connected with basin 3--which receives drainage from the GOB area, remains intact and is continuously discharging contaminated effluent into the Locust Fork.  Tributary 1, which receives contaminated acid mine drainage from the GOB pile, and flows through the two instream sediment basins, is discharging into the Locust Fork on a regular basis.

Along with the system of ditches, dams, and sediment basins, ABC installed several groundwater and surface water monitoring wells at the mine site.  Test results of discharges from basin 1, as reported by the ASMC, show low pH, consistently at or lower than 3.0 (pH 7 is neutral, pH 0 is the most acidic, while pH 14 is the most alkaline).  An inspection report dated May 11, 1983 indicates the "sediment basin near the river continues to discharge bad water."  Test results at that time record pH at 2.8.  Inspection reports in 1983 state that the discharge points observed are not permitted NPDES discharge points.  An inspection report dated April 11, 1984, notes that the site has a "leaking dam which must be corrected."

Hydrologic plans indicate that some of the runoff was to be treated chemically for a period of time, before being discharged to the Locust Fork at permitted outfalls.  Upon information and belief,

3

there are presently no NPDES discharge permits in place for discharges from the sediment basins, diversion ditches or the underground mine works, and no chemical treatment of any runoff is taking place.[4]

## B.   Description of Violations

Riverkeeper has monitored the Maxine Mine site since May 2006.  While on a routine patrol along the Locust Fork on May 24, 2006, Riverkeeper Nelson Brooke identified a stained, discolored rip-rap spillway in a dam on the riverbank.  Upon closer inspection, he saw that the rip-rap was part of a dam at the mouth of Tributary 1, which was entirely filled with GOB from Maxine Mine's GOB pile located on a ridge overlooking Tributary 1 and the Locust Fork.  Water was running over and through the accumulated GOB in multiple places in Tributary 1 as it flowed to the Locust Fork.  With a handheld meter, Brooke checked the pH in water flowing out of Tributary 1 and over the rip-rap dam into the Locust Fork; the pH was extremely acidic, measuring 2.3 s.μ.  These discharges from the Maxine site are what is commonly referred to as acid mine drainage ("AMD").  AMD can have severe impacts on fish, animals and plants.

Riverkeeper took Alabama Abandoned Mine Lands Program inspector Larry Barwick to Tributary 1 via patrol boat on November 14, 2006 where Barwick inspected the site and took water samples.  An aerial flight over the site on November 17, 2006, revealed significant erosion of the GOB pile on the ridgetop along the Locust Fork, impacting Tributary 1, as well as the Locust Fork of the Black Warrior River.

EPA recently stated that "high levels of salts, measured as TDS[5] or conductivity, are a primary cause of water quality impairments downstream from mine discharges."[6]  Sulfates are one of the types of salts associated with high conductivity.[7]  Accordingly, EPA scientists have developed an aquatic life benchmark identifying "that substantial and increasing aquatic life impacts occur as conductivity increases beyond 300 μS/cm."[8]  Building on this research, the West Virginia Department of

---

[4] Review of the ASMC file reveals that Drummond was concerned exclusively with its reclamation responsibilities under SMCRA, and obtaining a release of those responsibilities as quickly and inexpensively as possible. Drummond expressed no concerns about long-term problems with AMD runoff and water pollution emanating from the mine site, or the structural integrity of the dams, and gave no attention to these conditions, and the ongoing water pollution problems, before abandoning the site.

[5] TDS means total dissolved solids.

[6] EPA, Memorandum re: Improving Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order, Appendix 1, p. ii (July 21, 2011). Although Alabama is not formally included in this guidance for Central Appalachia, EPA has frequently stated in its Alabama § 404 comment letters that "the same concerns and science" present in Central Appalachia also apply to the coal fields of Alabama. *See, e.g.*, *April 4, 2011 EPA Letter re Masseyline Mine*. Moreover, the Black Warrior River watershed (and much of Alabama's coal) is contained in EPA's Eco-region 68, the same Eco-region containing the Central Appalachian states of Tennessee and Kentucky.

[7] *Id.*

[8] U.S. EPA (Environmental Protection Agency). 2011. A Field-based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams. Office of Research and Development, National Center for Environmental Assessment, Washington,

Environmental Protection ("WVDEP") has also recognized that conductivity and sulfate cause biological impairment of streams.[9]  In WVDEP's guidance, it provided ranges within which it believes that indicators of ionic pollution are likely to cause or contribute to such biological impairment. WVDEP considers conductivity to be a "definite stressor" when it exceeds 1,533 µS/cm and a "likely stressor" when it exceeds 1,075 µS/cm.  WVDEP considers sulfate to be a "definite stressor" when it exceeds 417 mg/L and a "likely stressor" when it exceeds 290 mg/L.  The water coming over the dam at Maxine contains sulfates at levels that are approximately five times the definite stressor level.

Results from samples taken on October 20, 2011, found aluminum levels were 230 mg/L, iron levels were 611 mg/L, lead levels were 0.0840 mg/L lead, and manganese levels were 26 mg/L, total dissolved solids levels were 7,050 mg/L, sulfate levels were 5,460 mg/L, and conductivity levels were 8,840 µmho/cm, which are all unacceptable levels for discharges to surface waters. The most recent samples of the water flowing over the rip-rap dam were taken on June 23, 2015.  The results show elevated levels of conductivity, TDS, sulfate, and heavy metals, among other pollutants.  For example, TDS levels were 5,125 mg/L, conductivity levels were 338µmho/cm[10], sulfate levels were 1,946 mg/L, iron levels were 70 mg/L, and aluminum levels were 430 mg/L.  Iron and aluminum can be toxic to fish and other aquatic organisms. For this reason, the EPA has set a Criterion Continuous Concentration ("CCC") (an estimate of the highest concentration of a material in surface water to which an aquatic community can be exposed indefinitely without resulting in an unacceptable effect) for iron at 1.0 mg/L in freshwater.[11]  The level in the water flowing over the dam was 70 times the CCC for iron.

The CCC for aluminum is .087 mg/L.[12]  In addition, EPA has set a Criteria Maximum Concentration ("CMC") for various substances, which is an estimate of the highest concentration of a material in surface water to which an aquatic community can be exposed briefly without resulting in an unacceptable effect.  The CMC for aluminum is 0.75 mg/L.  The water flowing over the dam contained aluminum at levels that are approximately 5,000 times the CCC and 500 times the CMC.  Thus, the water flowing over the dam is highly toxic to aquatic life and causes harm to the aquatic life in the Locust Fork until it dilutes sufficiently.

Analysis of dark colored sediment close to the dam in the edge of the Locust Fork, which had apparently come from the GOB pile, showed that it contained high levels of iron (108,000 mg/kg), aluminum (13,130 mg/kg), and sulfate (2,300 mg/kg).  These results indicate that the observed

---

DC. EPA/600/R-10/023F.  *See also* Susan M. Cormier, Glenn W. Suter II, and Lei Zheng, Derivation of a Benchmark for Freshwater Ionic Strength, 32 ENVIRONMENTAL TOXICOLOGY AND CHEMISTRY 263 (Nov. 12, 2012).
[9] WVDEP, Justification and Background for Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i (Aug. 12, 2010) *available at* http://www.dep.wv.gov/pio/Documents/Narrative/Narrative%20Standards%20Guidance%20Justification.pdf
[10]Riverkeeper measured conductivity levels as high as 8,840 in 2011.
[11]EPA, National Recommended Water Quality Criteria, http://water.epa.gov/scitech/swguidance/standards/criteria/current/index.cfm#cmc.
[12]The standards for aluminum are set for a pH range of 6.5 to 9.  Although the discharge is more acidic than this, it will rapidly come within this pH range in the Locust Fork.

pollutants in the water originated at the GOB pile. Riverkeeper has also observed a significant accumulation of black, gray and red GOB material in the Locust Fork and along the riverbank, at the upstream end of the GOB pile, which has evidently washed down from the GOB pile over time.

Based upon several recent visits and observation of the site, there is also serious concern about the physical state of the rip-rap spillway for the dam at the mouth of Tributary 1, which is eroding away toward the river and appears to be in danger of breaching. (*Figure 3*). Such a breach would allow massive amounts of additional GOB to spill directly into the Locust Fork. This area of the Locust Fork has been on Alabama's 303(d) List of impaired streams since 1998 for siltation from "agriculture and surface mining, abandoned."[13] Obviously, a major discharge of mine waste into the Locust Fork would exacerbate that existing impairment.

Finally, Riverkeeper has observed locations at which contaminated mine pool water is seeping from the underground mine works into a slough on the lower Locust Fork (via an unnamed tributary) on which several houses and boat docks are located.

## III.   SUMMARY OF CLAIMS

GOB is a solid waste that typically contains high levels of heavy metals such as iron and aluminum. Unsafe disposal of GOB is dangerous, threatening the health of local communities, making groundwater unsafe to drink, harming aquatic life and wildlife, and polluting rivers and streams. At Maxine Mine, AMD from the GOB pile has been illegally discharged into Tributary 1 and the Locust Fork for many years.

When an underground mine is abandoned and active pumping of groundwater ceases, water accumulates in the former underground mine works, forming a "mine pool." Mine pool water is a waste that typically contains heavy metals such as iron and aluminum. Improper disposal of mine pool water is dangerous, threatening the health of local communities, making groundwater unsafe to drink, harming aquatic life and wildlife, and polluting rivers and streams. Based upon eye witness accounts, contaminated mine pool water has continuously discharged through fissures from the Maxine mine works into a second unnamed tributary, which flows into the lower Locust Fork. (For ease of reference, Riverkeeper identifies the second unnamed tributary as "Brown's Creek" because the property on either side is owned by Jerry Brown.) (*Figure 4*).

After investigating complaints about the drainage from the GOB pile and mine pool at Maxine Mine, Riverkeeper has confirmed that both are causing illegal water pollution. Riverkeeper has also identified a third illegal discharge from a diversion ditch, which is discharging orange-stained water with algae in it directly into the Locust Fork. Drainage from the GOB pile, the mine pool and the diversion ditch is discharging into waters of the United States without the required NPDES permit. In

---

[13] http://adem.alabama.gov/programs/water/303d.cnt, last accessed April 27, 2016.

addition, GOB has accumulated at the mouth of Tributary 1, filling the watercourse, smothering the bottom, and rendering the water in the stream inhospitable to aquatic life and other organisms.  Just as concerning, the GOB in Tributary 1 is contained by a dam that shows significant signs of deterioration at its rip-rap spillway.  If the dam suffered a breach, a major release of GOB could occur, harming the Locust Fork, nearby property owners, recreational users and potentially threaten the source of drinking water for Bessemer, Lakeview, North Johns and parts of Jefferson County, which all draw their drinking water from the Black Warrior River, downstream of the Maxine Mine site.

## IV.    DRUMMOND HAS VIOLATED AND CONTINUES TO VIOLATE THE CWA AND RCRA

### A.  Clean Water Act Violations

After providing notice, citizens are entitled to bring suit under the CWA against "any person . . . alleged to be in violation" of an "effluent standard or limitation" established under the CWA. 33 U.S.C. § 1365(a)(1). In turn, Sections 1311 and 1342 prohibit discharges of a pollutant without a required permit. Sections 1344 specifically addresses permits to discharge dredged or fill materials.

Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of a pollutant into waters of the United States except, in relevant part, pursuant to a valid National Pollutant Discharge Elimination System ("NPDES") permit, issued pursuant to § 402  33 U.S.C. § 1342 (pollutants),[14] or § 404, 33 U.S.C. 1344 (fill materials.)   The term "discharge" refers to any addition of any pollutant to navigable waters from any point source.[15]

The term "pollutant" is broadly defined to include dredged spoil, solid waste, chemical wastes, biological materials, rock, sand, industrial, municipal, and agricultural waste.[16]

The term "point source" includes any "discernible, confined and discrete conveyance" from which pollutants may be discharged, including pipes, ditches, channels, tunnels, conduits, wells, and discrete fissures.[17]

The point source need not be the original source of the pollution; all that is required is that it conveys the pollution to a "navigable water," defined as the waters of the United States, including the territorial seas.[18]

After giving notice, citizens are entitled to bring suit under RCRA against "any person. . . who

---

[14] *Id.* § 1311(a).
[15] *Id.* § 1362(12)(A).
[16] *Id.* § 1362(6).
[17] *Id.* § 1362(14).
[18] 33 U.S.C. §1362(7).

has contributed to or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

1.    **Drummond is Violating Section 301 of the Clean Water Act by Discharging Pollutants from Point Sources into Tributaries of the Locust Fork, and to the Locust Fork, Without the Required Permit.**

As explained in detail above, illegal discharges are occurring at the Maxine site:1) through the discharge of AMD via man-made conveyances into Tributary 1 (including two sediment basins), then over and through the rip-rap spillway in the sediment basin dam at the mouth of Tributary 1 into the Locust Fork; 2) through direct discharges into the Locust Fork through one or more drainage ditches constructed to carry runoff from the GOB pile around the perimeter of Tributary 1 to sediment basin 3; 3) through the erosion of GOB  directly into the Locust Fork upstream of the mouth of Tributary 1, and the depositing and accumulation, for many years, of GOB on the riverbank of the Locust Fork in the same area; and 4) through seeps of contaminated mine pool water from the underground mine works which are discharging into Brown's Creek, and reaching the Locust Fork.

Surface water runoff containing pollutants constitutes a "discharge" for purposes of the CWA when the runoff is collected or channelized by human activity. *Committee to Save the Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305 (9th Cir. 1993). At Maxine, the mine owners/operators engineered and constructed sediment basins, contained by earthen dams, as well as a system of drainage ditches, basins, and discharge points, to channel and dispose of surface water runoff into Tributary 1 and the Locust Fork.

AMD discharged from abandoned mines, based upon its component parts, satisfies the definition of a "pollutant" under the CWA. *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979); *United States v. Iron Mountain Mines, Inc*. 881 F.Supp 1432, 1435 (E.D Cal. 1995); *Mokelumne River*, 13 F. 3d 305.

The term "point source," which is defined as any discernable, confined and discrete conveyance, is interpreted broadly to accomplish the remedial goals of the CWA. *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp 1168 (D. Mont. 1995)*; Earth Sciences*, 599 F.2d 368.  Point sources include surface water which is channeled or collected by man.  40 C.F.R. §122.2.  A spoil pile on an abandoned mine site designed to store discarded overburden may itself be a point source.  *Sierra Club v. Abston Construction Co.*, 620 F.2d 41 (5th Cir. 1980). Without question, a system in which AMD runoff from a spoil pile on a mine site is channeled through ditches into sediment basins, and ultimately into an adjacent water of the United States, is an illegal discharge from a point source.  *Abston Construction Co.*, 620 F.2d 41 (dealing with sediment basins designed to impound AMD on an abandoned mine site); *Consolidated Coal Co. v Costle*, 604 F.2d 239, 249 (4th Cir. 1979); *Mokelumne*

*River,* 13 F.3d 305 (9th Cir. 1993) (system of gullies designed to carry runoff on a mine site to sediment basins found to be a point source). Sediment basins, lagoons and collection basins like those constructed at Maxine are point sources. *Dague v. City of Burlington*, 935 F.2d 1348 (2d Cir. 1991); *Washington Wilderness Coalition v. Hecla Min. Co.* 870 F.Supp 983 (E.D. Wa. 1994). Finally, groundwater seeps traceable to mining wastes are point sources. *Earth Sciences*, 599 F.2d at 374.

A CWA citizen suit may properly be based upon the absence of a valid permit, and the claim that the defendant is discharging without the required NPDES permit. *Hecla Min. Co*. 870 F.Supp 983. Drummond does not possess a valid NPDES permit to discharge polluted water from the GOB pile into waters of the United States. The discharge of sediment and runoff from the GOB pile into waters of the Unites States without such a permit violates the CWA. While it is clear that illegal discharges are ongoing, without a thorough site inspection Riverkeeper cannot be certain exactly where the waters of the United States begin, nor how many additional illegal discharges may be present. This letter therefore, gives general notice of these violations.

In addition to the GOB pile and its related system of drainage ditches and sediment basins, the underground mine works are sufficiently "discernable, confined, and discrete" to constitute a point source under the CWA. *Beartooth Alliance, 904* F.Supp 1168 (holding that AMD seeping from mine openings or fissures is an unpermitted discharge of pollutants from a point source). Polluted water from the mine pool is escaping the mine works and entering Brown's Creek on a regular basis in sufficient quantities to turn the substrate of the tributary orange. (*Figure 5*.)

All of the discharges described in this section constitute ongoing and continuous violations of the CWA which are occurring on a daily basis.

       **2.**       **Drummond Has Violated and Continues to Violate the Clean Water Act by Filling a Tributary of the Locust Fork Without a Permit.**

Section 404 of the CWA empowers the Secretary of the Army to issue permits for the discharge of fill material "into the navigable waters at specified disposal sites."[19] Under the CWA, "fill material" is "material placed in waters of the United States where the material has the effect of: (i) replacing any portion of a water of the United States with dry land; or (ii) changing the bottom elevation of any portion of a water of the United States.[20] This definition includes rock, sand and overburden from mining or excavation. [21] A discharge of fill material is defined as the addition of fill material into waters of the United States.[22]

---

[19] 33 U.S.C. §1344(a).
[20] 67 Fed. Reg. 31, 129, 31, 143 (2002).
[21] *Id*
[22] 33 C.F.R. §323.2(f).

Drummond did not and does not have a § 404 permit which authorized the filling of the lower portion and mouth of Tributary 1 with GOB from the Maxine Mine site, and it is therefore in violation of the CWA. *Avoyelles Sportsmen's League, Inc.v. Marsh,* 715 F.2d 897 (5th Cir. 1983)(holding that filling in streams and sloughs with fill created by land clearing was redepositing fill materials into waters of the United States, constituting a discharge of a pollutant, which required a Section 404 permit).

In addition, the construction of the dams, which involved placing fill material in Tributary 1 in order to dam it for sediment basins, is also a violation of the CWA. In order to legally conduct such fill activity, Drummond was required to obtain a § 404 permit because the objective of that activity was to change the bottom elevation of the stream to create the sediment basins. *West Virginia Coal Ass'n; Minnehaha Creek Watershed Dist. V. Hoffman, 597 F.2d 617 (8th Cir. 1979)(*construction of dams and rip-rap in navigable waters was "clearly intended by Congress to come within the purview of…404 of the Act."). Even if the dams were originally constructed prior to enactment of the CWA, Drummond is still required to have a § 404 permit as the  constant discharge of GOB into Tributary 1 constitutes continuous fill activity which is an ongoing violation.

**B. RCRA Violations**

As stated above, Drummond has violated 42 U.S.C. § 6972(a)(1)(B) of RCRA by 1) causing the GOB from the GOB pile to accumulate in Tributary 1 in a manner that may present an imminent and substantial endangerment to the environment; 2) allowing the rip-rap spillway and dam at the confluence of Tributary 1 with the Locust Fork to deteriorate so that the dam could breach and release the accumulated GOB into the Locust Fork in a manner that would present an imminent and substantial endangerment to health and the environment; 3) allowing runoff from the GOB pile to flow into Tributary 1 in a manner that may present an imminent and substantial endangerment to the environment; 4) allowing GOB to erode directly into the Locust Fork upstream of the mouth of Tributary 1, and to deposit, for many years, on the riverbank of the Locust Fork in the same area; and 5) allowing mine pool water to discharge into Brown's Creek in a manner that  presents an imminent and substantial endangerment to health and the environment, to the extent that this discharge is not covered by the CWA.

The USGS National Hydrography Dataset shows that a slough used to exist at the confluence of Tributary 1 with the Locust Fork that extended towards the GOB pile.   Over time, that slough has been filled in by the discharge of GOB, which has accumulated behind a man-made dam constructed near Tributary 1's mouth. Upon information and belief, the GOB contains pollutants such as sulfate, aluminum, arsenic, cadmium, chromium, cobalt, copper, iron, lead, and vanadium  This deposited GOB has harmed the environment in Tributary 1 and (former) slough in a number of ways. First, the GOB has smothered the stream bed, impairing and virtually eliminating its aquatic habitat value.  Second, the GOB has leached substances, including at least, sulfate, ionic salts measured as conductivity or total dissolved solids, aluminum and iron, into water at levels that are harmful to any aquatic organisms

remaining in Tributary 1. Therefore, the accumulation of this GOB in Tributary 1 and the former slough may present an imminent and substantial endangerment to the environment.

The dam that holds back this accumulated GOB appears unstable near its spillway and in danger of breach. Rip-rap from the spillway and GOB are already migrating directly into the Locust Fork. If the dam breached, a large discharge of GOB would potentially occur, causing substantial harm to the Locust Fork, adjacent property owners and recreational users as well as potentially threatening the drinking water source for three downstream municipalities.[23]  Such discharges have occurred in other locations like the Gold King Mine, where mine wastes caused widespread environmental harm, and the Dan River, where discharge of coal ash caused environmental devastation downstream. Therefore, the potential breach of the dam retaining the GOB in Tributary 1 may present an imminent and substantial endangerment to health and the environment.

Finally, to the extent that discharges from the mine pool are not covered by the CWA, they violate RCRA in that they are causing harm to the environment. Brown's Creek downstream of the mine pool discharge is visibly contaminated, with iron bacteria discoloring the substrate. Sediment and other pollutants from the mine pool discharge have settled out of the water column onto the substrate of receiving water, forming what is known as armoring. Armoring binds to stream bottoms, rocks, and wood forming a hardened, impermeable coating on the substrate, which builds up as thick, impermeable deposits in the affected streams. These solids can coat stream bottoms, smother aquatic life and destroy stream habitat. Therefore, unless covered by the CWA, the ongoing discharges to this tributary may present an imminent and substantial endangerment to the environment.

## C.  Combined CWA and RCRA Violations

As described above in Sections IV(A)(1) and IV(B), it is visually apparent that GOB has eroded from the GOB pile over decades and deposited along the shoreline of the Locust Fork downgradient of the GOB pile, and directly into the Locust Fork in the same area. Sampling of the sediment material indicates that it is the same material which has filled Tributary 1. This discharge of runoff water and the GOB material it transports constitutes a continuous and ongoing violation of both Sections 402 and 404 of the CWA because it is a discharge of solids and contaminated water, together, in the runoff. It is also a RCRA violation, as detailed above, because it presents an imminent and substantial

---

[23] As Drummond well appreciates from its Shepherd Bend Mine litigation, the Birmingham Water Works Board is approaching a critical tipping point at its Mulberry Fork intake located 5.4 miles downstream. If concentrations of toxic pollutants increase in the source water for that intake, it is very likely that the BWWB will have to implement advanced water treatment technology not mandated by law, technology that it does not currently possess or use, and technology which would require significant additional capital costs. *See November 29, 2012 Testimony of BWWB Engineering Consultant Patrick Flannelly* at p. 15, pp. 32-34 (*Birmingham Water Works Board v. ASMC and Shepherd Bend Mine LLC*) ("*Flannelly*") (Applicable regulation does not require BWWB to employ advanced treatment methods, but certain concentrations of metals in source water would require advanced treatment to meet applicable drinking water standards). Some mining-related contaminants are not removed by treatment. *See* BWWB's "Treatability of Potential Mining Contaminants at Western Filter Plant."

endangerment to health and the environment.

## V.   CONCLUSION

If Drummond fails to remedy the issues discussed herein to come into full compliance with the CWA within 60 days of the receipt of this letter and/or fails to come into compliance with RCRA by abating the endangerments described above within 90 days of the receipt of this letter, Riverkeeper intends to file a citizen suit seeking declaratory and injunctive relief as well as civil penalties. Riverkeeper will request, among other remedies, a judgment declaring the discharges or violations described or listed herein to be unlawful; declaring that Drummond is in continuing violation of the CWA and/or RCRA at Maxine Mine; and enjoining Drummond from allowing Maxine Mine to continue to violate the CWA and/or RCRA.  Riverkeeper intends to pursue these and similar or related violations, including all violations which occur or continue after service of this notice and all violations revealed in the course of the litigation discovery process.  In addition, Riverkeeper will seek excavation and/or remediation of the contaminated streams as appropriate; removal of the GOB pile and cessation of all illegal discharges of any kind at the site, and any other necessary and appropriate injunctive relief.

Riverkeeper will also seek the imposition of civil penalties against Drummond under the CWA and RCRA in the amount of $37,500.00 per day for each statutory violation, the maximum allowed by law. See 40 C.F.R. Part 19.  In addition, if successful in the prosecution of this suit, Riverkeeper intends to seek an award of the costs of litigation (including reasonable attorney and expert witness fees) under 33 U.S.C. § 1365 and/or 42 U.S.C § 6972(e).

By failing to comply with the CWA and RCRA, as detailed above, Drummond has injured or threatened to injure, and will continue to injure or threaten to injure, the health, environmental, aesthetic, and economic interests of Riverkeeper and its members.  These injuries or risks are traceable to Drummond's continuous and ongoing violations alleged in this notice letter, and redressing those ongoing violations will redress the injuries or risks to Riverkeeper.  If Drummond has taken any steps to eradicate the underlying cause of the violations described above, or if anything in this letter is inaccurate, please let us know.  If Drummond does not advise us of any remedial steps taken during the notice period, we will assume that no such steps have been taken, that there are no material errors in this letter, and that violations are likely to continue. Finally, we would be happy to meet with Drummond or its representatives to attempt to resolve these issues within the notice period.

Sincerely,

Barry Brock
Senior Attorney, Birmingham Office
Southern Environmental Law Center
2829 Second Ave. S.
Ste. 282
Birmingham, AL 35233
tel:  (205) 745-3060
fax: (205) 745-3064
www.southernenvironment.org

Richard Webster
Public Justice
1620 L STREET NW, SUITE 630,
Washington, DC 20006
Tel. (202) 797-8600
Fax: (202) 232-7203
rwebster@publicjustice.net

Eva Dillard
Staff Attorney
Black Warrior Riverkeeper, Inc.
712 37th Street South
Birmingham, AL 35222-206
Tel: (205) 249-4743
Fax: (205) 458-0094
edillard@blackwariorriver.org

Counsel for:
Black Warrior Riverkeeper

13

cc:

Bruce C. Webster, Registered Agent
Drummond Company, Inc.
1000 Urban Center Drive, Suite 300
Birmingham, AL 35242

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Heather McTeer Toney, Regional Administrator
U.S. Environmental Protection Agency Region 4
61 Forsyth Street SW
Atlanta, GA 30303

Loretta Lynch, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC 20530-0001

Lance R. LeFleur, Director
Alabama Department of Environmental Management
P.O. Box 301463
Montgomery, AL 36130-1463

Johnathan Hall, Director
Alabama Surface Mining Commission
P. O. Box 2390
Jasper, AL  35502-2390

# Figure 1



# Figure 2



FIGURE 1. LOCATION OF PERCOLATION AND MONITORING SITES.

# Figure 3



# Figure 4

# Maxine Mine AMD



# Figure 5

