FILED
2018 Aug-15  PM 04:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

DRUM003427

# TTL — LIMS Chain of Custody Form

**Composite Sample Info**

**Sheet** 1 of 1

**Sample Security Requirements**

| | |
|---|---|
| Client: | Starnes, Davis, Florie, LLP |
| Contact: | Lynn Sisk – TTL-Montgomery |
| Mailing Address: | |
| City, State, Zip: | |
| Phone No.: | |
| Sampled By: | |
| Project ID: | Locust Fork-T2URB |
| Project Name: | Locust Fork - Surface Water - T2URB - 60D216095 |

**Sample** _____  Start _____ DATE/TIME  End _____ DATE/TIME

**Sample** _____  Start _____ DATE/TIME  End _____ DATE/TIME

1. Condition of Contents: _____
2. Sealed for Shipping By: _____
3. Initial Contents Temp: _____ °C
4. Custody Seal Intact Upon Receipt by Laboratory: Yes ____ No ____  Seal Applied  Yes ____ No ____
5. Condition of Contents: _____
6. Comments: _____
7. Reporting Status: Routine; _____ ; Rush By* _____   *SURCHARGES MAY APPLY
8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | | Analysis Parameters |
|------|------|----------------------|-------------|---------------|-------------------|---|---------------------|
| 2/16/17 | 1227 | T2URB | Aqueous | GRAB | 1 | 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1227 | T2URB | Aqueous | GRAB | 1 | QT PL NP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1219 | T2UMC-TOP | Aqueous | GRAB | 1 | 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1219 | T2UMC-TOP | Aqueous | GRAB | 1 | QT PL NP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1218 | T2UMC-BOT | Aqueous | GRAB | 1 | 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1218 | T2UMC-BOT | Aqueous | GRAB | 1 | QT PL NP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1224 | T2UMP-TOP | Aqueous | GRAB | 1 | 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1224 | T2UMP-TOP | Aqueous | GRAB | 1 | QT PL NP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1222 | T2UMP-BOT | Aqueous | GRAB | 1 | 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1222 | T2UMP-BOT | Aqueous | GRAB | 1 | QT PL NP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

**Relinquished by: (signed) Date/Time**

1. 2/16/17 1530
2.
3.
4.

**Received by (signed) Date/Time**

1.
2.
3.
4.

**CUSTODY TRANSFERS**

**SHIPPING DETAILS**

Air Bill #: _____

Method of Shipment: _____

Received By Lab: _____

Date/Time: 2-16-17 _____

TTL, Inc. – Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0992
NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

DRAKE PRINTERS   3135892 SA

## TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

### SECTION 1.   SITE RESPONSIBILITY

1.1  Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

1.2  While TTL will use reasonable precautions to minimize any damage to Client's property, Client acknowledges that in the normal course of performing the Work Authorized some damage to landscaping, pavement or other property may occur. Client agrees that TTL is not responsible for any such damage caused by TTL in the normal course of performing the Work Authorized.

1.3  TTL may provide observation of the work of the contractor or subcontractor. TTL does not guarantee the performance of the contractor or subcontractor and is not responsible for the contractor's or subcontractor's failure to perform their work in accordance with the contract documents or any applicable standard of care. TTL's performance of such construction observation shall not relieve the contractor of its obligations to perform the work in accordance with the applicable plans and specifications and/or contract. Client will require the contractor or subcontractor's procedures is not intended to include a review of the adequacy of such contractor's or subcontractor's procedures as it relate to safety on site or safety at or security at the site. It is agreed TTL is not responsible for safety, security or the contractor, and TTL does not have the right or duty to stop the contractor's work.

### SECTION 2.   PROJECT INFORMATION

2.1  Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized, which will include, but not be limited to, testing, depth and monitoring. Client will be responsible for updating the Project Information with TTL. Any changes to said Project Information of which Client becomes aware or which are made by Client as the work progresses.

### SECTION 3.   STANDARD OF CARE

3.1  Service performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing in the same locality under similar conditions. No other warranty, expressed or implied is made or intended and the same are specifically disclaimed. Client shall not be entitled to assert a claim against TTL based on any theory of negligence or violation of the standard of care unless and until Client has obtained the written opinion from a licensed, independent and qualified professional engineer or environmental professional that the services rendered by TTL has violated the standard of care applicable to the performance of those services as the same are described in this agreement.

3.2  Field test and boring locations described in our report to Client or shown on our drawings are based on specific information furnished to us by Client and/or others or estimates made in the field by our technicians. All such dimensions, depths or elevations are approximate unless otherwise noted.

3.3  Client recognizes that conditions may vary from those encountered at the location where borings, samplings, surveys, or explorations are made by TTL and that site and subsurface conditions may change over time. Client understands that the data, interpretations, and recommendations by TTL are based solely on information available to TTL. TTL is responsible solely for such data, interpretations, and recommendations developed by TTL, but shall not be responsible for the interpretation by others of the information developed.

### SECTION 4.   RISK ALLOCATION

4.1  There are relative risks and benefits for TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have established a balance of these risks and benefits described in Section 4.2.

4.2  Notwithstanding any other provision of this agreement, Client agrees, to the fullest extent allowed by law, to limit the total aggregate liability of TTL, and that of its officers, directors, employees, agents, and subcontractors for any and all costs, expenses, claims, losses, damages or liability of any type arising out of or in connection with the Work Authorized or the Project Information, to a maximum of $50,000.00 or the total amount of fees paid to TTL, whichever is greater. This limit applies regardless of the cause(s) or legal theory of action asserted. TTL will consider providing higher limits of liability at Client's request, prior to commencement of work, for an additional fee and by separate written agreement to be negotiated as part of this agreement. It is further agreed that in no event shall TTL be liable to Client for any incidental, indirect, special, consequential, or punitive damages whatsoever arising out of or related to this agreement.

4.3  When requested by Client, TTL's fee is subject to Project Information, which is provided to TTL by Client. However, Client agrees that TTL at its discretion reserves the right to re-evaluate its fee after it becomes aware that Project Information is in error or incomplete. It is agreed that TTL will not be liable for any such adverse outcome and Client will defend, hold harmless and indemnify TTL from and against all losses, costs, expenses and damages, including but not limited to attorney's fees and court costs, which may be incurred by TTL, on account of TTL's performance or non-performance based upon the Project Information.

4.4  Whether Client and TTL agree to proceed under Section 4.2 above, both agree, to the fullest extent allowed by law, that neither will be liable to the other for loss of use, loss of profit or any consequential, incidental, indirect, special, consequential, or punitive damages whatsoever arising out of or related to this agreement.

NOTE:  Sections 5 through 7 shall apply if sampling, testing or other intrusive services are part of TTL's scope of services.

### SECTION 5.   SUBTERRANEAN STRUCTURES AND UTILITIES

5.1  In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities.

5.2  Client will inform TTL of the locations of all subterranean structures and utilities as Client's property before the work authorized begins and agrees that TTL will not be liable for any subterranean structures or utilities that are not brought to TTL's attention and not correctly shown in the Project Information furnished.

5.3  TTL will contact the local Alone-call® utility authority, but assumes no responsibility with respect to utilities beyond that action.

### SECTION 6.   OWNERSHIP OF DOCUMENTS AND SAMPLES

6.1  All reports, borings logs, field data, test specimens, drilling samples, field notes, laboratory and data, calculations, estimates, and other documents prepared by TTL, as instruments of service, shall remain the property of TTL. These documents shall not be reused by Client or others without TTL's prior written authorization and adaptation, and shall be considered confidential, and they will not be available to, for, or with others without TTL's prior written approval.

6.2  TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed.

6.3  In the event any prior written Report and other work furnished to Client or Client's agents for which full payment has not been made will be returned to TTL upon demand and will not be used by Client for any purpose whatsoever at the time a written request is received.

6.4  TTL will retain pertinent documents relating to the services performed for a period of two (5) years following submission of TTL's Report. During this period, the documents will be made available to Client within a reasonable time after TTL receives a written request that Client specifically identifying the documents sought.

### SECTION 7.   DISPOSAL OF SAMPLES

7.1  Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of thirty (30) days after submission of TTL's Report. Upon written request received before the disposal dates referenced in this Section 7.1, TTL will retain test specimens or drilling samples for a mutually acceptable storage charge.

### SECTION 8.   DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

8.1  Client warrants that a reasonable effort is made to inform TTL of known or suspected hazardous materials on or near the project site has been made.

8.2  Hazardous materials may exist at a site where there is no reason to believe there could or should be present. TTL and Client agree that the discovery of unanticipated hazardous materials constitutes a changed condition mandating a renegotiation of the scope of the Work Authorized or termination of services. TTL and Client also agree that the discovery of unanticipated hazardous materials may also be necessary for TTL to take immediate measures to protect health and safety. Client agrees to compensate TTL for any costs it may incur, including any re-equipment or decontamination, in connection with the discovery of unanticipated hazardous materials.

8.3  During the performance of the Work Authorized hazardous materials may be uncovered or revealed at the site. Client agrees to any disclosures required by law to the appropriate governing agencies. Client also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL which are required by governing law, to the fullest extent permitted by law. In addition, in the event the Work Authorized is terminated, it is the Client's responsibility to inform the property owner or future buyer of the discovery of unanticipated hazardous materials.

8.4  Notwithstanding any other provision of the agreement, Client waives any claim against TTL, and to the maximum extent permitted by law, agrees to defend, indemnify, and hold TTL harmless from any claim, liability, and/or defense costs for injury or loss arising from TTL's discovery of unanticipated hazardous materials or suspected hazardous materials, including, but not limited to any reduction in the property's value attributable to the presence of unanticipated hazardous materials, or the Client's project and/or cost associated with possible reduction of the property's value.

8.5  Client will be responsible for ultimate proper disposal of any samples secured by TTL which are found to be contaminated.

### SECTION 9.   BIOLOGICAL POLLUTANTS

9.1  Except to the degree specified in the accompanying proposal letter, work specifically excludes the investigation, detection, prevention or assessment of the presence of Biological Pollutants. The term Biological Pollutants includes, but is not limited to, molds, fungi, spores, bacteria, viruses, and/or any of their byproducts. Client agrees that TTL will have no liability for any claims alleging a failure to investigate, detect, prevent, assess, or make recommendations for preventing, controlling, or abating Biological Pollutants. Furthermore, Client agrees to defend, indemnify, and hold TTL harmless from any claims by any third party concerning Biological Pollutants, except any damages caused directly by TTL's sole negligence.

### SECTION 10.   INSURANCE

10.1  TTL represents and warrants that and its agents, staff, and consultants employed by it are protected by worker's compensation insurance and that TTL has such coverage under public and private property damage insurance policies as TTL deems to be adequate. Certificates for all such policies will be made available to Client upon Client's request. Within the limits and conditions of such insurance, TTL agrees to indemnify and save Client harmless from any claim, loss, damage, or liability arising from any negligent acts, errors or omissions in connection with the Professional Services performed by TTL. As its agents, staff, and consultants employed by it. TTL will not be responsible for any claim, loss, damage, or liability beyond the amounts, limits, and conditions of such insurance. TTL shall not be responsible for any loss, damage, or liability arising from any acts by Client, its agents, staff, and other consultants employed by it.

### SECTION 11.   INVOICES

11.1  The Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL, at the unit fees quoted, or as otherwise agreed herein. A during the execution of the Work Authorized, TTL is required to stop operations as a result of changes in the scope of the Work Authorized, such as requests by the Client or requirements of third parties, additional charges may be applicable.

11.2  As deemed appropriate by TTL, Client may be required to complete a credit application and/or obtain personal or corporate guarantees prior to the commencement of or during the performance of the Work Authorized.

11.3  TTL will submit to Client invoices on a monthly basis and a final bill upon completion of work. Invoices will show charges for different personnel and expense classifications. A more detailed separation of charges and back-up data can be provided upon Client's specific prior written request.

11.4  Payment is due upon presentation of invoice and is past due thirty (30) days after the invoice date. If payment is not received by written request within 30 days from date of TTL's invoice, Client agrees to pay the lesser of 1 1/2% per month of the maximum rate allowed by law, on the past due amount until the account is paid in full. A fee shall be paid at the rate of the maximum attorney's fee, and all other costs incurred by TTL in collecting the amount due TTL under this agreement.

### SECTION 12.   TERMINATION

12.1  The agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before the expiration of the period specified in the written notice. In the event of termination, TTL shall be paid for services performed to the termination notice date plus reasonable termination expenses.

### SECTION 13.   DISPUTE RESOLUTION

13.1  In the unlikely event a dispute or claim or claim arises out of this Agreement, the parties will attempt to settle the dispute amongst each other. Failing that, the parties will agree to settle any such dispute, claim, or breach through mediation, where a non-biased mediator is chosen by the parties through mediation services in the parties. In the event that the parties cannot agree on the payment of TTL's fees where they have had a violation of state or applicable law. Not withstanding anything above to the contrary, the parties agree that the mediation proceedings shall be held in Tuscaloosa, Alabama

### SECTION 14.   ASSIGNS

14.1  Neither the Client nor TTL may delegate, assign, sublet or transfer their duties or interest in this agreement without the prior written agreement of the other party.

### SECTION 15.   SEVERABILITY

15.1  Any term or provision of this agreement found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of this agreement shall remain in full force and effect.

### SECTION 16.   GOVERNING LAW

16.1  Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama.

### SECTION 17.   ENTIRE AGREEMENT

17.1  This agreement and all attachments constitute the entire agreement between TTL and Client. All understandings and agreements heretofore reached by and between TTL and Client are merged into and superseded by this agreement, which alone fully and completely expresses their understanding. No representations, warranties or modifications of the terms of this agreement shall be of any force or effect unless the same are in writing, signed by the party to be charged and specifically refer to this agreement. No action or failure to act by TTL relate to by any party entering into this agreement. Nothing under this agreement shall be construed to give any rights or benefits in this agreement to anyone other than the Client and TTL, and all duties and obligations undertaken pursuant to this Agreement will be for the sole and exclusive benefit of the Client (Owner) and TTL, and not for the benefit of any other party.

DRUM003428

DRUM003429

**TTL** LIMS Chain of Custody Form

| | Composite Sample Info | Sheet 1 of 1 |
| --- | --- | --- |

**Sample Security Requirements**

Client: Starnes, Davis, Florie, LLP

Contact: Lynn Sisk - TTL-Montgomery

Mailing Address:

City, State, Zip:

Phone No.:

Sampled By:

Project ID: Locust Fork-T3URB

Project Name: Locust Fork – Surface Water – T3URB - 800216005

Composite Sample Info:
- Sample ___
- Start ___ DATE/TIME
- End ___ DATE/TIME
- Sample ___
- Start ___ DATE/TIME
- End ___ DATE/TIME

1. Condition of Contents: ___
2. Sealed for Shipping By: ___
3. Initial Contents Temp.: ___ °C   Seal Applied   Yes ___   No ___
4. Custody Seal Intact Upon Receipt by Laboratory:   Yes ___   No ___
5. Condition of Contents: Good 4.5° C ___
6. Comments: ___
7. Reporting Status: Routine; ___ ; Rush By* ___   *SURCHARGES MAY APPLY
8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | Analysis Parameters |
| --- | --- | --- | --- | --- | --- | --- |
| 2/16/17 | 1257 | T3URB | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1257 | T3URB | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1240 | T3UMC-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1240 | T3UMC-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1237 | T3UMC-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1237 | T3UMC-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1246 | T3UMP-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1246 | T3UMP-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1243 | T3UMP-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1243 | T3UMP-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

Relinquished by (signed) Date/Time
1. _Lynn Sisk_ 2/16/17 1536
2. ___
3. ___
4. ___

Received by (signed) Date/Time
1. ___
2. ___
3. ___
4. ___

TTL, Inc. - Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0982
NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

**SHIPPING DETAILS**

Air Bill #: ___

Method of Shipment: ___

Received By Lab: ___

Date/Time 2-16-17 15:30

CUSTODY TRANSFERS

# TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

## SECTION 1.   SITE RESPONSIBILITY

1.1   Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

1.2   While TTL will assume responsible precautions to minimize any damage to Client's property, Client acknowledges that in the normal course of performing the Work Authorized some damage to landscaping, pavement or other property may occur. Client agrees that the restoration of the damaged site is not the responsibility of TTL and is beyond the scope of the Work Authorized. Should it be necessary for TTL to take immediate measures to protect health and safety, Client agrees to compensate TTL for any costs it may incur, such as, but not limited to, equipment decontamination costs or other costs, reasonably incurred.

1.3   Concerning the observation of the work of the contractor or subcontractors, TTL does not guarantee the performance of the contractor or TTL's performance of such construction observation. TTL's undertaking hereunder shall not relieve the contractor of the contractor's obligation to perform the work in conformance with the plans and specifications and in a workmanlike manner. TTL's undertaking shall not create any obligation on the part of TTL to any contractor's or subcontractor's employees, any regulatory agencies, or any other third parties. It is agreed TTL is not responsible for safety or security at the site, and TTL does not have the right or duty to stop the work of others at the site.

## SECTION 2.   PROJECT INFORMATION

2.1   Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized, which will include, but not be limited to, Client's documents prepared by others and furnished to TTL by Client. If any changes in said Project Information of which Client becomes aware or which are made by Client as the work progresses.

## SECTION 3.   STANDARD OF CARE

3.1   Service performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions. No other warranty, expressed or implied is made or intended and the same are specifically disclaimed. Client shall not be entitled to assert a claim against TTL based on any theory of negligence or violation of the standard of care unless and until Client has obtained the written opinion from a licensed, independent and reputable engineering and/or environmental professional as appropriate that the services in question that TTL has violated the standard of care applicable to TTL's performance of those services under this agreement.

3.2   Field test and boring locations described in our report to Client or shown on our sketches are based on specific information furnished to us by Client and/or others or estimates made in the field by our technicians. Such dimensions, depths or elevations are approximations unless otherwise stated in our report.

3.3   Unless otherwise stated, TTL will not engage those unprecedented in the location where borings, samplings, surveys, or excavations are made by TTL, and that site and subsurface conditions that in the area, interpretations, and recommendations of TTL are based solely upon information provided from TTL. Client understands that the subsurface conditions may change. Client shall not be liable for any direct, or other problems which may develop at the site. TTL shall not be responsible for the interpretation by others of the information developed.

## SECTION 4.   RISK ALLOCATION

4.1   There are relative risks and benefits for TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have discussed these risks and benefits and have negotiated to allocate the risks in this agreement.

4.2   TTL agrees and Client agrees to the fullest extent permitted by law, to limit the total aggregate liability of TTL and all its officers, directors, employees, agents and subcontractors for any and all costs, losses, claims, expenses and damages of any nature whatsoever, which might be claimed or asserted from or arising out of TTL's performance under this agreement, or from any alleged professional acts, errors or omissions, including but not limited to, negligence, breach of contract, expressed or implied warranty, strict liability or other cause, to an aggregate amount not in excess of $50,000.00. Such claims and/or causes of action, would, but not limited to, negligence, errors, or omissions of TTL, breach of contract, warranty, expressed or implied, strict liability. TTL will consider providing higher limits at the Client's written request prior to the causes of action or legal theory pleaded or asserted. TTL will consider providing higher limits at the Client's written request prior to the commencement of services under this agreement. Client agrees that in consideration of providing higher limits at the Client's written request, the greater risk assumed by TTL, a reasonable charge for additional professional liability insurance. TTL shall provide this to Client. Client's acknowledgement of and agreement with the allocation of risks as set out in this Section 4.2

4.3   Limitations on liability and indemnities in this agreement are business terms agreed to by the parties and shall apply to all claims of action, except for willful misconduct or for these legislatures, in the agreement between the parties here. No limitation of liability or any other causes of action, except for willful misconduct or for gross negligence. Parties mean Client and TTL and their officers, employees, agents, affiliates and subcontractors of each. In the event, any of the limitations in this agreement that TTL will not bear damages in excess of the limitations indirectly through each other or third parties who may link TTL as a third party defendant.

4.4   Whether Client and TTL agree to proceed under Section 4.2 above, both agree, to the fullest extent allowed by law, that neither will be liable to the other for any consequential, or any special, indirect, consequential or punitive damages whatsoever arising out of or related to this agreement.

**NOTE: Sections 5 through 7 shall apply if sampling, testing or other intrusive services on any part of TTL's scope or services**

## SECTION 5.   SUBTERRANEAN STRUCTURES AND UTILITIES

5.1   In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities

5.2   Client will inform TTL of the locations of all subterranean structures and utilities on the work authorized property, before commencing the work. Client agrees to hold TTL harmless for any damage to subterranean structures and utilities which are not brought to TTL's attention and not correctly shown in the Project Information furnished.

6.3   TTL will contact the local Acme-Call utility authority, but assumes no responsibility with respect to utilities beyond that action

## SECTION 6.   OWNERSHIP OF DOCUMENTS AND SAMPLES

6.1   All reports, borings logs, field data, test specimens, drilling samples, field notes, laboratory test data, calculations, estimates, and other documents prepared by TTL, as instruments of service, shall remain the property of TTL. There are proprietary documents which shall be considered confidential, and they will not be available to any other entity unless express consent is obtained in writing from Client.

6.2   TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed.

6.3   Client agrees that any written Report and other work furnished to Client or Client's agents, for which full payment has not been made to TTL, may be retained by TTL upon demand and will not be used by Client for any purpose whatsoever until full payment is made.

## SECTION 7.   DISPOSAL OF SAMPLES

7.1   Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of thirty (30) days after submission of TTL's Report. Upon written request received before the disposal dates identified in this Section 7.1, TTL will retain test specimens and/or drilling samples for a mutually acceptable storage charge.

## SECTION 8.   DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

8.1   Client warrants that a reasonable effort to inform TTL of known or suspected hazardous materials on or near the project site has been made.

8.2   Hazardous materials may exist at a site where there is no reason to believe they could or should be present. TTL and Client agree that the discovery of unanticipated hazardous materials constitutes a changed condition mandating a renegotiation of the scope of the Work Authorized or termination of services. TTL and Client also agree that the discovery of unanticipated hazardous materials may make it necessary for TTL to take immediate measures to protect health and safety. Client agrees to compensate TTL for any costs it may incur, such as, but not limited to, equipment decontamination costs or other costs reasonably incurred, in connection with the discovery of unanticipated hazardous materials.

8.3   TTL retains the right to terminate its service to a client or any agreement whenever the presence of hazardous materials or suspected hazardous materials are encountered. Client agrees to make any decisions required by law to the appropriate governing agencies, and TTL also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL or the government. In the event the Client directs TTL or does not disclose, it is the Client's responsibility to inform the property owner of the discovery of unanticipated hazardous materials or suspected hazardous materials.

8.4   Notwithstanding any other provision of the agreement, Client waives any claim against TTL, and to the maximum extent permitted by law, agrees to defend, indemnify, and hold TTL, harmless from any claim, liability, and/or defense costs for injury or loss arising from TTL's discovery of unanticipated hazardous materials or suspected hazardous materials, including, but not limited to, any costs created by delay of the Work Authorized, delay of Client's project and/or cost associated with possible reduction of the property's value.

8.5   Client will be responsible for ultimate proper disposal of any samples secured by TTL which are found to be contaminated

## SECTION 9.   BIOLOGICAL POLLUTANTS

9.1   Except to the degree specified in the accompanying proposal labor, work specifically excludes the investigation, detection, prevention or assessment of the presence of Biological Pollutants. The term Biological Pollutants includes, but is not limited to, molds, fungi, spores, bacteria, viruses, and/or any of their byproducts. Client understands that TTL instruments of service will not include any interpretations, recommendations, findings, or conclusions pertaining to Biological Pollutants. Client agrees that TTL has no liability for any claims alleging a failure to investigate, detect, prevent, assess, or make recommendations for preventing, containing, or abating Biological Pollutants. Furthermore, Client agrees to release and hold harmless TTL from all claims by any third party concerning Biological Pollutants, except any damages caused directly by TTL's sole negligence

## SECTION 10.   INSURANCE

10.1   TTL represents and warrants that it and its agents, staff, and consultants employed by it are protected by worker's compensation insurance and that TTL has such coverage under public liability and property damage insurance policies as TTL deems to be adequate. Certificates for all such insurance shall be provided to Client upon request if required by law. Within the limits and conditions of such insurance, TTL agrees to indemnify and save Client harmless from and against any loss, damage, or liability arising from any negligent acts, errors or omissions in connection with the Professional Services performed by TTL. Its agents, staff, and consultants employed by it. TTL shall not be responsible for any loss, damage, or liability beyond the amounts, limits, and conditions of such insurance. TTL shall not be responsible for any loss, damage, or liability arising from any act by Client, its agents, staff, and other consultants employed by it

## SECTION 11.   INVOICES

11.1   The Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL, at the unit fees quoted, or as otherwise agreed to in writing during the execution of the Work Authorized, TTL is required to stop operations as a result of changes in the Work Authorized, such as requested by the Client or requirements of third parties, additional charges may be applicable.

11.2   TTL may be required to complete a credit application and/or obtain personal or corporate guarantees prior to the commencement of or during the performance of the Work Authorized.

11.3   TTL will submit to Client invoices on a monthly basis and a final upon completion of work. Invoices will show charges for different services by employee classifications or detailed breakdown. A more detailed separation of charges and back-up data can be provided upon Client's specific prior written request.

11.4   Payment is due upon presentation of invoice and is past due thirty (30) days after the invoice date. If payment is not received by TTL within 30 days from the date of TTL's invoice Client agrees to pay the lesser of 1 ½ % per month of the maximum rate allowed by law, whichever is lower, on the unpaid amount until it is paid in full, plus the higher of the amounts due TTL under this agreement

## SECTION 12.   TERMINATION

12.1   This agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before expiration of the period specified in the written notice. In the event of termination, TTL shall be paid for services performed to the termination notice date plus reasonable termination expenses.

## 13.   DISPUTE RESOLUTION

13.1   In the unlikely event a dispute or claim or breach arises out of this Agreement, the parties will attempt to settle the dispute amongst each other. Failing that, the parties will agree to settle any such dispute, claim, or breach through Mediation, where a non-biased mediator is chosen by both parties. Mediation shall be a condition precedent to the institution of legal proceedings or to any payment of TTL's fees where they may be a violation of claim or applicable law. Not withstanding anything above to the contrary, the parties agree that the mediation proceedings shall be held in Tuscaloosa, Alabama.

## SECTION 14.   ASSIGNS

14.1   Neither the Client nor TTL may delegate, assign, sublet or transfer their duties under or interest in this agreement without the prior written consent of the other

## SECTION 15.   SEVERABILITY

15.1   If any term or provision of this agreement found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of this agreement shall remain in full force and effect.

## SECTION 16.   GOVERNING LAW

16.1   Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama.

## SECTION 17.   ENTIRE AGREEMENT

17.1   This agreement and any attachments and agreements referenced constitute the entire agreement between TTL and Client. All understandings and agreements heretofore had between the parties are merged into this agreement, which alone fully and completely expresses their understanding. No representations, agreements, or stipulations are relied upon by any party entering into this agreement. Nothing under this agreement shall be construed to give any rights or benefits in this agreement to anyone other than the parties hereto, and all duties and responsibilities undertaken pursuant to this agreement will be for the sole and exclusive benefit of the parties TTL and Client, and not for the benefit of any other party.

DRUM003430

DRUM003431

# TTL LIMS Chain of Custody Form

**Composite Sample Info**

**Sample Security Requirements**

Sheet 1 of 1

**Client:** Starnes, Davis, Florie, LLP

**Contact:** Lynn Sisk – TTL–Montgomery

**Mailing Address:**

**City, State, Zip:**

**Phone No.:**

**Sampled By:**

**Project ID:** Locust Fork–T4URB

**Project Name:** Locust Fork – Surface Water – T4URB – 600216065

Sample _____

Start _____ DATE/TIME

End _____ DATE/TIME

Sample _____

Start _____ DATE/TIME

End _____ DATE/TIME

1. Condition of Contents: _____

2. Sealed for Shipping By: _____

3. Initial Contents Temp.: _____ °C   Seal Applied   Yes ___ No ___

4. Custody Seal Intact Upon Receipt by Laboratory:   Yes ___ No ___

5. Condition of Contents: _____

6. Comments: _____

7. Reporting Status: Routine; _____ ; Rush By* _____ *SURCHARGES MAY APPLY

8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | Analysis Parameters |
|------|------|----------------------|-------------|---------------|-------------------|---------------------|
| 2/16/17 | 1315 | T4URB | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1315 | T4URB | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1305 | T4UMC-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1305 | T4UMC-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1303 | T4UMC-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1303 | T4UMC-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1312 | T4UMP-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1312 | T4UMP-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1309 | T4UMP-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1309 | T4UMP-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

**CUSTODY TRANSFERS**

Relinquished by: (signed) Date/Time

1  2/16/17 1530

2 _____

3 _____

Received by (signed) Date/Time

1 _____

2 _____

3 _____

4 _____

**SHIPPING DETAILS**

Air Bill #: _____

Method of Shipment: _____

Received By Lab: _____

Date/Time: 2-16-17 15:50

TTL, Inc. – Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0892

NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

DRAKE PRINTERS

5136692 SA

# TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

## SECTION 1.   SITE RESPONSIBILITY

1.1   Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

1.2   While TTL will take reasonable precautions to minimize any damage to Client's property, Client acknowledges that in the normal course of performing the Work Authorized some damage to landscaping, pavement or other property may occur. Client agrees that the correction of such damage is not part of this agreement and the cost of such repairs shall be borne by Client.

1.3   TTL has made no evaluation of the work of the construction contractor observation. TTL does not guarantee the performance of the construction contractor of such construction observation. TTL's undertaking hereunder shall not relieve the contractor of his obligation to perform the work in accordance with applicable plans and specifications. Client acknowledges that the services of the contractor's or subcontractor's procedures is not intended to include a review of the adequacy of such contractor's or subcontractor's safety measures in or near the site. It is agreed TTL is not responsible for safety or security at the site, and TTL does not have the right or duty to stop the work of others.

## SECTION 2.   PROJECT INFORMATION

2.1   Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized, which will include, but not be limited to, testing, documents prepared by Client. Client shall be responsible for furnishing to TTL any changes in said Project Information of which Client becomes aware or which are made by Client as the work progresses.

## SECTION 3.   STANDARD OF CARE

3.1   Services performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions. No other warranty, expressed or implied is made or intended by the services and no warranty is included in any report, opinion, document, or otherwise. In the event of any claim against TTL based on any theory of negligence or omission of the standard of care unless and until Client had obtained the written opinion from a licensed, independent and reputable engineering and/or scientist that professional as appropriate that the services in question had been violated the standard of care and this caused the alleged damages. This opinion shall be specifically disclosed to TTL in advance.

3.2   Field test and boring locations described in our report to Client or shown on our sketches are based on specific information furnished to us by Client and/or others or estimates made in the field by our technicians. All such dimensions, depths or elevations are approximations unless otherwise stated in the document.

3.3   Client understands that conditions may vary from those encountered at the location where borings, samplings, surveys, or explorations are made by TTL and that site and subsurface conditions may change over time. Client understands that the data, interpretations, and recommendations by TTL are based solely on information available to TTL. TTL is responsible for those data, interpretations, and recommendations, but will not be responsible for the interpretations by others of the information developed.

## SECTION 4.   RISK ALLOCATION

4.1   There are relative risks and benefits for TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have discussed these risks and have mutually negotiated these risks in determining the fee for the services.

4.2   TTL agrees to perform the Work Authorized for the compensation agreed to and Client agrees, to the fullest extent allowed by law, to limit the total aggregate liability of TTL and that of its officers, directors, employees, agents, designs and subcontractors for any and all costs, losses, claims, expenses and damages of any nature whatsoever or claims expenses resulting from or in any way related to the project from any cause or causes, including but not limited to, TTL's negligence, errors, omissions, strict liability, breach of contract or breach of warranty (collectively Client's claims) so that the total aggregate liability of TTL and its subcontractors, employees, agents or subcontractors, to $50,000.00. Such claims include but are not limited to, negligence, professional errors or omissions, strict liability, breach of contract or warranty. If Client prefers to have higher limits on aggregate TTL liability, TTL agrees to increase the limits up to a maximum of $50,000.00 upon Client's written request at or prior to the causes of action or legal theory pleaded or asserted. TTL will consider Client providing higher limit if Client agrees to pay an additional consideration as set out in this Section 4.2. The additional charge for the higher limit is 4% of TTL's total fee, or $500.00, whichever is greater. If the greater risk assumed by TTL, his, and its not a charge for additional professional liability insurance. Client's signature indicates Client's acknowledgement and agreement with the allocation of risks as set out in this Section 4.2.

4.3   These limitations of risk and indemnities were included in the parties, and shall apply to all the different elements or members, including breach of warranty, tort including negligence, strict or statutory liability, or any other cause of action, except for willful misconduct or gross negligence. Parties mean Client and TTL and their officers, employees, affiliates and agents. This provision shall take precedence over any conflicting term or provision which may be contained in this agreement and shall survive the termination of this agreement for any reason whatsoever.

4.4   Whichever Client and TTL agree to proceed under Section 4.2 above, both agree, to the fullest extent allowed by law, that neither will assert a claim against the other in any amount, for any special, indirect, consequential or punitive damages whatsoever arising out of or related to this agreement

**NOTE:** Sections 5 through 7 shall apply if sampling, testing or other intrusive services are part of TTL's scope of services.

## SECTION 5.   SUBTERRANEAN STRUCTURES AND UTILITIES

5.1   In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities.

5.2   Client will inform TTL of the locations of all subterranean structures and utilities on Client's property before the work Authorized begins. Client agrees to hold TTL harmless for any damages to subterranean structures and utilities which are not brought to TTL's attention and not correctly shown in the Project Information furnished.

5.3   TTL will contact the local Alone-cell utility authority, but assumes no responsibility with respect to utilities beyond that action

## SECTION 6.   OWNERSHIP OF DOCUMENTS AND SAMPLES

6.1   All reports, borings, logs, field data, test specimens, drilling samples, field notes, laboratory test data, calculations, estimates, and other documents prepared by TTL, as instruments of service, shall remain the property of TTL. Further, proprietary concepts, systems and ideas developed during the course of the services shall remain the sole property of TTL. Any reports or other work product prepared by TTL for Client under this agreement will be available to Client upon Client's payment of all amounts due TTL.

6.2   TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed

6.3   Client agrees that any written Report and other work furnished to Client or Client's agents, for which full payment has not been made to TTL may, at TTL's option, be returned to TTL. Upon demand and will not be used by Client for any purpose whatsoever or disseminated to any third parties by Client.

6.4   TTL will retain pertinent documents relating to the services performed for a period of two (6) years following submission of TTL's Report, during which period the documents will be made available to Client at all times upon reasonable time after TTL receives a written request specifically identifying the documents sought.

## SECTION 7.   DISPOSAL OF SAMPLES

7.1   Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of (thirty (30) days after specimen is retained during sampling unless otherwise mutually acceptable arrangements are made. Upon written request received before the disposal dates identified in this Section 7.1, TTL will retain test specimen or drilling samples for a mutually acceptable storage charge.

## SECTION 8.   DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

8.1   Client warrants that a reasonable effort to inform TTL of known or suspected hazardous materials on or near the project site has been made

8.2   Hazardous materials may exist at a site where there is no reason to believe they could be present. TTL and Client agree that the discovery of unanticipated hazardous materials may constitute a changed condition mandating a renegotiation of the fees authorized or termination of services. TTL and Client also agree that the discovery of unanticipated hazardous materials may make it necessary for TTL to take immediate measures to protect health and safety. Client agrees to compensate TTL for any costs it may incur, such as, but not limited to, equipment decontamination costs or other costs incident to the discovery of unanticipated hazardous waste.

8.3   During the performance of the Work Authorized, TTL agrees to notify Client when unanticipated hazardous materials for suspected hazardous materials are encountered. TTL agrees to take appropriate measures to protect the health and safety of workers and the public. In the event also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL which are required by governing law. In the event it is agreed that the scope of the Work Authorized shall be renegotiated. It is also Client's responsibility to inform the property owner of the discovery of unanticipated hazardous materials

8.4   Notwithstanding any other provision of the agreement, Client waives any claim against TTL, and to the maximum extent permitted by law, agrees to defend, indemnify, and hold TTL harmless from any claim, liability, and/or defense costs for injury or loss arising from TTL's discovery of unanticipated hazardous or suspected hazardous materials, including reducing for loss not related to any costs created by delay of the Work Authorized, delay of Client's project and/or cost associated with possible reduction of the property's value

8.5   Client will be responsible for ultimate proper disposal of any samples secured by TTL which are found to be contaminated.

## SECTION 9.   BIOLOGICAL POLLUTANTS

9.1   Except to the degree specified in the accompanying proposal letter, work specifically includes the investigation, detection, prevention or assessment of the presence of Biological Pollutants. The term "Biological Pollutants" includes, but is not limited to, molds, fungi, spores, bacteria, and viruses, and their byproducts. Client agrees that TTL is not a guarantor and will not in any manner insure the survey, recommendations, findings, or conclusions pertaining to Biological Pollutants. Client agrees that TTL has no liability for any claims alleging failure to investigate, detect, prevent, assess, or make recommendations for preventing, correcting, or abating Biological Pollutants. Furthermore, Client agrees to release and hold harmless TTL from all claims for any and all claims by any third party concerning Biological Pollutants, except any damages caused directly by TTL's sole negligence

## SECTION 10.   INSURANCE

10.1   TTL represents and warrants that it and its agents, staff, and consultants employed by it are protected by worker's compensation insurance and that TTL has such coverage under public liability and property damage insurance policies as it deems to be adequate particulars for all such claims of loss arising out of the Work Authorized. Within the limits and conditions of the insurance, TTL agrees to indemnify and save Client harmless from and against any loss, damage, or liability arising from any negligent acts, errors or omissions in connection with the Professional Services performed by TTL, its agents, staff, and consultants employed by it. TTL shall not be responsible for any loss, damage, or liability beyond the amounts, limits, and conditions of such insurance. TTL shall not be responsible for any loss, damage, or liability arising from any act by Client, its agents, staff, and other consultants employed by it

## SECTION 11.   INVOICES

11.1   The Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL, at its unit fees quoted, or as otherwise requested herein. If, during the course of said Work Authorized, TTL is required to stop operations as a result of changes in the Work Authorized, such as requested by the Client or requirements of third parties, additional charges may be applicable.

11.2   As deemed appropriate by TTL, Client may be required to complete a credit application and/or obtain personal or corporate guarantees prior to the commencement of or during the performance of the Work Authorized

11.3   TTL will submit to Client invoices on a monthly basis and a final bill upon completion of work. Invoices will show charges for different professional and expense services for/distinctions. A more detailed separation of charges and backup data can be provided upon Client's specific prior written request.

11.4   Payment is due upon presentation of Invoice and is past due thirty (30) days after the invoice date. If payment is not received by TTL within 30 days from the date of TTL's invoice, Client agrees to pay the lesser of 1 ¾ per month or the maximum rate allowed by law, as the past due payment until it is paid. In the event that Client fails to pay TTL its invoices, Client shall reasonable attorney fees, and all other costs incurred by TTL in collecting the amounts due TTL under this agreement.

## SECTION 12.   TERMINATION

12.1   The agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before expiration of the period specified in the written notice. In the event of termination, TTL shall be paid for services performed to the termination notice date plus reasonable termination expenses.

## 13.   DISPUTE RESOLUTION

13.1   In the unlikely event a dispute or claim or breach arises out of this Agreement, the parties will attempt to settle the dispute amongst each other.  Failing that, the parties will agree to settle any such dispute, claim, or breach through Mediation, where a non-heated mediator is selected by the parties in advance. If parties are unable to resolve the dispute through Mediation, and if agreeable by mutual payment of TTL's fees where they may be a violation of state or federal law. Not withstanding anything above to the contrary, the parties agree that the mediation proceedings shall be held in Tuscaloosa, Alabama.

## SECTION 14.   ASSIGNS

14.1   Neither the Client nor TTL may delegate, assign, sublet or transfer their duties under or interest in this agreement without the prior written consent of the other party.

## SECTION 15.   SEVERABILITY

15.1   Any provision of the agreement later found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of the agreement shall remain in full force and effect.

## SECTION 16.   GOVERNING LAW

16.1   Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama.

## SECTION 17.   ENTIRE AGREEMENT

17.1   This agreement and its attachments constitute the entire agreement between TTL and Client. All understandings and agreements heretofore existing by and between TTL and Client are merged into this agreement, which alone fully and completely expresses their understandings. No amendment or modification of this agreement shall be binding unless contained in a writing signed by both parties and specifically relied on by any party entering into this agreement. Nothing under this agreement shall be used to give any rights or benefits in this agreement to anyone other than the Client and TTL, and all duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of the Client (Owner) and TTL, and not for the benefit of any other party.

DRUM003432

DRUM003433

# TTL LIMS Chain of Custody Form

Sheet 1 of 1

**Client:** Starnes, Davis, Florie, LLP

**Contact:** Lynn Sisk - TTL-Montgomery

**Mailing Address:**

**City, State, Zip:**

**Phone No.:**

**Sampled By:**

**Project ID:** Locust Fork-T5URB

**Project Name:** Locust Fork - Surface Water - T5URB - 600216065

### Composite Sample Info

Sample _____

Start _____  DATE/TIME

End _____  DATE/TIME

Sample _____

Start _____  DATE/TIME

End _____  DATE/TIME

### Sample Security Requirements

1. Condition of Contents: _____

2. Sealed for Shipping By: _____

3. Initial Contents Temp.: _____ °C  Seal Applied  Yes ___ No ___

4. Custody Seal Intact Upon Receipt by Laboratory:  Yes ___ No ___

5. Condition of Contents: _Good_ | _sl.___

6. Comments: _4 sl. Sativa_

7. Reporting Status: Routine; _____ ; Rush By* *SURCHARGES MAY APPLY

8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | Analysis Parameters |
|---|---|---|---|---|---|---|
| 2/6/17 | 1333 | T5URB | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/6/17 | 1333 | T5URB | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/6/17 | 1326 | T5UMC-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/6/17 | 1326 | T5UMC-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/6/17 | 1323 | T5UMC-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/6/17 | 1323 | T5UMC-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/6/17 | 1332 | T5UMP-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/6/17 | 1332 | T5UMP-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/6/17 | 1330 | T5UMP-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/6/17 | 1330 | T5UMP-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

### CUSTODY TRANSFERS

**Relinquished by (signed) Date/Time**

1. _Sisk 2/6/17 1530_
2. _____
3. _____
4. _____

**Received by (signed) Date/Time**

1. _____
2. _____
3. _____
4. _____

### SHIPPING DETAILS

Air Bill #: _____

Method of Shipment: _____

Received By Lab: _____ Date/Time: _2/6/17_ 1530

TTL, Inc. - Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0992

NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

DRAKE PRINTERS   3136682 SA

# TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

## SECTION 1.  SITE RESPONSIBILITY

**1.1** Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

**1.3** TTL may provide observation of the work of the contractor as specified in the Work Authorized.

## SECTION 2.  PROJECT INFORMATION

**2.1** Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized.

## SECTION 3.  STANDARD OF CARE

**3.1** Service performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions.

**3.2** TTL is not and shall not be required to assume responsibility for the means, methods, techniques, sequences or procedures of construction.

## SECTION 4.  RISK ALLOCATION

**4.1** There are relative risks and benefits from TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have discussed these risks and benefits and have negotiated to allocate the risks as described in Section 4.2.

**4.3** Limitations on liability and indemnities in this agreement are business understandings between the parties.

**4.4** Whether Client and TTL agree to proceed under Section 4.2 above, both parties, to the fullest extent allowed by law, that neither will be liable to the other.

**NOTE:** Sections 5 through 7 shall apply if sampling, testing or other intrusive services are part of TTL's scope of services.

## SECTION 5.  SUBTERRANEAN STRUCTURES AND UTILITIES

**5.1** In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities.

**5.2** Client will inform TTL of the locations of all subterranean structures and utilities on Client's property before TTL begins.

**5.3** TTL will contact the local Alone-call utility authority, but assumes no responsibility with respect to utilities beyond that action.

## SECTION 6.  OWNERSHIP OF DOCUMENTS AND SAMPLES

**6.1** All reports, boring logs, field data, test specimens, drilling samples, field notes, laboratory test data, calculations, estimates, and other documents prepared by TTL as instruments of service shall remain the property of TTL.

**6.2** TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed.

## SECTION 7.  DISPOSAL OF SAMPLES

**7.1** Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of thirty (30) days after submission of TTL's Report.

## SECTION 8.  DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

**8.1** Client warrants that a reasonable effort to inform TTL of known or suspected hazardous materials on or near the project site has been made.

**8.2** Hazardous materials may exist at a site where there is no reason to believe they could or should be present.

**8.3** During the performance at the Work Authorized, TTL agrees to notify Client when unanticipated hazardous materials or suspected hazardous materials are encountered.

**8.4** Notwithstanding any other provision of the agreement, Client waives any claim against TTL.

**8.5** Client will be responsible for ultimate proper disposal of any samples secured by TTL, which are found to be contaminated.

## SECTION 9.  BIOLOGICAL POLLUTANTS

**9.1** Except to the degree specified in the accompanying proposal letter, work specifically excludes the investigation, detection, prevention or assessment of the presence of Biological Pollutants.

## SECTION 11.  INVOICES

**11.1** The Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL.

**11.2** Client agrees to pay TTL for the performance of the Work Authorized, and any additional work.

**11.3** TTL will submit to Client invoices on a monthly basis and a final bill upon completion of work. Invoices will show charges for different personnel or expense classification.

**11.4** Payment is due upon presentation of invoice and is past due thirty (30) days after the invoice date.

## SECTION 12.  TERMINATION

**12.1** The agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof.

## SECTION 13.  DISPUTE RESOLUTION

**13.1** In the unlikely event a dispute or claim or breach arises out of this Agreement, the parties will attempt to settle the dispute amongst each other.

## SECTION 14.  ASSIGNS

**14.1** Neither the Client nor TTL may delegate, assign, sublet or transfer their duties under or interest in this agreement without the prior written consent of the other party.

## SECTION 15.  SEVERABILITY

**15.1** Any term or provision of this agreement found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of this agreement shall remain in full force and effect.

## SECTION 16.  GOVERNING LAW

**16.1** Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama.

## SECTION 17.  ENTIRE AGREEMENT

**17.1** This agreement and its attachments constitute the entire agreement between TTL and Client. All understandings and agreements between the parties are merged into this agreement.

# TTL LIMS Chain of Custody Form

Sheet 1 of 1

**Client:** Starnes, Davis, Florie, LLP

**Contact:** Lynn Sisk - TTL-Montgomery

**Mailing Address:**

**City, State, Zip:**

**Phone No.:**

**Sampled By:**

**Project ID:** Locust Fork-Dup-Blank

**Project Name:** Locust Fork-Surface Water - Dup/Blank - 600216065

### Composite Sample Info

**Sample**

Start

End _____ DATE/TIME

**Sample**

Start _____ DATE/TIME

End _____ DATE/TIME

### Sample Security Requirements

1. Condition of Contents:

2. Sealed for Shipping By:

3. Initial Contents Temp.: _____ °C    Seal Applied    Yes _____ No _____

4. Custody Seal Intact Upon Receipt by Laboratory:    Yes _____ No _____

5. Condition of Contents: Good LCC

6. Comments:

7. Reporting Status: Routine;    ; Rush By* *SURCHARGES MAY APPLY

8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | Analysis Parameters |
|------|------|----------------------|-------------|---------------|-------------------|---------------------|
| 2/16/17 | 0955 | Duplicate 1 | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 0955 | Duplicate 1 | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1363 | Duplicate 2 | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1363 | Duplicate 2 | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1405 | Field Blank 1 | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200.7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1405 | Field Blank 1 | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

### CUSTODY TRANSFERS

| | Relinquished By (signed) Date/Time | Received by (signed) Date/Time |
|---|---|---|
| 1 | 2/16/17 1530 | |
| 2 | | |
| 3 | | |
| 4 | | |

### SHIPPING DETAILS

Air Bill #:

Method of Shipment:

Received By Lab: 2-16-17 15:30

Date/Time

TTL, Inc. - Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0992

NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

DRAKE PRINTERS

3135682 SA

# TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

## SECTION 1.  SITE RESPONSIBILITY

1.1  Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

1.2  While TTL will provide reasonable precautions to minimize any damage to Client's property, TTL acknowledges that the normal course of performing the Work Authorized some damage to property may occur. Client agrees that the correction of such damage is not TTL's responsibility, unless it is caused by TTL's negligence.

1.3  Client agrees that it is the responsibility of the owner of the property, not TTL or TTL's subcontractor, for the location of all underground utilities and structures.

## SECTION 2.  PROJECT INFORMATION

2.1  Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized, which will include, but not be limited to, testing requirements and monitoring. Client shall be responsible for furnishing to TTL any changes to said Project Information of which Client becomes aware or which are made by Client as the work progresses.

## SECTION 3.  STANDARD OF CARE

3.1  Service performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions. No other warranty, expressed or implied is made or intended and the same are specifically disclaimed. Client shall not be entitled to assert a claim against TTL based on any theory of negligence or violation of the standard of care unless and until Client has obtained the written opinion from a licensed, independent and reputable engineering and/or environmental professional as appropriate for the services in question that TTL has violated the standard of care applicable to TTL's services.

3.2  Field test and boring locations described in our report by Client are shown on our sketches are based on specific information furnished to us by Client and/or others or estimates made in the field by our technicians. All such dimensions, depths or elevations are approximations unless otherwise stated in our report.

3.3  Client acknowledges that subsurface or latent conditions at the location where borings, samplings, surveys, or explorations are made by TTL and that site and subsurface conditions may change over time. Client understands that the data, interpretations, and recommendations by TTL are based solely on the information available to TTL. TTL is responsible for those data, interpretations, and recommendations developed by TTL.

3.4  When requested by Client, TTL will advise its Project Information which is provided to TTL by Client. Client agrees that TTL shall not be responsible for any adverse consequences which result from TTL's defense to the extent that TTL shall not be liable for any such adverse outcome unless Client shall defend, hold harmless and indemnify TTL from and against all losses, costs, etc. resulting from TTL's performance or non-performance in reliance upon the Project Information.

## SECTION 4.  RISK ALLOCATION

4.1  There are relative risks and benefits for TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have discussed these risks and benefits and have negotiated an equitable fee for the risks as described in Section 4.2.

4.2  In consideration for the compensation and benefits provided, Client agrees to the fullest extent permitted by law, to limit the total aggregate liability of TTL and that of its officers, directors, employees, agents and subcontractors for any and all costs, losses, claims, expenses and damages of any nature whatsoever, which might be claimed and proven in any court of law or other forum whatsoever, which arise out of the services under this agreement, to the amount of $50,000.00 or the total compensation of TTL under this agreement, whichever is greater. Such claims and causes of action include, but are not limited to, negligence, errors, omissions, strict liability, breach of contract or breach of warranty. The causes of action or legal theory upon which such claim is asserted. TTL shall not be responsible for any costs, etc. beyond the amount of TTL's liability. Client's acknowledgment of and agreement with the limitations in this agreement.

4.3  Notwithstanding the above, in no event shall a change for additional professional liability insurance, Client's acknowledgment of and agreement with the limitations in this Section 4.2.

4.4  Whether Client and TTL agree to proceed under Section 4.2 above, both parties to this agreement shall apply to all related to this agreement.

**NOTE:  Sections 5 through 7 shall apply if sampling, testing or other services are part of TTL's scope of services**

## SECTION 5.  SUBTERRANEAN STRUCTURES AND UTILITIES

5.1  In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities

5.2  Client will inform TTL of the locations of all subterranean structures and utilities on Client's property before the work authorized begins. Client agrees to hold TTL harmless for any damages to subterranean structures and utilities which are not brought to TTL's attention and correctly located in the Project Information furnished

5.3  TTL will contact the local Alabama One Call utility authority, but assumes no responsibility with respect to utilities beyond that action.

## SECTION 6.  OWNERSHIP OF DOCUMENTS AND SAMPLES

6.1  All reports, borings, logs, field data, test specimens, drilling samples, field notes, laboratory test data, calculations, estimates, and other documents prepared by TTL, as instruments of service, shall remain the property of TTL. Client agrees that all reports and other work products are instruments of service of TTL, and shall not be used for any other purpose whatsoever. Parties consent is obtained in writing from Client.

6.2  TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed.

6.3  Client agrees that any written Report and other work furnished to Client or Client's agents, for which full payment has not been made shall be returned to TTL upon demand and will not be used by Client for any purpose whatsoever or disseminated to any third parties by Client.

6.4  TTL will retain specimen and pertinent documents relating to the services performed for a period of two (5) years following submission of TTL's Report, during which period the documents will be made available to Client within a reasonable time after TTL receives a written request

## SECTION 7.  DISPOSAL OF SAMPLES

7.1  Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of thirty (30) days after submission of TTL's Report. Upon written request received before the disposal dates identified in this Section 7.1, TTL will retain test specimen and/or drilling samples for a mutually acceptable storage charge.

## SECTION 8.  DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

8.1  Client warrants that a reasonable effort to inform TTL of known or suspected hazardous materials on or near the project site has been made.

8.2  Hazardous materials may exist at a site where there is no reason to believe they could or should be present. TTL and Client agree that the discovery of unanticipated hazardous materials may constitute a changed condition mandating a renegotiation of the scope of performance of the Work Authorized or termination of services. TTL and Client further agree that the discovery of unanticipated hazardous materials may make it necessary for TTL to take immediate measures to protect health and safety. Client agrees to compensate TTL for any costs it may incur, such as, but not limited to, equipment decontamination cost or other costs incident to the discovery of unanticipated hazardous waste

8.3  During the performance of the Work Authorized, TTL agrees to notify Client when unanticipated hazardous or suspected hazardous materials are encountered. Client agrees to make any decision and disclosures required by law in the appropriate governmental agencies. Client also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL, which are required by governing law. In the event TTL encounters hazardous materials, Client agrees that TTL shall have the responsibility to inform the property owner of the discovery of unanticipated hazardous materials or suspected hazardous materials

8.4  Notwithstanding any other provision of the agreement, Client waives any claim against TTL, and to the maximum extent permitted by law, agrees to defend, indemnify, and hold TTL harmless from any claim, liability, and/or defense costs for injury or loss arising from TTL's discovery of unanticipated hazardous materials or suspected hazardous materials, including but not limited to, any costs created by delay of the Work Authorized, delay of Client's project and/or cost associated with possible reduction of the property's value.

8.5  Client will be responsible for ultimate proper disposal of any samples secured by TTL, which are found to be contaminated.

## SECTION 9.  BIOLOGICAL POLLUTANTS

9.1  Except to the degree specified in the accompanying proposal letter, work specifically excludes the investigation, detection, prevention or assessment of the presence of Biological Pollutants. The term "Biological Pollutants" includes, but is not limited to, molds, fungi, spores, bacteria, and viruses, and/or any of their byproducts. Client agrees that TTL is not responsible for any interpretations, recommendations, findings, or conclusions pertaining to Biological Pollutants. Client agrees that TTL has no liability for any claims alleging a failure to investigate, detect, prevent, assess, or make recommendations for preventing, controlling, or abating Biological Pollutants. Furthermore, Client agrees to defend, indemnify, and hold TTL harmless from all claims by any third party concerning Biological Pollutants, except any damages caused directly by TTL's sole negligence

## SECTION 10.  INSURANCE

10.1  TTL represents and warrants that it and its agents, staff, and consultants employed by it are protected by worker's compensation insurance and that TTL has such other insurance that TTL deems prudent for its own protection. Upon request and provided it is available, TTL agrees to provide Client with reasonable evidence of such insurance. TTL agrees to indemnify and save Client harmless from and against any loss, damage, or liability arising from any negligent acts, errors or omissions in connection with the Professional Services performed by TTL. In turn, Client agrees to indemnify and save harmless TTL from any and all liability for any loss, damage, or liability beyond the amounts, limits, and conditions of any such insurance, not attributable to TTL's sole negligence. TTL shall not be responsible for any loss, damage, or liability arising from any acts by Client, its agents, staff, and other consultants employed by it

## SECTION 11.  INVOICES

11.1  Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL, at the unit fees quoted, or as otherwise agreed herein. If, during the execution of the Work Authorized, TTL is required to stop operations as a result of changes in the Work Authorized, such as requests by the Client or requirements of third parties, additional charges may be applicable.

11.2  As deemed appropriate by TTL, Client may be required to complete a credit application and/or obtain personal or corporate guarantees prior to the commencement of or during the performance of the Work Authorized.

11.3  TTL will submit to Client invoices on a monthly basis and a final bill upon completion of work. Invoices will allow charges for different professional and labor service classifications. A more detailed separation of charges and backup data can be provided upon Client's specific prior written request.

11.4  Payment is due upon presentation of invoices and is past due thirty (30) days after the invoice date. If payment is not received by TTL within 30 days from the date of TTL's invoice, client agrees to pay the lesser of 1 - ½% per month or the maximum rate allowed by law, on the part of any payment until TTL receives payment. TTL shall be reimbursed by TTL for any amounts due TTL by Client, TTL's employees, reasonable attorney fees, and all costs of those costs incurred by TTL in collecting the amount due TTL, under this agreement

## SECTION 12.  TERMINATION

12.1  This agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before expiration of the period specified in the written notice. In the event of termination, TTL shall be paid for services performed to the termination notice date plus reasonable termination expenses.

## 13.  DISPUTE RESOLUTION

13.1  In the unlikely event a dispute or claim or breach arises out of this Agreement, the parties will attempt to settle the dispute amongst each other. Failing that, the parties will agree to settle any such dispute, claim, or breach through Mediation, where a non-biased mediator is chosen by both disputing parties. Both parties agree to split the expenses of the mediator evenly. Upon payment of TTL's fees where this may be a violation of state or applicable law. Not withstanding anything above to the contrary, the parties agree that the mediation proceedings shall be held in Tuscaloosa, Alabama.

## SECTION 14.  ASSIGNS

14.1  Neither the Client nor TTL may delegate, assign, sublet or transfer their duties under or interest in this agreement without the prior written consent of the other party.

## SECTION 15.  SEVERABILITY

15.1  Any term or provision of this agreement found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of this Agreement shall remain in full force and effect.

## SECTION 16.  GOVERNING LAW

16.1  Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama

## SECTION 17.  ENTIRE AGREEMENT

17.1  This agreement and its attachments constitute the entire agreement between TTL and Client. All understandings and agreements heretofore reached by and between TTL and Client are merged into this agreement, which alone fully and completely expresses their understanding. No other agreements or understandings exist and the parties agree that no verbal understandings have been relied on by any party entering into this agreement. Nothing under this agreement shall be construed to give any rights or benefits in this agreement to anyone other than Client and TTL, and all duties and responsibilities undertaken pursuant to this agreement will be for the sole and exclusive benefit of the Client (Owner) and TTL, and not for the benefit of any other party.

DRUM003437

# TTL LIMS Chain of Custody Form

Sheet 1 of 1

**Client:** Starnes, Davis, Florie, LLP

**Contact:** Lynn Sisk - TTL-Montgomery

**Mailing Address:**

**City, State, Zip:**

**Phone No.:**

**Sampled By:**

**Project ID:** Locust Fork-T1URB

**Project Name:** Locust Fork - Surface Water - T1URB - 600216085

## Composite Sample Info

| | |
|---|---|
| Sample | |
| Start | DATE/TIME |
| End | DATE/TIME |
| | |
| Sample | |
| Start | DATE/TIME |
| End | DATE/TIME |

## Sample Security Requirements

1. Condition of Contents:

2. Sealed for Shipping By:

3. Initial Contents Temp:_____ °C   Seal Applied   Yes ____ No ____

4. Custody Seal Intact Upon Receipt by Laboratory:   Yes ____ No ____

5. Condition of Contents:

6. Comments:

7. Reporting Status: Routine: ____ ; Rush By*

8. Client P.O. #

| Date | Time | Sample ID/Description | Sample Type | Sample Method | Sample Containers | Analysis Parameters |
|---|---|---|---|---|---|---|
| 2/16/17 | 1146 | T1URB | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200,7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1147 | T1URB | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1157 | T1UMC-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200,7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1123 | T1UMC-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1120 | T1UMC-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200,7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1120 | T1UMC-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1136 | T1UMP-TOP | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200,7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1136 | T1UMP-TOP | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |
| 2/16/17 | 1130 | T1UMP-BOT | Aqueous | GRAB | 1 1/2 PT PL HNO3 | 200,7PR, HARD_W, ICPMETALS_TOTAL |
| 2/16/17 | 1130 | T1UMP-BOT | Aqueous | GRAB | 1 QT PLNP | 300_W, ICPMETALS_DISSOLVED, TDS_DW |

**SHIPPING DETAILS**

Air Bill #:

Method of Shipment:

Received By Lab:

Date/Time: 2-15-17  15:30

## CUSTODY TRANSFERS

| Relinquished by: (signed) Date/Time | Received by (signed) Date/Time |
|---|---|
| 1   2/16/17  1530 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |

TTL, Inc. - Tuscaloosa Office/Laboratory: 3516 Greensboro Avenue, Tuscaloosa, Alabama 35401, Telephone (205) 345-0816, FAX (205) 345-0892
NOTE: Please read terms and conditions between TTL, Inc. and client on back of form.

# TERMS AND CONDITIONS BETWEEN TTL AND CLIENT

## SECTION 1.   SITE RESPONSIBILITY

1.1  Client will provide right of entry for TTL and all necessary equipment in order to complete the Work Authorized.

1.2  While TTL will take reasonable precautions to minimize any damage to Client's property, Client acknowledges that in the normal course of performing the Work Authorized, some damage to the property may occur. Client agrees that the correction of such damage is the Client's responsibility and at the Client's sole expense.

1.3  In order to minimize the possibility of any damage or injury, and to guarantee the performance of the contractor, it is the contractor's or TTL's performance of such construction observation. TTL's monitoring of any contractor by TTL does not relieve the contractor of the obligation to perform the work in conformity with the contract documents. TTL's monitoring of any contractor's performance shall not make TTL responsible for, or assume any of, the contractor's responsibilities. Client also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL, which are required by governing law, to the extent that the Client designated also TTL, if it is agreed, TTL is not responsible for safety or security of the site, and TTL does not have the right or responsibility to control the construction site.

## SECTION 2.   PROJECT INFORMATION

2.1  Client will furnish to TTL all plans, specifications, project requirements, drawings, guidelines and/or any other project information (referred to herein as Project Information) necessary to perform the Work Authorized, which will include, but not be limited to, which Client becomes aware of which are made by Client as the work progresses.

## SECTION 3.   STANDARD OF CARE

3.1  Services performed by TTL under this agreement will be conducted in a manner consistent with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions. No other warranty, expressed or implied, is made or intended by our proposal or by our performance of services. Client shall not be entitled to assert a claim against TTL based on any theory of negligence or violation of the standard of care unless and until Client has obtained the written opinion from a licensed, independent and reputable engineering and/or environmental professional as appropriate for the services in question that TTL has violated the standard of care applicable to the performance of those services under this agreement.

3.2  Field test and boring locations described in our report to Client or shown on our sketches are based on specific information furnished to us by Client and/or others or estimates made in the field by our technicians. All such dimensions, depths or elevations are approximations unless otherwise stated in our report.

3.3  Client acknowledges that certain conclusions or findings drawn from those encountered in drilling, sampling, surveys, or operations are made by TTL, and that all sites and subsurface conditions may change over time. Client understands that the data, interpretations, and recommendations of TTL are based solely on information available to TTL, and that, due to the nature of the work and variability of the information, interpretations, and recommendations developed by TTL, but shall not be responsible for the interpretation by others of the information developed.

## SECTION 4.   RISK ALLOCATION

4.1  There are relative risks and benefits for TTL and Client arising from their agreement regarding the Work Authorized. TTL and Client have discussed the relative risks and benefits of the Work Authorized and of the fee.

4.2  To the fullest extent allowed by law, to limit the total aggregate liability of TTL and that of all of its officers, directors, employees, agents, and subconsultants for any and all costs, losses, and damages so that the total aggregate liability of TTL shall not exceed the amount of $50,000 or TTL's total fee for the services rendered on this project, whichever is greater. Such claims and causes include, but are not limited to, negligence, professional errors or omissions, strict liability, breach of contract, or breach of warranty. This limitation shall apply regardless of the cause of action or legal theory pleaded or asserted. TTL will consider providing higher limits at the Client's written request prior to commencement of work if Client agrees to pay an additional charge. Any such agreement indicates the greater risk assumed by TTL, and is not a charge for additional professional liability insurance. Client's signature indicates Client's acknowledgement of and agreement with the allocation of risks as set forth in this Section 4.

4.3  Neither party shall be liable to the other for any special, indirect, or consequential damages incurred by either party, regardless of the cause, including either party's negligence, breach of contract, strict liability, or any other theory of action, except for willful misconduct or gross negligence. Parties mean Client and TTL and their officers, employees, agents, affiliates and subcontractors, and any of their subconsultants, for any damages whatsoever arising out of, relating to or resulting from the performance of any services under this agreement.

4.4  Whether Client and TTL agree to proceed under Section 4.2 above, both parties, to the fullest extent allowed by law, shall, either neither will be liable to the other for any circumstances, for any damages, whatsoever, relating to this agreement.

NOTE: Sections 5 through 7 shall apply if sampling, testing or other intrusive services are part of TTL's scope or services.

## SECTION 5.   SUBTERRANEAN STRUCTURES AND UTILITIES

5.1  In the prosecution of the Work Authorized, TTL will take reasonable precautions to avoid damage or injury to subterranean structures or utilities.

5.2  Client will furnish TTL, of the locations of all subterranean structures and utilities or Client's property before the work is performed being furnished, and accepts responsibility for any damage to subterranean structures and utilities which are not brought to TTL's attention and not correctly shown in the Project Information furnished.

5.3  TTL will contact the local Area-call® utility authority, but assumes no responsibility with respect to utilities beyond that action.

## SECTION 6.   OWNERSHIP OF DOCUMENTS AND SAMPLES

6.1  All reports, borings logs, field data, test specimens, drilling samples, field notes, laboratory test data, calculations, estimates, and other documents prepared by TTL, as instruments of service, shall remain the property of TTL. These documents, estimates, and documents shall not be considered confidential, and they will not be available to any other entity unless express consent is obtained in writing from Client.

6.2  TTL will render a Report (written or verbal, as particular circumstances dictate) to Client regarding the work performed.

6.3  Client agrees that any written Report documents relating to the services performed for a period of time (5) years following submission of TTL's Report, and such data is subject to disposal by TTL, upon demand and will not be used by Client for any purpose whatsoever after that time. After TTL receives a written request from Client specifically identifying the documents sought.

## SECTION 7.   DISPOSAL OF SAMPLES

7.1  Test specimens will be disposed of immediately upon completion of tests. Drilling samples will be disposed of thirty (30) days either after the submission of TTL's Report. If, upon written request of Client, the disposal dates identified in this Section 7.1, TTL will claim test specimens or drilling samples for a mutually acceptable storage charge.

## SECTION 8.   DISCOVERY OF UNANTICIPATED HAZARDOUS MATERIALS

8.1  Client warrants that a feasibility plan has been initiated. TTL will make a reasonable effort to inform TTL of known or suspected hazardous materials on or near the project site has been made.

8.2  Hazardous materials may exist at a site where there is no reason to believe they could or should be present. TTL and Client agree that the discovery of unanticipated hazardous materials may constitute a changed condition mandating a renegotiation of the scope of work or termination of services. TTL and Client also agree that the discovery of unanticipated hazardous materials may make it necessary for TTL to take immediate measures to protect health and safety. Client agrees to compensate TTL for any costs it may incur, such as, but not limited to, equipment decontamination costs or other costs incident to the discovery of unanticipated hazardous waste.

8.3  During the performance of the Work Authorized, TTL agrees to notify Client when unanticipated hazardous materials or suspected hazardous materials are encountered. Client agrees that TTL has the authority to take appropriate measures governing applicable. Client also agrees to hold TTL harmless for any and all consequences of disclosures made by TTL, which are required by governing law, to the extent that the Client designated also TTL, is not responsible. Client's responsibility to inform the property owner of the discovery of unanticipated hazardous materials or suspected hazardous materials.

8.4  Notwithstanding any other provision of the agreement, Client waives any claim against TTL, and to the maximum extent permitted by law, agrees to defend, indemnify, and hold TTL harmless from any claim, liability, and/or defense costs for injury or loss arising from TTL's discovery of unanticipated hazardous materials or suspected hazardous materials, including, but not limited to, any costs created by delay of the Work Authorized, delay of Client's project and/or cost associated with possible reduction of the property's value.

8.6  Client will be responsible for ultimate proper disposal of any samples secured by TTL, which are found to be contaminated.

## SECTION 9.   BIOLOGICAL POLLUTANTS

9.1  Except to the degree specified in the accompanying proposal letter, work specifically excludes the investigation, detection, prevention or assessment of the presence of Biological Pollutants. The term "Biological Pollutants" includes, but is not limited to, molds, fungi, spores, bacteria and microbes, and other microbial contaminants. Such terms and any other interpretations, interpretations, findings, or characteristics pertaining to Biological Pollutants. Client agrees that TTL has no liability for any claims alleging a failure to investigate, detect, prevent, assess, or make recommendations for preventing, controlling, or abating Biological Pollutants. Furthermore, Client agrees to defend and hold harmless TTL from all claims by any third party concerning Biological Pollutants, except any damages caused directly by TTL's sole negligence.

## SECTION 10.   INSURANCE

10.1  TTL represents and warrants that it and its agents, staff, and consultants employed by it are protected by worker's compensation insurance and that TTL has such coverage under public liability and property damage insurance policies as TTL deems to be adequate. Certificates for all such policies of insurance will be provided to Client upon request in writing. Within the limits and conditions of such insurance, TTL agrees to indemnify and save Client harmless from and against any loss, damage, or liability arising from any negligent acts, errors or omissions in connection with the performance of work performed by TTL, its agents, staff, and consultants. TTL will not be responsible for any loss, damage, or liability beyond the amounts, limits, and conditions of such insurance. Client, his agents, staff, and other consultants employed by it for any loss, damage, or liability arising from any acts by Client, his agents, staff, and other consultants employed by it.

## SECTION 11.   INVOICES

11.1  The Work Authorized will be accomplished in a timely, workmanlike, and professional manner by TTL, at the unit fees quoted, or as otherwise agreed herein. If, during the course of the work, it is determined that TTL is required to stop or restart operations, or as a result of changes in the Work Authorized, as requested by the Client or requirements of third parties, additional charges may be applicable.

11.2  As deemed appropriate by TTL, Client may be required to complete a credit application and/or obtain personal or corporate guaranties prior to the commencement of or during the performance of the work.

11.3  TTL will submit to Client invoices on a monthly basis and a final bill upon completion of work. Invoices will show charges for different services or phases in accordance with the classifications. Where a detailed separation of charges and back-up data can be provided upon Client's request prior to written request.

11.4  Payment is due upon presentation of invoice and is past due thirty (30) days after the invoice date. If payment is not received by TTL within 30 days from the date of TTL's invoice, Client agrees to pay the lesser of 1-1/2 per month or the maximum rate allowed by law, as a service charge, on the accounts past due. In addition, TTL may, at its election, stop all work under this agreement. In the event of nonpayment, TTL shall all other costs incurred by TTL in collecting the amounts due TTL under this agreement.

## SECTION 12.   TERMINATION

12.1  The agreement between TTL and Client may be terminated by either party upon seven (7) days written notice to the other in the event of substantial failure by the other party to perform in accordance with the terms hereof. Such termination shall not be effective if that substantial failure has been remedied before expiration of the period specified in the written notice. In the event of termination, TTL shall be paid for services performed to the termination date plus reasonable termination expenses.

## 13.   DISPUTE RESOLUTION

13.1  In the unlikely event a dispute or claim or breach arises out of this agreement, the parties will attempt to settle the dispute amongst each other. Failing that, the parties will agree to settle any such dispute, claim, or breach through Mediation, where a non-biased mediator is chosen by the mutual agreement of the parties. Should mediation attempts prove unsuccessful in resolving the dispute, the parties agree that the mediation proceedings shall be held in Tuscaloosa, Alabama.

## SECTION 14.   ASSIGNS

14.1  Neither the Client nor TTL may delegate, assign, sublet or transfer their duties under or interest in this agreement without the prior written consent of the other party.

## SECTION 15.   SEVERABILITY

15.1  Any item or provision of this agreement found to be invalid under any applicable statute or rule of law shall be deemed omitted and the remainder of this agreement shall remain in full force and effect.

## SECTION 16.   GOVERNING LAW

16.1  Client and TTL agree that this agreement and any legal actions concerning its validity, interpretation and performance shall be governed by the laws of the State of Alabama.

## SECTION 17.   ENTIRE AGREEMENT

17.1  This agreement and all attachments constitute the entire agreement between TTL and Client. All understandings and agreements between the parties are merged into this agreement, which alone fully and completely expresses their understanding. No representation or warranty made by any party which is not contained herein or expressly referred to herein has been relied on by any party entering into this agreement. Nothing under this agreement shall be construed to give any rights or benefits in this agreement to anyone other than the Client (Owner) and TTL, and all duties and obligations undertaken pursuant to this Agreement will be for the sole and exclusive benefit of the Client (Owner) and TTL, and not for the benefit of any other party.

STATE OF ALABAMA
# WATER IMPROVEMENT COMMISSION

Ira L. Myers, M.D.
Chairman, State Health Officer

Richard A. Forster
Vice Chairman
Commissioner, Department of
Conservation and Natural Resources

Perry Hill Office Park
3815 Interstate Court
Montgomery, Alabama

James W. Warr
Director

**Commission Members:**
Taney A. Brazeal, Sr., Fairhope
Charles O. Cargile, Hueytown
Frank E. Lindstrom, Sr., Birmingham
David L. Thomas, Montgomery
Dr. John H. Winston, Jr., Montgomery

Mailing address:
State Office Building
Montgomery, AL 36130
Telephone 205/277-3630

March 31, 1980

4/2/80 Copies from MBE to:
Mr. Breland/Mr. Burdette
Mr. Brown
Mr. Gilbert
Mr. Walker
Mr. J. McDuff

RECEIVED

APR 2 1980

A. B. C.
ENV. CONTROL

Mr. Moyer Edwards
Alabama By-Products Corporation
P.O. Box 10246
Birmingham, Alabama 35202

Dear Mr. Edwards:

Your company's operation, referred to in the attached NPDES Compliance Inspection Report, is considered as a major discharger of treated industrial waste to waters of the State of Alabama. Designation as a major discharger was jointly agreed to by the Environmental Protection Agency and this Commission.

The results of each inspection conducted by a member of the Alabama Water Improvement Commission Technical Staff will be reported on this form and a copy of this report will be forwarded to your company for information and action, as appropriate.

Should you have any questions concerning this matter, please feel free to contact us.

Yours very truly,

Joe B. Myers
Supervisor, Mining Activities
Water Improvement Commission

JBM:dst

Enclosure

DRUM003470

Form Approved
OMB No. 158-R0073

## NPDES COMPLIANCE INSPECTION REPORT (Coding Instructions on back of last page)

| TRANSACTION CODE | | NPDES | | YR MO DA | TYPE | INSPEC-TOR | FAC TYPE | | TIME |
|---|---|---|---|---|---|---|---|---|---|
| |5| |M| |5| |A|4|0|9|9|1|7|2|4| | 3 11 | |8|0|0|3|1|9| 12 17 | |C| 18 | |S| 19 | |2| 20 | | |1:00| a.m. p.m. |

REMARKS

| | | | | | | | | | | | | | | | | | | | | | | |
|21| | | | | | | | | | | | | | | | | | | | | |64|

ADDITIONAL

| | | | |
|65| | | 70|

### SECTION A - Permit Summary

NAME AND ADDRESS OF FACILITY (Include County, State and ZIP code)

Alabama By-Products Corp.
Maxine Mine                          Jefferson Co.
Maxine, Al.

EXPIRATION DATE  80/12/31

ISSUANCE DATE  78/07/01

RESPONSIBLE OFFICIAL  Moyer Edwards

TITLE  Dir. Environmental Control

PHONE  (205) 252-5171

FACILITY REPRESENTATIVE  ~~John Owl~~

TITLE

PHONE

### SECTION B - Effluent Characteristics (Additional sheets attached)      N/H records in B'HAM office

| PARAMETER OUTFALL | | MINIMUM | AVERAGE | MAXIMUM | ADDITIONAL |
|---|---|---|---|---|---|
| | SAMPLE MEASUREMENT | | | | |
| | PERMIT REQUIREMENT | | | | |
| | SAMPLE MEASUREMENT | | | | |
| | PERMIT REQUIREMENT | | | | |
| | SAMPLE MEASUREMENT | | | | |
| | PERMIT REQUIREMENT | | | | |
| | SAMPLE MEASUREMENT | | | | |
| | PERMIT REQUIREMENT | | | | |
| | SAMPLE MEASUREMENT | | | | |
| | PERMIT REQUIREMENT | | | | |

### SECTION C - Facility Evaluation (S = Satisfactory, U = Unsatisfactory, N/A = Not applicable)

| EFFLUENT WITHIN PERMIT REQUIREMENTS | S | OPERATION AND MAINTENANCE | | SAMPLING PROCEDURES | |
|---|---|---|---|---|---|
| RECORDS AND REPORTS | | COMPLIANCE SCHEDULE | | LABORATORY PRACTICES | |
| PERMIT VERIFICATION | | FLOW MEASUREMENTS | | OTHER: | |

### SECTION D - Comments

Lower Pond had been lined w/ lime-rock & lime was to be spread that day
as a temporary measure

### SECTION E - Inspection/Review

| SIGNATURES | | AGENCY | DATE |
|---|---|---|---|
| INSPECTED BY  Ashley T. Chadwick | | AWIC | 80/03/19 |
| INSPECTED BY | | | |
| REVIEWED BY | | | |

ENFORCEMENT DIVISION USE ONLY

COMPLIANCE STATUS

☐ COMPLIANCE
☐ NONCOMPLIANCE

EPA FORM 3560-3 (9-77)      REPLACES EPA FORM T-51 (9-76) WHICH IS OBSOLETE.      PAGE 1 OF 4

DRUM003471

Form Approved
OMB No. 158-R0073

Sections F thru L. Complete on all inspections, as appropriate.  N/A = Not Applicable

PERMIT NO. *AL0001724*

**SECTION F - Facility and Permit Background**

| ADDRESS OF PERMITTEE IF DIFFERENT FROM FACILITY *(Including City, County and ZIP code)* | DATE OF LAST PREVIOUS INVESTIGATION BY EPA/STATE *'74 / 12 / 11* |
|---|---|
| *Alabama By-Products Corp.* *P.O. Box 10246* *B'HAM, AL - 35202* | FINDINGS *satisfactory* |

**SECTION G - Records and Reports**

| RECORDS AND REPORTS MAINTAINED AS REQUIRED BY PERMIT. ☐YES ☐NO ☐N/A *(Further explanation attached _____)* DETAILS: | | | |
|---|---|---|---|
| (a) ADEQUATE RECORDS MAINTAINED OF: | | | |
|   (i)  SAMPLING DATE, TIME, EXACT LOCATION | ☐ YES | ☐ NO | ☐N/A |
|   (ii)  ANALYSES DATES, TIMES | ☐ YES | ☐ NO | ☐N/A |
|   (iii)  INDIVIDUAL PERFORMING ANALYSIS | ☐ YES | ☐ NO | ☐N/A |
|   (iv)  ANALYTICAL METHODS/TECHNIQUES USED | ☐ YES | ☐ NO | ☐N/A |
|   (v)  ANALYTICAL RESULTS *(e.g. consistent with self-monitoring report data)* | ☐ YES | ☐ NO | ☐N/A |
| (b) MONITORING RECORDS *(e.g. flow, pH, D.O. etc.)* MAINTAINED FOR A MINIMUM OF THREE YEARS INCLUDING ALL ORIGINAL STRIP CHART RECORDINGS *(e.g. continuous monitoring instrumentation, calibration and maintenance records)* | ☐ YES | ☐ NO | ☐N/A |
| (c) LAB EQUIPMENT CALIBRATION AND MAINTENANCE RECORDS KEPT. | ☐ YES | ☐ NO | ☐N/A |
| (d) FACILITY OPERATING RECORDS KEPT INCLUDING OPERATING LOGS FOR EACH TREATMENT UNIT. | ☐ YES | ☐ NO | ☐N/A |
| (e) QUALITY ASSURANCE RECORDS KEPT. | ☐ YES | ☐ NO | ☐N/A |
| (f) RECORDS MAINTAINED OF MAJOR CONTRIBUTING INDUSTRIES *(and their compliance status)* USING PUBLICLY OWNED TREATMENT WORKS. | ☐ YES | ☐ NO | ☐N/A |

**SECTION H - Permit Verification**

| INSPECTION OBSERVATIONS VERIFY THE PERMIT. ☐ YES ☐ NO ☐ N/A *(Further explanation attached _____)* DETAILS: | | | |
|---|---|---|---|
| (a) CORRECT NAME AND MAILING ADDRESS OF PERMITTEE. | ☐ YES | ☐ NO | ☐N/A |
| (b) FACILITY IS AS DESCRIBED IN PERMIT. | ☐ YES | ☐ NO | ☐N/A |
| (c) PRINCIPAL PRODUCT(S) AND PRODUCTION RATES CONFORM WITH THOSE SET FORTH IN PERMIT APPLICATION. | ☐ YES | ☐ NO | ☐N/A |
| (d) TREATMENT PROCESSES ARE AS DESCRIBED IN PERMIT APPLICATION. | ☐ YES | ☐ NO | ☐N/A |
| (e) NOTIFICATION GIVEN TO EPA/STATE OF NEW, DIFFERENT OR INCREASED DISCHARGES. | ☐ YES | ☐ NO | ☐N/A |
| (f) ACCURATE RECORDS OF RAW WATER VOLUME MAINTAINED. | ☐ YES | ☐ NO | ☐N/A |
| (g) NUMBER AND LOCATION OF DISCHARGE POINTS ARE AS DESCRIBED IN PERMIT. | ☐ YES | ☐ NO | ☐N/A |
| (h) CORRECT NAME AND LOCATION OF RECEIVING WATERS. | ☐ YES | ☐ NO | ☐N/A |
| (i) ALL DISCHARGES ARE PERMITTED. | ☐ YES | ☐ NO | ☐N/A |

**SECTION I - Operation and Maintenance**

| TREATMENT FACILITY PROPERLY OPERATED AND MAINTAINED. ☑ YES ☐ NO ☐ N/A *(Further explanation attached _____)* DETAILS: | | | |
|---|---|---|---|
| (a) STANDBY POWER OR OTHER EQUIVALENT PROVISIONS PROVIDED. | ☐ YES | ☐ NO | ☐N/A |
| (b) ADEQUATE ALARM SYSTEM FOR POWER OR EQUIPMENT FAILURES AVAILABLE. | ☐ YES | ☐ NO | ☐N/A |
| (c) REPORTS ON ALTERNATE SOURCE OF POWER SENT TO EPA/STATE AS REQUIRED BY PERMIT. | ☐ YES | ☐ NO | ☐N/A |
| (d) SLUDGES AND SOLIDS ADEQUATELY DISPOSED. | ☐ YES | ☐ NO | ☐N/A |
| (e) ALL TREATMENT UNITS IN SERVICE. | ☑ YES | ☐ NO | ☐N/A |
| (f) CONSULTING ENGINEER RETAINED OR AVAILABLE FOR CONSULTATION ON OPERATION AND MAINTENANCE PROBLEMS. | ☐ YES | ☐ NO | ☐N/A |
| (g) QUALIFIED OPERATING STAFF PROVIDED. | ☑ YES | ☐ NO | ☐N/A |
| (h) ESTABLISHED PROCEDURES AVAILABLE FOR TRAINING NEW OPERATORS. | ☐ YES | ☐ NO | ☐N/A |
| (i) FILES MAINTAINED ON SPARE PARTS INVENTORY, MAJOR EQUIPMENT SPECIFICATIONS, AND PARTS AND EQUIPMENT SUPPLIERS. | ☐ YES | ☐ NO | ☐N/A |
| (j) INSTRUCTIONS FILES KEPT FOR OPERATION AND MAINTENANCE OF EACH ITEM OF MAJOR EQUIPMENT. | ☐ YES | ☐ NO | ☐N/A |
| (k) OPERATION AND MAINTENANCE MANUAL MAINTAINED. | ☐ YES | ☐ NO | ☐N/A |
| (l) SPCC PLAN AVAILABLE. | ☐ YES | ☐ NO | ☐N/A |
| (m) REGULATORY AGENCY NOTIFIED OF BY-PASSING. *(Dates _____)* | ☐ YES | ☐ NO | ☐N/A |
| (n) ANY BY-PASSING SINCE LAST INSPECTION. | ☐ YES | ☐ NO | ☐N/A |
| (o) ANY HYDRAULIC AND/OR ORGANIC OVERLOADS EXPERIENCED. | ☐ YES | ☐ NO | ☐N/A |

EPA FORM 3560-3 (9-77)

PAGE 2 OF 4

DRUM003472

Form Approved
OMB No. 158-R0073

PERMIT NO. AL0001724

**SECTION J - Compliance Schedules**

PERMITTEE IS MEETING COMPLIANCE SCHEDULE. ☑ YES ☐ NO ☐ N/A *(Further explanation attached ___)*

CHECK APPROPRIATE PHASE(S):
- ☐ (a) THE PERMITTEE HAS OBTAINED THE NECESSARY APPROVALS FROM THE APPROPRIATE AUTHORITIES TO BEGIN CONSTRUCTION.
- ☐ (b) PROPER ARRANGEMENT HAS BEEN MADE FOR FINANCING *(mortgage commitments, grants, etc.).*
- ☐ (c) CONTRACTS FOR ENGINEERING SERVICES HAVE BEEN EXECUTED.
- ☐ (d) DESIGN PLANS AND SPECIFICATIONS HAVE BEEN COMPLETED.
- ☐ (e) CONSTRUCTION HAS COMMENCED.
- ☐ (f) CONSTRUCTION AND/OR EQUIPMENT ACQUISITION IS ON SCHEDULE.
- ☐ (g) CONSTRUCTION HAS BEEN COMPLETED.
- ☑ (h) START UP HAS COMMENCED.
- ☐ (i) THE PERMITTEE HAS REQUESTED AN EXTENSION OF TIME.

**SECTION K - Self-Monitoring Program**

**Part 1 — Flow measurement** *(Further explanation attached ___)*

| | | | |
|---|---|---|---|
| PERMITTEE FLOW MEASUREMENT MEETS THE REQUIREMENTS AND INTENT OF THE PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| DETAILS: | | | |
| (a) PRIMARY MEASURING DEVICE PROPERLY INSTALLED. | ☐ YES | ☐ NO | ☐ N/A |
| (TYPE OF DEVICE) ☐ WEIR ☐ PARSHALL FLUME ☐ MAGMETER ☐ VENTURI METER ☐ OTHER *(Specify)* | | | |
| (b) CALIBRATION FREQUENCY ADEQUATE. *(Date of last calibration ___)* | ☐ YES | ☐ NO | ☐ N/A |
| (c) PRIMARY FLOW MEASURING DEVICE PROPERLY OPERATED AND MAINTAINED. | ☐ YES | ☐ NO | ☐ N/A |
| (d) SECONDARY INSTRUMENTS *(totalizers, recorders, etc.)* PROPERLY OPERATED AND MAINTAINED. | ☐ YES | ☐ NO | ☐ N/A |
| (e) FLOW MEASUREMENT EQUIPMENT ADEQUATE TO HANDLE EXPECTED RANGES OF FLOW RATES. | ☐ YES | ☐ NO | ☐ N/A |

**Part 2 — Sampling** *(Further explanation attached ___)*

| | | | |
|---|---|---|---|
| PERMITTEE SAMPLING MEETS THE REQUIREMENTS AND INTENT OF THE PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| DETAILS: | | | |
| (a) LOCATIONS ADEQUATE FOR REPRESENTATIVE SAMPLES. | ☐ YES | ☐ NO | ☐ N/A |
| (b) PARAMETERS AND SAMPLING FREQUENCY AGREE WITH PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| (c) PERMITTEE IS USING METHOD OF SAMPLE COLLECTION REQUIRED BY PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| IF NO: ☐ GRAB ☐ MANUAL COMPOSITE ☐ AUTOMATIC COMPOSITE FREQUENCY ___ | | | |
| (d) SAMPLE COLLECTION PROCEDURES ARE ADEQUATE. | ☐ YES | ☐ NO | ☐ N/A |
| (i) SAMPLES REFRIGERATED DURING COMPOSITING. | ☐ YES | ☐ NO | ☐ N/A |
| (ii) PROPER PRESERVATION TECHNIQUES USED. | ☐ YES | ☐ NO | ☐ N/A |
| (iii) FLOW PROPORTIONED SAMPLES OBTAINED WHERE REQUIRED BY PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| (iv) SAMPLE HOLDING TIMES PRIOR TO ANALYSES IN CONFORMANCE WITH 40 CFR 136.3 | ☐ YES | ☐ NO | ☐ N/A |
| (e) MONITORING AND ANALYSES BEING PERFORMED MORE FREQUENTLY THAN REQUIRED BY PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| (f) IF (e) IS YES, RESULTS ARE REPORTED IN PERMITTEE'S SELF-MONITORING REPORT. | ☐ YES | ☐ NO | ☐ N/A |

**Part 3 — Laboratory** *(Further explanation attached ___)*

| | | | |
|---|---|---|---|
| PERMITTEE LABORATORY PROCEDURES MEET THE REQUIREMENTS AND INTENT OF THE PERMIT. | ☐ YES | ☐ NO | ☐ N/A |
| DETAILS: | | | |
| (a) EPA APPROVED ANALYTICAL TESTING PROCEDURES USED. *(40 CFR 136.3)* | ☐ YES | ☐ NO | ☐ N/A |
| (b) IF ALTERNATE ANALYTICAL PROCEDURES ARE USED, PROPER APPROVAL HAS BEEN OBTAINED. | ☐ YES | ☐ NO | ☐ N/A |
| (c) PARAMETERS OTHER THAN THOSE REQUIRED BY THE PERMIT ARE ANALYZED. | ☐ YES | ☐ NO | ☐ N/A |
| (d) SATISFACTORY CALIBRATION AND MAINTENANCE OF INSTRUMENTS AND EQUIPMENT. | ☐ YES | ☐ NO | ☐ N/A |
| (e) QUALITY CONTROL PROCEDURES USED. | ☐ YES | ☐ NO | ☐ N/A |
| (f) DUPLICATE SAMPLES ARE ANALYZED. ___ % OF TIME. | ☐ YES | ☐ NO | ☐ N/A |
| (g) SPIKED SAMPLES ARE USED. ___ % OF TIME. | ☐ YES | ☐ NO | ☐ N/A |
| (h) COMMERCIAL LABORATORY USED. | ☐ YES | ☐ NO | ☐ N/A |
| (i) COMMERCIAL LABORATORY STATE CERTIFIED. | ☐ YES | ☐ NO | ☐ N/A |

LAB NAME: _____

LAB ADDRESS: _____

EPA FORM 3560-3 (9-77)

PAGE 3 OF 4

DRUM003473

Form Approved
OMB No. 158-R0073

PERMIT NO.
AL2001724

SECTION L: Effluent/Receiving Water Observations (further explanation attached _____)

| OUTFALL NO. | OIL SHEEN | GREASE | TURBIDITY | VISIBLE FOAM | VISIBLE FLOAT SOL | COLOR | OTHER |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(Sections M and N: Complete as appropriate for sampling inspections)

SECTION M: Sampling/Inspection Procedures and Observations (further explanation attached _____)

☐ GRAB SAMPLE OBTAINED
☐ COMPOSITE OBTAINED
☐ FLOW PROPORTIONED SAMPLE
☐ AUTOMATIC SAMPLER USED
☐ SAMPLE SPLIT WITH PERMITTEE
☐ CHAIN OF CUSTODY EMPLOYED
☐ SAMPLE OBTAINED FROM FACILITY SAMPLING DEVICE

COMPOSITING FREQUENCY _____          PRESERVATION _____

SAMPLE REFRIGERATED DURING COMPOSITING   ☐ YES   ☒ NO
SAMPLE REPRESENTATIVE OF VOLUME AND NATURE OF DISCHARGE

SECTION N: Analytical Results (attach report if necessary)

EPA Form 3560-3 (9-77)                                    PAGE 4 OF 4

DRUM003474

December 5, 1978

MEMO TO FILE:

RE:  MEETING REGARDING RUNOFF PROBLEMS AT COAL MINES

ATTENDEES:  MESSRS. BRELAND, BURDETTE, COOK, MUSICK, J. McDUFF
and EDWARDS

Problems were pointed out in regards to OSM inspections, etc. Mr. Cook then
stated that he wanted Jack McDuff to work with the superintendents in regards
to the problems and wanted someone also at the mines who could be familiar
with these problems to work with the inspectors when they came. Mr. Breland
stated he envisioned this as being a twofold program - permanent type and a
temporary type. He stated he had previously discussed this with Mr. Burdette
and it will be Jack's job of doing it and it must be coordinated with the
superintendents. He is in turn thinking of ways that berms, dams, etc. have
to be built. At this point Mr. Burdette asked if we knew what is required at
all of our installations and why. Jack stated it was the law, that we had to
do this and that normally the Blue Book has a check list of things you are sup-
posed to do. Mr. Burdette stated that it was not in the design plans of OSM
for structures at present. He would think that Jack and the Division Superinten-
dents and Superintendents would establish drainage patterns at all mines. Mr.
Cook then noted that there were different criteria for different agencies. Mr.
Breland stated we now must establish drainage pattern initially with plans for
relief later on. Much emphasis was placed on formulating an overall plan. He
stated that Jack would not be able to perform all of this, he has to use local
engineers to make some of the drawings after determining what is needed. Mr.
Burdette stated he would have the Superintendent, Engineer and Jack to be fami-
liar with problems in order that they map attempt to guide the persons from OSM
around the mines. Mr. Breland then stated he thinks we ought to meet with Mr.
Ellis in regards to our problems and discuss them with him. Mr. Burdette noted
that the OSM people come onto your area without stopping, that they came into
the Knob Mine without stopping and just about ran up on a shot prior to shoot-
ing. Someone happened to see them and delayed the shot.

Mr. Breland then stated these men are under pressures to do a job and what we
have to do is cooperate with them any way we can. At this point Mr. McDuff
asked who should be the one to see Mr. Ellis. Mr. Breland indicated that there
would be no one person, perhaps everybody in the room should go see him. At
this point Mr. McDuff stated he had to meet a Mr. Dikes out at Mary Lee No. 2
at noon in regards to some of the problems which are supposed to have been cor-
rected. Mr. Breland also questioned how long it would take before we had some-
thing on paper in regards to our drainage plan; Jack stated it would be approxi-
mately 3 weeks. Mr. Cook stated he didn't want to put the monkey on his back,
just needed enough time and I stated at this point we had to have this plan re-
gardless of whether we want the monkey on our back or not. Mr. Breland then
stated we should get the plan ready prior to reviewing with the mines. Mr.

- 2 -

Burdette stated our first inspection could be preliminary investigation, we could then make our plans and thinks we would be better off to know what needs to be done before putting all of this on paper.  Mr. Cook stated he could almost look at a contour map and tell what needs to be done, to which Mr. Breland replied that the contours around some of the areas are not the same as they used to be, that they have been changed quite drastically.  Mr. Breland also requested that the cost and performing the work that is being recommended should be noted as well.

The Division Superintendent, the Mine Superintendent, Mine Engineer Jack McDuff and myself will be a Task Force to review the areas in question for corrective action.

As I see the above meeting, I see a replay of a similar meeting held at the Segco Mine with the AWIC Technical Staff in regards to runoff water - all mines concerned, the corrective action which was going to be taken at that time, some of which were carried through and no longer presents a problem, but some were taken part-way and dropped, some were taken all the way, however, and have deteriorated to a point where we no longer have control we once had.


                                        MOYER B. EDWARDS


MBE:rl

DRUM003478

bc:  Mr. Koenig          Mr. McAlpin
      Mr. Jones           Mr. Brown
      Mr. R. W. Self     Mr. Stuckey
      Mr. Lewis           Mr. Stockman
      Mr. W. E. Self     Mr. Gilbert
      Mr. Breland
      Mr. Cook/Mr. Musick

April 30, 1977

Mr. Buddy E. Cox, Jr.
Pollution Control Specialist
Alabama Water Improvement Commission
Perry Hill Office Park
3815 Interstate Court
Montgomery, Alabama  36109

Dear Mr. Cox:

As requested during our meeting on April 19, 1977 at our Segco Mine, we are submitting plans as outlined to you at that time and our estimated completion dates for the corrective action discussed.

GORGAS MINE - (Attachment "A")

Problem:  Excess water being routed from the preparation plant to the emergency holding ponds which necessitated an excavation of two additional ponds for containment.  The cause - insufficient pumping capacity as well as pumps not in operating condition.

Solution:  A new wastewater pipeline has been installed from the preparation plant to the holding pond and a standby wastewater pump will be installed at the washer sump.  This standby pump will be float activated at a predetermined level which will prevent overflow from the sump to the emergency ponds.  Completion date estimated to be May 15, 1977.

Problem:  Excess material in the emergency ponds.

Solution:  Clean ponds and keep in such condition that will insure adequate residence time for material deposition.  Completion date estimated to be August 1, 1977.

Note:  The second pond which was excavated to accommodate run over from the existing emergency ponds has now been drained and is in good condition.

One additional emergency pond will be connected to the existing ponds in order that draining and cleaning out of all ponds can be accommodated.

DRUM003480

Mr. Cox                          - 2 -                    April 30, 1977

Estimated completion date August 1, 1977.

Automatic air valves have been installed at the head tanks to con-
trol the incoming water to the preparation plant.  Work is now being
performed on air lines and automatic float switches to operate these
valves.  Completion date estimated May 1, 1977.

Existing pump for recycling water from the wastewater ponds is now
being evaluated to determine if present capacity is sufficient to
serve the preparation plant, if not a larger pump must be ordered.

One section of the fine coal recovery unit has been put on stream
as of April 11, 1977 with the second unit estimated to be on stream
by June 1, 1977.

SEGCO MINE - (Attachment "B")

Problem:  Excess material washing from the material storage yard into
the small holding pond below the railroad thus necessitating frequent
clean out.

Solution:  The sump which was used to trap material from this area
prior to the water flowing to the holding pond has now been enlarged
to a volume of approximately 53,200 cubic feet.

Problem:  Rapid fill up of the material yard holding pond necessitated
frequent clean outs or loss of the material to the stream.

Solution:  This pond is now being cleaned and a solids pump is to be
installed for pumping material back to the preparation plant sump and
from there to be pumped to the large holding ponds.  A raw water line
will be added to this pond for slurry purposes.  The raw water line
will be a 2 inch line, water pumped from this pond will be by a 4 inch
line.  At no time will the raw incoming water be in excess of the water
being pumped from the pond.  Pond cleaning estimated to be completed
by May 15, 1977.

Money has been budgeted for the second (pumping) phase of the project.
Estimated completion date dependent upon pump delivery.

MAXINE MINE - (Attachment "C")

Problem:  The holding pond located at the No. 1 belt transfer house
fills rapidly due to overflow from the washer and drainage from other
areas.  Overflow from this pond is trapped in a semi-diked area which
in turn has become full.

Solution:  A mud-cat has been contracted to dredge the small holding
pond and although it should have been on location April 22, 1977, the
estimated arrival date now will be May 3, 1977.

DRUM003481

Mr. Cox                    - 3 -                    April 30, 1977

The area below the small pond has now been excavated to provide an emergency catch basin in the event of a malfunction in the small pond.

A slurry pump will be purchased and installed to pump material from this holding pond back to the preparation plant and then to be pumped to the holding pond. As in the Segco Mine there will be incoming raw water to provide a slurry for pumping of this material but at no time will the incoming material exceed the pumping capacity of this pump.

Problem: Water being discharged from the preparation plant to the small holding pond.

Solution: Due to the absence of a standby pump or this pump being inoperable at times water flows to the small holding pond. The purchase of a larger waste water pump will be made in order to handle the additional water to the plant, the existing pump will then be used as a standby.

Problem: Low pH in the Maxine Hollow stream.

Solution: Purchase and installation of a treatment system for neutralizing these waters by the addition of sodium hydroxide. This system consist of a weir constructed of PVC material, a float control device is built into the weir which controls the caustic feed rate depending upon the volume of water flowing through this weir. Daily monitoring will be carried out by mine personnel as well as the vendor. Estimated completion date May 15, 1977.

At this submittal I have not received drawings for this system from the vendor, these will be forwarded to you as soon as received.

Problem: Possible runoff from material from the raw coal storage pile.

Solution: A berm has been constructed around the perimeter of this coal storage area which excludes outside waters from flowing into the pile. Any runoff from this area will be diverted by berm and channeling to the existing sump area at the belt switch station, from the belt switch station it will be pumped back to the preparation plant for disposal in the black water pond. Estimated completion date will be May 15, 1977.

Note: We have been informed by the vendor of Goyne pumps that the pumps required for both the Segco and Maxine Mines will have an estimated delivery time of 9 - 12 months. We will in the meantime keep all ponds in such condition as to minimize possible spillage of material to streams.

Yours truly,

Moyer B. Edwards
Director Environmental Control

MBE:rl
Attachments

_"A"_

GORGAS MINE

EMERGENCY POND SIZES -

FIRST POND - 30,000 SQ.FT - AVG. DEPTH 8'

Volume - 240,000 CU.FT.

SECOND POND - 47,200 SQ.FT. - AVG. DEPTH 8'

Volume - 377,600 CU. FT.

TOTAL VOLUME - 617,600 CU.FT.

PUMP CAPACITIES - TWO GOYNE PUMPS - 1000 GPM

(WASTE WATER PUMPS)

LINE SIZES - TWO 8" LINES. ONE PRESENTLY IN

USE AND ONE BEING INSTALLED.

4/18/57

Mtg c AWIC Personnel

| | |
|---|---|
| Moyer Edwards | ABC |
| Charles Horn | AWIC |
| JOE MYERS | AWIC |
| Buddy Cox | AWIC |
| LEONARD WYNN | ABC |
| M. E. McALPin | ABC |
| Son Gilbert | ABC |
| Glen Stockman | ABC, #7 Miner |
| J. E. BRELAND | ABC |
| T. E. MUSICK | ABC |
| RALPH STUCKEY | ABC  SEGCO |

DRUM003506

bc:  Mr. Koenig            Mr. Brown
     Mr. Jones             Mr. McAlpin
     Mr. R. W. Self        Mr. Gilbert
     Mr. Lewis             Mr. Burdette
     Mr. W. E. Self        Mr. Stockman
     Mr. Breland           Mr. Stuckey
     Mr. Cook              Mr. Bradford
     Mr. Musick

March 1, 1976

Mr. James W. Warr, Chief Administrative Officer
Alabama Water Improvement Commission
Perry Hill Office Park
3815 Interstate Court
Montgomery, Alabama  36109

Dear Mr. Warr:

We are in receipt of your letter of February 11, 1976 in which you
noted an inspection of our Maxine, Mary Lee No. 1, Gorgas America
No. 7 and Segco No. 1 Mines by Messrs. Robert Smith and Joe Meyers
of your Technical Staff.  In reply to the discrepancies detected by
the AWIC of the inspection made on February 4, 1976, we would note
the following actions which have been taken by ABC in order to cor-
rect the noted discrepancies.

MAXINE MINE

1.  Evidence of considerable siltation to the Locust Fork from the
    western portion of the waste rock pile.

2.  Erosion of the waste rock piles outerface on the river side.

        Plan of Action -  We are submitting the attached plan of
        action to your staff for approval which includes corrective
        action for Items No. 1 and No. 2 above.

3.  Numerous cases of discharge from the coal storage pile to the
    river at the barge loading site.

        Action -  The belt from which some of the leaks as noted in
        Item No. 3 were originating has now been repaired and this
        source no longer exist.  The second item referred to in No.
        3 would be a small pond from which drainage from our wet coal
        pile flows onto an area between the river and our storage
        area.  We have entrapped this water by erecting a clay berm
        around the periphery of our loading facility, however, since
        this is clay, percolation is very poor and therefore drainage

DRUM003517

Mr. Warr                    - 2 -                    March 1, 1976

during wet weather will have to be considered. At this
writing we are entertaining two possible approaches - (a)
installing essentially a french drain within the confines
of the area encircled by the dirt berm. (b) If all else
fails, install a sump and pump this water back to the drain-
age course which leads away from the river to an existing
drainage basin.

4. Basin for treatment of surface run-off from plant area and area
beneath the conveyor to barge loading facility was in a state of
disrepair. Floating waste was discharging from the basin to an
area that drains to the river. The basin had no means for normal
pool drainage as opposed to emergency overflow.

Action - This sump was installed to catch drainage from the
belt area and from the plant area. However, we have a very
close elevation tolerance on waters coming into this small
sump and waters leaving this sump. We have installed a pipe
which insures sub-surface drainage from this pond thus elimi-
nating the possibility of float dust. In regard to emergency
overflow as stated above, due to the very close tolerance and
elevations, this may not be possible for this particular sump.

MARY LEE NO. 1 MINE

1. New facilities for treatment of washer waste, approved by AWIC as
a closed system, was discharging to Lost Creek. Effluent was
significantly discolored.

Action - The recirculating system has been activated and as
of Friday, February 20, 1976, there was no outfall at this
holding pond, however, due to a solids buildup the pump intake
had to be relocated, this should be back in operation by Febru-
ary 27, 1976. At that time there will be no outfall.

2. Basin for treatment of surface run-off from plant area approved by
AWIC as a closed system, was discharging to Lost Creek. The first
basin was full of settled waste.

Action - This is one of two emergency holding ponds located be-
low the Preparation Plant and a contractor has been contacted
in regards to cleaning this pond. In addition, a tightening
up of all drainage which contributed to the influent to these
ponds is underway. If drainage from this pond continues after
the above action an application for waste water discharge will
be submitted to the AWIC.

DRUM003518

Mr. Warr — 3 — March 1, 1976

GORGAS AMERICA NO. 7 MINE

1. Surface run-off from the coal storage pile was discharging in two places to Lost Creek.

   Action - This area is being studied in order to arrive at a feasible method of containment and disposal of accumulated waters.

2. Coal fines were spilling from the conveyor belt into Lost Creek. Spillage of the fines had formed a pile beneath the conveyor directly on and in Lost Creek. The pile was approximately 20 feet high.

   Action - This accumulation was due to faulty belt cleaning. The belt cleaners located in this vicinity were to be adjusted or replaced immediately. The coal referred to in Item 2 has been removed.

SEGCO NO. 1 MINE

1. New facilities approved by the AWIC for treatment of washer waste was in dis-use with little evidence that they had been used since their construction over one year ago.

   Action - The reason this facility has experienced limited use has been (1) due to leakage in the pipe leading to the ponds which has now been corrected and (2) at this time there is no return line from the second pond to the Preparation Plant. However, piping has been placed on order and when received and installed this facility will be activated.

2. Basin for treatment of surface run-off from plant area had been discharging washer waste to a tributary of Lost Creek. Capacity of the basin appeared to be inadequate and there were no means for normal pool drainage as opposed to emergency overflow. There was no provision for sub-surface extraction from the basin.

   Action - This basin is indeed small for the area which it serves. As you know, this was an item that ABC inherited when we began to operate this mine. Since this inspection was made this basin has been cleaned completely and enlarged somewhat to provide a longer retention time for materials flowing into it. In addition, provisions are being made for the installation of sub-surface drainage and retaining the existing spillway as an emergency overflow. In order to reduce waters going to the yard drain we are routing as much drainage water and wash water as possible to the sump which

DRUM003519

Mr. Warr                    - 4 -                    March 1, 1976

in turn is discharged via the plant washer discharge route.

3.  Leakage from the washer and the hopper for rail loading was dis-
    charging to a tributary of Lost Creek without treatment.

    Action - Drainage from the hopper is now  routed back to the
    Preparation Plant discharge which in turn is pumped to the
    holding pond.  We anticipate a complete stoppage of waters
    draining via the route observed by your staff.  Instead said
    waters will be routed to holding areas where ample retention
    time will allow adequate settling of any suspended matter.

We hope this assessment of our immediate action, as well as our proposed
action, will meet with your approval and we hasten to assure you that we
at ABC desire to comply with the pollution control laws of the State of
Alabama.  If there are any questions in regard to the above items, please
do not hesitate to call me.

                            Sincerely,


                            Moyer B. Edwards
                            Director Environmental Control


MBE:rl
Attachment

PROPOSED PLAN TO CORRECT THE SILTATION
PROBLEM ASSOCIATED WITH THE MAXINE MINE
REFUSE STORAGE AREA

Discussions related to the overall drainage and siltation from the re-
fuse dump at Maxine Mine have lead to the following proposed plan.

A small dam approximately 20 feet high would be constructed in the main
hollow south of the mine refuse area "A". This dam would not be designed
to impound water but for containing the silt which would wash from the re-
fuse area until the final stages were completed. The area east of this
dam, which is now filled with silt washed from the refuse area, would be
dredged and cleaned for a distance of approximately 1,000 feet. This ma-
terial would be placed on the upstream of the north side of the dam.

A possible plan for the river side of this refuse area is to fill in the
existing washed areas with clay, moderate the existing refuse slope from
the tree line up to the road bed. A cover of clay will then be put down
with subsequent seeding with grass and/or trees.

A ditch line of approximately 10 to 12 feet wide and approximately 3 feet
deep located on the west side of the refuse pile would commence at the
present access road which crosses the refuse pile and runs for a distance
of approximately 5,800 feet meandering with the contours along the west
side of the hollow below the refuse pile and ending in a hollow south of
the proposed dam. This ditch would collect all drainage from the terrain
west of the refuse area and carry it to a point south of our proposed dam.
This water would not touch our refuse pile and should therefore be pollution
free.

The large hollow to the southwest of the present refuse dump would be used
for future mine refuse dumping. The refuse would be deposited from the bot-
tom of the hollow and layered according to the law to approximately the pro-
posed toe of refuse as shown on the attached sketch. The future refuse
would be deposited on a slope from the top of the existing pile to the pro-
posed toe and would measure approximately 27 degrees. This hollow would
comprise three and one-quarter million cubic yards of dumping space. As
the slopes for this area are completed, the top of the refuse pile would be
covered with clay and seeded with grass and/or trees. Clay for this project
is a scarce item and it may be necessary that some land south and west of
the project would have to be acquired in order to obtain the necessary amount
of clay. After removal of the clay, those areas too would be seeded with
grass and/or trees.

We have already contacted an excavating company in order that we may be in
a position to move forward on this project as soon as it meets with your
approval.

ALABAMA BY-PRODUCTS CORPORATION

By: _____
    Douglas H. Cook
    Vice President Engineering-Mines



DRUM003522

February 19, 1976

MESSRS.  KOENIG          BROWN
         JONES           McALPIN
         R. W. SELF      GILBERT
         LEWIS           BURDETTE
         W. E. SELF      STOCKMAN
         BRELAND         STUCKEY
         COOK            BRADFORD
         MUSICK

GENTLEMEN:

The attached letter was received from AWIC this morning (February
19, 1976). It notes items which were observed by the AWIC Technical
personnel, to be in non-compliance when we made an inspection on
February 4, 1976 for those mines listed.  As noted in my earlier
memo, a representative of each mine was present during this inspec-
tion and in addition, all mine superintendents have been notified
of each item on the attached list.

We have begun a series of meetings with both Operations and Engi-
neering to discuss and correct the problems as listed.  The Segco
problem was discussed on Monday, February 16, and is in the process
of being corrected.  The Mary Lee No. 1, Gorgas and Maxine problems
are to be discussed on Friday, February 20, after which I will have
to submit a report to the State in regard to the items on this list.

MOYER B. EDWARDS

MBE:rl
Attachment

DRUM003524

STATE OF ALABAMA

# WATER IMPROVEMENT COMMISSION

Ira L. Myers, M. D.
Chairman
State Health Officer

Claude D. Kelley
Vice Chairman
Commissioner, Department of
Conservation and Natural Resources

Perry Hill Office Park
3815 Interstate Court



James W. Warr
Chief Administrative Officer
Montgomery, Alabama 36109

Commission Members:
Marvin O. Berglin, Fairhope
Dr. Robert M. Bucher, Mobile
Charles O. Cargile, Hueytown
Louis Grabensteder, Huntsville
Henry A. Leslie, Montgomery

Telephone 205/277-3630

February 11, 1976

Mr. Moyer Edwards
Alabama By-Products Corporation
First National Bank Building
Birmingham, AL    35203

Dear Mr. Edwards:

This is to confirm an inspection on February 4, 1976, by Mr. Robert Smith and Mr. Joe Myers of your company's coal preparation facilities at the Maxine Mine, Mary Lee No. 1, America No. 7, and SEGCO No. 1.

The performance of the water pollution abatement and/or prevention facilities at all locations was unsatisfactory and in violation of Alabama's pollution control law, Act 1260, and AWIC permit conditions. Immediate action should be taken to correct the deficiencies listed on the attached list.

Should you have any questions concerning these matters, please contact Mr. Smith or Mr. Myers of this office.

Sincerely yours,

James W. Warr
Chief Administrative Officer
Water Improvement Commission

JWW:mcc

Attachment

cc:  Mr. Self
     Mr. Doug Cook

DRUM003525

DISCREPANCIES DETECTED BY AWIC

INSPECTION OF FEBRUARY 4, 1976

Maxine Mine:

1. Evidence of considerable siltation to the Locust Fork from the western portion of the waste rock pile.

2. Erosion of the waste rock pile's outer face on the riverside.

3. Numerous cases of discharge from the coal storage pile to the river at the barge loading site.

4. Basin for treatment of surface run-off from plant area and area beneath conveyor to barge loading facility was in a state of disrepair. Floating waste was discharging from the basin to an area that drains to the river. The basin had no means for normal pool drainage as opposed to emergency overflow.

Mary Lee No. 1:

1. New facilities for treatment of washer waste, approved by AWIC as a closed system, was discharging to Lost Creek. Effluent was significantly discolored.

2. Basin for treatment of surface run-off from plant area, approved by AWIC as a closed system, was discharging to Lost Creek. The first basin was full of settled waste.

America No. 7:

1. Surface run-off from the coal storage pile was discharging in two places to Lost Creek.

2. Coal fines were spilling from the conveyor belt into Lost Creek. Spillage of the fines had formed a pile beneath the conveyor directly on and in Lost Creek. The pile was approximately 20 feet high.

SEGCO No. 1:

1. New facilities approved by AWIC for treatment of washer waste was in disuse with little evidence that they had been used since their construction over one year ago.

2. Basin for treatment of surface run-off from plant area had been discharging washer waste to a tributary of Lost Creek. Capacity of the basin appeared to be inadequate and there were no means for normal pool drainage as opposed to emergency overflow. There was no provision for sub-surface extraction from the basin.

3. Leakage from the washer and the hopper for rail loading was discharging to a tributary of Lost Creek without treatment.

DRUM003526

cc:  Mr. Koenig          Mr. Breland
     Mr. Jones           Mr. Cook
     Mr. R. W. Self      Mr. Musick
     Mr. Lewis           Mr. Bradford
     Mr. W. E. Self

September 15, 1975

MESSRS. McALPIN
        BROWN
        STUCKEY
        BURDETTE
        BRYANT
        GILBERT

GENTLEMEN:

On Tuesday, September 23, 1975, I have an appointment to meet
with Mr. Joe Meyers of the AWIC Technical Staff to discuss any
pollution problems which the Alabama By-Products Corporation
may have relative to mining operations.  We intend to meet at
Segco Mine No. 1 Tuesday morning; from there we plan to visit
Mary Lee Mine No. 1 and Mary Lee Mine No. 2.  In the afternoon,
our tentative plans call for an inspection of the Maxine Mine
area.  I would request that you have either yourself or your
engineer most familiar with your mine water outfall and pol-
lution problems at that particular mine available when we make
our visit.

As stated, we plan to visit Segco Mine No. 1, Mary Lee Mine No.
1 and Mary Lee Mine No. 2 on the morning of Tuesday, September
23, commencing at 9:30 a.m. and that afternoon we plan to visit
the Maxine Mine area.

Your cooperation in having someone available when we are at your
mine will be appreciated.

MOYER B. EDWARDS

MBE:rl

DRUM003527

Copy 1/21/75 from W&B Co.

Mr. Koenig          Mr. Cook/Mr. Musick
Mr. Jones           Mr. Edwards
Mr. R. W. Self      Mr. Baker
Mr. Lewis
Mr. Breland

January 16, 1975

TO:      MR. W. E. SELF

FROM:    DON KEITH

SUBJECT: PROPOSED PLAN AND APPROXIMATE COSTS RELATED TO ACID MINE
         DRAINAGE AND REFUSE STORAGE AT MAXINE MINE

MINE REFUSE AREA "A"

Discussions on the activities related to acid mine drainage and refuse dump at
Maxine Mine have led to the following proposed plan.  A small dam, approximately
20 feet high, would be constructed in the main hollow south of the mine refuse
Area "A".  This dam would not be designed to impound water but for containing the
silt which would wash from the refuse area until the final stages are completed.
The area east of this dam, which is now filled with silt washed from the refuse
area, would be dredged and cleaned for a distance of approximately 1,000 feet.
This material would be placed on the upstream or north side of the dam.

A ditchline, approximately 10 to 12 feet wide and approximately 6 feet deep with
a berm on the east side of the ditch, would be constructed on the east or river
side of the refuse area.  This ditch would commence in the rock bin area and run
along the toe of the refuse pile for a distance of approximately 4,000 feet ending
in a small hollow at the south end of the refuse pile.  This ditchline would col-
lect the drainage from the east or river side slopes of the refuse pile and carry
it to the upstream or north side of the proposed dam.

A second ditchline, of approximately the same dimensions, located on the west
side of the refuse pile would commence at the present access road, which crosses
the refuse pile, and run for a distance of approximately 5,800 feet meandering
with the contours along the west side of the hollow below the refuse pile and
ending in a hollow south of the proposed dam.  This ditch would collect all drain-
age from the terrain west of the refuse area and carry it to a point south of our
proposed dam.  This water would not touch our refuse pile and should therefore
be pollution free.

The slopes on the east side of the refuse area would be approached in one of the
two following ways.  One method would be to contour and dress the slopes as they
are now, approximately 35° slope, terracing and carrying the drainage along the
terraces and depositing it north of the proposed dam.  The slopes would then be
covered with clay and seeded with grass and/or trees.

The second method proposed would be to cut the peaks of the existing terraces
making one slope which would reduce the slopes to comply with the proposed 27
degrees.  The slopes would be covered with clay and seeded with grass and/or trees.

The large hollow to the southwest of the present refuse dump would be used for
future mine refuse dumping.  The refuse would be deposited from the bottom of the
hollow and layered according to the law to approximately the proposed toe of refuse

-2-

as shown on the attached sketch. The future refuse would be deposited on a slope from the top of the existing pile to the proposed toe and would measure approximately 12 to 15 degrees. This hollow would comprise 3½ million cubic yards of dumping space and allow future dumping at the present rate for 16 years. As the slopes for this area were completed, the top of the refuse pile would be covered with clay and seeded with grass and/or trees.

Clay for this project could be a scarce item. It is possible that some land south and west of the project would have to be acquired in order to obtain the required amounts of clay. After removal of the clay, these areas too would be seeded with grass and/or trees.

Mr. Clyde Meade of Henderson Excavating Company has walked over the project and along with Dave Henderson has estimated the following timetable and costs. These costs are approximate as there are several unknowns such as the amount of clay material in which to cut the ditch on the south side of the pile, the amount of rock which will be encountered and the amount of refuse which will have to be moved to contour the slopes.

### ESTIMATE OF TIME AND COSTS
### REFUSE AREA "A"

| | Item | Time | Amount |
|---|---|---|---|
| 1. | Construction of proposed dam to collect washings from refuse Area "A" | 35 days | $ 60,000.00 |
| 2. | Cut proposed ditchline on east or river side of refuse Area "A" | 10 days | 5,000.00 |
| 3. | Cut proposed ditchline on west side of refuse Area "A" | 10 days | 5,000.00 |
| 4. | Contour, dress and clay the slopes on the east or river side of refuse Area "A" | 35 days | 60,000.00 |
| 5. | Clearing designated area to obtain clay for surfacing | 15 days | 10,000.00 |
| 6. | Dredging with dragline area below proposed dam which is now filled with material washed from refuse Area "A" | 35 days | 35,000.00 |
| | Grand Total | | $175,000.00 |

Another item which possibly may arise would be the treatment of the drainage coming from the refuse pile until the area has been covered with clay. This item, depending on the quality of the water, could possibly require a small treatment plant and an additional small dam to impound the water. This problem would have to be worked out after determining the quality of the drainage water.

DRUM003532

-3-

This report covers only Area "A" of the refuse area.  Areas "B" and "C" will be
explored after study is completed on Area "A" which is the largest and most
troublesome area.


DK/ah
Attach.

DRUM003533



DRUM003534

bcc:  Mr. Jones
      Mr. R. W. Self
      Mr. Lewis
      Mr. Breland/Burdette
      Mr. Musick
      Mr. J. McDuff
      Mr. F. McDuff
      Mr. Darden
      Mr. Edwards ✓

                                                    April 27, 1979


Mr. Philip E. La Moreaux, President
P.E. La Moreaux and Associates
P. O. Box 2310
Tuscaloosa, Alabama 34501

              Subject:  Hydrologic Studies
                        Alabama By-Products Corporation's Deep Mines

Dear Mr. La Moreaux:

Attached hereto is a map showing the location and area dedicated to the
deep mines operated by Alabama By-Products Corporation.

You will note that the area dedicated to Segco No. 1 and Mary Lee No. 1
Mines overlap the Gorgas No. 7 Mine area.  This is because the Gorgas
Mine is in the America Seam and the other two (2) mines are in the Mary
Lee Seam.  Mary Lee No. 2 and Chetopa Mines are in the Mary Lee Seam.
Maxine Mine is in the America Seam with a small area now being developed
in the Pratt Seam.

At most of the mine areas shown there are abandoned adjoining deep mines,
abandoned deep mines in a seam above the seam being mined and active and/or
abandoned surface mines above the seam being mined.  Most of the maps of
the abandoned mines are on file in this office.

This information is furnished per our recent conversation so you will be
familiar with our areas of operation prior to our meeting to discuss the
hydrologic investigations required by the Permanent Regulatory Program
of O.S.M.

If you require additional information, please feel free to call at anytime.

                              Yours very truly,

                              D. R. Cook
                              Vice President Engineering-Mines

DRC/ba
Att:

DRUM003553

**P.E.LaMoreaux&Associates**
Consulting Hydrologists, Geologists & Environmental Scientists

December 13, 1982

Mr. Douglas R. Cook
Vice President, Engineering-Mines
Alabama By-Products Corporation
P.O. Box 218
Goodsprings, Alabama  35560

Dear Mr. Cook:

As per our telephone conversation on Friday, December 10, 1982, below is given a summary of analyses completed on refuse rock samples:

| | pH | % Pyritic Sulfur as S | Neutralization Potential Tons CaCO$_3$ Equivalent/ Thousand Tons of Material |
|---|---|---|---|
| Maxine | 5.8 | 0.93 | 2.3 |
| Segco No. 1 | NA[1] | 0.04 | 22.7 |
| Gorgas No. 7/ Mary Lee No. 1 | NA | 0.27 | 23.0 |
| Mary Lee No. 2 | NA | 0.31 | 25.5 |
| Chetopa | NA | 0.65 | 24.5 |

NA[1] = not analyzed.

Home Office:   P.O. Box 2310   Tuscaloosa, Alabama 35403   Telephone 205/752-5543   Cable (PELA)

Offices:   4313  South Florida Avenue  Lakeland, Florida  33803   Telephone 813/646-8526
1440 Bank For Savings Building    Birmingham, Alabama 35203   Telephone 205/251-5283

DRUM003554

Mr. Douglas R. Cook
December 13, 1982
Page Two


In addition, analyses of breaker rock refuse for the Maxine Mine were completed as requested by ASMC. The results are as follows:

| | Breaker Rock[1] |
|---|---|
| pH | 7.3 |
| Neutralization Potential, Tons CaCO$_3$ Equivalent/ Thousand Tons of Material | 1.1 |
| % Pyritic Sulfur as S | 0.55 |
| Iron, ppm as Fe | 1682.0 |
| Manganese, ppm as Mn | 31.8 |

Breaker Rock[1] = composite of 6 samples collected.


If I can be of further assistance, please advise.

Sincerely,

Lois D. George
Project Manager

LDG/b6

DRUM003555

Copy sent 7-29-83 to:

Mr. Sheriff/Mr. Burdette
Mr. Cook
Mr. Bryant
Mr. Gilbert
Mr. Edwards
Mr. F. McDuff
Mr. C. Jones

RECE~ ~ ~

JUL 2 8 P.M.
A.B.C.
MINING DEPT.

July 26, 1983

TO:        Mr. Tom Musick

FROM:      Ronnie Key

SUBJECT:   ADEM inspection of Maxine Mine on Tuesday, July 26, 1983

On Tuesday, July 26, 1983, Bill Gibson and Steven Jenkins ADEM inspectors were at Maxine Mine.  They were accompanied by Sam Gilbert to treated creek and by Ronnie Key to rest of project.

The first area observed was  the treated creek where it flows into Coal Creek.  Ph of the water was found to be 10.1 at 1:00 pm.  Ph reading of 7.8 was recorded at 7:00 am.  Corrective measures were taken.

The next area observed was the catch basin at the river belt transfer house.

The next area observed was the limestone filter in the No. 1 dam below washer refuse disposal area.  A Ph reading of 3.5 was recorded on the downstream side of the filter.

The next area observed was the new refuse disposal area.

The next area observed was the reclaimed area of the washer refuse disposal area.

NOTE: Bill Gibson insinuated that NPDES permits may be required for the limestone filter and the diversion ditch (draining recent reclaimed area) at the No. 1 dam. As I understand it, this was not part of the agreement as signed by Joe Myers.

J. M.

RECEIVED

JUL 2 9 198?

A. B. C.
ENV. CONTROL

DRUM003574

*Mafene*

cc: Mr. Breland/Burdette     Mr. Stockman
    Mr. Cook                         Mr. Stuckey
    Mr. F. McDuff              Mr. Gilbert
    Mr. Edwards                Mr. Lee
    Mr. McAlpin                Mr. Hendrix
    Mr. Bryant

July 9, 1980

| | |
|---|---|
| **Memorandum To:** | Mr. James Brown |
| **From:** | Jack McDuff |
| **Subject:** | ASMRC Inspection – June 27, 1980 and July 1, 1980 |

**Chetopa Mine**



**Mary Lee No. 2 Mine**

- 2 -

Mary Lee No. 2 Mine (Cont.)



SEGCO No. 1 Mine



Maxine Mine

1.  The hay bales in the creek at the storage yard are in need of replacement.

2.  The ASMRC inspector requested that a hay filter be placed in the creek between the scrap yard and the shop.  All this drainage goes into the main creek and is retained in the pond created by the large concrete slab placed across the creek. I personally feel this is a waste of time just to meet the inspector's whim, especially in light of recent directives from AWIC to the effect that if it concerns water, that they (AWIC) are the authority.  However, the hay filter may possibly reduce the sediment load going into the pond.  The creek bed is, for the most part, stable and would add sediment only under heavy rainfall.

cc:  Mr. Lewis                    Mr. Gilbert - Maxine
     Mr. W. E. Self               Mr. Burdette - ML#1
     Mr. Breland                  Mr. Stockman - Gorgas
     Mr. Cook/Mr. Musick          Mr. Stuckey - Segco
     Mr. Brown - Chetopa          Mr. Bradford
     Mr. McAlpin - ML#1

February 12, 1976

MEMO TO FILE:

RE:  AWIC INSPECTION - MAXINE, MARY LEE #1
     AND SEGCO MINES

Mr. Bob Smith and Joe Meyers of the AWIC Technical Staff made an inspection
to the above mentioned mines on Wednesday, February 4, 1976.  I accompanied
these gentlemen during this inspection tour and as noted below a representa-
tive from each mine was present.

Listed below are items which must be followed up on with corrective measures:

MAXINE MINE - Present:  Smith, Meyers, AWIC; Millican, Hager and Edwards, ABC

1.  We first inspected the refuse pile and both men pushed for early action
    on the back side of this refuse area, as well as several places on the
    river side.  We indicated that we already had preliminary plans and monies
    approved to implement these plans.  They, however, have not been sent a
    copy of this which we must do.

2.  In the wet coal area there were two ponds, one small and one large.  These
    are ponds into which water from the wet coal is drained.  Both small ponds
    have outlets into the river.  These must be closed off.

3.  Coal dripping from the No. 2 belt line near the barge loading area shows
    drainage into the river.  This must be stopped.

4.  The holding pond near the switch station for No. 1 and No. 2 belt lines is
    running clear, however, there is no provision for containing float dust
    which will fall over with the water.

5.  Another item which must be noted is the small stream running down the Maxine
    Hollow, this stream has a low pH and we must look into this with the possi-
    bility of some type treatment in the future.

MARY LEE NO. 1 MINE -  Present:  Smith, Meyers, AWIC; Leonard Wynn and Edwards, ABC

- 2 -

<u>MARY LEE NO. 1 MINE</u> (Continued)

<u>SEGCO MINE</u> - Present:   Smith, Meyers, AWIC; Dennis Callahan, Edwards, ABC

These items were all noted by the AWIC Technical Staff.  I, in turn, would discuss this with our Mining Department and be back in touch, which I did on Monday, February 9, 1976.

MOYER B. EDWARDS

MBE:rl

DRUM003641

February 9, 1976

MR. BRELAND:

RE:   AGENDA FOR POLLUTION DISCUSSION

Items to be discussed relative to pollution control problems at Maxine,
Mary Lee No. 1 and Segco Mines are listed below which were noted by re-
presentatives of the AWIC Technical Staff during their visit to the mine
locations:

MAXINE MINE

1. The refuse area, in particular the back side and those areas
   fronting the river which indicate washing.

2. The pond area near the wet coal pile which has provisions for
   drainage to the river.

3. Small pond near the belt switch station at the wet coal pile
   which has drainage to the river.

4. Drippage from the No. 2 belt near the belt switch station at
   the wet coal pile - this is draining towards the river.

5. Small holding pond near the belt switch station which gets
   drainage from the No. 1 belt line, as well as the wet coal
   pile, at present has an overflow type run-off and no provisions
   for containing float dust.  In addition, someone has placed what
   appears to be drippage from the belt line into the drainage
   course of this pond, effluent side.

6. The stream running behind the preparation plant was discussed
   relative to its low pH.

MARY LEE NO. 1 MINE



2/4/76 — *AW - C Insp'nt*

on February 4 1976

Mr. Bob Smith and Jim Meyers of the AWIC made an inspection trip to our *Maxine* *Mary Lee No 1* and *Sego Mine*

Their findings were as follows —

Maxine — Present, Messrs Smith & Meyers AWIC, _____, Meyer & Edwards ____

at Mr Meyers request

we first inspected the ____ file ____ Mr. Meyers, had observed the ____ from an ____ and now wanted to see it from the ground. They commented on the siltation in the slough from his ____ ____ upper file as well as other areas on this river side. We informed ____ ____ that ____

had been approved for work on the refuse pile, and that we would submit a plan to them prior to starting work —

Maxine —

Items for which action must be taken are as follows —

Refuse Pile — Silt pond —
Wet Coal area — close opening in dirt berm
— eliminate small pool of water
near the barge loading belt —
— Coal spillage from the #2
belt is getting into the run —
Small Settling Pond — put in a T drain instead the
overflow method now used —
this should eliminate float dust —
Small creek behind washer — water very acidic —

M

2/4/74 — May see #1        Smith & Wesson
Lionel Wyn   Edwards

DRUM003646

4/4/16 –

Smith & Myer #W#
Dennis — Edward OK

Segco –

[redacted]

Talk to many people — present plan
& meet with Smith & amig
at Schedule –

DRUM003647

RECEIVED

MAR 1 8 1985

ABC
LEGAL DEPT.

IN THE DIVISION OF HEARINGS AND APPEALS
ALABAMA SURFACE MINING COMMISSION

ALABAMA SURFACE MINING          )
COMMISSION and ANITA P.         )
KELLY, in Her Capacity as       )
an Inspector for the            )
Alabama Surface Mining          )
Commission,                     )
                                )
              Plaintiffs        )
                                )        CASE NO:  R78-82-134S
vs.                             )
                                )
ALABAMA BY-PRODUCTS             )
CORPORATION,                    )
                                )
              Defendant         )

O R D E R

This cause came on to be heard upon the Plaintiffs'
Motion for Reconsideration the 12th day of March, 1985, and there
being present the Plaintiffs by and through their attorney, Norman
P. Snell, Assistant Attorney General, and the Defendant by and
through its attorney, Curtis W. Jones; and based upon the represen-
tations of the Parties, the acceptance of certain Stipulations of
Fact, due consideration having been given and for just cause shown,
the Hearing Officer hereby FINDS:

        1.   That Defendant has undertaken corrective action as
previously ORDERED,

        2.   That Defendant has substantially completed reclamation
as required by State Law and Regulations,

        3.   That there remains remedial corrective action nec-
essary to complete the revegetation phase of reclamation on certain
areas identified by Plaintiffs to the Defendant on the 11th day of
March, 1985, and

        4.   That Defendant's corrective action and reclamation
activities have effectively eliminated any contribution of non-
permissible effluent from the old coal processing waste disposal
area.

Case No: R78-82-134S
Order - Page 2

WHEREFORE, THESE PREMISES CONSIDERED, it is ORDERED,
ADJUDGED and DECREED:

1.   That Defendant shall perform required remedial recla-
mation activities to those certain areas identified by Plaintiffs
on the 11th day of March, 1985, pursuant to State Law and Regulations
said remedial reclamation to be completed no later than the 1st day
of June, 1985.

2.   That the Division of Hearings and Appeals retains and
reserves jurisdiction of the matter of the imposition of assessments,
civil penalties or other sanctions as might be deemed necessary and
appropriate for further hearing, and

3.   That this cause be and is hereby set for further hear-
ing to determine compliance with the provisions of this ORDER and
for the issuance of any such further ORDER as may be deemed appro-
priate at 9:00 A.M. on the 6th day of June, 1985.

DONE and ORDERED this 14th day of March, 1985.

Marlin V. MacLaughlin, Jr.
Chief Hearing Officer

①

X - 7.18° Chtepa Trust

re: Maxine

10:15 AM  M.K  ADEM-

9/2/83  - Horn, B.I Gilbert,
Do's Cook, M. Edwards

F - told me we had to talk about Maxine ...
just Maxine

Hom - Maxine & closed now?

C - Not yet but 15th est.
schedule drawn out, ___ produce coal. store it out
equip -
sell equip, scrap, transfer - pull pumps -

G - Perm. closing?

C - Yes - America Seam - - have plan to go
to Pratt seam. using 6 units out of 10
plans run & abandon area in 6/84 - c̄ jeopardizing
Pratt seam - use new opening all that
was due to problems -
old problics - ___ re AWIC -
Not pumped to creek at Radford c Thomas - then pumped
to old mines.
Refuse saturated i hollow c disposed thre until full
next ... on both c transferred to Hill Top -
Sed by. Prob was red rock after hutan -
Most of problems - at Maxine & Chetopa.
Acc at Maxine - Lick Creek coal at Chetopa
Roof. to our top to Pa., mly c̄ WRI, new A
Tooper

Now addresses Maxine -
working & solve problem

H. You are working & solve prob. if can avoid
waterfall seam.

DRUM003678

②

9/4/3

C. Displays plan of max project showing
   clay - crossover -

H. ask if 2 hour print - ?
   I had one copy of our 2 lines, not best
   one though.

C. Notes what is satisfy ASMC

R. Asks if NPDES have to be gotten ?

H. Thinks so

E. Asks if individual areas has to have permit

H.   oral states -

C. not bonded - due ASMC not permitting, therefore
   had to rescue or no Bond
   Also had zoning problems - Jasper told you or ASK betoff

H. when will reclamation be completed ?

C. Earthwork done - stabilize - central fees

G. Release from monitoring two growing season
   = 6 months

H. Offices permit until growing season
   had related problem been this point ≥ monitor ?

C. should not be one need
   show small pond - & clean out -
   Doesn't pass

IIIII Apply for Diversion ditch permit the

   short break. will conversation about coal mockup in
   general - OSM etc.
   Mr Horn looks up regulation -

(3)

9/2/83

A. Have the SID refusal over
A. Regulation allows to prevent mining over
B. Says Daniel said could apply to that
C. Ask what are quality under a rate structure
E. Explain mtg c AWIC & filter structure to get away from point source.
C. Don't know how this would be handled
G. other minor law filter damage and use
E. Noted Craig in mtg & didn't object to filter dam also Lamstein study shows no apparent impact this was submitted to AWIC —

C. Ask only does this surface at this time
G. Only rely on ADMC for $H_2O$ quality
A. read to make decision on valid reason, must discuss c others — No precedent we understand — but cost vs benefit
C. Note problem o ADMC & Dilber plus problem at mine c can best effort it

Prep p/f =

B. back to same problem — what are we to do here
C. second phase / ADMC — Break rock over 1st phase after conducted would go in
A. How often does high flow exist
C. Don't know —
c will do when other conducted nater spews, sludge

7/29/83  Call to Mr Costi - re: Maxie

Tom ~~has~~ notified me of Groundwater
by Gibson & Steve Jenkins WDEM-
Mr Gibson stated that we would probably
need NPDES permits for rock dam
& diversion ditch.

7/29/83  Attempted to contact Mr Horn of
ADEQ in but he is out of town
until Monday,

DRUM003681

IN THE MATTER OF:    )
             )    OPINION OF THE ALABAMA
             )   SURFACE MINING COMMISSION
ALABAMA BY-PRODUCTS CORPORATION )
G.W. LEWIS AS PRESIDENT,   )
             )
             ) Docket No:  R78-82-134
    RESPONDENT    )

## FINDINGS AND ORDER

Pursuant to the Order of August 3, 1982, the ASMC Technical Staff has reviewed the corrective action plan submitted by Alabama By-Products Corporation. The plan for the reclamation of the old coal processing waste disposal area and the construction of the new coal processing waste disposal area has been approved.

Upon the receipt by ASMC of a bond to insure reclamation of this area according to the applicable standards, in the amount of $69,875.00, and the proper posting of perimeter markers showing the exact confines of the waste disposal area as shown in the approved plans, it will be appropriate for Alabama By-Products Corporation to immediately commence preparation and utilization of this area along with the reclamation of the previous coal processing waste disposal area.  Based upon these findings, which  are mutually agreed upon by the parties, the following Order is issued:

## O R D E R

It is hereby ORDERED that Alabama By-Products Corporation shall immediately post the new coal processing waste disposal area as shown in the approved plan with durable and easily recognized perimeter markers. Alabama By-Products Corporation shall additionally submit to the Alabama Surface Mining Commission a bond for reclamation of this area in the amount of $69,875.00.  This bond shall be released in the procedure as set out in State law for release of reclamation bonds.  In the event the area is permitted under a permanent program permit, the bond shall be 100% released upon the issuance of the appropriate permit.

Upon the posting of perimeter markers and bond, Alabama By-Products Corporation shall immediately commence preparation and utilization of the new area and reclamation of the old area (as shown in red on the attached map).  This Order does not eliminate the requirement of other State laws and permitting procedures regarding utilization of the new area.

If at any time completion of reclamation of the old coal processing waste disposal area (as shown in red on the map attached hereto and made a part hereof), is accomplished to the standards of State law and regulations, including that such reclamation has eliminated any contribution therefrom of non-permissible effluent, if any, then and in that event an appropriate order of the Alabama Surface Mining Commission shall be entered completely releasing Alabama By-Products Corporation

-2-

for any and all further reclamation responsibility of the area shown
in red.

These proceedings specifically remain open for further orders
as may be necessary in the future.

ORDERED BY THE COMMISSION, this the 4th day of February, 1983.

Marlin V. MacLaughlin, Jr.
Chief Hearing Officer



NOTES:
1. POINT
VERTIC
WENT
SELECT
540.0
2. DASHED
APPROX
HEAVY

PHOTOGRAMMETRIC METHODS
IM AERIAL PHOTOGRAPHS
EN DURING THE MONTH OF
UARY, 1979

RECEIVED
SURFACE MINING
COMMISSION

400        0        4C

SCALE
CONTOUR

X - Will - Franklin

4/23/81 copy to:
Jack McDuff

bc:  Mr. Breland/Mr. Burdette
     Mr. Cook/Mr. Musick
     Mr. McAlpin
     Mr. Brown
     Mr. Gilbert
     Mr. Hendrix
     Mr. McDuff, F.

March 27, 1981

Mr. Joe Myers
Supervisor - Mining Activities
Alabama Water Improvement Commission
Public Health Services Building
Montgomery, Alabama  36130

Dear Mr. Myers:

This is to confirm our discussions with you and Mr. Napier on Thursday,
March 19, 1981, relative to our Mary Lee No. 1 and Maxine Mines.  As
stated during this meeting our plans for certain potential problem areas
will, of necessity, be addressed on a phased basis.

We would first recap the Maxine area discussion.  Alabama By-Products
Corporation, as part of its continuing pollution abatement program, has
addressed the large refuse area at Maxine in a phase or stage approach.
As you are aware, the area in question is a drainage from both refuse
disposal and undisturbed ground, all sloping to a common drainage course.
We have, in the past, constructed impoundment structures in tandem for
silt containment, as well as to construct a diversion channel above the
upper portion of the refuse area.  This diversion would prohibit the
waters from the upper undisturbed areas from contact with the disposal
refuse.  Later the diversion channel was extended to segregate additional
runoff from the undisturbed area.

The next phase would consist of extending this diversion channel to the
river thus isolating the large storm runoff from the undisturbed area
west of our refuse disposal area.  We would then construct a diversion
channel on the eastern side of the drainage course to again isolate un-
disturbed runoff water.

As a final step we would then propose to put limestone along the entire
inner side of the lower silt structure coupled with a limestone filter
approximately 25 ft. x 60 ft. for runoff of excess water.

We would plan to have the diversions completed by August 1, 1981 and the
entire project by November 30, 1981.  This, of course, would be contingent
upon weather and labor problems.

DRUM003687

Mr. Myers — 2 — March 27, 1981

Mary Lee No. 1 - As we discussed during this meeting, we would propose
to extend the existing washer discharge pipe to a point across and farther
from the impoundment structure. We would also, as a long term approach,
propose that we be allowed to discharge this water to the "old" underground
works as explained. This would be into the old Gorgas #4 Mine and from
which we now have a pump operating. The disposal area in our proposal con-
sist of approximately 1100 acres and would provide some 20 years storage
for washer sludge. You will note that the area is also a sloping one which
should minimize any stacking effect at the underground discharge point.

This underground disposal will be monitored via Outfall No. 002 and dis-
charge to the existing impoundment would be terminated, except under
emergency conditions.

Sincerely yours,

Moyer B. Edwards
Director Environmental Control

MBE:rl
Attachments

DRUM003688

July 27, 1982

## BRIEF SUMMARY - MAXINE MINE POLLUTION PROBLEMS

This area has been plagued with problems associated with refuse disposal for a number of years. Initially Staff personnel from AWIC approached me as early as 1973-74 relative to siltation on the large refuse area. At that time in cooperation with the Mining Department Engineering Staff, we attempted to use berms and diversions to decrease the velocity of runoff waters from the refuse areas and thus minimize siltation. It was not until later, after it was determined that we should attempt to extract silt which had moved into the Locust Fork, that a dike was built on the edge of the river and these actions were commenced. A second upper dike was built in the slough at this same time. Since that time the upper dike has been increased in height a number of times due to siltation building up behind it.

We were also asked by the Water Improvement Technical Staff if we could do anything to improve the water quality in the Unnamed Tributary in the Maxine Hollow. At that time we chose to use sodium hydroxide since mixing facilities would not be required. This instream treatment continues to this day, however, the instream treatment has ceased from time to time and unfortunately several Notice of Violations has been issued by the OSM or ASMRC personnel due to low pH. That is the basis for the present actions being carried out in that area at this time.

In the meanwhile, prior to these Notice of Violations, during an inspection by the EPA of the large refuse area a pipe was noted to be protruding from the lower dike near the river which constituted an illegal discharge as no permit had been requested nor obtained for a point source at that location. This pipe

DRUM003692

- 2 -

was to be removed and this area would then be an area source rather than a
point source and no permit would be required.  We would have pH problems with
this water though and several approaches were to be taken in this regard.  Di-
version ditches were cut on either side of the slough for rain water runoff, a
limestone filter was placed upon the tower dike.

The OSM and ASMRC inspections came into a reality and with it additional
attention was given the big refuse area, as well as runoff waters.  In addition
more attention was thrust upon the Maxine Hollow drainage ditch.  A Notice of
Violation has been issued on that drainage ditch on several occasions for low
pH.

Since February we have been issued two Notice of Violations by ASMRC for
the Maxine Hollow stream and we have also been informed that both the breaker
rock disposal area, as well as the refuse disposal area can not be permitted.
Representatives of ABC have met with the ASMRC and AWIC Staff on numerous occasions
in an effort to arrive at a workable solution to these problems.

The present status of our discussions is for ABC to present the ASMRC with
our proposed plan of action in regards to the areas in question.

EDWARDS

MBE:rl

DRUM003693

June 3, 1985

**MEMORANDUM**

TO:          MR. SHERIFF

FROM:       JIM DARDEN

SUBJECT:     MAXINE RECLAMATION

Please find attached a copy of the report prepared by Dr. Pettry and myself concerning the Maxine Mine (abandoned area) Reclamation and Water Quality. The report was presented to Mr. Adair and subsequently to the Southern Company, Gulf and Alabama Power Companies on Friday, May 31, 1985. The Southern Company officials concurred with the report and authorized the reclamation.

Please review the report and disseminate to your staff as you see fit. I welcome your comments concerning the approach and look forward to working with Messrs. Musick, Walker, McDuff or others as you deem appropriate.

Mr. Bowers and I will take the lead role in lining up contractors, material, etc., if this meets with your approval. We hope to begin work not later than June 17, 1985.

JWD:rl
Attachment

cc:  Mr. Adair
     Mr. Burdette
     Mr. Musick
     Mr. Walker
     Mr. Bowers
     Mr. McDuff, Jack
     Mr. Curtis Jones/Mr. Fred McDuff
     Mr. Edwards

DRUM003697

# RECLAMATION PLAN FOR PRE-LAW REFUSE DISPOSAL AREA

# OF MAXINE MINE AND IMPACTS ON WATER QUALITY

Prepared By

D.E. Pettry, Ph.D.

J. Darden, Manager Land
& Forestry, ABC

DRUM003698

i

# TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY...................................   ii

INTRODUCTION.......................................   1

NATURE OF THE AREA.................................   2

    Chemical Characteristics.......................   3

DISPOSAL AREA EFFECTS ON WATER QUALITY.............   5

RECLAMATION POTENTIAL..............................   12

PROPOSED RECLAMATION METHODOLOGY...................   15

    Phase I ......................................   15

    Phase II......................................   16

    Phase III.....................................   16

    Phase IV......................................   17

EFFECTS OF RECLAMATION ON WATER QUALITY............   17

CORRECTIVE ACTIONS IN DRAINAGE SYSTEM..............   18

PROPOSED BUDGET....................................   20

REFERENCES CITED...................................   21

DRUM003699

## EXECUTIVE SUMMARY

The 34 acre pre-law spoil disposal area of Maxine mine was evaluated for reclamation and stabilization.  The spoil originated from the Maxine mine coal preparation plant and it had been deposited prior to 1977.  The spoil area is extremely acid, lacks vegetative cover, and is actively eroding.  An extensive gulley system is becoming entrenched in the spoil.

The disposal area has a surface area greater than 1,481,040 square feet for contact with precipitation and subsequent acidification to occur.  The 34 acre watershed comprised by the spoil drains directly into the water emitted from the mine area which requires treatment.  Runoff waters from the spoil have a severe detrimental impact to water quality by making major contributions to acid pH levels, and high levels of sulfate, iron, manganese and suspended solids.  Acidic sediment erodes from the unstabilized spoil directly into the drainage system.

A reclamation plan is proposed to stabilize the spoil area consisting of four phases and based upon knowledge gained in recent work at the site.  The phases are as follows:

    I.  Site preparation and chemical amelioration

   II.  Seedbed preparation, chemical beneficiation and planting

 III.  Planting pine trees

  IV.  Spot treatment of "hot spots" and fertilization

Proposals are also made to ameliorate acidic drainage conditions and improve water quality.

DRUM003700

iii

Chemical and vegetative reclamation of the spoil would
stabilize the area against continued erosion and sediment
emission, prevent acidification of surface waters, and improve
quality of runoff waters and the immediate ecological system.
Reclamation would also have a major aesthetic impact to the
total mine area.

DRUM003701

## INTRODUCTION

Reclamation of post-law mine refuse areas in conjunction with closure of the Maxine underground mine has focused attention on the bare, eroding pre-law disposal area and raised questions concerning its contribution to stream degradation. This report addresses the nature of the spoil materials and the potential impacts to water quality. A reclamation plan is proposed based on knowledge gained in current and past reclamation activities at the Maxine Mine. The site and materials have been studied for the past two years as background for this report.

DRUM003702

## NATURE OF THE AREA

The pre-law mine spoil disposal area comprises an area of about 34 acres. The topography consists of a backslope, flat area, and steeply sloping lower outer face. The spoil materials are dominantly black (10YR 2/1), very dark gray (10YR 3/1), and dark gray (10YR 4/1) partially weathered shale and sandstone coarse fragments with scattered carbonaceous fines. The more highly weathered areas on the flat topography exhibit some yellow-brown and yellowish-gray colors (Photo 1). The coarse fragment (>2 mm) content ranges from about 40 to 70% and varies in size from 2 mm to 6 inches diameter (Photo 2). A large proportion of the material is in the 2 to 10 mm diameter range.

Finer textures of higher clay and silt contents occur in isolated "pockets" on the more level areas where greater weathering and less erosion have occurred. The spoil is somewhat compacted near the surface reflecting previous machine compaction and rainfall impact with no protective vegetative cover. The surface tends to be plated with coarse fragments due to erosion and leaching of fines by water action at the surface. The dark color of the spoil is conducive to build-up of high surface temperatures in the summer months which tend to create droughty conditions.

A few isolated depressions in the flatter topography were observed to have perched water tables during the winter months of 1985 at depths of 15 to 20 inches. The restricted subsurface permeability in these areas is due to the accumulation of fines

DRUM003703

which have filled interstices. Such conditions may represent a temporary stage of weathering and subsurface movement of labile components in the spoil. No water table was detected in auger holes to a depth of 72 inches immediately adjacent to the small (10-15 yards diameter) circular depressions which suggests the wet areas are very local in nature. The free-water represents isolated perching of water near the upper surface of the fill materials that does not extend throughout the matrix of the spoil.

Table 1.  pH and Potential Acidity of Representative Spoil After Oxidation with $H_2O_2$.

| Sample | pH | After $H_2O_2$ Treatment pH | pH |
|---|---|---|---|
| Backslope 0-6" | 3.3 | 2.8 | -0.5 |
| Backslope 6-12" | 3.4 | 2.8 | -0.6 |
| Flat Area 0-6" | 3.3 | 2.6 | -0.7 |
| Flat Area 6-10" | 3.3 | 2.8 | -0.5 |
| Flat Area 10-15" | 3.3 | 2.8 | -0.5 |
| Lower Slope 0-6" | 3.4 | 2.7 | -0.7 |
| Lower Slope 0-4 | 2.3 | 2.0 | -0.3 |
| Lower Slope 4-10 | 2.3 | 2.4 | -0.1 |
| Gulley top, lower slope | 3.5 | 2.5 | -1.0 |
| Gulley side, lower slope | 3.6 | 2.9 | -0.7 |
| Undisturbed soil on slope below fill | 5.8 | 5.3 | -0.5 |

The spoil materials are extremely acid with pH levels ranging from 3.6 to 2.3. The pH levels are similar to values previously obtained for spoil from the Maxine mine deposited in other locations. The differences in pH levels after oxidation with $H_2O_2$ reflect the potential acidity remaining to be

weathered.  The pH levels decreased from 0.1 to 0.7 pH units indicating the weathered spoil exposed to air has undergone extensive weathering.  In comparison, fresh spoil from the Maxine mine had a pH level of 6.3 after 12 hours exposure to the air (previous determination when the mine was operating) and decreased to 2.9 after $H_2O_2$ oxidation.  The extremely low pH levels are toxic to most plants and reflect the oxidation and subsequent hydrolyzing of the pyritic ($FeS_2$) components in the spoil.  The acidification reaction occurring when the spoil, which contains pyrite, is exposed to air and water may be expressed as follows:

$$2FeS_2 + 7\tfrac{1}{2}O_2 + 7H_2O \longrightarrow 2Fe(OH)_3 + 4H_2SO_4$$

The ferrous iron ($Fe^{++}$) is oxidized upon exposure to the air and subsequently hydrolyzed by contact with water to $Fe(OH)_3$ with production of acidity ($H_2SO_4$). Pyrites present in the spoil are usually oxidized naturally by both chemical and biological reactions.  Based on similarly low pH levels with increasing depth, it appears the bulk of the upper spoil area has weathered to a similar degree.  Much of the pyritic materials appear to have weathered to acidic sulfur compounds which results in the very acid status.

DRUM003705

## DISPOSAL AREA EFFECTS ON WATER QUALITY

The pre-law rock disposal area has an effective watershed area of about 34 acres (1,481,040 square feet). Incoming precipitation is drastically affected by contact with the acidic materials by overland flow and seepage through the refuse materials. The precipitation readily reacts with acidic reaction products of the weathered rock waste resulting in immediate acidification of the water coming in contact with the materials. The resultant waters containing sulphuric acid ($H_2SO_4$) attain the extremely acidic pH levels of the refuse before entering the drainage system. The pH levels along the drainage system exiting the area clearly reflect the impact of the refuse area (Figure 1). The effective surface contact area is considerably larger than 34 acres due to entrenched gullies eroded into the refuse and slopes which present greater spoil surface for reaction to occur.

The refuse area is essentially bare of surface vegetation except for scattered small pine trees which have become established naturally (Photo 3). The bare surface presents an area greater than one million square feet for rainfall impact and resultant detachment and transport of acidic sediment from the site. Gullies are actively entrenching into the spoil and developing an extensive gulley system on the steeper, lower slopes towards the base of the fill (Photo 4). The gullies have eroded to depths of 7 feet and greater in places and the erosion will continue unless checked by stabilizing the site (Photos 5, 6).



Figure 1.   pH Levels of Spoil, Natural Wooded Areas and Drainage
Waters Showing Detrimental Impact of Spoil to Water
Quality.

DRUM003707

The acidic sediment has lined the drainage channels draining the Maxine Mine giving rise to further emission.  The runoff waters have considerable velocity during periods of intense rainfall which has immediate effects on the fluctuation in base flow of the drainage system.  The water retention time for incoming precipitation does not appear to be very long in duration based on observations during and following rainfall events.  Relatively little discharge has been observed coming from the disposal area during dry periods.

The baseflow stream chemistry leaving the Maxine Mine area appears to be controlled by the combination of ground water inputs from the Pottsville Formation and runoff and seepage through the acidic rock disposal material and reclaimed areas in the watershed.  Waters leaving the rock disposal area have a profound impact on stream quality as shown in Table 2.  The pH of drainage waters in the natural wooded area adjacent to the disposal site ranges from 5.96 to 6.16 with trace quantities of iron and manganese, and low sulfate contents ranging from 20 to 35 mg/l.  Water at the edge of the natural area and the disposal area reflect the mixing and detrimental impact of the acidic spoil with pH levels decreasing to 4.04 and sulfate contents increasing to 93 mg/l.  Waters draining from the spoil have pH levels ranging from 2.68 to 2.84 and they contain 64-490 mg/l iron, 17-53 mg/l manganese, and 1,768 - 5,983 mg/l sulfate, respectively.  The detrimental impact to stream quality is clearly shown in Table 2, after disposal area drainage had

DRUM003708

8

Table 2.   Chemical Characteristics of Surface Discharge Waters Collected
in Natural Wooded Areas Adjacent to the Disposal Area and
Within the Disposal Area on April 14, 1984.[†]

| Location | pH | Total Iron | Total Manganese | Total Suspended[*] Solids | Sulfate |
|---|---|---|---|---|---|
| Natural Area | 5.96 | 0.02 | <0.1 | 16 | 35 |
| Natural Area | 5.98 | <0.01 | <0.1 | 49 | 22 |
| Natural Area | 6.16 | <0.01 | <0.1 | 12 | 20 |
| Edge of Natural Area – and Disposal Site | 4.04 | 0.04 | 1.3 | 1 | 93 |
| Disposal Site | 2.68 | 490 | 53 | 102 | 5,983 |
| Disposal Site | 2.76 | 92 | 20 | 3 | 2,293 |
| Disposal Site | 2.73 | 410 | 22 | 1 | 4,129 |
| Disposal Site | 2.84 | 64 | 17 | 7 | 1,768 |
| Disposal Site | 2.81 | 78 | 18 | 6 | 2,037 |
| Bottom Disposal Site – Entering Drain | 2.81 | 78 | 14 | 56 | 1,599 |

[*]  HCl was added to redissolve Fe that had precipitated in collection
bottles, which affects suspended solids data.

[†]  Analyzed by ABC Laboratory.

DRUM003709

entered the system the pH level was 2.81 with higher iron and manganese levels and 1,599 mg/l sulfate. For comparative purposes, researchers (Bieseker and George, 1966) reported that surface runoff waters from nine mines in Appalachia had a pH range of 2.5 to 7.8 with the majority occurring in the 2.5 to 3.0 range. Soluble iron concentrations ranged from 2.8 to 217 ppm, and soluble manganese concentrations varied from 2.2 to 9 ppm.

The surface waters in the natural wooded areas appear to have pH levels of 5.8 to 6.1 with very low levels of iron, manganese and sulfate. The natural precipitation may be somewhat acidic (<pH7), and the precipitation throughfall and interaction with vegetation results in some acidification of the poorly buffered stream during runoff periods. The soils adjoining the disposal area were mapped as Montevallo-Nauvoo Association, Steep (Spivey, 1982). They developed in sandstone and shale and are strongly to very strongly acid. Hence, the acid soils also contribute to the acidic nature of the natural surface runoff. Direct emission to the drainage system from exposed Pottsville Formation outcrops in the watershed may also contribute to the acidity of surface drainage. Recent research on acidification of streams in Pennsylvania (Sharpe et al., 1984) indicated very acidic water emerged naturally from the Pottsville rock formations resulting in low pH levels. It appears likely that surface drainage in the Maxine area before disturbance due to mining activities may have had pH levels of

DRUM003710

5.5 to 6, with very low levels of iron, manganese and relative-
ly low sulfate levels.

Without corrective stabilization, it appears that acce-
lerated erosion and gulley development will continue to erode
into the refuse material cutting deeper gullies with the "nick-
point" moving progressively up slope. Such actions increase the
surface area for acidification reactions to occur between the
spoil and precipitation, and increase the sediment detachment
and emission. Under these conditions, acidity, iron, manganese,
sulfate and sediment emissions of a severe impact nature will
continue for the foreseeable future and require continued water
treatment.

Although non-point seepage and emission from the spoil is
evident in places, most of the discharge from the refuse area
occurs along well-defined channels. As shown in Photo 8, a
defined channel at the bottom of the spoil directs runoff and
seepage from the site. Much of the channelized flow exits
through the culvert shown in Photo 9 into the drainage of the
natural wooded area. However, a large trash dump extends along
the outer slope and lies in the path of the outflowing drainage
(Photo 10). The trash is located directly in the path of the
drainage waters from the culvert. The solid waste comprises a
considerable volume and has a heterogeneous composition of
metals, plastics, paper, chemicals and containers of unknown
content (Photo 10). Contact of the exiting acidic waters with
the trash may result in numerous compounds detrimental to

water quality, including iron and other metallic reaction pro-
ducts and possibly chlorinated hydrocarbons.  The trash repre-
sents a concentrated reservoir of metallic components for entry
into the drainage water and subsequent degradation of water
quality.  Trash was being deposited at the dump as recently as
April, 1985, apparently from residences in the vicinity.

DRUM003712

## RECLAMATION POTENTIAL

Presently, the spoil area represents a very harsh environment for vegetative establishment due to the extremely aciditic conditions which are toxic to most plants, low fertility and hot, droughty nature. However, scattered pine have become established, primarily on the lower slopes where pH levels are slightly higher due to erosion of the finer particles (Photo 4). Although the pine trees appear to be surviving, they have not curtailed the erosion which is actively creating gullies in their presence. A marked absence of other plant types is a conspicuous feature of the site. The black spoil absorbs heat during summer months and experiences a significant heat build-up which is harmful to plants and increases water evaporative losses.

Chemical analysis indicates the spoil contains more than 30 m.e./100g acidity accompanied by elevated levels of aluminum and low contents of calcium, magnesium, potassium and phosphorus. Clay and silt sized particle contents are higher in the flatter topographic positions where less erosion has occurred. The finer sized particles have greater water-holding capacities than the coarser particles as well as greater cation exchange capacities. It is prudent to retain the finer sized particles from losses due to erosion. Erosion is a significant problem in reclaiming mine areas (Rubio-Montoya, 1984), and erosion control is critical to retain fines and reduce sediment emission.

DRUM003713

Recent literature (Draper, 1984) indicates successful direct vegetation of acidic deep coal mine refuse was accomplished on a demonstration basis for the Warwick mine coal preparation refuse disposal site in Greene County, Pennsylvania. Current reclamation efforts underway for the Maxine mine washing plant and barge loading area are utilizing mine spoil as an alternative soil material. The knowledge gained in the reclamation efforts at Maxine serve as the foundation for evaluation of the Maxine spoil for establishment of permanent vegetative cover. Pot studies of the spoil and current efforts indicate the feasibility of ameliorating the spoil materials chemically and adapting a prescription vegetative reclamation effort.

When the reclamation program was installed during the late summer and fall of 1984 at the lower Maxine area (washer plant area) a very small plot was prepared in the pre-law area for evaluation purposes by ABC personnel. Preparation of the area and application of amendments and seeding methods only approximated the reclamation efforts at the bottom site. Evaluations of the plot in April, 1985 indicated a partial stand of fescue had survived the winter and was growing (Photo 11). The surviving fescue was growing in depressed rills created by discing and little was noted between rills. The pH levels in the plot were very erratic and ranged from 3.2 to 6.5 indicating irregular distribution and incorporation of $Ca(OH)_2$ and lime. The lime and plant nutrients had tended to accumulate in the rills with finer particles of spoil. Moisture conditions were also more

favorable in the rills.  The fescue had a good root system as shown in Photo 12, with roots penetrating the spoil to the depth of Ca(OH)$_2$ treatment.  The grass exhibited no toxicity symptoms and was actively growing.  The roots of the fescue stabilized the spoil where they were growing.  The germination, winter-survival and growth characteristics of the fescue grass in the partially treated spoil attests to the feasibility of direct vegetative establishment in the material.  Pot tests with the spoil material indicate vegetation can be grown when it is properly beneficiated.  The establishment and survival of pine trees by natural invasion of the spoil area also reflects the potential suitability of the material.

## PROPOSED RECLAMATION METHODOLOGY

Based upon analyses and evaluation of the spoil materials, the following reclamation methodology and temporal sequence is recommended for consideration. Methodology draws heavily upon practices previously developed for reclamation areas of Maxine.

| PHASE | I | II | III | IV |
|---|---|---|---|---|
| ACTIVITY | Site Preparation<br>Chemical Amelioration | Prepare Seedbed<br>Add Amendments<br>Plant & Mulch | Plant Pine<br>Trees | Treat<br>Hot Spots |
| MONTH | June-July-August | September | February | March-April |

### PHASE I

The area should be disced perpendicular to the slope on the contour to an effective depth of 6-8 inches. Gullies need to be filled with as little disturbance as possible to the site. It may be desirable to haul in material to fill the larger gullies with consideration given to stone and soil materials. Smaller gullies can be smoothed by pushing material with a blade. Following site preparation, three tons per acre of Ca(OH) should be applied and disced in perpendicular to the slope, followed by another application of 2 tons per acre of $Ca(OH)_2$. Small terraces should be constructed on the sloping areas with a fire plow to reduce overland flow velocity. The area should

DRUM003716

then be mulched with hay (3000 lbs/acre). The mulch will
serve as a retardant to soil erosion. The addition of hay
also serves to increase the number of microorganisms, enzyme
activity and fungal genera in spoil materials as well as pro-
vide an available carbon source and aid in moisture retention
(Lindemann et al., 1984). The $Ca(OH)_2$ should react for
several weeks before commencing Phase II.

### PHASE II

Apply three tons per acre dolomitic lime and one ton per
acre of basic slag, and disc in perpendicular to the slope.
Apply one ton per acre dolomitic lime, one ton basic slag, and
500 pounds per acre 13-13-13 fertilizer and disc in perpendi-
cular to the slope.  Broadcast 60 pounds per acre KY 131
fescue and 15 pounds per acre Kenland red clover (inoculated)
by applying half of the seeds in perpendicular directions, and
harrow or drag lightly.  Mulch with 3000-4000 pounds per acre
hay.

### PHASE III

Plant pine trees at the rate of 700 to 900 trees per acre
during the optimum planting season.  Planting the trees at an
early stage of the reclamation will permit the root systems to
develop simultaneously in the prepared seedbed and minimize
later competition.  The grass should form a protective sod to
stabilize the site against erosion and retain the weathered
fine particles in-situ.  The grass will also serve as a

protective cover to buffer the site against extreme heat build-up in summer and frost-heave in winter.

## PHASE IV

The occurrence of any "hot spots" of low pH which affect vegetative growth should be treated with appropriate amounts of dolomitic lime and/or basic slag to correct the problem. These areas may need some overseeding. The site should be fertilized with 300 pounds per acre of 13-13-13 fertilizer.

Close on-site supervision of the reclamation activities is critical as well as proper timing of each phase of the operation.

### EFFECTS OF RECLAMATION ON WATER QUALITY

The impact of reclamation of the 34 acre spoil area watershed cannot be predetermined with certainty. Stabilizing the site with permanent vegetative cover will dramatically reduce the emission of sediment which contains a large proportion of fine particles that are active chemically. Neutralization of the surface six inches with $Ca(OH)_2$, lime, and basic slag will result in drastic curtailment of the surface acidification reaction on the 1,481,040 square foot area with resultant surface runoff waters leaving the site in a neutral to slightly alkaline condition. The immediate effect of this neutral flow to the drainage at Maxine should serve to dilute and improve the pH levels and lower the sulfate, iron and manganese levels.

DRUM003718

In view of the current treatment of water leaving the Maxine mine site and the prospect of continued future treatment to raise pH levels, the proposed improved quality due to reclamation seems of paramount importance both economically and ecologically.

Recent research findings (Brown et al., 1984) reported water quality of revegetated non-topsoiled lignite spoils approached that of undisturbed soils after 15 months. The pH and iron levels soon approached that of the undisturbed area.

## CORRECTIVE ACTIONS IN DRAINAGE SYSTEM

Prompt corrective actions to the immediate drainage system emitting from the pre-law spoil area are deemed prudent. It is recommended that he trash dump in the interception area of exiting waters be closed immediately to further dumping. The trash located in the drainage way should be removed, and the area should be treated with Ca(OH)$_2$. Trash located above the direct contact area with drainage waters should be treated with Ca(OH)$_2$, covered with at least 12-18 inches of topsoil and vegetated. It may be as economical and feasible to haul all the refuse off the site to a proper landfill for disposal rather than plate it.

Much of the upper drainage system immediately below the spoil area contains acidic spoil as shown in Photo 9. This acid material serves as a constant source of acidification to

DRUM003719

the drainage waters and source of sulfate, iron, and manganese. Fines from the spoil sediment (clay and silt) have tended to armour (coat) sandstone and shale coarse fragments which then serve as a constant source of acid in the drainage waters. Immediately below the drainage culvert in Photo 9, the channel bottom is coated with red iron oxides for some distance where the iron enriched leachate waters have reacted with oxygen and precipitated the iron to an insoluble form.  It appears that the red iron oxide coating forms during periods of reduced flow, and the material is periodically purged during peak flows when the water contains a high sediment load.

It is recommended that the acid sediment deposited upstream of the culvert be removed by backhoe or front-end loader and a neutralization interception system be constructed of $Ca(OH)_2$, lime, and limestone.  A similar intercept should be prepared at the other main outflow.  It is further suggested that the drain at the bottom of the spoil as shown in Photo 8 be lined with limestone coarse fragments to reduce flow velocity and neutralize acidity.

DRUM003720

20

## PROPOSED BUDGET

| PHASE | | TIMEFRAME | COST* |
|---|---|---|---|
| I | SITE PREPARATION - Disc, fill gullies, cut groves, apply Ca(OH)2 at 3 T/Ac. and disc, apply Ca(OH)2 at 2 T/Ac. and mulch with 3000 to 3500 lbs. hay/acre. Let react 6 weeks to 2 months. | Begin June-July 1985 | $ 29,340 |
| II | AMELIORATION AND PLANTING - Apply 3 T/Ac. dolomitic lime and 1 T/Ac. basic slag and disc. Apply 1 T/Ac. dolomitic lime and 1 ton/Ac. basic slag and 500 lbs./Ac. 13-13-13 fertilizer and disc in. Broadcast 60 lbs./Ac. KY 131 Fescue and 15 lbs./Ac. Kenland Red Clover. Harrow or drag lightly and mulch with 3000 to 4000 lbs. hay/acre. | September 1985 | 25,500 |
| III | Plant pine trees at rate 700 to 900 trees per acre. | January - February 1986 | 2,500 |
| IV | Treat and overseed "Hot Spots," and fertilizer with 300 lbs./Ac. 13-13-13 fertilizer. | March - April 1986 | 1,700 |
| | WATER QUALITY OPERATIONS | | |
| | Remove and clean up dump. Construct drainage intercept and neutralization systems (2) at primary exit drains. Line bottom channel with limestone riprap. (Summer activity with Phase I) | June 1985 | 5,200 |
| | | | $ 64,240 |
| | 15% Contingency | | 9,600 |
| | ABC Land Mgt. Time | | 10,000 |
| | Consulting Fees | | 10,000 |
| | | TOTAL | $ 93,840 |

*Costs include labor, materials and equipment

DRUM003721

## REFERENCES CITED

Bieseker, J.E. and J.R. George.  1966.  Stream quality in Appalachia as related to coal-mine drainage. U.S. Geol. Surv. Circular 526, Washington, D.C., 27p.

Brown, K.W., J.C. Thomas, and L.E. Davel, Jr. 1984. Chemical characteristics of surface runoff from soils and revegetated lignite mine spoils.  J. Soil and Water Conservation 39:146-148.

Draper, J.C., R.E. Pepperman, and R.J. Houston.  1984. Successful Direct Vegetation of Acidic Deep Coal Mine Refuse. Mining Engineering 1186, August, 1984.

Lindemann, W.C., D.L. Lindsey, and P.R. Fresquez.  1984. Amendment of mine spoil to increase the number and activity of microorganisms.  Soil Sci. Soc. Amer. J. 48:574-577.

Rubio-Montoya, D., and K.W. Brown.  1984.  Erodability of strip-mine spoils.  Soil Science 138:365-373.

Sharpe, W.E., D.R. DeWalle, R.T. Leibfried, R.S. Dinicola, W.G. Kimmel, and L.S. Sherwin. 1984. Causes of acidification of four streams on Laurel Hill in Southwestern Pennsylvania. J. Environ. Qual. 13:619-631.

Spivey, L.D., Jr.  1982.  Soil Survey of Jefferson County, Alabama.  U.S. Department of Agriculture, Soil Conservation Service.  U.S. Govt. Printing Office, Washington, D.C. 140p. and maps.

DRUM003722



Photo 1.   View of the Flatter Topographic Part of Refuse
           Area Showing Microrelief and Surface Flow Patterns.
           The Area Is Bare of Vegetation Except For Volunteer
           Pine Trees.  Note Coarse Fragment Surface Pavement
           and Brighter Colored Weathered Coarse Fragments.

DRUM003723



Photo 2.   Shallow Excavation Into Spoil Showing the Mixture
of Fines and Coarse Fragments.   A Large Proportion
of Coarse Fragments Are Less Than Two Inches
Diameter.



Photo 3.  View of Middle Slope Position of Rock Disposal Area
Showing Developing Gullies.  Surface is Bare of
Vegetation Except for Few Isolated Pine Trees That
Have Invaded the Site Naturally.  The Gulley System
is Progressively Moving Upslope.

DRUM003725



Photo 4.    Sideview of Midslope Position Showing Extensive
Gulley Development Which is Progressively Eroding
Deeper and Moving Upslope.  Sediment from the
Gullies Enters the Drainage System.

DRUM003726



Photo 5.  Large Gulley on Lower Slope Position Which Has
Eroded to Depths of 7 Feet.  Note Uniformity of
Material in the Banks of the Gulley.  Finer
Particles Have Been detached and Transported as
Sediment to the Drainage System.

DRUM003727



Photo 6.   Close-up View of Gulley on Lower Slope Showing the
Concentration of Coarse Fragments Remaining After
Finer Particles Have Eroded Away and Entered
Drainage System.  The Largest Coarse Fragments are
About Seven Inches in Diameter.  Note Iron and
Sulfur Compounds Coating Rocks.

DRUM003728



Photo 7.   View of Bottom Edge of Rock Disposal Area Showing
           Large Gulley.   Inside of Gulley Suggests Previous
           Combustion Activity.   Note Thin Soil-Spoil Mixture
           and Pine Trees.

DRUM003729



Photo 8.   Bottom Edge of Disposal Area Showing Gulley Outlets
and Drainage Channel that Collects Surface Runoff
From Spoil and Seepage.  Note Lining of Channel with
Acidic Spoil Material and Iron Oxide Coatings.



Photo 9.   Drainage Channel Immediately Downslope From Disposal
Area Showing Culvert Passing Under Road Constructed
of Old Spoil and "Red Dog."  Note Accumulation of
Acidic Spoil on Bottom of Channel Which Will Move
Downslope Into Drainage System.  Much of the Surface
Flow from the Disposal Area Exits Through This
Culvert.

DRUM003731



Photo 10. Trash Dump Located Directly in the Path of Water
Draining the Disposal Area.  Trash Covers Downslope
Exit of Culvert.  Note Diversity of the Trash Which
Serves to Add to Degradation of Stream Quality.
Channel Exiting Bottom of Dump is Coated with Red
Iron Oxide.



Photo 11. View of Small Plot Located on Disposal Material
Showing Fescue Growth in April, 1985.  Note Concen-
tration of Grass in the Rills.  The Area Was Planted
in Early Fall 1984 in Partially Amelioriated
Material.



Photo 12.  Close-up View of Fescue Clump in Experimental Plot
in Spoil.  The Fibrous Root System Had Developed
to Depth of Ca(OH)$_2$ Incorporation.  Note Stabili-
zation of Spoil Material by Fibrous Root System
Which Would Prevent Erosion.

DRUM003734

*Maxine*

# AGREEMENT FOR PURCHASE OF COAL

## BETWEEN

# ALABAMA BY-PRODUCTS CORPORATION

## AND

# ALABAMA POWER COMPANY,
# GEORGIA POWER COMPANY,
# AND GULF POWER COMPANY.

DRUM 003785

# CONTENTS

*Page*

Opening of Mine .......................................................................... 1-3

Term and Cancellation ............................................................... 3-5

Quantity of Coal ........................................................................ 5-6

Quality of Coal .......................................................................... 6-9

Size, Delivery, Shipment and Weights ...................................... 9-10

Force Majeure ............................................................................ 10

Price ........................................................................................... 10

    Amortization and Depreciation ............................................ 10-11

    Depletion ............................................................................ 11

    Royalties ............................................................................. 11

    Operating Cost .................................................................... 11

        Labor Cost .................................................................. 11

            Supervisory and Clerical Salaries ...................... 11

            Mine Labor ......................................................... 11-12

        Employee Benefits Charge ........................................... 12

        Materials and Supplies ................................................ 12

        Power .......................................................................... 12

        Insurance .................................................................... 12-13

        Maintenance and Repairs ............................................ 13

        Miscellaneous Mining Expense ................................... 13

    Taxes .................................................................................. 13

Claims for Compensation, Personal Injury and Property Damage ...... 13

Interest ....................................................................................... 14

Administrative Charge ............................................................... 14

Salvage ...................................................................................... 14-15

DRUM 003786

THIS AGREEMENT made and entered into as of the 19th day of August, 1952, by and between ALABAMA BY-PROD-UCTS CORPORATION, a corporation organized and existing under and by virtue of the laws of Delaware (herein called Seller) as party of the first part, and ALABAMA POWER COMPANY, a corporation organized and existing under and by virtue of the laws of Alabama, GEORGIA POWER COMPANY, a corporation organized and existing under and by virtue of the laws of Georgia and GULF POWER COMPANY, a corporation organized and existing under and by virtue of the laws of Maine, as parties of the second part (said parties of second part herein collectively called Buyer);

## WITNESSETH

That Whereas, the Seller is the owner of certain coal lands located in the Prescott Creek area in Jefferson and Walker Counties, Alabama, estimated to contain on a recoverable basis approximately eighteen million (18,000,000) net tons of coal in the American seam; and

Whereas, the Seller proposes to open, develop and construct a coal mine known as Maxine (hereinafter sometimes referred to as "A" mine) in such Prescott Creek area and to mine coal from the American seam thereon for sale to Buyer upon the terms and conditions hereinafter set out; and

Whereas, the Seller has heretofore given to the Buyer all of its information covering the geological data of the area where said mine is proposed to be opened, including information as to drillings, cores, analyses (including those made by independent and impartial laboratories), cover, anticipated roof and floor conditions, and Buyer is fully familiar with such data; and

Whereas, Buyer is familiar with the operation of coal mines similar to that to be opened hereunder and with the structures, improvements, railroads, facilities, developments, material, equipment and supplies necessary for the construction, operation and maintenance of such a mine; and

Whereas, the Buyer desires to purchase certain coal thus mined by the Seller for use in certain steam-electric generating plants owned and operated by Alabama Power Company, Georgia Power Company or Gulf Power Company, upon the terms and conditions hereinafter set out:

NOW, THEREFORE, IT IS HEREBY MUTUALLY AGREED AS FOLLOWS:

1. Opening and Construction of Mine

The Seller shall open, construct, develop, equip and operate a coal mine and appurtenances upon Seller's said lands in the Prescott Creek area, being the lands described in Exhibit B hereof hereinafter referred to, at a location to be mutually agreed upon by Seller and Buyer, such mine being herein referred to as "A"

DRUM 003787

expenditure shall be considered for all purposes hereunder to have been approved by Buyer. If Seller fails to request approval of Buyer of any expenditure for which Buyer's approval is required hereunder, or if Buyer objects to or disapproves or fails or refuses to approve any expenditure, or whenever the reasonableness of the overall inventory of supplies or of any individual item or items thereof is in dispute between the parties, the reasonableness of such expenditure, or of such overall inventory or item or items of supply, shall be promptly submitted to and be determined by arbitration as provided for herein.

No capital expenditure or item of supply (except as otherwise specifically provided for in this agreement) shall be included in net investment or cost of any kind hereunder (1) where approval of Buyer thereto is required hereunder, unless such expenditure shall have been approved by Buyer, or shall have been submitted to arbitration and determined by the arbitrators not to be unreasonable, or (2) where approval of Buyer thereto is not required but Buyer has the right to object thereto hereunder, if such expenditure, overall supply inventory or item or items of supply shall have been objected to by Buyer as being unreasonable and, if Seller shall have contested that the same is unreasonable and it shall have been determined by arbitration to be unreasonable. Any changes, additions or modifications in or to said mine and its appurtenances, however, which may be required by or under any law, governmental regulation, ordinance or order, or any final judicial decision, or union regulation or requirement of general application to coal mines in Jefferson and Walker Counties, Alabama, whether related to safety or health or otherwise, shall be made whether or not approved by Buyer and shall be included in net investment or cost.

b. The Seller shall undertake to provide or to arrange for the furnishing of railroad facilities (satisfactory to and approved by Buyer) to the "A" mine site, any cost thereof to Seller to be included in net investment, and the Buyer shall provide electric power lines to such site as provided in Section 12 of this agreement.

c. All work of construction and mining and preparation of coal shall be done by Seller efficiently and in accordance with good mining practice.

2. Term and Cancellation
The term of this agreement shall be for a period commencing July 1, 1952, and ending fifteen years from the date on which "A" mine is first in normal operation, or on June 30, 1969, or when the recoverable coal is earlier worked out, whichever first occurs. For the purpose of this agreement "A" mine shall be considered in normal operation on the first day of the month following the first month in which "A" mine attains a production of 49,000 net tons

3

DRUM 003788

shall have the right or option, upon six (6) months' notice to Seller prior to the expiration of such term, to renew or extend this agreement as to all of its terms and conditions for a further period of ten (10) years or until the recoverable coal is earlier mined or worked out.

c. Upon the expiration of the term of this agreement, or, if this agreement is renewed or extended, upon the expiration of such renewal or extension, Buyer shall pay Seller the then un-amortized development cost and the depreciated cost of the structures, improvements, railroads, or railroad materials, facilities, material, equipment and supplies theretofore purchased by Seller for use at "A" mine. Said structures, improvements, railroads, or railroad materials, facilities, material, equipment and supplies shall thereupon become the property of Buyer and Buyer shall have the right at its own risk to maintain the same on Seller's property for nine months from the date of such payment and may remove same within said nine months, but if the Buyer does not remove the same, or any part thereof from Seller's property within said nine months, then such of same as is not removed within said period shall become Seller's property.

## 3. Quantity of Coal to be Purchased

During the development period of the mine and until the mine is producing a minimum of 49,000 tons of coal per month, all coal produced at such mine shall be sold by Seller to Buyer and shall be purchased by Buyer from Seller, except as hereinafter provided. After "A" mine attains a production of 49,000 net tons of coal per month, Buyer shall purchase from Seller, and Seller shall sell to Buyer, a minimum of 49,000 tons of coal per month from such mine, except as hereinafter provided. At any time after such mine is producing a minimum of 49,000 tons of coal per month, or such lesser amount as Buyer shall have elected to take under its option to reduce tonnage, Buyer shall have the right to require Seller to increase the production of coal from such mine and to sell to Buyer hereunder additional coal from such mine in any quantities above 49,000 tons per month (or above such lesser amount) and up to the maximum reasonably available productive capacity of such mine consistent with the proper development of the mine and with the structures, improvements, railroads, or railroad materials, facilities, developments, material, equipment and supplies from time to time approved by Buyer for the construction, operation, development and maintenance of "A" mine and appurtenances, provided Buyer gives Seller twelve (12) months' written notice of its desire to increase such tonnage, and provided also that such increased production is not prevented by reason of governmental laws, regulations and orders, unavailability of labor, supplies, material or equipment, or other contingencies beyond the reasonable control of the Seller. If at any time during the original term of this agreement, or the term

5

ciently, or that Buyer, if the reasonable necessity thereof is dis-
puted by Buyer, shall approve for such installation such equip-
ment, machinery and facilities as may be determined by arbitra-
tion, as provided for herein, to be reasonably necessary for such
purpose). The amount of such BTU content during such test
period shall be established by tests made jointly by Buyer and
Seller, or, if not made jointly, acceptable to the party not making
the tests. The average BTU content of such coal produced during
such test period, on said delivered basis adjusted to said moisture
basis, shall thereafter be the standard BTU content for the pur-
poses of this agreement, except that if such average BTU content
is less than 12,750 BTU's said standard shall be 12,750 BTU's, on
said above basis, or if such average BTU content is more than
12,900 BTU's said standard shall be 12,900 BTU's, on said above
basis. Any question as to the BTU content of the coal, or as to
efficient operation, or use of proper methods, machinery, equip-
ment or facilities, during such test period which cannot be agreed
upon by the parties shall be determined by arbitration as provided
for herein.

In the event the average annual BTU content of such coal (as
established by tests made jointly by Buyer and Seller, or, if not
made jointly, acceptable to the party not making the tests) for any
calendar year under this agreement subsequent to the expiration
of such test period, is less than the standard BTU content on a
delivered (at Buyer's generating plants) BTU basis adjusted to
such moisture basis, the Seller shall, provided that Buyer shall
have approved for installation at "A" mine all equipment, ma-
chinery and facilities reasonably considered by Seller necessary to
prepare or dewater the coal in order to meet the said standard (or
provided that Buyer, if the reasonable necessity thereof is disputed
by Buyer, shall have approved for such installation such equip-
ment, machinery and facilities as may be determined by arbitra-
tion, as provided for herein, to be reasonably necessary for such
purpose), adjust the price for the coal sold and delivered to Buyer
hereunder during any such subsequent calendar year pro rata on
the basis of the actual average annual delivered BTU content per
pound of said coal adjusted to such moisture basis; Seller shall
thereupon have the option to continue to supply coal to Buyer
hereunder at such adjusted price, subject to year-end adjustment
on said actual average annual BTU content, or, within one cal-
endar year thereafter, to cancel this agreement upon six months'
written notice; such right to cancel this agreement shall, however,
be suspended and of no effect during any period that Buyer may
waive the price adjustment for the lowered BTU content of such
coal and shall pay the full price therefor.

In the event that the average annual BTU content of such
coal (as established by tests as hereinabove provided) for any cal-

DRUM 003790

sample theretofore made, such sample shall be jointly submitted by the parties to Southern Testing Laboratories, or to some other mutually acceptable independent chemist, for testing; the results of such test shall be final and binding on the parties and the cost of such independent test shall be paid jointly by the parties.

## 5. Size, Delivery, Shipment and Weights

The size of the coal to be delivered hereunder by the Seller to the Buyer shall be $1\frac{1}{2}'' \times 0''$, or in a range of $1\frac{1}{2}'' \times 0''$ to $3'' \times 0''$, as designated from time to time by Buyer, or as otherwise mutually agreed upon. Shipments of coal shall be made in approximately equal monthly and daily quantities (on the basis of five working days per week, holidays excepted), so as to assure minimum operating cost, but the Buyer shall have the privilege from time to time of designating the monthly and daily quantities provided that Seller shall not be required, except as otherwise specified herein, to make deliveries more than ten per cent in excess of or less than normal quantities without its consent, and further provided, that the Buyer shall in any event purchase and pay in each calendar year for the minimum annual tonnage as provided in Section 3 hereof, as modified by the provisions of Sections 4 and 6 hereof.

All coal shall be delivered and title thereto shall pass to the Buyer at the mine when loaded for transportation to destination and shall be shipped from the mine to such steam-electric generating plant or plants as may from time to time be designated by Buyer. Shipment shall be by any method of transportation designated by Buyer, consistent with the transportation means available, and Buyer shall have the right to determine and designate transportation routing. For the purpose of determining the payments to be made per ton for coal sold hereunder, destination weights, that is, weights of coal at the steam-electric generating plant where destined for use, or when scales for weighing are not available at any such plant the weight at the point nearest such plant where scales are available, shall govern, except as to the weight of coal lost in transit. Weights shall be determined on scales under the supervision of the Southern Weighing and Inspection Bureau, or if such scales are not available the scaling and weighing methods shall be subject to joint supervision by Buyer and Seller.

Buyer shall prior to unloading inspect all shipments of coal received hereunder to determine whether or not there has been any loss of coal in transit. Buyer shall likewise promptly notify Seller of any shipments not received. In the event any such loss or any failure to receive a shipment is indicated, Buyer shall promptly take steps to protect any claim against the carrier and shall notify Seller of the loss. Seller agrees to and shall have full authority for

9

DRUM 003791

basis. For the purpose of this provision the life of "A" mine shall be estimated at 25 years from the date the mine is first placed in normal operation.

Depreciation expense shall be based on the original cost of the depreciable property and the estimated useful life of such property and shall be computed on a straight line basis at annual rates to be mutually agreed upon, and applied to original cost until fully depreciated or removed from service. There shall be no depreciation of supplies in stock.

Such amortization and depreciation shall be included in cost through appropriate monthly charges.

b. **Depletion:** A charge shall be made for depletion at the rate of two cents (2¢) per net ton for all coal produced at "A" mine which is mined from said lands now owned by Seller. The rate of depletion applicable to coal mined from lands hereafter acquired by Seller shall be based on the cost of such lands as follows: The purchase price, which must be first approved by Buyer, shall be divided by the reasonable estimated amount of recoverable coal in the seam to be mined in the acquired lands.

c. **Royalties:** In the event any coal is mined and delivered to Buyer from lands which may hereafter be leased by Seller from others after the approval of the Buyer, the actual rate of royalty paid by Seller shall be applicable, unless said royalty payment per ton of coal also covers the purchase of additional coal for future mining, in which event only the applicable proportion of said royalty payments shall apply to coal sold to Buyer.

d. **Operating Cost:**

(1) **Labor Cost**

(a) **Supervisory and Clerical Salaries:** The cost not included in the mine labor, of salaries and other compensation of all employees engaged exclusively in the mining or preparation or servicing of coal produced at "A" mine, or whose duties relate exclusively thereto, including but not limited to salaries of mine superintendents and assistants, safety, electrical, construction and mining engineers, electricians, mine foremen and bosses, chief clerks and clerks in mine offices, watchmen, weighmen, chemists, scale inspectors, draftsmen and auditors, but excluding all such salaries, compensation and expenses which are properly chargeable to Seller's administrative and general expenses, and also excluding Seller's selling, advertising and other sales expenses. By mutual agreement salaries of certain other personnel may be prorated between "A" mine and other mines of the Seller, in accordance with the respective services of such personnel to the various mines.

(b) **Mine Labor:** The cost of wages and other compensation

11

DRUM 003792

addition to customary catastrophe insurance, Seller shall, if requested by Buyer so to do, carry insurance protecting Seller and Buyer from any loss or damage to any facilities, material or equipment in the mine resulting from fire, explosion or any catastrophe, including use and occupancy insurance covering loss due to shut down of mine as a result of any catastrophe. The cost of any premium therefor shall be included as a cost item herein. The reasonableness of any insurance carried by Seller substantially different in type, kind or greater in amount to that normally carried on similar operations and properties by companies engaged in similar businesses in Jefferson County, Alabama, shall upon objection by Buyer be submitted to arbitration as provided herein and, if determined by the arbitrators to be unreasonable, the cost thereof attributable to such unreasonable excess shall not thereafter be charged as an item of cost hereunder.

(6) **Maintenance and Repairs:** Shall include all other cost for labor, materials and supplies necessary to keep the plant and property at or used in connection with "A" mine in first class condition, such cost to be handled in accordance with generally accepted accounting principles.

(7) **Miscellaneous Mining Expense:** Includes all costs which directly apply to "A" mine and which are not otherwise covered.

e. **Taxes:** Shall include all local, state and federal licenses and taxes appertaining to the properties and operations of "A" mine, and sales applicable to coal taken by Buyer from "A" mine, except federal and state income or profit taxes, and except sales taxes applicable to coal sold by Seller to others. The portion of Seller's land or interests in land which is to be considered as a part of "A" mine for tax purposes, and for all other purposes under this agreement, shall be that specifically described in Exhibit "B" which is attached to and made a part of this agreement.

f. **Claims for Compensation, Personal Injury and Property Damage:** Shall include all cost (not reimbursed by insurance provided for herein) applicable to the operation of "A" mine arising out of claims for compensation, personal injuries and property damage sustained by employees and others, including cost of services and expenses of claim agents, adjusters, accountants and attorneys, including either insurance premium payments or proper charges, to create and maintain a separate fund for such purposes, the amount thereof to be determined from time to time by mutual agreement. Any balance remaining in such separate fund after termination of this agreement, by expiration or otherwise, and after settlement of all outstanding claims for compensation, personal injuries, and property damage, shall be paid by Seller to Buyer.

13

become obsolete or is otherwise required to be withdrawn from service shall be made by mutual agreement. Any net profit or loss, after all taxes (including benefit of any reduction in income or profit taxes resulting from the tax deductibility of any such loss and of any increase in such taxes resulting from any such gain) on the sale or other disposition of such materials, supplies and equipment as has been mutually agreed upon, shall be applied to cost during the month of sale or disposition and the depreciated value, if any, remaining in net investment shall be removed at that time.

j. **Price of Development Coal:** Buyer shall not be required to pay for development coal during any development period any amount in excess of the then current guaranteed maximum price. In the event, however, the price for such coal calculated as provided in this Section 7 is, during any such development period, in excess of such guaranteed maximum price, such excess shall be capitalized and treated as a part of the net mine development cost or shall be handled as otherwise determined by mutual agreement.

Development coal shall mean (1) during the initial development period, all coal produced at "A" mine, and (2) during any further development period, that coal produced at "A" mine in the area or areas then being developed for the purpose of increasing the capacity of "A" mine.

k. **Allocation and Proration:** Except as otherwise provided for herein, whenever there is any provision in this agreement for allocating or prorating cost between "A" mine and other mines of the Seller, such allocation or proration shall be determined by mutual agreement of Seller and Buyer. Whenever there is any provision for allocating or prorating cost between Buyer and other purchasers of coal from "A" mine, such cost shall be allocated or prorated on a tonnage basis, based on the total tons of coal produced at "A" mine.

8. **Guaranteed Maximum Price**

It has been mutually estimated as of November 1, 1951, that the cost of mining coal with mining machines commonly known and referred to on the date of the execution of this agreement as continuous miners, based on the conditions set out below, should be approximately as follows:

| Annual Production | Capital Investment | Total Price Inc. Int. & Profit |
|---|---|---|
| 588,000 Tons | $2,691,000 | $3.86 per ton |
| 768,000 Tons | 3,149,500 | 3.73 per ton |
| 1,008,000 Tons | 3,672,000 | 3.61 per ton |

The above estimated Capital Investment includes an estimated expenditure of $343,000 for railroad facilities to a plant site near

15

of (a) any change in net investment which has been made with the specific mutual understanding that a decrease or increase in cost should result, (b) any change in interest and/or depreciation charges on the net investment, (c) any change in such wage scales applicable to mining operations at "A" mine, (d) any change in the per-ton rate of the welfare or retirement benefit funds, (e) any change in man-hours of work per week or per day due to changes in labor contracts or refusal (general in the district) of the miners to work on the existing schedule, or to federal or state governmental action requiring such change, (f) any change in the 5-day 2-shifts-a-day regular work week schedule due to changes in Buyer's requirements for coal or to strikes, (g) any imposition by federal or state statutes of a tax on the sale, mining or delivery of coal, or changes in the rate of such existing taxes subsequent to November 1, 1951, (h) any change in federal or state statutes imposing a levy or tax on payrolls or otherwise, for unemployment compensation, old-age benefits or retirement pay, and any change in the rate thereof from the rate in effect for Seller on November 1, 1951, under such statutes, (i) any change in cost of insurance on approved coverage, (j) any change in the normal monthly charge of 2¢ per ton for a reserve for payment of claims for workmen's compensation, personal injury or property damage, or any change in cost resulting from any causes covered in Section 6 hereof reimbursement for which is not provided by insurance the premiums on which are included in cost hereunder, (k) any change in the cost of necessary materials, supplies and/or power for the proper operation of said mine, (l) any profit or loss on salvage, and (m) any change in cost resulting from changes, additions or modifications in or to said mine or its appurtenances which may be required by or under any law, governmental regulation, ordinance, or order, or any final judicial decision, or union regulation or requirement of general application to coal mines in Jefferson and Walker Counties, Alabama, whether related to safety or health or otherwise, the guaranteed maximum price per ton then applicable to coal from the American seam from "A" mine shall be correspondingly increased or decreased. No increase or decrease in the cost of any items other than those hereinabove specifically set forth in this paragraph under designations (a) to (m), inclusive, shall cause any change in the guaranteed maximum price. No change shall be made in the guaranteed maximum price more than one time within any six months' period to reflect the effect of (i) and (k) above; however, other changes shall be made effective as of the date of such other increases or decreases.

The guaranteed maximum price shall not be subject to adjustment, except as above provided in this Section 8, during the first five years after date on which "A" mine is first in normal operation. If at any time, however, after the guaranteed maximum price has been in effect for four and one-half years subsequent to

17

at the then current price during the course of the negotiations or other proceedings provided for herein for readjustment of the guaranteed maximum price; similarly, Buyer is required and obligated to purchase during the term and subject to the provisions of this agreement at least the guaranteed minimum tonnage of coal at not exceeding the price provided for in this Section 8 hereof unless this agreement is cancelled in accordance with provisions of Section 2 a or Section 4 hereof, or the provisions of this Section 8.

## 9. Billing

The Seller shall bill the Buyer not later than the tenth of each month, and Buyer shall pay said billing not later than the twentieth of such month, for coal delivered hereunder during the preceding month. Such monthly billing shall be on a tentative basis and shall be adjusted at the end of each calendar quarter under this agreement on the basis of the actual price determined as provided for in Sections 7 and 8 hereof for such calendar quarter. Upon such adjustment Seller shall, not later than one month after the expiration of such quarter, invoice or credit Buyer on the basis of such actual price for the coal delivered during such quarter and Buyer or Seller shall pay any balance thus determined to be due within one month from the date of any such invoice. The billing for the period from the date on which coal is first delivered to Buyer hereunder to the end of the first full calendar quarter thereafter shall be at a mutually agreed upon price and shall be adjusted on the basis of actual price as above provided, at the end of such calendar quarter; thereafter the tentative billing during such succeeding calendar quarter shall be on the basis of the actual price per ton for the immediately preceding calendar quarter, provided nevertheless that changes in billing to reflect any change in wage scales or other major change in cost which can be immediately established shall be made promptly upon the occurrence of such changes. During any period of excusable interruption hereunder not longer than six months in duration when no coal is shipped by Seller to Buyer, Seller shall invoice Buyer for and Buyer shall pay to Seller the costs (of the nature provided for in this agreement) which are incurred during such period and which are not covered by insurance. Within one month after Seller's books have been audited by its independent accountants after the end of each calendar year hereunder, Seller shall make any further adjustment as may be rendered necessary by such audit and shall submit such audit pertaining to "A" mine to Buyer for its concurrence or protest, which shall be made within two (2) months, and when such audit has been concurred in by Seller and Buyer, or if not concurred in, when any dispute in regard thereto has been determined by arbitration, the Seller shall invoice or credit Buyer on the basis of any such adjustment for the coal delivered during such calendar year and Buyer or Seller shall pay any balance thus deter-

19

DRUM 003796

of the drawing away of water from the American seam area thus relieving or decreasing the necessity of the pumping of water from the American seam area as the result of such mining operations in such other coal seams, then Buyer and Seller shall jointly determine whether such other mining operations in drawing away such water have in fact decreased the cost of mining such coal, and, if so, the extent of any such decrease, but if Buyer and Seller cannot so agree, then Seller's claim shall be submitted to arbitration as provided for herein and if Seller's claim shall be substantiated by said arbitrators and the extent of said decrease in cost is fixed by said arbitrators, or if Buyer and Seller shall agree to the extent of such decrease in cost without arbitration, then the Seller shall thereafter have the right to add the amount of such decrease in cost as an element of cost in determining the price to be paid by Buyer to Seller for coal received by Buyer hereunder during the period of time that such condition causing such decrease in cost shall continue. Whenever after such an increase or decrease has been established and placed in effect either party shall claim that the cause of such increase or decrease in cost has been overcome or eliminated and that no further effect should be given to such increase or decrease then the parties shall jointly determine whether such cause has been overcome or eliminated and whether no further effect should be given to such increase or decrease and if the parties cannot so agree then the matter shall be submitted to arbitration as provided for herein.

### 12.  Limitation or Allocation of Liability of Buyer

a.  While the term "Buyer" is used throughout this agreement to refer to Alabama Power Company, Georgia Power Company and Gulf Power Company, collectively, it is agreed that the liability of Alabama Power Company for the obligations (other than for the power lines mentioned below) imposed upon or assumed by Buyer under the terms of this agreement, including the obligation to purchase and pay for coal or to make any other payments hereunder, shall be and is hereby limited to thirty-three and one-third per cent (33-1/3%) of the total obligation or liability of the Buyer hereunder; that the similar liability or obligation of Georgia Power Company shall be and is hereby limited to thirty-three and one-third per cent (33-1/3%) of the total obligation or liability of Buyer hereunder, and that the similar liability or obligation of Gulf Power Company shall be and is hereby limited to thirty-three and one-third per cent (33-1/3%) of the total obligation or liability of the Buyer hereunder. It is further agreed that neither Georgia Power Company nor Gulf Power Company shall be under any obligation or duty to provide electric power lines to the mine site as required of Buyer under the provisions of Section 1 b hereof, and that the obligation or duty of Alabama Power Company to provide such electric power lines is to do so only pursuant to and under

21

DRUM 003797

as hereinafter provided for. The designation of the person to be notified or the address of such person may be changed by Seller or Buyer at any time or from time to time by giving thirty (30) days' written notice of intention so to do.

### 14. Agent for Buyer

Southern Services, Inc., an Alabama corporation, is hereby designated by Buyer as agent for Buyer and for each of the companies constituting or composing Buyer, jointly and severally, to act for and on behalf of Buyer for the purpose of giving or receiving any notice, demand or request required or authorized by this agreement, for the purpose of designating the quantity, size, destination and routing of coal to be shipped from time to time to Buyer hereunder, and for such other purposes as may from time to time be designated by Buyer. Buyer may designate a new agent from time to time by giving Seller thirty (30) days' notice in writing of intention so to do, and in that event the authority of Southern Services, Inc., as agent for Buyer shall cease and the newly designated agent shall be substituted therefor.

### 15. Waivers

Any waiver at any time by any party hereto of its rights with respect to any other party, or with respect to any matter arising in connection with this agreement, shall not be considered a waiver with respect to any subsequent default or matter.

### 16. Arbitration

In the event of any dispute, difference of opinion or controversy between the parties as to any question of fact which may arise under this agreement, and in the event of any failure or inability of the parties to arrive at a mutual agreement with respect to matters provided to be mutually agreed upon between the parties herein (excepting failure or inability to agree to a new maximum price as provided for in Section 8 hereof), either party shall have the right to request arbitration by giving written notice thereto to the other party, in which event each party agrees to appoint a competent and reasonable person skilled in the subject matter of the issue in dispute as an arbitrator. Should either party fail to appoint an arbitrator within ten (10) days after giving or receiving such written notice an arbitrator for such party shall be appointed by the person who is then acting as Senior Judge of the United States District Court for the Northern District of Alabama in the manner hereinafter provided. If, within a reasonable time, the two arbitrators are unable to agree as to the determination of the questions submitted to them, they, within ten (10) days after such inability to agree becomes apparent, shall appoint a third arbitrator and the decision of the majority shall be final and binding on the parties hereto as to such matters that are submitted and determined by the arbitrators. Should the two arbitrators be unable to agree

23

DRUM 003798

event Buyer exercises its right contained in Section 3 of this agreement to require an increase in production at "A" mine, then a further development period shall commence and extend from the date of the commencement of such further development period until (a) such further development period, in the opinion of Seller, is completed, or (b) the first day of the month following the first month in which "A" mine attains the required increased productive capacity, whichever first occurs. (This definition is for the purpose of accounting hereunder by the parties hereto and is not intended as necessarily controlling or determinative of the handling of any developments or development period or periods hereunder for state or federal income tax purposes.)

"Ton" or "net ton" means two thousand (2000) pounds avoirdupois.

### 18. Construction of Agreement

This agreement shall be construed in accordance with the laws of the State of Alabama.

### 19. Assignment

This agreement shall not be assigned or transferred by either party without first obtaining the consent in writing of the other party thereto. The agreement shall, however, inure to the benefit of and be binding upon the successor, by merger, consolidation or otherwise, of each party hereto. Should the federal government or any agency or instrumentality thereof take over the operation or ownership of the property or properties of either party hereto this contract shall nevertheless not be subject to cancellation because of such taking over so long as said government or agency or instrumentality thereof shall comply with the terms of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this agreement by their officers thereunto duly authorized, as of the day and year first above written.

25

## EXHIBIT A

STATE OF ALABAMA
JEFFERSON COUNTY

### CONTINGENT LEASE

THIS AGREEMENT, made and entered into as of the the_____
day of _____, 19\_\_, by and between ALABAMA BY-PROD-
UCTS CORPORATION, a corporation organized and existing under
and by virtue of the laws of Delaware (herein called Lessor), as
party of the first part, and such associated or affiliated company of
ALABAMA POWER COMPANY, GEORGIA POWER COM-
PANY, or GULF POWER COMPANY, as may be nominated or
designated by said Power Companies, to execute this lease agreement
(herein called Lessee), as party of the second part; PROVIDED,
HOWEVER, that if Lessor is not at the time of the execution of this
contingent lease agreement satisfied as to the financial responsibility of
such associated or affiliated company it may require the performance
of the obligations of such company as Lessee hereunder to be guaran-
teed by a financially responsible party;

### WITNESSETH:

WHEREAS, the parties hereto have entered into an agreement
for the opening by Lessor of a coal mine and for the sale to Lessee of
the coal produced therefrom (which said agreement is herein called
"A" Mine Agreement) to which said "A" Mine Agreement this Con-
tingent Lease is attached and made a part as Exhibit A;

NOW THEREFORE, the Lessor, for the considerations and sub-
ject to the terms, conditions and covenants hereinafter set forth,
hereby grants to the Lessee the right and privilege, upon the contin-
gency hereinafter set forth, of mining and removing by the under-
ground method only the coal in the American seam in the lands here-
inafter designated.

#### 1. Contingency and effective date

This Contingent Lease shall be and become effective only in the
event that the option provided for in Section 2 a of the "A" Mine
Agreement is exercised by the Buyer therein designated in accordance
with the provisions thereof, and that the payment provided for in said
Section 2 a is paid by the Buyer and accepted by the Seller therein
designated. In the event of the exercise of such option and of the
making and acceptance of such payment the date such payment is paid
and accepted shall be the date on which this Contingent Lease and all
of the terms, conditions and covenants hereof shall be and become
effective.

#### 2. Lands leased hereunder

The lands leased hereunder shall be those fee and mineral lands

1

DRUM 003800

the right to use said railroads, roads and ways for purposes of its operations other than mining operations; and shall have the right to construct, maintain and operate in, under, over or upon said lands all of such power lines, pipe lines, drill holes, ventilating shafts, shafts, slopes and openings as may be necessary or proper for the mining and removing of said coal and the preparation of same for use; and shall, have the right to occupy and use such portion of the surface of said lands as may be necessary or proper in connection with the construction, maintenace and operation of equipment, facilities, machinery and buildings of all kinds proper or necessary for Lessee's use in mining and removing said coal and preparing the same for use.

### b. Mineral lands

As to the lands leased hereby in which the Lessor owns only the mineral and mining rights, the Lessor grants to the Lessee such rights, but only such rights, as it has and can lawfully grant as the owner of such mineral and mining rights.

### c. Reservation by Lessor

#### i. Mining in other seams

Lessor shall have, and hereby reserves to itself, its successors, agents or assigns, the right to mine and remove the coal in all seams in the lands leased hereunder, except the American seam, to the extent that the mining and removal of the coal from such seam or seams does not unduly interfere with Lessee's mining operations on the American seam in such lands.

#### ii. Use of railroad

Lessor shall have and hereby reserves the right to connect with and use the railroad serving "A" mine to the extent that such use does not unreasonably interfere with Lessee's use of such railroad. Lessor shall pay Lessee, or, if such railroad is owned by any person, firm or corporation other than Lessee, Lessor shall pay such person, firm or corporation a reasonable compensation for the use of such railroad; in the event of any dispute as to such compensation between the parties hereto the same shall be submitted to arbitration as provided for herein.

### 4. Royalty

#### a. Tonnage royalty

Lessee shall pay Lessor not later than the 20th day of each month eighteen cents (18¢) per ton of two thousand (2000) pounds for all coal mined under this agreement during the immediately preceding month. Such payment shall be based upon mine weights of the Lessee evidenced by statements to be furnished by it to the Lessor on or before the 10th day of each month which statements shall show the exact amount of coal mined during the immediately preceding month. Mine

3

Lessor to terminate this agreement because of the failure of Lessee to mine coal or pay the minimum royalty herein provided for shall be suspended during the time that the mining, removal or transportation of said coal become impossible by reason of any of the aforesaid causes. No strike or labor trouble, and none of said other causes, shall be considered as being included within the meaning of this paragraph if it is of shorter duration than one full calendar month.

### 5. Manner of operation

Lessee shall mine said coal in a proper and workmanlike manner, in accordance with good mining practice and substantially in the same manner as is Lessee's practice in the same seam in similar mines, or in a better manner, and in any event so as to entail no unnecessary loss or waste; it is agreed however that Lessee shall not be required to mine from said leased lands coal which is not recoverable coal as the same is hereinafter defined.

### a. Pillars

In prosecuting the mining of the coal hereunder, Lessee shall be permitted to provide under the portion of the leased lands to which Lessor does not own the surface, pillars reasonably adequate to prevent damage to said surface, and in all portions of said leased lands shall be permitted to provide pillars reasonably adequate to protect the other seams of coal in said leased lands, also railroads, transmission lines, telephone lines, pipe lines or other easements or rights-of-way thereon owned by third persons, also to protect public roads, easements and rights-of-way thereon and shall be permitted to provide barrier pillars adequate to protect Lessee's workings from any streams over or adjoining said leased lands. Except as above provided, Lessee shall be permitted to remove or "rob" any and all pillars, but shall do so in such manner as not to block-off any otherwise recoverable coal or unreasonably to affect the other seams of coal in said leased lands, or the mining and removal of coal therefrom.

### b. Notice of completion or abandonment of area

Lessee shall notify Lessor whenever Lessee has completed or abandoned, or proposes to complete or abandon, the removal of coal within any panel or working entries or similar area in said leased lands, and, in order that Lessor may ascertain whether or not Lessee has removed all recoverable coal therefrom and otherwise has complied with the conditions hereof, the entries, aircourses and all other workings in said area proposed for completion or abandonment, shall for a period of thirty days after said notice by Lessee to Lessor with respect to said completion or abandonment, be kept open, unobstructed and reasonably free from water in order that Lessor may make such surveys and inspections as it may deem necessary. Where pillars are to be pulled or

5

DRUM 003802

and Lessee shall pay Lessor for all of such unmined recoverable coal, if any, as so agreed upon or determined by arbitration, at the rate of 18¢ per ton of 2000 pounds after making proper allowance for rock and washer loss. Lessee shall thereupon have the right to mine and remove all recoverable coal so paid for by it, and all other rights herein granted in respect to the mining and removal of coal, for and during a further period of years after the date of the expiration or termination of this lease, or of the extension hereof, equal to the total amount of recoverable coal determined to be remaining in said seam in said leased lands divided by a specified annual rate of removal of not less than 300,000 net tons annually. If any recoverable coal paid for by Lessee should remain in said seam in said leased lands at the time said further period of years expires then the same shall at said time revert to and become the property of Lessor free from all interests and rights of Lessee. Nothing herein contained shall be deemed to grant Lessee any right to mine or remove, after the expiration or termination of this lease, or of the extension thereof, any coal, except the amount of recoverable coal so paid for by Lessee, except upon written agreement of the parties in respect thereto.

**b. Recoverable coal**

The term "recoverable coal" wherever used in this agreement shall mean all coal in said American seam in said leased lands where the seam is not less than forty-four inches in total thickness and the aggregate thickness of the coal is not less than thirty-seven inches and which coal would be considered practically and customarily recoverable under good mining practice in this district, excluding, however, any coal in any pillar or barrier provided for in Section 5 a hereof.

i. Where an area of coal otherwise defined as recoverable coal hereunder is separated by a fault or an area of coal which does not meet said specifications for recoverable coal, said coal so blocked off shall be deemed to be recoverable coal if, in the circumstances of the particular case, said coal would be deemed practically and customarily recoverable in accordance with the usual mining practice in the district in the mining of the particular seam.

ii. Where coal defined as recoverable coal is blocked off, damaged, destroyed or otherwise made unminable as a result of the negligence of Lessee, its servants, agents, employees or contractors, or as a result of the failure to mine coal hereunder in a proper and workmanlike manner, as aforesaid, or as a result of Lessee's mining operations on lands not owned by Lessor, said coal shall, for the purposes of payment by Lessee to Lessor for unmined recoverable coal, be deemed recoverable coal.

iii. In the event of dispute between the parties hereto in connection with coal not proposed to be recovered by Lessee, or

7

DRUM 003803

taxes now or hereafter imposed by the State and Federal governments, either or both, on the mining or sale of said coal.

### 10. Indemnity

Lessor shall not be liable for any claims for damages or compensation which may in any way arise from the exercise by Lessee, its servants, agents, employees or contractors, of the rights herein granted, or of any of them or in any way growing out of said mining operations by Lessee, its servants, agents, employees or contractors, and Lessee agrees to and does hereby indemnify, protect and hold harmless the Lessor against any and all loss suffered by Lessor as the result of any claim or demand made upon it or any judgment or decree rendered against it arising from the exercise by Lessee, its servants, agents, employees or contractors, of the rights herein granted or at any time or in any way growing out of said mining operations by Lessee, its servants, agents, employees or contractors.

### 11. Termination

a. In the event of failure by Lessee to comply with any or all of the terms and conditions herein set out, Lessor shall thereupon have the right to terminate this agreement at any time by giving to Lessee thirty (30) days' notice in writing of its intention so to do specifying the default complained of, and at the expiration of said thirty days, unless Lessee shall have made good the default or shall have taken steps as shall be reasonably adapted to the curing of said default without delay, this lease shall terminate, the liability of Lessee to pay for unmined recoverable coal, if not theretofore paid for, as provided for hereinabove shall become immediately effective, and any and all rights of Lessee under this lease except the right to mine and remove subject to the terms of this agreement, the recoverable coal paid for, shall cease and determine. Default authorizing the termination of the lease, however, shall not be held to have matured in respect to any matter as to which bona fide dispute of fact exists as to the method of mining or as to the coal which should be removed or paid for hereunder or any other operating detail unless and until the same shall have been determined by agreement or arbitration as provided herein.

### 12. Arbitration

In the event of any difference of opinion or controversy as to whether mining operations are being conducted in accordance with approved mining methods, or as to any other matter of fact involved in the performance of this agreement, or necessary to proper accounting by Lessee to Lessor, then such difference or controversy, if not adjusted by agreement of the parties, shall be settled by arbitration in the following manner: Either party may notify the other party of its desire for such arbitration and of the

9

DRUM 003804

15. **Right to remove personal property**

Upon the termination or expiration of this lease; or, in the event of the extension or renewal hereof, upon the termination or expiration of such extension; or, in the event Lessee pays Lessor for recoverable coal remaining in said leased lands, upon the termination or expiration of Lessee's right to mine and remove such coal; Lessee shall have the right to maintain on Lessor's property at Lessee's risk during nine months thereafter, and may within such period remove, providing that all sums owed by Lessee to Lessor shall have first been paid, all of its structures, improvements, railroads, facilities, material, equipment and supplies from Lessor's property and if Lessee does not remove the same, or any part thereof, from Lessor's property within such nine months' period then such of same as is not removed within such period shall thereupon become Lessor's property. Lessee further agrees upon such final expiration or termination (or, as to any individual item, upon Lessee's determination that the same is no longer needed), to and shall properly fence, cover, block or otherwise safeguard each and every drill hole, slope, shaft, opening, pit, structure or hazardous condition made, constructed, installed or used by it in its mining operations on said leased lands.

16. **Term**

Unless earlier terminated as provided for herein, this lease shall be for a period commencing with the effective date hereof, as provided for in Section 1 hereof, and continuing for the then remaining term under the "A" Mine Agreement or until the recoverable coal in said leased lands is earlier worked out, provided that Lessee shall have the right or option at the expiration of such term to renew or extend this lease as to all of its terms and conditions for a further period of ten (10) years, provided further that if Lessee, upon the termination or expiration of this lease, or of the extension thereof, shall have paid for the then remaining unmined recoverable coal in said leased lands as provided in Section 7a hereof, this lease shall be further extended for the period of time provided for in said Section 7a.

17. **Assignment**

This lease shall not be assigned or transferred by either party hereto without first obtaining the consent in writing of the other party thereto. This lease shall however inure to the benefit of and be binding upon the successor, by merger, consolidation or otherwise, of each party hereto. Should the Federal government or any agency or instrumentality thereof take over the operation or ownership of the property or properties of either party hereto this contract shall nevertheless not be subject to cancellation because of such taking over so long as said government or agency or in-

11

DRUM 003805

## EXHIBIT B
## DESCRIPTION OF "A" MINE LANDS

| | Fee | Number of Acres Min. | Total |
|---|---|---|---|
| **Section 32-16-6** | | | |
| E½-NE¼ | 80 | | 80 |
| W½-NE¼ | | 80 | 80 |
| All-NW¼ | | 160 | 160 |
| W½-SW¼ | | 80 | 80 |
| E½-SW¼ | 80 | | 80 |
| All-SE¼ | 160 | | 160 |
| | 320 | 320 | 640 |
| **Section 33-16-6** | | | |
| SW¼-NE¼ | | 40 | 40 |
| All-NW¼ | 160 | | 160 |
| NE¼-SW¼ | | 40 | 40 |
| NW¼-SW¼ | 40 | | 40 |
| SW¼-SW¼ | | 40 | 40 |
| SE¼-SW¼ | | 40 | 40 |
| All-SE¼ | | 160 | 160 |
| | 200 | 320 | 520 |
| **Section 34-16-6** | | | |
| S½-NW¼ | 80 | | 80 |
| NE¼-SW¼ | 40 | | 40 |
| NW¼-SW¼ | | 40 | 40 |
| S½-SW¼ | 80 | | 80 |
| All-SE¼ | 160 | | 160 |
| | 360 | 40 | 400 |
| **Section 3-17-6** | | | |
| All-NE¼ | 160 | | 160 |
| All-NW¼ | 160 | | 160 |
| NE¼-SW¼ | 18.8 | 21.2 | 40 |
| NW¼-SW¼ | 40 | | 40 |
| SW¼-SW¼ | | 40 | 40 |
| SE¼-SW¼ | 30 | 10 | 40 |
| W½-SE¼ | 80 | | 80 |
| | 488.8 | 71.2 | 560 |
| **Section 4-17-6** | | | |
| N½-NE¼ | 80 | | 80 |
| E½-NW¼ | 80 | | 80 |
| W½-NW¼ | | 80 | 80 |
| All-SW¼ | | 160 | 160 |
| All-SE¼ | | 160 | 160 |
| | 160 | 400 | 560 |

13

DRUM 003806