FILED

2018 Aug-15  PM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA


# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:16-cv-01443-AKK** |
| **v.** | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF BLACK WARRIOR RIVERKEEPER'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## Table of Contents

Introduction ..................................................................................................1

Statement of Undisputed Material Facts ......................................................1

Summary Judgment Standard .....................................................................15

Argument....................................................................................................15

I.      BWR Has Standing..........................................................................15

II.     Drummond Has Violated § 301 of the CWA by Discharging
        Pollutants from Point Sources to Waters of the United States without a
        Permit.............................................................................................18

        A.      Drummond's GOB Pile, Ditches, Channels, Dams, Basins and
                Groundwater Seeps Are Point Sources ................................19

        B.      Locust Fork, T1, Ditches Are "Waters of the United States."...........22

        C.      Drummond Has Discharged Pollutants to WOTUS ...........24

III.    Alternatively, if Drummond's Discharges Are from Non-Point
        Sources, Drummond Has Violated § 6972(a)(1)(B) of RCRA ...................28

        A.      The Materials in and Leaching from Drummond's GOB Pile Are
                RCRA Solid Wastes. ............................................................28

        B.      Handling/Treatment of RCRA Solid Wastes .......................29

        C.      The Wastes in Drummond's GOB Pile May Present an Imminent
                and Substantial Endangerment to the Environment............30

Conclusion and Relief Requested ...............................................................34

**Introduction**

Plaintiff Black Warrior Riverkeeper ("BWR") moves for partial summary judgment on Counts I and IV as to the liability of Defendant Drummond Company, Inc. (Drummond), for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k. Drummond has violated the CWA by discharging pollutants without a permit from point sources at its Maxine Mine site (the "site") into Locust Fork of the Black Warrior River and its tributaries. Alternatively, Drummond has violated RCRA by contributing to the handling and treatment of solid wastes at that site that may present an imminent and substantial endangerment to the environment.

**Statement of Undisputed Material Facts**

1.      In 1953, Alabama By-Products Corporation (ABC) started mining the site, which is adjacent to Locust Fork. **Ex. A**, Hicks Dep. at 242:16–243:6.

2.      Locust Fork is a navigable-in-fact tributary of the Black Warrior River. **Ex. B**, Brooke Decl. ¶ 8; **Ex. C**, Brown Decl., Att. 1 (Brown Expert Rep.) at 5 [hereinafter **Ex. C-1**].[1]

3.      Prior to mining, and currently, a tributary of Locust Fork ran through the site and is visible in historical aerial photos, on the U.S. Geological Survey's

---

[1] *See also* Corps River Navigation Chart 50, *available at* http://www.sam.usace.army.mil/ Portals/46/docs/ navigation/BWT/Nav%20Charts%202013/Navigation%20Chart%2050.pdf.

National Hydrography Dataset, and on U.S. Geological Survey topographical maps. **Ex. D**, Photographs (Ex. 2 to George Dep.) at PELA 0020; **Ex. C-1** at 5, Fig. 3; **Ex. E**, Johnson Decl., Att. 1 (Johnson Expert Rep.) at Fig. 4-3 [hereinafter **Ex. E-1**]. That tributary ("Tributary 1" or "T1") has a surface connection to Locust Fork, and still maintains a physical and chemical connection to Locust Fork. **Ex. C-1** at 20. Upstream portions of T1 still have typical characteristics of a stream—bed and banks and periodic flow—and meet the U.S. Army Corps of Engineers' definition of an intermittent stream. *Id.* T1 formed a slough at its confluence with the Locust Fork. **Ex. D**, Photographs at PELA 0019–20; **Ex. E-1** at Fig. 4-3.

4.     BWR members recall that T1 was once a scenic waterbody, with a canopy of shade trees in the slough, where families went boating and fishing. **Ex. F**, R. Tuggle Decl. ¶ 7; **Ex. G**, Vines Decl. ¶ 7; **Ex. H**, J. Tuggle Decl. ¶ 5.

5.     ABC's consultants called T1 "a tributary to the Locust Fork, which has in part been filled in with rock disposal material," a "filled estuary," and a "buried stream." **Ex. I**, Letter from P. LaMoreaux, PELA to D. Cook, VP, ABC (Aug. 6, 1979) (Ex. 39 to Hicks Dep.) at DRUM000929; **Ex. J**, George Dep. at 132:6–16; **Ex. K**, Letter from P. LaMoreaux, PELA, to D. Cook, VP, ABC (Nov. 16, 1979) (Ex. 15 to George Dep.) at DRUM000921; **Ex. L**, PELA, Maxine Rock Disposal Area Hydrologic and Water Quality Investigations (Oct. 5, 1984) (Ex. 36 to George Dep.) at BWR000473.

2

6.     Starting in the 1950s, ABC created a 160-acre waste or geologic overburden ("GOB") pile on the Maxine site, on a ridge adjacent to Locust Fork. **Ex. C-1** at 16. The material in the GOB pile consists of waste rock separated from coal, overburden dug out of the earth when the underground mine was created, and coal fragments.  **Ex. M**, Muncher Dep. at 50:11–52:13; **Ex. J** at 65:18–66:10; **Ex. C-1** at 39; **Ex. N**, Johnson Dep. at 56:11–59:19.

7.     The GOB waste contains sulfide-bearing minerals which, when exposed to air and water, oxidize and transform into an acidic mixture, laden with heavy metals, that leaches out of the GOB pile as acid mine drainage or "AMD." **Ex. C-1** at18; **Ex. E-1** at 6-1; **Ex. N** at 78:21–81:3 (discussing conclusion that water on-site is impacted by AMD).

8.     In 1976, ABC began documenting problems with AMD, as well as substantial erosion of sediment and mine waste from the GOB pile, which was degrading water quality. **Ex. M** at 104:23–105:22; **Ex. A** at 86:13–88:22; **Ex. O**, Letter from D. Cook, VP, ABC to H. Robins, Ala. Surface Mining Reclamation Comm'n (ASMRC) (Aug. 13, 1979) (Ex. 40 to Hicks Dep.) at DRUM002174; **Ex. P**, Letter from M. Edwards, ABC, to J. Meyers, Ala. Water Improvement Comm'n (Mar. 6, 1980) (Ex. 42 to Hicks Dep.); **Ex. Q**, Letter from J. Brown, ABC to D. Cook (Mar. 25, 1980) (Ex. 44 to Hicks Dep.); **Ex. R**, Memo from M. Edwards (July 27, 1982) (Ex. 54 to Hicks Dep.).

9.      In 1979, the Alabama Surface Mining Commission ("ASMC") issued the first of several notices of violation for discharges of acidic water from the site to Locust Fork. **Ex. S**, ASMRC, Notice of Violation, 79-HVR-073 (July 5, 1979) (Ex. 37 to Hicks Dep.). In response, ABC hired P.E. LaMoreaux & Associates ("PELA"), to assess the site. **Ex. J** at 121:22–123:5, 127:14–128:5; **Ex. T**, Letter from P. LaMoreaux, PELA, to D. Cook, VP, ABC (Aug. 21, 1979) (Ex. 12 to George Dep.). PELA's project manager, Lois George, described the problem as "low pH water," and PELA's task as developing a permanent solution to the "acid mine runoff." **Ex. J** at 125:3–5, 142:20–144:19; 145:2–17; **Ex. U**, ASMRC, Notice of Violation No. 79-HVR-073 (Feb. 4, 1980) (Ex. 19 to George Dep.).

10.      PELA determined that the GOB pile was a "catchment" which trapped water during rain or runoff. **Ex. J** at 125:22–126:9; **Ex. I** at DRUM000929. The GOB in the course of T1 created a "perched aquifer system" which allowed "accumulation, storage, and movement of ground water." **Ex. J** at 76:10–77:3, 136:12–137:20; **Ex. V**, Letter from P. LaMoreaux, PELA, to B. Smith, ASMRC (Jan. 28, 1980) (Ex. 41 to Hicks Dep.) at DRUM000832-33. Drummond agrees and concedes that water moves from the GOB as surface and underground flow. **Ex. A** at 242:4–245:23; **Ex. I** at DRUM000929–30.

11.      The GOB also caused increased flow of polluted surface water, creating a network of drainage gullies, which drained east to Locust Fork and to

4

T1, and transported that runoff to Locust Fork. **Ex. C-1** at 65.

12.     George prepared two figures in 1982 to document key features of the site. **Ex. W**, Fig. 1 (Ex. 6 to George Dep.); **Ex. X**, Site Fig. (Ex. 7 to George Dep.). The figures depict[2] 1) a system of drainage or "diversion" ditches to channel surface water and sediment runoff from the GOB pile, **Ex. J** at 83:6–89:20, 108:6– 115:6; **Ex. W**; **Ex. X** , 2) two dams constructed in the T1 stream course, and 3) sedimentation basins or ponds created above each dam. The dams were built to control sediment runoff from the waste pile. **Ex. A** at 114:22–116:19. The sedimentation basins were built to catch sediment eroding from the GOB pile and areas disturbed by mining activity. **Ex. M** at 57:1–58:22.[3]

13.     Those channels, dams and basins were still present and observed by BWR's expert hydrologist, Anthony Brown, during a site visit in 2017, and he documented them in his report. **Ex. C-1** at 4, 65–68, Fig. 3.1, App. D (photos). The sedimentation basins were built in T1. **Ex. A** at 81:17–82:8, 122:3–133:16; **Ex. X**; **Ex. M** at 61:9–12. They now contain an estimated 60,000 cubic yards of waste material. **Ex. C-1** at 33. The material filling the lower basin contains "soil, spoil,

---

[2] The first figure (Ex. W) refers to part of the GOB pile as the "post-law" area, and the older part, closest to the Locust Fork, as the "pre-law" area. "Pre-law" refers mining operations completed prior to the effective date of the federal Surface Mining Control and Reclamation Act, and "post-law" refers to mining operations conducted after that date. 30 U.S.C. § 1201, *et seq.* The pre-law versus post-law distinction is immaterial to the claims in this case.
[3] See **Exhibit Y** for aerial photos of the site (Exs. 22 and 23 to Hicks Dep.), discussed in Exhibit A., Hicks Deposition at 194:17–195:2, 198:7–15. These photographs and those cited *infra* notes 7–8, 10, and 12 were taken by Nelson Brooke. *See* **Ex. B** ¶ 22.

and coarse refuse" from the GOB pile. **Ex. A** at 126:18–128:17, 130:7–18; **Ex. J** at 62:12–23.[4]

14.     The east ditch, shown in **Ex. X**,[5] intercepted runoff from the "pre-law" GOB pile, or the "old refuse." **Ex. J** at 108:6–111:1; **Ex. M** at 76:11–22; **Ex. AA**, Revisions to Maxine Mine Permit App. Supp. (Ex. 6 to Muncher Dep.); **Ex. A** at 99:9–13. The east ditch then discharged surface and groundwater to the upper sediment basin. **Ex. C-1** at 39–40, 65–66.  In the 1980s, the west ditch,[6] which captured and conveyed runoff from the "post-law" area, flowed into to a small collection basin, *see* **Ex. X**, then, south of that basin, through a channel to the Locust Fork. **Ex. W**; **Ex. X**; **Ex. J** at 113:16–21. The same general flow conditions were noted by Brown in the June 2017 inspection. **Ex. C-1** at 66. Drummond's expert testified that intermittent or ephemeral streams, like these ditches, are chemically connected to downstream waters. **Ex. PP**, Simpson Dep. at 81:11–86:1.

15.     In a 1982 mining permit renewal application, ABC explained its drainage and channelization system and how it conveyed runoff from the "refuse pile" through instream sediment basins. **Ex. BB**, Supp. to Permit App. (Ex. 55 to

---

[4] See **Exhibit Z**, Site visit photographs taken by Lois George (Ex. 3 to George Dep.) at PELA 0027-30, discussed to **Ex. J** at 60:15-68:17.
[5] Brown refers to the east ditch as Channel 1 or the central drainage channel in his expert report, *see* **Ex. C-1** at 9, Fig. 3-1.
[6] In his expert report, Brown refers to the west ditch as Channel 5 north of the collection basin, and, south of the collection basin, as a channel flowing south of the instream sediment basins. *See id.* at Fig. 10, 41, 3-1.

Hicks Dep.) DRUM000219–220. A drawing was included to illustrate the system. Ex. C-1 at Fig. 13.

16. GOB was placed in the course of T1, as Drummond's Vice President of Operations Support, David Muncher, admitted. **Ex. M** at 61:17–62:16; **Ex. CC**, Supp. Permit Map 405 (Ex. 3 to Muncher Dep.). Drummond's Director of Reclamation and Environmental Control, Dwight Hicks, concurs as to the course of T1, and that the surface flow of T1 is now buried in mine wastes. **Ex. A** at 81:17–82:8, 122:3–133:16. George confirms that T1 (the "intermittent stream") ran directly through the instream sediment basins. **Ex. X**.

17. Two dams were built across T1 in attempt to catch sediment runoff from the GOB pile. **Ex. A** at 114:22–116:19. The lower dam was built directly across the slough, or "embayment." **Ex. J** at 88:8–10, 147:8–148:2; **Ex. DD**, Memo from L. George (July 30, 1980) (Ex. 21 to George Dep.) at DRUM000749. The lower dam includes a "notch" or spillway which, by design, will "allow water to leave the impoundment." **Ex. J** at 70:23–71:14.[7] Drummond admits that surface water from the site discharges to Locust Fork via the spillway, when the lower basin is full. **Ex. A** at 118:10–119:10, 131:10–20, 181:8–183:22; **Ex. M** at 62:18–63:2. Drummond also admits that surface water discharges from the lower dam "any time you have a certain size precipitation event." **Ex. A** at 187:12–188:2,

---

[7] See **Exhibit EE** for photos of the spillway (Exs.17–18 of Hicks Dep.), discussed in **Exhibit A**, Hicks Deposition at 181:8–182:17, 185:14:20.

193:4–17.[8] No permits were issued authorizing the construction of the dams. *Id.* at 143:20–145:15. Drummond never had a permit to discharge from the spillway at the lower dam. *Id.*

18.    ABC's consultants wrote a memo in June 1985 describing pollution at the site. **Ex. GG**, Reclamation Plan for Pre-Law Refuse Disposal Area (June 3, 1985) (Ex. 40 to Muncher Dep.) at DRUM003698. They described the area as "extremely acidic" and "actively eroding" with runoff from the "spoil" having "severe detrimental impact on water quality by making major contributions to acid pH levels and high levels of sulfate, iron, manganese and suspended solids," and acidic sediment eroding from "unstabilized spoil directly to the drainage system." *Id.* at DRUM003700; *see id.* at DRUM003709 (water quality data). Drummond admits the validity of those statements. **Ex. M** at 206:3–207:19, 211:10–11.

19.    A PELA report, dated October 5, 1984, documents one year of sampling results for iron, pH and specific conductance, and compared results for the post-law area, the pre-law area, and "undisturbed" areas. **Ex. L** at BWR000477–493; **Ex. J** at 202:21–206:5.[9] The data shows average values for iron at 264 times the daily permit discharge limits under a permit issued to Drummond (discussed *infra* ¶ 23) and shows average pH at 2.81 s.u. (almost 3 times lower

---

[8] See **Exhibit FF** for photos of flow over the spillway (Exs.19–21 of Hicks Dep.), discussed in Exhibit A., Hicks Deposition at 186:13–193:17.
[9] See **Exhibit W** for the location of the pre-law and post-law areas of the GOB pile, the drainage ditch separating them, and the sampling locations.

than acceptable ranges for the pre-law area). **Ex. L** at BWR000490. The data also shows values for iron and manganese orders of magnitude higher than the permit discharge limits. *Id.* at BWR000478–85. Drummond stipulates to the validity of the PELA data. **Ex. A** at 65:14–67:14.

20.     ABC reclaimed the post-law area (*see* **Ex. W**) in 1982-1983, which included re-sloping so it would drain to the west; "capping" it with clay; and revegetation. **Ex. J** at 107:17–111:1, 170:5–12, 173:18–174:13. No reclamation was performed on the "pre-law" area. *Id.* at 174:7–175:16; **Ex. M** at 173:14–175:7. ABC chose to reclaim only the "post-law" area by grading and capping it, based on its belief that it had no "regulatory" obligation to reclaim the "pre-law" GOB, a belief shared by Drummond. **Ex. A** at 88:23–91:9.

21.     Drummond obtained the property from ABC on December 31, 1985. **Ex. M** at 44:1–45:7, 112:17–113:3, and became the permittee on the mining permit, responsible for final reclamation of the site. *Id.* at 109:14–110:16, 119:11– 20, 120:10–121:18.

22.     In 1988, the Alabama Department of Environmental Management ("ADEM") reissued a permit to Drummond under the CWA, allowing it to discharge iron, manganese, total suspended solids, and pH, at specified effluent limits, into the lower west ditch, at outfall 24E. **Ex. HH**, NPDES Permit AL0001724 (Ex. 33 to Muncher Dep.); **Ex. II**, NPDES Outfall Locations (Ex. 30

9

to Muncher Dep.); **Ex. A** at 68:16–70:11, 105:16–107:8. In its application for that permit, Drummond described outfall 24E as a "channel," and the "origin of pollutants" into it as "drainage from surface disturbed areas of an underground coal mine." **Ex. M** at 162:1–165:16; **Ex. JJ,** 1988 NPDES Permit Application (Ex. 29 to Muncher Dep.) at DRUM002531. Drummond listed the receiving water for discharges from outfall 24E as an "unnamed Tributary to Locust Fork," **Ex. JJ** at DRUM002532; **Ex. M** at 165:16–167:7, affirming that the lower west ditch was and is an unnamed tributary of Locust Fork.

23.     In response to an ADEM notice of violation of its NPDES effluent limits, Drummond responded in June 1989 that "[t]he abandoned refuse area will be treated with neutralizers to reduce the potential acidity of offsite drainage to Basin 020 and maintain water quality standards." **Ex. KK**, Letter from D. Hicks, Drummond, to S. Foster, ADEM (June 19, 1989). Drummond maintained a 3000-gallon tank of sodium hydroxide on the site for this purpose. **Ex. JJ** at DRUM002534.

24.     Drummond's 1988 NPDES permit expired in October 1993. **Ex. HH** at DRUM002468. Drummond has not had a permit for discharges from the site since then.

25.     Drummond has not performed any maintenance on the site since 1992. **Ex. A** at 151:21–154:14. Nor has it performed any monitoring of discharges

10

from the site. *Id.* at 173:6–9.

26.     Samples of discharges at the lower dam outfall taken by BWR on October 20, 2011, and June 23, 2015, and tested at an EPA-approved lab, showed levels of aluminum, iron, lead, nickel, zinc, manganese, total dissolved solids (TDS), sulfate, and conductivity that far exceeded background levels in water and soil samples from 2017. *Id.* **Ex. B** ¶¶ 13–15, Ex. 1(analytical results); *id.* at ¶ 16–18, Ex. 2 (analytical results); **Ex.C-1,** Fig. 29.

27.     Samples taken by BWR near the mouth of the slough in September 2016 showed low pH and high levels of aluminum, iron, manganese, TDS, sulfate, zinc, nickel, and conductivity.  Sediment samples taken in the same area showed high levels of aluminum, iron, lead, manganese, and sulfate. **Ex. LL**, Sulkin Decl. ¶ 7, Att. 1 (Sulkin Report) at 5–9 [hereinafter **Ex. LL-1**].  These levels similarly exceeded background sample levels.  *Id.*

28.     The pH levels from the Maxine samples are the worst that Riverkeeper Nelson Brooke has seen in 14 years of patrolling the river. **Ex. B** ¶ 11.

29.      In August 2017, the parties conducted a joint sampling program at the site. **Ex. LL** ¶ 8. Surface water was sampled at 13 locations; soil at 10 locations; and groundwater at 4 locations, as depicted in Brown's Figure 20. *Id.* ¶ 9; **Ex. C-1** at 52–57, Fig. 20. Barry Sulkin, BWR's environmental consultant, sampled all surface water locations shown on Figure 20, and sent the samples to a laboratory

for analysis. **Ex. LL** ¶ 11.

30.     The sampling results show that the water at the GOB-impacted surface water sample sites (SW3, SW4, SW5, SW8, SW9, SW12, and SW13) had much more acidic pH values and much higher concentrations of metals than the unimpacted, on-site background sample locations (SW2, SW7, and SW11), and background sample locations in the Locust Fork (SW15 and SW1). **Ex. C-1** at Fig. 29, Tbls. 6–11.

31.     The GOB-impacted surface water sample sites are: SW3—surface water discharging over the lower dam; SW4—seep discharges below the dam on the river shore; SW5—the west ditch in the lower sediment basin; SW8—surface water in a channel that flows from the GOB pile into T1 in the upper sediment basin; SW9—the east ditch or "central drainage channel" as Brown calls it; and SW12 and SW13—drainage gullies running off of eastern slope of the pre-law GOB pile. **Ex. C-1** at 67; **Ex. LL** ¶ 9.[10] SW7 and SW11 are natural springs or streams on the site which do not receive runoff from the GOB pile. *Id.* The pollutant levels at SW3, SW4, SW5, SW8, SW9, SW12 and SW13 are much higher than the background concentrations at SW7 and SW11. **Ex. C-1** at 67–68.

---

[10] For example, see **Exhibit MM** for a photo of SW13 drainage gully (Ex. 32 to Hicks Dep.), discussed in **Ex. A** at 216:17–217:10. Wade Keeton, a Drummond employee, has also observed this flow path on previous visits to the site. **Ex. NN**, Keeton Dep. at 62:14–64:8.

32.     BWR's expert also sampled water at SW3, SW4, SW8 and SW9[11] to use for whole effluent toxicity (WET) testing in August 2017, in accordance with EPA WET testing protocols. SW8 and SW9 are in channels that flow into T1, SW3 is at the lower dam spillway where it discharges into Locust Fork, and SW4 is along the bank of the Locust Fork. All of the tests showed that the water was acutely and chronically toxic to aquatic life. The laboratory had to dilute the samples with clean water by ratios of up to 333 to 1 to eliminate the observed toxicity. **Ex. OO**, Mitchelmore Decl., Att. 1 at 2; **Ex. LL** ¶ 12. Drummond's counter-expert agrees that the water is toxic to aquatic life. **Ex. PP**, Simpson Dep. at 160:22–162:22.

33.     The surface water samples taken in 1983-84 (by PELA), 2011, 2015, 2016, and 2017 consistently demonstrate AMD contamination and the acid-generating ability of the GOB. **Ex. C-1** at 68.

34.     By analyzing historic aerial photos of the site, BWR's expert, Anthony Brown, determined that by 1960, GOB began eroding and discharging to T1 to the west and the south, and directly to Locust Fork to the east. **Ex. C-1** at 62, Figs. 8, 9. The eroded sediments were conveyed by T1 to the Locust Fork. *Id.* Eventually, GOB and sediment completely filled the upper half of T1, altering its course, flow characteristics, chemistry and ecology. *Id.*

---

[11] *See* **Ex. C-1** at Fig. 29.

13

35.     Using aerial photos, topographic maps, software which calculates volumetric changes from topographic lines, Brown calculated that approximately 7.5 million cubic yards of GOB were placed on site; approximately 4.9 million cubic yards had eroded from the site into Locust Fork as of 2009; and approximately 2.68 million cubic yards of GOB remain on the site. **Ex. C**, Brown Decl., Att. 2 (Brown Rebuttal Rep.) at 6–7, Fig. 16. The erosion of GOB to Locust Fork has changed its bed, flow characteristics and chemistry. **Ex. C-1** at 64. The erosion is the worst that BWR's geotechnical engineer, Gordon Johnson, has ever seen at any mine site on which he has worked. **Ex. E** at 215:19–216:8. Without corrective action, the erosion of GOB into T1 and Locust Fork will continue into future. *Id.*[12]

36.     The 2017 data also show that groundwater discharging from the GOB pile to T1 and Locust Fork is contaminated with AMD. **Ex. C-1** at 58–62. Groundwater-supported flow, originating from the GOB pile, moves through gullies and the east ditch/central channel. *Id.* at 39–40, 65–68. The polluted groundwater discharges directly to Locust Fork, and to the east ditch/central channel, then percolates through GOB waste accumulated in the sedimentation basins in T1, and flows into the Locust Fork as bed seepage or seeps. *Id.* at 69–70. Drummond's experts agree that such seeps discharge into Locust Fork. **Ex. RR**,

---

[12] See **Exhibit QQ** for photos of the GOB pile (Exs. 27–29 to Hicks Dep.), discussed in **Exhibit A** at 204:04–20, 205:22–206:8, 207:10–18.

14

Sisk Dep. at 144:11–146:6; **Ex. PP** at 150:20–151:20. Dissolved metals concentrations in groundwater samples taken during the joint sampling are at least ten times higher than those in unimpacted samples and are associated with AMD originating from the GOB pile. **Ex. C-1** at 70–71. These groundwater samples are corroborated by PELA's previous groundwater monitoring. *See* **Ex. L**, at BWR000477–493.

## Summary Judgment Standard

Summary judgment should be granted if the movant shows that there is no "genuine dispute as to any material fact," with material facts defined by the substantive law, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once BWR satisfies its initial Rule 56(c) burden by demonstrating the absence of genuine disputes of fact, the burden shifts to the Drummond to come forward with specific facts "showing that there is a genuine issue for trial," *Allen*, 121 F.3d at 646.

## Argument

### I.    BWR Has Standing

BWR has satisfied the three statutory requirements to bring a citizen suit under the CWA and RCRA. First, BWR provided the required notice of its intent

to file suit[13] and waited 60 days before filings its CWA claims, and 90 days

thereafter before filing its RCRA claim. 33 U.S.C. § 1365(b)(1)(A); 42 U.S.C. §

6972(b)(2)(A).[14] Second, Drummond admits that neither ADEM nor the U.S.

Environmental Protection Agency (EPA) has taken any administrative or judicial

enforcement action to redress the violations alleged by BWR. Doc. 27, ¶ 14; 33

U.S.C. §§ 1365(b)(1)(B), 1319(g)(6), 6972(b)(2)(B). Third, for its CWA claim,

BWR satisfies the requirement in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay*

*Foundation*, 484 U.S. 49, 57 (1989), for an ongoing violation, because BWR's site

sampling in 2017 shows that Drummond has and will continue to discharge

pollutants without a permit after the filing of BWR's Complaint. *See* Statement of

Undisputed Material Facts ¶¶ 7, 17, 35 [hereinafter Facts].

      BWR also satisfies the "three requirements to have standing under Article III

of the Constitution: (1) 'injury-in-fact'; (2) 'a causal connection between the

asserted injury-in-fact and the challenged action of the defendant'; and (3) 'that the

injury will be redressed by a favorable decision.'" *Black Warrior Riverkeeper v.*

*U.S. Army Corps of Eng'rs,* 781 F.3d 1271, 1279 (11th Cir. 2015). BWR "has

standing to sue on behalf of its members when '(a) its members would otherwise

have standing to sue in their own right; (b) the interests it seeks to protect are

---

[13] BWR's notice of intent to sue letter, which was attached to the Complaint (Doc. 1-1) was
postmarked June 29, 2016.
[14] See Doc. 1, Complaint, filed September 1, 2016 and Doc. 12, First Amended Complaint, filed
October 21, 2016.

germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc*., 326 F.3d 505, 517 (4th Cir. 2003).

BWR's members have suffered injuries-in-fact as a result of the pollution at the Maxine Mine site. "[A]n individual plaintiff may show injury-in-fact 'by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed.'" *Riverkeeper*, 781 F.3d at 1280 (quoting *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005)). "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000).

BWR has filed seven standing declarations from its members establishing that their interests have been and will be harmed by the illegal and unpermitted discharges of pollutants into Locust Fork and T1. *See* **Exs. B, F–H**, **SS–UU**. BWR's members live, own property, recreate and work downstream of Maxine Mine. They document how these waters are harmed by continuing discharges of polluted waste from Maxine Mine, which decreases members' enjoyment of them. *Id.* For example, BWR's members Jo Ellen Tuggle, Buddy Vines and Jane Johnson are aesthetically offended by the polluted orange water that they see flowing into

17

Locust Fork from T1 when they boat past the Maxine Mine site, which they have done recently and will continue to do in the future. See **Ex. G**, Vines Decl. ¶¶ 7-10; **Ex. H**, J. Tuggle Decl. ¶ 14; **Ex. UU**, J. Johnson Decl. ¶¶ 13-14.

These injuries to BWR's members are fairly traceable to Drummond's failure to comply with the CWA and RCRA at the Maxine Mine site. Drummond placed mine wastes on a steep ridge in a location that allowed it to erode substantially and fill T1 with mine waste. Facts ¶¶ 34-35. Further, Drummond's failure to properly stabilize the site or implement water treatment contributes AMD and sediment to Locust Fork through surface and groundwater. *Id*. ¶ 36.

The injuries of BWR's members are likely to be addressed by a favorable decision. An award of civil penalties will deprive Drummond of some of the benefit of its violations and deter future violation of the CWA and RCRA, thereby also redressing those injuries. *Laidlaw,* 528 U.S. at 185–86. The Court also "may grant additional injunctive relief governing the post-permit operations of the companies insofar as the court is remedying harm caused by their past violations." *U.S. Pub. Interest Research Group v. Atl. Salmon of Me*., 339 F.3d 23, 31 (1st Cir. 2003). This injunctive relief could require Drummond to restore T1 and abate unpermitted discharges of pollutants into T1 and Locust Fork. This relief would also redress the injuries of BWR's members.

## II.   Drummond Has Violated § 301 of the CWA by Discharging Pollutants from Point Sources to Waters of the United States without a Permit.

18

Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, § 301 prohibits "the discharge of any pollutant" into waters of the United States except in accordance with permits issued under the CWA, including permits for discharges of pollutants under § 402. *Id.* §§ 1311(a), 1342.

The CWA citizen-suit provision allows "any citizen" to sue any "person" who is alleged to be in violation of an "effluent standard or limitation." *Id.* § 1365(a)(1).  Discharging without a permit required by § 301 is a violation of an "effluent standard or limitation." *Id.* § 1365(f)(1). To prevail on Count I, BWR must show that a person (1) discharged (2) a pollutant (3) into waters of the United States (4) from a point source (5) without a permit. *Parker v. Scrap Metal Processors, Inc*., 386 F.3d 993, 1003 (11th Cir. 2004). Drummond is a corporation, which is a "person" under the CWA. 33 U.S.C. § 1362(5). It is undisputed that Drummond does not have a permit for its discharges from its Maxine site. Facts ¶¶ 17, 24. As we show below, the other elements for liability are also met.

### A.  Drummond's GOB Pile, Ditches, Channels, Dams, Basins and Groundwater Seeps Are Point Sources

The CWA defines a point source to include "any discernable, confined, and discrete conveyance," including any "ditch," "channel," or "conduit" from which "pollutants are or may be discharged." 33 U.S.C. § 1362(14).  Point sources include surface water runoff which is channeled or collected by man.  40 C.F.R.

§122.2.  "The concept of a point source was designed [to embrace] the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States." *United States v. Earth Sciences*, Inc., 599 F.2d 368, 373 (10th Cir. 1979).[15]

Drummond's ditches and channels obviously meet this definition, as do its dams and sediment basins in T1, which are also point sources. *See Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist*., 13 F.3d 305, 308–09 (9th Cir. 1993) (dam in spillway that channeled acid mine runoff from mine site was a point source); *Ohio Valley Envtl. Coal., Inc. v. Pocahontas Land Corp.,* No. 3:14–11333, 2015 WL 2144905 at *1 (S.D. W.Va. May 7, 2015) (sediment ponds on mine site releasing runoff into navigable downstream waters "unequivocally" a point source).

Drummond's GOB pile is also a point source under two binding decisions from this Circuit. First, *Sierra Club v. Abston Construction Co., Inc*. dealt with Drummond-operated coal mines on a tributary of the Black Warrior River. 620 F.2d 41, 43 (5th Cir. 1980). Like here, the mine site included "highly erodible" spoil piles consisting of mining overburden. *Id.* Like here, rain water running off

---

[15] *See also Wash.Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988 (E.D. Wash. 1994) ("Non-point source designation is limited to uncollected runoff from water from, for example, oil and gasoline on a highway, which is difficult to ascribe to a single polluter. Discharges from a pond or refuse pile can easily be traced to their source. Thus, even though runoff might be caused by rainfall or snow melt percolating through a pond or refuse pile, the discharge is from a point source because the pond or pile acts to collect and channel contaminated water." (emphasis added) (citations omitted)).

the piles carried the eroded material to adjacent streams, "causing siltation and acid deposits." The defendants had constructed sediment basins to catch runoff, which occasionally overflowed. The site had naturally-formed gullies and ditches carrying pollution from "steep spoil piles" to protected creeks. *Id.* at 45–46. The court of appeals held that all of those structures, including the waste pile, are point sources if shown that the surface runoff was "collected or channeled by coal miners in connection with mining activities." *Id.* at 47.

Second, in *Parker*, the Court held that piles of debris were point sources. 386 F.3d at 1009 ("The piles of debris in this case collected water, which then flowed into the stream. They are, therefore, point sources within the meaning of the CWA."); *see also Consol. Coal Co. v. Costle,* 604 F.2d 239, 249 (4th Cir. 1979) (EPA had authority to regulate discharges from coal refuse piles as point sources)*; Earth Sciences,* 599 F.2d at 374 (system designed to catch runoff meets CWA definition of point source);

Here, the GOB pile collects polluted water and runoff which is channeled by ditches and channels to TI, where it is collected by dams and basins, then conveyed to Locust Fork. Facts ¶¶ 10-17.  Thus the GOB pile, channels, ditches, and dams are point sources. They are, individually and collectively, "discernable, confined, and discrete" sources and conveyors of pollution under the CWA.

Groundwater seeps that are hydrologically connected to surface water from

mines are also point sources. In a 1993 letter, EPA's Region VIII office stated

> [i]t is . . . EPA's position that seeps and other ground water discharges hydrologically connected to surface water from mines, either active or abandoned, are discharges from point sources and are subject to regulation through an NPDES permit. . . . Therefore, any seeps coming from identifiable sources of pollution (i.e., mine workings; land application sites, ponds, pits, etc.,) would need to be regulated by discharge permits.

**Ex. WW**, M. Dodson Letter (Dec. 22, 1993), *cited with approval in Beartooth All. v. Crown Butte Mines*, 904 F. Supp. 1168, 1173 (D. Mont. 1995). BWR's hydrology expert determined from on-site sampling and analysis that the AMD from Drummond's GOB pile is hydrologically connected to groundwater seeps that emerge at the mouth of T1 and upstream along Locust Fork. Facts ¶¶ 29, 36. Consequently, those are also point sources.

### B.    Locust Fork, T1, Ditches Are "Waters of the United States."

CWA jurisdiction for discharges of pollutants is predicated on discharges to "navigable waters." 33 U.S.C. § 1362(12). "[N]avigable waters" are defined as "the waters of the United States, including territorial seas," or "WOTUS" for short. *Id.* § 1362(7). Applicable regulations define WOTUS to include "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce . . . ," and "[t]ributaries to [those] waters . . . ." 33 C.F.R. § 328.3(a)(1), (5); 40 C.F.R. § 122.2(a), (e).

The Eleventh Circuit has interpreted *Rapanos v. United States*, 547 U.S. 715 (2006), the seminal case addressing CWA jurisdiction over WOTUS, to mean that

a tributary is a WOTUS if it has a "significant nexus" to a navigable water. *United States v. Robison*, 505 F.3d 1208, 1222–23 (11th Cir. 2007) (adopting Justice Kennedy's test). The significant nexus test is met if there is downstream pollutant transport from the tributary to a navigable river. *United States v. Cundiff,* 555 F.3d 200, 211 n.4 (6th Cir. 2009); *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1001 (9th Cir. 2007) ; *United States v. Hubenka*, 438 F.3d 1026, 1034 (10th Cir. 2006). WOTUS includes "tributaries of waters that can be navigated." *Parker*, 386 F.3d at 1009. A tributary is a "stream which contributes its flow to a larger stream or other body of water." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001). "[D]itches and canals, as well as streams and creeks," including man-made ditches and man-altered water bodies, are navigable waters if they are tributaries of a larger body of water. *Parker*, 386 F.3d at 1009

First, Locust Fork is a WOTUS because it is a navigable-in-fact water. Drummond admits in its Answer that it is navigable, Doc. 27, ¶ 23, and Riverkeeper's declaration, as well as Corps navigation charts, proves Locust Fork is navigable year round. Facts ¶ 2. Second, T1 is a WOTUS because it is a tributary to Locust Fork, with a physical and chemical connection to the Locust Fork. **Ex. C-1** at p. 20. Drummond admitted T1 is a WOTUS in its 1988 application for a CWA permit. Facts ¶ 22. The lower part of T1 (slough) was navigable before it was dammed, and filled with mine waste. Facts ¶ 4.

23

Drummond and its expert admit that T1 is a tributary or intermittent stream. Facts ¶¶ 16, 22. T1 is marked as a dotted blue line (meaning an intermittent stream) on U.S. Geologic Survey topographic maps and as a stream on aerial photos. Facts ¶ 3. Third, the east and west ditches, even though they are manmade or man-altered tributaries, flow into T1 and the Locust Fork. Facts ¶¶ 14, 22, 36. In fact, the west ditch—listed as an unnamed tributary—was a receiving water for permitted discharges from the site. Facts ¶ 22. Thus, these ditches have a significant nexus to T1 and the Locust Fork, are WOTUS, and discharges of pollutants to them violates the CWA.

### C.   Drummond Has Discharged Pollutants to WOTUS

The terms "discharge of a pollutant" and "pollutant" are defined broadly to achieve the purposes of the CWA. *See Rapanos*, 547 U.S. at 723. "Pollutant" includes spoil, solid waste, industrial waste, biological materials, and rock. *Id.* § 1362(6). Surface water runoff containing pollutants is a "discharge" under the CWA when the runoff is collected or channelized by human activity. *Mokelumne*, 13 F.3d at 308. AMD is a pollutant under the CWA. *W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 164–65 (4th Cir. 2010) (explaining formation of AMD and how it poses serious water quality issues); *Citizens Coal Council v. EPA*, 447 F.3d 879, 893 (6th. Cir. 2006) ("[A]cid mine drainage from abandoned mine lands causes serious water quality problems because of its high

acidity and other contaminants."); *Beartooth*, 904 F. Supp. at 1173; *Mokelumne*, 13

F.3d at 309.[16] Sediment and its components are also pollutants. *Driscoll v. Adams*,

181 F.3d 1285, 1291 (11th Cir. 1999); *N.C. Shellfish Growers Ass'n v. Holly Ridge*

*Assocs., LLC*, 278 F.Supp.2d 654, 676 (E.D.N.C. 2003).

"Discharge of a pollutant" means "any addition of any pollutant to navigable

waters from any point source." 33 U.S.C. § 1362(12)(A). "[T]he Act does not

forbid the 'addition of any pollutant *directly* to navigable waters from any point

source,' but rather the 'addition of any pollutant *to* navigable waters.'" *Rapanos,*

547 U.S. at 743. Thus, "the discharge into intermittent channels of any pollutant

that naturally washes downstream likely violates § 1311(a), even if the pollutants

discharged from a point source do not emit 'directly into' covered waters, but pass

'through conveyances' in between." *Id.* Drummond has discharged pollutants,

because AMD, sediment, coal and GOB from its GOB pile wash downstream into

ditches and channels, and via groundwater to seeps, and then flow into T1, the east

and west ditches, and Locust Fork. Facts ¶¶ 10–15; 17–19; 26–36.

The leaching of pollutants into groundwater is a violation of the CWA

where, as here, groundwater is hydrologically connected to surface waters, and

serves as a conduit for the conveyance of pollutants to surface waters. "A majority

of district courts addressing this issue . . . has concluded that the CWA prohibits

---

[16] The EPA lists pH, iron, sulfate, aluminum, and manganese, all present in AMD, as pollutants under the CWA.  40 C.F.R. § 122.21(h)(4); *id.* Part 122, App. D, Tbl. IV.

such discharge." *Flint Riverkeeper, Inc. v. Southern Mills*, 276 F. Supp. 3d 1359, 1366 (M.D. Ga. 2017). This Court has found that hydrologically connected groundwater can be subject to the CWA. *Tenn. Riverkeeper, Inc. v. Hensley-Graves Holdings, LLC*, 2:13-CV-877-LSC, 2013 WL 12304022, at *6 (N.D. Ala. Aug. 20, 2013) ("Eleventh Circuit precedent points to the idea that groundwater may be covered by the CWA if the claiming party can prove a substantial nexus."). While the Eleventh Circuit has not expressly held that the CWA covers the pollution of waters via hydrologically connected groundwater, at least four other circuit courts have so held.[17]

EPA maintains that the CWA applies to hydrologically connected groundwater discharges. *See, e.g.*, 66 Fed. Reg. 2960, 3015–16 (Jan. 12, 2001) (EPA "interprets the [CWA] to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water"; excluding such discharges "would . . . be inconsistent with the overall Congressional goals expressed in the statute."); 63 Fed. Reg. 7858, 7881 (Feb. 17, 1998) (same); 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991); 55 Fed. Reg. 47,990,

---

[17] *See Upstate Forever v. Kinder Morgan Energy Partners*, 887 F.3d 637, 652 (4th Cir. 2018) (CWA covers discharges from a point source to navigable waters "by means of ground water with a direct hydrological connection to such navigable waters"); *Hawai'i Wildlife Fund v. County of Maui*, 886 F.3d 737, 749 (9th Cir. 2018) (Discharges are within the scope of the CWA when "the pollutants are fairly traceable from the point source to a navigable water."); *N. Cal. River Watch*, 496 F.3d at 1000 (Clean Water Act coverage based on hydrologic connection); *Waterkeeper All. Inc. v. EPA*, 399 F.3d 486, 515 (2d Cir. 2005) (upholding EPA's case-by-case approach to regulating pollutant discharges to surface waters through connected groundwater); *Quivira Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir. 1985).

47,997 (Nov. 16, 1990).

At the Maxine Mine site, pollutants from the GOB pile and other point sources are discharged into subsurface waters, and then directly discharged into T1 and Locust Fork, which are WOTUS.  Facts ¶ 36. The groundwater in the catchment area beneath the GOB pile and in the reservoir beneath the sediment basins (which follows the path of the buried T1) is a conduit for Drummond's illegal discharges to T1 and the Locust Fork. There is a close, direct hydrologic connection between the upgradient GOB Pile and the nearby waterways, which are WOTUS.  Therefore, Drummond's discharges from point sources via both surface water and groundwater are unpermitted discharges in violation of the CWA.

Finally, it is irrelevant that Drummond did not create the GOB pile or conveyances. Successor mine owners are liable under the CWA for unpermitted discharges of pollutants from their land. *Huffman*, 625 F.3d at 167–68 (4th Cir. 2010). Discharges are deemed ongoing where, as here, pollutants "continue to reach navigable waters, even if the discharger is no longer adding pollutants to the source itself." *Umatilla Waterquality Prot. Ass'n v. Smith Frozen Foods, Inc.,* 962 F. Supp. 1312, 1322 (D. Or. 1997). Thus, discharges from inactive mines can violate the CWA. *Sierra Club v. El Paso Gold Mines, Inc.,* 421 F.3d 1133, 1142 (10th Cir. 2005); *Pocahontas*, 2015 WL 2144905, at *10.

27

## III.   Alternatively,[18] if Drummond's Discharges Are from Non-Point Sources, Drummond Has Violated § 6972(a)(1)(B) of RCRA

RCRA authorizes a citizen suit against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). To prevail on Count IV, BWR must prove (1) the existence of a solid or hazardous waste; (2) that Drummond has contributed to handling, storing, treating, transporting, or disposing of; and (3) that may present an imminent and substantial endangerment to health or the environment. *Parker*, 386 F.3d at 1014–15. "The section applies retroactively to past violations, so long as those violations are a present threat to health or the environment." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485–86 (1996).

### A.   The Materials in and Leaching from Drummond's GOB Pile Are RCRA Solid Wastes.

RCRA defines "solid waste," in relevant part, as "any garbage, refuse, sludge . . . and other discarded material, including solid, [or] liquid . . . material

---

[18] Discharges from point sources subject to § 402 of the CWA are excluded from RCRA's definition of "solid waste." 42 U.S.C. § 6903(27) (excluding "solid or dissolved materials in . . . industrial discharges which are point sources subject to permits under section 1342 of" the CWA). Thus, to the extent that this Court accepts BWR's contention that Drummond's discharges are from point sources covered by CWA § 402, those discharges are covered by the CWA and excluded from RCRA. BWR's RCRA claim is therefore an alternative basis for liability if, and to the extent that, Drummond's discharges are from non-point sources. For example, in *Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co.*, 91 F. Supp. 3d 940, 962 (S.D. Ohio 2015), the court found that RCRA applied to non-point discharges of solid waste that were "placed directly in water, or placed on land and then eventually discharged into water."

resulting from . . . mining . . . operations." 42 U.S.C. § 6903(27). Drummond's

GOB pile contains RCRA solid wastes, since it contains discarded solid and liquid

materials resulting from coal mining operations. *See Citizens Coal Council v. Matt*

*Canestrale Contracting, Inc*., 51 F. Supp. 3d 593, 611 (W.D. Pa. 2014) (coal refuse

is a RCRA solid waste under § 6972(a)(1)(B)). The AMD seeping and flowing out

of the GOB pile is also a RCRA solid waste. *Dague v. City of Burlington*, 935 F.2d

1343, 1356 (2d Cir. 1991), *rev'd in part on other grds.*, 505 U.S. 557 (1992);

*PennEnvironment v. PPG Indus., Inc.*, 127 F. Supp. 3d 336, 377 (W.D. Pa. 2015).

## B.  Handling/Treatment of RCRA Solid Wastes

Drummond actively contributed to the handling and treatment of the solid

wastes at the site. Upon acquiring the site, Drummond assumed the permit and all

reclamation responsibilities under the mining permit. "Handling" is not defined in

RCRA. However, in ordinary usage, to "handle" something is "to deal with or have

responsibility" for it. *Lincoln Properties, Ltd. v. Higgins*, CIV. S-91-

760DFL/GGH, 1993 WL 217429, at *15 (E.D. Cal. Jan. 21, 1993). Drummond

was responsible for the wastes in the GOB pile.

In 1988, Drummond obtained a permit for water discharges from the site,

which remained in effect until 1993. Facts ¶ 22. In 1989, Drummond applied

sodium hydroxide to the wastes as a neutralizing agent to reduce their acidity.

Facts ¶ 22. This satisfies the requirement for "treatment" of a solid waste.  RCRA

defines "treatment" of a hazardous waste to mean:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amendable for recovery, amenable for storage, or reduced in volume.

42 U.S.C. § 6903(34). EPA has applied this same definition to treatment of a solid waste when it enforces the RCRA endangerment provision. EPA, Transmittal of Guidance on the Use of Section 7003 of RCRA (Oct. 1997), at 13, *available at* https://nepis.epa.gov. Thus, the applicable definition specifically includes neutralization. Drummond actively contributed to the treatment of the wastes by using neutralization to change their chemical character (acidity) and attempt to render them less hazardous for offsite drainage. Since RCRA liability is joint and several, Drummond is liable for the entire indivisible harm caused by the solid waste in its GOB pile. *Me. People's All. v. Mallinckrodt, Inc*., 471 F.3d 277, 298 (1st Cir. 2006).

## C.     The Wastes in Drummond's GOB Pile May Present an Imminent and Substantial Endangerment to the Environment

The endangerment standard is a "lenient" one which "shall be developed in a liberal, not a restrictive, manner." *United States v. Waste Indus., Inc*., 734 F.2d 159, 167 (4th Cir. 1984). RCRA requires only a showing that a solid or hazardous waste "may present" an imminent and substantial endangerment. 42 U.S.C. § 6972(a)(1)(B). The endangerment provision contains "'expansive language,' which

is 'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes.'" *Parker*, 386 F.3d at 1015.

As to the imminence requirement, "plaintiffs must [only] show that there is a potential for an imminent threat of serious harm." *Id.* "An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for some time." *Me. People's All. v. Holtrachem Mfg. Co., LLC.*, 211 F. Supp. 2d 237, 247 (D. Me. 2002).

An endangerment is "substantial" if "there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Interfaith Cmty. Org. v. Honeywell Int'l*, 399 F.3d 248, 259 (3rd Cir. 2005). Endanger "means something less than actual harm." *United States v. Vertac Chem. Corp.*, 489 F. Supp. 870, 885 (E.D. Ark. 1980). "Danger is a risk, and so must be decided by an assessment of risk." *Id.* "In terms of substantiality, [BWR] need not quantify the risk of harm in order to establish an endangerment." *See Holtrachem*, 211 F. Supp. 2d at 247.

BWR also need not point to or document harm to a particular living organism to show endangerment. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 837 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005); *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007)

31

("proof of harm to a living population is unnecessary to succeed on the merits").
"Neither the statute nor the case law interposes an additional requirement that
humans or other life forms be threatened." *Interfaith*, 263 F. Supp. 2d at 837.

The scope of RCRA's endangerment provision is also more expansive than
the CWA. The CWA is media-specific and applies to water pollution in waters of
the United States, while RCRA "appl[ies] to releases to all media (i.e., 'the
environment' defined broadly)." EPA, Enforcement Authority Guidance, 56 Fed.
Reg. 24,393, 24,398 (May 30, 1991). Thus, harm to water, air, or soil alone may
constitute "imminent and substantial endangerment." *Interfaith*, 263 F. Supp. 2d at
837. "[A]n imminent and substantial endangerment to the environment in and of
itself may exist if contamination threatens the ability of a non-living element of the
environment to serve some potential function in the local ecosystem." *Tri-Realty
Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 456 (E.D. Pa. 2015). This is a highly
protective standard covering any aspect of the environment, including the land,
river bottom, surface water, and groundwater at the Maxine site.

Drummond's wastes meet these broad standards for an imminent and
substantial endangerment to the environment. BWR's expert sampled the surface
water runoff from the GOB pile in August 2017. Facts ¶ 32. Two of the sampling
locations were at upstream points on the mine site where water flows into T1 (SW8
and SW9), and two were near the mouth of T1 just prior to its confluence with

Locust Fork (SW3 and SW4). **Ex. OO**, Att. 1 at Fig. 17. A certified laboratory

performed EPA's whole effluent toxicity (WET) test procedure on water samples

from the four sampling locations. *Id.* at 3-4. BWR's expert in aquatic toxicology

states that those tests all showed that the sampled water showed both acute and

chronic toxicity to aquatic life, with values of 250 to 333 toxicity units for chronic

toxicity (TUc). *Id.* at 1, 4. The EPA threshold for chronic toxicity is one toxicity

unit. *Id.* Drummond's expert agreed that those results showed toxicity and did not

question their validity. Facts ¶ 32.

EPA has stated that WET tests are designed to "predict impacts of effluents

on the biological integrity of receiving waters" and that "WET testing is an

effective tool for predicting receiving system impacts when appropriate

considerations of exposure are considered." EPA, Guidelines Establishing Test

Procedures for the Analysis of Pollutants; Whole Effluent Toxicity Test Methods,

Final Rule, 67 Fed. Reg. 69,952, 69,965–66 (Nov. 19, 2002). The WET test

therefore demonstrates that discharges of contaminated water from its GOB pile

may present an imminent and substantial endangerment to surface water and

groundwater on the site and that flows into T1 and Locust Fork. *Dague*, 935 F.2d

at 1356 (finding endangerment, in part, because "[s]tandard bioassay techniques

revealed that leachate from the landfill was toxic to freshwater aquatic life").

Drummond's toxic GOB and leachate has impaired, if not obliterated, the

functional ability of the water at the site to support the survival and reproduction of aquatic life. *See Tri-Realty*, 124 F. Supp. 3d at 456. BWR has therefore satisfied all three requirements for a violation of the RCRA endangerment provision and is entitled to summary judgment as to Drummond's liability for that claim.

### Conclusion and Relief Requested

Based upon the undisputed facts and law set forth herein, Drummond has discharged pollutants at Maxine, without a permit, in violation of the CWA. Alternatively, if any of Drummond's discharges are deemed not to be from "point sources," then Drummond has improperly handled and treated wastes in a manner which may present imminent and substantial endangerment to the environment, in violation of RCRA. BWR is entitled to summary judgment and a declaratory judgment in its favor as to Drummond's liability as to Count I and/or Count IV.

Further proceedings will be necessary for remedy issues, including BWR's entitlement to permanent injunctive relief[19] ordering abatement of unpermitted discharges, by removing the source of pollution, obtaining a permit and/or restoring T1 to its natural state. The CWA and RCRA authorize these forms of equitable relief. *United States v. Bedford*, CIV.A.2:07CV491, 2009 WL 1491224, at *14 (E.D. Va. May 22, 2009) ("CWA violations may be remediated in a variety of ways, but restoration of a violation site to its pre-violation condition is the

---

[19] The CWA authorizes injunctive relief where "necessary to secure prompt compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

preferred remedy."); *Mallinckrodt*, 471 F.3d at 297 (once RCRA endangerment is found, the court should "start[] with the proposition that its primary concern ought to be how best to remedy a potentially serious near-term environmental hazard.").*Ohio Valley Envtl. Coal. v. Fola Coal Co.,* Nos. 2:13-21588, 2:13-16044, 2016 WL 3190255, at *9-11 (S.D. W.Va. June 7, 2016) (injunction granted in a CWA discharge case involving a coal mine).

If BWR prevails on its CWA Count, it will request the Court to impose civil penalties on Drummond for each day of unpermitted discharges, pursuant to CWA §§ 505(a) and 319(d), 33 U.S.C. §§ 1365(a), 1319(d), and 40 C.F.R. Pt. 19.  BWR will also seek to recover its costs of litigation (attorney's fees and expert witness fees), pursuant to CWA § 505(d), 33 U.S.C. § 1365(d) and 42 U.S.C. § 6972(e). Further proceedings will be necessary to determine the appropriate amount of civil penalties and litigation costs.

BWR respectfully requests that the Court grant its motion for partial summary judgment on liability on Count I or Count IV, and proceed with trial on the issues of remedy on those Counts, and the merits of Counts II and III, on the scheduled December 10, 2018 trial date.

Respectfully submitted this 15th day of August, 2018.

**s/Barry Brock**
Barry Brock (ASB-9137-B61B)
Christina Andreen (ASB-9696-D10R)
Southern Environmental Law Center
2829 Second Avenue S., Ste. 282
Birmingham, AL 35233
tel: (205) 745-3060
fax: (205) 745-3064
bbrock@selcal.org
candreen@selcal.org

James Hecker
Public Justice
1620 L Street NW, Ste. 630
Washington, DC 20006
tel:  (202) 797-8600
fax: (202) 232-7203
jhecker@publicjustice.net

Eva L. Dillard (ASB-4118-A59E)
Black Warrior Riverkeeper, Inc.
710 37th Street South
Birmingham, AL 35222-3206
tel:  (205) 458-0095
fax: (205) 458-0094
edillard@blackwarriorriver.org

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2018, the foregoing Plaintiff Black

Warrior Riverkeeper's Memorandum of Law in Support of its Motion for Partial

Summary Judgment was filed with the Clerk of Court using the CM/ECF system

which will send notifications of such filing and service copies to the following:

William A. Davis, III
Richard E. Davis
Alfred H. Perkins, Jr.
Starnes Davis Florie, LLP
100 Brookwood Place, 7th Floor
Telephone:   (205) 868-6000
Facsimile:   (205) 868-6099
Birmingham, AL 35209
RDavis@starneslaw.com
TDavis@starneslaw.com
APerkins@starneslaw.com

*Attorneys for Defendant*

                                                      **s/Barry Brock**

                                                      Barry Brock