FILED
2018 Aug-15  PM 10:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

Exhibit J

| Page 1 | Page 3 |
|---|---|

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT NORTHERN

2      DISTRICT OF ALABAMA SOUTHERN DIVISION

3      CIVIL ACTION NUMBER 2:16-CV-01443-AKK

4

5  BLACK WARRIOR RIVERKEEPER, INC.,

6          PLAINTIFF,

7  VS.

8  DRUMMOND COMPANY,

9          DEFENDANT.

10

11

12

13

14

15

16

17

18

19

20

21      DEPOSITION OF LOIS GEORGE

22      MONDAY, JUNE 25, 2018

23      JOB NUMBER 235563

**Page 2**

1      S T I P U L A T I O N

2      IT IS STIPULATED AND AGREED by and between

3  the parties through their respective counsel,

4  that the deposition of LOIS GEORGE may be taken

5  before Donna Winters, Commissioner and Notary

6  Public, State of Alabama at Large, at the law

7  offices of Southern Environmental  Law Center,

8  2829 Second Avenue South, Suite 282, Birmingham,

9  Alabama 35233, on the 25th day of June, 2018

10 commencing at 9:50 a.m.

11 DEPOSITION OF LOIS GEORGE

12

13

14

15

16

17

18

19

20

21

22

23

**Page 3**

1      IT IS FURTHER STIPULATED AND AGREED that

2  the signature to and the reading of the

3  deposition by the witness is reserved, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws and

6  rules of Court relating to the taking of

7  depositions.

8      IT IS FURTHER STIPULATED AND AGREED that it

9  shall not be necessary for any objections to be

10 made by counsel as to any questions, except as to

11 form or leading questions, and that counsel for

12 the parties may make objections and assign

13 grounds at the time of the trial, or at the time

14 said deposition is offered in evidence or prior

15 thereto.

16      IT IS FURTHER STIPULATED AND AGREED that

17 notice of filing of this deposition by the

18 Commissioner is waived.

19      In accordance with Rule 5(d) of Alabama

20 Rules of Civil Procedure, as amended, effective

21 May 15, 1988, I, Donna Winters, am hereby

22 delivering to Barry A. Brock, Esquire, the

23 original transcript of the oral testimony taken

**Page 4**

1  on the 25th day of June, 2018, along with

2  exhibits.

3      Please be advised that this is the same and

4  not retained by the Court Reporter, nor filed

5  with the Court.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 5

1        E X H I B I T S
2    EXHIBIT PG DESCRIPTION
3    PX-1 12 November 17, 2017 PELA Expert Report
4    PX-2 96 Historic aerial photos and maps
5    PX-3 60 Photographs, Bates PELA 27 through 59.
6    PX-4   May 25, 2018 Rebuttal Report
7    PX-5   CD with pictures (retained by counsel)
8    PX-6 63 Figure 1: Location of Monitoring Sites
9    PX-7 83 Figure photograph showing ditches
10   PX-8 45 Testimony provided by Lois George
11   PX-9 115 12-12-78 Memorandum from Sam Gilbert to
12   Jack McDuff re: Inspection Report Maxine Mine
13   PX-10 121 7-5-79 Notice of Violation
14   PX-11 123 8-6-79 Letter from PELA to Doug Cook
15   re: Maxine Mine - Rock Storage - Discharge
16   Problem
17   PX-12 127 8-21-79 Letter from PELA to Doug Cook
18   re: Maxine Mine - Rock Disposal Area
19   PX-13 128 11-1-79 Letter from D.R. Cook to PELA
20   re: Maxine Mine Geologic and Hydrologic Study
21   PX-14 129 11-6-79 Letter from PELA to Doug Cook
22   re: detailed progress statement of work
23   PX-15 131 11-16-79 Letter from PELA to Doug Cook

Page 6

1    re: Maxine Mine - Rock Storage Area Study
2    PX-16 133 11-16-79 Letter from PELA to Doug Cook
3    PX-17 136 1-24-80 Letter from PELA to Doug Cook
4    with attached Conclusions
5    PX-18 140 1-28-80 Letter from PELA to Bruce Smith
6    re: Maxine Mine Rock Storage Study
7    PX-19 145 2-4-80 Termination of Notice
8    Violation(s)
9    PX-20 146 3-10-80 Letter from PELA to Doug Cook
10   PX-21 147 7-30-80 Memorandum For the Record re:
11   Maxine Rock Storage Area Project
12   PX-22 157 10-2-80 Letter from PELA to Doug Cook
13   PX-23 160 12-30-80 Letter from PELA to Doug Cook
14   PX-24 162 January 1981 Assessment of Effect of
15   Drainage from the Rock Storage area, Maxine Mine
16   PX-25 167 7-30-82 Supplement to Permit
17   Application for Coal Processing Waste Disposal
18   PX-26 177 7-30-82 Addendum to Alabama By-Products
19   Corporation Maxine Mine Supplement to Permit
20   Application for Coal Processing Waste Disposal
21   PX-27 180 PELA Outline Work Elements Proposed for
22   Assessment of Hydrologic Conditions of the Capped
23   Area, Maxine Rock Disposal Area

Page 7

1    PX-28 181 8-26-82 Letter from PELA to Tom Musick
2    PX-29 183 12-13-82 Letter from PELA to Doug Cook
3    PX-30 184 12-15-82 Letter from PELA to Doug Cook
4    PX-31 186 2-11-83 Letter from PELA to Tom Musick
5    PX-32 187 4-22-83 Maxine Rock Disposal Area
6    Surface and Groundwater Monitoring
7    PX-33 191 7-26-83 Memo from Ronnie Key to Tom
8    Musick re: ADEM Inspection of Maxine Mine on
9    Tuesday, July 26, 1983
10   PX-34 194 12-8-83 Letter from D.R. Cook to
11   Richard Simon
12   PX-35 196 4-5-84 Maxine Rock Disposal Area
13   Surface and Groundwater Monitoring report by PELA
14   PX-36 202 10-5-84 Maxine Rock Disposal Area
15   Hydrologic and Water Quality Investigations
16   PX-37 208 Order
17   PX-38 209 7-21-92 Letter from ADEM to Clifton
18   McRoy re: Maxine Mine NPDES Permit
19   PX-39 210 7-7-92 Letter from Drummond Company,
20   Inc. to Dwight Hicks re: NPDES Permit Maxine Mine
21
22
23

Page 8

1            I N D E X
2    EXAMINATION BY: PAGE NUMBER
3    Mr. Brock              9 - 212
4
5
6
7
8
9
10        A P P E A R A N C E S :
11      SOUTHERN ENVIRONMENTAL LAW CENTER, by
12   Messrs. Barry A. Brock, Keith Johnston, and Ms.
13   Christina Andreen, 2829 Second Avenue South,
14   Suite 282, Birmingham, Alabama 35233, appearing
15   for the Plaintiff.  Bbrock@selcal.org
16   kjohnston@selcal.org
17      BLACK WARRIOR RIVERKEEPER, by Ms. Eva
18   Dillard, 712 37th Street South, Birmingham,
19   Alabama 35222, appearing for the Plaintiff.
20      STARNES DAVIS FLORIE, by Mr. Richard E.
21   Davis, Seventh Floor, 100 Brookwood Place,
22   Birmingham, Alabama 35209, appearing for the
23   Defendant.  Rdavis@starneslaw.com

Page 9

1    I, Donna Winters, a Court Reporter of
2  Birmingham, Alabama, acting as Commissioner, and
3  a Notary Public for the State of Alabama at
4  Large, certify that on this date, as provided by
5  Rule 30 of the Alabama Rules of Civil Procedure,
6  and the foregoing stipulation of counsel, there
7  came before me, LOIS GEORGE, witness in the above
8  cause, for oral examination, whereupon the
9  following proceedings were had:
10
11          LOIS GEORGE,
12  having been first duly sworn, was examined
13  and testified as follows:
14
15    COURT REPORTER:  Usual stipulations?
16    MR. DAVIS:  She would like to read and
17  sign; but otherwise, yes.
18    MR. BROCK:  Yes.
19
20  EXAMINATION BY MR. BROCK:
21  Q.  Good morning.  Would you state your full
22  name and address for the record, please?
23  A.  Lois D. George.

Page 10

1  Q.  And your address?
2  A.  1141 Mallard Circle, Tuscaloosa, Alabama
3  35405.
4  Q.  Ms. George, my name is Barry Brock.  I'm
5  one of the attorneys for Black Warrior
6  Riverkeeper in this lawsuit that's pending in the
7  Northern District of Alabama against Drummond
8  Company, and I understand you've been retained as
9  an expert in that case.  Is that correct?
10  A.  Yes, in part.
11  Q.  And you say "in part."  In what other
12  capacity have you been retained?
13  A.  I think I've been retained for factual
14  information, historical information.
15  Q.  Right.  We're going to go through some of
16  that.  As I understand, you were actually on the
17  site for a period of time in the late '70s and
18  early '80s; is that correct?
19  A.  Yes, sir.
20  Q.  Your report says 1979 through '84.  Is that
21  accurate?
22  A.  Yes.  Yes, it is.
23  Q.  So actually, you are both an expert and a

Page 11

1  fact witness, I would say, in this instance.  Is
2  that a fair assessment?
3  A.  Yes, sir.
4    MR. DAVIS:  And let me just interject here,
5  the retention is for Lois's work as an expert
6  witness.  She is a fact witness, not separately
7  retained, but here to talk about any facts as
8  well.  Does that make sense?
9    MR. BROCK:  Understood.  And we're going
10  to, hopefully, flesh that out some today.
11  Q.  I know it may be a little difficult at
12  times to determine what's in the expert bucket
13  and what's in the fact bucket, but I'm going to
14  try to do that, and ask you about all your
15  opinions in your report, and also ask you about
16  some historical documents and records, and see
17  what your recollection is of those events, okay?
18  A.  Very good.  Thank you.
19  Q.  I'm not doing it to punish you or to go
20  back through a lot of old documents.  It's
21  because we really are interested in some of these
22  events that happened back in the '80s; and there
23  aren't that many people around, we've discovered,

Page 12

1  who have personal knowledge about it, so that's
2  the reason that we're asking about it, okay?
3  A.  Yes.
4  Q.  And I will try not to let it get tedious,
5  but we do have a lot of documents to go through,
6  so please bear with me on that, okay?
7  A.  Will do.
8    (Whereupon, Plaintiff's Exhibit Number 1
9  was marked for identification, a copy of which is
10  attached to the original of the transcript.)
11  Q.  Let me show you what I've marked as Exhibit
12  1 to your deposition, and take your time to look
13  through that.  Is that a complete copy of your
14  Expert Report in this case?
15  A.  Yes, it appears to be.
16  Q.  Did you draft this report yourself?
17  A.  Yes, I did.
18  Q.  Did anyone else at -- I'm going to call
19  Lamoreaux & Associates PELA today, is that okay?
20  A.  That's great.
21  Q.  Did you pronounce it "PELA" or "PELLA"?
22  A.  It's PELA.  Pella are the blinds.
23  Q.  PELA?

**Lois George**

**4 (13 - 16)**

Page 13

1  A.  PELA.
2  Q.  So when I say that, you'll know what I'm
3  referring to, I trust?
4  A.  Yes.
5  Q.  You've been at PELA since 1976; is that
6  correct?
7  A.  Yes.
8  Q.  Did anyone else at PELA work on this with
9  you?
10  A.  Word processor.
11  Q.  And if you would turn in the report, it has
12  a copy of your resume attached as Appendix A.
13  It's right after page 14.  Do you see that?
14  A.  Yes, sir.
15  Q.  Is this a current edition of your resume?
16  A.  Yes.
17  Q.  If you would, first, tell us about your
18  educational background, starting with
19  undergraduate.
20  A.  I have a bachelor's degree in geology from
21  SUNY Fredonia, which is in Upstate New York in
22  Buffalo.  I actually have a double major in
23  geology and art.

Page 14

1  Q.  What year did you graduate?
2  A.  1975.
3  Q.  Are you from New York originally?
4  A.  Yes, I am.
5  Q.  Is that where you went to high school and
6  grew up?
7  A.  Yes.
8  Q.  What formal education have you had after
9  you obtained your geology degree?
10  A.  I took a number of graduate courses at The
11  University of Alabama.  I've taken specialized
12  training, short courses in various subjects on
13  hydrogeology and field methods and
14  report-writing.  I've also been an instructor on
15  some of those aspects, too.  I taught several day
16  classes at The University of Alabama as a
17  substitute teacher for Dr. Lamoreaux when he was
18  part of the faculty, and we've had in-house
19  training that counts as continuing education
20  also.
21  Q.  Thank you.  And we'll go through some of
22  that on your resume.  Did you obtain a master's
23  degree?

Page 15

1  A.  No, I did not.
2  Q.  How many hours of postgraduate credit did
3  you earn at The University of Alabama?
4  A.  I believe it was 15, but I'm not certain at
5  the moment.
6  Q.  Were you in a particular master's degree
7  program?
8  A.  No.  No.
9  Q.  How did you get from Buffalo, New York to
10  Tuscaloosa, Alabama?
11  A.  At the time I graduated from Fredonia, most
12  of my colleagues were going into the oil and gas
13  industry and moving to somewhere in Texas,
14  Louisiana or New York City, for the most part,
15  and I didn't care to do that.  I looked into
16  research institutes and ended up at the
17  Geological Survey of Alabama.
18  Q.  So was that your first job in Alabama?
19  A.  Yes.
20  Q.  What did you do there?
21  A.  I was a draftsman and editor, and I worked
22  in the mineral resources division at the
23  Geological Survey.

Page 16

1  Q.  How long were you in that position?
2  A.  It was about a year.
3  Q.  And then after that, where did you go?
4  A.  With P.E. Lamoreaux & Associates.
5  Q.  On your resume, there are some professional
6  registrations that are listed, I want to ask you
7  about some of those.  The American Institute of
8  Professional Geologists, it indicates you have a
9  certificate number on that.  How do you earn that
10  certificate?
11  A.  It was based on five years' experience --
12  I'm sorry, I believe it was three years'
13  experience, and written sponsorships from three
14  professionals, I believe.
15  Q.  How long have you had that certificate?
16  A.  35 years.
17  Q.  Do you consider yourself to have a
18  specialty or a special area of knowledge within
19  the field of geology?
20  A.  Yes, that would cover several areas.
21  Q.  Tell us what those would be.
22  A.  I guess first would be coal resources and
23  hydrogeology, associated with coal deposits and

Page 17

1  coal mining.  General environmental issues;
2  geomorphology and air photo interpretation.
3  Q.   What form of training or experience have
4  you had with air photo interpretation?
5  A.   Several of the courses in undergraduate
6  school, the professor I had was a
7  geomorphologist, and we studied aerial
8  photography and maps by different methods using
9  stereoscopes and different visual aids.  Also,
10  when I was at the Geological Survey, I believe
11  the geologist's name was Jim Drahozal.  He was
12  one of the senior geologists, and his specialty
13  was air photo interpretation.  I did some
14  projects, really his mappings, and also
15  coordinated some of my efforts with him when I
16  started at P.E. Lamoreaux & Associates.  We use
17  aerial photography in a lot of projects.
18  Q.   Okay.  It looks like from your resume, that
19  you --
20  A.   I'm sorry, I did put together a short
21  course on remote sensing that was part of a
22  continuing education seminar.  I can't remember
23  the date now, but it was put together for

Page 18

1  geologists' continuing education, and that was
2  one component of the seminar.
3  Q.   Aerial photo interpretation?
4  A.   Remote sensing and aerial photos.
5  Q.   Your resume indicates that you are a
6  licensed professional geologist in the state of
7  Alabama.  Is that correct?
8  A.   Yes, sir.
9  Q.   And how long have you had that designation?
10  A.   Since the program started.  2002?  I'm
11  sorry, I just don't remember the date.
12  Q.   That's okay, as close as you can remember
13  is fine.  What does one have to do to become a
14  licensed professional geologist?
15  A.   In Alabama?
16  Q.   Yes, ma'am.
17  A.   At the time, five years' experience; and,
18  again, I believe it was three references from
19  other professionals.
20  Q.   It looks like you list eight other states
21  where you have a similar-type designation.  Are
22  those different in any way?  Like, for example,
23  Florida, you list professional geologist.  What

Page 19

1  did you have to do to attain that license and
2  designation in Florida?
3  A.   Essentially the same thing.  And the reason
4  there's a little bit of difference in the title
5  is because the states give them a different
6  designation.
7  Q.   Is it all basically the same process, that
8  you need a certain number of years of experience
9  and references?
10  A.   Yes, it did at the time.  I was certified
11  back in the grandfathering phase.  Most of these,
12  now exams are required for the licensure.
13  Q.   I appreciate that clarification.  So for
14  any of the states that you list, did you have to
15  take an exam?
16  A.   Not for the states; but for the certified
17  environmental auditor, I took a 40-hour course
18  and an examination.
19  Q.   What is a Certified Environmental Auditor
20  or CEA?
21  A.   It's a certification that represents a
22  certain class of capabilities relative to
23  environmental regulations and processes of

Page 20

1  evaluation of properties.
2  Q.   When did you complete that course?
3  A.   I believe it was 1993 or 1994.
4  Q.   And you said you took a written exam?
5  A.   Yes.
6  Q.   Was that in Alabama?
7  A.   Yes.  The certification is to the National
8  Registry of Environmental Professionals.
9  Q.   Ms. George, working down your resume here,
10  it indicates that you were the chief of PELA's
11  coal division from 1978 to 1984.  Is that
12  correct?
13  A.   That's correct.
14  Q.   And what were your duties in connection
15  with being chief of that division?
16  A.   I think it's pretty well spelled-out in my
17  resume, but I guess what's not spelled-out is
18  report-writing and project management,
19  contracting drillers and other subcontractors;
20  coordination with the clients and regulatory
21  authorities, depending on the project.
22  Q.   Looking specifically at some of the things
23  that you listed about midway through the

Page 21

1 paragraph, it says "Sedimentation and water
2 quality studies in areas affected by mining."  Do
3 you see that part?
4 A.   Yes, sir.
5 Q.   Can you elaborate on any projects that
6 you've worked on or that you did work on that
7 would involve that activity?
8 A.   Well, the Maxine rock disposal area
9 certainly comes to mind, and we did permit a
10 number of underground and surface mines
11 throughout the state of Alabama, and there were a
12 number of those investigations that included an
13 assessment of current activities and monitoring
14 that was being done by the mining companies.  We
15 were also contracted by the Office of Surface
16 Mining to do a project in Tennessee, I believe it
17 was the White something Watershed.  It covered a
18 large area, and we were contracted by the Office
19 of Surface Mining to investigate potential
20 pollution to surface water and groundwater as a
21 result of mining, coal mining.
22 Q.   Was that at one mine site in Tennessee, or
23 multiple?

Page 22

1 A.   I believe it covered multiple mine sites.
2 Q.   So as to this sedimentation and water
3 quality studies, can you remember the names of
4 any mine sites in Alabama, other than Maxine,
5 where you performed that type of work?
6 A.   Knob Mine, Bankhead, Chetopa.  I believe
7 there were some in eastern Walker County that
8 were associated with Cobb Coal Mining.  They had
9 a number of mines; but, I'm sorry, I don't
10 remember the name of the specific mine.  That's
11 all the names I can think of right now.
12 Q.   Okay.  Very good, thank you.  You also list
13 geologic and hydraulic studies for mine
14 permitting and operating requirements.  Can you
15 recall any mines where you did that type work,
16 other than the Maxine Mine?
17 A.   I don't remember all their names, but there
18 were a number of companies that we did work for
19 that had multiple surface mines and underground
20 mines.  I believe we permitted -- assisted in
21 permitting eleven underground mines, and I think
22 it was 22 surface mines.  We also worked for the
23 Small Operators Assistance Program in Alabama,

Page 23

1 and assisted a couple small mining companies in
2 the Cahaba coal field; and I'm sorry, I don't
3 remember their names either.
4 Q.   That was my next question.  During this
5 period 1978 to '84, what mining companies did
6 PELA perform services for?
7 A.   First, I would like to say that we have a
8 nondisclosure policy, and I consider all of our
9 projects confidential; so other than what we're
10 referring to here today, I would rather not go
11 into much detail.  I can recount where the mines
12 are, what coal field they're in, and some of the
13 aspects of the work.
14 Q.   Well, let me ask you this.  Did PELA
15 perform work for Alabama Byproducts, ABC, at
16 mines other than Maxine?
17 A.   Yes.
18 Q.   On how many occasions?
19 A.   Occasions?
20 Q.   Yes.  How many mines, however you want to
21 define it, how many projects?
22 A.   I can't tell you how many projects, because
23 there were different aspects of work we were

Page 24

1 doing, but we did work in permitting at all of
2 their mines.
3 Q.   Roughly, what would that number be?
4 A.   Six, six mines.
5 Q.   During that same time period, did PELA
6 perform services for Drummond Company at any of
7 its mines?
8 A.   No, we did not.
9 Q.   Other than this case involving Maxine, has
10 PELA worked for Drummond before?
11 A.   I believe we did some geophysical logging
12 in the Kellerman area.  That's all the work we
13 did directly for Drummond.
14 Q.   Can you spell that?
15 A.   Kellerman?
16 Q.   Yes.
17 A.   K-E-L-L-E-R-M-A-N.  It's in the Brookwood
18 area.
19 Q.   What year would that have been?
20 A.   Probably sometime in the 1980s.
21 Q.   During this time period we're looking at,
22 '78 to '84, did PELA do work for other mining
23 entities or companies that were affiliated with

**Lois George** 7 (25 - 28)

Page 25

1 Drummond Company?

2 A.   Not that I know of, no.

3 Q.   One of the things that you list that you

4 did during that time frame was water quality and

5 environmental assessment of surface and

6 underground mine areas.  Other than the Maxine

7 project, can you list any others where you did

8 that kind of work?

9 A.   All the mines where we helped with the

10 permit applications; we installed monitoring

11 wells, and gathered information from the mining

12 companies about the geologic setting, and also

13 did extensive well inventory, probably thousands

14 of wells throughout the Warrior basin and some in

15 the Cahaba coal field.

16 Q.   And would that have included all the six

17 ABC mines?

18 A.   Yes.

19 Q.   You also list supervision and coordination

20 of mine reclamation.  First, let me ask, was PELA

21 involved in the reclamation work at the Maxine

22 Mine?

23 A.   Yes, I would say we were.

Page 26

1 Q.   We'll get into more detail about that a

2 little later.  Can you tell us any other mines

3 that you worked on at PELA on reclamation

4 aspects?

5 A.   I think there were a couple of the other

6 ABC mines, particularly the surface mine, and

7 possibly three or four mines in the western part

8 of the coal field for another coal company.

9 Q.   Your present position at PELA is vice

10 president of environment and ecology; is that

11 correct?

12 A.   Yes, sir.

13 Q.   How long have you had that position?

14 A.   Since the early '90s.

15 Q.   And you work in the Tuscaloosa office?

16 A.   Yes.

17 Q.   What sort of projects do you primarily work

18 on now?

19 A.   Groundwater contamination and remediation;

20 environmental assessments; peer reviews; resource

21 evaluations.

22 Q.   What do you mean by "peer reviews"?

23 A.   Providing consultation to clients regarding

Page 27

1 review of other consultants' reports.

2 Q.   Are you currently working on any matters,

3 other than Maxine, that involve coal mining or

4 coal waste?

5 A.   Yes, I am.

6 Q.   How many?

7 A.   Currently on the books, I believe it's just

8 one.

9 Q.   Is that a litigation case or something

10 else?

11 A.   No, it's not in litigation.

12 Q.   Now, you perform litigation services in

13 addition to the other things that PELA does,

14 right?

15 A.   Yes.

16 Q.   How long have you been providing litigation

17 support?

18 A.   I think primarily from the mid '90s, but

19 there were a few occasions before that.  You're

20 asking me personally?

21 Q.   Yes, ma'am.

22 A.   That's my answer.

23 Q.   What percentage of your time currently do

Page 28

1 you devote to litigation support, compared to

2 other work, as a percentage, if you know?

3 A.   Currently?

4 Q.   Yes, ma'am.

5 A.   A lot.  Excuse me, I didn't mean to be

6 flip.

7 Q.   No, you're fine.

8 A.   Can we put some time frame on "currently"?

9 Q.   Well, by that, I mean open matters that

10 you're working on right now.

11 A.   I guess of all the projects that might be

12 open, probably less than 30 percent.  The time

13 spent on those obviously is going to vary

14 depending on the scheduling.

15 Q.   Less than 30 percent if you look at the

16 number of open files; but if you look at the time

17 that is spent, it would be greater than that?

18 A.   Yes, sir.

19 Q.   What percentage, roughly, would it be, in

20 terms of time, your time?

21 A.   Well, if we look at the last several days,

22 it would be a significant amount of time

23 preparing for litigation, 85 to 90 percent; but

Page 29

1  if we spread that out over six months to a year,
2  it would probably bump down to 35 or 40 percent.
3  Q.   So 35 to 40 percent of your time over the
4  last calendar year, is what you're saying?
5  A.   Yes, I think that's a fair estimate.
6  Q.   When you work on litigation matters, do you
7  bill by the hour?
8  A.   Yes, sir.
9  Q.   And what is your standard rate?
10  A.   $175 an hour.
11  Q.   Is that what you're billing in this case?
12  A.   Yes.
13  Q.   Ms. George, when were you retained to be an
14  expert in this case?
15  A.   Last fall sometime.
16  Q.   Fall of 2017?
17  A.   '17.
18  Q.   Have you reviewed the Complaint?
19  A.   I believe so, yes.
20  Q.   Do you know, one way or the other?
21  A.   Yes, I have.  It would have been early on.
22  Q.   Have you reviewed the Notice of Intent to
23  Sue letter issued by Riverkeeper?

Page 30

1  A.   Yes, I have.
2  Q.   Have you reviewed any of the depositions in
3  the case?
4  A.   I thumbed through a couple, yes.
5  Q.   Which depositions were those?
6  A.   Mr. Hicks and Mr. Muncher.
7  Q.   Any others?
8  A.   No.
9  Q.   Did you review the exhibits to those
10  depositions?
11  A.   I thumbed through them, yes.
12  Q.   Did you meet with Mr. Hicks or Mr. Muncher?
13  A.   No, sir.
14  Q.   Did you know Mr. Hicks prior to being
15  retained in this case?
16  A.   I think we've met on several occasions in
17  the past; and, yes, I know of him.
18  Q.   Have you worked with him?
19  A.   No, I have not.
20  Q.   Did you know Mr. Muncher before you were
21  retained in this case?
22  A.   No, I did not, do not.
23  Q.   You said you do now?

Page 31

1  A.   I do not, sorry.
2  Q.   What other materials have you reviewed in
3  connection with generating your report in this
4  case?  And if you would like to refer to your
5  references in your report, you're welcome to.
6  A.   Okay, thank you.  I did review the expert
7  report submitted on behalf of the plaintiffs.
8  That would include Mr. Brown's report,
9  Mr. Johnson's report.  I did look through the
10  Sulkin report; Professor Dimova's report; I did
11  review several references that are included in my
12  expert report and my rebuttal report.
13  Q.   If you would, turn to page 12 of your
14  report.
15  A.   I'm there.
16  Q.   Where the references start, this is Section
17  8, correct?
18  A.   Yes, sir.
19  Q.   Did you put this list together?
20  A.   I did.
21  Q.   In several places there are documents that
22  are marked DRUM, D-R-U-M, and then a number after
23  them which is the Bates number that we've used

Page 32

1  for discovery in this case.  Do you see those?
2  A.   Yes, sir.
3  Q.   Did you review those Drummond Bates-stamped
4  documents?
5  A.   You did.
6  Q.   How were those documents provided to you?
7  A.   Either e-mail or a thumb drive,
8  electronically.
9  Q.   Who provided them to you?
10  A.   Richard did, Richard Davis.
11  Q.   Richard Davis?
12  A.   Yes.
13  Q.   Have you worked on cases before with
14  Mr. Davis?
15  A.   Yes, I have.
16  Q.   What cases are those?
17  A.   Let's see.  State of Alabama versus Alabama
18  Wood Treating.  I'm trying to recall the
19  citation.  University of Montevallo versus
20  somebody Tennessee; Woods Knoll.
21  Q.   I'm sorry, could you say that one again?
22  A.   Woods Knoll, K-N-O-L-L, and I'm sure I'm
23  not giving the entire citation, versus the City

Page 33

1  of Lincoln.  I think those are the cases.
2  Q.    The first case, again, you said State of
3  Alabama versus who or whom?
4  A.    Alabama Wood Treating.
5  Q.    What year would that have been when you
6  worked on that?
7  A.    2009-2010.
8  Q.    Did you give a deposition in that case?
9  A.    Yes, I did.
10  Q.    Did you testify at a trial or hearing?
11  A.    No, I did not.
12  Q.    Did you do an expert report?
13  A.    Yes.
14  Q.    Generally, what was the subject matter of
15  your expert report in the case?
16  A.    The case had to do with the
17  responsibility -- I guess in a nutshell, the
18  responsibility of contamination of waterfront
19  property in the upper Mobile Bay, Mobile River.
20  Q.    And who were you retained by?
21  A.    I think it was Starnes.
22  Q.    Who was Starnes' client?
23  A.    Alabama Wood Treating.  They also had

Page 34

1  another corporate name, but I don't recall it at
2  the moment.  I'm sorry.
3  Q.    And was Alabama Wood Treating accused of
4  polluting the property that was at issue in the
5  case?
6  A.    It was alleged they were one of the
7  responsible parties for creosote contamination.
8  Q.    What was the outcome of the case?
9  A.    I believe it settled.
10  Q.    In the University of Montevallo case, what
11  year or years did you work on that one?
12  A.    Late 1990s.
13      MR. DAVIS:  Are you sure about that?
14      THE WITNESS:  No, I'm not, to be honest.
15      MR. DAVIS:  Can I help on the date?
16      MR. BROCK:  Sure.
17      MR. DAVIS:  That case tried in 2006.
18      THE WITNESS:  Oh, wow.
19  A.    If I may refer to this, I believe there's
20  some information on that.
21  Q.    Yes, I was looking for that.  In Section 7,
22  there's some prior litigation, but I think it
23  only goes back a few years.  I don't think it

Page 35

1  includes these matters, but you're welcome to
2  take a look.
3  A.    If you have dates on some of these, it
4  would be helpful to me.
5  Q.    Sure.
6      THE WITNESS:  Thank you for answering the
7  question.
8  Q.    Ms. George, are any of the cases, are
9  either of the two that you've been testifying
10  about listed on page 11 of your report?
11  A.    Yes, the first one, Woods Knoll versus the
12  City of Lincoln.
13  Q.    But the State of Alabama versus Wood
14  Treating and the University of Montevallo cases
15  are not listed here; is that right?
16  A.    That's right.
17  Q.    How many years does this list of previous
18  cases go back, do you know?
19  A.    The oldest date I have is 2011 for
20  depositions, but typically five years.
21  Q.    In the University of Montevallo case, did
22  you give a deposition?
23  A.    Yes, I did.

Page 36

1  Q.    Did you do an expert report?
2  A.    Yes, I did.
3  Q.    And did the case go to trial?
4  A.    It did.
5  Q.    Did you testify at trial?
6  A.    I did.
7  Q.    Was it in state court or federal?
8  A.    I don't know.
9  Q.    Was it in Shelby County?
10  A.    Yes.
11  Q.    And generally, what was the nature of your
12  expert opinion in that case?
13  A.    That a proposed mining operation would
14  irreparably harm the waterways in Ebenezer
15  Spring, which was part of Ebenezer Preserve,
16  property belonging to the University of
17  Montevallo.
18  Q.    Were you retained by Starnes?
19  A.    I worked with --
20  Q.    Was it a different law firm?
21  A.    It may be, yes.
22  Q.    That's fine if you don't remember the name
23  of the firm.  Did Mr. Davis work at the firm?

Page 37

1  A.   Yes.
2  Q.   And you worked with him on that case?
3  A.   I did.
4  Q.   The Woods Knoll case is the first one
5  listed here, and it indicates you gave a
6  deposition and courtroom testimony in that case,
7  right?
8  A.   That's correct.
9  Q.   And what was the general nature of your
10 opinion that you rendered in that case?
11 A.   That the activities of the City of Lincoln
12 did not cause sedimentation or water runoff
13 damages to the adjoining property, Woods Knoll.
14 Q.   Do you have copies of these depositions?
15 A.   I may.  I may have electronic copies.
16 Q.   Specifically, the Woods Knoll deposition?
17 A.   I'm not sure about that one, 2011.
18 Q.   Do you have a copy of your deposition in
19 the University of Montevallo case?
20 A.   I'm not sure about that.  We've moved
21 several times, and archives have been purged for
22 older projects.  We may have electronic copies.
23 Q.   Do you keep copies of your expert reports

Page 38

1  in a particular place?
2  A.   I do.
3  Q.   Do you have expert reports for all of the
4  cases that are listed on page 11 of your report
5  in this case?
6  A.   Yes, I believe I do.
7  Q.   In the second item on this list, the Rodger
8  Morrison versus Harvest Monrovia case, can you
9  tell us what generally your opinion that you
10 rendered was in that case?
11 A.   Yes, I can.  The Harvest Monrovia and Fire
12 Protection Authority is also the public water
13 supply of the Harvest Monrovia area.  They're
14 pumping out of a Karst aquifer, and the opinion
15 was that the withdrawal of the groundwater from
16 the formation was not having an impact on the
17 property of Rodger Morrison.
18 Q.   So were you retained by the defendant in
19 the case, or a defendant?
20 A.   The defendant, yes.
21 Q.   In the next listed case, Mount Canaan, were
22 you retained by the plaintiff or the defendant?
23 A.   The plaintiff.

Page 39

1  Q.   What was the nature of your opinion in that
2  case?
3  A.   Soil and groundwater contamination and
4  vapors that the church was experiencing on their
5  property were attributed to the adjacent tank
6  farm and their pipeline.
7  Q.   And did you conclude in that case that
8  there was contamination?
9  A.   Yes.
10 Q.   What was the outcome of that case?
11 A.   I believe that one settled.
12 Q.   And the next item, Skelton, were you
13 retained by the plaintiff or defendant?
14 A.   The defendant.
15 Q.   And what was the general nature of your
16 testimony?
17 A.   That the defendant, Mr. Cunningham, the
18 activities on his property adjacent to the
19 Warrior River were not causing adverse erosion
20 effects to his neighboring property.
21 Q.   What activity was he engaged in?
22 A.   It was a private residence.
23 Q.   Was he just clearing it to build it?

Page 40

1  A.   He had cleared it, built, and maintained
2  it.
3  Q.   With regard to that case, you indicate "did
4  a technical report."  Is that something different
5  than an expert report, or is that just another
6  terminology for an expert report?
7  A.   It's just another term for an expert
8  report.
9  Q.   In the City of Hattiesburg case, were you
10 retained by the defendant or the plaintiff?
11 A.   Plaintiff.
12 Q.   And you did a report and a deposition,
13 right?
14 A.   Yes, sir.
15 Q.   But no trial testimony?
16 A.   No, sir.
17 Q.   What was the nature of your opinion in the
18 Hattiesburg case?
19 A.   The case was related to the historical use
20 and current ongoing activities of remediation at
21 the Hercules site in the outskirts of
22 Hattiesburg.  My opinion related to certain areas
23 of the site that had not had attention, needed

**Lois George**                                                    **11 (41 - 44)**

Page 41

1 further attention, and I developed cost estimates
2 for potential remedial activities associated with
3 that.
4 Q.   What sort of facility is Hercules?
5 A.   They produced a wide range of different
6 chemicals at that facility, pesticides and other
7 organic constituents that I don't recall the list
8 of the names of the constituents.
9 Q.   Did you give an opinion about the existence
10 of the contamination, or just the costs
11 associated with remediation?
12 A.   My opinion did include the existence of
13 contamination.
14 Q.   Did the estimate for remediation include
15 any excavation of soil or other material?
16 A.   Yes, it did, at specific areas on-site.
17 Q.   What other components did the remedial cost
18 estimate include?
19 A.   Continued recovery of DNPL, Dense
20 Non-aqueous Phase Liquids; groundwater treatment;
21 closure of the site.
22 Q.   And what was the resolution of that case,
23 if you know?

Page 42

1 A.   It was settled.
2 Q.   Is the facility still in operation?
3 A.   The remediation, I believe, is still
4 ongoing.  The facility has been closed for quite
5 some time.
6 Q.   This case was in Mississippi, according to
7 this document?
8 A.   Yes, sir.
9 Q.   Was this the first time that you had worked
10 in Mississippi?
11 A.   No.
12 Q.   You've had other cases where you gave
13 expert reports and testimony in Mississippi?
14 When I say "worked," I mean on a lawsuit in
15 litigation support, to clarify.
16 A.   No, that was not the first time.
17 Q.   The next case, Village of Sauk Village, it
18 says, and that was in Illinois, correct?
19 A.   Yes, sir.
20 Q.   Is that near Chicago?
21 A.   Yes, it is.
22 Q.   Were you retained by the plaintiff or the
23 defendant?

Page 43

1 A.   By the plaintiff.
2 Q.   What was the nature of your testimony in
3 that case?
4 A.   The Village of Sauk Village was
5 experiencing groundwater contamination in their
6 public water supply, and it was my opinion that
7 it was likely that the Roadway Express was the
8 source of the contamination.
9 Q.   What is Roadway Express?
10 A.   At this location of Sauk Village, it was a
11 significantly large trucking transfer location.
12 Q.   I recall in that case, if I'm correct, that
13 part of the defense was that there were some
14 landfills that were responsible for the
15 contamination.  Is that the right case?
16 A.   Yes.  Yes.
17 Q.   And what was the ultimate outcome of that
18 case, if you know?
19 A.   The jury found for Roadway.
20 Q.   And you testified at trial in 2017?
21 A.   I did.
22 Q.   Was this the first case that you had worked
23 on in the state of Illinois?

Page 44

1 A.   Yes.  In Illinois, yes.
2 Q.   Did you feel that you were qualified to
3 give an opinion in a lawsuit in the state of
4 Illinois?
5 A.   Yes.
6 Q.   Did the Court accept you as an expert in
7 that case?
8 A.   Yes.
9 Q.   Did the fact that it was the first time you
10 had worked in Illinois impede or impact your
11 opinion in any way?
12 A.   No, sir.
13 Q.   And the last case, the first plaintiff is
14 Janice Potter.  Were you retained by the
15 plaintiff or defendant in that case?
16 A.   Plaintiffs.
17 Q.   It looks like you did a report and a
18 deposition, correct?
19 A.   Yes.
20 Q.   What was the nature of your testimony in
21 that case?
22 A.   The case had to do with the application of
23 pesticides at individual properties and a nearby

Page 45

1 country club.

2 Q.   This was in the state of Florida; is that

3 correct?

4 A.   Yes.

5 Q.   Is this case ongoing?

6 A.   I did testify in court also.

7 Q.   Okay.  So it might be updated?

8 A.   That would be on the updated.

9      (Whereupon, Plaintiff's Exhibit Number 8

10 was marked for identification, a copy of which is

11 attached to the original of the transcript.)

12 Q.   Let me go ahead and hand you what's Exhibit

13 8, which Mr. Davis gave me this morning, which I

14 understand is an updated version of this previous

15 case listing.  Is that accurate?

16 A.   Yes.

17 Q.   And I see it has some additional

18 information about the Potter case that indicates

19 you testified at trial in February of this year;

20 is that correct?

21 A.   Yes, sir.

22 Q.   Has there been a verdict in that case?

23 A.   The trial -- yes, there has.  The trial was

Page 46

1 for class certification, and it was denied.

2 Q.   Did you testify about class certification?

3 A.   I testified about the hydrogeologic setting

4 and contamination of the proposed class area.

5 Q.   Is the case still going on, even though

6 they didn't get class certification, or has it

7 ended, or do you know?

8 A.   I'm not certain.

9 Q.   So my review of these two documents, it

10 looks like that additional information about the

11 Potter case is there, and there's another --

12 wait.  It looks like all the other cases are the

13 same; is that correct?

14 A.   Yes, sir, that's correct.

15 Q.   If I'm missing any additional information

16 on here, let me know.  All I see is the

17 information at the end of the description of the

18 Potter case.

19 A.   Yes, that was added to update it, since

20 that occurred after preparing the expert report.

21 Q.   Okay, I understand.  Thank you.

22 Ms. George, in any of the cases listed in Section

23 7, was any of your testimony excluded that you

Page 47

1 attempted to offer in those cases?

2 A.   No, sir.

3 Q.   Have you ever had an instance where your

4 testimony was excluded?

5 A.   No, I haven't.

6 Q.   Have you ever had an instance where a court

7 declined to recognize you as an expert in the

8 case?

9 A.   No.

10 Q.   If you would turn to page 9 in your report,

11 please.

12 A.   (Witness complies.)

13 Q.   This section is titled Qualifications.  Do

14 you see that?

15 A.   I do.

16 Q.   And did you draft this?

17 A.   I did.

18 Q.   In the last paragraph of this description

19 of your qualifications, it mentions that you have

20 done coal market studies?

21 A.   Yes.

22 Q.   Can you tell us what that is?

23 A.   Yes.  We were retained several years in a

Page 48

1 row, and ultimately for use by the Public Service

2 Commission.  I will talk about this one, since it

3 is public information.

4 Q.   Let me stop you, though.  The Public

5 Service Commission of Alabama?

6 A.   Yes, sir.

7 Q.   Okay, go ahead.

8 A.   We put together a report based on

9 interviews of, as I recall, surface mining

10 operators and underground mining operators, and

11 got information about how much they were mining.

12 And it focused mostly on their cost of money and

13 their sales cost for either long-term or

14 short-term contracts that they had with their

15 customers.  I believe the Public Service

16 Commission used it for aspects of looking at the

17 Alabama Power Company.

18 Q.   Is there a written report or series of

19 reports that came out of that work?

20 A.   There were, but I don't believe we have

21 record of them anymore.

22 Q.   What years are we talking about here?

23 A.   Right around 1980, or '79 to '82 or '83,

Page 49

1 something like that.
2 Q.   If I understood your testimony correctly,
3 the Public Service Commission retained and
4 compensated PELA for this work?
5 A.   I'm not sure if it was the Public Service
6 Commission or Alabama Power Company.
7 Q.   It's kind of hard to tell the difference
8 sometimes, isn't it?
9 A.   It might have been why we were doing it.  I
10 don't know.
11 Q.   Ms. George, if you need to take a break at
12 any time, I should have told you that, you
13 probably know that, you've done a lot of
14 depositions; but if at any time you need to take
15 a break, just let me know.
16 A.   Thank you.  We're good.
17 Q.   In the Qualifications section, you also
18 mention that you were a member of ADEM's
19 Groundwater Program Advisory Committee.  Can you
20 tell me what that work entailed?
21 A.   Yes.  There was a committee of
22 professionals, engineers and geologists,
23 environmental scientists that was pulled together

Page 50

1 by, I believe it was Sonya Massey or Whitt Slagle
2 at ADEM in the groundwater division.  We met on
3 numerous occasions regarding their current and
4 potential revisions of their program aspects.
5 Q.   What years was that?
6 A.   Early 1990s.
7 Q.   Did that committee sponsor any particular
8 administrative or legislative initiatives or
9 action?
10 A.   Not that I recall that specifically came
11 out of the committee.  I think it was more
12 advisement to the internal operations.
13 Q.   At ADEM?  The internal operations at ADEM?
14 A.   At ADEM, the groundwater branch.
15 Q.   You also list the risk-based corrective
16 action or RBCA work group.  Can you tell me what
17 that is or was?
18 A.   Yes.  It is defunct now, but this also was
19 in probably the early 2000s.  The Underground
20 Storage Tank Program had already established a
21 risk-based corrective action program or system,
22 and ADEM and many other states at the time were
23 looking at how to put together their risk

Page 51

1 programs for other types of properties besides
2 underground storage tanks.  And this, again, was
3 a committee group that was led by an ADEM
4 consultant that ultimately has put together a
5 computer program that many, many consultants and
6 states use for calculating or determining risk.
7 Q.   Who is the consultant?
8 A.   It's called the RAM Group out of Texas.
9 Q.   R-A-M?
10 A.   Yes, sir.  It's an acronym.  I don't recall
11 what their --
12 Q.   What is the software program called?
13 A.   RAM Version 4 right now.
14 Q.   And what is it used to assess the risk of?
15 A.   The risk of exposure from all the chemicals
16 that are listed on the regional screening level
17 list put out by EPA every six months, and it's
18 also used as a forward calculation to determine
19 potential clean-up levels of those constituents
20 also.
21 Q.   Do you use that software in your work?
22 A.   Yes, on some projects.  I don't personally,
23 our firm does.

Page 52

1 Q.   Has it been used on the Maxine project?
2 A.   No, sir.
3 Q.   Would it be applicable?
4 A.   No, sir.
5 Q.   Coming back to the References section on
6 page 12 of your report, if you could turn to that
7 page, please.
8 A.   (Witness complies.)
9 Q.   On the items that have the Drummond Bates
10 stamp numbers, were those individual documents
11 provided to you, or did you cull those documents
12 out of a larger set of Drummond documents?
13 A.   I'm sorry, I misspoke when I answered your
14 question earlier.  I believe that I used these on
15 the basis of reviewing the appendices of
16 Mr. Brown's report.
17 Q.   Okay.  So if I'm understanding you --
18 A.   So I did cull them from a compendium of
19 documents.
20 Q.   Just to make sure I understand, attached to
21 Mr. Brown's report was a stack of Drummond
22 Bates-stamped documents, right?
23 A.   That's correct.

Page 53

1  Q.   And you looked at those?
2  A.   Yes.
3  Q.   Are you saying that all of the documents
4  listed in your reference list came out of that
5  group of documents that were attached to Mr.
6  Brown's report?
7  A.   I believe so, yes.
8  Q.   And the reason I ask is, in this case in
9  the document production, we're up to about 4,000
10 pages of documents.  I just didn't know if you
11 went through all of the Drummond document
12 production to cull down to these documents, or
13 not.  Did you do that?
14 A.   I did not, not at this time of preparation
15 of the expert report.
16 Q.   So your testimony today is, you believe all
17 of these Drummond documents came from Brown's
18 report?
19 A.   Yes, sir.
20 Q.   If you would, please turn to page 10 of
21 your report titled Compensation.  Are you with
22 me?
23 A.   Yes, sir.

Page 54

1  Q.   Are the rates shown here what you are
2  billing the Starnes firm for work in this case?
3  A.   Yes, sir.
4  Q.   Do you have a written retainer agreement
5  with the Starnes firm?
6  A.   I believe so, yes.
7  Q.   Is it a contract-type document or a letter?
8  A.   Just a letter.
9  Q.   Did you counter-sign it and accept the
10 terms as are set out in the letter, or what does
11 the document look like?  How is it formatted?
12 A.   I'm not sure.  Just a brief letter.
13 Q.   Does it set out a scope of work for PELA in
14 this case?
15 A.   No, sir.
16 Q.   Does it describe what it is that PELA has
17 been retained to do?
18 A.   No, sir.
19 Q.   Other than the hourly rate, does it have
20 any instruction about the work PELA is supposed
21 to do or not do in the case?
22 A.   No.
23 Q.   What is your understanding of what PELA has

Page 55

1  been retained to do in this case?
2  A.   To view documents and provide
3  interpretation and expert opinion, and also
4  provide information and review about our historic
5  project.  Projects, excuse me.
6      MR. DAVIS:  I'm sorry.  If it helps, I've
7  said this before, I'm happy to produce every
8  engagement letter with any of our consultants, as
9  long as there's reciprocity.
10     MR. BROCK:  Okay, we can talk about that.
11 I was just going to ask those questions and
12 see --
13     MR. DAVIS:  That's fine.  I just wanted to
14 make sure that you understood I'm happy to give
15 them to you.
16 Q.   Are all of the opinions that you have
17 developed pursuant to that retention by defense
18 counsel in this case, set forth in the two
19 reports that you've submitted?
20 A.   Yes.
21 Q.   And you've done a lot of expert reports,
22 and you understand the way the process works, is
23 that the rules require you to set forth your

Page 56

1  opinions in writing in the report, right?
2  A.   Yes.
3  Q.   And you've done so?
4  A.   Yes.
5  Q.   Have you submitted invoices for your work
6  in the case?
7  A.   Yes.
8  Q.   And are those based on your hourly rate
9  times the number of hours you've worked?
10 A.   Yes, and it would also include support
11 staff and expenses.
12 Q.   What support staff have been involved in
13 this case?
14 A.   Primarily, the word processor.
15 Q.   No technical staff?
16 A.   Yes.  A limited number of hours, yes.
17 Q.   Who would that be?
18 A.   Dan Green.
19 Q.   What work did he perform?
20 A.   He pulled some reference documents for me
21 and also just discussion of some of the aspects
22 of Mr. Brown's volumetrics.  I believe that's
23 all.

Page 57

1  Q.    What is Mr. Green's area of expertise?
2  A.    He's a geologist.  He's our chief of
3  operations.
4  Q.    Through the date of today's deposition, how
5  many hours has PELA billed for its work on this
6  case?
7  A.    I don't know.
8  Q.    Have you seen bills that contain the number
9  of hours?
10 A.    I have.
11 Q.    Do you have any reasonable estimate you can
12 provide?
13 A.    No.  No, I don't.
14 Q.    Do you know how many hours were invoiced
15 for preparation of your first report?
16 A.    Not without looking, no, I don't.
17 Q.    Do you have any estimate?
18 A.    It certainly would be just an estimate.  60
19 hours, 40 hours, somewhere in that realm.
20 Q.    What about with regard to your rebuttal
21 report, what would your best estimate be of how
22 many hours PELA had invested in that?
23 A.    I'd really rather not just give a

Page 58

1  guesstimate at this time.
2  Q.    Yes, I don't want you to make a wild guess,
3  but if you have a reasonable estimate --
4  A.    I don't.
5  Q.    At the time you prepared your initial
6  report, the date on the front, it was submitted
7  November 17, 2017 --
8  A.    Yes, sir.
9  Q.    -- had you made a visit to the Maxine Mine
10 site?
11 A.    Not recently, no.
12 Q.    As of the date you submitted this report in
13 2017, what was the most recent trip to the mine
14 site that you had made?
15 A.    Likely in the mid '80s.
16 Q.    Same question with the rebuttal report, did
17 you make a visit to the mine between the time you
18 submitted the first report and the rebuttal
19 report?
20 A.    No, I did not.
21 Q.    Have you recently made a visit to the mine
22 site?
23 A.    Yes, I have.

Page 59

1  Q.    How recently was that?
2  A.    It was on June 7th.
3  Q.    Of this year?
4  A.    Yes, sir.
5  Q.    Who accompanied you on that trip?
6  A.    Mr. Davis; Leslie Noble; an associate with
7  Mr. Davis's firm; and Tom Simpson.  There was one
8  other person.  Her name will come to me and I'll
9  give it to you later, if I may.
10 Q.    Who was she affiliated with?
11 A.    I believe she's with Tuscaloosa Testing, or
12 retired, I'm not positive.
13 Q.    Generally, what all did you view when you
14 made that site visit on June 7th?
15 A.    What I would refer to would be the upper
16 pond and the lower pond; the basin that was
17 constructed as part of the drainage ditch system
18 in the 1980s; portions of the drainage ditch
19 system, the cross-over; and the pine forest that
20 occupies the majority of the rock disposal area
21 now.
22 Q.    Did you do this on foot?
23 A.    Yes, sir.

Page 60

1  Q.    Did you go in by vehicle or boat?
2  A.    Vehicle.
3  Q.    Did you keep any field notes from that
4  visit?
5  A.    No, I did not.
6  Q.    Did you take any photographs?
7  A.    I did take photographs, some.
8  Q.    It's a little bit out of order, I
9  apologize.  I try to be organized and mark them
10 in advance, and I should have known better,
11 because I never stay in the same order.
12     (Whereupon, Plaintiff's Exhibit Number 3
13 was marked for identification, a copy of which is
14 attached to the original of the transcript.)
15 Q.    Let me show you what I've marked Exhibit 3,
16 which is a stack of photographs that Mr. Davis
17 has produced to us.  For the record, these are
18 stamped PELA 27 through 59.
19 A.    Yes, sir.
20 Q.    Are these photos that you took on the mine
21 site visit on June 7th?
22 A.    I haven't looked at each and every one,
23 but, yes, they do look like it.

Page 61

1  Q.    Take your time and do that.  We just need
2  to be accurate for the record, make sure we
3  didn't sneak one in there on you.
4  A.    Okay.  (Witness complies.)
5        (Whereupon, at this time a short break
6  was taken.)
7  Q.    Ms. George, did you have an opportunity to
8  look at those photographs?
9  A.    I did.  If I may, I told you if I
10 remembered the other individual's name, I would
11 bring it to your attention.  It's Cindy
12 House-Pearson.  I remembered it before I got
13 outside of your door.
14 Q.    And she was with who?
15 A.    I believe she's with TTL or she has
16 retired.  I'm not positive.
17 Q.    And that's the testing lab in Tuscaloosa?
18 A.    Yes, they do have a component that's a
19 testing lab.
20 Q.    Let's talk a little bit about some of these
21 photos.  Did you take these yourself?
22 A.    I did.
23 Q.    On the first one, number 27, what do you

Page 62

1  refer to that area as?  It's been called in this
2  case the lower sediment basin and the alluvial
3  fan and some other things.  How do you refer to
4  it?
5  A.    The lower pine.
6  Q.    And is this the area just upgradient of the
7  lower dam?
8  A.    Yes, it is.
9  Q.    And by "lower dam," I mean the one that is
10 closest to the Locust Fork?
11 A.    Yes.
12 Q.    What is the material that we see on the
13 ground there in that first photo, number 27?
14 A.    Primarily eroded shale.
15 Q.    Eroded shale?
16 A.    Uh-huh.  Shale is the siltstone.
17 Q.    What is the origin of that material?
18 A.    The origin would be from the refuse rock
19 and also from the natural bedrock.
20 Q.    How much of it, if you could attribute,
21 would be to the rock refuse pile?
22 A.    I have not made an estimate, but the
23 majority of it probably is from the refuse pile.

Page 63

1        (Whereupon, Plaintiff's Exhibit Number 6
2  was marked for identification, a copy of which is
3  attached to the original of the transcript.)
4  Q.    I'm going to go ahead and show you this
5  exhibit, too, Plaintiff's Exhibit 6, because we
6  might want to refer to it going through these
7  photographs.
8  A.    Yes, sir.
9  Q.    Have you seen this figure before?
10 A.    Yes, I have.
11 Q.    Did you prepare this?
12 A.    Yes, I did.
13 Q.    Do you know the year that this was
14 prepared?  Because I don't see a year on it.
15 A.    I can't give you a specific date, because I
16 believe it was used in a number of progress
17 reports, and it would be in the early '80s, '82,
18 '83, to the best of my recollection.
19 Q.    That seems to be everybody's best
20 recollection, but I just thought maybe because
21 you're the author of it, you might have a more
22 precise recollection.  I mean, I know it was a
23 long time ago.

Page 64

1  A.    It was a long time ago.
2  Q.    Do the best you can do, that's all we can
3  ask.  If you don't mind, just so we can identify
4  these things, I'm going to hand you this red pen;
5  and if you would on Exhibit 6, can you write on
6  this one the number 27 where this photo, the area
7  that the photo depicts?
8  A.    Well, the number wouldn't really be
9  representative of the entire area, but I'll put
10 the number in the middle of the area.
11 Q.    Okay, thank you.  When you said that the
12 material, the majority came from the rock refuse,
13 what did you refer to it as, rock refuse pile?
14 A.    I think I called it refuse material.
15 Q.    Because we have got a lot of different
16 terminology for some of these piles.  Are you
17 familiar with the terms pre-law and post law?
18 A.    Yes.
19 Q.    Is that terminology that you all used when
20 you were working on the site in the '80s?
21 A.    Yes.
22 Q.    If you would, can you tell us which area on
23 Exhibit 6 would comprise the, [quote], "pre-law"

Page 65

1 refuse area?

2 A.   The lighter stippled area would be the

3 pre-law area.

4 Q.   If you would, would you write up at the top

5 "pre-law" in that area?

6 A.   It is also in the explanation.

7 Q.   Okay, I understand.

8 A.   (Witness complies.)  And if I may, draw an

9 arrow to the explanation.

10 Q.   That would be fine.

11 A.   (Witness complies.)

12 Q.   And the other area that's a darker shade

13 that looks like, when you're looking at this

14 exhibit to the left, which I guess would be the

15 west, what do you refer to that area as?

16 A.   This would be the capped area or the post

17 law area.

18 Q.   Is the material in the post law area

19 different than the material in the pre-law area?

20 A.   Yes and no, yes in the fact that it does

21 have a clay cover placed upon it after the

22 completion of the refuse placement.  It may have

23 a somewhat different composition than parts of

Page 66

1 the pre-law area, because the washing of the coal

2 may have changed over time.

3 Q.   How would the coal wash-aways possibly be

4 different than the material in the pre-law pile?

5 A.   The amount of coal could be less, coal

6 fines, coal dust.

7 Q.   Let me stop you.  It could be less in which

8 section?

9 A.   It could be less in the post law because of

10 increased sufficiency in recovering coal.

11 Q.   The material in the pre-law refuse area,

12 I'm going to refer to it that way because that's

13 what it's called on this document, is that

14 material the same as geologic overburden?

15 A.   I've never used that term for refuse rock.

16 Geologic overburden, to me, is associated with

17 surface mines, and it's the material that's the

18 overburden that is removed above the coal that's

19 placed in a spoil pile.  It hasn't gone through a

20 washing process, it's just transported.  I always

21 refer to washer rock, refuse.

22 Q.   Mr. Hicks referred to it as coarse refuse.

23 Are you familiar with that terminology?

Page 67

1 A.   Yes, as opposed to the fines that are more

2 of a slurry and are deposited in different areas.

3 Q.   Is it appropriate to refer to it as mine

4 waste?

5     MR. DAVIS:  Object to form.  You can

6 answer.

7 A.   I'm just not familiar with calling it that.

8 Q.   Okay.  Is the material in the pond that we

9 see in photograph 27, did that come from the

10 pre-law or the post law waste area?

11 A.   Are you referring to the surface of it or

12 the entirety of it?

13 Q.   The entirety of it.

14 A.   It could come from both.

15 Q.   Have you performed any sampling or analysis

16 on your own to try to determine the origin of the

17 material we see there in that pond?

18 A.   Recently or historically?

19 Q.   Ever.

20 A.   I don't believe that was a specific task at

21 the time.

22 Q.   If you would turn to page 29 in that

23 exhibit, tell us what is depicted in that photo.

Page 68

1 A.   It's essentially the same area that's in

2 photograph 27, it's just taken from a different

3 angle.

4 Q.   On the right side of the photo, it appears

5 that there's some surface water moving over the

6 top of the sediment.  Is that what that is?

7 A.   Yes, there was a trickle of drainage at the

8 time we were there.

9 Q.   Was it raining that day?

10 A.   Not that day, no.

11 Q.   On the next page, page 30, is that a

12 close-up shot of that same drainage that we saw

13 in the prior photo?

14 A.   Yes, it is.

15 Q.   Is there any particular reason why you took

16 this photo?

17 A.   No, not particular.

18 Q.   Turn to page 31, if you would, and tell us

19 what's depicted in that photo.

20 A.   This is the -- I was standing on the lower

21 dam looking towards the Locust Fork, and this is

22 the coarse riprap comprising the dam, the exposed

23 portion of it, anyway.

Page 69

1  Q.   Is that area what's referred to as the
2  spillway?
3       MR. DAVIS:  Object to the form.  You can
4  answer.
5  A.   I'm not sure what to refer to it by name.
6  When we were working on the project, the drainage
7  from the lower pond was at the other side of the
8  pond; and there were some alterations or
9  additions or augmentations made to the dam that
10 changed its configuration, and I believe the
11 notch for the outlet was changed to the north
12 side of the dam.
13 Q.   Do you know about what year that happened?
14 A.   It would be somewhere around '83, '84, '85,
15 but I can't pinpoint the year.
16 Q.   But it was while you were working on the
17 project, on the Maxine site?
18 A.   It was either while we were working on it
19 or shortly after we completed our investigations.
20 Q.   Did PELA play any role in the design of
21 this notch, as you describe it, in the lower dam?
22 A.   No, sir.
23 Q.   Was that something PELA recommended to ABC?

Page 70

1  A.   No, I don't recall any specific
2  recommendations about engineering or design for
3  this feature or any of the other dams or
4  impoundments.
5  Q.   So to make sure I'm understanding your
6  testimony, this notch or discharge area when you
7  were there was on the downriver or south end of
8  the dam?
9  A.   Yes.  It's where the drainage was.
10 Q.   Did it look like this was rock riprap, or
11 did it look different?
12 A.   I think it looked different in several
13 different ways through the process of our
14 investigations.  There were other times when
15 limestone riprap was applied to the dam.
16 Q.   We may look at this in some of the
17 documents, but there was a mention at times of a
18 limestone filter in the lower dam.  Do you know
19 what that terminology refers to?
20 A.   Yes, sir, and I have looked at the design
21 documents that's included in the compendium of
22 documents, so I know what you're referring to.
23 Q.   What is the purpose of the limestone

Page 71

1  filter?
2  A.   To allow water to leave the impoundment,
3  but the impoundment would serve its purpose as
4  being a sediment basin to catch the sediment.
5  Q.   Was the limestone filter when the discharge
6  was on the south end of the dam?
7  A.   No, sir, I don't believe so.
8  Q.   Is what we're looking at in this photo 31,
9  is that the limestone filter or part of it?
10 A.   It may be.
11 Q.   You're not sure?
12 A.   I'm not sure.
13 Q.   When you were on the site, I know you
14 worked with a lot of ABC employees and engineers,
15 right?
16 A.   Yes, sir.
17 Q.   Did you ever work with anybody from
18 Drummond Company?
19 A.   No, sir.
20 Q.   With Mr. Hicks or anybody else?
21 A.   No, sir.
22 Q.   Was your work completed by 1984?
23 A.   '84, '85, yes.

Page 72

1  Q.   The next four photos, number 32 through 35,
2  seem to be highlighting a particular pine tree.
3  Can you explain to us the significance of those
4  photos, or why you took those photos?
5  A.   Yes.  I was really quite astounded as to
6  the size of some of the trees from the vegetation
7  that had grown up over the entire site since I
8  was there last.  I had looked at the site from
9  time to time in aerial photography, just out of
10 curiosity, and could see that it was forested for
11 the most part, but I hadn't been on the ground.
12 Really, I was surprised as to the amount of
13 forestry.
14 Q.   Could you show us by reference to Exhibit
15 6, where on the property this particular pine
16 tree is?
17 A.   I don't think so.
18 Q.   Do you have any idea at all, in terms of
19 the structures that are shown on that?
20 A.   I believe we were at some location between
21 the upper dam and, let's call it, the toe of the
22 post law area.
23 Q.   Would that be in the capped area?

Page 73

1  A.   No, I think we were below the capped area,
2  but I'm really not certain, because the terrain
3  was somewhat hummocky, but it was difficult to
4  really position where I was because of the line
5  of vision and the trees.  I really couldn't tell
6  at some locations.
7  Q.   Did your camera have any GPS coordinates --
8  A.   My camera?  No.
9  Q.   Was this taken with a camera or a phone?
10  A.   Camera.
11  Q.   So there is no GPS information to identify
12  where these photos are?
13  A.   No.
14  Q.   If you would turn to page 36, what is the
15  structure that we see in that photo?
16  A.   This is layered bedrock of the Pottsville,
17  with a trickle of drainage, seepage.
18  Q.   Where is the seepage coming from?
19  A.   In this instance, it looked like it was
20  coming out from on top of one of the more
21  resistant layers of the Pottsville near the top
22  of the picture.
23  Q.   Can you tell us where on the site this

Page 74

1  photo was taken?
2  A.   My recollection is that we were somewhere
3  in the vicinity of SW-1, maybe a little further
4  north and up in that valley.
5  Q.   Well, if you can approximate where it was,
6  and I understand it's approximate, and write "36"
7  on it, I would appreciate it.
8  A.   Okay.  (Witness complies.)
9  Q.   Is the next photo 37 part of that same
10  formation we were looking at in 36?
11  A.   Yes, I believe so.
12  Q.   Photos 38 and 39 also appear to be a
13  similar location, and there are some pine trees
14  in those photos.  What were you capturing in
15  those two photos?
16  A.   This is an area where the refuse rock is
17  now covered with the pine trees and a thick layer
18  of pine straw and other small trees growing up
19  through it.
20  Q.   Where is this on the site?
21  A.   I think we're still in proximity down in
22  the lower part.
23  Q.   Close to where you wrote 36?

Page 75

1  A.   Further northeast in that draw.
2  Q.   Can you write 38 to approximate it?
3  A.   (Witness complies.)
4  Q.   The next three photos, 40, 41 and 42, look
5  like they have a boot in it and then a stream or
6  some flowing water, anyway.  What are we looking
7  at in those pictures?
8  A.   This is some of the Pottsville bedrock and
9  seepage, and what I was trying to capture was the
10  sheen that's on the water.  It's indicative of
11  iron or iron bacteria in the water -- on the
12  water, excuse me.
13  Q.   Am I understanding you to say that you
14  believe this seep is from the bedrock formation
15  as opposed to some other source on the site?
16  A.   I think this is a different location.
17  Q.   Well, I thought you just said a moment ago
18  that this related to the Pottsville formation?
19  A.   Well, it does, but the Pottsville formation
20  is underneath the entire area, and it's exposed
21  at many different places.
22  Q.   Throughout the documents there's -- and
23  we'll get into these -- a reference to an aquifer

Page 76

1  that was formed by the placement of the waste
2  material.  Are you familiar with that?
3  A.   Are you referring to PELA's documents?
4  Q.   Yes.
5  A.   Yes.
6  Q.   Are you making a determination about
7  whether these seeps are from that aquifer or not
8  from that aquifer?
9  A.   I hadn't made that determination; but, no,
10  I don't believe they are.  The aquifer that was
11  referred to was in the hollow, to the best of my
12  recollection.
13  Q.   Which would be where in reference to
14  Exhibit 6?
15  A.   Between the lower dam at the right-hand
16  edge of the picture and to somewhere in the
17  vicinity of SW-3 or MO-3.
18  Q.   And that's what you refer to as the hollow?
19  A.   The hollow, the ravine, the valley.
20  Q.   The tributary?
21     MR. DAVIS:  Object to the form.
22  A.   I don't think we ever called it a
23  tributary.

**Lois George**

Page 77

1  Q.   PELA never called it a tributary?

2  A.   Dr. Lamoreaux may have referred to it as a

3  tributary in some of his documents.

4  Q.   Photos 43, 44 and 45 appear to be the same

5  general subject matter there.  Can you tell us

6  what we're looking at in those pictures?

7  A.   43 is pretty blurry, so I would like to

8  skip that one.

9  Q.   Yes, ma'am.

10  A.   This is a face along the western ditch

11  where the runoff or the drainage is collected

12  from the pre-law area, and we're looking at some

13  of the pre-law area that's covered with trees.

14  Q.   Turn to photo 46, if you would.

15  A.   Yes, sir.

16  Q.   Is this the upper dam?

17  A.   I don't believe so.  We were walking near

18  and in the vicinity of what used to be the old

19  road that came down between the pre-law and the

20  post law area and the drainage, but I don't

21  believe this is the dam.

22  Q.   So it's an area along where the road once

23  existed between the pre- and the post law waste

Page 78

1  areas?

2  A.   Yes, and it would be in the narrow, I

3  believe in the narrow area of the valley.

4  Q.   Can you mark 46?

5  A.   (Witness complies.)  I think we were close

6  to where the writing is for SW-3 and MO-3.

7  Q.   Okay, that's sufficient.  So you were close

8  to SW-3?

9  A.   Yes, I think so.  Like I said earlier, it

10  was starkly different and very difficult to

11  determine precisely where we were.

12  Q.   Photos 48 through 51 appear to be in the

13  same general area.  Can you tell us where those

14  are on the site?

15  A.   Yes, I believe we were somewhere between

16  the location of MW-9 and SW-3, where the

17  reclamation in the capped area had terracing.

18  Q.   And would that be the case for all four of

19  these pictures?

20  A.   Yes.

21  Q.   Pictures 52 and 53, it looks like a pipe in

22  those photos.  Is that correct?

23  A.   Yes, it's corrugated culvert.

Page 79

1  Q.   Where is that on the site?

2  A.   It is in the vicinity of what's labeled as

3  the basin, and there's a small enlargement down

4  in the lower left-hand corner of the diagram.  It

5  shows, in cartoon fashion, let me say --

6  Q.   Cartoon fashion, that's the same word our

7  engineer used.  Okay, go ahead.

8  A.   This is not a design drawing, obviously,

9  but it was prepared to show the placement of the

10  pipe relative to how the drainage system would

11  work.

12  Q.   Well, what was the function of this pipe

13  that we see in the photo?

14  A.   The pipe was to convey runoff from the post

15  law area, that came down the west side of the

16  post law area into the basin, and then that basin

17  would drain out separate from pre-law, separate

18  it from pre-law drainage.

19  Q.   Did that basin go all the way to the Locust

20  Fork at the time this figure was prepared?

21  A.   The basin itself?

22  Q.   I'm sorry.  Did the drainage channel that

23  came out of the basin that's shown on this

Page 80

1  enlargement?  Do you understand what I'm asking?

2  A.   Yes, sir, I do.  I was trying to recall.

3  Yes, I believe it did.

4  Q.   Photos 54 through 59 depict some concrete

5  structures.  Can you tell us what we're looking

6  at there?

7  A.   Yes.  This is what we refer to as the

8  cross-over, and the approximate location is shown

9  on whatever figure this is called, Exhibit 6,

10  Figure 1.  It was older reports.  It's west of

11  the post law area, and it's where the solid line

12  and the dashed line cross each other.

13  Q.   If you would, can you just draw an arrow

14  out from that and put the number of one of these

15  photos?

16  A.   (Witness complies.)

17  Q.   What was the function or purpose of the

18  cross-over?

19  A.   It was to prevent the commingling of the

20  pre-law and the post law drainage from the west

21  side of the rock disposal area.

22  Q.   Why was there an effort made to segregate

23  the runoff from those two areas?

Page 81

1  A.   The purpose was to, I guess, be in
2  compliance with the regulations.
3  Q.   What regulations?
4  A.   The surface mining regulations, surface
5  mining control.
6  Q.   Was that a determination that PELA made or
7  ABC made, or who made the determination that they
8  would be in compliance in some way by segregating
9  those waste streams?
10  A.   My recollection and from reviewing some of
11  the documents is that it was a cooperative
12  planning process by ABC, with PELA's input, in
13  coordination with the Surface Mining Commission
14  and at the time the Water Improvement Commission
15  which transitioned into ADEM, the Alabama
16  Department of Environmental Management.
17  Q.   What was PELA's contribution to that?
18  A.   Recommendations, how and where, but we did
19  not design anything.
20  Q.   Did PELA design any of the drainage
21  ditches?
22  A.   No, we did not design.
23  Q.   What sort of recommendations did you make,

Page 82

1  specifically?
2  A.   Potential placement of the ditches, and
3  also the contouring of the post law area so that
4  it would drain into the ditch properly, and that
5  commingle in the other direction would be pre-law
6  drainage; again, no design.  Recommendations in
7  writing and verbally while we were all on-site.
8  Q.   Who did you work with primarily at ABC on
9  those issues?
10  A.   There wasn't one individual.  I think our
11  on-site activities were mostly with Tom Musick
12  and Jack McDuff.  Other discussions, not
13  necessarily on-site recommendations would have
14  been to Doug Cook and Lawyer Edwards.
15  Q.   Have you spoken to any of those people
16  about this lawsuit?
17  A.   I have not.
18  Q.   Have you spoken to any of them since 1984
19  or '5 when you left the site?
20  A.   Yes.  Jack McDuff was working for -- he
21  still may, he worked for Jefferson County, and we
22  acquired some aerial photography, I believe it
23  was, from his offices.

Page 83

1  Q.   How recently was that?
2  A.   2003, 2004, possibly.
3  Q.   How about Mr. Musick, have you had any
4  contact with him?
5  A.   I have not.
6  (Whereupon, Plaintiff's Exhibit Number 7
7  was marked for identification, a copy of which is
8  attached to the original of the transcript.)
9  Q.   Let me go ahead and show you another
10  document that I've marked as Exhibit 7 to your
11  deposition.  It's another figure.  Are you
12  familiar with that document?
13  A.   Yes, I am.
14  Q.   Did you prepare this?
15  A.   I think so.
16  Q.   It looks similar to Exhibit 6 in a lot of
17  ways.  A lot of the same features are shown here,
18  correct?
19  A.   Yes, the monitoring sites are shown; both
20  surface water and the wells; the locations of the
21  infiltration testing that we did is shown; arrows
22  that show general direction of drainage, runoff.
23  Q.   We're going to come back to this in more

Page 84

1  detail, but this drawing shows east ditch, west
2  ditch, north ditch, and parallel ditch.  Do you
3  see all four of those?
4  A.   Yes, I do.
5  Q.   Were those ditches actually constructed and
6  put into operation on the site?
7  A.   Yes.
8  Q.   Were those all in existence when you left
9  the property in '84 or '85?
10  A.   I believe so, yes.  Yes.
11  Q.   Are those all manmade ditches?
12  A.   I think for the most part, with the
13  exception of the drainage that's shown from SW-2
14  or the basin, out towards the lower dam, that
15  does hug the natural topography, and you can see
16  the Pottsville exposed, so it drains along an
17  expression of the original hollow or topography
18  that was there; and in some places, it goes from
19  the drainage along the east ditch in the vicinity
20  of SW-3 and MO-3, which I think you can tell that
21  better on Exhibit 6, where the pattern on the
22  diagram indicates it's treed, it's forested.
23  Q.   Let me try to deconstruct that a little

Page 85

1 bit.
2 A.   Have I confused you?
3 Q.   No, it's fine.  My question was about the
4 four ditches that I listed, the one that's on
5 Exhibit 7 that's designated north, east, west,
6 and parallel.  First, let me limit it to those
7 four.  Are those all manmade ditches?
8 A.   Yes.
9 Q.   Who were they constructed by?
10 A.   Either Alabama Byproducts or a contractor
11 of theirs.
12 Q.   Did PELA supervise or direct the
13 construction of those ditches in any way?
14 A.   No.  We were on site and made observations,
15 but we were not the supervisor of it.
16 Q.   Did you provide recommendations about the
17 location of those ditches?  By "you," I mean
18 PELA.
19 A.   Yes, sir, I understood that.  Not a
20 specific location, but the fact that there would
21 be two ditches to the west, and they needed to be
22 segregated, and then there needed to be a means
23 of settling-out any solids or sediment, so there

Page 86

1 needed to be a basin.
2 Q.   Were there any recommendations that PELA
3 made to ABC with regard to those four ditches
4 that were disregarded, that you recall?
5 A.   No, not that I recall.
6 Q.   Earlier you were saying maybe that part of
7 this would not be manmade.  Were you referring to
8 the blue line with the two arrows on the bottom
9 of the photo that moved toward the lower dam and
10 the river?
11 A.   Yes.  I was referring to the drainage up
12 close to the embankment, I guess you would call
13 it.
14 Q.   And for the record for reference purposes,
15 we're talking to the blue line that's just below
16 the site number 1 which the explanation says is
17 an infiltration test site?
18 A.   Yes.
19 Q.   Ms. George, do you know if this ditch that
20 we're talking about now was part of the original
21 tributary that ran through the site?
22      MR. DAVIS:  Object to the form.  You can
23 answer.

Page 87

1 A.   The hollow as mapped on the USGS topo maps
2 is an intermittent or ephemeral stream.
3 Q.   Is it intermittent or ephemeral?
4 A.   By symbology, I guess USGS, would be an
5 intermittent stream.  The blue line that's shown
6 on Exhibit 7, I guess it would be to the south of
7 where that line would have been drawn on the map.
8 Q.   So you've seen the USGS map with the
9 intermittent stream depicted on the Maxine site?
10 A.   Oh, yes, sir.
11 Q.   Can you show us with the red pen on Exhibit
12 7, if it will show up, you said it would be --
13 I'm sorry, did you say north or south of the blue
14 line?
15 A.   I think I said north.
16 Q.   Can you show us with a line on there, the
17 approximate path that you believe the tributary
18 was depicted on USGS maps?
19 A.   Only to a certain extent.
20 Q.   Yes, I understand.  This might work better,
21 the blue pen.
22 A.   Blue?  Could it get confused with the other
23 blue line we're talking about?  I'm going to

Page 88

1 start at the location of 2, the infiltration
2 test, and make a dash there; dash down to number
3 1 infiltration test; and then a dash to the large
4 arrow.  I'm going to stop there because the USGS
5 topo maps, 1971 and the 1938, indicate a slough,
6 so that would not be included in the intermittent
7 stream symbology.
8 Q.   Was the lower dam constructed across the
9 slough?
10 A.   Yes.
11 Q.   If you would, can you just bring an arrow
12 out here and write "UT"?  That's our terminology
13 for unnamed tributary.  What would you refer to
14 it as?  You can call it whatever you think is
15 proper for that which was designated on the USGS
16 map, and you can abbreviate it and tell us what
17 you're abbreviating for.
18 A.   I'm just going to write over here
19 "intermittent stream."
20 Q.   All right, fair enough.
21 A.   May I write "approximate," please?
22 Q.   Yes, ma'am.
23 A.   (Witness complies.)

Page 89

1  Q.  I'm going to really take you down memory
2  lane now and ask -- and you can do it by
3  reference to these exhibits or any way that you
4  want to, but what I would like for you to do is
5  walk us through the site and some of these
6  primary features, and tell us what it looked like
7  when you first got there in 1979.  I'll ask you
8  the first question, did the two dams that are
9  shown on Exhibit 6, were they in place?
10 A.  Yes, they were.
11 Q.  Were the two sediment basins in place?
12 A.  Could you tell me more about what you mean
13 by "sediment basins"?
14 Q.  You referred to it as a pond?
15 A.  Yes, sir.
16 Q.  So we can try to get the terminology
17 straight, the area between the lower dam and the
18 upper dam, what would you call that area?
19 A.  The lower pond.
20 Q.  Lower pond.  The area above the upper dam
21 and the toe of the capped area, what would you
22 call that area?
23 A.  Part of it would have been the upper pond.

Page 90

1  Q.  Were the upper and lower ponds in existence
2  when you got there?
3  A.  Yes.
4  Q.  What was in them?
5  A.  From time to time there was water impounded
6  behind them, and there was also eroded sediment.
7  Q.  What was the purpose of those two ponds?
8  A.  It's my understanding they were just as
9  named, sediment ponds, to capture sediment before
10 it went into the Locust Fork.
11 Q.  Sediment from where?
12 A.  From the refuse area and the native
13 Pottsville that was eroding.
14 Q.  Did you ever see the upper sediment, is
15 that what you called it?
16 A.  Sediment.
17 Q.  Sediment pond full of refuse material?
18 A.  I saw it full.  I'm not sure it would all
19 be refuse material.
20 Q.  Was it full of solid material up to the top
21 of the dam?
22 A.  I'm not sure if it was up to the top, but
23 it was quite -- you know, at capacity, let's say,

Page 91

1  and it did have fine materials that had settled
2  in it, too, clay-type material.
3  Q.  During the time that you were there from
4  '79 to '84, was the upper sediment pond ever
5  cleaned out or excavated?
6  A.  Yes, it was.
7  Q.  How many times, or how often?
8  A.  I don't know.
9  Q.  Was that done by ABC?
10 A.  ABC or their contractor.
11 Q.  How did they excavate or remove the
12 material?
13 A.  With a backhoe on tracks, I believe.  I do
14 recall they got stuck one time.
15 Q.  Now, earlier you said that there was a road
16 that came into that area of the mine site at that
17 time; is that right?
18 A.  We never referred to this as the mine site.
19 It was always the rock disposal area.
20 Q.  Rock disposal area, okay.
21 A.  Yes, there was a road that went from the
22 top of the pre-law area up at the north end of
23 Exhibit 6, that you could drive all the way down

Page 92

1  to the area between the two ponds.
2  Q.  You know what I'm going to ask you to do
3  next, right?  Can you take the red pen and show
4  us the general path of that road?
5      MR. DAVIS:  After she makes that
6  illustration, can we take a break?
7      MR. BROCK:  Yes.
8  A.  Can I have a wide marker, please?
9  Q.  Yes.
10 A.  I'm going to start by MO-7, because I'm
11 really not sure where it might have been up at
12 the top.  I won't cover up my red writing.
13 Q.  Thank you.
14 A.  (Witness complies.)
15 Q.  So the thicker red line is the path of the
16 road through the rock --
17 A.  Disposal area.
18 Q.  -- disposal area, okay.
19     (Whereupon, at this time a lunch break was
20 taken.)
21 Q.  Ms. George, we're back on the record after
22 a lunch break.  I hope you had a nice lunch.
23 A.  I did.

Page 93

1 Q. Good. I was asking you some questions
2 about the status of the rock disposal area when
3 you got to the site in 1979, a few more questions
4 about that. So the area that you marked on
5 Plaintiff's Exhibit 6 earlier -- scratch that.
6 On Exhibit 7, it has the approximate intermittent
7 stream area?
8 A. Yes, sir.
9 Q. What did that stream area look like when
10 you first saw it in 1979?
11 A. Well, obviously, we talked about the fact
12 that the lower pine and upper pine and associated
13 dams were there. I'm not sure I can just tie
14 this to '79, because we were in and out of the
15 site, you know, early on. Sometimes there was
16 impounded water behind each of the sediment
17 ponds; there was sediment fill in the hollow or
18 the valley; there were drainage courses along the
19 upper eastern side. The upper pine or the upper
20 dam was not a substantial structure as it was at
21 the end of our project.
22 Q. With regard to the area where you made the
23 slashed red line below SW-2, was there a stream

Page 94

1 that you could see visibly on the surface?
2 A. No, there was not at that point, because
3 there was also disposal areas up in the upper
4 part of the area to be capped. I'd say that any
5 of the runoff was ephemeral at that time.
6 Q. Was the stream that you marked in there,
7 the intermittent stream, was it buried under fill
8 material when you first got there?
9 A. I'm not sure I would characterize it that
10 way, because I don't really know what it looked
11 like before Alabama Byproducts had the road and
12 any of the dam structure and things like that.
13 And I did say that there was fill in the hollow.
14 Q. Okay. So what I'm really, I guess, trying
15 to ask is, the blue line intermittent stream that
16 we see on the USGS maps, the older maps, was
17 there any visible stream on the surface as it's
18 depicted on the USGS maps, in that location when
19 you got to the site?
20 A. See, I'm not sure -- I understand your
21 question, but I'm not sure I can make that
22 comparison, because parts of the area had been
23 cleared and logged, and I really don't know what

Page 95

1 it looked like, potentially looked like before,
2 even before there were any mining activities
3 there, so I can just tell you what I saw.
4 Q. Right, I understand. You know, none of us
5 were there and we've had some difficulty, you
6 know, just piecing together the sequence, and
7 when things happened and what things looked like,
8 clearly before any disturbance; and mining that
9 stream looked a particular way, but I don't know
10 how it looked when you got there, if it was
11 visible or discernible at all, and that's what
12 I'm trying to ask.
13 A. Well, I think I've answered it. Maybe I
14 didn't make myself clear, but there was fill in
15 the valley, the two ponds were there, sometimes
16 there was water in the ponds, sometimes there
17 wasn't.
18 Q. How about further north in the area that
19 was later capped? Could you see any visible on
20 the surface part of that stream or tributary in
21 that area?
22 A. My recollection was that they had already
23 started -- well, they were using it as a refuse

Page 96

1 area at the time. That's why there's the
2 distinction of the pre-law, post law.
3 Q. So the area that was capped was already
4 being used as a refuse area when you first got
5 there?
6 A. In part. Part of it was, yes.
7 Q. Which part?
8 A. Certainly the area that's north of the
9 north ditch on Exhibit 7, and I can't tell you
10 how far down-slope at first, but part of that was
11 being used also.
12 Q. Do you know where the headwaters of the
13 tributary were, in terms of north or south of the
14 north ditch?
15 A. I think the USGS mapping could get that
16 out, a reference to it. I think it is within or
17 north of that area; but, again, it's an
18 intermittent stream ending the eroded valley.
19     (Whereupon, Plaintiff's Exhibit Number 2
20 was marked for identification, a copy of which is
21 attached to the original of the transcript.)
22 Q. Let me go ahead and show you this that I've
23 marked as Exhibit 2 to your deposition, and these

Page 97

1 are some historic aerial photos and maps, I
2 believe.  These were produced to us by Mr. Davis.
3 Are these your documents?  They're Bates-stamped
4 PELA 1 through 26.
5 A.   Yes, they are.
6 Q.   Did you use these in preparing your report?
7 A.   I did look at them, yes.  There were
8 certain ones I relied on, not all of them.
9 Q.   Where did you get the aerial photos?
10 A.   I obtained them from the photography lab at
11 The University of Alabama.
12 Q.   Did you obtain them after you were retained
13 as an expert in this case, or did you already
14 have them on-hand?
15 A.   I retained them specifically for this
16 project.
17 Q.   Looking through this stack, there are some
18 USGS maps, I believe.  Do any of them help you
19 with the question you were just asking?
20 A.   If I could read them.
21 Q.   The print is too small?
22 A.   Yes, sir.  I mean, let me find one.
23 Q.   Number 18, maybe?

Page 98

1 A.   It's a little hard to see, but I believe
2 that -- and I'm going to call it the valley.
3 Q.   Okay.
4 A.   The headwaters of an intermittent stream
5 depends on where USGS drew it, and it's pretty
6 arbitrary.
7 Q.   Okay.
8 A.   The stream does -- the valley does turn
9 north under what is the capped area, and it
10 becomes less and less steep as you go north, so
11 the drainage would have been underneath the
12 pre-law area.
13 Q.   And you're pointing to Exhibit 6 when you
14 say, "The drainage would be underneath the
15 pre-law area"?
16 A.   Yes, sir.
17 Q.   What year is this map in number 18?
18 A.   I believe it's '71.  Oh, it's 2014, and it
19 just has the topos on it.
20    MR. BROCK:  Richard might have brought his
21 magnifying glass.
22    MR. DAVIS:  No, unfortunately I didn't.
23 That's not what I was looking for.  I apologize.

Page 99

1 A.   Do you want to look at 19?
2 Q.   Yes, ma'am.  What is page 19 of Exhibit 2?
3 A.   It's also a topographic map, but it's the
4 1971 version.
5 Q.   And does this map show the rock disposal
6 area that we've been talking about?
7 A.   It does have a symbology on the top of the
8 ridge that indicates the disturbed land.  I
9 believe the words are -- I can't read what it
10 says.
11 Q.   Can you take the red pen, if you don't
12 mind, and circle on that map?  Does it show the
13 slough by the lower dam that we've been talking
14 about?
15 A.   It does.
16 Q.   Could you circle that for us?
17 A.   (Witness complies.)  May I label it?
18 Q.   Yes, please.
19 A.   (Witness complies.)
20 Q.   Ms. George, my understanding of your
21 testimony, and you please correct me if I'm
22 wrong, is that what you're saying is, by the
23 time -- when you got to the site, this stream

Page 100

1 shown on these USGS maps was not visible on the
2 surface, and it was in the area that at that time
3 contained fill material.  Is that accurate?
4 A.   I guess the problem I'm having is, we're
5 talking about water versus -- we're talking about
6 flow versus the physical setting; and because it
7 was still a valley, the drainage was flowing
8 through that valley, so I saw visible evidences
9 of the flow in the valley.
10 Q.   What did that visible evidence look like?
11 A.   Well, it was drainage that would go into
12 the water bodies behind the ponds, and some of
13 the early ditch work that was alongside the road
14 that I drew on Exhibit 6.  I think that's about
15 all I could describe it as.
16 Q.   While we're looking at this, would you turn
17 to the next page in that stack to PELA 20?  What
18 is this document?
19 A.   This is a frame of black-and-white aerial
20 photography dated April 4, 1951.
21 Q.   Is that before there was any mining
22 activity conducted at the Maxine site?
23 A.   There was no activity at the rock disposal

Page 101

1 area.

2 Q.   Can you see the rock disposal area in this

3 photo?

4 A.   I can see the location of where it is now.

5 Q.   Okay.  And can you see the slough?

6 A.   Yes.

7 Q.   Would you mark that with the red pen?

8 A.   (Witness complies.)

9 Q.   If you would, would you turn to page 26,

10 the last page?  What is this document?

11 A.   This is a poor quality color aerial photo.

12 I'm looking for the date, but I don't see it.

13 Q.   Yes, I didn't see one either.

14 A.   I don't know if it got cut off.  I think it

15 had it on there when I received it.  But it's a

16 more recent aerial photograph.

17 Q.   Yes, that's kind of what I was wondering,

18 whether this was an old photo that had been

19 colorized somehow, or this was a more recent

20 color photo.  Do you have an estimation of

21 approximately what year it might be?

22 A.   No, I don't.  It would be after the east

23 and west and parallel ditches were in place.

Page 102

1 Q.   Can you see those on this photo?

2 A.   Sort of.

3 Q.   Okay.  Will you circle the area where you

4 can see the area where the ditches are?

5 A.   I'm going to label it "area ditches."

6 Q.   That sounds just fine.

7 A.   (Witness complies.)

8 Q.   Could I take a look at that real quick?

9 A.   Sure.

10 Q.   Thank you, ma'am.  Ms. George, do you know

11 what year the upper and lower dams were

12 constructed?

13 A.   No, I don't.

14 Q.   Do you have a range?

15 A.   No.  They were there when we started work.

16 Q.   Do you know what they are made of,

17 material-wise?

18 A.   I'm thinking about the answer to my last

19 question.  The early '60s -- the '71 topo map

20 doesn't have them on it, but it doesn't

21 necessarily mean that it wasn't there in '71, or

22 was.  The photography from the '60s may or may

23 not indicate it's there; so I don't think from

Page 103

1 looking at historical documents like that, we

2 could make that discernation.

3 Q.   Was the 1971 topo map you referenced what

4 we looked at in Exhibit 2?

5 A.   Yes, gray circled slope.

6 Q.   Do you know the dimensions of the dams when

7 you first saw them?

8 A.   The lower dam probably covered the same

9 territory that it does today.

10 Q.   In terms of its --

11 A.   Its width.

12 Q.   -- width?

13 A.   Yes.

14 Q.   What about its height?

15 A.   I'm not certain about that.

16 Q.   And you said during the time you were

17 there, that the discharge was moved from the

18 south end to the north end?

19 A.   Yes, the drainage pipe was at the south end

20 when we started, same way.

21 Q.   Were there any other modifications or

22 changes to the lower dam, that you recall, while

23 you were working on the site?

Page 104

1 A.   Well, I think I mentioned earlier that

2 there was at least one period when limestone

3 riprap was placed on the backside of the dam.

4 Q.   When you say "the backside," do you mean

5 the river side?

6 A.   No, the --

7 Q.   The upgradient side?

8 A.   -- upstream side.  I think there were hay

9 bales and lime and things like that placed in

10 proximity of the pond from time to time, and that

11 was done in coordination with the agencies.  But

12 I don't remember any -- we kind of deviated from

13 your first question, what did it look like when

14 we first got there.

15 Q.   Well, I'm asking you that, and then I'm

16 asking also about any changes that were made

17 while you were there.  And we're talking now

18 about the lower dam.

19 A.   Other than what I've just said, I don't

20 really remember.

21 Q.   The upper dam, do you know how tall it was

22 when you first saw it?

23 A.   No, I don't.

Page 105

1  Q.   Was its width the same as it is today?
2  A.   I don't believe so.  I think it didn't have
3  the same width.  I think it was shorter in
4  length.
5  Q.   Was it expanded while you were there,
6  lengthened?
7  A.   Yes, it was, and it had been repaired also.
8  Q.   In which direction was it lengthened?  You
9  might want to refer to Exhibit 6, if it will
10 help.
11 A.   Yes, but I'm not sure my cartoon helps me
12 there, so I can't say.
13 Q.   Do you remember the height of the dam being
14 raised, the upper dam?
15 A.   I'm not certain.
16 Q.   I know you've testified some about the
17 ponds when you first saw them.  The upper pond,
18 do you know its depth?
19 A.   No, I don't.
20 Q.   Do you know what volume of material that it
21 would hold?
22 A.   No.
23 Q.   Same question about the lower pond, do you

Page 106

1  know the depth of volume?
2  A.   No.  We never made estimates about how much
3  water they would hold.
4  Q.   Or sediment?
5  A.   Not what the dam held.  We did make some
6  estimates about the amount of infill relative to
7  looking at the possibility of taking the water
8  and letting it -- pumping it into the abandoned
9  parts of the underground mine.
10 Q.   Yes, I've seen some reference to that in
11 some of the documents.  Did that ever happen?
12 A.   No, it did not.  Again, we coordinated with
13 the agencies, and that was something that AWIC
14 made the decision that that wasn't going to
15 happen.
16 Q.   With reference to Exhibit 6, what's
17 referred to there is the capped reclaimed area.
18 What did that look like when you first got to the
19 site?
20 A.   It was being used for current disposal of
21 the refuse rock, but I can't tell you how far
22 down in the valley it was being used at the time.
23 Q.   During the time you were there, did ABC

Page 107

1  continue to put more material in that area?
2  A.   Yes.
3  Q.   Do you know the depth of the material when
4  you got there?
5  A.   Not when we initially started, but we
6  drilled a number of wells at different locations.
7  The boring logs would indicate that.
8  Q.   We can look at it; but if I said it was
9  like 70 to 75 feet worth of material, would that
10 sound accurate to you?
11 A.   Yes, I believe 76, or something like that,
12 was the maximum thickness.  That may have been in
13 the pre-law area, though, the wells that are 4, 5
14 and 6.
15 Q.   Right, north of the capped area?
16 A.   Yes.
17 Q.   What year was the reclaimed capped post law
18 area capped?
19 A.   Somewhere around '82, '83.  There's a
20 chronology in one of PELA's documents that has
21 that date in it.
22 Q.   Did PELA play any role in that process, the
23 capping?

Page 108

1  A.   We did infiltration tests at a couple of
2  locations after it was capped, and I know we also
3  had discussions about the sloping of the refuse
4  and the areas we capped so that it would drain to
5  the western ditch.
6  Q.   On Exhibit 6, I want to ask you now about
7  the ditches that are shown.  First, the dashed
8  line, it says, is a diversion ditch pre-law area
9  drainage.  Would that be what is also referred to
10 as the east ditch?
11 A.   One of them, yes.  Yes.  Yes.
12 Q.   Good point.  I'm referring to the dashed
13 line that starts right by MO-7 and goes south.
14 A.   Yes, sir.
15 Q.   Is that the east ditch?
16 A.   Yes.
17 Q.   Would you take the pen and just write E
18 beside it?
19 A.   (Witness complies.)
20 Q.   Was that ditch in place when you got to the
21 site?
22 A.   There was a drain that captured runoff, but
23 I don't think it was in the same configuration as

Page 109

1  it was at the end of the project.
2  Q.    How was it reconfigured?
3  A.    Well, I think earthmoving equipment defined
4  it better, and I don't recall what side of the
5  road or if the road didn't exist after a certain
6  point.  I just don't remember that.
7  Q.    How deep was it when you got there?
8  A.    It didn't have a consistent depth.  It
9  varied.
10 Q.    From what to what?
11 A.    I really don't remember.
12 Q.    Do you remember the width?
13 A.    You're talking about the ditch itself?
14 Q.    Yes, ma'am.
15 A.    I don't remember that.
16 Q.    What area of the rock disposal area did the
17 east ditch drain?
18 A.    The initial one or the final one?
19 Q.    The initial one.
20 A.    The initial one?
21 Q.    By my question, I want you to understand
22 I'm asking basically pre-law or post law.
23 A.    Oh.  Both.

Page 110

1  Q.    Initially it drained both?
2  A.    Yes.
3  Q.    Was that changed at some point in time?
4  A.    Yes, because when the area was capped, the
5  area was graded so that it would slope towards
6  the west capped area; and if we look at Exhibit
7  7, there were terraces that facilitated the
8  direction of runoff.
9  Q.    So tell me that again.  It was changed in
10 what way, the slope?
11 A.    The slope of the refuse rock and its
12 subsequent capping was sloped towards the
13 southwest, essentially, so that it would drain
14 towards the ditch on the southwest.
15 Q.    So after that change in slope was made, the
16 capped area drained to the west; is that right?
17 A.    That's right.
18 Q.    But the pre-law area still drained to the
19 east ditch; is that correct?
20 A.    Yes.
21 Q.    And after that adjustment was made you
22 described, the east ditch was draining only the
23 pre-law area?

Page 111

1  A.    Yes.
2  Q.    And that happened in approximately 1982 or
3  '83, you said?
4  A.    You know, obviously, it was a work in
5  process because of coordinating with the
6  agencies, and it would take time on the ground to
7  make these things happen.
8  Q.    On Exhibit 6, is the north ditch shown on
9  that drawing?
10 A.    Part of it is.
11 Q.    Where is the part of it that is visible?
12 A.    It's the dash line that's between MO-4 and
13 MO-8.
14 Q.    Can you take the pen and write an N on that
15 ditch, or just above it?
16 A.    (Witness complies.)
17 Q.    Was the north ditch in existence when you
18 got to the site?
19 A.    No, it was not.
20 Q.    When was it installed?
21 A.    I certainly don't remember.
22 Q.    Was it in operation when you finished your
23 work on the site in '84 or '85?

Page 112

1  A.    Yes.
2  Q.    At that point in time, what area did the
3  north ditch drain?
4  A.    It captured the runoff from the pre-law
5  area.
6  Q.    From the pre-law area north of in the area
7  where MO-4 is?
8  A.    Yes.
9  Q.    And where did it channel the drainage that
10 it captured to?
11 A.    The north ditch went to the west ditch.
12 And referring to Exhibit 6, you can even see the
13 contouring in the pre-law area, which is still
14 visible today.
15 Q.    On Exhibit 6 or 7?
16 A.    The contouring?
17 Q.    Yes.
18 A.    7.
19 Q.    Right.  In the area north of the capped
20 area, right?
21 A.    Yes.
22 Q.    When was that contouring done?
23 A.    I can't say precisely, no.

Page 113

1  Q.  Was it done after you got there?

2  A.  I'm really not sure.

3  Q.  On Exhibit 6, is the west ditch visible?

4  A.  Yes, it is.

5  Q.  Is it a solid line or a dash line?

6  A.  It is a solid line.

7  Q.  Can you mark a W to indicate the west

8  ditch?

9  A.  I just want to make sure my terminology is

10 correct.  I know the dash line is for the

11 pre-law, and I believe there are little

12 indicators on there (indicating).

13 Q.  What did the west ditch drain?  What did it

14 discharge into at the time you completed your

15 work on the site?

16 A.  The west ditch captured the runoff from the

17 capped area, post law area, sent it through the

18 basin that's shown on Figure 6 in the cartoon.

19 Then after catching the sediment, the runoff

20 would have gone off down through the valley and

21 drained into the Locust Fork.

22 Q.  What did the east ditch discharge into?  Is

23 it the upper pond?

Page 114

1  A.  Yes.

2  Q.  Well, one more ditch on this drawing, which

3  is the slashed line to the west of the west

4  ditch.  Do you see that?

5  A.  Yes, sir.

6  Q.  What was that ditch referred to as?

7  A.  Based on the diagram, we called it the

8  parallel ditch.

9  Q.  Is that what you called it?

10 A.  I don't remember calling it that, but

11 that's what my drawing shows.

12 Q.  Right.  So that dashed line is what's

13 referred to as the parallel ditch on Exhibit 7,

14 right?

15 A.  Yes.

16 Q.  Can you make a P beside that one, so we

17 know?

18 A.  (Witness complies.)

19 Q.  And what did the parallel ditch drain?

20 A.  It captured the runoff from the pre-law

21 area north of the capped area.

22 Q.  And what did it discharge that runoff into?

23 A.  It initially drained into under the

Page 115

1  cross-over.

2  Q.  It looks like it's also into the upper pond

3  on the west side, but you correct me if that's

4  incorrect.

5  A.  I believe it went under the culvert and

6  into the upper pond.

7  Q.  I'm going to show you some documents now

8  that relate to these topics that we've been

9  talking about.  Some of them are PELA documents,

10 a lot of them are ones that you used in your

11 reference list in your report; some of them

12 aren't.  But if you have some recollection or

13 knowledge about these, then tell us; and there

14 will be some of them, maybe, that you don't, and

15 if that's the case, you can tell us that.  The

16 reason I'm showing you these, you know, this is

17 not all just a memory test.  I'm hoping that

18 these will be useful to give us a framework to

19 talk about some of this and to jog your memory

20 about things, okay?

21 A.  Okay.

22      (Whereupon, Plaintiff's Exhibit Number 9

23 was marked for identification, a copy of which is

Page 116

1  attached to the original of the transcript.)

2  Q.  And as we go through these, if you want to

3  refer to these diagrams to help you remember it

4  or explain it, that will be just fine.

5  A.  Okay, thank you.

6      MR. DAVIS:  I have a question, what was

7  Exhibit 8?

8      (Off-the-record discussion.)

9  Q.  Ms. George, I have handed you a document

10 that's dated December 12, 1978, from the Drummond

11 production.  Do you recall ever seeing this

12 before?

13 A.  I have seen it before today, but I don't

14 recall seeing it, let's say, historically.

15 Q.  What is your recollection of when you saw

16 it?

17 A.  Recently.

18 Q.  Oh, you saw it reviewing to prepare for the

19 deposition?

20 A.  Yes, sir.

21 Q.  This was before you got to the mine site,

22 right, December '78?

23 A.  Yes.

Page 117

1  Q.   And this is written by Mr. McDuff, who you
2  said earlier that you remember working with him
3  some on the site, right?
4  A.   Yes.
5  Q.   In Section D on the second page, he writes
6  that "The active spoil area has no runoff control
7  whatsoever."  Do you know what is referred to
8  there as the active spoil area?
9  A.   No, I don't.
10 Q.   You don't recall that terminology, or can
11 you tell from the context of the document what
12 he's talking about?
13 A.   Not for certain, no.  I would have to
14 guess.
15 Q.   When you arrived on the site, what was the
16 appearance of the pre-law waste pile to the east
17 of the area that was later capped?
18 A.   I'm sorry.  Would you repeat that again?
19 Q.   Yes.  I was just asking, what did that area
20 look like?
21 A.   I'm sorry.  Which area was it?
22 Q.   That area (indicating).  It would have been
23 the area to the east of the east ditch.

Page 118

1  A.   There was very little vegetation; it
2  essentially was a plateau with a flat top, and
3  was gullied to the west.
4  Q.   Did that change at any point while you were
5  there?
6  A.   Not notably that I recall, no.
7  Q.   Does that area look any different today
8  than it did in the early 1980s?
9  A.   Absolutely, remarkable.  There's very
10 little area that is not vegetated; there's pine
11 trees of various sizes.  I don't know whether
12 they were planted or volunteers.  There's small
13 two-inch pine saplings growing and pines of
14 various heights and establishment.  Pretty much,
15 the area is covered with a layer of pine straw.
16 Q.   Is there any ground vegetation that you
17 noticed other than pine straw?
18 A.   There are some small -- I don't know what
19 kind of trees they are, they might be hardwoods
20 or other pines.
21 Q.   Anything else?
22 A.   I don't think so.
23 Q.   I'll show you some pictures that we marked

Page 119

1  at Mr. Muncher's deposition, who is a Drummond
2  witness, and I believe these are going to be
3  pictures from the '80s that were among those that
4  you produced.  Can you flip through those and
5  tell me that that is the case?
6  A.   And I'm sorry, what was the question?
7  Q.   Can you tell me that those are your photos
8  from the 1980s?
9  A.   Yes, they're photographs from PELA's
10 record.
11 Q.   If you would look at page 2933, is that a
12 picture of the pre-law waste pile?
13 A.   Yes.
14 Q.   Do you know what year that would have been
15 taken?
16 A.   Not specifically, no.
17 Q.   The next page, 2959, is that also a picture
18 of the pre-law waste pile?
19 A.   Yes.
20 Q.   And the next one is 2963; same?
21 A.   Yes.
22 Q.   Do you know when that material was
23 originally placed in that location?

Page 120

1  A.   Not the upper part of the material.  '50s
2  and '60s, and early '70s.  It just depends on the
3  location within the refuse pile.
4  Q.   Okay, I'll take that back.  Thank you.
5  Back to the document that we were looking at
6  there on the second page, Mr. McDuff says in the
7  last paragraph that "The old spoil areas are
8  severely eroded."  Would you agree with that
9  characterization, based on what you saw when you
10 first arrived on the scene?
11     MR. DAVIS:  Object to form.
12 A.   The word "severely" is, you know, a
13 personal characterization, but they certainly
14 were eroded.
15 Q.   Would you characterize the photos we just
16 looked at as severely eroded material?
17 A.   I think I would say highly eroded.  That
18 would be more in tune to a technical, technical
19 terminology.
20 Q.   In the last sentence, he says that that
21 area should be regraded and a vegetative cover
22 established.  In the time you were out there, was
23 that ever done?

Page 121

1  A.   If he is referring to what we've been
2  talking about, the pre-law area, the answer is
3  no.
4      (Whereupon, Plaintiff's Exhibit Number 10
5  was marked for identification, a copy of which is
6  attached to the original of the transcript.)
7  Q.   Let me show you what I've marked as Exhibit
8  10 to your deposition.  Have you seen that
9  document before?
10  A.   I have.
11  Q.   Did you see it in connection with preparing
12  for the deposition?
13  A.   Yes.
14  Q.   Did you see it back in 1979?
15  A.   I don't recall if I had seen it or not.  I
16  could have.
17  Q.   Do you recall any discussion about it
18  during that time frame?
19  A.   I think we have documents that refer to
20  notice of violations; but whether or not PELA was
21  given a copy of it, I don't know.
22  Q.   Were you told at any point in time that the
23  Surface Mining Commission had issued this notice

Page 122

1  of violation, and that some response was needed?
2  A.   Oh, sure.  I mean, that's why we were
3  contracted to do some of the work.
4  Q.   That's why you were hired?
5  A.   Yes, sir.
6  Q.   I thought so, but I wanted to make sure
7  that that was your recollection, too.  On the
8  second page, when it describes the violation, up
9  at the top, the handwritten part says, "Discharge
10  from disturbed area not within effluent
11  limitations."  Do you see that part?
12  A.   Yes, sir.
13  Q.   What were the effluent limitations they
14  were referring to, if you know?
15  A.   The Surface Mining Commission had
16  limitations established for, I'm certain for pH,
17  total suspended solids, and possibly iron.
18  Q.   So that was a requirement of the Surface
19  Mining Commission and not AWIC?
20     MR. DAVIS: Object to form.  You can
21  answer.
22  Q.   I don't know, and I'm not suggesting one
23  way or the other.

Page 123

1  A.   I think so.  I'm not certain.  This is an
2  Office of Surface Mining Commission document, so.
3  Q.   Yes, and I'm just asking for your
4  recollection.  Did they have their own setup of
5  effluent limitations?
6  A.   I think they did.
7  Q.   Do you remember what they were numerically,
8  in terms of those values?
9  A.   Just the pH; and, again, it could be AWIC
10  at the time, but 6 to 9 or 6 to 10 pH.
11  Q.   What about for iron or manganese?
12  A.   I don't recall what those might have been.
13     (Whereupon, Plaintiff's Exhibit Number 11
14  was marked for identification, a copy of which is
15  attached to the original of the transcript.)
16  Q.   Let me show you what I've marked as Exhibit
17  11, and this is one of the documents that was
18  listed in your reference list on your Expert
19  Report, so apparently you reviewed it in
20  connection with doing your report, right?
21  A.   I'm sorry, I'm not seeing the corresponding
22  numbers.
23  Q.   It's like the middle of page 13.

Page 124

1  A.   Yes, I'm sorry.  I was looking at the wrong
2  page.
3  Q.   That's okay.  In any event, this letter is
4  from August 6th of 1979, and it describes a visit
5  to the mine.  Do you recall, was this the first
6  visit that you made there for PELA?
7  A.   I think so.  I have not seen this letter in
8  many years, decades.
9  Q.   In the third line there, is that your
10  maiden name?
11  A.   Yes, it is.
12  Q.   How do you pronounce that?
13  A.   Dildine.
14  Q.   Dildine, okay.  And it says that you all
15  made a review of the notice of violation, which I
16  believe is the one we were just looking at.  Does
17  that square with your recollection?
18  A.   I don't believe there were more than one in
19  '79, so it appears that way.
20  Q.   This letter was written by Mr. Philip
21  Lamoreaux, correct?
22  A.   That's right.
23  Q.   And you were working with him at the time

Page 125

1 on this project?

2 A.   Yes.

3 Q.   Were you the project manager, or did you

4 have any particular title on this PELA project?

5 A.   I think I evolved into that.

6 Q.   How often during the work on the site,

7 roughly '79 to '84, were you on the site?

8 A.   Often.

9 Q.   Weekly?

10 A.   It could have been monthly for some time.

11 Q.   So monthly for a period of years?

12 A.   No.  I think after things got established,

13 there were other folks that did the monitor runs.

14 Q.   Were you there more often early in the

15 project?

16 A.   Yes.

17 Q.   What was PELA hired to do in 1979?

18 A.   I think there's subsequent documentation

19 that shows that the work elements that Dr.

20 Lamoreaux outlined was turned into a proposal

21 that was authorized.

22 Q.   We'll look at that, then, when we get to

23 that.  In the third paragraph, Dr. Lamoreaux says

Page 126

1 that "The rubble material is acting as a

2 catchment area for recharge."  Do you see that

3 language?

4 A.   Yes.

5 Q.   What does that mean?

6 A.   That when it rains and there's contact with

7 the material or runoff across the area, the

8 material would accumulate in the subsurface

9 saturation.

10 Q.   Then a little lower down in that paragraph,

11 he says, "The area in violation is a tributary to

12 the Locust Fork, which has, in part, been filled

13 with rock disposal material."  Do you see that

14 part?

15 A.   Yes, sir.

16 Q.   Is that reference to what you've drawn on

17 Exhibit 7?  What you've labeled the intermittent

18 stream, is that what he's referring to as the

19 tributary there?

20 A.   Yes.  If I may --

21 Q.   Sure.

22 A.   -- "tributary," at this time being written

23 by geologists and hydrogeologists, is a technical

Page 127

1 term, not a regulatory term.

2 Q.   What do you mean by that distinction?

3 A.   Well, there currently is distinction.  When

4 this project was going on, there may not have

5 been.

6 Q.   Do you mean that Dr. Lamoreaux is using it

7 as a technical term or a regulatory term?

8 A.   A technical term.  And how we referred to

9 the hollow may not be consistent throughout the

10 documentation.

11       (Whereupon, Plaintiff's Exhibit Number 12

12 was marked for identification, a copy of which is

13 attached to the original of the transcript.)

14 Q.   Let me show you what I've marked as Exhibit

15 12.  Ms. George, have you seen this letter

16 before?

17 A.   Yes, I have.

18 Q.   Is this what you referred to earlier as the

19 work elements that PELA was hired to perform?

20 A.   Yes.

21 Q.   This has eleven separate items listed.

22 Were all of those work elements performed?

23 A.   I think for the most part, yes.

Page 128

1 Q.   Does that generally and accurately describe

2 the work that PELA did, major components of it

3 anyway?

4 A.   I think it's a better way to say it, to

5 help me with my recollection, yes.

6       (Whereupon, Plaintiff's Exhibit Number 13

7 was marked for identification, a copy of which is

8 attached to the original of the transcript.)

9 Q.   I'm handing you now what I've marked

10 Exhibit 13, which is a letter dated November 1,

11 1979.  Really, just to complete the record, it

12 appears that this is just confirming acceptance

13 of that proposal by PELA from Mr. Cook.  Is that

14 what it appears to you?

15 A.   Yes, in the first paragraph.  The second

16 paragraph talks about drilling.

17 Q.   Okay.  And he says, "It will not be

18 necessary to drill the core test holes."  Can you

19 explain what that meant?

20 A.   Based on what he's saying, referring back

21 to item 8 on Exhibit 12, we had proposed to core

22 test holes.  That's a special kind of drilling

23 rig that makes a rock core, and Mr. Cook offered

Page 129

1 that just drilling a shallow test hole rather
2 than using that coring rig into bedrock, would be
3 something that they wanted to do at this time.
4 Q.   What would the coring that PELA had
5 proposed demonstrate, versus what Mr. Cook
6 authorized?
7 A.   I'm not sure specifically what it would
8 demonstrate, but I think the element was proposed
9 to look at the makeup of the groundwater in the
10 bedrock, and Mr. Cook proposed looking at
11 something more shallow initially.  And I think
12 this turned into MO-1.
13 Q.   And MO-1, when it was ultimately drilled,
14 did it go into the bedrock or not?
15 A.   No, it did not.  Well, possibly a few feet.
16 We knew we hit bedrock.
17      (Whereupon, Plaintiff's Exhibit Number 14
18 was marked for identification, a copy of which is
19 attached to the original of the transcript.)
20 Q.   I'm handing you what I've marked Exhibit 14
21 to your deposition.  This is a PELA document,
22 dated November 6, 1979.  It says in the first
23 sentence it's a progress statement.  Do you

Page 130

1 recall seeing these kinds of documents during the
2 project?
3 A.   There were many.
4 Q.   In paragraph 3, it talks about four water
5 samples collected.  Do you recall where those
6 were taken?
7 A.   No.  No, I don't.
8 Q.   Did PELA do the sampling itself, or did TTL
9 or someone else do the sampling?
10 A.   We did the sampling.
11 Q.   Did PELA have its own lab?
12 A.   Yes.
13 Q.   Were all of the samples that are mentioned
14 in these documents conducted by PELA done in
15 PELA's lab?
16 A.   I'm not sure.  I'm not sure what the lab
17 methods and the holding times were at this time.
18 Our laboratory was in Lakeland, Florida.
19 Q.   Okay.  So you shipped samples there for
20 analysis?
21 A.   Yes.
22 Q.   But it was a PELA-owned lab in Florida?
23 A.   Yes.  Yes.

Page 131

1      (Whereupon, Plaintiff's Exhibit Number 15
2 was marked for identification, a copy of which is
3 attached to the original of the transcript.)
4 Q.   Take a look at what I've marked as Exhibit
5 15 to your deposition.  This is a document that
6 was listed in your reference list on your Expert
7 Report.  The first paragraph talks about staking
8 the location for MO-1.  Do you see that part?
9 A.   Yes, sir.
10 Q.   Do you remember by reference Exhibit 6
11 where MO-1 was?
12 A.   I thought it was between the two ponds and
13 between the two dams, and I think there's
14 documentation, a map that shows the locations of
15 MO-1 and MO-2.
16 Q.   There probably is.  If we get there, we'll
17 find it; and if we don't, I may come back and ask
18 you to give your best estimation of where it was.
19 Was the purpose of it to ascertain groundwater
20 chemistry, or something else?
21 A.   At the time -- yes, in part.  We were
22 looking at the dynamics of the system and how
23 much water there might need to be handled to

Page 132

1 potentially "dispose," in quotes, the water in
2 the underground mine.  That was an initial
3 component of our project before this aspect
4 (indicating), and I'm pointing to Exhibits 7 and
5 6, started.
6 Q.   In the second paragraph, this is Dr.
7 Lamoreaux writing again, he says that MO-1 is
8 going to be in a, [quote], "filled estuary" of
9 the Locust Fork.  What area is he referring to
10 there?
11 A.   I think he's talking about somewhere in the
12 area between, like I said, the two ponds.
13 Q.   Between the two ponds?
14 A.   Yes, down-slope of the upper pond or upper
15 dam, and up-slope of the lower pond and lower
16 dam.
17 Q.   So down-slope of the upper dam?
18 A.   Correct.
19 Q.   In the pond area?
20 A.   It would not have been a pond when we were
21 working there, though.
22 Q.   But the dams were there, right?
23 A.   May I rephrase that?

Page 133

1  Q.    Yes.
2  A.    The area of -- capture of the runoff behind
3  the upper dam wouldn't have covered the area we
4  were drilling in.
5  Q.    So you know it was below the upper dam?
6  A.    Yes.
7  Q.    These initial two wells, right?
8  A.    MO-1 was.
9  Q.    What about MO-2?
10  A.    I think -- and again, hopefully we'll find
11  a map.  I think MO-2 was between the upper dam
12  and the location of MO-3.
13  Q.    That would make sense.
14  A.    But without seeing one of the diagrams, I'm
15  not certain.
16      (Whereupon, Plaintiff's Exhibit Number 16
17  was marked for identification, a copy of which is
18  attached to the original of the transcript.)
19  Q.    Please look at what I've marked as Exhibit
20  16.  It's another PELA letter by Dr. Lamoreaux.
21  A.    (Witness complies.)
22  Q.    So he gives a progress update on various
23  items, all eleven.  During this period of time,

Page 134

1  what sort of work were you performing personally
2  on the project?
3  A.    I really can't say with certainty in late
4  November, but it was likely fieldwork, sampling,
5  preparing reports, helping to prepare the
6  progress reports.  Whatever was documented, I
7  probably had some hand in it.
8  Q.    At that point in time, I guess you had been
9  working there, what, two to three years?
10  A.    Yes.
11  Q.    Who was on-site with PELA that might have
12  been your supervisor or superior, if anyone?
13  A.    Dr. Lamoreaux was on-site from time to
14  time.  I don't recall when Doug Powell, who had
15  retired from USGS, had joined PELA as a senior
16  hydrogeologist, and he was on-site sometimes, or
17  supervising and directing the activities.
18  Q.    So these documents were all produced by
19  Drummond, and they're represented, or testified
20  from their files and everything.  Does PELA have
21  copies of any old records from this era in its
22  possession?
23  A.    Very few.

Page 135

1  Q.    You've looked for them?
2  A.    I have looked for them.
3  Q.    When you say "very few," what did you find,
4  if anything?
5  A.    The final 1984 report; slides, but they
6  didn't go back this far.  I know we took
7  pictures, but they didn't go back this far; and a
8  couple of the interim progress reports.
9      MR. DAVIS:  And the permit.
10  A.    Oh, yes, and the permit application, 1982
11  permit application for the Maxine Mine.
12  Q.    And you've provided all those to Drummond's
13  attorneys?
14      MR. DAVIS:  We produced to you what we had.
15  These seemed to duplicate.  We gave you the
16  photographs.  You're welcome to look at that,
17  too, but my understanding is it's duplicate.
18  A.    I did not provide the permit application.
19  I assumed they had the record of that.
20  Q.    I think we're going to have that in this
21  stack.  If you see something that you recognize
22  as something you also had at PELA that's a
23  duplicate, will you try to remember to let me

Page 136

1  know?
2  A.    Sure.
3  Q.    This document, Exhibit 16, was one of the
4  ones cited in your report.  Do you know, is there
5  anything about this that you relied on in your
6  report, or any opinion you formed?
7  A.    I think they were for chronological
8  reference.
9      (Whereupon, Plaintiff's Exhibit Number 17
10  was marked for identification, a copy of which is
11  attached to the original of the transcript.)
12  Q.    I'm handing you what I've marked Exhibit
13  17.  Have you seen this document before,
14  Ms. George?
15  A.    Yes, recently.
16  Q.    In connection with preparing for the
17  deposition?
18  A.    Yes, sir.
19  Q.    Did you play any role in drafting the
20  conclusions that start on the second page which
21  is Bates-stamped 827?
22  A.    I think all I can say is probably.
23  Q.    This document was also one that was listed

Page 137

1 in the references for your report.  If you'll
2 turn to page 827, these are the conclusions that
3 you all have drawn to date, as I understand it.
4 Right?
5 A.   Yes.
6 Q.   And it says they are based on evaluation of
7 data obtained from field investigations.  What
8 would that have consisted of?
9 A.   More than likely, things that were
10 documented in the previous documents and the
11 progress reports to Mr. Cook.
12 Q.   The first item says that "An aquifer system
13 has been created above the groundwater system in
14 the Pottsville Formation."  By reference to
15 Exhibit 6 or 7, where would this aquifer system
16 that's referred to be located?
17 A.   I'm not sure of its entirety, but I think
18 we were referring to the area between the upper
19 dam -- I'm sorry, the lower dam and slightly
20 up-slope of the upper dam.
21 Q.   Would you describe the material that was in
22 that area as permeable?
23 A.   Permeability is relative.  I know we did

Page 138

1 some infiltration tests that would give us an
2 indication of what the hydraulic conductivity
3 was, but certainly it has a certain amount of
4 ability to take on water and hold it.
5 Q.   Would you describe it as having a high
6 hydraulic conductivity?
7 A.   Again, you know, it's relative.  I'm not
8 sure what you mean by "high."  No, I don't
9 believe so.  I think there's enough clay material
10 in it, that it wouldn't necessarily have a high
11 conductivity, like a beach sand or something.
12 Q.   We may get to it in this stack, but was
13 there some testing done by PELA in this area that
14 we're talking about now, to assess
15 permeability?
16 A.   The map indicates that there was an
17 infiltration test between the lower dam and the
18 upper dam.
19 Q.   And it's designated by the number 1, with a
20 black square beside it?
21 A.   Black square, yes, sir, on Exhibit 7.
22 Q.   In paragraph 3, it discusses the source of
23 recharge to the aquifer as rainfall drainage.  Do

Page 139

1 you see that part?
2 A.   Yes, sir, item 3.
3 Q.   Would that process still be going on today
4 in that area?
5 A.   It could be, but I believe it would be a
6 more limited area, because the area up-slope has
7 been capped.  It should be vegetated.
8 Q.   Have you done any testing or looked at any
9 sampling data that would tell you whether that
10 aquifer is still present or not?
11 A.   The material in the valley is still there,
12 so I think that part of the setting is much as it
13 was; but limited to what we were talking about,
14 the lower part of the valley.
15 Q.   Are there any natural processes that would
16 make the aquifer go away if the material isn't
17 removed?
18 A.   You said natural processes?
19 Q.   Right.
20 A.   Volunteer vegetation would reduce the
21 amount of recharge.
22 Q.   Is there any vegetation on either the upper
23 or lower ponds at this time?

Page 140

1 A.   Not the lower.  Not the lower.  I guess
2 also, if the Locust Fork had a catastrophic flood
3 and overtopped the lower dam and deposited a lot
4 of clay material, it could limit the amount of
5 direct recharge into the sediments that are
6 there.  That's all I can think of right offhand.
7 Q.   Are you aware of that happening since 1979?
8 A.   I don't remember that we had any floods to
9 that extent since 1979, no, but there were
10 before.
11    (Whereupon, Plaintiff's Exhibit Number 18
12 was marked for identification, a copy of which is
13 attached to the original of the transcript.)
14 Q.   Let me show you another PELA document that
15 I've marked Exhibit 18.
16    MR. BROCK:  This was also, Richard, Exhibit
17 41 to Hicks' deposition.
18    MR. DAVIS:  Okay.
19 Q.   This was a letter from Dr. Lamoreaux to
20 Bruce Smith at the Surface Mining Commission.
21 Was this something that PELA did while you were
22 working on the project, was to send updates to
23 the mining commission?

Page 141

1 A.   Yes.  I think the record would indicate how
2 frequently it was done.  The purpose was to keep
3 the Surface Mining Commission informed of
4 progress in addressing the notice of violation.
5 Q.   Would you read to yourself on the second
6 page, 832, paragraph number 2, the first sentence
7 about interstitial openings?  Do you agree with
8 that sentence, is it accurate?
9 A.   I don't have any reason to disagree with
10 it, and that's what I was attempting to describe
11 to you during our last question and answer.
12 Q.   And that same paragraph talks about the
13 thickness of the zone of saturation.  What does
14 that term mean?
15 A.   It means the amount of material in the
16 subsurface that contained water.
17 Q.   In this case, does "subsurface" mean below
18 the surface of the fill that's in that area?
19 A.   Yes.
20 Q.   On the last page of this document, 834, it
21 talks about installing a surface water gauging
22 station.  What does that measure?
23 A.   Depending on its level of sophistication,

Page 142

1 it could measure the height or change of surface
2 water.
3 Q.   Do you recall any data being generated from
4 that gauging station?
5 A.   I don't recall if we installed anything
6 that would constitute a station.  We may have put
7 some gauging -- technology has changed so much, I
8 can't remember what they were called.  They were
9 more or less just a ruled-off porcelain and metal
10 yardstick that you would place so that you could
11 take readings periodically by observation.
12 Q.   So this is not something that would measure
13 like flow of surface water on the site?
14 A.   A gauging station like USGS has on the
15 Warrior River, certainly they measure flow and
16 gauge height on a real frequent basis.  But I
17 think what we were referring to here was setting
18 up something that you would make an observation
19 as to what the level was.
20 Q.   In the numbered fourth paragraph where Dr.
21 Lamoreaux is talking about, [quote], "acid water
22 discharging from the system," what was it
23 discharging to?

Page 143

1 A.   I guess he was referring to drainage to the
2 Locust Fork.
3 Q.   Was there a problem on the site when you
4 got there with acid water drainage?
5     MR. DAVIS:  Object to form.
6 A.   We were addressing what I think everybody
7 called low pH water.  Whether or not it was
8 drainage, I'm not sure I can address that.  I
9 know there was runoff, and we set up monitoring
10 stations, and the results do indicate there was
11 low pH measured at those locations.
12 Q.   Did you use the term "acid mine drainage"
13 in describing that runoff?
14 A.   I don't recall that we did.
15 Q.   Are you familiar with that term?
16 A.   Oh, sure.
17 Q.   How would you define acid mine drainage?
18 A.   Well, it's low pH, high in other mineral
19 contents.
20 Q.   Did PELA take surface water samples on the
21 Maxine site that would meet what you would
22 consider the definition of acid mine drainage?
23 A.   I haven't really made that correlation,

Page 144

1 because we didn't use that term, but there were
2 measurements at various locations for the
3 results.  You could classify it as that.  I don't
4 know if it was really drainage from a
5 mine-constituted area, though.
6 Q.   What do you mean by "a mine-constituted
7 area"?
8 A.   When I think of acid mine drainage and I
9 think the way it initially came out in literature
10 and discussions and investigations, were old
11 portals of underground mines that the water was
12 actually flowing out onto the ground and into
13 surface water systems; and likewise, the same
14 thing from abandoned surface pits, I think our
15 reference to anything that was below a neutral
16 pH, we just referred to as low pH water.
17 Q.   Numerically, what would be -- you said
18 "below neutral," but --
19 A.   6.  Sorry.
20     (Whereupon, at this time a short break
21 was taken.)
22     (Whereupon, Plaintiff's Exhibit Number 19
23 was marked for identification, a copy of which is

Page 145

1  attached to the original of the transcript.)
2  Q.   Back from a break, on the record, I'll show
3  you what I've marked as Exhibit 19. Following up
4  with what we were just discussing, this relates
5  to the notice of violation that we looked at
6  earlier. And my question is, down at the bottom
7  it mentions a permanent treatment of acid mine
8  runoff, and assigns an abatement date. Do you
9  see that part?
10 A.   I do.
11 Q.   Was that part of what PELA was hired to do,
12 was to try to develop a permanent treatment of
13 acid mine runoff on the site?
14 A.   Yes. You know, I think that was
15 everybody's goal. I'm sorry, I'm referring back
16 to the NOV. I think I've answered that question.
17 I'm sorry.
18 Q.   I'm sorry, I thought you had something else
19 you wanted to add.
20 A.   Well, I thought I was going to, but my
21 research didn't indicate that.
22      (Whereupon, Plaintiff's Exhibit Number 20
23 was marked for identification, a copy of which is

Page 146

1  attached to the original of the transcript.)
2  Q.   I'm showing you what I've marked Exhibit 20
3  to your deposition. This is a PELA letter dated
4  March 10, 1980, by Mr. Lamoreaux. Have you seen
5  this document before?
6  A.   Yes, I have.
7  Q.   This letter lays out eight alternatives, or
8  potential alternatives for abatement of water
9  quality problems on the site. It says, "Were any
10 of these eight or which of these eight were
11 implemented?"
12 A.   Well, I'm certain that 1, 2 and 3 were not
13 accepted as alternatives, and 5, 6 or 7 -- 5, 6
14 and 8 were not accepted as alternatives, but
15 ultimately there was a system of diversion
16 ditches which, in part, may have been a
17 springboard off of 4; and for some reason,
18 there's no 7.
19 Q.   Yes, I noticed that, too. So the
20 alternative here that is closest to what was
21 actually implemented is number 4?
22 A.   Yes, just the discussion related to
23 diversion ditches generally, yes.

Page 147

1  Q.   And the purpose of those diversion ditches
2  was to reroute surface runoff and sediment on the
3  site; is that correct?
4  A.   That's what it says.
5       (Whereupon, Plaintiff's Exhibit Number 21
6  was marked for identification, a copy of which is
7  attached to the original of the transcript.)
8  Q.   Let me show you what I've marked Exhibit
9  21. Can you identify this for us for the record,
10 please?
11 A.   This is an internal memo written by me,
12 dated July 30, 1980.
13 Q.   Okay. Do you remember writing this memo?
14 A.   I don't remember writing it, but I
15 certainly remember the components, or some of the
16 components of it, yes.
17 Q.   And the third item there, you say that "The
18 dam was constructed across an embayment." What
19 does the word "embayment" mean, or what does it
20 refer to on the site by reference by maybe
21 Exhibit 6 or Exhibit 7?
22 A.   It refers to that slough that I outlined on
23 one of the topographic maps. I think I was using

Page 148

1  Dr. Lamoreaux's language. I believe that was in
2  one of the previous letters.
3  Q.   Throughout this memo, you refer to "a
4  system." Can you explain to us what you mean in
5  this context, by "a system"?
6  A.   I think it's documented in the previous
7  letter by Dr. Lamoreaux to Doug Cook, our
8  objectives at the time were trying to address the
9  saturated materials in the valley fill, and how
10 to handle that water. Maybe that's what I meant
11 by "system." I'm not sure I would call something
12 like that a system today. Even on the next page,
13 750, we were looking at ways to, you know,
14 physically handle that water.
15 Q.   Would "a system" in this context mean
16 basically the same as a drainage area or a
17 watershed or sub watershed?
18 A.   I don't know how to answer that.
19 Q.   When you say in item 5 that "The water in
20 the system had high concentrations of iron and
21 manganese," what particular area were you
22 referring to?
23 A.   I don't think this document really

Page 149

1  indicates that; but in the previous sentence,
2  there's reference to the monitoring wells and the
3  monitoring sites that are all in the lower part
4  of the valley.
5  Q.   If you look at the last page in this
6  Document 755, are you with me there?
7  A.   I'm there, yes.
8  Q.   What is this document?
9  A.   It's a topographic map that was prepared --
10 I believe it was prepared especially for Alabama
11 Byproducts, and it shows some of the monitoring
12 stations.
13 Q.   And as I'm reading it, the ones that say MO
14 are for groundwater, and the ones that just say M
15 are surface water; is that correct?
16 A.   Yes.  Referring back to item 4, that's
17 correct.
18 Q.   And looking at page 755, that site M-2,
19 where exactly was that located in relation to the
20 lower dam?
21 A.   Topographically, it looks like it's on the
22 lower dam; but as I was referring to earlier
23 today, the point of drainage at the lower dam was

Page 150

1  at the south end.
2  Q.   Was the point of drainage at the south end
3  at the time of this memo in 1980?
4  A.   I believe so, yes.
5  Q.   So what I'm really getting at is, was M-2
6  measuring discharge at a spillway or over or
7  through the dam at that point?
8  A.   There was drainage through, I'd say, the
9  emergency spillway.
10 Q.   Where was M-4 located that seems to be just
11 north of that?
12 A.   It looks like it was something at the north
13 end of the pond, but I don't recall what it was.
14 Q.   Do you recall how those surface water
15 samples were collected from M-4?  In other words,
16 was it standing water or moving water, or what
17 sort of surface water there was being sampled?
18 A.   Looking back on the table, it doesn't have
19 a flow associated with M-4, so there may not have
20 been runoff.
21 Q.   While we're on that page, let me make sure
22 that I'm interpreting this document correctly.
23 On page 751, is that where you are?

Page 151

1  A.   Can be.  Yes, sir.
2  Q.   So this is water quality analyses, and this
3  data on this page is from three different dates
4  from samples collected at the Maxine site?
5  A.   Yes.
6  Q.   August 27th, January 24th, and
7  February 22nd?
8  A.   Yes.
9  Q.   And the sample sites across the top
10 correspond to those that are marked on page 755;
11 is that correct?
12 A.   They appear to, yes.
13 Q.   Do you know who did the analysis on these
14 sample results on page 751?
15 A.   PELA would have done the field
16 determinations, and I can only assume we sent
17 them to our laboratory.  If not, it may have been
18 TTL.
19 Q.   On the next page, 752, these are just three
20 subsequent sample dates, correct?
21 A.   Yes, in March and April of 1980.
22 Q.   Page 753 are three more dates that go
23 through the latest, May 29, 1980; is that

Page 152

1  correct?
2  A.   Yes, sir.
3  Q.   And following through to page 754, it looks
4  like this sample ends at July 14, 1980.  Is that
5  correct?
6  A.   Yes.
7  Q.   At this time, was there a discharge permit
8  that was in place in this area of the rock
9  disposal area?
10 A.   I don't believe so, no.  I don't think that
11 was a requirement.
12 Q.   Did you ever review a NPDES permit that
13 related to an outfall number 24 that was in this
14 general area?
15 A.   I know it's in the compendium of the
16 documents.
17 Q.   Back then in 1980, were you aware of it?
18 A.   The pond hadn't been constructed at this
19 time.
20 Q.   When do you first recall being aware that
21 there was a NPDES discharge permit at an outfall
22 in this area of the rock disposal site?
23 A.   Upon review of the documents.

Page 153

1   Q.   After this lawsuit was filed?
2   A.   Yes.
3   Q.   So back in the eighties when you were on
4   the site, you were never cognizant of there being
5   a NPDES sampling point in this area at all?
6        MR. DAVIS:  Object to the form.
7   A.   Not at the rock disposal area, no.
8   Q.   Did you ever review the permit of effluent
9   limitations or any other information in the
10  permit itself?
11  A.   There weren't any permits.
12  Q.   Are you aware that there was a NPDES permit
13  at some point in the 1980s on the Maxine site?
14  A.   Yes.
15  Q.   When did it come into being, from your
16  understanding?
17  A.   I would have to look at the document, but I
18  believe it was after construction of that basin,
19  which was in the mid '80s, near the mid '80s,
20  somewhere around there.
21  Q.   Was it in effect from 1983 to '88, do you
22  know?
23  A.   The permit?

Page 154

1   Q.   Yes.
2   A.   Without looking at the document, I'm not
3   certain of the dates, but I know there wasn't one
4   early on.
5   Q.   Did you ever have to compare PELA's data to
6   the limits in the permit?
7   A.   I think what I referred to earlier was
8   comparing, specifically, I know, pH to the 6 to 9
9   limits.  I would imagine we had compared the iron
10  and the other constituents, too, but I'm not sure
11  if it was, like you talked about earlier, AWIC or
12  surface mining limitations, although I think it
13  was surface mining limitations.
14  Q.   In paragraph 6 here, you've got some
15  figures for volumetric calculations.  Do you see
16  that part?
17  A.   Yes.
18  Q.   How did you perform those calculations?
19  A.   I think based on some cross-sections that
20  were made using the two different dates of
21  topography, and the thickness of the fill
22  material based on the MO-1 and MO-2.
23  Q.   Is the use of two different dated

Page 155

1   topographical maps in that manner an accepted way
2   to perform a volumetric calculation?
3        MR. DAVIS:  Object to form.
4   A.   Sure.  You're comparing two different
5   elevations.  But you have to have the third
6   component, too, not just the difference in
7   elevation.
8   Q.   Third component, being?
9   A.   Well, the three dimensions.
10  Q.   What is the third dimension?
11  A.   The lateral extent and the actual -- we had
12  a ground truthing, actual measurement based on
13  the drilling data.
14  Q.   In item 7, you performed some calculations
15  to get an estimate of the -- how much water was
16  in the aquifer, do you see that?  Can you explain
17  how you made that calculation?
18  A.   Based on the cubic yards that were
19  determined in item 6, using a porosity of
20  25 percent, which would be the void space that
21  would be occupied by water, do the calculations
22  to go from cubic yards to gallons.
23  Q.   In item 8, you've got some calculations

Page 156

1   related to annual precipitation.  Do you see that
2   part?
3   A.   Yes, sir.
4   Q.   Where do the 4.3 feet come from?
5   A.   I'm not certain.  It may have been records
6   accumulated by NOAA, the National Oceanic
7   Atmosphere Administration, that were more
8   specific to the area.
9   Q.   Do you know if that is -- that 4.3 figure,
10  is that typical today of rainfall in the Maxine
11  Mine area?
12  A.   No, I don't.  I haven't looked at
13  precipitation in that area in quite some time.
14  Generally Alabama, you know, middle Alabama,
15  somewhere around 55 inches.
16  Q.   Around 55 inches is typical in middle
17  Alabama?
18  A.   Yes, sir.
19  Q.   As I understand this, then, when you
20  convert that into gallons per minute, you're
21  saying it's 480 gallons per minute working off of
22  52 inches in annual rainfall, and that would be
23  daily?

**Lois George**

40 (157 - 160)

Page 157

1  A.   The 52 inches is per -- for a year.
2  Q.   Right.
3  A.   And the calculation was 252 million gallons
4  per year.
5  Q.   Right.
6  A.   So then you would relate that back to
7  gallons per day, hour, minute.
8  Q.   Right.  But the 480 gallons is a
9  calculation of gallons that flow per minute every
10  day of the year for that year?
11  A.   Oh, I'm sorry, yes.  Yes.
12  Q.   Right?
13  A.   Yes.  I misunderstood your question.
14      (Whereupon, Plaintiff's Exhibit Number 22
15  was marked for identification, a copy of which is
16  attached to the original of the transcript.)
17  Q.   Have a look at what I've marked as Exhibit
18  22 to your deposition.  Are you familiar with
19  this document?
20  A.   Yes.
21  Q.   Can you tell us what it is that Dr.
22  Lamoreaux is illustrating in these three numbered
23  scenarios in this document?

Page 158

1  A.   Based on the titration evaluation and the
2  pages that follow, Dr. Lamoreaux was summarizing
3  the amount of water and the associated treatment
4  and costs that it would take to adjust the pH to
5  8, 9 or 10, with three different components of
6  being able to put the water down in the mine.
7  First, you would have to treat the water in the
8  mine up to this level, one of these levels, so
9  that whatever the pH was in the mine -- and I'm
10  not sure it says it anywhere in here, it may --
11  so that when you introduce the water from the
12  surface into the mine, it just doesn't null-out,
13  you've already elevated the pH of the water in
14  the mine.
15  Q.   Let me ask you this, because it looks to me
16  like number 1 and number 2 are dealing with the
17  mine or the underground part of the pit, whereas
18  number 3, I'm not sure.  Number 3 refers to the
19  rock fill area, so does that relate to the waste
20  pile area?
21  A.   I think that's the valley, the valley fill.
22  Q.   So what he's illustrating here is to bring
23  the pH of the water discharging from the valley

Page 159

1  fill up to 8 would cost $4,548 a day for
2  treatment?
3  A.   The water that's in it currently and the
4  water that would continue to be there based on
5  rainfall and runoff to that area.
6  Q.   For how long would you have to treat it in
7  this manner to keep the pH at 8?
8  A.   I don't think that was a component that was
9  evaluated.
10  Q.   Do you recall how Mr. Cook or ABC responded
11  to this computation, I guess?  I'm not sure it's
12  a recommendation; but, I mean, as to number 3,
13  did they accept that?
14      MR. DAVIS:  Object to form.
15  A.   I don't recall what Mr. Cook's response was
16  to it, but the Alabama Water Improvement
17  Commission did not accept the recommendation to
18  put the water in the mine.
19  Q.   So this item number 3 also related to
20  pumping water into the mine?
21  A.   Yes.  Yes, the whole letter does.
22  Q.   Now you've educated me.
23      (Whereupon, Plaintiff's Exhibit Number 23

Page 160

1  was marked for identification, a copy of which is
2  attached to the original of the transcript.)
3  Q.   I've showed you what I've marked as
4  Plaintiff's Exhibit 23.  This is a PELA document
5  dated December 30, 1980.  Have you seen this
6  document before?
7  A.   Yes, recently.
8  Q.   In the fourth paragraph, he indicates that
9  the upper pond is silted up to the level of the
10  spillway.  Do you see that part?
11  A.   I do.
12  Q.   Do you recall seeing it in that condition?
13  A.   I don't recall, but it does indicate I was
14  there.
15  Q.   But you don't recall one way or the other?
16  A.   No, I don't.
17  Q.   Would you agree with me that a sediment
18  pond, if it is full of sediment, can't perform
19  its function properly of settling-out solids?
20      MR. DAVIS:  Object to form.
21  A.   It certainly wouldn't be near as efficient.
22  You would still have water slowing down and going
23  over the top of it.  Some settlement would

Page 161

1 happen, but it wouldn't be as efficient as it was
2 constructed to be.
3 Q.   Right.  In fact, further in that paragraph,
4 Dr. Lamoreaux says that it's filled in
5 two-and-a-half to three feet, and that will
6 greatly eliminate the retention time.  Do you see
7 that part?
8 A.   Yes.
9 Q.   So that's a true statement, right?
10 A.   Yes.
11 Q.   And if you eliminate the retention time,
12 wouldn't it be true that more solids are going to
13 travel through the pond, over its surface,
14 downgradient toward the river?
15 A.   I think that's what the last part of the
16 sentence says, yes.
17 Q.   He described this as an item of concern he
18 was presenting to ABC.  Do you remember what
19 action, if any, in response to this letter ABC
20 took?
21 A.   Cleaned out the pond.
22 Q.   Do you think or do you know that they did,
23 or is that your best recollection?

Page 162

1 A.   I recall that there was earthmoving
2 equipment in that area several times.  Sediments
3 were removed.
4 Q.   Would you agree that if you don't
5 periodically remove the sediments, that a
6 sediment pond is not going to function properly?
7      MR. DAVIS:  Object to form.
8 A.   Well, it depends on where the spillway is
9 relative to how much water there is when the
10 rainfall event comes in.  But with time, yes, if
11 it fills up to the point that everything is just
12 washing over, yes.
13      (Whereupon, Plaintiff's Exhibit Number 24
14 was marked for identification, a copy of which is
15 attached to the original of the transcript.)
16 Q.   Let me show you what I've marked Exhibit 24
17 to your deposition, and this is one of the
18 documents you had in your reference list for your
19 Expert Report.  Are you familiar with this
20 document?
21 A.   Yes.
22 Q.   Was this document ever submitted to state
23 regulators?

Page 163

1 A.   I don't know for certain.
2 Q.   This is a document which I believe deals
3 with a mixing zone.  Do you recall that?
4 A.   Yes, sir.
5 Q.   Do you remember ever discussing this work
6 or a mixing zone with any state regulators?
7 A.   I think we discussed it on-site with AWIC.
8 Q.   What's your best recollection of that
9 discussion?
10 A.   Not substance.
11 Q.   Do you know if notices of violation were
12 issued after this point in time where you
13 established this so-called "mixing zone"?
14 A.   There was an additional notice of
15 violation, but I thought it had to do with the
16 upper part of the rock disposal area.
17 Q.   Can you explain to us the methodology that
18 PELA employed in calculating or establishing what
19 it referred to as a mixing zone?
20 A.   Using a boat; a tape that we used as a sign
21 to measure the depth of the water; used a
22 specific conductance meter that had a long cable
23 on it, and I specifically remember this because

Page 164

1 typically the meters only had cables that were
2 three or four feet long, and it had to be
3 acquired.  Since this was pre-GPS or anything, we
4 may have had a rope stretched across the river
5 temporarily so that we could determine where we
6 were at each station.  The station was
7 established so many feet from the bank all the
8 way across at intervals; the depth of the water
9 was measured, and then the specific conductance
10 sign was lowered incrementally and measurements
11 made.
12 Q.   If you look at page 32 in this document,
13 it's got a topo map with some explanatory
14 material.
15 A.   Yes, sir.
16 Q.   So what does M1-1 represent, or MI-1?
17 A.   If you look on page 29, the last paragraph
18 indicates that MI-1 was in the mixing zone
19 itself.
20 Q.   How far is MI-1 from the shoreline?
21 A.   I don't see that there's a specific
22 reference to it, but in looking -- it says it's
23 within the mixing zone.  If you look at 34, page

Page 165

1  34, please --
2  Q.   All right.
3  A.   -- it shows the extent of the mixing zone
4  out 25 to 35 feet, and it would be someplace in
5  that area that's what we called it, but I don't
6  know specifically where.
7  Q.   Do you know what depth the measurement was
8  taken at MI-1?
9  A.   MI-1?
10 Q.   Yes.
11 A.   I don't think the report indicates that.
12 Q.   So on page 30, we have a comparison of MI-1
13 and M-2.  Is that M-2 location the same that we
14 looked at earlier --
15 A.   Yes.
16 Q.   -- on the south end of the lower dam?
17 A.   Yes.
18 Q.   So basically, this is comparing the water
19 chemistry at M-2 versus MI-1 here on page 30?
20 A.   That's correct.  For comparison, if we look
21 at the specific conductance on page 30 for MI-1,
22 and look back at the diagram on page 34, I'm not
23 sure we can correlate the symbology; but the

Page 166

1  specific conductance was 140, so it would -- I
2  can't compare the symbology.  I was trying to do
3  that, but it's not working.  There's too many
4  stipples that look the same that was reproduced.
5  Q.   Right, for those different numeric levels
6  of conductance?
7  A.   Yes.  I was trying to see where the extent
8  of the 140 was on the diagram.
9  Q.   So conceptually, what does the concept of a
10 mixing zone mean in this application?  What does
11 it show you?  What does it prove?
12 A.   Well, it demonstrates where the water
13 entering the Locust Fork from the lower pond, it
14 shows an elevated, slightly elevated specific
15 conductance, versus the conductance over the rest
16 of the river.  It shows it had a limited extent
17 out into the river and a limited extent down the
18 river.  It's 180 feet by 40 feet.
19 Q.   To your knowledge, was any mixing zone ever
20 established at the Maxine site by any state
21 regulators?
22 A.   No.
23 Q.   To what use did PELA or ABC put this mixing

Page 167

1  zone exercise?
2  A.   I think in answer to your earlier question,
3  I don't know whether or not it was given to an
4  agency, but it was completed at the request of
5  Doug Cook, which I believe he had implemented as
6  a result of the NOV or discussions with the
7  agency.  In fact, I think there is somewhere in
8  the record that Mr. Cook asked that we
9  specifically do this as an additional aspect of
10 working on the rock disposal area.
11 Q.   So Mr. Cook at ABC would have requested
12 PELA to perform this mixing zone exercise?
13 A.   He authorized it.
14 Q.   And they paid PELA to do it?
15 A.   Yes.
16       (Whereupon, Plaintiff's Exhibit Number 25
17 was marked for identification, a copy of which is
18 attached to the original of the transcript.)
19 Q.   I've handed you what has been marked
20 Exhibit 25.  This is also one of the documents
21 listed in your expert list, reference list.  This
22 is a folder that is titled Supplement to Permit
23 Application.  Is this similar to the documents

Page 168

1  that you said PELA had?
2  A.   No.  We had the original permit
3  application.
4  Q.   Have you seen this document before?
5  A.   I have.
6  Q.   Did you review it recently?
7  A.   Yes, sir.
8  Q.   Which permit was this application
9  pertaining to?
10 A.   I don't see the permit number here, but it
11 was Maxine's P, whatever number it was, 32.
12 Q.   3254, maybe?  Something close to that.  Is
13 that the surface mining or the mining permit?
14 A.   Yes.
15 Q.   Did PELA provide some information to ABC in
16 connection with its permit application in 1982?
17 A.   Yes.
18 Q.   If you would look at page 219 in this
19 document, starting at the bottom of the page,
20 area 2, the reference to the active coal
21 processing waste bank, what area of the site is
22 that a reference to, if you know?
23 A.   It makes reference to a map.  The map is

Page 169

1 after page -- I can't read the number on it, it's
2 too small.
3 Q.   On the map?
4 A.   The Bates number.
5       MS. ANDREEN:  It's 267.
6 A.   Looking at the map, map 405 on 267, it's
7 the area labeled as number 2, the active washer
8 refuse disposal area.  That is the capped area.
9 Q.   Right, the capped area is basically what
10 they're talking about there?
11 A.   Right.  Yes, sir.
12 Q.   And they describe in a couple of paragraphs
13 a plan that they have for reclaiming and
14 abandoning that area.  Are you familiar with the
15 content of what's set forth in this page?
16 A.   Yes, it talks about the diversion ditches.
17 Q.   Is this basically what ended up being
18 implemented on the site?  You can take your time
19 to read it.
20 A.   I think this is the conceptual stage still,
21 so it's not the end result.
22 Q.   Do you know if this Area 1 that they
23 discuss was ever approved and constructed?

Page 170

1 A.   I think it was approved.  I think it was
2 cleared.  I'm really not sure if it was ever
3 used.  If it was, it was after the fact.  I'm not
4 really sure.
5 Q.   In the top paragraph there on page 220,
6 Bates-stamped 220, page 4 of the document, it's
7 discussing the reclamation of the post law area,
8 and it says that they were going to cover it with
9 one foot of clay and then revegetate it.  Do you
10 know if that's what was done?
11 A.   I think it was two feet of clay, and I know
12 it was revegetated.
13 Q.   Then it says that "The basin will be
14 reclaimed and vegetated."  Did that ever happen?
15 A.   I'm not sure which basin is being
16 referenced here.
17 Q.   I thought they were referring to the basin
18 shown in Exhibit 7.
19 A.   Could be.
20 Q.   But you don't know for sure?
21 A.   Yes, I believe it is referring to an
22 additional basin besides the upper and the lower
23 ponds; but, again, this was conceptual.  I'm not

Page 171

1 sure it's that area.
2 Q.   Do you know if this information was
3 actually submitted to the ASMC as part of the
4 permit application?
5 A.   I don't have any reason to believe that it
6 wasn't.
7 Q.   If you'll turn to page 222 within that
8 document, there's a PELA document there.  Do you
9 see that?
10 A.   Yes.
11 Q.   It's from July 30th of 1982.  Did you work
12 on this document?
13 A.   Yes, sir.
14 Q.   Did you draft all of it or parts of it?
15 A.   I don't believe all of it, but possibly the
16 majority of it, and then reviewed by Dr.
17 Lamoreaux and Mr. Powell.
18 Q.   If you'll turn to page 239 -- actually, I
19 think I've already asked you all the questions
20 that I would have about that page.
21 A.   Okay.
22 Q.   On page 241, the discussion of the surface
23 water monitoring program, do you see that part?

Page 172

1 A.   Yes, I do.
2 Q.   It describes, the wording uses "segregate
3 runoff."  Do you recall that being an objective
4 of this plan that PELA drafted?
5 A.   I'm sorry, I don't see where "segregate"
6 is.
7 Q.   It's in the first sentence under the
8 heading Surface Water Monitoring Program.
9 A.   Oh, "to segregate the runoff."  Yes.
10 Q.   And it indicates below, as we discussed
11 earlier, that the east side channel would collect
12 from the old material, and the west side would
13 collect from the capped area, correct?
14 A.   Correct.
15 Q.   As we've already discussed.  Why was the
16 objective to segregate the runoff in that manner?
17 A.   To segregate the pre-law and the post law
18 contribution to drainage.
19 Q.   Was there a scientific reason to do it that
20 way?
21 A.   Well, the science is based on the
22 configuration of land surface and the
23 configuration of a planned final land surface,

Page 173

1 but the reason was to move forward with
2 regulatory requirements for permitting and
3 operating the Maxine Mine in their rock disposal
4 area.
5 Q.   Is what you just said, that was your
6 understanding of the purpose of segregating the
7 runoff?
8 A.   Yes, it was.
9 Q.   And who told you that?
10 A.   I think there were a number of discussions
11 with Randy Johnson, the ABC engineers.  I don't
12 know if Mr. Willett was involved in discussions,
13 but I think there was correspondence regarding
14 that.
15 Q.   Do you remember the Clean Water Act ever
16 coming up in any of those discussions?
17 A.   No, sir.
18 Q.   How was the capped area reclaimed?
19 A.   In part, it was the way the waste was
20 placed there.  It was placed in maybe six-inch or
21 twelve-foot lifts so it would be more compact; it
22 was sloped to not necessarily a design plan, but
23 it was sloped so it would drain towards the west;

Page 174

1 and terraced; and then the one foot or two foot
2 of cap material which was from a nearby borrow
3 pit; and it was tested, the material fit criteria
4 for using as cover.  It was placed and then
5 vegetated and augmented with nutrients and
6 whatever.
7 Q.   Was all of that reclamation work completed
8 by the time you left in '84?
9 A.   Yes, in the capped area.  The only part I'm
10 not certain about was some of the lower ditch
11 construction.  I know the cross-over was
12 completed.  Yes, it was completed, because we did
13 monitoring, post cap monitoring.
14 Q.   What reclamation work was done on the
15 pre-law area in comparison?
16      MR. DAVIS:  Object to the form.
17 Q.   If any?
18 A.   The pre-law area north of the north ditch
19 was contoured to drain into the ditch.
20 Q.   What about the rest of the pre-law area?
21 A.   There was no work, to my knowledge, done on
22 the pre-law area to the east of the capped area.
23 Q.   Do you know why not?

Page 175

1 A.   There wasn't any regulatory requirement at
2 the time.
3 Q.   That was your understanding?
4 A.   Yes, sir.
5 Q.   And what was the basis of that
6 understanding?  I mean, you don't have any legal
7 training, do you?
8 A.   No.
9 Q.   Did you make a legal analysis about what --
10 A.   I did not.
11 Q.   -- what they were obligated to do or not?
12 A.   I did not.  It wasn't our recommendation.
13 We were consulting to Alabama Byproducts, with
14 the objective of satisfying the NOVs and
15 obtaining permits.  It wasn't required.  It
16 wasn't asked for.
17 Q.   Okay.  Some testimony earlier in the case
18 indicated that this area, the pre-law, is not
19 within the boundary of the mining permit.  Do you
20 know if that's true, or not?
21 A.   It's my recollection that mining permits
22 for underground mines had to do with their
23 surface activities, such as airshafts, washers,

Page 176

1 conveyors, roads, active rock disposal areas, and
2 that's what was permitted.
3 Q.   But my question was whether the pre-law
4 rock disposal area was within the permit, or not?
5 A.   No, it was not.
6 Q.   Were you aware of that back in the '80s?
7 A.   Sure.
8 Q.   What impact did that have, if any, on any
9 of the work that PELA did; did it matter?
10 A.   I don't understand the question.
11 Q.   Okay.  Did it matter to PELA in any way, in
12 any of the hydrologic analysis or work you did,
13 whether this area was within the mining permit
14 boundary or not?
15      MR. DAVIS:  Object to the form.  You can
16 answer.
17 A.   I don't understand what "matter" means.  We
18 were monitoring at surface water points and
19 groundwater points.  I'm not sure I understand
20 what you mean.
21 Q.   Would you have performed your work any
22 differently if the area had been within the
23 permit boundaries?

Page 177

1  A.  I don't know the answer to that. The
2  permitting was completed in accordance with the
3  requirements of surface mining regs as to what
4  underground mines had to do at the time.
5      (Whereupon, at this time a short break
6  was taken.)
7      (Whereupon, Plaintiff's Exhibit Number 26
8  was marked for identification, a copy of which is
9  attached to the original of the transcript.)
10  Q.  Can you tell, is Exhibit 26 a PELA
11  document? I know part of it is, starting at
12  1798.
13  A.  I believe so. I think it was generated by
14  ABC as a result of follow-up questions. I was
15  wondering that myself, to be honest with you,
16  where it came from.
17  Q.  Item 3 talks about hydrology monitoring and
18  the, [quote], "old disposal area" for a year. I
19  think that's referring to the capped area there.
20  In any event, is that what happened, in fact, did
21  PELA monitor that for a year after vegetative
22  cover?
23  A.  I believe so. I think our final report in

Page 178

1  1984 documents all those activities, summarizes
2  them, anyway.
3  Q.  If you would look at page 1798, and just
4  confirm if that is a PELA document that sets out
5  some of the details of that monitoring program?
6  A.  It looks like a more formal recap of some
7  of the letters to Mr. Cook.
8  Q.  Were there some groundwater wells that were
9  installed as part of the monitoring program?
10  A.  Yes, MO-3 through MO-9.
11  Q.  And are those shown on Exhibits 6 and 7?
12  A.  Some of them are shown on 7; all of them
13  are shown on 6.
14  Q.  So Exhibit 6 contains all of the monitoring
15  wells that PELA ever installed on the Maxine
16  site?
17  A.  Yes.
18  Q.  Were Wells 3 through 9 installed at the
19  same time?
20  A.  I think 7 and 8 were installed after -- and
21  possibly 9, after the capping, so.
22  Q.  Which ones were pre-capping and which ones
23  were post capping, to the best of your

Page 179

1  recollection?
2  A.  3, 4, 5 and 6. I don't remember the
3  sequence of installation, but the purpose of
4  installing 7, 8 and 9 were related to evaluating
5  the post effect of capping. One of the wells, 7
6  or 8, was actually drilled through the post law
7  area and cased through the post law area, and
8  then drilled down into the pre-law area; so you
9  were just monitoring the pre-law, the deeper
10  underneath, and then the other well was
11  shallower, to make a comparison of what was going
12  on in the pre-law and the post law at the same
13  location.
14  Q.  Let me see if I understand what you're
15  saying. Are you saying within the depth of some
16  of the material, some of the deeper material was
17  considered pre-law?
18  A.  Yes.
19  Q.  At what depth did it become or was it
20  deemed to be pre-law?
21  A.  We'll have to look at the boring logs.
22  Q.  Was that true for the entire capped area?
23  A.  No.

Page 180

1  Q.  Just parts of it?
2  A.  Just the upper part, is my recollection.
3  Q.  Can you specify when you say "upper"?
4  A.  No.
5  Q.  How much of it?
6  A.  No, I can't. I'm sorry.
7      (Whereupon, Plaintiff's Exhibit Number 27
8  was marked for identification, a copy of which is
9  attached to the original of the transcript.)
10  Q.  Ms. George, will you take a look at what
11  I've marked as Exhibit 27? This is another PELA
12  document that deals with these monitoring wells.
13  If you could, do you see the part that describes
14  four wells in the middle of the page, first page?
15  A.  Yes.
16  Q.  And the first one, A, it says "Up-dip from
17  the capped area." What number monitoring well
18  would that correspond to in number 6?
19  A.  Either 4 or 5 or 6.
20  Q.  What about B, "Down-dip from the capped
21  area," what would that correspond to?
22  A.  MO-3.
23  Q.  Two wells in the capped area, it looks like

Page 181

1 there are actually three, right?

2 A.   That's correct.

3 Q.   So apparently there was an adjustment made

4 to this outline or plan?

5 A.   Right.  This was a plan.

6 Q.   And for the record, this was one of the

7 documents you listed in your reference list on

8 your expert report.  Did you review this for

9 historical reference, or for what purpose in

10 connection with your report?

11 A.   Chronological information.

12      (Whereupon, Plaintiff's Exhibit Number 28

13 was marked for identification, a copy of which is

14 attached to the original of the transcript.)

15 Q.   If you would, take a look at what has been

16 marked Exhibit 28, and let us know if you recall

17 seeing this document before?

18 A.   I do.

19 Q.   It looks like on the second page, you

20 signed it.  Is that right?

21 A.   Yes, sir.

22 Q.   In this letter, you and Dr. Lamoreaux set

23 out eight different recommendations.  Can you

Page 182

1 tell us which of these were undertaken?  It looks

2 like the third page is a map, but I can't see any

3 of the sites that are listed in that list of

4 eight items.

5 A.   I can't say that they all were completed as

6 a result of this letter.  As I discussed earlier,

7 and I think there was another letter after

8 another inspection that upon going to the site,

9 if we saw issues that were not consistent with

10 the planning, or based on things that had

11 happened during rain events, we made

12 recommendations to ABC to, as it says on page 2,

13 to ensure the segregation and the monitoring and

14 maintenance.

15 Q.   Particular reference to number 7, you

16 recommended building up a berm to prohibit

17 commingling.  Do you recall if that was done?

18 A.   I assume it was done since the NOV and the

19 Order were addressed.  I'm not sure I actually

20 witnessed it.

21 Q.   But as far as you recall, the segregation

22 of the two streams was accomplished?

23 A.   The ditches?  Yes.

Page 183

1      (Whereupon, Plaintiff's Exhibit Number 29

2 was marked for identification, a copy of which is

3 attached to the original of the transcript.)

4 Q.   Please look at what has been marked Exhibit

5 29 to your deposition.  Have you seen this

6 document before?

7 A.   I did sign it.

8 Q.   On the second page, it talks about breaker

9 rock samples.  Do you recall where those samples

10 were taken from?

11 A.   I think these were collected by ABC from

12 various locations underground in the mine, and

13 this was a component of requirement for the

14 permit.

15 Q.   Okay.  So this is underground --

16 A.   Yes.

17 Q.   -- breaker rock?

18 A.   Yes.

19 Q.   On the first page there's some data there

20 for Maxine compared to other mines, and it

21 indicates that the neutralization potential is a

22 lot lower than the others.  Do you know why that

23 was or would be?

Page 184

1 A.   Maxine Mine was mining the American coal

2 seam; the Mary Lee 2, Segco 7 and Mary Lee 1,

3 were obviously mining the Mary Lee coal seam

4 which is a deeper coal seam, a different coal

5 seam, and I think Segco and Chetopa were also

6 established in the Mary Lee coal seam.

7 Regardless of that, there's different

8 environments at different places in the Warrior

9 basin.

10 Q.   It also indicates a lot higher pyritic

11 sulfur content in the Maxine Mine samples.  What,

12 if anything, does that indicate?

13 A.   That it's different from other locations.

14 Again, it likely has to do with the geology and

15 the environment and deposition of the coal.

16      (Whereupon, Plaintiff's Exhibit Number 30

17 was marked for identification, a copy of which is

18 attached to the original of the transcript.)

19 Q.   Ms. George, you're looking at Exhibit 30.

20 Would you turn to page 3542?  And there are some

21 latitude and longitude coordinates for wells, is

22 that what those are?

23 A.   Yes, sir.

Page 185

1 Q. Are these some of the wells that are on the
2 Maxine site?
3 A. No, sir.
4 Q. Okay. What are these?
5 A. These are wells that were drilled into the
6 Pottsville formation to collect groundwater
7 monitoring information for the overall mine
8 permit.
9 Q. The first two pages of this document, it
10 looks like it's a letter that you wrote
11 December 15, 1992?
12 A. '82.
13 Q. I'm sorry, '82. Do you recall this letter?
14 A. Not very well.
15 Q. Well, it seems to be discussing a process
16 of training ABC personnel to do some of the
17 monitoring work. Do you remember that happening?
18 A. Yes.
19 Q. So at some point in time, did they take
20 over the groundwater well sample gathering?
21 A. Some of the information that was being
22 collected was taken over by the mining staff. I
23 believe we needed a year of monitoring data

Page 186

1 before you could submit a permit.
2 Q. So did they go out and physically gather
3 the samples from the wells?
4 A. I'm not sure they did the sampling. This
5 is relative to the water level recorders and rain
6 gauges.
7 Q. It says in the third paragraph, "They
8 completed the monitoring well circuit." What
9 does that mean?
10 A. We went to each well at each mine site and
11 inspected the conditions of the well and the
12 instrumentation. One of the challenges in doing
13 some of these projects is vandalism. People like
14 to shoot at things that aren't -- things that are
15 supposed to be there.
16 Q. Use it as a target?
17 A. Yes. Not the mine people.
18 Q. Right.
19    (Whereupon, Plaintiff's Exhibit Number 31
20 was marked for identification, a copy of which is
21 attached to the original of the transcript.)
22 Q. Ms. George, have you seen this document
23 before, that we've marked as Exhibit 31 to your

Page 187

1 deposition?
2 A. I did sign it.
3 Q. The main purpose of this, I guess, is just
4 chronology? It seems to indicate on the second
5 page that as of this time, February of '83, that
6 the parallel ditch hadn't been constructed yet?
7 A. Right, it appears to be still a work in
8 process.
9 Q. So that was the last ditch that was
10 constructed, apparently, right?
11 A. I can't say that with certainty, but
12 possibly.
13 Q. Possibly, okay.
14    (Whereupon, Plaintiff's Exhibit Number 32
15 was marked for identification, a copy of which is
16 attached to the original of the transcript.)
17 Q. I'm handing you what I've marked as Exhibit
18 32 to your deposition. Did you play any role in
19 preparing this document?
20 A. More than likely, yes.
21 Q. This is the first record that I see
22 documenting surface water sampling results from
23 SW-2 and SW-3 and SW-1, so I want to ask you

Page 188

1 about those with reference to Exhibit 6. Are
2 those surface water sampling points shown on
3 Exhibit 6?
4 A. Yes.
5 Q. And if you look at page 430, the second
6 page of this document, in the second paragraph,
7 as I read it, it indicates that SW-2, the sample
8 site, was in the west ditch. Do you see that
9 part?
10 A. Yes, sir.
11 Q. Is that correct?
12 A. Yes.
13 Q. It looks like, looking at Exhibit 6, that
14 SW-2 was a little bit downgradient from the basin
15 that's shown there in the ditch. Is that
16 correct?
17 A. Yes.
18 Q. And SW-3, it says, was in the east ditch?
19 A. Yes.
20 Q. So that means that somebody was taking a
21 surface water sample out of those particular
22 ditches and compiling this data, correct?
23 A. That's right.

Page 189

1  Q.  Do you know how far apart SW-2 and SW-3
2  were?
3  A.  No, I don't, and unfortunately neither of
4  these diagrams have scales.
5  Q.  Do you remember approximately how many feet
6  apart they were?
7  A.  No, I don't.
8  Q.  What was used to mark or designate a
9  particular sampling spot that was designated 2
10  and 3?
11  A.  I don't recall.
12  Q.  On page 433 of this document, there's a
13  table.  Would you take a look at that?  It
14  appears to indicate three different sampling
15  dates for SW-2, SW-3, and MO-3.  Is that correct?
16  A.  Yes, sir.
17  Q.  So when we see the column SW-2 and SW-3 on
18  the right, that will correspond to the two
19  locations we see on Exhibit 6?
20  A.  Yes.
21  Q.  This indicates on February 4, 1983, at SW-2
22  the pH was 4.4.  That's below the 6 threshold
23  that you mentioned earlier, correct?

Page 190

1  A.  It says 4.4, yes.
2  Q.  So was there any action taken, that you
3  recall, to try to improve on the pH of that
4  discharge?
5  A.  I don't recall at the time.
6  Q.  And it indicates that the pH from the SW-3
7  sample was 2.9, correct?
8  A.  Yes.
9  Q.  Do you recall any action that was taken to
10  improve the water chemistry from that sampling
11  site?
12  A.  Not that I recall.  But if you look at the
13  last page, it indicates that grading of the
14  systems weren't completed yet either, so it was a
15  work in process.
16  Q.  The last sentence of page 434 says "Grading
17  of pre-law refuse disposal area was initiated on
18  March 31, 1983."  What grading was done of the
19  pre-law refuse?
20  A.  I'm not certain, but it may have been
21  referring to the area north of the north ditch.
22  Q.  What were the parameters or the objective
23  for SW-2 that you and ABC were trying to achieve,

Page 191

1  do you remember?
2  A.  Not at this time.  The objective at this
3  time was to get in the segregation of the waters
4  and monitor it and report as each event was taken
5  and the date it was compiled.
6  Q.  So at this point in time you were just
7  trying to demonstrate a difference between the
8  two samples, SW-2 and SW-3?
9  A.  Just monitor what it was.
10  Q.  Pardon?
11  A.  Monitor what the actual conditions were.
12  I'm not sure we were really making comparisons,
13  because everything wasn't completed yet.  I don't
14  see that the report really does anything other
15  than just reporting what was done and what the
16  results were.
17      (Whereupon, Plaintiff's Exhibit Number 33
18  was marked for identification, a copy of which is
19  attached to the original of the transcript.)
20  Q.  Let me show you Plaintiff's Exhibit 33.
21  Have you ever seen this before?
22  A.  I have, just recently.
23  Q.  In connection with preparing for the

Page 192

1  deposition?
2  A.  Yes.
3  Q.  After the lawsuit was filed?
4  A.  Yes.
5  Q.  The bottom part of this has some
6  handwritten information that is recounting a
7  conversation about possible NPDES permits.  Were
8  you involved in any of these discussions?
9  A.  I don't believe so.  It doesn't indicate
10  that I was involved in the inspection at this
11  time.
12  Q.  And it also refers to an agreement that was
13  signed by Joe Myers.  Do you know what that
14  reference is to?
15  A.  I'm sorry, let me find that, please.
16  Q.  That's the last sentence in the handwritten
17  part.
18  A.  Oh, okay.  I'm really not certain.  It may
19  be related to the conclusion of inspections or
20  investigations regarding the lower part of the
21  valley.  But I'm really not certain what it was.
22  Q.  I'm just trying to find out if you have any
23  recollection of being involved in any discussion

Page 193

1 about possibly having to get a permit for a
2 discharge from the diversion ditch that was
3 draining the reclaimed area?
4 A.   Not on this occasion, no.  That was always
5 an internal discussion.  We have to achieve what
6 is being required, but an NPDES permit was not
7 required.
8 Q.   What are you referring to that was being
9 required?
10 A.   Addressing the rock disposal area, the
11 pre-law area, the post law area, obtaining the
12 initial permit that was submitted in 1982 to the
13 Surface Mining Commission; obtaining the
14 supplemental permit for the rock disposal area
15 off to the west; and satisfying the two Notices
16 of Violation.
17 Q.   Earlier you mentioned, I think, the pH
18 needing to be between 6 and 9.  Were there ever
19 any other water chemistry parameters like that,
20 that you were aware of, that ABC was trying to
21 achieve for the post law area?
22 A.   I believe I talked about iron and
23 manganese, but I don't recall the specific range

Page 194

1 that might have been applicable.  Again, I
2 believe I was referring to ASMC, not AWIC.  But
3 all the agencies, including OSM, were well aware
4 of what was going on.
5       (Whereupon, Plaintiff's Exhibit Number 34
6 was marked for identification, a copy of which is
7 attached to the original of the transcript.)
8 Q.   I don't mean to belabor this point, but I'm
9 going to show you Exhibit 34, which is another
10 letter that relates to this same topic.  If you
11 look at the third paragraph, that being -- well,
12 actually it's the fourth paragraph, there being
13 some discussion about ADEM requiring a NPDES
14 permit.  It says, [quote] "For outflow through
15 the limestone filter," and I'm just trying to
16 make absolutely certain that you don't have any
17 knowledge about this, what's being described in
18 this letter, and weren't involved in any
19 discussions about it?
20 A.   Well, I think I know what the limestone
21 filter is.  I mean, we talked about that early
22 this morning about the lower pond and lower dam.
23 Again, this is a letter amongst ABC and Southern

Page 195

1 Company.  I don't know what their discussions
2 were, but I know throughout our period of working
3 with ABC, there were discussions of what might be
4 required and what might not.  But there was not a
5 requirement for a NPDES permit ultimately.
6 Q.   Right.  And I know you're not shown on this
7 letter anywhere, but I know there were a lot of
8 meetings and discussions.  So that's what I'm
9 trying to get at, is whether you were ever a part
10 of any meetings or discussions about what's
11 discussed in the fourth paragraph of this letter?
12 A.   I don't know who Mr. Simon is.
13 Q.   And you were not involved in any
14 discussions about a NPDES permit for the
15 reclaimed capped area?
16 A.   I think I just said earlier that there were
17 discussions on-site, and even with the folks from
18 AWIC.
19 Q.   Who were you having those discussions with?
20 A.   Joe Myers was on-site several times.
21 Q.   Did he specifically talk about a NPDES
22 permit in your presence?
23 A.   I don't remember what terms we used.

Page 196

1 Q.   What do you remember him saying?
2 A.   I don't remember any specifics of
3 conversation.
4 Q.   In the last paragraph, there's a
5 description of a meeting with ADEM staff on
6 September 6, 1983.  Were you a part of that
7 meeting?
8 A.   No.  Any meetings I was involved with, with
9 ADEM, I believe, were always at the site.
10       (Whereupon, Plaintiff's Exhibit Number 35
11 was marked for identification, a copy of which is
12 attached to the original of the transcript.)
13 Q.   Ms. George, let me show you what I've
14 marked Exhibit 35 to your deposition.  Take a
15 look at that, and let me know if you assisted in
16 the preparation of this report?
17 A.   I did.
18 Q.   What is this report?
19 A.   Maxine Rock Disposal Area Surface and
20 Groundwater Monitoring.
21 Q.   The date on the front page is April 5th of
22 1984, on the cover page.  Do you see that?
23 A.   Yes, sir.

Page 197

1  Q.  At that point, had the reclamation work on
2  the post law area been completed?
3  A.  I believe so, I'm not certain.  I was
4  looking for a table which is in one of these
5  final reports that has a chronology in it.
6  Q.  Are you still reviewing it?
7  A.  Yes.  I was trying to look at some of the
8  dates and monitoring about the surface water.
9  I'm just not certain all the ditches were in yet
10  at this point.  I know the wells were in, but I'm
11  not sure --
12  Q.  On page 2 of the document, which is
13  Drummond 151, it seems to indicate that all the
14  wells were in, it speaks of them in the past
15  tense.  Is that your understanding?
16  A.  Yes, sir.
17  Q.  Starting on page 153, we talked about this
18  a little bit earlier, the depth of the wells and
19  the depth of the material?
20  A.  Yes, sir.
21  Q.  In the second paragraph, it's talking about
22  Well MO-5 which, looking at Exhibit 6, is in the
23  pre-law area north of the north ditch, correct?

Page 198

1  A.  Yes, sir.
2  Q.  What does it indicate there about --
3  looking at these depths of the well, how deep the
4  material was in that area?
5  A.  76 feet.
6  Q.  And Well MO-6, how deep was the material in
7  that area?
8  A.  74 feet.
9  Q.  And you said earlier that in the locations
10  of some of these wells, that at a certain depth
11  there was pre-law refuse, correct?
12  A.  Yes, sir.
13  Q.  I don't recall which ones, but you said by
14  looking at some of the borings information, you
15  could determine that.  Is that contained in this
16  document?
17  A.  Yes, the last paragraph on that page, MO-7
18  and MO-8.
19  Q.  What about MO-7 and MO-8?
20  A.  They were drilled in the capped area, but
21  they were drilled at two different depths.  And
22  if you look at pages 157 and 158, it shows how
23  deep they were drilled.

Page 199

1  Q.  All right, stop there.  How deep was Well
2  Number 7 drilled?
3  A.  62 feet, it looks like.
4  Q.  And how deep was the post law material?
5  A.  16 or 17 feet.
6  Q.  And so the rest of it, from the 16 or
7  17 feet down to the full depth, would be pre-law
8  material?
9  A.  That's right.
10  Q.  How about for Well Number 8, which is on
11  page 158?
12  A.  It looks like it was drilled to about 15 or
13  16 feet.
14  Q.  Why was it so much shallower?
15  A.  Because we were making a comparison of --
16  if there was water in these wells, a comparison
17  of the water quality and water level fluctuations
18  in the two wells, pre-law and post law.
19  Q.  So if I'm understanding what you're saying,
20  the MO-8 was drilled due to its depth such that
21  it was only sampling from the post law material?
22  A.  That's right.
23  Q.  And 7, due to its depth, was sampling from

Page 200

1  the pre-law material below the post law material?
2  A.  That's right.
3  Q.  Would those be the only two wells where
4  there would be a layer of post law material on
5  top of pre-law material?
6  A.  MW-9 was a well drilled to monitor the post
7  law, and there was only several feet of pre-law.
8  Q.  What page are you looking at?
9  A.  I'm sorry.  159.
10  Q.  So looking at the information on 159, how
11  deep was the post law material?
12  A.  About 41 feet.
13  Q.  And what was the total depth of the well?
14  A.  The total depth that we drilled was 45,
15  46 feet.  The total depth of the well was all
16  within the post law.
17  Q.  Starting on page 164, we've got some
18  monitoring data, and these sample sites, again,
19  would correspond to the ones that we see on
20  Exhibit 6?
21  A.  That's right.
22  Q.  It looks like the last date of sampling in
23  this batch was January 5th of 1984, which is on

Page 201

1 page 168?
2 A.  That is the last sampling date on the
3 table.
4 Q.  For the surface water sampling for SW-2, on
5 the first sample it's February 4th of '83, pH was
6 4.4, and it looks like the highest reading was on
7 January 5th of '84 at 5.55.  Was that an
8 acceptable level for pH to PELA?
9 A.  We were monitoring and reporting the data.
10 We weren't making judgment of its acceptance.
11 Q.  Did you report the data to ABC only, or to
12 someone else, too?
13 A.  I think ultimately the final document of
14 all the monitoring went to the Surface Mining
15 Commission, for certain.  Progress reports were
16 supposed to have been provided on a monthly
17 basis, according to the program, so this data was
18 presented to ASMC.
19 Q.  In that same document, if you would turn to
20 page 193, this is something you mentioned
21 earlier, I believe, some infiltration and
22 percolation tests?
23 A.  193, was that the page?

Page 202

1 Q.  Yes, 193.
2 A.  Okay.
3 Q.  It goes through 196.  If I'm interpreting
4 it correctly, it looks like there were eight
5 different sites picked for percolation tests.  Is
6 that correct?
7 A.  Yes.
8 Q.  And on 194, the map shows where those
9 locations were?
10 A.  Yes.
11 Q.  And the results and data on page 196
12 correspond to those eight locations, right?
13 A.  That's what the document says, yes.
14 Q.  That last document was one that you
15 designated in your reference list in your report,
16 okay?
17 A.  Yes, sir.
18    (Whereupon, Plaintiff's Exhibit Number 36
19 was marked for identification, a copy of which is
20 attached to the original of the transcript.)
21 Q.  Let me show you what I've marked Exhibit
22 36.  Did you assist in the preparation of this
23 document?

Page 203

1 A.  I did.
2 Q.  And what is it, for the record, please?
3 A.  It's a report dated October 5, 1984,
4 entitled Maxine Rock Disposal Area Hydrologic and
5 Water Quality Investigations.
6 Q.  Do you know if this was the final such
7 report that was generated by PELA?
8 A.  I believe it is, because it is the only
9 final bound document that we have in our office.
10 Q.  So you have this document in its entirety?
11 A.  Yes.
12 Q.  Is it page-for-page the same as this
13 exhibit we're looking at?
14 A.  I haven't compared what I have in front of
15 me, but I believe so.  Yes, this is the final
16 document.
17 Q.  Have you given the copy that PELA had to
18 Mr. Davis?
19 A.  We scanned it and provided it
20 electronically to him.
21    MR. BROCK:  We might want to get a copy of
22 that, okay?
23    MR. DAVIS:  Okay.  That may well be true,

Page 204

1 and you're welcome to it.  I'll just have to find
2 it.
3    THE WITNESS:  I can.
4    MR. DAVIS:  We'll find it and give it to
5 him.
6    THE WITNESS:  Okay.
7 Q.  So in this document, pages 478 through 485
8 contains similar format and data to the reports
9 we saw before, right, in terms of the format, the
10 table?
11 A.  Right, and it starts out with February 4,
12 1983, where the pH was 4.4 that we've looked at
13 in several other documents.
14 Q.  So it's cumulative?
15 A.  Yes, sir.  And it ends with September 4,
16 1984, so that's a year-and-a-half of information.
17 Q.  On page 485, it looks like it's
18 September 5, 1984.
19 A.  Excuse me.
20 Q.  That's all right.  I just want to make sure
21 I'm reading the right thing.
22 A.  Did I say 4th?
23 Q.  I think so.

Page 205

1  A.  Okay.

2  Q.  In any event, there's no data for SW-2 at

3  that time.  I guess that means there was no flow

4  to take a sample from?

5  A.  If you look down in the middle of the table

6  where it says Discharge --

7  Q.  Yes.

8  A.  -- SW-1 and 2 were dry, as they were on

9  many occasions.

10  Q.  Right.  It looks like on July 6th, you had

11  the same thing for SW-2; so it looks like, if I'm

12  reading this correctly, the last time there was

13  an actual sample was May 2, 1984.  Is that

14  correct?  I'm on page 484.

15  A.  Yes.

16  Q.  Starting at page 489, there's a series

17  of -- well, there are three tables that relate to

18  surface water samples, and I understand this is

19  basically a compilation of the data from all of

20  the samples that were taken by PELA as part of

21  this program?

22  A.  Tables 8 and 9 are, yes, the surface water.

23  Table 7 is from published information.

Page 206

1  Q.  And Tables 8 and 9 in the Average column is

2  taking all of the samples that were shown in

3  those underlying -- in Table 1 that we saw, and

4  just tabulating an average?

5  A.  Yes.

6  Q.  Would you look at page 473?  In the last

7  paragraph on that page, it's talking about

8  groundwater monitoring wells MO-3, 5 and 6.  Do

9  you see that part?

10  A.  Yes, sir.

11  Q.  And it says that MO-5 and 6 are established

12  in the pre-law refuse rock upgradient from the

13  capped area in the buried stream?

14  A.  That's what it says.

15  Q.  Do you know who wrote that language?

16  A.  I may have.

17  Q.  Does that have reference to the tributary,

18  when it says the "buried stream"?

19  A.  Yes, the intermittent stream.

20  Q.  So from that, we would discern that these

21  monitoring wells 5 and 6, because they were

22  producing water, unlike 4, are thought to be in

23  the buried stream, right?

Page 207

1       MR. DAVIS:  Object to form.

2  Q.  That's what it says, right?

3       MR. DAVIS:  Object to form, since I haven't

4  objected much.

5  Q.  Double objection to the same question.

6  A.  The wells were drilled across that area

7  to -- without looking at the well construction

8  diagrams, they were drilled in order to monitor

9  the deepest part of the hollow or the valley.

10  The water that was monitored in these wells was

11  valley fill that was saturated from recharge.

12  I'm sorry, in the refuse rock north of the capped

13  area would have been saturation of the refuse

14  rock, and I think your question asked if we were

15  monitoring the stream.

16  Q.  No.  I was just asking about that language

17  and whether I'm interpreting correctly that it

18  means those two wells are located in the course

19  of the buried stream?

20  A.  Those three wells were drilled in the

21  hollow so we would have good representation of

22  where the water may accumulate at the deepest

23  portions of the hollow.

Page 208

1  Q.  Okay.  Was the tributary in the hollow?

2  A.  Yes, certainly.

3       (Whereupon, Plaintiff's Exhibit Number 37

4  was marked for identification, a copy of which is

5  attached to the original of the transcript.)

6  Q.  Ms. George, I'm handing you Exhibit 37, and

7  this was a document that was referenced in your

8  reference list for your report.  This is an Order

9  from the Alabama Surface Mining Commission, dated

10  March 14, 1985.  And my question is simply, what

11  does an administrative procedure order have to do

12  with geology or the opinion of a scientist?

13  A.  Well, the reason we were doing all of this

14  was to satisfy NOVs and Order.

15  Q.  To satisfy what?

16  A.  The NOVs and the subsequent consent order,

17  or whatever the document was that was issued that

18  was satisfied.  It says it was satisfied here.

19  Q.  Okay.  Are you giving an opinion on the

20  legal meaning or effect of this Order?

21  A.  Not the meaning of it, but the effect was

22  that the matter was addressed.

23  Q.  Are you giving a legal opinion on the

Page 209

1 effect of this Order on any of the claims in this
2 lawsuit by the Riverkeeper?
3 A.   No, absolutely not. I was using it as a
4 reference for the chronology, but it does
5 document, so to speak, closure of the situation.
6 Q.   Closure from whose perspective?
7 A.   The Surface Mining Commission's
8 perspective.
9     (Whereupon, Plaintiff's Exhibit Number 38
10 was marked for identification, a copy of which is
11 attached to the original of the transcript.)
12 Q.   Let me show you what I've marked Exhibit 38
13 to your deposition. This is another document
14 that you referenced in your reference list for
15 your report. This is an ADEM letter from 1992
16 that has to do with releasing monitoring
17 requirements. Had you ever seen this letter
18 prior to being retained in this lawsuit?
19 A.   No, I did not.
20 Q.   How does this letter inform any opinions
21 that you have formed in this case?
22 A.   It indicates granting the conclusion of the
23 responsibilities for monitoring at all the

Page 210

1 remaining outfalls, particularly outfall -- not
2 outfall -- Pond 027 associated with the basin.
3     MR. DAVIS:  Are you sure you got the number
4 right?
5     THE WITNESS:  24, excuse me.
6 Q.   Who provided this letter to you?
7 A.   I believe it was in -- if it was in my
8 report, this was in Mr. Brown's compendium and
9 Appendix A or B to his document.
10 Q.   Okay. That's your recollection, that this
11 letter was included in Anthony Brown's report?
12 A.   Yes.
13 Q.   Are you offering any legal opinion about
14 the end effect of this monitoring release on any
15 claim Riverkeeper is making in this case?
16 A.   No. I'm using it for reference to the
17 conclusion of activities.
18     (Whereupon, Plaintiff's Exhibit Number 39
19 was marked for identification, a copy of which is
20 attached to the original of the transcript.)
21 Q.   Let me show you what I've marked Exhibit 39
22 to your deposition. This is a Drummond Company
23 letter from July 7, 1992. Drummond had requested

Page 211

1 from ADEM to be released from the monitoring
2 requirement. Had you ever seen this letter prior
3 to being retained in the case?
4 A.   No, I had not.
5 Q.   Who provided this letter to you?
6 A.   I believe this was amongst the 3,000
7 documents.
8 Q.   Was it attached to Mr. Brown's report?
9 A.   I'm not sure. I'm not sure I've seen this
10 before. If I have, I don't recollect it.
11 Q.   Are you offering any kind of legal opinion
12 about the effect of this letter on any claim
13 asserted in the case?
14 A.   No, sir.
15 Q.   Does this letter have anything to do with
16 any scientific opinion that you formed?
17 A.   Yes, it does.
18 Q.   How so?
19 A.   Well, it ultimately relates to the fact
20 that Alabama Byproducts and ultimately Drummond
21 satisfied the regulatory for these regarding the
22 two violations and the subsequent investigations
23 and modifications made to drainage, and the ASMC

Page 212

1 permitting, and the bond releases for that
2 permitting.
3 Q.   Are you offering any opinion on the legal
4 effect of a reclamation bond release on any
5 claims asserted in this case?
6 A.   Not legal opinion, no, sir.
7 Q.   Are you offering an opinion as an expert on
8 administrative procedures under Alabama law?
9 A.   No, sir.
10     (Whereupon, at this time a short break
11 was taken.)
12     (Whereupon, at this time the deposition
13 was concluded at 6:10 p.m.)
14     FURTHER DEPONENT SAITH NOT.
15
16
17
18
19
20
21
22
23

**Lois George**                                              **54 (213 - 213)**

Page 213

1        C E R T I F I C A T E

2

3   STATE OF ALABAMA)

4   JEFFERSON COUNTY)

5

6        I hereby certify that the above and

7   foregoing proceedings were taken down by me in

8   stenotype, and the questions and answers thereto

9   were reduced to computer print under my

10  supervision, and that the foregoing represents a

11  true and correct transcript of the testimony

12  given by said witness upon said proceedings.

13       I further certify that I am neither of

14  counsel nor of kin to the parties to the action,

15  nor am I anywise interested in the result of said

16  cause.

17

18

19       /s/Donna L. Winters

20       Donna L. Winters, ACCR #373

21       Expires 9-30-2018

22       Donna L. Winters, Commissioner

23       My Commission Expires 10-10-2021

Lois George

**214**

## WORD INDEX

**< $ >**
**$175**  29:*10*
**$4,548**  159:*1*

**< 0 >**
**027**  210:*2*

**< 1 >**
**1**  5:*8*  12:*8, 12*
80:*10*  86:*16*  88:*3*
97:*4*  128:*10*
138:*19*  146:*12*
158:*16*  169:*22*
184:2  206:*3*
**10**  53:*20*  121:*4, 8*
123:*10*  146:*4*
158:*5*
**100**  8:*21*
**10-10-2021**  213:*23*
**10-2-80**  6:*12*
**10-5-84**  7:*14*
**11**  35:*10*  38:*4*
123:*13, 17*
**11-16-79**  5:*23*  6:2
**11-1-79**  5:*19*
**1141**  10:2
**115**  5:*11*
**11-6-79**  5:*21*
**12**  5:*3*  31:*13*  52:6
116:*10*  127:*11, 15*
128:*21*
**121**  5:*13*
**12-12-78**  5:*11*
**12-13-82**  7:2
**12-15-82**  7:3
**123**  5:*14*
**12-30-80**  6:*13*
**1-24-80**  6:*3*
**127**  5:*17*
**128**  5:*19*
**1-28-80**  6:5
**12-8-83**  7:*10*
**129**  5:*21*
**13**  123:*23*  128:*6,*
*10*
**131**  5:*23*
**133**  6:2
**136**  6:*3*

**14**  13:*13*  129:*17,*
*20*  152:4  208:*10*
**140**  6:5  166:*1, 8*
**145**  6:7
**146**  6:9
**147**  6:*10*
**15**  3:*21*  15:4
131:*1, 5*  185:*11*
199:*12*
**151**  197:*13*
**153**  197:*17*
**157**  6:*12*  198:22
**158**  198:22  199:*11*
**159**  200:9, *10*
**16**  133:*16, 20*
136:*3*  199:*5, 6, 13*
**160**  6:*13*
**162**  6:*14*
**164**  200:*17*
**167**  6:*16*
**168**  201:*1*
**17**  5:*3*  29:*17*  58:7
136:*9, 13*  199:*5, 7*
**177**  6:*18*
**1798**  177:*12*  178:*3*
**18**  97:*23*  98:*17*
140:*11, 15*
**180**  6:*21*  166:*18*
**181**  7:*1*
**183**  7:2
**184**  7:*3*
**186**  7:4
**187**  7:5
**19**  99:*1, 2*  144:22
145:*3*
**191**  7:7
**193**  201:*20, 23*
202:*1*
**1938**  88:5
**194**  7:*10*  202:8
**1951**  100:*20*
**196**  7:*12*  202:*3, 11*
**1971**  88:5  99:4
103:*3*
**1975**  14:2
**1976**  13:5
**1978**  20:*11*  23:5
116:*10*
**1979**  10:*20*  89:7
93:*3, 10*  121:*14*

**124**:4  125:17
128:*11*  129:22
140:7, *9*
**1980**  48:23  146:*4*
147:*12*  150:*3*
151:*21, 23*  152:*4,*
*17*  160:*5*
**1980s**  24:*20*  59:*18*
118:*8*  119:*8*
153:*13*
**1981**  6:*14*
**1982**  111:2  135:*10*
168:*16*  171:*11*
193:*12*
**1983**  7:*9*  153:*21*
189:*21*  190:*18*
196:6  204:*12*
**1984**  20:*11*  71:22
82:*18*  135:5  178:*1*
196:22  200:*23*
203:*3*  204:*16, 18*
205:*13*
**1985**  208:*10*
**1988**  3:*21*
**1990s**  34:*12*  50:6
**1992**  185:*11*
209:*15*  210:*23*
**1993**  20:*3*
**1994**  20:*3*

**< 2 >**
**2**  88:*1*  96:*19, 23*
99:2  103:*4*  141:6
146:*12*  158:*16*
168:20  169:7
182:*12*  184:2
189:9  197:*12*
205:8, *13*
**2.9**  190:7
**2:16-CV-01443-AK**
**K**  1:*3*
**20**  100:*17*  145:22
146:2
**2000s**  50:*19*
**2002**  18:*10*
**2003**  83:2
**2004**  83:2
**2006**  34:*17*
**2009-2010**  33:7

**2011**  35:*19*  37:*17*
**2014**  98:*18*
**2017**  5:*3*  29:*16*
43:20  58:7, *13*
**2018**  1:22  2:*9*  4:*1*
5:6
**202**  7:*14*
**208**  7:*16*
**209**  7:*17*
**21**  147:*5, 9*
**210**  7:*19*
**2-11-83**  7:4
**212**  8:*3*
**219**  168:*18*
**22**  22:22  157:*14,*
*18*
**220**  170:*5, 6*
**222**  171:7
**22nd**  151:7
**23**  159:*23*  160:*4*
**235563**  1:*23*
**239**  171:*18*
**24**  152:*13*  162:*13,*
*16*  210:*5*
**241**  171:22
**2-4-80**  6:7
**24th**  151:6
**25**  1:22  5:6
155:*20*  165:*4*
167:*16, 20*
**252**  157:*3*
**25th**  2:*9*  4:*1*
**26**  7:*9*  97:*4*  101:9
177:*7, 10*
**267**  169:*5, 6*
**27**  5:5  60:*18*
61:*23*  62:*13*  64:6
67:*9*  68:2  180:*7,*
*11*
**27th**  151:6
**28**  181:*12, 16*
**282**  2:8  8:*14*
**2829**  2:8  8:*13*
**29**  67:22  151:*23*
164:*17*  183:*1, 5*
**2933**  119:*11*
**2959**  119:*17*
**2963**  119:*20*

**< 3 >**

**Lois George** 215

**3**  60:*12*, *15*  130:*4*
138:22  139:2
146:*12*  158:*18*, *18*
159:*12*, *19*  177:*17*
178:*18*  179:2
189:*10*

**3,000**  211:*6*

**30**  9:*5*  28:*12*, *15*
68:*11*  147:*12*
160:*5*  165:*12*, *19*,
*21*  184:*16*, *19*

**30th**  171:*11*

**31**  68:*18*  71:*8*
186:*19*, *23*  190:*18*

**3-10-80**  6:*9*

**32**  72:*1*  164:*12*
168:*11*  187:*14*, *18*

**3254**  168:*12*

**33**  191:*17*, *20*

**34**  164:*23*  165:*1*,
*22*  194:*5*, *9*

**35**  16:*16*  29:*2*, *3*
72:*1*  165:*4*  196:*10*,
*14*

**35209**  8:22

**35222**  8:*19*

**35233**  2:9  8:*14*

**35405**  10:*3*

**3542**  184:*20*

**36**  73:*14*  74:*6*, *10*,
*23*  202:*18*, *22*

**37**  74:9  208:*3*, *6*

**373**  213:*20*

**37th**  8:*18*

**38**  74:*12*  75:2
209:*9*, *12*

**39**  74:*12*  210:*18*,
*21*

**< 4 >**

**4**  51:*13*  100:*20*
107:*13*  146:*17*, *21*
149:*16*  170:*6*
179:2  180:*19*
189:*21*  204:*11*, *15*
206:22

**4,000**  53:9

**4.3**  156:*4*, *9*

**4.4**  189:22  190:*1*
201:6  204:*12*

**40**  29:*2*, *3*  57:*19*
75:4  166:*18*

**405**  169:6

**40-hour**  19:*17*

**41**  75:4  140:*17*
200:*12*

**42**  75:4

**4-22-83**  7:5

**43**  77:4, 7

**430**  188:5

**433**  189:*12*

**434**  190:*16*

**44**  77:4

**45**  5:*10*  77:4
200:*14*

**4-5-84**  7:*12*

**46**  77:*14*  78:4
200:*15*

**473**  206:6

**478**  204:7

**48**  78:*12*

**480**  156:*21*  157:8

**484**  205:*14*

**485**  204:7, *17*

**489**  205:*16*

**4th**  201:5  204:22

**< 5 >**

**5**  3:*19*  82:*19*
107:*13*  146:*13*, *13*
148:*19*  179:2
180:*19*  203:*3*
204:*18*  206:8, *21*

**5.55**  201:7

**50s**  120:*1*

**51**  78:*12*

**52**  78:*21*  156:22
157:*1*

**53**  78:*21*

**54**  80:4

**55**  156:*15*, *16*

**59**  5:5  60:*18*  80:4

**5th**  196:*21*  200:*23*
201:7

**< 6 >**

**6**  63:*1*, *5*  64:*5*, *23*
72:*15*  76:*14*  80:9
83:*16*  84:*21*  89:9
91:*23*  93:*5*  98:*13*

**100:*14*  105:9**
106:*16*  107:*14*
108:6  111:8
112:*12*, *15*  113:*3*,
*18*  123:*10*, *10*
129:22  131:*10*
132:5  137:*15*
144:*19*  146:*13*, *13*
147:*21*  154:8, *14*
155:*19*  178:*11*, *13*,
*14*  179:2  180:*18*,
*19*  188:*1*, *3*, *13*
189:*19*, *22*  193:*18*
196:6  197:22
200:*20*  206:8, *11*,
*21*

**6:10**  212:*13*

**60**  5:5  57:*18*

**60s**  102:*19*, 22
120:2

**62**  199:*3*

**63**  5:8

**6th**  124:*4*  205:*10*

**< 7 >**

**7**  34:*21*  46:*23*
83:*6*, *10*  85:5  87:*6*,
*12*  93:*6*  96:9
110:7  112:*15*, *18*
114:*13*  126:*17*
132:*4*  137:*15*
138:*21*  146:*13*, *18*
147:*21*  155:*14*
170:*18*  178:*11*, *12*,
*20*  179:*4*, *5*  182:*15*
184:2  199:*2*, *23*
205:*23*  210:*23*

**70**  107:9

**70s**  10:*17*  120:2

**71**  98:*18*  102:*19*,
*21*

**712**  8:*18*

**7-21-92**  7:*17*

**7-26-83**  7:7

**7-30-80**  6:*10*

**7-30-82**  6:*16*, *18*

**74**  198:8

**75**  107:9

**750**  148:*13*

**751**  150:*23*  151:*14*

**752**  151:*19*

**753**  151:22

**754**  152:*3*

**755**  149:6, *18*
151:*10*

**7-5-79**  5:*13*

**76**  107:*11*  198:5

**7-7-92**  7:*19*

**78**  24:22  116:22

**79**  48:*23*  91:*4*
93:*14*  124:*19*
125:7

**7th**  59:*2*, *14*  60:*21*

**< 8 >**

**8**  31:*17*  45:9, *13*
116:7  128:*21*
146:*14*  155:*23*
158:5  159:*1*, *7*
178:*20*  179:*4*, *6*
199:*10*  205:22
206:*1*

**80s**  10:*18*  11:22
58:*15*  63:*17*  64:*20*
119:*3*  153:*19*, *19*
176:6

**82**  48:*23*  63:*17*
107:*19*  185:*12*, *13*

**8-21-79**  5:*17*

**8-26-82**  7:*1*

**827**  136:*21*  137:2

**83**  5:9  48:*23*
63:*18*  69:*14*
107:*19*  111:*3*
187:5  201:5

**832**  141:6

**834**  141:*20*

**84**  10:*20*  23:5
24:22  69:*14*  71:*23*
84:9  91:*4*  111:*23*
125:7  174:8  201:7

**85**  28:*23*  69:*14*
71:*23*  84:9  111:*23*

**8-6-79**  5:*14*

**88**  153:*21*

**< 9 >**

**9**  8:*3*  47:*10*
115:22  123:*10*

154:8  158:5
178:18, 21  179:4
193:18  205:22
206:1
**9:50**  2:10
**90**  28:23
**90s**  26:14  27:18
**9-30-2018**  213:21
**96**  5:4

**< A >**
**a.m**  2:10
**abandoned**  106:8
144:14
**abandoning**  169:14
**abatement**  145:8
146:8
**abbreviate**  88:16
**abbreviating**  88:17
**ABC**  23:15  25:17
26:6  69:23  71:14
81:7, 12  82:8  86:3
91:9, 10  106:23
159:10  161:18, 19
166:23  167:11
168:15  173:11
177:14  182:12
183:11  185:16
190:23  193:20
194:23  195:3
201:11
**ability**  138:4
**able**  158:6
**Absolutely**  118:9
194:16  209:3
**accept**  44:6  54:9
159:13, 17
**acceptable**  201:8
**acceptance**  128:12
201:10
**accepted**  146:13, 14
155:1
**accompanied**  59:5
**accomplished**
182:22
**ACCR**  213:20
**accumulate**  126:8
207:22
**accumulated**  156:6

**accurate**  10:21
45:15  61:2  100:3
107:10  141:8
**accurately**  128:1
**accused**  34:3
**achieve**  190:23
193:5, 21
**acid**  142:21  143:4,
12, 17, 22  144:8
145:7, 13
**acquired**  82:22
164:3
**acronym**  51:10
**Act**  173:15
**acting**  9:2  126:1
**ACTION**  1:3  50:9,
16, 21  161:19
190:2, 9  213:14
**active**  117:6, 8
168:20  169:7
176:1
**activities**  21:13
37:11  39:18  40:20
41:2  82:11  95:2
134:17  175:23
178:1  210:17
**activity**  21:7  39:21
100:22, 23
**actual**  155:11, 12
191:11  205:13
**add**  145:19
**added**  46:19
**Addendum**  6:18
**addition**  27:13
**additional**  45:17
46:10, 15  163:14
167:9  170:22
**additions**  69:9
**address**  9:22  10:1
143:8  148:8
**addressed**  182:19
208:22
**addressing**  141:4
143:6  193:10
**ADEM**  7:8, 17
50:2, 13, 13, 14, 22
51:3  81:15  194:13
196:5, 9  209:15
211:1

**ADEM's**  49:18
**adjacent**  39:5, 18
**adjoining**  37:13
**adjust**  158:4
**adjustment**  110:21
181:3
**Administration**
156:7
**administrative**  50:8
208:11  212:8
**advance**  60:10
**adverse**  39:19
**advised**  4:3
**advisement**  50:12
**Advisory**  49:19
**aerial**  5:4  17:7, 17
18:3, 4  72:9  82:22
97:1, 9  100:19
101:11, 21
**affiliated**  24:23
59:10
**agencies**  104:11
106:13  111:6
194:3
**agency**  167:4, 7
**ago**  63:23  64:1
75:17
**agree**  120:8  141:7
160:17  162:4
**AGREED**  2:2  3:1,
8, 16
**agreement**  54:4
192:12
**ahead**  45:12  48:7
63:4  79:7  83:9
96:22
**aids**  17:9
**air**  17:2, 4, 13
**airshafts**  175:23
**ALABAMA**  1:2
2:6, 9  3:19  6:18
8:14, 19, 22  9:2, 3,
5  10:2, 7  14:11, 16
15:3, 10, 17, 18
18:7, 15  20:6
21:11  22:4, 23
23:15  32:17, 17
33:3, 4, 23  34:3
35:13  48:5, 17
49:6  81:15  85:10

**94:11**  97:11
149:10  156:14, 14,
17  159:16  175:13
208:9  211:20
212:8  213:3
**alleged**  34:6
**allow**  71:2
**alluvial**  62:2
**alongside**  100:13
**alterations**  69:8
**alternative**  146:20
**alternatives**  146:7,
8, 13, 14
**amended**  3:20
**American**  16:7
184:1
**amount**  28:22
66:5  72:12  106:6
138:3  139:21
140:4  141:15
158:3
**analyses**  151:2
**analysis**  67:15
130:20  151:13
175:9  176:12
**Andreen**  8:13
169:5
**angle**  68:3
**annual**  156:1, 22
**answer**  27:22  67:6
69:4  86:23  102:18
121:2  122:21
141:11  148:18
167:2  176:16
177:1
**answered**  52:13
95:13  145:16
**answering**  35:6
**answers**  213:8
**Anthony**  210:11
**anybody**  71:17, 20
**anymore**  48:21
**anyway**  68:23
75:6  128:3  178:2
**anywise**  213:15
**apart**  189:1, 6
**apologize**  60:9
98:23
**apparently**  123:19
181:3  187:10

**appear** 74:*12* 77:*4* 78:*12* 151:*12*

**appearance** 117:*16*

**appearing** 8:*14, 19, 22*

**appears** 12:*15* 68:*4* 124:*19* 128:*12, 14* 187:*7* 189:*14*

**appendices** 52:*15*

**Appendix** 13:*12* 210:*9*

**applicable** 52:*3* 194:*1*

**Application** 6:*17, 20* 44:*22* 135:*10, 11, 18* 166:*10* 167:*23* 168:*3, 8, 16* 171:*4*

**applications** 25:*10*

**applied** 70:*15*

**appreciate** 19:*13* 74:*7*

**appropriate** 67:*3*

**approved** 169:*23* 170:*1*

**approximate** 74:*5, 6* 75:*2* 80:*8* 87:*17* 93:*6*

**approximate,** 88:*21*

**approximately** 101:*21* 111:*2* 189:*5*

**April** 100:*20* 151:*21* 196:*21*

**aquifer** 38:*14* 75:*23* 76:*7, 8, 10* 137:*12, 15* 138:*23* 139:*10, 16* 155:*16*

**arbitrary** 98:*6*

**archives** 37:*21*

**Area** 5:*18* 6:*1, 11, 15, 23, 23* 7:*5, 12, 14* 16:*18* 21:*8, 18* 24:*12, 18* 38:*13* 46:*4* 57:*1* 59:*20* 62:*1, 6* 64:*6, 9, 10, 22* 65:*1, 2, 3, 5, 12, 15, 16, 17, 18, 19* 66:*1, 11* 67:*10*

68:*1* 69:*1* 70:*6* 72:*22, 23* 73:*1* 74:*16* 75:*20* 77:*12, 13, 20, 22* 78:*3, 13, 17* 79:*15, 16* 80:*11, 21* 82:*3* 89:*17, 18, 20, 21, 22* 90:*12* 91:*16, 19, 20, 22* 92:*1, 17, 18* 93:*2, 4, 7, 9, 22* 94:*4, 22* 95:*18, 21* 96:*1, 3, 4, 8, 17* 98:*9, 12, 15* 99:*6* 100:*2* 101:*1, 2* 102:*3, 4, 5* 106:*17* 107:*1, 13, 15, 18* 108:*8* 109:*16, 16* 110:*4, 5, 6, 16, 18, 23* 112:*2, 5, 6, 6, 13, 19, 20* 113:*17, 17* 114:*21, 21* 117:*6, 8, 17, 19, 21, 22, 23* 118:*7, 10, 15* 120:*21* 121:*2* 122:*10* 126:*2, 7, 11* 132:*9, 12, 19* 133:*2, 3* 137:*18, 22* 138:*13* 139:*4, 6, 6* 141:*18* 144:*5, 7* 148:*16, 21* 152:*8, 9, 14, 22* 153:*5, 7* 156:*8, 11, 13* 158:*19, 20* 159:*5* 162:*2* 163:*16* 165:*5* 167:*10* 168:*20, 21* 169:*7, 8, 9, 14, 22* 170:*7* 171:*1* 172:*13* 173:*4, 18* 174:*9, 15, 18, 20, 22, 22* 175:*18* 176:*4, 13, 22* 177:*18, 19* 179:*7, 7, 8, 22* 180:*17, 23* 190:*17, 21* 193:*3, 10, 11, 11, 14, 21* 195:*15* 196:*19* 197:*2, 23* 198:*4, 7, 20* 203:*4* 206:*13* 207:*6, 13*

**area,** 180:*21*

**areas** 16:*20* 21:*2* 25:*6* 40:*22* 41:*16* 67:*2* 78:*1* 80:*23* 94:*3* 108:*4* 120:*7* 176:*1*

**arrived** 117:*15* 120:*10*

**arrow** 65:*9* 80:*13* 88:*4, 11*

**arrows** 83:*21* 86:*8*

**art** 13:*23*

**ascertain** 131:*19*

**asked** 167:*8* 171:*19* 175:*16* 207:*14*

**asking** 12:*2* 27:*20* 80:*1* 93:*1* 97:*19* 104:*15, 16* 109:*22* 117:*19* 123:*3* 207:*16*

**ASMC** 171:*3* 194:*2* 201:*18* 211:*23*

**aspect** 132:*3* 167:*9*

**aspects** 14:*15* 23:*13, 23* 26:*4* 48:*16* 50:*4* 56:*21*

**asserted** 211:*13* 212:*5*

**assess** 51:*14* 138:*14*

**Assessment** 6:*14, 22* 11:*2* 21:*13* 25:*5*

**assessments** 26:*20*

**assign** 3:*12*

**assigns** 145:*8*

**assist** 202:*22*

**Assistance** 22:*23*

**assisted** 22:*20* 23:*1* 196:*15*

**associate** 59:*6*

**associated** 16:*23* 22:*8* 41:*2, 11* 66:*16* 93:*12* 150:*19* 158:*3* 210:*2*

**Associates** 12:*19* 16:*4* 17:*16*

**assume** 151:*16* 182:*18*

**assumed** 135:*19*

**astounded** 72:*5*

**Atmosphere** 156:*7*

**attached** 6:*4* 12:*10* 13:*12* 45:*11* 52:*20* 53:*5* 60:*14* 63:*3* 83:*8* 96:*21* 116:*1* 121:*6* 123:*15* 127:*13* 128:*8* 129:*19* 131:*3* 133:*18* 136:*11* 140:*13* 145:*1* 146:*1* 147:*7* 157:*16* 160:*2* 162:*15* 167:*18* 177:*9* 180:*9* 181:*14* 183:*3* 184:*18* 186:*21* 187:*16* 191:*19* 194:*7* 196:*12* 202:*20* 208:*5* 209:*11* 210:*20* 211:*8*

**attain** 19:*1*

**attempted** 47:*1*

**attempting** 141:*10*

**attention** 40:*23* 41:*1* 61:*11*

**attorneys** 10:*5* 135:*13*

**attribute** 62:*20*

**attributed** 39:*5*

**auditor** 19:*17, 19*

**augmentations** 69:*9*

**augmented** 174:*5*

**August** 124:*4* 151:*6*

**author** 63:*21*

**authorities** 20:*21*

**Authority** 38:*12*

**authorized** 125:*21* 129:*6* 167:*13*

**Avenue** 2:*8* 8:*13*

**Average** 206:*1, 4*

**aware** 140:*7* 152:*17, 20* 153:*12* 176:*6* 193:*20* 194:*3*

**AWIC** 106:*13*
122:*19* 123:*9*
154:*11* 163:*7*
194:*2* 195:*18*

**< B >**
**bachelor's** 13:*20*
**back** 11:*20, 22*
19:*11* 34:*23* 35:*18*
52:*5* 83:*23* 92:*21*
120:*4, 5* 121:*14*
128:*20* 131:*17*
135:*6, 7* 145:*2, 15*
149:*16* 150:*18*
152:*17* 153:*3*
157:*6* 165:*22*
176:*6*
**background** 13:*18*
**backhoe** 91:*13*
**backside** 104:*3*
**backside,** 104:*4*
**bacteria** 75:*11*
**bales** 104:*9*
**bank** 164:*7* 168:*21*
**Bankhead** 22:*6*
**Barry** 3:*22* 8:*12*
10:*4*
**based** 16:*11* 48:*8*
56:*8* 114:*7* 120:*9*
128:*20* 137:*6*
154:*19, 22* 155:*12,
18* 158:*1* 159:*4*
172:*21* 182:*10*
**basically** 19:*7*
109:*22* 148:*16*
165:*18* 169:*9, 17*
205:*19*
**basin** 25:*14* 59:*16*
62:*2* 71:*4* 79:*3, 16,
16, 19, 21, 23* 84:*14*
86:*1* 113:*18*
153:*18* 170:*13, 15,
17, 22* 184:*9*
188:*14* 210:*2*
**basins** 89:*11, 13*
**basis** 52:*15* 142:*16*
175:*5* 201:*17*
**batch** 200:*23*
**Bates** 5:*5* 31:*23*
52:*9* 169:*4*

**Bates-stamped**
32:*3* 52:*22* 97:*3*
136:*21* 170:*6*
**Bay** 33:*19*
**Bbrock@selcal.org**
8:*15*
**beach** 138:*11*
**bear** 12:*6*
**bedrock** 62:*19*
73:*16* 75:*8, 14*
129:*2, 10, 14, 16*
**behalf** 31:*7*
**belabor** 194:*8*
**believe** 15:*4* 16:*12,
14* 17:*10* 18:*18*
20:*3* 21:*16* 22:*1, 6,
20* 24:*11* 27:*7*
29:*19* 34:*9, 19*
38:*6* 39:*11* 42:*3*
48:*15, 20* 50:*1*
52:*14* 53:*7, 16*
54:*6* 56:*22* 59:*11*
61:*15* 63:*16* 67:*20*
69:*10* 71:*7* 72:*20*
74:*11* 75:*14* 76:*10*
77:*17, 21* 78:*3, 15*
80:*3* 82:*22* 84:*10*
87:*17* 91:*13* 97:*2,
18* 98:*1, 18* 99:*9*
105:*2* 107:*11*
113:*11* 115:*5*
119:*2* 124:*16, 18*
138:*9* 139:*5* 148:*1*
149:*10* 150:*4*
152:*10* 153:*18*
163:*2* 167:*5*
170:*21* 171:*5, 15*
177:*13, 23* 185:*23*
192:*9* 193:*22*
194:*2* 196:*9* 197:*3*
201:*21* 203:*8, 15*
210:*7* 211:*6*
**belonging** 36:*16*
**berm** 182:*16*
**best** 57:*21* 63:*18,
19* 64:*2* 76:*11*
131:*18* 161:*23*
163:*8* 178:*23*
**better** 60:*10* 84:*21*

87:*20* 109:*4* 128:*4*
**bill** 29:*7*
**billed** 57:*5*
**billing** 29:*11* 54:*2*
**bills** 57:*8*
**Birmingham** 2:*8*
8:*14, 18, 22* 9:*2*
**bit** 19:*4* 60:*8*
61:*20* 85:*1* 188:*14*
197:*18*
**BLACK** 1:*5* 8:*17*
10:*5* 138:*20, 21*
**black-and-white**
100:*19*
**blinds** 12:*22*
**blue** 86:*8, 15* 87:*5,
13, 21, 22, 23* 94:*15*
**blurry** 77:*7*
**boat** 60:*1* 163:*20*
**bodies** 100:*12*
**bond** 212:*1, 4*
**books** 27:*7*
**boot** 75:*5*
**boring** 107:*7*
179:*21*
**borings** 198:*14*
**borrow** 174:*2*
**bottom** 86:*8* 145:*6*
168:*19* 192:*5*
**bound** 203:*9*
**boundaries** 176:*23*
**boundary** 175:*19*
176:*14*
**branch** 50:*14*
**break** 49:*11, 15*
61:*5* 92:*6, 19, 22*
144:*20* 145:*2*
177:*5* 212:*10*
**breaker** 183:*8, 17*
**brief** 54:*12*
**bring** 61:*11* 88:*11*
158:*22*
**Brock** 3:*22* 8:*3, 12*
9:*18, 20* 10:*4* 11:*9*
34:*16* 55:*10* 92:*7*
98:*20* 140:*16*
203:*21*
**Brookwood** 8:*21*
24:*17*
**brought** 98:*20*

**Brown's** 31:*8*
52:*16, 21* 53:*6, 17*
56:*22* 210:*8, 11*
211:*8*
**Bruce** 6:*5* 140:*20*
**bucket** 11:*12, 13*
**Buffalo** 13:*22* 15:*9*
**build** 39:*23*
**building** 182:*16*
**built** 40:*1*
**bump** 29:*2*
**buried** 94:*7*
206:*13, 18, 23*
207:*19*
**Byproducts** 23:*15*
85:*10* 94:*11*
149:*11* 175:*13*
211:*20*
**By-Products** 6:*18*

**< C >**
**cable** 163:*22*
**cables** 164:*1*
**Cahaba** 23:*2* 25:*15*
**calculating** 51:*6*
163:*18*
**calculation** 51:*18*
155:*2, 17* 157:*3, 9*
**calculations** 154:*15,
18* 155:*14, 21, 23*
**calendar** 29:*4*
**call** 12:*18* 72:*21*
86:*12* 88:*14* 89:*18,
22* 98:*2* 148:*11*
**called** 51:*8, 12*
62:*1* 64:*14* 66:*13*
76:*22* 77:*1* 80:*9*
90:*15* 114:*7, 9*
142:*8* 143:*7* 165:*5*
**calling** 67:*7* 114:*10*
**camera** 73:*7, 8, 9,
10*
**Canaan** 38:*21*
**cap** 174:*2, 13*
**capabilities** 19:*22*
**capacity** 10:*12*
90:*23*
**Capped** 6:*22*
65:*16* 72:*23* 73:*1*
78:*17* 89:*21* 94:*4*

95:*19*  96:*3*  98:*9*
106:*17*  107:*15, 17,
18*  108:*2, 4*  110:*4,
6, 16*  112:*19*
113:*17*  114:*21*
117:*17*  139:*7*
169:*8, 9*  172:*13*
173:*18*  174:*9, 22*
177:*19*  179:*22*
180:*17, 20, 23*
195:*15*  198:*20*
206:*13*  207:*12*
**capping**  107:*23*
110:*12*  178:*21, 23*
179:*5*
**capture**  75:*9*  90:*9*
133:*2*
**captured**  108:*22*
112:*4, 10*  113:*16*
114:*20*
**capturing**  74:*14*
**care**  15:*15*
**cartoon**  79:*5, 6*
105:*11*  113:*18*
**case**  10:*9*  12:*14*
24:*9*  27:*9*  29:*11,
14*  30:*3, 15, 21*
31:*4*  32:*1*  33:*2, 8,
15, 16*  34:*5, 8, 10,
17*  35:*21*  36:*3, 12*
37:*2, 4, 6, 10, 19*
38:*5, 8, 10, 19, 21*
39:*2, 7, 10*  40:*3, 9,
18, 19*  41:*22*  42:*6,
17*  43:*3, 12, 15, 18,
22*  44:*7, 13, 15, 21,
22*  45:*5, 15, 18, 22*
46:*5, 11, 18*  47:*8*
53:*8*  54:*2, 14, 21*
55:*1, 18*  56:*6, 13*
57:*6*  62:*2*  78:*18*
97:*13*  115:*15*
119:*5*  141:*17*
175:*17*  209:*21*
210:*15*  211:*3, 13*
212:*5*
**cased**  179:*7*
**cases**  32:*13, 16*
33:*1*  35:*8, 14, 18*

38:*4*  42:*12*  46:*12,
22*  47:*1*
**catastrophic**  140:*2*
**catch**  71:*4*
**catching**  113:*19*
**catchment**  126:*2*
**cause**  9:*8*  37:*12*
213:*16*
**causing**  39:*19*
**CD**  5:*7*
**CEA**  19:*20*
**Center**  2:*7*  8:*11*
**certain**  15:*4*  19:*8,
22*  40:*22*  46:*8*
73:*2*  87:*19*  97:*8*
103:*15*  105:*15*
109:*5*  117:*13*
122:*16*  123:*1*
133:*15*  138:*3*
146:*12*  154:*3*
156:*5*  163:*1*
174:*10*  190:*20*
192:*18, 21*  194:*16*
197:*3, 9*  198:*10*
201:*15*
**certainly**  21:*9*
57:*18*  96:*8*  111:*21*
120:*13*  138:*3*
142:*15*  147:*15*
160:*21*  208:*2*
**certainty**  134:*3*
187:*11*
**certificate**  16:*9, 10,
15*
**certification**  19:*21*
20:*7*  46:*1, 2, 6*
**certified**  19:*10, 16,
19*
**certify**  9:*4*  213:*6,
13*
**challenges**  186:*12*
**change**  110:*15*
118:*4*  142:*1*
**changed**  66:*2*
69:*10, 11*  110:*3, 9*
142:*7*
**changes**  103:*22*
104:*16*
**channel**  79:*22*
112:*9*  172:*11*

**characterization**
120:*9, 13*
**characterize**  94:*9*
120:*15*
**chemicals**  41:*6*
51:*15*
**chemistry**  131:*20*
165:*19*  190:*10*
193:*19*
**Chetopa**  22:*6*
184:*5*
**Chicago**  42:*20*
**chief**  20:*10, 15*
57:*2*
**Christina**  8:*13*
**chronological**
136:*7*  181:*11*
**chronology**  107:*20*
187:*4*  197:*5*  209:*4*
**church**  39:*4*
**Cindy**  61:*11*
**Circle**  10:*2*  99:*12,
16*  102:*3*
**circled**  103:*5*
**circuit**  186:*8*
**citation**  32:*19, 23*
**cited**  136:*4*
**City**  15:*14*  32:*23*
35:*12*  37:*11*  40:*9*
**CIVIL**  1:*3*  3:*20*
9:*5*
**claim**  210:*15*
211:*12*
**claims**  209:*1*  212:*5*
**clarification**  19:*13*
**clarify**  42:*15*
**class**  19:*22*  46:*1, 2,
4, 6*
**classes**  14:*16*
**classify**  144:*3*
**clay**  65:*21*  138:*9*
140:*4*  170:*9, 11*
**clay-type**  91:*2*
**Clean**  173:*15*
**cleaned**  91:*5*
161:*21*
**clean-up**  51:*19*
**clear**  95:*14*
**cleared**  40:*1*  94:*23*

170:*2*
**clearing**  39:*23*
**clearly**  95:*8*
**client**  33:*22*
**clients**  20:*20*  26:*23*
**Clifton**  7:*17*
**close**  18:*12*  74:*23*
78:*5, 7*  86:*12*
168:*12*
**closed**  42:*4*
**closest**  62:*10*
146:*20*
**close-up**  68:*12*
**closure**  41:*21*
209:*5, 6*
**club**  45:*1*
**Coal**  6:*17, 20*
16:*22, 23*  17:*1*
20:*11*  21:*21*  22:*8*
23:*2, 12*  25:*15*
26:*8, 8*  27:*3, 4*
47:*20*  66:*1, 3, 5, 5,
6, 10, 18*  168:*20*
184:*1, 3, 4, 4, 6, 15*
**coarse**  66:*22*  68:*22*
**Cobb**  22:*8*
**cognizant**  153:*4*
**colleagues**  15:*12*
**collect**  172:*11, 13*
185:*6*
**collected**  77:*11*
130:*5*  150:*15*
151:*4*  183:*11*
185:*22*
**color**  101:*11, 20*
**colorized**  101:*19*
**column**  189:*17*
206:*1*
**come**  59:*8*  67:*9,
14*  83:*23*  131:*17*
153:*15*  156:*4*
**comes**  21:*9*  162:*10*
**Coming**  52:*5*
73:*18, 20*  173:*16*
**commencing**  2:*10*
**commingle**  82:*5*
**commingling**  80:*19*
182:*17*
**Commission**  48:*2,
5, 16*  49:*3, 6*  81:*13,*

*14* 121:*23* 122:*15*,
*19* 123:2 140:*20*,
*23* 141:*3* 159:*17*
193:*13* 201:*15*
208:*9* 213:*23*
**Commissioner** 2:*5*
3:*18* 9:2 213:22
**Commission's** 209:*7*
**Committee** 49:*19*,
*21* 50:*7*, *11* 51:*3*
**compact** 173:*21*
**companies** 21:*14*
22:*18* 23:*1*, *5*
24:*23* 25:*12*
**COMPANY** 1:*8*
7:*19* 10:*8* 24:*6*
25:*1* 26:*8* 48:*17*
49:*6* 71:*18* 195:*1*
210:22
**compare** 154:*5*
166:2
**compared** 28:*1*
154:*9* 183:*20*
203:*14*
**comparing** 154:*8*
155:*4* 165:*18*
**comparison** 94:22
165:*12*, *20* 174:*15*
179:*11* 199:*15*, *16*
**comparisons** 191:*12*
**compendium** 52:*18*
70:*21* 152:*15*
210:*8*
**compensated** 49:*4*
**Compensation**
53:*21*
**compilation** 205:*19*
**compiled** 191:*5*
**compiling** 188:22
**Complaint** 29:*18*
**complete** 12:*13*
20:2 128:*11*
**completed** 69:*19*
71:22 113:*14*
167:*4* 174:*7*, *12*, *12*
177:2 182:*5* 186:*8*
190:*14* 191:*13*
197:2
**completion** 65:22

**compliance** 3:*5*
81:2, *8*
**complies** 47:*12*
52:*8* 61:*4* 65:*8*, *11*
74:*8* 75:*3* 78:*5*
80:*16* 88:*23* 92:*14*
99:*17*, *19* 101:*8*
102:*7* 108:*19*
111:*16* 114:*18*
133:*21*
**component** 18:2
61:*18* 132:*3* 155:*6*,
*8* 159:*8* 183:*13*
**components** 41:*17*
128:2 147:*15*, *16*
158:*5*
**composition** 65:*23*
**comprise** 64:*23*
**comprising** 68:22
**computation** 159:*11*
**computer** 51:*5*
213:*9*
**concentrations**
148:*20*
**concept** 166:*9*
**conceptual** 169:*20*
170:*23*
**conceptually** 166:*9*
**concern** 161:*17*
**conclude** 39:*7*
**concluded** 212:*13*
**conclusion** 192:*19*
209:22 210:*17*
**Conclusions** 6:*4*
136:*20* 137:2
**concrete** 80:*4*
**condition** 160:*12*
**Conditions** 6:22
186:*11* 191:*11*
**conductance**
163:22 164:*9*
165:*21* 166:*1*, *6*, *15*,
*15*
**conducted** 100:22
130:*14*
**conductivity** 138:2,
*6*, *11*
**confidential** 23:*9*

**configuration**
69:*10* 108:*23*
172:22, *23*
**confirm** 178:*4*
**confirming** 128:*12*
**confused** 85:2
87:22
**connection** 20:*14*
31:*3* 121:*11*
123:*20* 136:*16*
168:*16* 181:*10*
191:*23*
**consent** 208:*16*
**consider** 16:*17*
23:*8* 143:22
**considered** 179:*17*
**consisted** 137:*8*
**consistent** 109:*8*
127:*9* 182:*9*
**constituents** 41:*7*, *8*
51:*19* 154:*10*
**constitute** 142:*6*
**constructed** 59:*17*
84:*5* 85:*9* 88:*8*
102:*12* 147:*18*
152:*18* 161:2
169:*23* 187:*6*, *10*
**construction** 85:*13*
153:*18* 174:*11*
207:*7*
**consultant** 51:*4*, *7*
**consultants** 27:*1*
51:*5* 55:*8*
**consultation** 26:*23*
**consulting** 175:*13*
**contact** 83:*4* 126:*6*
**contain** 57:*8*
**contained** 100:*3*
141:*16* 198:*15*
**contains** 178:*14*
204:*8*
**contamination**
26:*19* 33:*18* 34:*7*
39:*3*, *8* 41:*10*, *13*
43:*5*, *8*, *15* 46:*4*
**content** 169:*15*
184:*11*
**contents** 143:*19*
**context** 117:*11*
148:*5*, *15*

**continue** 107:*1*
159:*4*
**Continued** 41:*19*
**continuing** 14:*19*
17:22 18:*1*
**contoured** 174:*19*
**contouring** 82:*3*
112:*13*, *16*, 22
**contracted** 21:*15*,
*18* 122:*3*
**contracting** 20:*19*
**contractor** 85:*10*
91:*10*
**contracts** 48:*14*
**contract-type** 54:*7*
**contribution** 81:*17*
172:*18*
**control** 81:*5* 117:*6*
**conversation** 192:*7*
196:*3*
**convert** 156:*20*
**convey** 79:*14*
**conveyors** 176:*1*
**Cook** 5:*14*, *17*, *19*,
*21*, *23* 6:2, *3*, *9*, *12*,
*13* 7:2, *3*, *10* 82:*14*
128:*13*, *23* 129:*5*,
*10* 137:*11* 148:*7*
159:*10* 167:*5*, *8*, *11*
178:*7*
**Cook's** 159:*15*
**cooperative** 81:*11*
**coordinated** 17:*15*
106:*12*
**coordinates** 73:*7*
184:*21*
**coordinating** 111:*5*
**coordination** 20:*20*
25:*19* 81:*13*
104:*11*
**copies** 37:*14*, *15*, 22,
*23* 134:*21*
**copy** 12:*9*, *13*
13:*12* 37:*18* 45:*10*
60:*13* 63:2 83:*7*
96:*20* 115:*23*
121:*5*, *21* 123:*14*
127:*12* 128:*7*
129:*18* 131:2
133:*17* 136:*10*

140:*12*  144:*23*
145:*23*  147:6
157:*15*  160:*1*
162:*14*  167:*17*
177:*8*  180:*8*
181:*13*  183:2
184:*17*  186:*20*
187:*15*  191:*18*
194:6  196:*11*
202:*19*  203:*17*, *21*
208:*4*  209:*10*
210:*19*
**core**  128:*18*, *21*, *23*
**coring**  129:2, *4*
**corner**  79:*4*
**corporate**  34:*1*
**Corporation**  6:*19*
**correct**  10:*9*, *18*
13:6  18:7  20:*12*,
*13*  26:*11*  31:*17*
37:8  42:*18*  43:*12*
44:*18*  45:*3*, *20*
46:*13*, *14*  52:*23*
78:*22*  83:*18*  99:*21*
110:*19*  113:*10*
115:*3*  124:*21*
132:*18*  147:*3*
149:*15*, *17*  151:*11*,
*20*  152:*1*, *5*  165:*20*
172:*13*, *14*  181:2
188:*11*, *16*, *22*
189:*15*, *23*  190:*7*
197:*23*  198:*11*
202:6  205:*14*
213:*11*
**corrective**  50:*15*, *21*
**correctly**  49:2
150:*22*  202:*4*
205:*12*  207:*17*
**correlate**  165:*23*
**correlation**  143:*23*
**correspond**  151:*10*
180:*18*, *21*  189:*18*
200:*19*  202:*12*
**correspondence**
173:*13*
**corresponding**
123:*21*
**corrugated**  78:*23*

**cost**  41:*1*, *17*  48:*12*,
*13*  159:*1*
**costs**  41:*10*  158:*4*
**counsel**  2:*3*  3:*10*,
*11*  5:7  9:6  55:*18*
213:*14*
**counter-sign**  54:*9*
**country**  45:*1*
**counts**  14:*19*
**County**  22:7  36:*9*
82:*21*  213:*4*
**couple**  23:*1*  26:*5*
30:*4*  108:*1*  135:*8*
169:*12*
**course**  17:*21*
19:*17*  20:2  207:*18*
**courses**  14:*10*, *12*
17:*5*  93:*18*
**COURT**  1:*1*  3:6
4:*4*, *5*  9:*1*, *15*  36:7
44:6  45:6  47:6
**courtroom**  37:6
**cover**  16:*20*  65:*21*
92:*12*  120:*21*
170:*8*  174:*4*
177:*22*  196:*22*
**covered**  21:*17*
22:*1*  74:*17*  77:*13*
103:*8*  118:*15*
133:*3*
**created**  137:*13*
**credit**  15:2
**creosote**  34:7
**criteria**  174:*3*
**cross**  80:*12*
**cross-over**  59:*19*
80:*8*, *18*  115:*1*
174:*11*
**cross-sections**
154:*19*
**cubic**  155:*18*, *22*
**cull**  52:*11*, *18*
53:*12*
**culvert**  78:*23*
115:*5*
**cumulative**  204:*14*
**Cunningham**  39:*17*
**curiosity**  72:*10*

**current**  13:*15*
21:*13*  40:*20*  50:*3*
106:*20*
**currently**  27:2, *7*,
*23*  28:*3*, *8*  127:*3*
159:*3*
**customers**  48:*15*
**cut**  101:*14*

**< D >**
**D.R**  5:*19*  7:*10*
**daily**  156:*23*
**dam**  62:7  68:*21*,
*22*  69:*9*, *12*, *21*
70:*8*, *15*, *18*  71:6
72:*21*  76:*15*  77:*16*,
*21*  84:*14*  86:*9*
88:*8*  89:*17*, *18*, *20*
90:*21*  93:*20*  94:*12*
99:*13*  103:*8*, *22*
104:*3*, *18*, *21*
105:*13*, *14*  106:*5*
132:*15*, *16*, *17*
133:*3*, *5*, *11*  137:*19*,
*19*, *20*  138:*17*, *18*
140:*3*  147:*18*
149:*20*, *22*, *23*
150:*7*  165:*16*
194:*22*
**dam,**  62:*9*
**damages**  37:*13*
**dams**  70:*3*  89:*8*
93:*13*  102:*11*
103:6  131:*13*
132:*22*
**Dan**  56:*18*
**darker**  65:*12*
**dash**  88:2, *2*, *3*
111:*12*  113:*5*, *10*
**dashed**  80:*12*
108:*7*, *12*  114:*12*
**data**  137:7  139:*9*
142:*3*  151:*3*  154:*5*
155:*13*  183:*19*
185:*23*  188:*22*
200:*18*  201:*9*, *11*,
*17*  202:*11*  204:*8*
205:*2*, *19*
**date**  9:*4*  17:*23*
18:*11*  34:*15*  35:*19*

57:*4*  58:6, *12*
63:*15*  101:*12*
107:*21*  137:*3*
145:*8*  191:*5*
196:*21*  200:*22*
201:*2*
**dated**  100:*20*
116:*10*  128:*10*
129:*22*  146:*3*
147:*12*  154:*23*
160:*5*  203:*3*  208:*9*
**dates**  35:*3*  151:*3*,
*20*, *22*  154:*3*, *20*
189:*15*  197:*8*
**DAVIS**  8:*20*, *21*
9:*16*  11:*4*  32:*10*,
*11*, *14*  34:*13*, *15*, *17*
36:*23*  45:*13*  55:6,
*13*  59:6  60:*16*
67:*5*  69:*3*  76:*21*
86:*22*  92:*5*  97:*2*
98:*22*  116:6
120:*11*  122:*20*
135:*9*, *14*  140:*18*
143:*5*  153:6  155:*3*
159:*14*  160:*20*
162:7  174:*16*
176:*15*  203:*18*, *23*
204:*4*  207:*1*, *3*
210:*3*
**Davis's**  59:7
**day**  2:*9*  4:*1*  14:*15*
68:*9*, *10*  157:7, *10*
159:*1*
**days**  28:*21*
**dealing**  158:*16*
**deals**  163:2  180:*12*
**decades**  124:*8*
**December**  116:*10*,
*22*  160:*5*  185:*11*
**decision**  106:*14*
**declined**  47:7
**deconstruct**  84:*23*
**deemed**  179:*20*
**deep**  109:7  198:*3*,
*6*, *23*  199:*1*, *4*
200:*11*
**deeper**  179:*9*, *16*
184:*4*
**deepest**  207:*9*, *22*

**DEFENDANT** 1:9 8:23 38:18, 19, 20, 22 39:13, 14, 17 40:10 42:23 44:15
**defense** 43:13 55:17
**define** 23:21 143:17
**defined** 109:3
**definition** 143:22
**defunct** 50:18
**degree** 13:20 14:9, 23 15:6
**delivering** 3:22
**demonstrate** 129:5, 8 191:7
**demonstrates** 166:12
**denied** 46:1
**Dense** 41:19
**Department** 81:16
**depending** 20:21 28:14 141:23
**depends** 98:5 120:2 162:8
**depict** 80:4
**depicted** 67:23 68:19 87:9, 18 94:18
**depicts** 64:7
**DEPONENT** 212:14
**deposited** 67:2 140:3
**DEPOSITION** 1:21 2:4, 11 3:3, 4, 14, 17 12:12 33:8 35:22 37:6, 16, 18 40:12 44:18 57:4 83:11 96:23 116:19 119:1 121:8, 12 129:21 131:5 136:17 140:17 146:3 157:18 162:17 183:5 184:15 187:1, 18 192:1 196:14 209:13 210:22 212:12

**depositions** 3:7 30:2, 5, 10 35:20 37:14 49:14
**deposits** 16:23
**depth** 105:18 106:1 107:3 109:8 163:21 164:8 165:7 179:15, 19 197:18, 19 198:10 199:7, 20, 23 200:13, 14, 15
**depths** 198:3, 21
**describe** 54:16 69:21 100:15 128:1 137:21 138:5 141:10 169:12
**described** 110:22 161:17 194:17
**describes** 122:8 124:4 172:2 180:13
**describing** 143:13
**DESCRIPTION** 5:2 46:17 47:18 196:5
**design** 69:20 70:2, 20 79:8 81:19, 20, 22 82:6 173:22
**designate** 189:8
**designated** 85:5 88:15 138:19 189:9 202:15
**designation** 18:9, 21 19:2, 6
**detail** 23:11 26:1 84:1
**detailed** 5:22
**details** 178:5
**determination** 76:6, 9 81:6, 7
**determinations** 151:16
**determine** 11:12 51:18 67:16 78:11 164:5 198:15
**determined** 155:19
**determining** 51:6
**develop** 145:12

**developed** 41:1 55:17
**deviated** 104:12
**devote** 28:1
**diagram** 79:4 84:22 114:7 165:22 166:8
**diagrams** 116:3 133:14 189:4 207:8
**difference** 19:4 49:7 155:6 191:7
**different** 17:8, 9 18:22 19:5 23:23 36:20 40:4 41:5 64:15 65:19, 23 66:4 67:2 68:2 70:11, 12, 13 75:16, 21 78:10 107:6 118:7 151:3 154:20, 23 155:4 158:5 166:5 181:23 184:4, 7, 8, 13 189:14 198:21 202:5
**differently** 176:22
**difficult** 11:11 73:3 78:10
**difficulty** 95:5
**Dildine** 124:13, 14
**Dillard** 8:18
**dimension** 155:10
**dimensions** 103:6 155:9
**Dimova's** 31:10
**direct** 85:12 140:5
**directing** 134:17
**direction** 82:5 83:22 105:8 110:8
**directly** 24:13
**disagree** 141:9
**discern** 206:20
**discernation** 103:2
**discernible** 95:11
**Discharge** 5:15 70:6 71:5 103:17 113:14, 22 114:22 122:9 150:6 152:7, 21 190:4 193:2 205:6

**discharging** 142:22, 23 158:23
**discovered** 11:23
**discovery** 32:1
**discuss** 169:23
**discussed** 163:7 172:10, 15 182:6 195:11
**discusses** 138:22
**discussing** 145:4 163:5 170:7 185:15
**discussion** 56:21 116:8 121:17 146:22 163:9 171:22 192:23 193:5 194:13
**discussions** 82:12 108:3 144:10 167:6 173:10, 12, 16 192:8 194:19 195:1, 3, 8, 10, 14, 17, 19
**Disposal** 5:18 6:17, 20, 23 7:5, 12, 14 21:8 59:20 80:21 91:19, 20 92:17, 18 93:2 94:3 99:5 100:23 101:2 106:20 109:16 126:13 152:9, 22 153:7 163:16 167:10 169:8 173:3 176:1, 4 177:18 190:17 193:10, 14 196:19 203:4
**dispose,** 132:1
**disregarded** 86:4
**distinction** 96:2 127:2, 3
**DISTRICT** 1:1, 2 10:7
**disturbance** 95:8
**disturbed** 99:8 122:10
**ditch** 59:17, 18 77:10 82:4 84:1, 2, 2, 2, 19 86:19 96:9, 14 100:13 108:5, 8,

*10*, *15*, *20*  109:*13*,
*17*  110:*14*, *19*, *22*
111:*8*, *15*, *17*  112:*3*,
*11*, *11*  113:*3*, *8*, *13*,
*16*, *22*  114:*2*, *4*, *6*, *8*,
*13*, *19*  117:*23*
174:*10*, *18*, *19*
187:*6*, *9*  188:*8*, *15*,
*18*  190:*21*  193:*2*
197:*23*
**ditches**  5:*9*  81:*21*
82:*2*  84:*5*, *11*  85:*4*,
*7*, *13*, *17*, *21*  86:*3*
101:*23*  102:*4*, *5*
108:*7*  146:*16*, *23*
147:*1*  169:*16*
182:*23*  188:*22*
197:*9*
**diversion**  108:*8*
146:*15*, *23*  147:*1*
169:*16*  193:*2*
**DIVISION**  1:*2*
15:*22*  20:*11*, *15*
50:*2*
**DNPL**  41:*19*
**document**  42:*7*
53:*9*, *11*  54:*7*, *11*
66:*13*  83:*10*, *12*
100:*18*  101:*10*
116:*9*  117:*11*
120:*5*  121:*9*  123:*2*
129:*21*  131:*5*
136:*3*, *13*, *23*
140:*14*  141:*20*
146:*5*  148:*23*
149:*6*, *8*  150:*22*
153:*17*  154:*2*
157:*19*, *23*  160:*4*, *6*
162:*20*, *22*  163:*2*
164:*12*  168:*4*, *19*
170:*6*  171:*8*, *8*, *12*
177:*11*  178:*4*
180:*12*  181:*17*
183:*6*  185:*9*
186:*22*  187:*19*
188:*6*  189:*12*
197:*12*  198:*16*
201:*13*, *19*  202:*13*,
*14*, *23*  203:*9*, *10*, *16*

204:*7*  208:*7*, *17*
209:*5*, *13*  210:*9*
**documentation**
125:*18*  127:*10*
131:*14*
**documented**  134:*6*
137:*10*  148:*6*
**documenting**
187:*22*
**documents**  11:*16*,
*20*  12:*5*  31:*21*
32:*4*, *6*  46:*9*  52:*10*,
*11*, *12*, *19*, *22*  53:*3*,
*5*, *10*, *12*, *17*  55:*2*
56:*20*  70:*17*, *21*, *22*
75:*22*  76:*3*  77:*3*
81:*11*  97:*3*  103:*1*
106:*11*  107:*20*
115:*7*, *9*  121:*19*
123:*17*  130:*1*, *14*
134:*18*  137:*10*
152:*16*, *23*  162:*18*
167:*20*, *23*  178:*1*
181:*7*  204:*13*
211:*7*
**doing**  11:*19*  24:*1*
49:*9*  123:*20*
186:*12*  208:*13*
**Donna**  2:*5*  3:*21*
9:*1*  213:*19*, *20*, *22*
**door**  61:*13*
**double**  13:*22*  207:*5*
**Doug**  5:*14*, *17*, *21*,
*23*  6:*2*, *3*, *9*, *12*, *13*
7:*2*, *3*  82:*14*
134:*14*  148:*7*
167:*5*
**Down-dip**  180:*20*
**downgradient**
161:*14*  188:*14*
**downriver**  70:*7*
**down-slope**  96:*10*
132:*14*, *17*
**Dr**  14:*17*  77:*2*
125:*19*, *23*  127:*6*
132:*6*  133:*20*
134:*13*  140:*19*
142:*20*  148:*1*, *7*
157:*21*  158:*2*

161:*4*  171:*16*
181:*22*
**draft**  12:*16*  47:*16*
171:*14*
**drafted**  172:*4*
**drafting**  136:*19*
**draftsman**  15:*21*
**Drahozal**  17:*11*
**drain**  79:*17*  82:*4*
108:*4*, *22*  109:*17*
110:*13*  112:*3*
113:*13*  114:*19*
173:*23*  174:*19*
**Drainage**  6:*15*
59:*17*, *18*  68:*7*, *12*
69:*6*  70:*9*  73:*17*
77:*11*, *20*  79:*10*, *18*,
*22*  80:*20*  81:*20*
82:*6*  83:*22*  84:*13*,
*19*  86:*11*  93:*18*
98:*11*, *14*  100:*7*, *11*
103:*19*  108:*9*
112:*9*  138:*23*
143:*1*, *4*, *8*, *12*, *17*,
*22*  144:*4*, *8*  148:*16*
149:*23*  150:*2*, *8*
172:*18*  211:*23*
**drained**  110:*1*, *16*,
*18*  113:*21*  114:*23*
**draining**  110:*22*
193:*3*
**drains**  84:*16*
**draw**  65:*8*  75:*1*
80:*13*
**drawing**  79:*8*  84:*1*
111:*9*  114:*2*, *11*
**drawn**  87:*7*
126:*16*  137:*3*
**drew**  98:*5*  100:*14*
**drill**  128:*18*
**drilled**  107:*6*
129:*13*  179:*6*, *8*
185:*5*  198:*20*, *21*,
*23*  199:*2*, *12*, *20*
200:*6*, *14*  207:*6*, *8*,
*20*
**drillers**  20:*19*
**drilling**  128:*16*, *22*
129:*1*  133:*4*

155:*13*
**drive**  32:*7*  91:*23*
**DRUM**  31:*22*
**D-R-U-M**  31:*22*
**DRUMMOND**  1:*8*
7:*19*  10:*7*  24:*6*, *10*,
*13*  25:*1*  32:*3*  52:*9*,
*12*, *21*  53:*11*, *17*
71:*18*  116:*10*
119:*1*  134:*19*
197:*13*  210:*22*, *23*
211:*20*
**Drummond's**
135:*12*
**dry**  205:*8*
**due**  199:*20*, *23*
**duly**  9:*12*
**duplicate**  135:*15*,
*17*, *23*
**dust**  66:*6*
**duties**  20:*14*
**Dwight**  7:*20*
**dynamics**  131:*22*

**< E >**
**earlier**  52:*14*  78:*9*
86:*6*  91:*15*  93:*5*
104:*1*  117:*2*
127:*18*  145:*6*
149:*22*  154:*7*, *11*
165:*14*  167:*2*
172:*11*  175:*17*
182:*6*  189:*23*
193:*17*  195:*16*
197:*18*  198:*9*
201:*21*
**early**  10:*18*  26:*14*
29:*21*  50:*6*, *19*
63:*17*  93:*15*
100:*13*  102:*19*
118:*8*  120:*2*
125:*14*  154:*4*
194:*21*
**earn**  15:*3*  16:*9*
**earthmoving**  109:*3*
162:*1*
**east**  84:*1*, *19*  85:*5*
101:*22*  108:*10*, *15*
109:*17*  110:*19*, *22*
113:*22*  117:*16*, *23*,

*23* 172:*11* 174:*22*
188:*18*
**eastern** 22:7 93:*19*
**Ebenezer** 36:*14, 15*
**ecology** 26:*10*
**edge** 76:*16*
**edition** 13:*15*
**editor** 15:*21*
**educated** 159:*22*
**education** 14:*8, 19*
17:*22* 18:*1*
**educational** 13:*18*
**Edwards** 82:*14*
**effect** 3:*4* 6:*14*
153:*21* 179:*5*
208:*20, 21* 209:*1*
210:*14* 211:*12*
212:*4*
**effective** 3:*20*
**effects** 39:*20*
**efficient** 160:*21*
161:*1*
**effluent** 122:*10, 13*
123:*5* 153:*8*
**effort** 80:*22*
**efforts** 17:*15*
**eight** 18:*20* 146:7,
*10, 10* 181:*23*
182:*4* 202:*4, 12*
**eighties** 153:*3*
**either** 23:*3* 32:7
35:*9* 48:*13* 69:*18*
85:*10* 101:*13*
139:*22* 180:*19*
190:*14*
**elaborate** 21:*5*
**electronic** 37:*15, 22*
**electronically** 32:*8*
203:*20*
**element** 129:*8*
**Elements** 6:*21*
125:*19* 127:*19, 22*
**elevated** 158:*13*
166:*14, 14*
**elevation** 155:7
**elevations** 155:*5*
**eleven** 22:*21*
127:*21* 133:*23*
**eliminate** 161:*6, 11*

**e-mail** 32:7
**embankment** 86:*12*
**embayment** 147:*18,*
*19*
**emergency** 150:*9*
**employed** 163:*18*
**employees** 71:*14*
**ended** 15:*16* 46:7
169:*17*
**ends** 152:*4* 204:*15*
**engaged** 39:*21*
**engagement** 55:*8*
**engineer** 79:7
**engineering** 70:*2*
**engineers** 49:*22*
71:*14* 173:*11*
**enlargement** 79:*3*
80:*1*
**ensure** 182:*13*
**entailed** 49:*20*
**entering** 166:*13*
**entire** 32:*23* 64:*9*
72:7 75:*20* 179:*22*
**entirety** 67:*12, 13*
137:*17* 203:*10*
**entities** 24:*23*
**entitled** 203:*4*
**environment** 26:*10*
184:*15*
**Environmental** 2:7
8:*11* 17:*1* 19:*17,*
*19, 23* 20:*8* 25:*5*
26:*20* 49:*23* 81:*16*
**environments** 184:*8*
**EPA** 51:*17*
**ephemeral** 87:*2, 3*
94:*5*
**equipment** 109:*3*
162:*2*
**era** 134:*21*
**eroded** 62:*14, 15*
90:*6* 96:*18* 120:*8,*
*14, 16, 17*
**eroding** 90:*13*
**erosion** 39:*19*
**especially** 149:*10*
**Esquire** 3:*22*
**Essentially** 19:*3*
68:*1* 110:*13* 118:*2*

**established** 50:*20*
120:*22* 122:*16*
125:*12* 163:*13*
164:7 166:*20*
184:*6* 206:*11*
**establishing** 163:*18*
**establishment**
118:*14*
**estimate** 29:*5*
41:*14, 18* 57:*11, 17,*
*18, 21* 58:*3* 62:*22*
155:*15*
**estimates** 41:*1*
106:*2, 6*
**estimation** 101:*20*
131:*18*
**estuary** 132:*8*
**Eva** 8:*17*
**evaluated** 159:*9*
**evaluating** 179:*4*
**evaluation** 20:*1*
137:*6* 158:*1*
**evaluations** 26:*21*
**event** 124:*3*
162:*10* 177:*20*
191:*4* 205:*2*
**events** 11:*17, 22*
182:*11*
**everybody** 143:*6*
**everybody's** 63:*19*
145:*15*
**evidence** 3:*14*
100:*10*
**evidences** 100:*8*
**evolved** 125:*5*
**exactly** 149:*19*
**exam** 19:*15* 20:*4*
**EXAMINATION**
8:*2* 9:*8, 20* 19:*18*
**examined** 9:*12*
**example** 18:*22*
**exams** 19:*12*
**excavate** 91:*11*
**excavated** 91:*5*
**excavation** 41:*15*
**exception** 84:*13*
**excluded** 46:*23*
47:*4*

**Excuse** 28:*5* 55:*5*
75:*12* 204:*19*
210:*5*
**exercise** 167:*1, 12*
**EXHIBIT** 5:*2*
12:*8, 11* 45:*9, 12*
60:*12, 15* 63:*1, 5, 5*
64:*5, 23* 65:*14*
67:*23* 72:*14* 76:*14*
80:*9* 83:*6, 10, 16*
84:*21* 85:*5* 87:*6,*
*11* 89:*9* 91:*23*
93:*5, 6* 96:*9, 19, 23*
98:*13* 99:*2* 100:*14*
103:*4* 105:*9*
106:*16* 108:*6*
110:*6* 111:*8*
112:*12, 15* 113:*3*
114:*13* 115:*22*
116:7 121:*4, 7*
123:*13, 16* 126:*17*
127:*11, 14* 128:*6,*
*10, 21* 129:*17, 20*
131:*1, 4, 10* 133:*16,*
*19* 136:*3, 9, 12*
137:*15* 138:*21*
140:*11, 15, 16*
144:*22* 145:*3, 22*
146:*2* 147:*5, 8, 21,*
*21* 157:*14, 17*
159:*23* 160:*4*
162:*13, 16* 167:*16,*
*20* 170:*18* 177:7,
*10* 178:*14* 180:7,
*11* 181:*12, 16*
183:*1, 4* 184:*16, 19*
186:*19, 23* 187:*14,*
*17* 188:*1, 3, 13*
189:*19* 191:*17, 20*
194:*5, 9* 196:*10, 14*
197:*22* 200:*20*
202:*18, 21* 203:*13*
208:*3, 6* 209:*9, 12*
210:*18, 21*
**exhibits** 4:*2* 30:*9*
89:*3* 132:*4* 178:*11*
**exist** 109:*5*
**existed** 77:*23*
**existence** 41:*9, 12*

84:8  90:1  111:17
expanded  105:5
expenses  56:11
experience  16:11,
13  17:3  18:17
19:8
experiencing  39:4
43:5
Expert  5:3  10:9,
23  11:5, 12  12:14
29:14  31:6, 12
33:12, 15  36:1, 12
37:23  38:3  40:5, 6,
7  42:13  44:6
46:20  47:7  53:15
55:3, 21  97:13
123:18  131:6
162:19  167:21
181:8  212:7
expertise  57:1
Expires  213:21, 23
explain  72:3  116:4
128:19  148:4
155:16  163:17
explanation  65:6, 9
86:16
explanatory  164:13
exposed  68:22
75:20  84:16
exposure  51:15
Express  43:7, 9
expression  84:17
extensive  25:13
extent  87:19  140:9
155:11  165:3
166:7, 16, 17

< F >
face  77:10
facilitated  110:7
facility  41:4, 6
42:2, 4
fact  11:1, 6, 13
44:9  65:20  85:20
93:11  161:3  167:7
170:3  177:20
211:19
facts  11:7
factual  10:13
faculty  14:18

fair  11:2  29:5
88:20
fall  29:15, 16
familiar  64:17
66:23  67:7  76:2
83:12  143:15
157:18  162:19
169:14
fan  62:3
far  96:10  106:21
135:6, 7  164:20
182:21  189:1
farm  39:6
fashion  79:5, 6
feature  70:3
features  83:17  89:6
February  45:19
151:7  187:5
189:21  201:5
204:11
federal  36:7
feel  44:2
feet  107:9  129:15
156:4  161:5  164:2,
7  165:4  166:18, 18
170:11  189:5
198:5, 8  199:3, 5, 7,
13  200:7, 12, 15
few,  135:3
field  14:13  16:19
23:2, 12  25:15
26:8  60:3  137:7
151:15
fieldwork  134:4
Figure  5:8, 9  63:9
79:20  80:9, 10
83:11  113:18
156:9
figures  154:15
filed  4:4  153:1
192:3
files  28:16  134:20
filing  3:17
fill  93:11  94:7, 13
95:14  100:3
141:18  148:9
154:21  158:19, 21
159:1  207:11
filled  126:12  132:8

161:4
fills  162:11
filter  70:18  71:1, 5,
9  194:21
filter,  194:15
final  109:18  135:5
172:23  177:23
197:5  201:13
203:6, 9, 15
find  97:22  131:17
133:10  135:3
192:15, 22  204:1, 4
fine  18:13  28:7
36:22  55:13  65:10
85:3  91:1  102:6
116:4
fines  66:6  67:1
finished  111:22
Fire  38:11
firm  36:20, 23, 23
51:23  54:2, 5  59:7
first  9:12  13:17
15:18  16:22  23:7
25:20  33:2  35:11
37:4  42:9, 16
43:22  44:9, 13
57:15  58:18  61:23
62:13  85:6  89:7, 8
93:10  94:8  96:4,
10  103:7  104:13,
14, 22  105:17
106:18  108:7
120:10  124:5
128:15  129:22
131:7  137:12
141:6  152:20
158:7  172:7
180:14, 16  183:19
185:9  187:21
201:5
fit  174:3
five  16:11  18:17
35:20
flat  118:2
flesh  11:10
flip  28:6  119:4
flood  140:2
floods  140:8
Floor  8:21

Florida  18:23  19:2
45:2  130:18, 22
FLORIE  8:20
flow  100:6, 9
142:13, 15  150:19
157:9  205:3
flowing  75:6  100:7
144:12
fluctuations  199:17
focused  48:12
folder  167:22
folks  125:13
195:17
follow  158:2
following  9:9
145:3  152:3
follows  9:13
follow-up  177:14
foot  59:22  170:9
174:1, 1
force  3:4
foregoing  9:6
213:7, 10
forest  59:19
forested  72:10
84:22
forestry  72:13
Fork  62:10  68:21
79:20  90:10
113:21  126:12
132:9  140:2  143:2
166:13
form  3:11  17:3
67:5  69:3  76:21
86:22  120:11
122:20  143:5
153:6  155:3
159:14  160:20
162:7  174:16
176:15  207:1, 3
formal  14:8  178:6
format  204:8, 9
formation  38:16
74:10  75:14, 18, 19
137:14  185:6
formatted  54:11
formed  76:1  136:6
209:21  211:16
forth  55:18, 23
169:15

forward 51:*18*
173:*1*
found 43:*19*
four 26:*7* 72:*1*
78:*18* 84:*3* 85:*4, 7*
86:*3* 130:*4* 164:*2*
180:*14*
fourth 142:*20*
160:*8* 194:*12*
195:*11*
frame 25:*4* 28:*8*
100:*19* 121:*18*
framework 115:*18*
Fredonia 13:*21*
15:*11*
frequent 142:*16*
frequently 141:*2*
front 58:*6* 196:*21*
203:*14*
full 3:*5* 9:*21*
90:*17, 18, 20*
160:*18* 199:*7*
function 79:*12*
80:*17* 160:*19*
162:*6*
FURTHER 3:*1, 8,
16* 41:*1* 74:*3* 75:*1*
95:*18* 161:*3*
212:*14* 213:*13*

< G >
gallons 155:*22*
156:*20, 21* 157:*3, 7,
8, 9*
gas 15:*12*
gather 186:*2*
gathered 25:*11*
gathering 185:*20*
gauge 142:*16*
gauges 186:*6*
gauging 141:*21*
142:*4, 7, 14*
General 17:*1* 37:*9*
39:*15* 77:*5* 78:*13*
83:*22* 92:*4* 152:*14*
Generally 33:*14*
36:*11* 38:*9* 59:*13*
128:*1* 146:*23*
156:*14*

generated 142:*3*
177:*13* 203:*7*
generating 31:*3*
Geologic 5:*20*
22:*13* 25:*12* 66:*14,
16*
Geological 15:*17,
23* 17:*10*
geologist 18:*6, 14,
23* 57:*2*
Geologists 16:*8*
17:*12* 18:*1* 49:*22*
126:*23*
geologist's 17:*11*
geology 13:*20, 23*
14:*9* 16:*19* 184:*14*
208:*12*
geomorphologist
17:*7*
geomorphology
17:*2*
geophysical 24:*11*
GEORGE 1:*21*
2:*4, 11* 5:*10* 9:*7,
11, 23* 10:*4* 20:*9*
29:*13* 35:*8* 46:*22*
49:*11* 61:*7* 86:*19*
92:*21* 99:*20*
102:*10* 116:*9*
127:*15* 136:*14*
180:*10* 184:*19*
186:*22* 196:*13*
208:*6*
getting 150:*5*
Gilbert 5:*11*
give 19:*5* 33:*8*
35:*22* 41:*9* 44:*3*
55:*14* 57:*23* 59:*9*
63:*15* 115:*18*
131:*18* 138:*1*
204:*4*
given 121:*21*
167:*3* 203:*17*
213:*12*
gives 133:*22*
giving 32:*23*
208:*19, 23*
glass 98:*21*
go 10:*15* 11:*19*
12:*5* 14:*21* 16:*3*

23:*10* 35:*18* 36:*3*
45:*12* 48:*7* 60:*1*
63:*4* 79:*7, 19* 83:*9*
96:*22* 98:*10*
100:*11* 116:*2*
129:*14* 135:*6, 7*
139:*16* 151:*22*
155:*22* 186:*2*
goal 145:*15*
goes 34:*23* 84:*18*
108:*13* 202:*3*
going 10:*15* 11:*9,
13* 12:*18* 15:*12*
28:*13* 46:*5* 55:*11*
63:*4, 6* 64:*4* 66:*12*
83:*23* 87:*23* 88:*4,
18* 89:*1* 92:*2, 10*
98:*2* 102:*5* 106:*14*
115:*7* 119:*2* 127:*4*
132:*8* 135:*20*
139:*3* 145:*20*
160:*22* 161:*12*
162:*6* 170:*8*
179:*11* 182:*8*
194:*4, 9*
Good 9:*21* 11:*18*
22:*12* 49:*16* 93:*1*
108:*12* 207:*21*
GPS 73:*7, 11*
graded 110:*5*
grading 190:*13, 16,
18*
graduate 14:*1, 10*
graduated 15:*11*
grandfathering
19:*11*
granting 209:*22*
gray 103:*5*
great 12:*20*
greater 28:*17*
greatly 161:*6*
Green 56:*18*
Green's 57:*1*
grew 14:*6*
ground 62:*13*
72:*11* 111:*6*
118:*16* 144:*12*
155:*12*
grounds 3:*13*

Groundwater 7:*6,
13* 21:*20* 26:*19*
38:*15* 39:*3* 41:*20*
43:*5* 49:*19* 50:*2,
14* 129:*9* 131:*19*
137:*13* 149:*14*
176:*19* 178:*8*
185:*6, 20* 196:*20*
206:*8*
group 50:*16* 51:*3,
8* 53:*5*
growing 74:*18*
118:*13*
grown 72:*7*
guess 16:*22* 20:*17*
28:*11* 33:*17* 58:*2*
65:*14* 81:*1* 86:*12*
87:*4, 6* 94:*14*
100:*4* 117:*14*
134:*8* 140:*1* 143:*1*
159:*11* 187:*3*
205:*3*
guesstimate 58:*1*
gullied 118:*3*

< H >
hand 45:*12* 64:*4*
134:*7*
handed 116:*9*
167:*19*
handing 128:*9*
129:*20* 136:*12*
187:*17* 208:*6*
handle 148:*10, 14*
handled 131:*23*
handwritten 122:*9*
192:*6, 16*
happen 106:*11, 15*
111:*7* 161:*1*
170:*14*
happened 11:*22*
69:*13* 95:*7* 111:*2*
177:*20* 182:*11*
happening 140:*7*
185:*17*
happy 55:*7, 14*
hard 49:*7* 98:*1*
hardwoods 118:*19*
harm 36:*14*
Harvest 38:*8, 11, 13*

**Hattiesburg** 40:*9, 18, 22*
**hay** 104:*8*
**heading** 172:*8*
**headwaters** 96:*12* 98:*4*
**hearing** 33:*10*
**height** 103:*14* 105:*13* 142:*1, 16*
**heights** 118:*14*
**held** 106:*5*
**help** 34:*15* 97:*18* 105:*10* 116:*3* 128:*5*
**helped** 25:*9*
**helpful** 35:*4*
**helping** 134:*5*
**helps** 55:*6* 105:*11*
**Hercules** 40:*21* 41:*4*
**Hicks** 7:*20* 30:*6, 12, 14* 66:*22* 71:*20* 140:*17*
**high** 14:*5* 138:*5, 8, 10* 143:*18* 148:*20*
**higher** 184:*10*
**highest** 201:*6*
**highlighting** 72:*2*
**highly** 120:*17*
**hired** 122:*4* 125:*17* 127:*19* 145:*11*
**Historic** 5:*4* 55:*4* 97:*1*
**historical** 10:*14* 11:*16* 40:*19* 103:*1* 181:*9*
**historically** 67:*18* 116:*14*
**hit** 129:*16*
**hold** 105:*21* 106:*3* 138:*4*
**holding** 130:*17*
**hole** 129:*1*
**holes** 128:*18, 22*
**hollow** 76:*11, 18, 19* 84:*17* 87:*1* 93:*17* 94:*13* 127:*9* 207:*9, 21, 23* 208:*1*

**honest** 34:*14* 177:*15*
**hope** 92:*22*
**hopefully** 11:*10* 133:*10*
**hoping** 115:*17*
**hour** 29:*7, 10* 157:*7*
**hourly** 54:*19* 56:*8*
**hours** 15:*2* 56:*9, 16* 57:*5, 9, 14, 19, 19, 22*
**House-Pearson** 61:*12*
**hug** 84:*15*
**hummocky** 73:*3*
**hydraulic** 22:*13* 138:*2, 6*
**hydrogeologic** 46:*3*
**hydrogeologist** 134:*16*
**hydrogeologists** 126:*23*
**hydrogeology** 14:*13* 16:*23*
**Hydrologic** 5:*20* 6:*22* 7:*15* 176:*12* 203:*4*
**hydrology** 177:*17*

**< I >**
**idea** 72:*18*
**identification** 12:*9* 45:*10* 60:*13* 63:*2* 83:*7* 96:*20* 115:*23* 121:*5* 123:*14* 127:*12* 128:*7* 129:*18* 131:*2* 133:*17* 136:*10* 140:*12* 144:*23* 145:*23* 147:*6* 157:*15* 160:*1* 162:*14* 167:*17* 177:*8* 180:*8* 181:*13* 183:*2* 184:*17* 186:*20* 187:*15* 191:*18* 194:*6* 196:*11* 202:*19* 208:*4* 209:*10* 210:*19*

**identify** 64:*3* 73:*11* 147:*9*
**Illinois** 42:*18* 43:*23* 44:*1, 4, 10*
**illustrating** 157:*22* 158:*22*
**illustration** 92:*6*
**imagine** 154:*9*
**impact** 38:*16* 44:*10* 176:*8*
**impede** 44:*10*
**implemented** 146:*11, 21* 167:*5* 169:*18*
**impounded** 90:*5* 93:*16*
**impoundment** 71:*2, 3*
**impoundments** 70:*4*
**improve** 190:*3, 10*
**Improvement** 81:*14* 159:*16*
**inches** 156:*15, 16, 22* 157:*1*
**include** 31:*8* 41:*12, 14, 18* 56:*10*
**included** 21:*12* 25:*16* 31:*11* 70:*21* 88:*6* 210:*11*
**includes** 35:*1*
**including** 194:*3*
**incorrect** 115:*4*
**increased** 66:*10*
**incrementally** 164:*10*
**indicate** 40:*3* 88:*5* 102:*23* 107:*7* 113:*7* 141:*1* 143:*10* 145:*21* 160:*13* 184:*12* 187:*4* 189:*14* 192:*9* 197:*13* 198:*2*
**indicated** 175:*18*
**indicates** 16:*8* 18:*5* 20:*10* 37:*5* 45:*18* 84:*22* 99:*8* 138:*16* 149:*1* 160:*8* 164:*18* 165:*11* 172:*10*

183:*21* 184:*10* 188:*7* 189:*21* 190:*6, 13* 209:*22*
**indicating** 113:*12* 117:*22* 132:*4*
**indication** 138:*2*
**indicative** 75:*10*
**indicators** 113:*12*
**individual** 44:*23* 52:*10* 82:*10*
**individual's** 61:*10*
**industry** 15:*13*
**infill** 106:*6*
**infiltration** 83:*21* 86:*17* 88:*1, 3* 108:*1* 138:*1, 17* 201:*21*
**inform** 209:*20*
**information** 10:*14, 14* 25:*11* 34:*20* 45:*18* 46:*10, 15, 17* 48:*3, 11* 55:*4* 73:*11* 153:*9* 168:*15* 171:*2* 181:*11* 185:*7, 21* 192:*6* 198:*14* 200:*10* 204:*16* 205:*23*
**informed** 141:*3*
**in-house** 14:*18*
**initial** 58:*5* 109:*18, 19, 20* 132:*2* 133:*7* 193:*12*
**initially** 107:*5* 110:*1* 114:*23* 129:*11* 144:*9*
**initiated** 190:*17*
**initiatives** 50:*8*
**input** 81:*12*
**inspected** 186:*11*
**Inspection** 5:*12* 7:*8* 182:*8* 192:*10*
**inspections** 192:*19*
**installation** 179:*3*
**installed** 25:*10* 111:*20* 142:*5* 178:*9, 15, 18, 20*
**installing** 141:*21* 179:*4*

**instance** 11:*1* 47:*3*, *6* 73:*19*
**Institute** 16:7
**institutes** 15:*16*
**instruction** 54:*20*
**instructor** 14:*14*
**instrumentation** 186:*12*
**Intent** 29:*22*
**interested** 11:*21* 213:*15*
**interim** 135:8
**interject** 11:*4*
**intermittent** 87:2, *3*, *5*, *9* 88:*6*, *19* 93:6 94:*7*, *15* 96:*18* 98:*4* 126:*17* 206:*19*
**internal** 50:*12*, *13* 147:*11* 193:5
**interpretation** 17:2, *4*, *13* 18:*3* 55:*3*
**interpreting** 150:*22* 202:*3* 207:*17*
**interstitial** 141:7
**intervals** 164:*8*
**interviews** 48:*9*
**introduce** 158:*11*
**inventory** 25:*13*
**invested** 57:*22*
**investigate** 21:*19*
**Investigations** 7:*15* 21:*12* 69:*19* 70:*14* 137:7 144:*10* 192:*20* 203:*5* 211:22
**invoiced** 57:*14*
**invoices** 56:*5*
**involve** 21:7 27:*3*
**involved** 25:*21* 56:*12* 173:*12* 192:8, *10*, *23* 194:*18* 195:*13* 196:8
**involving** 24:*9*
**iron** 75:*11*, *11* 122:*17* 123:*11* 148:*20* 154:*9* 193:22

**irreparably** 36:*14*
**issue** 34:*4*
**issued** 29:*23* 121:*23* 163:*12* 208:*17*
**issues** 17:*1* 82:*9* 182:*9*
**item** 38:7 39:*12* 128:*21* 137:*12* 139:*2* 147:*17* 148:*19* 149:*16* 155:*14*, *19*, *23* 159:*19* 161:*17* 177:*17*
**items** 52:*9* 127:*21* 133:*23* 182:*4*
**its** 24:7 57:*5* 69:*10* 71:*3* 103:*10*, *11*, *14* 105:*1*, *18* 110:*11* 130:*11* 134:*21* 137:*17* 141:*23* 160:*19* 161:*13* 168:*16* 199:*20*, *23* 201:*10* 203:*10*

**< J >**
**Jack** 5:*12* 82:*12*, *20*
**Janice** 44:*14*
**January** 6:*14* 151:6 200:*23* 201:7
**Jefferson** 82:*21* 213:*4*
**Jim** 17:*11*
**JOB** 1:*23* 15:*18*
**Joe** 192:*13* 195:*20*
**jog** 115:*19*
**Johnson** 173:*11*
**Johnson's** 31:*9*
**Johnston** 8:*12*
**joined** 134:*15*
**judgment** 201:*10*
**July** 7:*9* 147:*12* 152:*4* 171:*11* 205:*10* 210:*23*
**JUNE** 1:*22* 2:*9* 4:*1* 59:2, *14* 60:*21*

**jury** 43:*19*

**< K >**
**Karst** 38:*14*
**keep** 37:*23* 60:*3* 141:*2* 159:7
**Keith** 8:*12*
**Kellerman** 24:*12*, *15*
**K-E-L-L-E-R-M-A-N** 24:*17*
**Key** 7:7
**kin** 213:*14*
**kind** 25:*8* 49:7 101:*17* 104:*12* 118:*19* 128:22 211:*11*
**kinds** 130:*1*
**kjohnston@selcal.org** 8:*16*
**knew** 129:*16*
**Knob** 22:6
**Knoll** 32:*20*, *22* 35:*11* 37:*4*, *13*, *16*
**K-N-O-L-L** 32:*22*
**know** 11:*11* 13:2 25:*2* 28:*2* 29:*20* 30:*14*, *17*, *20* 35:*18* 36:*8* 41:*23* 43:*18* 46:*7*, *16* 49:*10*, *13*, *15* 53:*10* 57:*7*, *14* 63:*13*, *22* 69:*13* 70:*18*, *22* 71:*13* 86:*19* 90:*23* 91:*8* 92:*2* 93:*15* 94:*10*, *23* 95:*4*, *6*, *9* 96:*12* 101:*14* 102:*10*, *16* 103:*6* 104:*21* 105:*16*, *18*, *20* 106:*1* 107:*3* 108:*2* 111:*4* 113:*10* 114:*17* 115:*16* 117:7 118:*11*, *18* 119:*14*, *22* 120:*12* 121:*21* 122:*14*, *22* 133:*5* 135:*6* 136:*1*, *4* 137:*23* 138:*7* 143:*9* 144:*4* 145:*14* 148:*13*, *18* 151:*13* 152:*15*

153:*22* 154:*3*, *8* 156:*9*, *14* 161:*22* 163:*1*, *11* 165:*6*, *7* 167:*3* 168:*22* 169:*22* 170:*10*, *11*, *20* 171:*2* 173:*12* 174:*11*, *23* 175:*20* 177:*1*, *11* 181:*16* 183:*22* 189:*1* 192:*13* 194:*20* 195:*1*, *2*, *6*, *7*, *12* 196:*15* 197:*10* 203:*6* 206:*15*
**knowledge** 12:*1* 16:*18* 115:*13* 166:*19* 174:*21* 194:*17*
**known** 60:*10*

**< L >**
**lab** 61:*17*, *19* 97:*10* 130:*11*, *15*, *16*, *22*
**label** 99:*17* 102:*5*
**labeled** 79:2 126:*17* 169:7
**laboratory** 130:*18* 151:*17*
**Lakeland** 130:*18*
**Lamoreaux** 12:*19* 14:*17* 16:*4* 17:*16* 77:2 124:*21* 125:*20*, *23* 127:6 132:7 133:*20* 134:*13* 140:*19* 142:*21* 146:*4* 148:7 157:*22* 158:2 161:*4* 171:*17* 181:*22*
**Lamoreaux's** 148:*1*
**land** 99:*8* 172:*22*, *23*
**landfills** 43:*14*
**lane** 89:*2*
**language** 126:*3* 148:*1* 206:*15* 207:*16*
**Large** 2:6 9:*4* 21:*18* 43:*11* 88:*3*
**larger** 52:*12*

**late** 10:*17* 34:*12* 134:*3*
**lateral** 155:*11*
**latest** 151:*23*
**latitude** 184:*21*
**law** 2:*6, 7* 8:*11* 36:*20* 64:*17* 65:*17, 18* 66:*9* 67:*10* 72:*22* 77:*20, 23* 79:*15, 16* 80:*11, 20* 82:*3* 96:*2* 107:*17* 109:*22* 113:*17* 170:*7* 172:*17* 179:*6, 7, 12* 193:*11, 21* 197:*2* 199:*4, 18, 21* 200:*1, 4, 7, 11, 16* 212:*8*
**laws** 3:*5*
**lawsuit** 10:*6* 42:*14* 44:*3* 82:*16* 153:*1* 192:*3* 209:*2, 18*
**Lawyer** 82:*14*
**layer** 74:*17* 118:*15* 200:*4*
**layered** 73:*16*
**layers** 73:*21*
**lays** 146:*7*
**leading** 3:*11*
**leave** 71:*2*
**led** 51:*3*
**Lee** 184:*2, 2, 3, 6*
**left** 65:*14* 82:*19* 84:*8* 174:*8*
**left-hand** 79:*4*
**legal** 175:*6, 9* 208:*20, 23* 210:*13* 211:*11* 212:*3, 6*
**legislative** 50:*8*
**length** 105:*4*
**lengthened** 105:*6, 8*
**Leslie** 59:*6*
**Letter** 5:*14, 17, 19, 21, 23* 6:*2, 3, 5, 9, 12, 13* 7:*1, 2, 3, 4, 10, 17, 19* 29:*23* 54:*7, 8, 10, 12* 55:*8* 124:*3, 7, 20* 127:*15* 128:*10* 133:*20* 140:*19* 146:*3, 7* 148:*7* 159:*21*

161:*19* 181:*22* 182:*6, 7* 185:*10, 13* 194:*10, 18, 23* 195:*7, 11* 209:*15, 17, 20* 210:*6, 11, 23* 211:*2, 5, 12, 15*
**letters** 148:*2* 178:*7*
**letting** 106:*8*
**level** 51:*16* 141:*23* 142:*19* 158:*8* 160:*9* 186:*5* 199:*17* 201:*8*
**levels** 51:*19* 158:*8* 166:*5*
**license** 19:*1*
**licensed** 18:*6, 14*
**licensure** 19:*12*
**lifts** 173:*21*
**lighter** 65:*2*
**likewise** 144:*13*
**lime** 104:*9*
**limestone** 70:*15, 18, 23* 71:*5, 9* 104:*2* 194:*15, 20*
**limit** 85:*6* 140:*4*
**limitations** 122:*11, 13, 16* 123:*5* 153:*9* 154:*12, 13*
**limited** 56:*16* 139:*6, 13* 166:*16, 17*
**limits** 154:*6, 9*
**Lincoln** 33:*1* 35:*12* 37:*11*
**line** 73:*4* 80:*11, 12* 86:*8, 15* 87:*5, 7, 14, 16, 23* 92:*15* 93:*23* 94:*15* 108:*8, 13* 111:*12* 113:*5, 5, 6, 10* 114:*3, 12* 124:*9*
**Liquids** 41:*20*
**list** 18:*20, 23* 19:*14* 22:*12* 25:*3, 7, 19* 31:*19* 35:*17* 38:*7* 41:*7* 50:*15* 51:*17* 53:*4* 115:*11* 123:*18* 131:*6* 162:*18* 167:*21, 21* 181:*7* 182:*3*

202:*15* 208:*8* 209:*14*
**listed** 16:*6* 20:*23* 35:*10, 15* 37:*5* 38:*4, 21* 46:*22* 51:*16* 53:*4* 85:*4* 123:*18* 127:*21* 131:*6* 136:*23* 167:*21* 181:*7* 182:*3*
**listing** 45:*15*
**literature** 144:*9*
**litigation** 27:*9, 11, 12, 16* 28:*1, 23* 29:*6* 34:*22* 42:*15*
**little** 11:*11* 19:*4* 26:*2* 60:*8* 61:*20* 74:*3* 84:*23* 98:*1* 113:*11* 118:*1, 10* 126:*10* 188:*14* 197:*18*
**located** 137:*16* 149:*19* 150:*10* 207:*18*
**Location** 5:*8* 43:*10, 11* 72:*20* 74:*13* 75:*16* 78:*16* 80:*8* 85:*17, 20* 88:*1* 94:*18* 101:*4* 119:*23* 120:*3* 131:*8* 133:*12* 165:*13* 179:*13*
**locations** 73:*6* 83:*20* 107:*6* 108:*2* 131:*14* 143:*11* 144:*2* 183:*12* 184:*13* 189:*19* 198:*9* 202:*9, 12*
**Locust** 62:*10* 68:*21* 79:*19* 90:*10* 113:*21* 126:*12* 132:*9* 140:*2* 143:*2* 166:*13*
**logged** 94:*23*
**logging** 24:*11*
**logs** 107:*7* 179:*21*
**LOIS** 1:*21* 2:*4, 11* 5:*10* 9:*7, 11, 23*
**Lois's** 11:*5*

**long** 16:*1, 15* 18:*9* 26:*13* 27:*16* 55:*9* 63:*23* 64:*1* 159:*6* 163:*22* 164:*2*
**longitude** 184:*21*
**long-term** 48:*13*
**look** 12:*12* 28:*15, 16, 21* 31:*9* 35:*2* 54:*11* 60:*23* 61:*8* 70:*10, 11, 16* 75:*4* 93:*9* 97:*7* 99:*1* 100:*10* 102:*8* 104:*13* 106:*18* 107:*8* 110:*6* 117:*20* 119:*11* 125:*22* 129:*9* 131:*4* 133:*19* 135:*16* 149:*5* 153:*17* 157:*17* 164:*12, 17, 23* 165:*20, 22* 166:*4* 168:*18* 178:*3* 179:*21* 180:*10* 181:*15* 183:*4* 188:*5* 189:*13* 190:*12* 194:*11* 196:*15* 197:*7* 198:*22* 205:*5* 206:*6*
**looked** 15:*15* 53:*1* 60:*22* 70:*12, 20* 72:*8* 73:*19* 89:*6* 94:*10* 95:*1, 1, 7, 9, 10* 103:*4* 120:*16* 135:*1, 2* 139:*8* 145:*5* 156:*12* 165:*14* 204:*12*
**Looking** 20:*22* 24:*21* 34:*21* 48:*16* 50:*23* 57:*16* 65:*13* 68:*21* 71:*8* 74:*10* 75:*6* 77:*6, 12* 80:*5* 97:*17* 98:*23* 100:*16* 101:*12* 103:*1* 106:*7* 120:*5* 124:*1, 16* 129:*10* 131:*22* 148:*13* 149:*18* 150:*18* 154:*2* 164:*22* 169:*6* 184:*19*

188:*13*  197:*4, 22*
198:*3, 14*  200:*8, 10*
203:*13*  207:*7*
**looks**  17:*18*  18:*20*
44:*17*  46:*10, 12*
65:*13*  78:*21*  83:*16*
115:*2*  149:*21*
150:*12*  152:*3*
158:*15*  178:*6*
180:*23*  181:*19*
182:*1*  185:*10*
188:*13*  199:*3, 12*
200:*22*  201:*6*
202:*4*  204:*17*
205:*10, 11*
**lot**  11:*20*  12:*5*
17:*17*  28:*5*  49:*13*
55:*21*  64:*15*  71:*14*
83:*16, 17*  115:*10*
140:*3*  183:*22*
184:*10*  195:*7*
**Louisiana**  15:*14*
**low**  143:*7, 11, 18*
144:*16*
**lower**  59:*16*  62:*2,*
*5, 7, 9*  68:*20*  69:*7,*
*21*  70:*18*  74:*22*
76:*15*  79:*4*  84:*14*
86:*9*  88:*8*  89:*17,*
*19, 20*  90:*1*  93:*12*
99:*13*  102:*11*
103:*8, 22*  104:*18*
105:*23*  126:*10*
132:*15, 15*  137:*19*
138:*17*  139:*14, 23*
140:*1, 1, 3*  149:*3,*
*20, 22, 23*  165:*16*
166:*13*  170:*22*
174:*10*  183:*22*
192:*20*  194:*22, 22*
**lowered**  164:*10*
**lunch**  92:*19, 22, 22*

**< M >**
**M1-1**  164:*16*
**M-2**  149:*18*  150:*5*
165:*13, 13, 19*
**M-4**  150:*10, 15, 19*
**ma'am**  18:*16*
27:*21*  28:*4*  77:*9*

88:*22*  99:*2*  102:*10*
109:*14*
**magnifying**  98:*21*
**maiden**  124:*10*
**main**  187:*3*
**maintained**  40:*1*
**maintenance**  182:*14*
**major**  13:*22*  128:*2*
**majority**  59:*20*
62:*23*  64:*12*
171:*16*
**makeup**  129:*9*
**making**  76:*6*
191:*12*  199:*15*
201:*10*  210:*15*
**Mallard**  10:*2*
**management**  20:*18*
81:*16*
**manager**  125:*3*
**manganese**  123:*11*
193:*23*
**manganese,**  148:*21*
**manmade**  84:*11*
85:*7*  86:*7*
**manner**  155:*1*
159:*7*  172:*16*
**map**  87:*7, 8*  88:*16*
98:*17*  99:*3, 5, 12*
102:*19*  103:*3*
131:*14*  133:*11*
138:*16*  149:*9*
164:*13*  168:*23, 23*
169:*3, 6, 6*  182:*2*
202:*8*
**mapped**  87:*1*
**mapping**  96:*15*
**mappings**  17:*14*
**maps**  5:*4*  17:*8*
87:*1, 18*  88:*5*
94:*16, 16, 18*  97:*1,*
*18*  100:*1*  147:*23*
155:*1*
**March**  146:*4*
151:*21*  190:*18*
208:*10*
**mark**  60:*9*  78:*4*
101:*7*  113:*7*  189:*8*
**marked**  12:*9, 11*
31:*22*  45:*10*  60:*13,*
*15*  63:*2*  83:*7, 10*

93:*4*  94:*6*  96:*20,*
*23*  115:*23*  118:*23*
121:*5, 7*  123:*14, 16*
127:*12, 14*  128:*7, 9*
129:*18, 20*  131:*2, 4*
133:*17, 19*  136:*10,*
*12*  140:*12, 15*
144:*23*  145:*3, 23*
146:*2*  147:*6, 8*
151:*10*  157:*15, 17*
160:*1, 3*  162:*14, 16*
167:*17, 19*  177:*8*
180:*8, 11*  181:*13,*
*16*  183:*2, 4*  184:*17*
186:*20, 23*  187:*15,*
*17*  191:*18*  194:*6*
196:*11, 14*  202:*19,*
*21*  208:*4*  209:*10,*
*12*  210:*19, 21*
**marker**  92:*8*
**market**  47:*20*
**Mary**  184:*2, 2, 3, 6*
**Massey**  50:*1*
**master's**  14:*22*
15:*6*
**material**  41:*15*
62:*12, 17*  64:*12, 14*
65:*18, 19*  66:*4, 11,*
*14, 17*  67:*8, 17*
76:*2*  90:*17, 19, 20*
91:*2, 12*  94:*8*
100:*3*  105:*20*
107:*1, 3, 9*  119:*22*
120:*1, 16*  126:*1, 7,*
*8, 13*  137:*21*  138:*9*
139:*11, 16*  140:*4*
141:*15*  154:*22*
164:*14*  172:*12*
174:*2, 3*  179:*16, 16*
197:*19*  198:*4, 6*
199:*4, 8, 21*  200:*1,*
*1, 4, 5, 11*
**materials**  31:*2*
91:*1*  148:*9*
**material-wise**
102:*17*
**matter**  33:*14*  77:*5*
176:*9, 11, 17*
208:*22*

**matters**  27:*2*  28:*9*
29:*6*  35:*1*
**maximum**  107:*12*
**Maxine**  5:*12, 15, 18,*
*20*  6:*1, 6, 11, 15, 19,*
*23*  7:*5, 8, 12, 14, 18,*
*20*  21:*8*  22:*4, 16*
23:*16*  24:*9*  25:*6,*
*21*  27:*3*  52:*1*  58:*9*
69:*17*  87:*9*  100:*22*
135:*11*  143:*21*
151:*4*  153:*13*
156:*10*  166:*20*
173:*3*  178:*15*
183:*20*  184:*1, 11*
185:*2*  196:*19*
203:*4*
**Maxine's**  168:*11*
**McDuff**  5:*12*
82:*12, 20*  117:*1*
120:*6*
**McRoy**  7:*18*
**mean**  26:*22*  28:*5,*
*9*  42:*14*  62:*9*
63:*22*  85:*17*  89:*12*
97:*22*  102:*21*
104:*4*  122:*2*  126:*5*
127:*2, 6*  138:*8*
141:*14, 17*  144:*6*
147:*19*  148:*4, 15*
159:*12*  166:*10*
175:*6*  176:*20*
186:*9*  194:*8, 21*
**meaning**  208:*20, 21*
**means**  85:*22*
141:*15*  176:*17*
188:*20*  205:*3*
207:*18*
**meant**  128:*19*
148:*10*
**measure**  141:*22*
142:*1, 12, 15*
163:*21*
**measured**  143:*11*
164:*9*
**measurement**
155:*12*  165:*7*
**measurements**
144:*2*  164:*10*

**measuring** 150:6
**meet** 30:12 143:21
**meeting** 196:5, 7
**meetings** 195:8, 10
196:8
**member** 49:18
**Memo** 7:7 147:11,
13 148:3 150:3
**Memorandum** 5:11
6:10
**memory** 89:1
115:17, 19
**mention** 49:18
70:17
**mentioned** 104:1
130:13 189:23
193:17 201:20
**mentions** 47:19
145:7
**Messrs** 8:12
**met** 30:16 50:2
**metal** 142:9
**meter** 163:22
**meters** 164:1
**methodology**
163:17
**methods** 14:13
17:8 130:17
**MI-1** 164:16, 18, 20
165:8, 9, 12, 19, 21
**mid** 27:18 58:15
153:19, 19
**middle** 64:10
123:23 156:14, 16
180:14 205:5
**midway** 20:23
**million** 157:3
**mind** 21:9 64:3
99:12
**Mine** 5:12, 15, 18,
20 6:1, 6, 15, 19
7:8, 18, 20 21:22
22:1, 4, 6, 10, 13, 16
25:6, 20, 22 26:6
58:9, 13, 17, 21
60:20 67:3 91:16,
18 106:9 116:21
124:5 132:2
135:11 143:12, 17,
22 144:8 145:7, 13

156:11 158:6, 8, 9,
12, 14, 17 159:18,
20 173:3 183:12
184:1, 11 185:7
186:10, 17
**mine-constituted**
144:5, 6
**mineral** 15:22
143:18
**mines** 21:10 22:9,
15, 19, 20, 21, 22
23:11, 16, 20 24:2,
4, 7 25:9, 17 26:2,
6, 7 66:17 144:11
175:22 177:4
183:20
**mining** 17:1 21:2,
14, 16, 19, 21, 21
22:8 23:1, 5 24:22
25:11 27:3 36:13
48:9, 10, 11 81:4, 5,
13 95:2, 8 100:21
121:23 122:15, 19
123:2 140:20, 23
141:3 154:12, 13
168:13, 13 175:19,
21 176:13 177:3
184:1, 3 185:22
193:13 201:14
208:9 209:7
**minute** 156:20, 21
157:7, 9
**missing** 46:15
**Mississippi** 42:6,
10, 13
**misspoke** 52:13
**misunderstood**
157:13
**mixing** 163:3, 6, 13,
19 164:18, 23
165:3 166:10, 19,
23 167:12
**MO** 149:13
**MO-1** 129:12, 13
131:8, 11, 15 132:7
133:8 154:22
**MO-2** 131:15
133:9, 11 154:22
**MO-3** 76:17 78:6
84:20 133:12

178:10 180:22
189:15 206:8
**MO-4** 111:12
112:7
**MO-5** 197:22
206:11
**MO-6** 198:6
**MO-7** 92:10
108:13 198:17, 19
**MO-8** 111:13
198:18, 19 199:20
**MO-9** 178:10
**Mobile** 33:19, 19
**modifications**
103:21 211:23
**moment** 15:5 34:2
75:17
**MONDAY** 1:22
**money** 48:12
**monitor** 125:13
177:21 191:4, 9, 11
200:6 207:8
**monitored** 207:10
**Monitoring** 5:8
7:6, 13 21:13
25:10 83:19 143:9
149:2, 3, 11 171:23
172:8 174:13, 13
176:18 177:17
178:5, 9, 14 179:9
180:12, 17 182:13
185:7, 17, 23 186:8
196:20 197:8
200:18 201:9, 14
206:8, 21 207:15
209:16, 23 210:14
211:1
**Monrovia** 38:8, 11,
13
**Montevallo** 32:19
34:10 35:14, 21
36:17 37:19
**monthly** 125:10, 11
201:16
**months** 29:1 51:17
**morning** 9:21
45:13 194:22
**Morrison** 38:8, 17
**Mount** 38:21
**move** 173:1

**moved** 37:20 86:9
103:17
**moving** 15:13 68:5
150:16
**multiple** 21:23
22:1, 19
**Muncher** 30:6, 12,
20
**Muncher's** 119:1
**Musick** 7:1, 4, 8
82:11 83:3
**MW-9** 78:16 200:6
**Myers** 192:13
195:20

**< N >**
**name** 9:22 10:4
17:11 22:10 34:1
36:22 59:8 61:10
69:5 124:10
**named** 90:9
**names** 22:3, 11, 17
23:3 41:8
**narrow** 78:2, 3
**National** 20:7
156:6
**native** 90:12
**natural** 62:19
84:15 139:15, 18
**nature** 36:11 37:9
39:1, 15 40:17
43:2 44:20
**near** 42:20 73:21
77:17 153:19
160:21
**nearby** 44:23
174:2
**necessarily** 82:13
102:21 138:10
173:22
**necessary** 3:9
128:18
**need** 19:8 49:11,
14 61:1 131:23
**needed** 40:23
85:21, 22 86:1
122:1 185:23
**needing** 193:18
**neighboring** 39:20

**neither** 189:*3*
213:*13*
**neutral** 144:*15*
**neutral,** 144:*18*
**neutralization**
183:*21*
**never** 60:*11* 66:*15*
77:*1* 91:*18* 106:*2*
153:*4*
**New** 13:*21* 14:*3*
15:*9, 14*
**nice** 92:*22*
**NOAA** 156:*6*
**Noble** 59:*6*
**Non-aqueous** 41:*20*
**nondisclosure** 23:*8*
**north** 69:*11* 74:*4*
84:*2* 85:*5* 87:*13,
15* 91:*22* 95:*18*
96:*8, 9, 13, 14, 17*
98:*9, 10* 103:*18*
107:*15* 111:*8, 17*
112:*3, 6, 11, 19*
114:*21* 150:*11, 12*
174:*18, 18* 190:*21,
21* 197:*23, 23*
207:*12*
**northeast** 75:*1*
**NORTHERN** 1:*1*
10:*7*
**notably** 118:*6*
**Notary** 2:*5* 9:*3*
**notch** 69:*11, 21*
70:*6*
**notes** 60:*3*
**notice** 3:*17* 5:*13*
6:*7* 29:*22* 121:*20,
23* 124:*15* 141:*4*
145:*5* 163:*14*
**noticed** 118:*17*
146:*19*
**notices** 163:*11*
193:*15*
**NOV** 145:*16*
167:*6* 182:*18*
**November** 5:*3*
58:*7* 128:*10*
129:*22* 134:*4*
**NOVs** 175:*14*
208:*14, 16*

**NPDES** 7:*18, 20*
152:*12, 21* 153:*5,
12* 192:*7* 193:*6*
194:*13* 195:*5, 14,
21*
**null-out** 158:*12*
**NUMBER** 1:*3, 23*
8:*2* 12:*8* 14:*10*
16:*9* 19:*8* 21:*10,
12* 22:*9, 18* 24:*3*
28:*16* 31:*22, 23*
45:*9* 56:*9, 16* 57:*8*
60:*12* 61:*23* 62:*13*
63:*1, 16* 64:*6, 8, 10*
72:*1* 80:*14* 83:*6*
86:*16* 88:*2* 96:*19*
97:*23* 98:*17* 107:*6*
115:*22* 121:*4*
123:*13* 127:*11*
128:*6* 129:*17*
131:*1* 133:*16*
136:*9* 138:*19*
140:*11* 141:*6*
144:*22* 145:*22*
146:*21* 147:*5*
152:*13* 157:*14*
158:*16, 16, 18, 18*
159:*12, 19, 23*
162:*13* 167:*16*
168:*10, 11* 169:*1, 4,
7* 173:*10* 177:*7*
180:*7, 17, 18*
181:*12* 182:*15*
183:*1* 184:*16*
186:*19* 187:*14*
191:*17* 194:*5*
196:*10* 199:*2, 10*
202:*18* 208:*3*
209:*9* 210:*3, 18*
**numbered** 142:*20*
157:*22*
**numbers** 52:*10*
123:*22*
**numeric** 166:*5*
**numerically** 123:*7*
144:*17*
**numerous** 50:*3*
**nutrients** 174:*5*
**nutshell** 33:*17*

**< O >**
**Object** 67:*5* 69:*3*
76:*21* 86:*22*
120:*11* 122:*20*
143:*5* 153:*6* 155:*3*
159:*14* 160:*20*
162:*7* 174:*16*
176:*15* 207:*1, 3*
**objected** 207:*4*
**objection** 207:*5*
**objections** 3:*9, 12*
**objective** 172:*3, 16*
175:*14* 190:*22*
191:*2*
**objectives** 148:*8*
**obligated** 175:*11*
**observation** 142:*11,
18*
**observations** 85:*14*
**obtain** 14:*22* 97:*12*
**obtained** 14:*9*
97:*10* 137:*7*
**obtaining** 175:*15*
193:*11, 13*
**obviously** 28:*13*
79:*8* 93:*11* 111:*4*
184:*3*
**occasion** 193:*4*
**occasions** 23:*18, 19*
27:*19* 30:*16* 50:*3*
205:*9*
**occupied** 155:*21*
**occupies** 59:*20*
**occurred** 46:*20*
**Oceanic** 156:*6*
**October** 203:*3*
**offer** 47:*1*
**offered** 3:*14*
128:*23*
**offering** 210:*13*
211:*11* 212:*3, 7*
**offhand** 140:*6*
**Office** 21:*15, 18*
26:*15* 123:*2* 203:*9*
**offices** 2:*7* 82:*23*
**Off-the-record**
116:*8*
**Oh** 34:*18* 87:*10*
98:*18* 109:*23*

116:*18* 122:*2*
135:*10* 143:*16*
157:*11* 172:*9*
192:*18*
**oil** 15:*12*
**okay** 11:*17* 12:*2, 6,
19* 17:*18* 18:*12*
22:*12* 31:*6* 45:*7*
46:*21* 48:*7* 52:*17*
55:*10* 61:*4* 64:*11*
65:*7* 67:*8* 74:*8*
78:*7* 79:*7* 91:*20*
92:*18* 94:*14* 98:*3,
7* 101:*5* 102:*3*
115:*20, 21* 116:*5*
120:*4* 124:*3, 14*
128:*17* 130:*19*
140:*18* 147:*13*
171:*21* 175:*17*
176:*11* 183:*15*
185:*4* 187:*13*
192:*18* 202:*2, 16*
203:*22, 23* 204:*6*
205:*1* 208:*1, 19*
210:*10*
**old** 11:*20* 77:*18*
101:*18* 120:*7*
134:*21* 144:*10*
172:*12* 177:*18*
**older** 37:*22* 80:*10*
94:*16*
**oldest** 35:*19*
**once** 77:*22*
**ones** 97:*8* 115:*10*
136:*4* 149:*13, 14*
178:*22, 22* 198:*13*
200:*19*
**ongoing** 40:*20*
42:*4* 45:*5*
**on-hand** 97:*14*
**on-site** 41:*16* 82:*7,
11, 13* 134:*11, 13,
16* 163:*7* 195:*17,
20*
**open** 28:*9, 12, 16*
**openings** 141:*7*
**operating** 22:*14*
173:*3*
**operation** 36:*13*
42:*2* 84:*6* 111:*22*

**operations** 50:*12*, *13* 57:*3*
**Operators** 22:*23* 48:*10*, *10*
**opinion** 36:*12* 37:*10* 38:*9*, *14* 39:*1* 40:*17*, *22* 41:*9*, *12* 43:*6* 44:*3*, *11* 55:*3* 136:*6* 208:*12*, *19*, *23* 210:*13* 211:*11*, *16* 212:*3*, *6*, *7*
**opinions** 11:*15* 55:*16* 56:*1* 209:*20*
**opportunity** 61:*7*
**opposed** 67:*1* 75:*15*
**oral** 3:*23* 9:*8*
**Order** 7:*16* 60:*8*, *11* 182:*19* 207:*8* 208:*8*, *11*, *14*, *16*, *20* 209:*1*
**organic** 41:*7*
**organized** 60:*9*
**origin** 62:*17*, *18* 67:*16*
**original** 3:*23* 12:*10* 45:*11* 60:*14* 63:*3* 83:*8* 84:*17* 86:*20* 96:*21* 116:*1* 121:*6* 123:*15* 127:*13* 128:*8* 129:*19* 131:*3* 133:*18* 136:*11* 140:*13* 145:*1* 146:*1* 147:*7* 157:*16* 160:*2* 162:*15* 167:*18* 168:*2* 177:*9* 180:*9* 181:*14* 183:*3* 184:*18* 186:*21* 187:*16* 191:*19* 194:*7* 196:*12* 202:*20* 208:*5* 209:*11* 210:*20*
**originally** 14:*3* 119:*23*
**OSM** 194:*3*
**outcome** 34:*8* 39:*10* 43:*17*

**outfall** 152:*13*, *21* 210:*1*, *2*
**outfalls** 210:*1*
**outflow** 194:*14*
**outlet** 69:*11*
**Outline** 6:*21* 181:*4*
**outlined** 125:*20* 147:*22*
**outside** 61:*13*
**outskirts** 40:*21*
**overall** 185:*7*
**overburden** 66:*14*, *16*, *18*
**overtopped** 140:*3*

**< P >**
**P.E** 16:*4* 17:*16*
**p.m** 212:*13*
**PAGE** 8:*2* 13:*13* 31:*13* 35:*10* 38:*4* 47:*10* 52:*6*, *7* 53:*20* 67:*22* 68:*11*, *11*, *18* 73:*14* 99:*2* 100:*17* 101:*9*, *10* 117:*5* 119:*11*, *17* 120:*6* 122:*8* 123:*23* 124:*2* 136:*20* 137:*2* 141:*6*, *20* 148:*12* 149:*5*, *18* 150:*21*, *23* 151:*3*, *10*, *14*, *19*, *22* 152:*3* 164:*12*, *17*, *23* 165:*12*, *19*, *21*, *22* 168:*18*, *19* 169:*1*, *15* 170:*5*, *6* 171:*7*, *18*, *20*, *22* 178:*3* 180:*14*, *14* 181:*19* 182:*2*, *12* 183:*8*, *19* 184:*20* 187:*5* 188:*5*, *6* 189:*12* 190:*13*, *16* 196:*21*, *22* 197:*12*, *17* 198:*17* 199:*11* 200:*8*, *17* 201:*1*, *20*, *23* 202:*11* 204:*17* 205:*14*, *16* 206:*6*, *7*
**page-for-page** 203:*12*

**pages** 53:*10* 158:*2* 185:*9* 198:*22* 204:*7*
**paid** 167:*14*
**paragraph** 21:*1* 47:*18* 120:*7* 125:*23* 126:*10* 128:*15*, *16* 130:*4* 131:*7* 132:*6* 138:*22* 141:*6*, *12* 142:*20* 154:*14* 160:*8* 161:*3* 164:*17* 170:*5* 186:*7* 188:*6* 194:*11*, *12* 195:*11* 196:*4* 197:*21* 198:*17* 206:*7*
**paragraphs** 169:*12*
**parallel** 84:*2* 85:*6* 101:*23* 114:*8*, *13*, *19* 187:*6*
**parameters** 190:*22* 193:*19*
**Pardon** 191:*10*
**part** 10:*10*, *11* 14:*18* 15:*14* 17:*21* 21:*3* 26:*7* 36:*15* 43:*13* 59:*17* 71:*9* 72:*11* 74:*9*, *22* 84:*12* 86:*6*, *20* 89:*23* 94:*4* 95:*20* 96:*6*, *6*, *7*, *10* 111:*10*, *11* 120:*1* 122:*9*, *11* 126:*12*, *14* 127:*23* 131:*8*, *21* 139:*1*, *12*, *14* 145:*9*, *11* 146:*16* 149:*3* 154:*16* 156:*2* 158:*17* 160:*10* 161:*7*, *15* 163:*16* 171:*3*, *23* 173:*19* 174:*9* 177:*11* 178:*9* 180:*2*, *13* 188:*9* 192:*5*, *17*, *20* 195:*9* 196:*6* 205:*20* 206:*9* 207:*9*
**particular** 15:*6* 38:*1* 50:*7* 68:*15*, *17* 72:*2*, *15* 95:*9*

125:*4* 148:*21* 182:*15* 188:*21* 189:*9*
**particularly** 26:*6* 210:*1*
**parties** 2:*3* 3:*12* 34:*7* 213:*14*
**parts** 65:*23* 94:*22* 106:*9* 171:*14* 180:*1*
**path** 87:*17* 92:*4*, *15*
**pattern** 84:*21*
**peer** 26:*20*, *22*
**PELA** 5:*3*, *5*, *14*, *17*, *19*, *21*, *23* 6:*2*, *3*, *5*, *9*, *12*, *13*, *21* 7:*1*, *2*, *3*, *4*, *13* 12:*19*, *21*, *22*, *23* 13:*1*, *5*, *8* 23:*6*, *14* 24:*5*, *10*, *22* 25:*20* 26:*3*, *9* 27:*13* 49:*4* 54:*13*, *16*, *20*, *23* 57:*5*, *22* 60:*18* 69:*20*, *23* 77:*1* 81:*6*, *20* 85:*12*, *18* 86:*2* 97:*4* 100:*17* 107:*22* 115:*9* 121:*20* 124:*6* 125:*4*, *17* 127:*19* 128:*2*, *13* 129:*4*, *21* 130:*8*, *11*, *14* 133:*20* 134:*11*, *15*, *20* 135:*22* 138:*13* 140:*14*, *21* 143:*20* 145:*11* 146:*3* 151:*15* 160:*4* 163:*18* 166:*23* 167:*12*, *14* 168:*1*, *15* 171:*8* 172:*4* 176:*9*, *11* 177:*10*, *21* 178:*4*, *15* 180:*11* 201:*8* 203:*7*, *17* 205:*20*
**PELA-owned** 130:*22*
**PELA's** 20:*10* 76:*3* 81:*12*, *17* 107:*20* 119:*9*

130:*15*  154:*5*
**PELLA**  12:*21, 22*
**pen**  64:*4*  87:*11, 21*
  92:*3*  99:*11*  101:*7*
  108:*17*  111:*14*
**pending**  10:*6*
**people**  11:*23*
  82:*15*  186:*13, 17*
**percent**  28:*12, 15,*
  *23*  29:*2, 3*  155:*20*
**percentage**  27:*23*
  28:*2, 19*
**percolation**  201:*22*
  202:*5*
**perform**  23:*6, 15*
  24:*6*  27:*12*  56:*19*
  127:*19*  154:*18*
  155:*2*  160:*18*
  167:*12*
**performed**  22:*5*
  67:*15*  127:*22*
  155:*14*  176:*21*
**performing**  134:*1*
**period**  10:*17*  23:*5*
  24:*5, 21*  104:*2*
  125:*11*  133:*23*
  195:*2*
**periodically**  142:*11*
  162:*5*
**permanent**  145:*7,*
  *12*
**Permeability**
  137:*23*  138:*15*
**permeable**  137:*22*
**Permit**  6:*16, 19*
  7:*18, 20*  21:*9*
  25:*10*  135:*9, 10, 11,*
  *18*  152:*7, 12, 21*
  153:*8, 10, 12, 23*
  154:*6*  167:*22*
  168:*2, 8, 10, 13, 16*
  171:*4*  175:*19*
  176:*4, 13, 23*
  183:*14*  185:*8*
  186:*1*  193:*1, 6, 12,*
  *14*  194:*14*  195:*5,*
  *14, 22*
**permits**  153:*11*
  175:*15, 21*  192:*7*

**permitted**  22:*20*
  176:*2*
**permitting**  22:*14,*
  *21*  24:*1*  173:*2*
  177:*2*  212:*1, 2*
**person**  59:*8*
**personal**  12:*1*
  120:*13*
**personally**  27:*20*
  51:*22*  134:*1*
**personnel**  185:*16*
**perspective**  209:*6, 8*
**pertaining**  168:*9*
**pesticides**  41:*6*
  44:*23*
**PG**  5:*2*
**pH**  122:*16*  123:*9,*
  *10*  143:*7, 11, 18*
  144:*16, 16*  154:*8*
  158:*4, 9, 13, 23*
  159:*7*  189:*22*
  190:*3, 6*  193:*17*
  201:*5, 8*  204:*12*
**phase**  19:*11*  41:*20*
**Philip**  124:*20*
**phone**  73:*9*
**photo**  17:*2, 4, 13*
  18:*3*  62:*13*  64:*6, 7*
  67:*23*  68:*4, 13, 16,*
  *19*  71:*8*  73:*15*
  74:*1, 9*  77:*14*
  79:*13*  86:*9*  101:*3,*
  *11, 18, 20*  102:*1*
**photograph**  5:*9*
  67:*9*  68:*2*  101:*16*
**Photographs**  5:*5*
  60:*6, 7, 16*  61:*8*
  63:*7*  119:*9*  135:*16*
**photography**  17:*8,*
  *17*  72:*9*  82:*22*
  97:*10*  100:*20*
  102:*22*
**photos**  5:*4*  18:*4*
  60:*20*  61:*21*  72:*1,*
  *4, 4*  73:*12*  74:*12,*
  *14, 15*  75:*4*  77:*4*
  78:*12, 22*  80:*4, 15*
  97:*1, 9*  119:*7*
  120:*15*
**physical**  100:*6*

**physically**  148:*14*
  186:*2*
**picked**  202:*5*
**picture**  73:*22*
  76:*16*  119:*12, 17*
**pictures**  5:*7*  75:*7*
  77:*6*  78:*19, 21*
  118:*23*  119:*3*
  135:*7*
**piecing**  95:*6*
**pile**  62:*21, 23*
  64:*13*  66:*4, 19*
  117:*16*  119:*12, 18*
  120:*3*  158:*20*
**piles**  64:*16*
**pine**  59:*19*  62:*5*
  72:*2, 15*  74:*13, 17,*
  *18*  93:*12, 12, 19*
  118:*10, 13, 15, 17*
**pines**  118:*13, 20*
**pinpoint**  69:*15*
**pipe**  78:*21*  79:*10,*
  *12, 14*  103:*19*
**pipeline**  39:*6*
**pit**  158:*17*  174:*3*
**pits**  144:*14*
**Place**  8:*21*  38:*1*
  89:*9, 11*  101:*23*
  108:*20*  142:*10*
  152:*8*
**placed**  65:*21*
  66:*19*  104:*3, 9*
  119:*23*  173:*20, 20*
  174:*4*
**placement**  65:*22*
  76:*1*  79:*9*  82:*2*
**places**  31:*21*  75:*21*
  84:*18*  184:*8*
**PLAINTIFF**  1:*6*
  8:*15, 19*  38:*22, 23*
  39:*13*  40:*10, 11*
  42:*22*  43:*1*  44:*13,*
  *15*
**plaintiffs**  31:*7*
  44:*16*
**Plaintiff's**  12:*8*
  45:*9*  60:*12*  63:*1, 5*
  83:*6*  93:*5*  96:*19*
  115:*22*  121:*4*
  123:*13*  127:*11*

128:*6*  129:*17*
131:*1*  133:*16*
136:*9*  140:*11*
144:*22*  145:*22*
147:*5*  157:*14*
159:*23*  160:*4*
162:*13*  167:*16*
177:*7*  180:*7*
181:*12*  183:*1*
184:*16*  186:*19*
187:*14*  191:*17, 20*
194:*5*  196:*10*
202:*18*  208:*3*
209:*9*  210:*18*
**plan**  169:*13*  172:*4*
  173:*22*  181:*4, 5*
**planned**  172:*23*
**planning**  81:*12*
  182:*10*
**planted**  118:*12*
**plateau**  118:*2*
**play**  69:*20*  107:*22*
  136:*19*  187:*18*
**Please**  4:*3*  9:*22*
  12:*6*  47:*11*  52:*7*
  53:*20*  88:*21*  92:*8*
  99:*18, 21*  133:*19*
  147:*10*  165:*1*
  183:*4*  192:*15*
  203:*2*
**point**  94:*2*  108:*12*
  109:*6*  110:*3*  112:*2*
  118:*4*  121:*22*
  134:*8*  149:*23*
  150:*2, 7*  153:*5, 13*
  162:*11*  163:*12*
  185:*19*  191:*6*
  194:*8*  197:*1, 10*
**pointing**  98:*13*
  132:*4*
**points**  176:*18, 19*
  188:*2*
**policy**  23:*8*
**polluting**  34:*4*
**pollution**  21:*20*
**pond**  59:*16, 16*
  67:*8, 17*  69:*7, 8*
  89:*14, 19, 20, 23*
  90:*17*  91:*4*  104:*10*
  105:*17, 23*  113:*23*

115:2, 6  132:14, 15, 19, 20  150:13  152:18  160:9, 18  161:13, 21  162:6  166:13  194:22  210:2

**ponds**  90:1, 7, 9  92:1  93:17  95:15, 16  100:12  105:17  131:12  132:12, 13  139:23  170:23

**poor**  101:11

**porcelain**  142:9

**porosity**  155:19

**portals**  144:11

**portion**  68:23

**portions**  59:18  207:23

**position**  16:1  26:9, 13  73:4

**positive**  59:12  61:16

**possession**  134:22

**possibility**  106:7

**possible**  192:7

**possibly**  26:7  66:3  83:2  122:17  129:15  171:15  178:21  187:12, 13  193:1

**post**  64:17  65:16, 18  66:9  67:10  72:22  77:20, 23  79:14, 16  80:11, 20  82:3  96:2  107:17  109:22  113:17  170:7  172:17  174:13  178:23  179:5, 6, 7, 12  193:11, 21  197:2  199:4, 18, 21  200:1, 4, 6, 11, 16

**postgraduate**  15:2

**potential**  21:19  41:2  50:4  51:19  82:2  146:8  183:21

**potentially**  95:1  132:1

**Potter**  44:14  45:18  46:11, 18

**Pottsville**  73:16, 21  75:8, 18, 19  84:16  90:13  137:14  185:6

**Powell**  134:14  171:17

**Power**  48:17  49:6

**pre**  77:23

**pre-capping**  178:22

**precipitation**  156:1, 13

**precise**  63:22

**precisely**  78:11  112:23

**pre-GPS**  164:3

**pre-law**  64:17, 23  65:3, 5, 19  66:1, 4, 11  67:10  77:12, 13, 19  79:17, 18  80:20  82:5  91:22  96:2  98:12, 15  107:13  108:8  109:22  110:18, 23  112:4, 6, 13  113:11  114:20  117:16  119:12, 18  121:2  172:17  174:15, 18, 20, 22  175:18  176:3  179:8, 9, 12, 17, 20  190:17, 19  193:11  197:23  198:11  199:7, 18  200:1, 5, 7  206:12

**preparation**  53:14  57:15  196:16  202:22

**prepare**  63:11  83:14  116:18  134:5

**prepared**  58:5  63:14  79:9, 20  149:9, 10

**preparing**  28:23  46:20  97:6  121:11  134:5  136:16  187:19  191:23

**presence**  195:22

**present**  26:9  139:10

**presented**  201:18

**presenting**  161:18

**Preserve**  36:15

**president**  26:10

**pretty**  20:16  77:7  98:5  118:14

**prevent**  80:19

**previous**  35:17  45:14  137:10  148:2, 6  149:1

**primarily**  26:17  27:18  56:14  62:14  82:8

**primary**  89:6

**print**  97:21  213:9

**prior**  3:14  30:14  34:22  68:13  209:18  211:2

**private**  39:22

**Probably**  24:20  25:13  28:12  29:2  49:13  50:19  62:23  103:8  131:16  134:7  136:22

**Problem**  5:16  100:4  143:3

**problems**  146:9

**Procedure**  3:20  9:5  208:11

**procedures**  212:8

**proceedings**  9:9  213:7, 12

**process**  19:7  55:22  66:20  70:13  81:12  107:22  111:5  139:3  185:15  187:8  190:15

**processes**  19:23  139:15, 18

**Processing**  6:17, 20  168:21

**processor**  13:10  56:14

**produce**  55:7

**produced**  41:5  60:17  97:2  119:4  134:18  135:14

**producing**  206:22

**production**  53:9, 12  116:11

**professional**  16:5, 8  18:6, 14, 23

**professionals**  16:14  18:19  20:8  49:22

**professor**  17:6  31:10

**program**  15:7  18:10  22:23  49:19  50:4, 20, 21  51:5, 12  171:23  172:8  178:5, 9  201:17  205:21

**programs**  51:1

**progress**  5:22  63:16  129:23  133:22  134:6  135:8  137:11  141:4  201:15

**prohibit**  182:16

**Project**  6:11  20:18, 21  21:16  25:7  52:1  55:5  69:6, 17  93:21  97:16  109:1  125:1, 3, 4, 15  127:4  130:2  132:3  134:2  140:22

**projects**  17:14, 17  21:5  23:9, 21, 22  26:17  28:11  37:22  51:22  55:5  186:13

**pronounce**  12:21  124:12

**proper**  88:15

**properly**  82:4  160:19  162:6

**properties**  20:1  44:23  51:1

**property**  33:19  34:4  36:16  37:13  38:17  39:5, 18, 20  72:15  84:9

**proposal**  125:20  128:13

**Proposed**  6:21  36:13  46:4  128:21  129:5, 8, 10

**Protection**  38:12

**prove**  166:11

**Lois George** 236

**provide** 55:2, 4 57:12 85:16 135:18 168:15
**provided** 5:10 9:4 32:6, 9 52:11 135:12 201:16 203:19 210:6 211:5
**Providing** 26:23 27:16
**proximity** 74:21 104:10
**Public** 2:6 9:3 38:12 43:6 48:1, 3, 4, 15 49:3, 5
**published** 205:23
**pulled** 49:23 56:20
**pumping** 38:14 106:8 159:20
**punish** 11:19
**purged** 37:21
**purpose** 70:23 71:3 80:17 81:1 90:7 131:19 141:2 147:1 173:6 179:3 181:9 187:3
**purposes** 86:14
**pursuant** 55:17
**put** 17:20, 23 28:8 31:19 48:8 50:23 51:4, 17 64:9 80:14 84:6 107:1 142:6 158:6 159:18 166:23
**PX-1** 5:3
**PX-10** 5:13
**PX-11** 5:14
**PX-12** 5:17
**PX-13** 5:19
**PX-14** 5:21
**PX-15** 5:23
**PX-16** 6:2
**PX-17** 6:3
**PX-18** 6:5
**PX-19** 6:7
**PX-2** 5:4
**PX-20** 6:9
**PX-21** 6:10
**PX-22** 6:12

**PX-23** 6:13
**PX-24** 6:14
**PX-25** 6:16
**PX-26** 6:18
**PX-27** 6:21
**PX-28** 7:1
**PX-29** 7:2
**PX-3** 5:5
**PX-30** 7:3
**PX-31** 7:4
**PX-32** 7:5
**PX-33** 7:7
**PX-34** 7:10
**PX-35** 7:12
**PX-36** 7:14
**PX-37** 7:16
**PX-38** 7:17
**PX-39** 7:19
**PX-4** 5:6
**PX-5** 5:7
**PX-6** 5:8
**PX-7** 5:9
**PX-8** 5:10
**PX-9** 5:11
**pyritic** 184:10

**< Q >**
**Qualifications** 47:13, 19 49:17
**qualified** 44:2
**Quality** 7:15 21:2 22:3 25:4 101:11 146:9 151:2 199:17 203:5
**question** 23:4 35:7 52:14 58:16 85:3 89:8 94:21 97:19 102:19 104:13 105:23 109:21 116:6 119:6 141:11 145:6, 16 157:13 167:2 176:3, 10 207:5, 14 208:10
**questions** 3:10, 11 55:11 93:1, 3 171:19 177:14 213:8
**quick** 102:8

**quite** 42:4 72:5 90:23 156:13
**quote** 64:23 132:8 142:21 177:18 194:14
**quotes** 132:1

**< R >**
**rain** 182:11 186:5
**rainfall** 138:23 156:10, 22 159:5 162:10
**raining** 68:9
**rains** 126:6
**raised** 105:14
**RAM** 51:8, 13
**R-A-M** 51:9
**ran** 86:21
**Randy** 173:11
**range** 41:5 102:14 193:23
**rate** 29:9 54:19 56:8
**rates** 54:1
**ravine** 76:19
**RBCA** 50:16
**Rdavis@starneslaw. com** 8:23
**read** 9:16 97:20 99:9 141:5 169:1, 19 188:7
**reading** 3:2 149:13 201:6 204:21 205:12
**readings** 142:11
**real** 102:8 142:16
**really** 11:21 17:14 57:23 64:8 72:5, 12 73:2, 4, 5 89:1 92:11 94:10, 14, 23 104:20 109:11 113:2 128:11 134:3 143:23 144:4 148:23 150:5 170:2, 4 191:12, 14 192:18, 21
**realm** 57:19
**reason** 12:2 19:3 53:8 68:15 115:16

141:9 146:17 171:5 172:19 173:1 208:13
**reasonable** 57:11 58:3
**Rebuttal** 5:6 31:12 57:20 58:16, 18
**recall** 22:15 32:18 34:1 41:7 43:12 48:9 50:10 51:10 70:1 80:2 86:4, 5 91:14 103:22 109:4 116:11, 14 117:10 118:6 121:15, 17 123:12 124:5 130:1, 5 134:14 142:3, 5 143:14 150:13, 14 152:20 159:10, 15 160:12, 13, 15 162:1 163:3 172:3 181:16 182:17, 21 183:9 185:13 189:11 190:3, 5, 9, 12 193:23 198:13
**recap** 178:6
**received** 101:15
**recharge** 126:2 138:23 139:21 140:5 207:11
**reciprocity** 55:9
**reclaimed** 106:17 107:17 170:14 173:18 193:3 195:15
**reclaiming** 169:13
**reclamation** 25:20, 21 26:3 78:17 170:7 174:7, 14 197:1 212:4
**recognize** 47:7 135:21
**recollect** 211:10
**recollection** 11:17 63:18, 20, 22 74:2 76:12 81:10 95:22 115:12 116:15 122:7 123:4 124:17 128:5

161:*23*  163:*8*
175:*21*  179:*1*
180:*2*  192:*23*
210:*10*
**recommendation**
159:*12, 17*  175:*12*
**recommendations**
70:2  81:*18, 23*
82:6, *13*  85:*16*
86:2  181:*23*
182:*12*
**recommended**
69:*23*  182:*16*
**reconfigured**  109:*2*
**Record**  6:*10*  9:22
48:*21*  60:*17*  61:2
86:*14*  92:21
119:*10*  128:*11*
135:*19*  141:*1*
145:2  147:9  167:*8*
181:6  187:*21*
203:2
**recorders**  186:*5*
**records**  11:*16*
134:*21*  156:*5*
**recount**  23:*11*
**recounting**  192:6
**recovering**  66:*10*
**recovery**  41:*19*
**red**  64:*4*  87:*11*
92:*3*, *12*, *15*  93:*23*
99:*11*  101:*7*
**reduce**  139:*20*
**reduced**  213:9
**refer**  31:*4*  34:*19*
59:*15*  62:*1*, *3*  63:6
64:*13*  65:*15*  66:*12*,
*21*  67:*3*  69:*5*
76:*18*  80:*7*  88:*13*
105:9  116:*3*
121:*19*  147:*20*
148:*3*
**reference**  53:*4*
56:*20*  72:*14*  75:*23*
76:*13*  86:*14*  89:*3*
96:*16*  106:*10, 16*
115:*11*  123:*18*
126:*16*  131:6, *10*
136:8  137:*14*
144:*15*  147:*20*

149:2  162:*18*
164:22  167:*21*
168:*20, 22, 23*
181:*7, 9*  182:*15*
188:*1*  192:*14*
202:*15*  206:*17*
208:*8*  209:*4, 14*
210:*16*
**referenced**  103:*3*
170:*16*  208:*7*
209:*14*
**references**  18:*18*
19:*9*  31:*5, 11, 16*
52:*5*  137:*1*
**referred**  66:22
69:*1*  76:*11*  77:2
89:*14*  91:*18*
106:*17*  108:9
114:6, *13*  117:*7*
127:*8*, *18*  137:*16*
144:*16*  154:*7*
163:*19*
**referring**  13:*3*
23:*10*  67:*11*  70:22
76:*3*  86:*7*, *11*
108:*12*  112:*12*
121:*1*  122:*14*
126:*18*  128:*20*
132:9  137:*18*
142:*17*  143:*1*
145:*15*  148:22
149:*16, 22*  170:*17*,
*21*  177:*19*  190:*21*
193:*8*  194:2
**refers**  70:*19*
147:22  158:*18*
192:*12*
**refuse**  62:*18, 21, 23*
64:*12*, *13*, *14*  65:*1*,
*22*  66:*11*, *15*, *21*, *22*
74:*16*  90:*12*, *17*, *19*
95:*23*  96:*4*  106:*21*
108:*3*  110:*11*
120:*3*  169:*8*
190:*17*, *19*  198:*11*
206:*12*  207:*12*, *13*
**regard**  40:*3*  57:*20*
86:*3*  93:22

**regarding**  26:*23*
50:*3*  173:*13*
192:*20*  211:*21*
**Regardless**  184:*7*
**regional**  51:*16*
**registrations**  16:*6*
**Registry**  20:*8*
**regraded**  120:*21*
**regs**  177:*3*
**regulations**  19:*23*
81:*2, 3, 4*
**regulators**  162:*23*
163:6  166:*21*
**regulatory**  20:*20*
127:*1, 7*  173:*2*
175:*1*  211:*21*
**relate**  115:*8*  157:6
158:*19*  205:*17*
**related**  40:*19, 22*
75:*18*  146:22
152:*13*  156:*1*
159:*19*  179:*4*
192:*19*
**relates**  145:*4*
194:*10*  211:*19*
**relating**  3:6
**relation**  149:*19*
**relative**  19:22
79:*10*  106:6
137:*23*  138:*7*
162:*9*  186:*5*
**release**  210:*14*
212:*4*
**released**  211:*1*
**releases**  212:*1*
**releasing**  209:*16*
**relied**  97:*8*  136:*5*
**remaining**  210:*1*
**remarkable**  118:*9*
**remedial**  41:2, *17*
**remediation**  26:*19*
40:*20*  41:*11, 14*
42:*3*
**remember**  17:22
18:*11, 12*  22:*3, 10,*
*17*  23:*3*  36:22
104:*12, 20*  105:*13*
109:6, *11, 12, 15*
111:*21*  114:*10*
116:*3*  117:2  123:*7*

131:*10*  135:*23*
140:*8*  142:*8*
147:*13, 14, 15*
161:*18*  163:*5, 23*
173:*15*  179:*2*
185:*17*  189:*5*
191:*1*  195:*23*
196:*1, 2*
**remembered**  61:*10,*
*12*
**remote**  17:*21*  18:*4*
162:*5*
**removed**  66:*18*
139:*17*  162:*3*
**rendered**  37:*10*
38:*10*
**repaired**  105:*7*
**repeat**  117:*18*
**rephrase**  132:*23*
**Report**  5:*3*, 6, *12*
7:*13*  10:*20*  11:*15*
12:*14, 16*  13:*11*
31:*3, 5, 7, 8, 9, 10,*
*10, 12, 12, 14*  33:*12,*
*15*  35:*10*  36:*1*
38:*4*  40:*4, 5, 6, 8,*
*12*  44:*17*  46:*20*
47:*10*  48:*8, 18*
52:6, *16, 21*  53:*6,*
*15, 18, 21*  56:*1*
57:*15, 21*  58:6, *12,*
*16, 18, 19*  97:*6*
115:*11*  123:*19, 20*
131:*7*  135:*5*  136:*4,*
*6*  137:*1*  162:*19*
165:*11*  177:*23*
181:*8, 10*  191:*4, 14*
196:*16, 18*  201:*11*
202:*15*  203:*3, 7*
208:*8*  209:*15*
210:*8, 11*  211:*8*
**Reporter**  4:*4*  9:*1,*
*15*
**reporting**  191:*15*
201:*9*
**reports**  27:*1*  37:*23*
38:*3*  42:*13*  48:*19*
55:*19, 21*  63:*17*
80:*10*  134:*5, 6*

**Lois George** 238

135:8 137:11
197:5 201:15
204:8
**report-writing**
14:14 20:18
**represent** 164:16
**representation**
207:21
**representative** 64:9
**represented** 134:19
**represents** 19:21
213:10
**reproduced** 166:4
**request** 167:4
**requested** 167:11
210:23
**require** 55:23
**required** 19:12
175:15 193:6, 7, 9
195:4
**requirement**
122:18 152:11
175:1 183:13
195:5 211:2
**requirements** 22:14
173:2 177:3
209:17
**requiring** 194:13
**reroute** 147:2
**research** 15:16
145:21
**reserved** 3:3
**residence** 39:22
**resistant** 73:21
**resolution** 41:22
**resource** 26:20
**resources** 15:22
16:22
**respective** 2:3
**responded** 159:10
**response** 122:1
159:15 161:19
**responsibilities**
209:23
**responsibility**
33:17, 18
**responsible** 34:7
43:14
**rest** 166:15 174:20
199:6

**result** 21:21 167:6
169:21 177:14
182:6 213:15
**results** 143:10
144:3 151:14
187:22 191:16
202:11
**resume** 13:12, 15
14:22 16:5 17:18
18:5 20:9, 17
**retained** 4:4 5:7
10:8, 12, 13 11:7
29:13 30:15, 21
33:20 36:18 38:18,
22 39:13 40:10
42:22 44:14 47:23
49:3 54:17 55:1
97:12, 15 209:18
211:3
**retainer** 54:4
**retention** 11:5
55:17 161:6, 11
**retired** 59:12
61:16 134:15
**revegetate** 170:9
**revegetated** 170:12
**review** 27:1 30:9
31:6, 11 32:3 46:9
55:4 124:15
152:12, 23 153:8
168:6 181:8
**reviewed** 29:18, 22
30:2 31:2 123:19
171:16
**reviewing** 52:15
81:10 116:18
197:6
**reviews** 26:20, 22
**revisions** 50:4
**Richard** 7:11 8:20
32:10, 10, 11 98:20
140:16
**ridge** 99:8
**rig** 128:23 129:2
**Right** 10:15 13:13
22:11 27:14 28:10
35:15, 16 37:7
40:13 43:15 48:23
51:13 52:22 56:1
68:4 71:15 88:20

91:17 92:3 95:4
107:15 108:13
110:16, 17 112:19,
20 114:12, 14
116:22 117:3
123:20 124:22
132:22 133:7
137:4 139:19
140:6 157:2, 5, 8,
12 161:3, 9 165:2
166:5 169:9, 11
181:1, 5, 20 186:18
187:7, 10 188:23
189:18 195:6
199:1, 9, 22 200:2,
21 202:12 204:9,
11, 20, 21 205:10
206:23 207:2
210:4
**right-hand** 76:15
**riprap** 68:22
70:10, 15 104:3
**risk** 50:23 51:6, 14,
15
**risk-based** 50:15, 21
**River** 33:19 39:19
86:10 104:5
142:15 161:14
164:4 166:16, 17,
18
**RIVERKEEPER**
1:5 8:17 10:6
29:23 209:2
210:15
**road** 77:19, 22
91:15, 21 92:4, 16
94:11 100:13
109:5, 5
**roads** 176:1
**Roadway** 43:7, 9,
19
**Rock** 5:15, 18 6:1,
6, 11, 15, 23 7:5, 12,
14 21:8 59:20
62:18, 21 64:12, 13
66:15, 21 70:10
74:16 80:21 91:19,
20 92:16 93:2
99:5 100:23 101:2
106:21 109:16

110:11 126:13
128:23 152:8, 22
153:7 158:19
163:16 167:10
173:3 176:1, 4
183:9, 17 193:10,
14 196:19 203:4
206:12 207:12, 14
**Rodger** 38:7, 17
**role** 69:20 107:22
136:19 187:18
**Ronnie** 7:7
**rope** 164:4
**Roughly** 24:3
28:19 125:7
**row** 48:1
**rubble** 126:1
**Rule** 3:19 9:5
**ruled-off** 142:9
**rules** 3:6, 20 9:5
55:23
**runoff** 37:12
77:11 79:14 80:23
83:22 94:5 108:22
110:8 112:4
113:16, 19 114:20,
22 117:6 126:7
133:2 143:9, 13
145:8, 13 147:2
150:20 159:5
172:3, 9, 16 173:7
**runs** 125:13

**< S >**
**SAITH** 212:14
**sales** 48:13
**Sam** 5:11
**sample** 151:9, 14,
20 152:4 185:20
188:7, 21 190:7
200:18 201:5
205:4, 13
**sampled** 150:17
**samples** 130:5, 13,
19 143:20 150:15
151:4 183:9, 9
184:11 186:3
191:8 205:18, 20
206:2

sampling 67:15 130:8, 9, 10 134:4 139:9 153:5 186:4 187:22 188:2 189:9, 14 190:10 199:21, 23 200:22 201:2, 4
sand 138:11
saplings 118:13
satisfied 208:18, 18 211:21
satisfy 208:14, 15
satisfying 175:14 193:15
saturated 148:9 207:11
saturation 126:9 141:13 207:13
Sauk 42:17 43:4, 10
saw 68:12 90:18 93:10 95:3 100:8 103:7 104:22 105:17 116:15, 18 120:9 182:9 204:9 206:3
saying 29:4 53:3 86:6 99:22 128:20 156:21 179:15, 15 196:1 199:19
says 10:20 21:1 42:18 86:16 99:10 108:8 120:6, 20 122:9 124:14 125:23 126:11 128:17 129:22 132:7 137:6, 12 146:9 147:4 158:10 161:4, 16 164:22 170:8, 13 180:16 182:12 186:7 188:18 190:1, 16 194:14 202:13 205:6 206:11, 14, 18 207:2 208:18
scales 189:4
scanned 203:19
scenarios 157:23

scene 120:10
scheduling 28:14
school 14:5 17:6
science 172:21
scientific 172:19 211:16
scientist 208:12
scientists 49:23
scope 54:13
scratch 93:5
screening 51:16
seam 184:2, 3, 4, 5, 6
Second 2:8 8:13 38:7 117:5 120:6 122:8 128:15 132:6 136:20 141:5 181:19 183:8 187:4 188:5, 6 197:21
Section 31:16 34:21 46:22 47:13 49:17 52:5 66:8 117:5
sediment 62:2 68:6 71:4, 4 85:23 89:11, 13 90:6, 9, 9, 11, 14, 16, 17 91:4 93:16, 17 106:4 113:19 147:2 160:17, 18 162:6
Sedimentation 21:1 22:2 37:12
sediments 140:5 162:2, 5
see 11:16 13:13 21:3 32:1, 17 45:17 46:16 47:14 55:12 62:12 63:14 67:9, 17 72:10 73:15 79:13 84:3, 15 90:14 94:1, 16, 20 95:19 98:1 101:2, 4, 5, 12, 13 102:1, 4 112:12 114:4 121:11, 14 122:11 126:2, 13 131:8 135:21 139:1 145:9 154:15 155:16

156:1 160:10
161:6 164:21
166:7 168:10
171:9, 23 172:5
179:14 180:13
182:2 187:21
188:8 189:17, 19
191:14 196:22
200:19 206:9
seeing 116:11, 14 123:21 130:1 133:14 160:12 181:17
seen 57:8 63:9 87:8 106:10 116:13 121:8, 15 124:7 127:15 136:13 146:4 160:5 168:4 183:5 186:22 191:21 209:17 211:2, 9
seep 75:14
seepage 73:17, 18 75:9
seeps 76:7
Segco 184:2, 5
segregate 80:22 172:2, 5, 9, 16, 17
segregated 85:22
segregating 81:8 173:6
segregation 182:13, 21 191:3
seminar 17:22 18:2
send 140:22
senior 17:12 134:15
sense 11:8 133:13
sensing 17:21 18:4
sent 113:17 151:16
sentence 120:20 129:23 141:6, 8 149:1 161:16 172:7 190:16 192:16
separate 79:17, 17 127:21
separately 11:6

September 196:6 204:15, 18
sequence 95:6 179:3
series 48:18 205:16
serve 71:3
Service 48:1, 5, 15 49:3, 5
services 23:6 24:6 27:12
set 52:12 54:10, 13 55:18, 23 143:9 169:15 181:22
sets 178:4
setting 25:12 46:3 100:6 139:12 142:17
settled 34:9 39:11 42:1 91:1
settlement 160:23
settling-out 85:23 160:19
setup 123:4
Seventh 8:21
severely 120:8, 12, 16
shade 65:12
shale 62:14, 15, 16
shallow 129:1, 11
shallower 179:11 199:14
sheen 75:10
Shelby 36:9
shipped 130:19
shoot 186:14
shoreline 164:20
short 14:12 17:20 61:5 144:20 177:5 212:10
shorter 105:3
shortly 69:19
short-term 48:14
shot 68:12
show 12:11 60:15 63:4 72:14 79:9 83:9, 22 87:11, 12, 16 92:3 96:22 99:5, 12 115:7 118:23 121:7 123:16 127:14

**Lois George**

**240**

140:*14*  145:*2*
147:*8*  162:*16*
166:*11*  191:*20*
194:*9*  196:*13*
202:*21*  209:*12*
210:*21*

**showed**  160:*3*

**showing**  5:*9*
115:*16*  146:*2*

**shown**  54:*1*  72:*19*
79:*23*  80:*8*  83:*17*,
*19, 21*  84:*13*  87:*5*
89:*9*  100:*1*  108:*7*
111:*8*  113:*18*
170:*18*  178:*11, 12,
13*  188:2, *15*  195:*6*
206:*2*

**shows**  79:*5*  84:*1*
114:*11*  125:*19*
131:*14*  149:*11*
165:*3*  166:*14, 16*
198:*22*  202:*8*

**side**  68:*4*  69:*7, 12*
79:*15*  80:*21*  93:*19*
104:*5, 7, 8*  109:*4*
115:*3*  172:*11, 12*

**sign**  9:*17*  163:*20*
164:*10*  183:*7*
187:*2*

**signature**  3:*2*

**signed**  181:*20*
192:*13*

**significance**  72:*3*

**significant**  28:22

**significantly**  43:*11*

**silted**  160:*9*

**siltstone**  62:*16*

**similar**  74:*13*
83:*16*  167:*23*
204:*8*

**similar-type**  18:*21*

**Simon**  7:*11*  195:*12*

**simply**  208:*10*

**Simpson**  59:*7*

**sir**  10:*19*  11:*3*
13:*14*  18:*8*  21:*4*
26:*12*  28:*18*  29:*8*
30:*13*  31:*18*  32:*2*
40:*14, 16*  42:*8, 19*
44:*12*  45:*21*  46:*14*

47:*2*  48:*6*  51:*10*
52:2, *4*  53:*19, 23*
54:*3, 15, 18*  58:*8*
59:*4, 23*  60:*19*
63:*8*  69:22  70:20
71:*7, 16, 19, 21*
77:*15*  80:*2*  85:*19*
87:*10*  89:*15*  93:*8*
97:22  98:*16*
108:*14*  114:*5*
116:*20*  122:5, *12*
126:*15*  131:*9*
136:*18*  138:*21*
139:*2*  151:*1*  152:*2*
156:*3, 18*  163:*4*
164:*15*  168:*7*
169:*11*  171:*13*
173:*17*  175:*4*
181:*21*  184:*23*
185:*3*  188:*10*
189:*16*  196:*23*
197:*16, 20*  198:*1,
12*  202:*17*  204:*15*
206:*10*  211:*14*
212:*6, 9*

**site**  10:*17*  21:22
40:*21, 23*  41:*21*
58:*10, 14, 22*  59:*14*
60:*21*  64:*20*  69:*17*
71:*13*  72:*7, 8*
73:*23*  74:20  75:*15*
78:*14*  79:*1*  82:*19*
84:*6*  85:*14*  86:*16,
17, 21*  87:*9*  89:*5*
91:*16, 18*  93:*3, 15*
94:*19*  99:*23*
100:22  103:*23*
106:*19*  108:*21*
111:*18, 23*  113:*15*
116:*21*  117:*3, 15*
125:6, *7*  142:*13*
143:*3, 21*  145:*13*
146:*9*  147:*3, 20*
149:*18*  151:*4*
152:22  153:*4, 13*
166:*20*  168:*21*
169:*18*  178:*16*
182:*8*  185:*2*
186:*10*  188:*8*
190:*11*  196:*9*

**Sites**  5:*8*  22:*1, 4*
83:*19*  149:*3*  151:*9*
182:*3*  200:*18*
202:*5*

**situation**  209:*5*

**Six**  24:*4, 4*  25:*16*
29:*1*  51:*17*

**six-inch**  173:*20*

**size**  72:*6*

**sizes**  118:*11*

**Skelton**  39:*12*

**skip**  77:*8*

**Slagle**  50:*1*

**slashed**  93:*23*
114:*3*

**slides**  135:*5*

**slightly**  137:*19*
166:*14*

**slope**  103:*5*  110:*5,
10, 11, 15*

**sloped**  110:*12*
173:22, *23*

**sloping**  108:*3*

**slough**  88:*5, 9*
99:*13*  101:*5*
147:22

**slowing**  160:22

**slurry**  67:*2*

**Small**  22:*23*  23:*1*
74:*18*  79:*3*  97:*21*
118:*12, 18*  169:*2*

**Smith**  6:*5*  140:*20*

**sneak**  61:*3*

**so-called**  163:*13*

**software**  51:*12, 21*

**Soil**  39:*3*  41:*15*

**solid**  80:*11*  90:*20*
113:5, *6*

**solids**  85:*23*
122:*17*  160:*19*
161:*12*

**somebody**  32:*20*
188:*20*

**someplace**  165:*4*

**somewhat**  65:*23*
73:*3*

**Sonya**  50:*1*

**sophistication**
141:*23*

**sorry**  16:*12*  17:*20*
18:*11*  22:*9*  23:*2*
31:*1*  32:*21*  34:*2*
52:*13*  55:*6*  79:22
87:*13*  117:*18, 21*
119:*6*  123:*21*
124:*1*  137:*19*
144:*19*  145:*15, 17,
18*  157:*11*  172:*5*
180:*6*  185:*13*
192:*15*  200:*9*
207:*12*

**sort**  26:*17*  41:*4*
81:*23*  102:*2*  134:*1*
150:*17*

**sound**  107:*10*

**sounds**  102:*6*

**source**  43:*8*  75:*15*
138:22

**South**  2:*8*  8:*13, 18*
70:*7*  71:*6*  87:*6, 13*
96:*13*  103:*18, 19*
108:*13*  150:*1, 2*
165:*16*

**SOUTHERN**  1:*2*
2:*7*  8:*11*  194:*23*

**southwest**  110:*13,
14*

**space**  155:*20*

**speak**  209:*5*

**speaks**  197:*14*

**special**  16:*18*
128:22

**specialized**  14:*11*

**specialty**  16:*18*
17:*12*

**specific**  22:*10*
41:*16*  63:*15*  67:*20*
70:*1*  85:*20*  156:*8*
163:22  164:*9, 21*
165:*21*  166:*1, 14*
193:*23*

**specifically**  20:22
37:*16*  50:*10*  82:*1*
97:*15*  119:*16*
129:*7*  154:*8*
163:*23*  165:*6*
167:*9*  195:*21*

**specifics**  196:*2*

specify 180:*3*
spell 24:*14*
spelled-out 20:*16,*
*17*
spent 28:*13, 17*
spillway 69:2
150:*6, 9* 160:*10*
162:*8*
spoil 66:*19* 117:*6,*
*8* 120:*7*
spoken 82:*15, 18*
sponsor 50:*7*
sponsorships 16:*13*
spot 189:*9*
spread 29:*1*
Spring 36:*15*
springboard 146:*17*
square 124:*17*
138:*20, 21*
stack 52:*21* 60:*16*
97:*17* 100:*17*
135:*21* 138:*12*
staff 56:*11, 12, 15*
185:*22* 196:*5*
stage 169:*20*
staking 131:*7*
stamp 52:*10*
stamped 60:*18*
standard 29:*9*
standing 68:*20*
150:*16*
starkly 78:*10*
STARNES 8:*20*
33:*21, 22* 36:*18*
54:*2, 5*
start 31:*16* 88:*1*
92:*10* 136:*20*
started 17:*16*
18:*10* 95:*23*
102:*15* 103:*20*
107:*5* 132:*5*
starting 13:*18*
168:*19* 177:*11*
197:*17* 200:*17*
205:*16*
starts 108:*13*
204:*11*
State 2:*6* 9:*3, 21*
18:*6* 21:*11* 32:*17*
33:*2* 35:*13* 36:*7*

43:*23* 44:*3* 45:2
162:*22* 163:*6*
166:*20* 213:*3*
statement 5:*22*
129:*23* 161:*9*
STATES 1:*1*
18:*20* 19:*5, 14, 16*
50:*22* 51:*6*
station 141:*22*
142:*4, 6, 14* 164:*6,*
*6*
stations 143:*10*
149:*12*
status 93:*2*
stay 60:*11*
steep 98:*10*
stenotype 213:*8*
stereoscopes 17:*9*
stippled 65:*2*
stipples 166:*4*
STIPULATED 2:*2*
3:*1, 8, 16*
stipulation 9:*6*
stipulations 9:*15*
stop 48:*4* 66:*7*
88:*4* 199:*1*
Storage 5:*15* 6:*1,*
*6, 11, 15* 50:*20*
51:*2*
straight 89:*17*
straw 74:*18*
118:*15, 17*
stream 75:*5* 87:*2,*
*5, 9* 88:*7, 19* 93:*7,*
*9, 23* 94:*6, 7, 15, 17*
95:*9, 20* 96:*18*
98:*4, 8* 99:*23*
126:*18* 206:*13, 18,*
*19, 23* 207:*15, 19*
streams 81:*9*
182:*22*
Street 8:*18*
stretched 164:*4*
structure 73:*15*
93:*20* 94:*12*
structures 72:*19*
80:*5*
stuck 91:*14*
studied 17:*7*

studies 21:2 22:*3,*
*13* 47:*20*
Study 5:*20* 6:*1, 6*
sub 148:*17*
subcontractors
20:*19*
subject 33:*14* 77:*5*
subjects 14:*12*
submit 186:*1*
submitted 31:*7*
55:*19* 56:*5* 58:*6,*
*12, 18* 162:*22*
171:*3* 193:*12*
subsequent 110:*12*
125:*18* 151:*20*
208:*16* 211:*22*
substance 163:*10*
substantial 93:*20*
substitute 14:*17*
subsurface 126:*8*
141:*16, 17*
Sue 29:*23*
sufficiency 66:*10*
sufficient 78:*7*
suggesting 122:*22*
Suite 2:*8* 8:*14*
sulfur 184:*11*
Sulkin 31:*10*
summarizes 178:*1*
summarizing 158:*2*
SUNY 13:*21*
superior 134:*12*
supervise 85:*12*
supervising 134:*17*
supervision 25:*19*
213:*10*
supervisor 85:*15*
134:*12*
Supplement 6:*16,*
*19* 167:*22*
supplemental
193:*14*
supply 38:*13* 43:*6*
support 27:*17*
28:*1* 42:*15* 56:*10,*
*12*
supposed 54:*20*
186:*15* 201:*16*
sure 32:*22* 34:*13,*
*16* 35:*5* 37:*17, 20*

49:*5* 52:*20* 54:*12*
55:*14* 61:2 69:*5*
70:*5* 71:*11, 12*
90:*18, 22* 92:*11*
93:*13* 94:*9, 20, 21*
102:*9* 105:*11*
113:*2, 9* 122:*2, 6*
126:*21* 129:*7*
130:*16, 16* 136:*2*
137:*17* 138:*8*
143:*8, 16* 148:*11*
150:*21* 154:*10*
155:*4* 158:*10, 18*
159:*11* 165:*23*
170:*2, 4, 15, 20*
171:*1* 176:*7, 19*
182:*19* 186:*4*
191:*12* 197:*11*
204:*20* 210:*3*
211:*9, 9*
Surface 7:*6, 13*
21:*10, 15, 19, 20*
22:*19, 22* 25:*5*
26:*6* 48:*9* 66:*17*
67:*11* 68:*5* 81:*4, 4,*
*13* 83:*20* 94:*1, 17*
95:*20* 100:*2*
121:*23* 122:*15, 18*
123:*2* 140:*20*
141:*3, 18, 21* 142:*1,*
*13* 143:*20* 144:*13,*
*14* 147:*2* 149:*15*
150:*14, 17* 154:*12,*
*13* 158:*12* 161:*13*
168:*13* 171:*22*
172:*8, 22, 23*
175:*23* 176:*18*
177:*3* 187:*22*
188:*2, 21* 193:*13*
196:*19* 197:*8*
201:*4, 14* 205:*18,*
*22* 208:*9* 209:*7*
surprised 72:*12*
Survey 15:*17, 23*
17:*10*
suspended 122:*17*
SW-1 74:*3* 187:*23*
205:*8*
SW-2 84:*13* 93:*23*
187:*23* 188:*7, 14*

189:*1, 15, 17, 21*
190:*23*  191:*8*
201:*4*  205:2, *11*
**SW-3**  76:*17*  78:*6,*
*8, 16*  84:*20*  187:*23*
188:*18*  189:*1, 15,*
*17*  190:*6*  191:*8*
**sworn**  9:*12*
**symbology**  87:*4*
88:*7*  99:*7*  165:*23*
166:2
**system**  50:*21*
59:*17, 19*  79:*10*
131:22  137:*12, 13,*
*15*  146:*15*  148:*4, 5,*
*11, 12, 15, 20*
**system,**  142:22
**systems**  144:*13*
190:*14*

**< T >**
**table**  150:*18*
189:*13*  197:*4*
201:*3*  204:*10*
205:*5, 23*  206:*3*
**tables**  205:*17*, 22
206:*1*
**tabulating**  206:*4*
**take**  12:*12*  19:*15*
35:2  49:*11, 14*
60:*6, 7*  61:*1, 21*
89:*1*  92:*3, 6*  99:*11*
102:*8*  108:*17*
111:*6, 14*  120:*4*
131:*4*  138:*4*
142:*11*  143:*20*
158:*4*  169:*18*
180:*10*  181:*15*
185:*19*  189:*13*
196:*14*  205:*4*
**taken**  2:*4*  3:*23*
14:*11*  61:*6*  68:*2*
73:*9*  74:*1*  92:*20*
119:*15*  130:*6*
144:*21*  165:*8*
177:*6*  183:*10*
185:22  190:*2, 9*
191:*4*  205:*20*
212:*11*  213:*7*

**talk**  11:*7*  48:*2*
55:*10*  61:*20*
115:*19*  195:*21*
**talked**  93:*11*
154:*11*  193:22
194:*21*  197:*17*
**talking**  48:22
86:*15, 20*  87:*23*
99:*6, 13*  100:*5, 5*
104:*17*  109:*13*
115:*9*  117:*12*
121:2  132:*11*
138:*14*  139:*13*
142:*21*  169:*10*
197:*21*  206:*7*
**talks**  128:*16*  130:*4*
131:*7*  141:*12, 21*
169:*16*  177:*17*
183:*8*
**tall**  104:*21*
**tank**  39:5  50:*20*
**tanks**  51:2
**tape**  163:*20*
**target**  186:*16*
**task**  67:*20*
**taught**  14:*15*
**teacher**  14:*17*
**technical**  40:*4*
56:*15*  120:*18, 18*
126:*23*  127:*7, 8*
**technology**  142:*7*
**tedious**  12:*4*
**tell**  13:*17*  16:*21*
23:22  26:2  38:*9*
47:22  49:*7, 20*
50:*16*  64:22  67:*23*
68:*18*  73:*5, 23*
77:*5*  78:*13*  80:*5*
84:*20*  88:*16*  89:*6,*
*12*  95:*3*  96:*9*
106:*21*  110:*9*
115:*13, 15*  117:*11*
119:*5, 7*  139:*9*
157:*21*  177:*10*
182:*1*
**temporarily**  164:*5*
**Tennessee**  21:*16,*
*22*  32:*20*
**tense**  197:*15*

**term**  40:*7*  66:*15*
127:*1, 1, 7, 7, 8*
141:*14*  143:*12, 15*
144:*1*
**Termination**  6:*7*
**terminology**  40:*6*
64:*16, 19*  66:*23*
70:*19*  88:*12*  89:*16*
113:*9*  117:*10*
120:*19*
**terms**  28:*20*  54:*10*
64:*17*  72:*18*  96:*13*
103:*10*  123:*8*
195:*23*  204:*9*
**terraced**  174:*1*
**terraces**  110:*7*
**terracing**  78:*17*
**terrain**  73:2
**territory**  103:*9*
**test**  86:*17*  88:2, *3*
115:*17*  128:*18, 22*
129:*1*  138:*17*
**tested**  174:*3*
**testified**  9:*13*
43:*20*  45:*19*  46:*3*
105:*16*  134:*19*
**testify**  33:*10*  36:*5*
45:*6*  46:2
**testifying**  35:*9*
**testimony**  3:*23*
5:*10*  37:*6*  39:*16*
40:*15*  42:*13*  43:2
44:*20*  46:*23*  47:*4*
49:2  53:*16*  70:*6*
99:*21*  175:*17*
213:*11*
**Testing**  59:*11*
61:*17, 19*  83:*21*
138:*13*  139:*8*
**tests**  108:*1*  138:*1*
201:22  202:*5*
**Texas**  15:*13*  51:*8*
**Thank**  11:*18*
14:*21*  22:*12*  31:*6*
35:*6*  46:*21*  49:*16*
64:*11*  92:*13*
102:*10*  116:*5*
120:*4*
**theirs**  85:*11*

**thereto**  3:*15*  213:*8*
**thick**  74:*17*
**thicker**  92:*15*
**thickness**  107:*12*
141:*13*  154:*21*
**thing**  19:*3*  144:*14*
204:*21*  205:*11*
**things**  20:22  25:*3*
27:*13*  62:*3*  64:*4*
94:*12*  95:*7, 7*
104:*9*  111:*7*
115:*20*  125:*12*
137:*9*  182:*10*
186:*14, 14*
**think**  10:*13*  20:*16*
22:*11, 21*  26:*5*
27:*18*  29:*5*  30:*16*
33:*1, 21*  34:22, *23*
50:*11*  64:*14*  70:*12*
72:*17*  73:*1*  74:*21*
75:*16*  76:22  78:*5,*
*9*  82:*10*  83:*15*
84:*12, 20*  87:*15*
88:*14*  95:*13*  96:*15,*
*16*  100:*14*  101:*14*
102:*23*  104:*1, 8*
105:2, *3*  108:*23*
109:*3*  118:22
120:*17*  121:*19*
123:*1, 6*  124:*7*
125:*5, 12, 18*
127:*23*  128:*4*
129:*8, 11*  131:*13*
132:*11*  133:*10, 11*
135:*20*  136:*7, 22*
137:*17*  138:*9*
139:*12*  140:*6*
141:*1*  142:*17*
143:*6*  144:*8, 9, 14*
145:*14, 16*  147:*23*
148:*6, 23*  152:*10*
154:*7, 12, 19*
158:*21*  159:*8*
161:*15, 22*  163:*7*
165:*11*  167:2, *7*
169:*20*  170:*1, 1, 11*
171:*19*  173:*10, 13*
177:*13, 19, 23*
178:*20*  182:*7*
183:*11*  184:*5*

193:*17*  194:*20*
195:*16*  201:*13*
204:*23*  207:*14*
**thinking**  102:*18*
**third**  124:*9*  125:*23*
147:*17*  155:*5, 8, 10*
182:*2*  186:*7*
194:*11*
**thought**  63:*20*
75:*17*  122:*6*
131:*12*  145:*18, 20*
163:*15*  170:*17*
206:*22*
**thousands**  25:*13*
**three**  16:*12, 13*
18:*18*  26:*7*  75:*4*
134:*9*  151:*3, 19, 22*
155:*9*  157:*22*
158:*5*  161:*5*  164:*2*
181:*1*  189:*14*
205:*17*  207:*20*
**threshold**  189:*22*
**thumb**  32:*7*
**thumbed**  30:*4, 11*
**tie**  93:*13*
**time**  3:*13, 13*
10:*17*  12:*12*  15:*11*
18:*17*  19:*10*  24:*5,
21*  25:*4*  27:*23*
28:*8, 12, 16, 20, 20,
22*  29:*3*  42:*5, 9, 16*
44:*9*  49:*12, 14*
50:*22*  53:*14*  58:*1,
5, 17*  61:*1, 5*  63:*23*
64:*1*  66:*2*  67:*21*
68:*8*  72:*9, 9*  79:*20*
81:*14*  90:*5, 5*  91:*3,
14, 17*  92:*19*  94:*5*
96:*1*  99:*23*  100:*2*
103:*16*  104:*10, 10*
106:*22, 23*  110:*3*
111:*6*  112:*2*
113:*14*  120:*22*
121:*18, 22*  123:*10*
124:*23*  125:*10*
126:*22*  129:*3*
130:*17*  131:*21*
133:*23*  134:*8, 13,
14*  139:*23*  144:*20*
148:*8*  150:*3*  152:*7,*

19  156:*13*  161:*6,
11*  162:*10*  163:*12*
169:*18*  174:*8*
175:*2*  177:*4, 5*
178:*19*  185:*19*
187:*5*  190:*5*  191:*2,
3, 6*  192:*11*  205:*3,
12*  212:*10, 12*
**times**  11:*12*  37:*21*
56:*9*  70:*14, 17*
91:*7*  130:*17*  162:*2*
195:*20*
**title**  19:*4*  125:*4*
**titled**  47:*13*  53:*21*
167:*22*
**titration**  158:*1*
**today**  11:*10*  12:*19*
23:*10*  53:*16*  103:*9*
105:*1*  112:*14*
116:*13*  118:*7*
139:*3*  148:*12*
149:*23*  156:*10*
**today's**  57:*4*
**toe**  72:*21*  89:*21*
**told**  49:*12*  61:*9*
121:*22*  173:*9*
**Tom**  7:*1, 4, 7*  59:*7*
82:*11*
**top**  65:*4*  68:*6*
73:*20, 21*  90:*20, 22*
91:*22*  92:*12*  99:*7*
118:*2*  122:*9*  151:*9*
160:*23*  170:*5*
200:*5*
**topic**  194:*10*
**topics**  115:*8*
**topo**  87:*1*  88:*5*
102:*19*  103:*3*
164:*13*
**topographic**  99:*3*
147:*23*  149:*9*
**topographical**  155:*1*
**Topographically**
149:*21*
**topography**  84:*15,
17*  154:*21*
**topos**  98:*19*
**total**  122:*17*
200:*13, 14, 15*
**tracks**  91:*13*

**training**  14:*12, 19*
17:*3*  175:*7*  185:*16*
**transcript**  3:*23*
12:*10*  45:*11*  60:*14*
63:*3*  83:*8*  96:*21*
116:*1*  121:*6*
123:*15*  127:*13*
128:*8*  129:*19*
131:*3*  133:*18*
136:*11*  140:*13*
145:*1*  146:*1*  147:*7*
157:*16*  160:*2*
162:*15*  167:*18*
177:*9*  180:*9*
181:*14*  183:*3*
184:*18*  186:*21*
187:*16*  191:*19*
194:*7*  196:*12*
202:*20*  208:*5*
209:*11*  210:*20*
213:*11*
**transfer**  43:*11*
**transitioned**  81:*15*
**transported**  66:*20*
**travel**  161:*13*
**treat**  158:*7*  159:*6*
**Treating**  32:*18*
33:*4, 23*  34:*3*
35:*14*
**treatment**  41:*20*
145:*7, 12*  158:*3*
159:*2*
**tree**  72:*2, 16*
**treed**  84:*22*
**trees**  72:*6*  73:*5*
74:*13, 17, 18*  77:*13*
118:*11, 19*
**trial**  3:*13*  33:*10*
36:*3, 5*  40:*15*
43:*20*  45:*19, 23, 23*
**tributary**  76:*20, 23*
77:*1, 3*  86:*21*
87:*17*  88:*13*  95:*20*
96:*13*  126:*11, 19*
206:*17*  208:*1*
**tributary,**  126:*22*
**trickle**  68:*7*  73:*17*
**tried**  34:*17*
**trip**  58:*13*  59:*5*
**trucking**  43:*11*

**true**  161:*9, 12*
175:*20*  179:*22*
203:*23*  213:*11*
**trust**  13:*3*
**truthing**  155:*12*
**try**  11:*14*  12:*4*
60:*9*  67:*16*  84:*23*
89:*16*  135:*23*
145:*12*  190:*3*
**trying**  32:*18*  75:*9*
80:*2*  94:*14*  95:*12*
148:*8*  166:*2, 7*
190:*23*  191:*7*
192:*22*  193:*20*
194:*15*  195:*9*
197:*7*
**TTL**  61:*15*  130:*8*
151:*18*
**Tuesday**  7:*9*
**tune**  120:*18*
**turn**  13:*11*  31:*13*
47:*10*  52:*6*  53:*20*
67:*22*  68:*18*  73:*14*
77:*14*  98:*8*  100:*16*
101:*9*  137:*2*  171:*7,
18*  184:*20*  201:*19*
**turned**  125:*20*
129:*12*
**Tuscaloosa**  10:*2*
15:*10*  26:*15*  59:*11*
61:*17*
**twelve-foot**  173:*21*
**two**  35:*9*  46:*9*
55:*18*  74:*15*  80:*23*
85:*21*  86:*8*  89:*8,
11*  90:*7*  92:*1*
95:*15*  131:*12, 13*
132:*12, 13*  133:*7*
134:*9*  154:*20, 23*
155:*4*  170:*11*
174:*1*  180:*23*
182:*22*  185:*9*
189:*18*  191:*8*
193:*15*  198:*21*
199:*18*  200:*3*
207:*18*  211:*22*
**two-and-a-half**
161:*5*
**two-inch**  118:*13*

type 22:5, *15*
types 51:*1*
typical 156:*10, 16*
typically 35:*20*
164:*1*

< U >
Uh-huh 62:*16*
ultimate 43:*17*
ultimately 48:*1*
51:*4* 129:*13*
146:*15* 195:*5*
201:*13* 211:*19, 20*
undergraduate
13:*19* 17:*5*
underground 21:*10*
22:*19, 21* 25:*6*
48:*10* 50:*19* 51:*2*
106:*9* 132:*2*
144:*11* 158:*17*
175:*22* 177:*4*
183:*12, 15*
underlying 206:*3*
underneath 75:*20*
98:*11, 14* 179:*10*
understand 10:*8,*
*16* 45:*14* 46:*21*
52:*20* 55:*22* 65:*7*
74:*6* 80:*1* 87:*20*
94:*20* 95:*4* 109:*21*
137:*3* 156:*19*
176:*10, 17, 19*
179:*14* 205:*18*
understanding
52:*17* 54:*23* 70:*5*
75:*13* 90:*8* 99:*20*
135:*17* 153:*16*
173:*6* 175:*3, 6*
197:*15* 199:*19*
Understood 11:*9*
49:*2* 55:*14* 85:*19*
undertaken 182:*1*
unfortunately
98:*22* 189:*3*
UNITED 1:*1*
University 14:*11,*
*16* 15:*3* 32:*19*
34:*10* 35:*14, 21*
36:*16* 37:*19* 97:*11*
unnamed 88:*13*

update 46:*19*
133:*22*
updated 45:*7, 8, 14*
updates 140:*22*
Up-dip 180:*16*
upgradient 62:*6*
104:*7* 206:*12*
upper 33:*19* 59:*15*
72:*21* 77:*16* 89:*18,*
*20, 23* 90:*1, 14*
91:*4* 93:*12, 19, 19,*
*19* 94:*3* 102:*11*
104:*21* 105:*14, 17*
113:*23* 115:*2, 6*
120:*1* 132:*14, 14,*
*17* 133:*3, 5, 11*
137:*18, 20* 138:*18*
139:*22* 160:*9*
163:*16* 170:*22*
180:*2, 3*
up-slope 132:*15*
137:*20* 139:*6*
Upstate 13:*21*
upstream 104:*8*
use 17:*16* 40:*19*
48:*1* 51:*6, 21* 97:*6*
143:*12* 144:*1*
154:*23* 166:*23*
186:*16*
useful 115:*18*
uses 172:*2*
USGS 87:*1, 4, 8, 18*
88:*4, 15* 94:*16, 18*
96:*15* 97:*18* 98:*5*
100:*1* 134:*15*
142:*14*
Usual 9:*15*
UT 88:*12*

< V >
valley 74:*4* 76:*19*
78:*3* 93:*18* 95:*15*
96:*18* 98:*2, 8*
100:*7, 8, 9* 106:*22*
113:*20* 139:*11, 14*
148:*9* 149:*4*
158:*21, 21, 23*
192:*21* 207:*9, 11*
values 123:*8*

vandalism 186:*13*
vapors 39:*4*
varied 109:*9*
various 14:*12*
118:*11, 14* 133:*22*
144:*2* 183:*12*
vary 28:*13*
vegetated 118:*10*
139:*7* 170:*14*
174:*5*
vegetation 72:*6*
118:*1, 16* 139:*20,*
*22*
vegetative 120:*21*
177:*21*
vehicle 60:*1, 2*
verbally 82:*7*
verdict 45:*22*
version 45:*14*
51:*13* 99:*4*
versus 32:*17, 19, 23*
33:*3* 35:*11, 13*
38:*8* 100:*5, 6*
129:*5* 165:*19*
166:*15*
vice 26:*9*
vicinity 74:*3* 76:*17*
77:*18* 79:*2* 84:*19*
view 55:*2* 59:*13*
Village 42:*17, 17*
43:*4, 4, 10*
Violation 5:*13* 6:*8*
122:*1, 8* 124:*15*
126:*11* 141:*4*
145:*5* 163:*11, 15*
193:*16*
violations 121:*20*
211:*22*
visible 94:*17*
95:*11, 19* 100:*1, 8,*
*10* 111:*11* 112:*14*
113:*3*
visibly 94:*1*
vision 73:*5*
visit 58:*9, 17, 21*
59:*14* 60:*4, 21*
124:*4, 6*
visual 17:*9*
void 155:*20*

volume 105:*20*
106:*1*
volumetric 154:*15*
155:*2*
volumetrics 56:*22*
Volunteer 139:*20*
volunteers 118:*12*
VS 1:*7*

< W >
wait 46:*12*
waived 3:*18*
walk 89:*5*
Walker 22:*7*
walking 77:*17*
want 16:*6* 23:*20*
58:*2* 63:*6* 89:*4*
99:*1* 105:*9* 108:*6*
109:*21* 113:*9*
116:*2* 187:*23*
203:*21* 204:*20*
wanted 55:*13*
122:*6* 129:*3*
145:*19*
WARRIOR 1:*5*
8:*17* 10:*5* 25:*14*
39:*19* 142:*15*
184:*8*
wash-aways 66:*3*
washer 66:*21*
169:*7*
washers 175:*23*
washing 66:*1, 20*
162:*12*
Waste 6:*17, 20*
27:*4* 67:*4, 10* 76:*1*
77:*23* 81:*9* 117:*16*
119:*12, 18* 158:*19*
168:*21* 173:*19*
Water 7:*15* 21:*1,*
*20* 22:*2* 25:*4*
37:*12* 38:*12* 43:*6*
68:*5* 71:*2* 75:*6, 10,*
*11, 12* 81:*14* 83:*20*
90:*5* 93:*16* 95:*16*
100:*5, 12* 106:*3, 7*
130:*4* 131:*23*
132:*1* 138:*4*
141:*16, 21* 142:*2,*
*13, 21* 143:*4, 7, 20*

144:*11, 13, 16*
146:*8*  148:*10, 14,
19*  149:*15*  150:*14,
16, 16, 17*  151:*2*
155:*15, 21*  158:*3, 6,
7, 11, 13, 23*  159:*3,
4, 16, 18, 20*  160:*22*
162:*9*  163:*21*
164:*8*  165:*18*
166:*12*  171:*23*
172:*8*  173:*15*
176:*18*  186:*5*
187:*22*  188:*2, 21*
190:*10*  193:*19*
197:*8*  199:*16, 17,
17*  201:*4*  203:*5*
205:*18, 22*  206:*22*
207:*10, 22*
**waterfront**  33:*18*
**waters**  191:*3*
**Watershed**  21:*17*
148:*17, 17*
**waterways**  36:*14*
**way**  18:*22*  29:*20*
44:*11*  55:*22*  66:*12*
79:*19*  81:*8*  85:*13*
89:*3*  91:*23*  94:*10*
95:*9*  103:*20*
110:*10*  122:*23*
124:*19*  128:*4*
144:*9*  155:*1*
160:*15*  164:*8*
172:*20*  173:*19*
176:*11*
**ways**  70:*13*  83:*17*
148:*13*
**Weekly**  125:*9*
**welcome**  31:*5*  35:*1*
135:*16*  204:*1*
**well**  11:*8*  20:*16*
21:*8*  23:*14*  25:*13*
28:*9, 21*  64:*8*  74:*5*
75:*17, 19*  79:*12*
93:*11*  95:*13, 23*
100:*11*  104:*1, 15*
109:*3*  114:*2*  127:*3*
129:*15*  143:*18*
145:*20*  146:*12*
155:*9*  162:*8*
166:*12*  172:*21*

179:*10*  180:*17*
185:*14, 15, 20*
186:*8, 10, 11*  194:*3,
11, 20*  197:*22*
198:*3, 6*  199:*1, 10*
200:*6, 13, 15*
203:*23*  205:*17*
207:*7*  208:*13*
211:*19*
**wells**  25:*11, 14*
83:*20*  107:*6, 13*
133:*7*  149:*2*  178:*8,
15, 18*  179:*5*
180:*12, 14, 23*
184:*21*  185:*1, 5*
186:*3*  197:*10, 14,
18*  198:*10*  199:*16,
18*  200:*3*  206:*8, 21*
207:*6, 10, 18, 20*
**went**  14:*5*  53:*11*
90:*10*  91:*21*
112:*11*  115:*5*
186:*10*  201:*14*
**We're**  10:*15*  11:*9*
12:*2*  23:*9*  24:*21*
49:*16*  53:*9*  71:*8*
74:*21*  77:*6, 12*
80:*5*  83:*23*  86:*15,
20*  87:*23*  92:*21*
100:*4, 5, 16*  104:*17*
135:*20*  138:*14*
150:*21*  203:*13*
**west**  65:*15*  79:*15*
80:*10, 20*  84:*1*
85:*5, 21*  101:*23*
110:*6, 16*  112:*11*
113:*3, 7, 13, 16*
114:*3, 3*  115:*3*
118:*3*  172:*12*
173:*23*  188:*8*
193:*15*
**western**  26:*7*
77:*10*  108:*5*
**we've**  11:*23*  14:*18*
30:*16*  31:*23*  37:*20*
95:*5*  99:*6, 13*
115:*8*  121:*1*
172:*15*  186:*23*
200:*17*  204:*12*

**whatsoever**  117:*7*
**White**  21:*17*
**Whitt**  50:*1*
**wide**  41:*5*  92:*8*
**width**  103:*11, 12*
105:*1, 3*  109:*12*
**wild**  58:*2*
**Willett**  173:*12*
**Winters**  2:*5*  3:*21*
9:*1*  213:*19, 20, 22*
**withdrawal**  38:*15*
**witness**  3:*3*  9:*7*
11:*1, 6, 6*  34:*14, 18*
35:*6*  47:*12*  52:*8*
61:*4*  65:*8, 11*  74:*8*
75:*3*  78:*5*  80:*16*
88:*23*  92:*14*  99:*17,
19*  101:*8*  102:*7*
108:*19*  111:*16*
114:*18*  119:*2*
133:*21*  204:*3, 6*
210:*5*  213:*12*
**witnessed**  182:*20*
**wondering**  101:*17*
177:*15*
**Wood**  32:*18*  33:*4,
23*  34:*3*  35:*13*
**Woods**  32:*20, 22*
35:*11*  37:*4, 13, 16*
**Word**  13:*10*  56:*14*
79:*6*  120:*12*
147:*19*
**wording**  172:*2*
**words**  99:*9*  150:*15*
**work**  5:*22*  6:*21*
11:*5*  13:*8*  21:*6*
22:*5, 15, 18*  23:*13,
15, 23*  24:*1, 12, 22*
25:*8, 21*  26:*15, 17*
28:*2*  29:*6*  34:*11*
36:*23*  48:*19*  49:*4,
20*  50:*16*  51:*21*
54:*2, 13, 20*  56:*5,
19*  57:*5*  71:*17, 22*
79:*11*  82:*8*  87:*20*
100:*13*  102:*15*
111:*4, 23*  113:*15*
122:*3*  125:*6, 19*
127:*19, 22*  128:*2*
134:*1*  163:*5*

171:*11*  174:*7, 14,
21*  176:*9, 12, 21*
185:*17*  187:*7*
190:*15*  197:*1*
**worked**  15:*21*
21:*6*  22:*22*  24:*10*
26:*3*  30:*18*  32:*13*
33:*6*  36:*19*  37:*2*
42:*9*  43:*22*  44:*10*
56:*9*  71:*14*  82:*21*
**worked,**  42:*14*
**working**  20:*9*  27:*2*
28:*10*  64:*20*  69:*6,
16, 18*  82:*20*
103:*23*  117:*2*
124:*23*  132:*21*
134:*9*  140:*22*
156:*21*  166:*3*
167:*10*  195:*2*
**works**  55:*22*
**worth**  107:*9*
**wow**  34:*18*
**write**  64:*5*  65:*4*
74:*6*  75:*2*  88:*12,
18, 21*  108:*17*
111:*14*
**writes**  117:*5*
**writing**  56:*1*  78:*6*
82:*7*  92:*12*  132:*7*
147:*13, 14*
**written**  16:*13*  20:*4*
48:*18*  54:*4*  117:*1*
124:*20*  126:*22*
147:*11*
**wrong**  99:*22*  124:*1*
**wrote**  74:*23*
185:*10*  206:*15*

**< Y >**
**yards**  155:*18, 22*
**yardstick**  142:*10*
**year**  14:*1*  16:*2*
24:*19*  29:*1, 4*  33:*5*
34:*11*  45:*19*  59:*3*
63:*13, 14*  69:*13, 15*
98:*17*  101:*21*
102:*11*  107:*17*
119:*14*  157:*1, 4, 10,
10*  177:*18, 21*
185:*23*

**year-and-a-half**
204:*16*
**years**  16:*11, 12, 16*
18:*17*  19:*8*  34:*11,*
*23*  35:*17, 20*  47:*23*
48:*22*  50:*5*  124:*8*
125:*11*  134:*9*
**York**  13:*21*  14:*3*
15:*9, 14*
**you,**  85:*17*

**< Z >**
**zone**  141:*13*  163:*3,*
*6, 13, 19*  164:*18, 23*
165:*3*  166:*10, 19*
167:*1, 12*

Page 214

1      UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF ALABAMA

3          SOUTHERN DIVISION

4

5   CASE NUMBER: 2:16-CV-01443-AKK

6

7   BLACK WARRIOR RIVERKEEPER, INC.,

8          Plaintiff,

9      vs.

10  DRUMMOND COMPANY,

11         Defendant.

12

13          DEPOSITION

14             OF

15          LOIS GEORGE

16   (VOLUME 2, PAGES 214-312)

17         June 27, 2018

18

19  REPORTED BY:

20     Kimberly B. Dowdy, CSR, RPR

21     Freedom Court Reporting

22     2031 Shady Crest Drive

23     Hoover, Alabama 35216

Page 215

1          S T I P U L A T I O N S

2

3       IT IS STIPULATED AND AGREED by and between

4   the parties through their respective counsel, that

5   the deposition of LOIS GEORGE may be taken before

6   Kimberly B. Dowdy, Commissioner, at 100 Brookwood

7   Place, 7th Floor, Birmingham, Alabama, on the 27th

8   day of June, 2018.

9

10      IT IS FURTHER STIPULATED AND AGREED that

11  the signature to and the reading of the deposition

12  by the witness is specifically NOT waived, the

13  deposition to have the same force and effect as if

14  full compliance had been had with all laws and

15  rules of Court relating to the taking of

16  depositions.

17

18

19

20

21

22

23

Page 216

1          S T I P U L A T I O N S

2          (Continued)

3

4       IT IS FURTHER STIPULATED AND AGREED that

5   it shall not be necessary for any objections except

6   as to form or leading questions, and that counsel

7   for the parties may make objections and assign

8   grounds at the time of the trial, or at the time

9   said deposition is offered in evidence or prior

10  thereto.

11

12      IT IS FURTHER STIPULATED AND AGREED that

13  the notice of filing of the deposition by the

14  Commissioner is waived.

15

16

17

18

19

20

21

22

23

Page 217

1          A P P E A R A N C E S

2

3   APPEARING ON BEHALF OF THE PLAINTIFF:

4     SOUTHERN ENVIRONMENTAL LAW CENTER

5     BY:  Mr. Barry Brock

6     Ms. Christina Andreen

7     2829 Second Avenue South, Suite 282

8     Birmingham, Alabama  35233

9

10    Eva Dillard, Staff Attorney

11    Black Warrior Riverkeeper, Inc.

12    712 37th Street South

13    Birmingham, Alabama  35222-206

14

15  APPEARING ON BEHALF OF THE DEFENDANT:

16    STARNES DAVIS FLORIE, LLP

17    BY:  Mr. Richard E. Davis

18    100 Brookwood Place, 7th Floor

19    Birmingham, Alabama  35209

20

21  ALSO PRESENT:  Jorge Solis, law clerk

22          David Diab, law clerk

23

**Lois George (Continuation)**          2 (218 - 221)

Page 218

1          I N D E X

2

3  EXAMINATION                    PAGE:
4  By Mr. Brock                    219

5

6          E X H I B I T S

7

8  Plaintiff's Exhibit No. 40..............229
9  (L. George Rebuttals to A. Brown's report)
   Plaintiff's Exhibit No. 41..............279
10 (L. George Rebuttals to G. Johnson's report)
11 Plaintiff's Exhibit No. 42..............301
12 (Aerial of BW1, BW2, BW3, BW4 & BW5)

13
14 ERRATA SHEET                    310
15 DEPONENT'S CERTIFICATE          311
16 CERTIFICATE OF REPORTER         312

17
18
19
20
21
22
23

Page 219

1          I, Kimberly B. Dowdy, CSR, RPR, a
2  Court Reporter and Notary Public of the State of
3  Alabama, acting as Commissioner, do certify that on
4  this date, as provided by the Alabama Rules of
5  Civil Procedure and the foregoing stipulation of
6  counsel, there came before me at 100 Brookwood
7  Place, 7th Floor, Birmingham, Alabama, on June
8  27th, 2018, beginning at 2:23 p.m., LOIS GEORGE,
9  witness in the above cause for oral examination,
10 whereupon the following proceedings were had:
11         LOIS GEORGE,
12 after having been first duly sworn under oath, was
13 examined and testified as follows:
14         COURT REPORTER:  Usual stipulations
15 with read and sign?
16         MR. DAVIS:  Yes, ma'am.
17 EXAMINATION BY MR. BROCK:
18     Q.    Ms. George, thank you for coming back
19 to finish your deposition today.  I'm sorry we
20 couldn't finish it the first time, but I'll try to
21 be as efficient as I can be, and if I ask you
22 something I've already asked you, I apologize.  I
23 think I remember most of what we talked about but I

Page 220

1  can't promise you I won't repeat a question, but
2  I'll try not to do that.
3          What I really want to focus on today
4  are your two reports, but as we go through that it
5  may bring up some factual issues about things we
6  discussed before, and if it does, we'll deal with
7  that in that way.
8          So we went through your resumé last
9  time and we went through most of these reports, but
10 I'm going to just put these over in front of you.
11 Exhibit 1 is your first expert report and Exhibit 4
12 is the second one.  If you can just go ahead and
13 take a look at those and confirm if that's true?
14     A.    I have looked through Exhibit 1
15 Monday.  So that one was fine.  Exhibit 4 is my
16 rebuttal report.
17     Q.    Is that a complete copy of it?  I
18 don't think there were any attachments or
19 appendices or anything like that.
20     A.    No, there were not.  It's a complete
21 copy.
22     Q.    What I'm also going to do is put
23 before you a copy of Anthony Brown's report because

Page 221

1  some of your report deals with his.  I think it
2  will be easier if we're able to refer to it as we
3  did with Mr. Sisk.
4          You have in front of you what we have
5  marked as Exhibit 8 to Mr. Sisk's deposition this
6  morning, which is a complete copy of Anthony
7  Brown's expert report with all of the tables and
8  figures, and some of those figures are referred to
9  in your report, I believe, but we'll confirm that.
10         Do you remember looking at his report
11 and those figures that are attached?
12     A.    Yes.  Yes, I do.  The appendices
13 aren't here, but we likely won't need those.
14     Q.    I hope not, but if we do, if there's
15 something in there you want to look at we'll go
16 find it.
17     A.    Thank you.
18     Q.    So on page four of Exhibit 1, if
19 you'll turn to that page, we start off with a
20 discussion there of interpretation of aerial
21 photography and topographic maps, right?
22     A.    Yes, sir.
23     Q.    This was something that you testified

Page 222

1 that you have some experience and expertise about?

2    A.    Yes, sir.

3    Q.    In particular, this is about Figures

4 8, 9, 10, 11 and 12 of the Brown report. If you

5 could turn to Figure 8, and you were questioned

6 here the methodology of review of the photos and

7 things that went into this figure. I know since

8 this there's been an additional report and a

9 response to that report. So do you recall, has

10 this issue been cleared up for you or do you still

11 have questions or criticisms about this Figure 8?

12          MR. DAVIS:  Object to form.

13    A.    Could we talk about them

14 collectively instead of individually?

15    Q.    Sure.

16    A.    My first comment was regarding the

17 methodology, and I don't believe that Mr. Brown

18 discussed his methodology of viewing and

19 interpreting the maps, how he was able to make

20 these outlines. He talked about -- in his

21 rebuttal he talked about the use of the

22 topographic maps but not the aerial photography.

23    Q.    Are there particular methodologies or

Page 223

1 techniques that are recognized for review of aerial

2 photography that he could cite to or reference?

3    A.    Certainly. And just a response as

4 to whether or not he looked at them on the

5 computer or stereoscopically or on paper.

6    Q.    For the record, what does

7 stereoscopically mean?

8    A.    A stereoscope is a viewing

9 instrument much like a pair of glasses, or can be

10 a larger instrument that looks like it has

11 binoculars on it and it allows you to look at

12 aerial photography stereo pairs, photography that

13 overlaps, and you can actually see it in three

14 dimension.

15    Q.    Now, in his rebuttal report I believe

16 he indicated that the maps had been digitized as

17 part of this process. Does that help to answer the

18 question at all?

19    A.    I believe he was talking about the

20 topographic mapping.

21    Q.    Okay. And so you're saying he still

22 has not described in sufficient detail how he

23 reviewed the photographs?

Page 224

1    A.    Correct.

2    Q.    Now, you said you want to refer to the

3 figures as collectively. Was that a collective

4 comment that you were just --

5    A.    That was one, yes.

6    Q.    That would be applicable to all five

7 of the figures that we're talking about, 8 through

8 12?

9    A.    That's right.

10    Q.    Looking at Figure 8, as I understand

11 it, the red outlined area is the extent of the GOB

12 pile; is that the way you interpret it?

13    A.    That's what he shows in the legend,

14 yes.

15    Q.    And the yellow within the red circle

16 is meant to portray erosion of the GOB pile; is

17 that your understanding of it?

18    A.    It is now, after his rebuttal

19 response where he discussed the distinction

20 between the red and the yellow. The application

21 of the lines on the map weren't discussed in his

22 initial report.

23    Q.    Okay. I'm with you. And so the area

Page 225

1 that we see along the closest to the river in

2 yellow is meant to show erosion, but erosion

3 outside the GOB pile, correct?

4    A.    Correct. And there are many other

5 areas on the photograph that he could have

6 outlined in yellow that are the results of

7 erosion.

8    Q.    Where would those be in your view?

9    A.    I'm not sure the 65 is -- on Figure

10 8 there are some gullies at other locations down

11 to the Locust Fork, but if you look down at the

12 end of the ridge, the south end of the ridge,

13 these are natural erosion gullies, these two

14 parallel lines.

15    Q.    So you're gesturing to two parallel

16 lines down near the bottom of the part that's

17 within the red area on the photo?

18    A.    That's correct. And I don't agree

19 with his delineation of the extent of the refuse

20 pile. I don't believe it goes this far south and

21 --

22    Q.    Let's take those one at a time.

23    A.    Okay.

Page 226

1    Q.    So the first thing is you're saying
2 some of the area that he shows as erosion of GOB is
3 you say actually natural erosion or erosion of --
4 how did you put it?
5    A.    No, I didn't say that it was erosion
6 of GOB. He just wasn't comprehensive in
7 assigning what was erosion. Up near the bend in
8 the Locust Fork he has these yellow outlined
9 erosion areas, but there are other areas on the
10 aerial outside of what he's assigned as GOB that
11 represent erosion. So why --
12    Q.    We need to mark those.
13    A.    -- have it here and not other areas,
14 I guess, is the point.
15    (Whereupon, a discussion was held off the
16    record.)
17    Q.    Okay. As I understand your testimony,
18 you're saying in addition to the yellow areas shown
19 along the ridge outside the red circle to the
20 riverside of the GOB pile, there are additional
21 areas of erosion that could have been depicted?
22    A.    Correct; that aren't associated with
23 the GOB pile.

Page 227

1    Q.    Okay. Can you indicate where those
2 would be just by maybe drawing arrows to them?
3    A.    Yeah. This photograph is a little
4 bit fuzzy but these areas are within his red area
5 delineating what he's calling the GOB. If you
6 recall yesterday that's the term that I was not
7 familiar -- well, I'm familiar with it, but we
8 did not use that term.
9    Q.    Let me understand. So if I'm
10 understanding, you're saying the GOB pile actually
11 does not move as far south as he depicts it?
12    A.    That's right.
13    Q.    And it ends somewhere north of where
14 he shows the boundary?
15    A.    That's correct.
16    Q.    Can you draw a line approximately
17 where you think the GOB pile ends?
18    A.    (Indicating). Something like that.
19    Q.    What's your basis of that opinion?
20    A.    Aerial photography, mapping by
21 Alabama By-Products, and the mapping that I
22 showed on Figure 1, which is Exhibit 6.
23    Q.    The aerial photography, is that this

Page 228

1 photo that we're looking at in Figure 8?
2    A.    Not this photo alone, but several of
3 the other photographs.
4    Q.    Are the other photographs contained
5 within his stack of figures?
6    A.    Yes.
7    Q.    Can you tell us for the record which
8 other photographs you're basing it on when --
9    A.    Figure 9 would have 1975 and 1987.
10    Q.    What do you conclude by looking at
11 those two photographs?
12    A.    That the area that he has delineated
13 to include the refuse pile is wooded at the time,
14 particularly in the 1975. The 1987 photograph is
15 a color infrared photograph and the red and pink
16 colors indicate vegetation. The refuse pile is
17 shown in the grays and the blues where there is
18 no vegetation.
19    Q.    So if there's any vegetation shown on
20 this map, then that would mean that it's not
21 refuse?
22    A.    Yes, in this particular area that
23 we're talking about that's between the refuse

Page 229

1 pile and the lower pond.
2    Q.    With regard to the area that you're
3 talking about now that you're talking about an
4 error in his delineation of the pile, what did the
5 topographic maps indicate about elevations in that
6 area?
7    A.    I'm not sure I understand what
8 you're asking.
9    Q.    Did the elevation change up or down in
10 that area based on comparing the older maps to, I
11 think, the 1971 map, which was based on topography
12 from 1965, I think?
13    A.    I'd like to refer to his Figure 14,
14 14 and 15 in his rebuttal report because he made
15 significant revisions to the interpretation of
16 the changes.
17    Q.    Okay. So I don't think we marked this
18 previously, so we'll mark this Exhibit 40 to your
19 deposition. This is Mr. Brown's rebuttal report so
20 you can look at that and let us know what we need
21 to look at.
22    (Whereupon, Plaintiff's Exhibit Number 40
23    was marked for identification.)

Page 230

1   A.   On Figure 14 Mr. Brown made
2   revisions to the map, I think, to reflect some of
3   my comments regarding the source of the maps that
4   he used but also changed the contour interval.
5   The contour interval of the topographic maps --
6   and to a certain extent we're moving on to the
7   second opinion here, the contour maps of the USGS
8   maps are 20-foot contour maps.  His first
9   presentation had 10-foot contours, 10-foot
10  contour interval, which would be an inaccurate
11  way to portray it since you can't make the map
12  more accurate than the initial maps were.
13       And that goes the same with the
14  topographic changes on Figure 15, which there was
15  no defined contour interval.  And some of the
16  values just didn't correspond with the legend, so
17  Mr. Brown's Figure 15 is very different than the
18  original Figure 15.
19  Q.   Is it different in terms of the
20  delineation of the extent of the GOB pile?
21  A.   No, the red area that he used, I
22  guess, is his reference area is the same in all
23  the figures.

Page 231

1   Q.   Okay.  And I'm trying to understand.
2   So I understood your first criticism or comment
3   about Figure 8 that we started looking at, and the
4   second thing is, you said it was incorrectly
5   delineated down on the south end and you drew in
6   where you believe that the GOB pile footprint
7   should have been shown to end, right?
8   A.   Correct.
9   Q.   And then you made reference to
10  Exhibits -- to Figures 14 and 15 as being pertinent
11  to that point I thought.
12  A.   Yes.  I was answering your question
13  about the changes in the elevation that you
14  asked.
15  Q.   How are Figures 14 and 15 pertinent to
16  this issue of the delineation of the southern end
17  of the GOB pile footprint?
18  A.   Because those -- the red line
19  represents the area that Mr. Brown used for his
20  volumetric computations of how much was placed
21  and how much was eroded.
22  Q.   Okay.  You may have answered my
23  question, but it was, I think, or should have been

Page 232

1   simply, what was the basis for your view that the
2   delineation of the southern end of the GOB pile was
3   incorrect and you answered that.  Have you answered
4   that fully?
5   A.   Yes, I think so.
6   Q.   Still looking at page four of your
7   report, the last paragraph under the first section
8   in the second sentence, it says, the gullies are
9   the result of erosion of the steep natural
10  escarpment along the west bank of the Locust Fork."
11       Do you see that language?
12  A.   Yes.
13  Q.   And that's what you were telling us
14  earlier that you drew the arrows to demonstrate; am
15  I correct about that?
16  A.   Yes.  Those are the areas that he
17  had in yellow, but with Mr. Brown's explanation
18  of how he utilized the yellow versus the red, I
19  think this last paragraph is addressed also.
20  Q.   The last paragraph is addressed to
21  what?
22  A.   The last paragraph addresses the
23  question I had about what was outlined in yellow

Page 233

1   versus what was outlined in red.  That wasn't
2   discussed in his report at all, the red and the
3   yellow.  He clarified that in his rebuttal
4   report.  In other words --
5   Q.   No, I'm with you.  I understand.
6   A.   Okay.
7   Q.   Yeah, I think the first time around it
8   wasn't clear exactly what the red and the yellow
9   meant or included, right?
10  A.   Not at all.
11  Q.   And he clarified that in the rebuttal
12  report?
13  A.   Yes, sir.
14  Q.   The way that your report is
15  structured, this section is called "Findings and
16  Opinions", and it looks to me like each section
17  where there's bold single-spaced typed is a
18  separate opinion; is that correct?
19  A.   Some are probably a combination of a
20  finding and an opinion.
21  Q.   Okay.  But my point is, you intended
22  to break it down that way based on these bold
23  headings?

Page 234

1  A.    Yes, sir.

2  Q.    And when I read through your report I

3  put numbers beside them so that the one we just

4  looked at would be number one.  Then you come down

5  to the next bold section that starts "The analysis

6  of volumes", and I numbered that number two.  So

7  that would be the second opinion or conclusion that

8  you're offering, right?

9  A.    Yes, sir.

10 Q.    And this relates to the volumetric

11 calculations of the GOB pile, which you say are

12 speculative?

13 A.    Yes, sir.

14 Q.    Right.  Explain why you say that.

15 A.    Covered a little bit of that already

16 talking about the contour intervals.  Comparing a

17 map that was prepared in 1938, which is a

18 different scale.  The topographic map from 1938

19 was prepared at a scale of one to 62,000.  The

20 1971 topographic map is prepared at a scale of

21 one to 24,000, so overlaying those and comparing

22 the differences in the elevation, the precision

23 of determining that difference in elevation is

Page 235

1  somewhat questionable.  That is the first portion

2  of my critique.

3      The second is the comparison of

4  Mr. Brown's calculations from his original report

5  to his rebuttal report had vast changes in his

6  assumptions or how much was placed and how much

7  was eroded up to three times the amount.

8  Q.    As I understood it, that was to

9  account for the different number of years between

10 when the photo was taken and the map was published.

11 A.    That is correct, but it's all based

12 on assumption.  In his first computations I

13 believe the erosion rate was something like

14 32,000, the second report it was 92 or 93,000

15 cubic yards per year.  Those are vast differences

16 and the --

17 Q.    Well, you understand --

18 A.    -- volume --

19 Q.    I'm sorry.  Go ahead.

20 A.    The information that was provided by

21 the topographic changes, the net loss, that near

22 700,000 cubic yards could be a difference between

23 what the interpretation of these maps of very

Page 236

1  different ages are, but to fit this number and

2  back calculate, or however Mr. Brown came up with

3  those numbers, is just purely assumption.

4  Q.    You have his rebuttal report as

5  Exhibit 40, and what I want to do is let's look on

6  page two at Rebuttal 1, Anthony Brown.  And this is

7  the part where he was provided more information

8  about the topographic analysis, right?

9  A.    Yes.

10 Q.    And so after reading that do you

11 question the methodology that aquilogic used?

12 A.    I don't question the methodology

13 that they used for comparing the two topographic

14 maps.  I question the results of comparing the

15 two topographic maps, as I described, different

16 vintage, different scale, and the resulting

17 accuracy, and then the application of that

18 information.

19 Q.    Are you questioning the use of this

20 Spatial Analyst software that he cites?

21 A.    No, not at all.

22 Q.    Then what --

23 A.    I'm not -- I'm not questioning the

Page 237

1  application of the tools that they used to make

2  the resulting maps.  I'm questioning the accuracy

3  of the resulting maps, again, because of the

4  difference of the age of the maps, and the

5  contour interval.  And what I'm also questioning

6  is Mr. Brown's application and use of that

7  information that came out of that modeling.

8  Q.    So the first component of that has to

9  do with the maps being at different scale and ages

10 even if you digitize them, you're saying there

11 could be an issue with that?

12 A.    Certainly.  And just a change in

13 accuracy of five feet over the whole acreage

14 could make a difference of several hundred

15 thousand cubic yards likely.

16 Q.    Have you made any independent

17 calculation of what you think the volume of

18 material is in the pre-law or post-law GOB areas?

19 A.    No, I haven't.  Their numeric

20 information isn't sufficient to do that.

21 Q.    Okay.  If you were going to attempt to

22 do that in 2017, how would you go about it?

23 A.    I haven't been asked to do that so I

Page 238

1 really haven't given that consideration.

2 Q. Is it possible to make an accurate

3 calculation of the differential in volume in that

4 pile as Mr. Brown has endeavored to do in his

5 report?

6 A. I think one could make

7 determinations and it would be estimates of the

8 distinction in the volume, and it would take some

9 ground -- some drilling to measure the actual

10 thickness. But to come up with a value for how

11 much had eroded, I don't believe that there's

12 information available to do that.

13 Q. So just so I'm clear in understanding

14 your testimony, you're just saying there isn't any

15 data or information in the world that would allow

16 you to make a calculation like that?

17 MR. DAVIS: Object to form. You can

18 answer.

19 A. Well, let's look at the Maxine

20 disposal area. The information that is available

21 that I'm aware of doesn't include volume that

22 Alabama By-Products placed in these areas over

23 the years. And in order to make determinations

Page 239

1 of erosion it was being placed and potentially

2 eroded at the same time under different

3 climatological conditions, under different

4 compaction rates, different slopes. To apply one

5 value to the whole area for erosion over 365 days

6 really is just assumption.

7 Q. How did PELA perform its volumetric

8 calculations when it did those back in the '80's?

9 A. To the best of my recollection, this

10 was done in the early '80's. Our calculations

11 were limited to -- may I refer to Exhibit 6?

12 Q. Yes, absolutely.

13 A. The area between the lower dam and

14 somewhere between the upper dam and MO3, we used

15 elevations from existing USGS topographic maps,

16 the detailed topographic mapping that was

17 provided by Alabama By-Products, I don't recall

18 the date, but in addition to that we had two

19 drill holes that indicated the thickness of the

20 material. And the volume we came up was just an

21 estimate for what was there at that time based on

22 that data.

23 Q. Well, was there anything else you can

Page 240

1 think of that PELA used in connection with its

2 volumetric calculations?

3 A. Not that I can think of.

4 Q. If you turn to page five in your

5 report, opinion or conclusion, Number 3 starts "Mr.

6 Brown's assertions about hydrologic flow

7 calculations." Do you see that part?

8 A. I think that would be Number 4.

9 Q. What would Number 3 be?

10 A. That Mr. Johnson relies on Mr.

11 Brown's interpretations, conclusions, and

12 opinions. And if Mr. Brown's are flawed,

13 Mr. Johnson's interpretations, opinions, and

14 conclusions are also flawed.

15 Q. Okay.

16 A. He accepts them and says it numerous

17 times in his 2017 report and his 2018 report.

18 Q. No question. That's straightforward.

19 I understand there, if Brown's wrong, then

20 Johnson's wrong because he relied on him. That's

21 it?

22 A. Yes.

23 Q. All right. So moving down to Number

Page 241

1 4, you say that Mr. Brown failed to consider storm

2 runoff in his analysis. Explain that for us.

3 A. Mr. Brown, and I believe Mr. Johnson

4 also, referred to different flow potentials

5 through the valley and relate that to the quality

6 of water that might be discharging into the

7 Locust Fork. The language used in the report.

8 In my opinion, didn't account for the fact that

9 when you have peak flows, the residence time of

10 that rain water and runoff would not be

11 comparable to any waters that have been

12 tested that --

13 Q. Is this an issue -- I'm sorry. Go

14 ahead.

15 A. -- that are in the valley fill. So

16 relative to any consideration of handling or

17 treating, I felt that there was not a

18 representation of conditions that occurred or

19 could occur.

20 Q. So is this an issue about

21 concentration of chemicals in the flow -- in the

22 discharge being affected by the rate of flow?

23 A. Yes, but also the characterization

Page 242

1 of the potential volume that might be going out
2 into the Locust Fork.
3 Q. Did you see the volume calculations
4 that were performed by Amec Foster Wheeler,
5 Drummond's consultants?
6 A. I think I saw the end result of
7 them. I didn't look at the calculations
8 themselves.
9 Q. I was just wondering if you had any
10 criticism of their methodology?
11 MR. DAVIS: Object to the form.
12 A. I don't have an opinion regarding
13 that, no.
14 Q. Are you expressing criticisms of
15 questions about the methodology that Mr. Brown and
16 Mr. Johnson used to arrive at the flow
17 calculations?
18 A. No, and I'm not sure they actually
19 made the flow calculations. What my criticism
20 is, is about the characterization of the amount
21 of water and the characterization of its
22 character being toxic and not considering the
23 retention time with storm events.

Page 243

1 Q. Well, if you take a sample at the
2 point where water from the site -- surface water is
3 discharging to the Locust Fork, wouldn't that
4 sample tell you what the concentration or the water
5 chemistry of the discharge is?
6 A. At a specific time, yes.
7 Q. Have you made any sort of calculations
8 or analysis to try to account for what differences
9 there might be in a sample like that based on flow
10 conditions?
11 A. No, I haven't.
12 Q. Is there a methodology or procedure
13 that can be used to do that?
14 A. It likely could be modeled, yes.
15 Q. So in other words, if you take a
16 sample and you say the flow today is ten gallons
17 per minute and this is the water chemistry, that
18 you might be able to model it to say if the flow
19 was a hundred gallons per minute what impact would
20 it have on the water chemistry?
21 A. You might be able to if you had
22 sufficient data. Of course, some modeling is
23 based on assumption and you can put your forward

Page 244

1 assumptions in and get your number crunch and get
2 results that are based purely on assumption. I
3 don't think there's enough information to be able
4 to do that at this point.
5 Q. So the next conclusion or opinion,
6 Number 5, would be at the bottom of the page. Tell
7 us what that one is, please.
8 A. Yes, sir. It's essentially
9 consistent with Number 4 above.
10 Q. Your next conclusion or opinion at the
11 top of page six relates to Mr. Brown's Key Opinion
12 1, right?
13 A. Yes, sir.
14 Q. What is his Key Opinion 1?
15 A. On page two that you've opened Mr.
16 Brown's October 2017 report to, indicates that
17 his key opinion is -- or question, that he, I
18 guess, is answering, "Have operations at the
19 Drummond Maxine Mine site physically altered
20 natural surface water streams?"
21 Q. As I read your criticism, you're
22 questioning the use of the term flow
23 characteristics?

Page 245

1 MR. DAVIS: Object to form.
2 A. Yes.
3 Q. Can you explain what you mean by that?
4 A. Well, I don't know what Mr. Brown
5 means by flow characteristics, and I was
6 referring to his discussions within the report
7 where he says that the flow characteristics have
8 been altered. Flow characteristics would mean
9 the -- there's something that has changed in the
10 stream to change the way the water flows.
11 Q. Would a change in the bottom elevation
12 change the flow characteristics?
13 A. Yes. Change in bottom elevation,
14 deposits of stream bars along the edge of the
15 bank of the river.
16 Q. But if there were deposits of
17 nonnatural river bottom materials on the bottom of
18 the Locust Fork would that change the flow
19 characteristics?
20 MR. DAVIS: Object to the form.
21 Foundation.
22 A. It would depend on their thickness,
23 where they were, and natural deposits could do

Page 246

1 the same thing. Mr. Brown doesn't define what he
2 means and doesn't provide any information to
3 address that.
4      Q.      Okay. But could you answer my
5 question, which was, if you did deposit nonnatural
6 material from the mine site on the bottom of the
7 Locust Fork, would it change the flow
8 characteristics?
9           MR. DAVIS: Object to the form.
10      A.      I think I answered that when I said
11 it could depending on the thickness.
12      Q.      Have you made any assessment about
13 whether there are such materials on the bottom of
14 the Locust Fork adjacent to the mine site?
15           MR. DAVIS: Object to form.
16      A.      I have looked at information that
17 indicates to me that there are no obstructions or
18 thicknesses of either natural deposits or
19 deposits that may have come from the refuse pile
20 that have changed the configuration of the Locust
21 Fork.
22      Q.      What materials have you looked at that
23 indicate that?

Page 247

1      A.      The studies that PELA did in the
2 early 1980's.
3      Q.      Would the conditions have changed
4 since the 1980's?
5      A.      Yes. And I think that conditions
6 regarding the rock disposal area have changed
7 such that erosion would have decreased over the
8 years. I've also looked at the information of
9 Lynn Sisk where they did water quality and
10 measured the depth of water and showed the
11 configuration of the bottom of the Locust Fork.
12 I believe his investigations were completed in
13 2016, 2017.
14      Q.      What did Mr. Sisk say, if anything,
15 about deposits of material on the bottom of the
16 Locust Fork?
17      A.      I don't recall reading about what he
18 said but the diagrams that were made don't
19 indicate that there are any obstructions.
20      Q.      Okay.
21      A.      The bottom has a relative uniform
22 shape to it throughout the whole area where the
23 bottom was measured.

Page 248

1      Q.      If I'm understanding your testimony
2 you said you believe that the rate of erosion has
3 decreased at some point?
4      A.      Yes.
5      Q.      So you're comparing now to what point
6 in the past?
7      A.      Well, obviously based on my
8 knowledge when PELA started working at the site,
9 there is a lot of --
10      Q.      Let's try to break it down.
11      A.      Okay.
12      Q.      You're giving an opinion that the rate
13 of erosion is less now than it was in 1984 when you
14 were last working on the site?
15      A.      Yes.
16      Q.      What is your basis for that? Any
17 scientific or factual basis?
18      A.      My observations of the aerial
19 photography that indicate that the majority of
20 the area is vegetated, and also my site visit.
21      Q.      And now the second question, are you
22 giving an opinion that sediment from the mine site
23 currently is not eroding into the Locust Fork?

Page 249

1      A.      Sure there's sediment into the
2 Locust Fork, not only from limited areas that may
3 get there from the refuse pile, but there's also
4 erosion from the natural bedrock that is exposed.
5      Q.      So you said sure, there's erosion from
6 the site. So my follow-up question is, do you know
7 how much?
8      A.      No. No, I don't. Not
9 quantitatively, no --
10      Q.      And is it an efficient quantity to
11 affect the flow characteristics?
12      A.      I don't know quantitatively, no, but
13 from looking at the data I don't believe there's
14 sufficient information -- I mean, sufficient
15 sediment that would make any obstruction.
16      Q.      What data?
17      A.      I just described that. The data
18 from PELA studies, the data from Mr. Sisk's
19 studies, and I hadn't finished my answer to your
20 question. Dr. Dimova's studies. Dr. Dimova
21 sampled a limited number of sites based on the
22 latitude and longitude of the coordinates that
23 were given. The locations of her sample sites

Page 250

1 were very close to the shoreline and would not be
2 indicative of the entire channel of the Locust
3 Fork.
4    Q.    So I got PELA's data from the '80's,
5 Mr. Sisk's data, and Dr. Dimova's data.  Anything
6 else?
7    A.    My observations.
8    Q.    Observations of photographs or
9 observations of the site?
10    A.    Both.
11    Q.    The next opinion, I guess, would be
12 Number 7 there in the middle of the page, has to do
13 with restoration.  Are you with me?
14    A.    Yes, sir.
15    Q.    Okay.  And as I'm paraphrasing your
16 opinion there you're saying based on the data from
17 testing upstream and downstream that the
18 remediation recommended by Mr. Johnson and Brown is
19 not warranted.
20    A.    Yes.
21    Q.    Is that a correct paraphrase?
22    A.    Yes.
23    Q.    Okay.  What specific remediation

Page 251

1 though are you referring to there?
2    A.    Restoring the site to natural
3 conditions by removal of all the refuse material.
4    Q.    Are you saying that no mitigation is
5 warranted based on those two water samples?
6    A.    Yes, based on the fact that the
7 information indicates that there is no impact on
8 the stream.
9    Q.    What about inshore or near-shore
10 impact on macroinvertebrates and other organisms;
11 have you considered that?
12         MR. DAVIS:  Object to the form.
13 Foundation.  You can answer.
14    A.    I have reviewed the information that
15 I think you're referring to, the expert reports.
16 I think the water quality is what I'm referring
17 to.  And the water quality obviously is the
18 environment that the organisms live in, but my
19 opinion is based on the water quality.
20    Q.    And is it your opinion that there is
21 no adverse impact on the water quality in the
22 Locust Fork from any discharges from the Maxine
23 Mine?

Page 252

1    A.    Yes.
2    Q.    None whatsoever?
3    A.    There may be a limited area of
4 mixing zone, but when you look at the information
5 that's -- all the information upstream and the
6 information downstream, there is no impact
7 indicated.
8    Q.    Have you looked at sampling results of
9 the discharge that's actually leaving the mine
10 site?
11    A.    I've looked at testing that was
12 documented in Mr. Brown's report.  I have looked
13 at the water quality information that was
14 documented in PELA's report, and the
15 investigation that we completed of the specific
16 conductance values at the Locust Fork.  Yes, I
17 have.
18    Q.    Okay.  And in connection with this
19 Opinion Number 7, is this confined to the Locust
20 Fork or are you opining also about any harm or
21 impact to Tributary 1?
22    A.    My opinion as written here is based
23 on the information of the Locust Fork.

Page 253

1    Q.    Next, and I guess the last area of
2 opinion in this report, Number 8, pertains to
3 certain regulatory actions; is that correct?
4    A.    Yes, sir.  Regulatory actions and
5 also activities that were completed in the rock
6 disposal area.
7    Q.    And you conclude the section with
8 reference to an order from the Surface Mining
9 Commission from 1985 down at the bottom of the
10 page; do you see that?
11    A.    Yes, sir.
12    Q.    What does an administrative order do
13 to inform your opinion as to a geologist about any
14 scientific issue presented in this case?
15         MR. DAVIS:  Object to the form.
16    A.    I think I answered that yesterday.
17 The document --
18         MR. DAVIS:  Monday.
19         MR. BROCK:  Monday.
20    A.    Seems like yesterday.
21    Q.    Seems like a month ago to me, but go
22 ahead.
23    A.    The order itself was used as a frame

Page 254

1 of chronological reference but also the fact that
2 the document indicated that the activities were
3 completed and satisfied the regulatory
4 requirements at the time.
5      Q.     And we talked about this yesterday
6 and --
7          MR. DAVIS: Monday.
8      Q.     Monday. And I don't need to reiterate
9 it all, but the segregation of the surface water
10 runoff from the post-law area as Drummond calls it
11 from the pre-law area, that was done as I
12 understood your earlier testimony, really based on
13 legal or regulatory reasons; in other words, what
14 ABC believed that it was legally obligated to do;
15 is that correct?
16          MR. DAVIS: Object to the form.
17 Foundation.
18      A.     I'm not sure I can answer it the way
19 you asked it. But it's my understanding that the
20 actions that were completed were completed to
21 address notices of violation, an order, and
22 permit requirements, and those were all
23 satisfied.

Page 255

1      Q.     Right. And what I'm asking is, that
2 was done for legal reasons as opposed to scientific
3 reasons?
4          MR. DAVIS: Object to the form.
5 Foundation.
6      A.     The reasons the activities were
7 completed, yes, were legal reasons. But there
8 were scientific design and investigations that
9 were completed to address that.
10      Q.     Right, and those investigations were
11 designed to establish that the post-law area was
12 a lot cleaner than the pre-law runoff, right?
13          MR. DAVIS: Object to the form.
14 Foundation.
15      A.     No. The investigations were done
16 to -- well, initially the investigations were
17 done to provide a guide as to how to move forward
18 to address satisfying the NOV's and the
19 regulatory requirements. The monitoring that was
20 done for about a year after the reclamation was
21 completed was provided to the agency for their
22 review to make those decisions.
23      Q.     And we looked at the data on Monday,

Page 256

1 right?
2      A.     Yes.
3      Q.     Let's be honest about it, the data
4 that was taken at SW3 that showed the runoff from
5 the east ditch being captured from the pre-law GOB
6 pile was vastly different than the data taken from
7 the runoff from the post-law GOB pile, wasn't it?
8          MR. DAVIS: Object to form and
9 foundation.
10      A.     There was a difference in the
11 measurements, yes, and site.
12      Q.     There was difference of orders of
13 magnitude, wasn't there?
14          MR. DAVIS: Object to form and
15 foundation.
16      A.     May we look at the tables again,
17 please?
18      Q.     Sure. This is Exhibit 36 that we
19 looked at on Monday and I think you testified was
20 the last report that PELA did of water quality.
21 I'm going to show it to you in just a minute. And
22 I'm comparing SW2 is the runoff that came from the
23 post-law area. Can you confirm that?

Page 257

1      A.     Yes.
2      Q.     And SW3 is the data for the runoff
3 that came off the pre-law area, correct?
4      A.     Yes.
5      Q.     And on these figures, laboratory
6 analysis for total iron, would you tell us what the
7 reading is for SW2 versus SW3?
8      A.     Total iron in milligrams per liter
9 for SW2 is 1.9 and for SW3 is 501.
10      Q.     Would that be a difference in orders
11 of magnitude?
12      A.     Yes.
13      Q.     Would there be a scientific reason
14 that you can think of why you would have that
15 disparity and leave the site that way?
16          MR. DAVIS: Object to the form.
17      A.     The information in this report was
18 gathered to address the regulatory or legal
19 requirements at the time.
20      Q.     Okay. That's all I was asking.
21 You've answered the question. Thank you.
22          Please turn to page seven in your
23 report, if you would. On that same topic, if you

Page 258

1  look at the paragraph in the middle of the page
2  that starts, "The October 5, 1984 report"?
3      A.    Yes.
4      Q.    If you could take a second just to
5  read that to yourself and let me know when you've
6  read it.
7      A.    Yes, sir.
8      Q.    And this refers to that report we were
9  just looking at, right, Exhibit 36?
10     A.    Yes.
11     Q.    It says that work was completed by ABC
12  in fulfillment of the requirements of ASMC. Do you
13  see that part?
14     A.    Yes.
15     Q.    Where were those requirements set
16  forth?
17     A.    I believe in the Notice of
18  Violations but I'm not certain.
19     Q.    Anywhere else that you can think of?
20     A.    Permitting requirements but that
21  still might be ASMC. It would be, excuse me,
22  ASMC.
23     Q.    I'm sorry. Did you say permitting?

Page 259

1      A.    Permitting requirements.
2      Q.    I think I asked you this yesterday but
3  I'm going to ask you again in reference to this
4  material, and that portion of your report. Was
5  there any discussion to your recollection of future
6  Clean Water Act issues or obligations in connection
7  with the discussion of the regulatory requirements?
8          MR. DAVIS: Object to the form.
9      A.    I'm not understanding your question.
10  I know we talked about a lot of different things
11  regarding that, but I'm not sure I understand.
12     Q.    In connection with discussing the
13  requirements of ASMC or the regulators during this
14  timeframe, you're talking about 1984, was there
15  ever any mention of the Clean Water Act or future
16  obligations under the Clean Water Act?
17         MR. DAVIS: Object to the form.
18     A.    I certainly don't remember any
19  discussions about future obligations.
20     Q.    Was that something that PELA
21  considered in any way?
22     A.    Not to my recollection, no.
23     Q.    You knew --

Page 260

1      A.    We concluded --
2      Q.    I'm sorry. Go ahead.
3      A.    We concluded our tasks and
4  documented it, and it's my understanding this
5  document was provided to ASMC.
6      Q.    Exhibit 36 when you say this document?
7      A.    I'm sorry. Yes, Exhibit 36. With
8  all of the other progress reports and permit
9  application and everything.
10     Q.    In 1984 you knew what the Clean Water
11  Act was, right?
12     A.    Yes, sir.
13     Q.    And I'm asking did it ever occur to
14  you upon leaving the site in 1984 that there might
15  be Clean Water Act liability issues in the future
16  given the water chemistry that we see in this data
17  coming off of that GOB pile?
18         MR. DAVIS: Object to the form and
19  foundation.
20     A.    I think it's a legal --
21         MR. DAVIS: And to the extent that it
22  calls for a legal conclusion.
23     Q.    My question was: Did that ever occur

Page 261

1  to you?
2          MR. DAVIS: Same objection. He wants
3  you to give a legal opinion today that he wouldn't
4  let you give last Monday. Go ahead and answer
5  subject to the objection.
6      A.    I don't recall, no, sir. We
7  finished our job.
8      Q.    You don't remember if that ever
9  occurred to you or not?
10         MR. DAVIS: Same objection.
11     A.    No, sir, I don't remember.
12     Q.    Let's take a quick break.
13     (Whereupon, a break was taken at 3:33 p.m.)
14     Q.    We are back on the record, Ms. George.
15  I turned in your first report to the section on
16  References, Section 8.
17     A.    Yes, sir.
18     Q.    And I had a few questions about some
19  of those. The second item on there you list as the
20  Risk-Based Corrected Action Guidance Manual.
21     A.    Yes, sir.
22     Q.    How did you use that in formulating
23  your opinions or drafting your report?

Page 262

1    A.    I didn't make a specific use of any
2 specific section of it. I'm very familiar with
3 it. And in order to move forward with
4 remediation it's typical that some sort of risk
5 is evaluated.
6    Q.    Are there any particular sections or
7 pages out of that manual that you think are
8 applicable to your report in this case?
9    A.    Well, just the fact that you really
10 need sufficient data to move forward to put
11 together a conceptual model, to evaluate risks,
12 to make decisions about how to remediate. And I
13 can't tell you specifically what section in that
14 guidance is those --
15    Q.    Do you believe there's a need for
16 additional data as to Maxine Mine to make an
17 assessment about remediation?
18    A.    If there were to be remediation
19 there's not enough data right now to make a
20 conclusion what's the best way to remediate.
21    Q.    What additional data would you
22 recommend?
23    A.    Well, there could be pilot tests

Page 263

1 completed.
2    Q.    What do you mean by that?
3    A.    A pilot test is an experiment on a
4 certain theory or an area to see whether or not
5 an application might work.
6    Q.    How would that work or how would you
7 conceive that might be applicable to Maxine?
8    A.    It could be applicable to the low
9 flat areas in the vicinity of the two dams.
10    Q.    What sort of pilot program would you
11 conceive of?
12    A.    I don't have anything specific. I
13 haven't been asked to make any formulations nor
14 have I.
15    Q.    Based on the data that we looked at
16 from PELA's water sampling in the 1980's to now,
17 has the water chemistry improved on the pre-law
18 waste pile area?
19       MR. DAVIS: Object to the form.
20    A.    I'm not sure there is any data
21 specifically on the pre-law waste data.
22    Q.    I'm talking about like SW8 and SW9
23 that are measuring the discharges off of that area

Page 264

1 of the waste pile. Has the water chemistry
2 improved recently since the '80's?
3    A.    I'm sorry. You were talking about
4 the runoff not the actual waste pile itself?
5    Q.    Yes.
6    A.    Based on sampling at specific
7 points, no. It's fairly consistent.
8    Q.    Is there any reason to believe that it
9 will improve naturally in the future without some
10 remedial action being taken?
11       MR. DAVIS: Object to the form and
12 foundation.
13    A.    Again, are we referring to a
14 specific location?
15    Q.    Not in that question. I'm just
16 talking about to any surface water runoff off of
17 the pre-law waste pile. Is it going to improve in
18 the future without any corrective action being
19 taken?
20       MR. DAVIS: Object to the form and
21 foundation, and to the extent it calls for
22 speculation.
23    A.    And I certainly can't answer based

Page 265

1 on any runoff. The runoff is going to be
2 dependent on rainfall, climatological conditions.
3    Q.    Are there any natural processes that
4 are going to improve the water chemistry of the
5 runoff coming off the pre-law GOB file?
6       MR. DAVIS: Same three objections.
7    A.    Further natural revegetation that's
8 occurred since Alabama By-Products completed
9 their remediation.
10    Q.    Has the vegetation increased since the
11 1980's from then to now?
12    A.    Yes, substantially.
13    Q.    And as you just said though, the
14 sampling data has not improved with the vegetation
15 increasing, has it?
16       MR. DAVIS: Object to form.
17 Foundation.
18    A.    It depends on where the samples are
19 taken and under what circumstances.
20    Q.    Well, that was really a yes or no
21 question. Have the sampling data improved as the
22 vegetation has become -- has increased on the site?
23       MR. DAVIS: Object to the form and

Page 266

1  foundation; and I think she answered it.

2      Q.    He doesn't want you to answer that

question.  He really doesn't want you to answer.

4          MR. DAVIS:  No, he really doesn't want

5  you to answer yes or no to the question in which

6  sampling points are not specified and not specified

7  to be --

8      Q.    You can answer yes or no and then

9  explain.

10         MR. DAVIS:  If you can.

11     Q.    And the question is the vegetation has

12  increased, the sampling results have not improved,

13  correct?

14     A.    I understand your question.

15         MR. DAVIS:  Object to form.

16  Foundation.

17     A.    At certain locations at certain

18  points in time you could say there is comparable

19  results; however, they are just points in time

20  and specific climatological conditions.

21     Q.    The ADEM Investigation and Remediation

22  Guidance Manual, how did you use that in connection

23  with your opinions in your report?

Page 267

1      A.    Pretty much in concert with the same

2  way as the risk assessment.  This guidance

3  document specifies different -- the approaches

4  that are taken or required for investigations,

5  and steps to hone down the feasibility of

6  remediation, then the selection of remediation.

7      Q.    Did you use it though in connection

8  with any one of those eight opinions we identified

9  in particular?

10     A.    I don't know what number it might

11  be, but there is a part to the opinion on page

12  six, the middle of the page, regarding

13  restoration of the site to natural condition.

14     Q.    Okay.  You list an ADEM Administrative

15  Code provision about Brownfield redevelopment.  How

16  did you use that in connection with this report?

17     A.    I think the same.  Just a foundation

18  for requirement for investigation and a process

19  to come to the final results of any remediation.

20     Q.    Some of these references, and this is

21  not something you were necessarily a party to, but

22  we have an agreement in the case as to things that

23  are publicly available we are not exchanging, or

Page 268

1  making available copies, and some of the references

2  you listed we could not find them publicly

3  available online so I just want to ask, I guess, if

4  you have a copy if we wanted to get it that you

5  could get it to Richard or something like that.

6  The first one is on the top of page 13.  It says

7  it's Alabama coal data for 1993.

8      A.    It's a Geological Survey

9  publication.  It should be available to the

10  public, but I'll be glad to --

11         MR. DAVIS:  You can copy and provide

12  it to me and I'll give them a copy.

13     A.    Okay.

14     Q.    And when it says 136p does that mean

15  you were looking at that page or does that mean

16  that's how many pages are in the document?

17     A.    It's the number of pages in the

18  document.

19     Q.    So we can't tell from that what you

20  actually looked at within it?

21     A.    No.

22     Q.    That's not a pinpoint site in other

23  words?

Page 269

1      A.    No, it is not.

2      Q.    For any of these do you actually have

3  copies of them?

4      A.    Oh, yes.  Some of them are personal

5  copies.

6      Q.    Okay.  The next one though, Samuel

7  Cassidy, Elements of Practical Coal Mining, is that

8  a book?

9      A.    Yes, it is.

10     Q.    And you have a copy of that?

11     A.    Yes, I do.

12     Q.    About halfway down the page Henry

13  McCalley, report on the Warrior coal basin.  Do you

14  have a copy of that?

15     A.    I have a reproduction of it, yes, a

16  reprint of it.  Yes.

17     Q.    And the next one too, Metzger, do you

18  have a copy of that?

19     A.    I believe I do.  If I don't, PELA

20  has a copy, I believe, in our library.

21     Q.    And you're citing these things, does

22  that indicate that you just looked at some part of

23  it, it's like background information, or did you

Page 270

1  rely on it in a more substantial way in drafting
2  the report?
3      A.    Background information, just to
4  refamiliarize myself with parts of the Warrior
5  Basin and coal seams, the strata.
6      Q.    On page 14 there are two that we
7  couldn't locate.  The first is Szabo & Copeland
8  Geologic map.  Do you have a copy of that?
9      A.    I believe I have the digital
10 downloaded copy.  The original paper copies are
11 larger than the table.
12     Q.    And then the next one, William
13 Thornbury, Principles of Geomorphology, is that a
14 book you have a copy of?
15     A.    It's a textbook.  I have it.
16     Q.    Did that play into any of the eight
17 particular opinions in your report?
18     A.    Again, just used to look up some
19 terminology regarding stream geomorphology.
20     Q.    All right.  We can close that one up
21 and move to Exhibit 4, your rebuttal report of PELA
22 dated May 25, 2018.  You looked at that earlier and
23 said that was a complete copy of the report?

Page 271

1      A.    Yes, sir.
2      Q.    On page one, fourth paragraph down,
3  you set out the purpose of this report is to
4  specifically address Mr. Johnson and Mr. Brown's
5  rebuttal reports, right?
6      A.    Yes.
7      Q.    Did you consider any other data or
8  information other than looking at their reports to
9  draft this rebuttal report?
10     A.    Yes, I did.
11     Q.    What was that?
12     A.    I looked at the 1988 US EPA guidance
13 document to refresh my memory.  I looked at a
14 number of the references regarding rock
15 description --
16     Q.    It looks like --
17     A.    -- sediment description, standards
18 for describing and classifying soils.
19     Q.    Looks like on page 17 there's a couple
20 of ASTM standards.  Would that be two of the things
21 you're talking about?
22     A.    Yes, sir.
23     Q.    Is that connected with Ms. Dimova's

Page 272

1  report?
2      A.    Yes.
3      Q.    Do you know Professor Dimova?
4      A.    I may have met her, but, no, I don't
5  really know her.
6      Q.    Have you worked with her on any
7  projects or research?
8      A.    No.
9      Q.    Do you know her student Daniel
10 Montiel?
11     A.    Yes, I know Daniel.
12     Q.    Have you worked with him on projects?
13 I understand he may have interned or worked at PELA
14 for some period of time?
15     A.    He was an intern for two months
16 several years ago, but I did not work with him.
17     Q.    Other than these additional reference
18 materials between the time of your first report and
19 your second report, did you do any field
20 investigation or sampling or testing or anything of
21 that nature?
22     A.    Not in the field, no.
23     Q.    And I think you said before, but I'm

Page 273

1  not sure, but you did not make a visit to the site
2  before writing the rebuttal report?
3      A.    That's correct.
4      Q.    Did you prepare the entire report
5  yourself?
6      A.    Yes, with the assistance of a word
7  processor.  Excuse me.  I think I also testified
8  on Monday that Mr. Green provided some assistance
9  but he did not prepare the report.
10     Q.    In this report unlike the first one
11 that said opinions and conclusions, this one in
12 Section 2.0 says Discussion is the heading, right?
13     A.    Yes, sir.
14     Q.    Does this Discussion section contain
15 your opinions and conclusions?
16     A.    In addition to the ones we've
17 already talked about, yes.
18     Q.    The first section deals with
19 restoration, and let me direct your attention to
20 the second paragraph that starts with "Regarding".
21     A.    Yes, sir.
22     Q.    Do you see that part?
23     A.    Yes, sir.

Page 274

1    Q.    At the end of that in the last
2  sentence you mention some scoping and screening
3  alternatives. Can you define for us what you mean
4  by that?
5    A.    Sure. The procedures that are
6  outlined for -- just for instance, CERCLA, or
7  RCRA, or addressing ADEM procedures, or any other
8  state procedures at this time for going from
9  defining the extent of the problem and leading up
10 to a remedy typically require that you scope out
11 potential remedial alternatives and then screen
12 them down to a narrower list of the ones that
13 might be applicable, and use scientific
14 information about the site to make a selection.
15   Q.    Has Drummond asked you to do any of
16 that?
17   A.    No.
18   Q.    This bullet point list you have of
19 nine items, where did that come from?
20   A.    This was out of the -- well, based
21 on my experience and also out of the EPA guidance
22 document.
23   Q.    Make sure I know which one that is on

Page 275

1  your reference list.
2    A.    Yes, sir.
3    Q.    Which one is that?
4    A.    On page 18 it's the October 1988
5  guidance document.
6    Q.    So as your reference list indicates
7  that's a document about CERCLA; is that right?
8    A.    Yes.
9    Q.    And so by including that list here
10 you're saying that would be applicable to
11 assessment at the Maxine site?
12   A.    The list, yes.
13   Q.    Have any of these nine bullet points
14 that you listed there been considered in the
15 opinions you've read by Mr. Johnson?
16         MR. DAVIS: Object to the extent that
17 Johnson's document would speak for itself.
18   A.    He does make reference to human
19 health and the environment, compliance with
20 standards. Does have a -- Mr. Johnson does have
21 a recommendation for treatment, but I don't
22 believe there's substantiating information to use
23 what he says to move forward to conclude that the

Page 276

1  entire refuse area has to be removed.
2    Q.    Let me ask it this way. Are there any
3  of these items that you believe that he hasn't
4  considered at all, these criterion as you call
5  them?
6    A.    I don't know what all he considered
7  in formulating his conclusion.
8    Q.    Well, he put it in writing and this is
9  your critique of what he put in writing, so that's
10 why I'm asking you.
11   A.    But I don't know what he actually
12 considered to get to his opinion about
13 restoration.
14   Q.    Did his written report fail to address
15 any of these criterion?
16         MR. DAVIS: Object. The report would
17 speak for itself. You can answer if you can take a
18 memory test.
19   A.    I think I answered the counter
20 question of what he might have addressed. Now
21 you're asking me what he didn't address. I'm
22 sorry. I'm just --
23   Q.    Right. The way I read your report you

Page 277

1  listed nine criterion from a CERCLA document and
2  the implementation is that these should be
3  considered in connection with any remedy at Maxine;
4  is that correct?
5          MR. DAVIS: Object. The report will
6  speak for itself --
7    Q.    Or it's there for no reason? What is
8  the reason why you put it there if it's not an
9  implication that it's relevant to --
10   A.    The reason -- the reason that I put
11 it there -- and I think I explained it was
12 reference to the risk assessment document also
13 and the ADEM document -- is there are steps and
14 criteria that a methodical approach that should
15 be taken and presented. I don't believe Mr.
16 Johnson has done that.
17   Q.    And I'm asking you in what respects
18 with specific reference to these criterion.
19         MR. DAVIS: Same objection.
20   A.    I'm sorry. Would you ask the
21 question again? I believe I answered when you
22 said which ones did he address.
23         MR. DAVIS: Just let him ask you a

Page 278

1 question and then we'll provide the answer and I'll
2 provide the objection, asked and answered.  The
3 documents speak for themselves.
4      Q.     Have you listed all of the criterion
5 that you believe he has addressed?
6      A.     That he has addressed?
7      Q.     Yes.
8      A.     No.  I did not go through his
9 document and list what he has addressed.
10     Q.     Let me ask you a question about the
11 formulating of this report.  So the information
12 that's inside the boxes, you're quoting from
13 someone else's report --
14     A.     Yes.
15     Q.     -- is that correct?  But sometimes
16 there's information inside the box that appears
17 that it is not quoting from somebody else's report,
18 like at the top of page three, in that box there's
19 a sentence that's in italics and then there's a
20 sentence below it that's not.  Can you explain
21 what's going on there?
22     A.     The information in its entirety in
23 the box is from Mr. Johnson's report.  And if we

Page 279

1 could pull up his rebuttal report.
2          (Whereupon, Plaintiff's Exhibit Number 41
3           was marked for identification.)
4      Q.     I'm handing you his rebuttal report
5 marked as Exhibit 41.  Okay.  So this is starting
6 right here where I'm pointing is what you've put
7 inside the box, right?
8      A.     Yes, sir.
9      Q.     Okay.  And this is from Mr. Johnson's
10 rebuttal report but this particular part of it is
11 him quoting something that somebody else said;
12 those are not his words is why it makes it a little
13 confusing I think.
14     A.     The information in the boxes
15 throughout my rebuttal report is specifically
16 from either Mr. Johnson or Mr. Brown's report.
17 And if there are italics, some of them may be
18 direct quotes from my report or others, or I
19 think Mr. Johnson did paraphrase things in some
20 instances.
21     Q.     Right.  So the information in the
22 first sentence inside that box comes from
23 Mr. Johnson's rebuttal report and he is quoting

Page 280

1 PELA's report.
2      A.     I'm not positive he was quoting it
3 but that's where it came from.  Yes, sir.
4      Q.     My concern was I did not believe that
5 that sentence was Mr. Johnson's words, and the fact
6 that it was inside the box made it appear that
7 maybe it was.  But I think we cleared it up now.
8      A.     Okay.  Good.
9      Q.     So you just took that block out of
10 this page of his report and put it inside the box?
11     A.     Yes, sir.
12     Q.     At the bottom of page three in the box
13 where you're referring to Johnson page A-2, do you
14 see that part?
15     A.     Yes, sir.
16     Q.     And so inside the box you have quoted
17 a portion of his report about removal being the
18 best option, right?
19     A.     Yes.
20     Q.     And after that box concludes you
21 wrote, "Refer to my comments on page 1, above".
22     A.     Yes, sir.
23     Q.     So that was your response to

Page 281

1 everything inside the box?
2      A.     Yes, sir.
3      Q.     Now, page one is the introduction page
4 and it doesn't seem to address anything in the box.
5      A.     Correct.  It should have said page
6 two.
7      Q.     So it should be page two?
8      A.     Yes, sir.
9      Q.     So you're just reincorporating
10 everything you said on page two.  And in that box
11 that you quoted with Mr. Johnson's rationale, he
12 says that removal would be a, quote, "permanent
13 solution."  Do you agree with that?
14         MR. DAVIS:  Object to the form.
15     A.     I don't think I got past the fact
16 that I don't agree with the remediation, the
17 method that he is approaching -- or recommending.
18 I don't have an opinion regarding that, no.
19     Q.     You can't say yes or no about whether
20 if you removed all the waste that that would be a
21 permanent solution to the problems at the site?
22         MR. DAVIS:  Object to the form.
23     A.     No, I don't have an opinion about

Page 282

1  that.  Like I said, I don't think I got past the
2  fact that I strongly disagree with the total
3  removal.
4       Q.     I got that part but I'm just asking if
5  it would be a permanent solution, and you say you
6  can't answer that?
7       A.     No, I don't have an opinion about
8  that right now.
9       Q.     Would removal of the waste material
10 reduce future maintenance and upkeep of the
11 property?
12          MR. DAVIS:  Object to form.
13      Q.     Maintenance and monitoring?  Let me
14 ask you this way.  Those are Mr. Johnson's words.
15          MR. DAVIS:  Same objection.
16      A.     I guess maintenance of what and
17 monitoring of what?
18      Q.     Well, I believe from his opinion it
19 was evident that he meant maintenance and
20 monitoring of a treat-in-place system for the
21 pollution on the site coming off the GOB pile.
22      A.     Sorry.  A treat in place?
23      Q.     Yes.  Are you familiar with that

Page 283

1  terminology?
2       A.     Certainly.
3       Q.     That's what he was referring to; that
4  it would -- removal would reduce the maintenance
5  and monitoring requirements in the future, and I'm
6  asking if you agree or disagree?
7       A.     As opposed to a treat in place?
8       Q.     Yes.
9          MR. DAVIS:  Object to the form.
10 Foundation.
11      A.     I guess it could, but I don't really
12 have an opinion because I don't understand the
13 specifics of the treat in place.
14      Q.     Have you developed on your own any
15 kind of conceptual proposal for treatment in-place
16 scenarios on the Maxine site?
17      A.     No, not since working with Alabama
18 By-Products in the early '80's when we worked
19 together.
20      Q.     In the top of page four in the box
21 where you quoted Mr. Johnson's language, he says
22 that if you are going to engage in restoration of
23 the GOB pile in place that any such program should

Page 284

1  include certain things.  And the first one is that
2  you should account for each contaminant migration
3  pathway.  Do you agree with that?
4       A.     Certainly.  A restoration of any
5  site should account for pathways.
6       Q.     Okay.  The second thing is he says it
7  should be designed to minimize active controls and
8  the need for ongoing maintenance and monitoring.
9  Do you agree with that?
10          MR. DAVIS:  Object to the form and
11 foundation.
12      A.     Generically, yes.
13      Q.     Do you believe that there is a way to
14 stabilize the mine waste on the site without
15 removing the trees on the site?
16      A.     I don't have an opinion about
17 stabilization.
18      Q.     Okay.  In the next box that you quoted
19 on that page, you quote Mr. Johnson says steep
20 slopes and the GOB pile are susceptible to erosion
21 and sloughing.  Do you agree with that or disagree?
22          MR. DAVIS:  Object to the form.
23      A.     I disagree based on my observations.

Page 285

1  There are steep slopes that are vegetated with
2  pine trees and covered with pine straw.  There's
3  no indication that any rain events have washed
4  the pine straw away and exposed -- exposed the
5  refuse material where there is current
6  vegetation.
7       Q.     Okay.  At the bottom of the page you
8  refer to Figure A-2.  Do you see that?
9       A.     Yes, sir.
10      Q.     Can you explain to me like I'm an
11 eight year old what your criticism means there with
12 regard to this figure, even though you may think it
13 should be younger that than, indulge me?
14      A.     I'm older than eight years old and I
15 don't understand it either, what these numbers
16 relate to in the map in his report.
17      Q.     You said the existing slope line does
18 not clearly correspond with the contours.
19      A.     I'm assuming this black line is the
20 cross-section across this map.
21      Q.     You're pointing to Figure A-1?
22      A.     Yes.  Sorry.
23      Q.     Okay.

Page 286

1    A.    And on Figure A-2, that the two
2 lines refer to -- two different colored lines
3 refer to an existing slope and a regraded slope.
4 And I did make a comparison or attempted to make
5 a comparison of what I think are land surface
6 contours on the map, although they're not
7 labeled, as to where the steeper areas and the
8 flat areas are in relation to the cross-section,
9 and just was not a good reference between one
10 document and the other.
11    Q.    Do you understand how he derived the
12 existing slope that's shown in Figure A-2?
13    A.    I understand how one might, but I'm
14 not sure how Mr. Johnson did.
15    Q.    Let me ask simply then:  Do you
16 believe that what he depicts as the existing slope
17 is inaccurate?
18    A.    I don't know if it's accurate or
19 not.  There's no numbers on the contours if
20 that's what they are on Figure --
21    Q.    Look at the copy that you have, if you
22 don't mind.  I think we marked -- this is my copy.
23 It's got a few things written on it.  Here it is.

Page 287

1    A.    Sorry.
2    Q.    I'm sorry.  I took it from you.
3    A.    I wasn't trying to grab it out of
4 your hand.  Assuming these are land surface
5 contours, they're not labeled as to what the
6 elevation is.
7    Q.    On Figure A-1?
8    A.    Yes, sir.
9    Q.    Anything else?  I'm just trying to
10 have you explain it so that we can make sure
11 Mr. Johnson can straighten himself out.
12        MS. ANDREEN:  Those are bigger pages
13 if you need to pull it out.
14    A.    I can see there is no numbers on
15 them.
16    Q.    Okay.  Have you finished your
17 explanation on that?
18    A.    I think so.
19    Q.    Okay.  On page five of your report
20 after the last box where you refer to page 31 of
21 Mr. Brown's --
22    A.    Yes, sir.
23    Q.    -- opinion, this is about vegetation

Page 288

1 and site control.  And you say based on aerial
2 photography that you think the areas are
3 substantially reforested?
4    A.    Yes, sir.
5    Q.    Which photographs would that be based
6 on?
7    A.    The recent aerial photography from
8 Google Earth.  Google Earth Pro, which I
9 reference on page 18.
10    Q.    And how would you define substantially
11 reforested?
12    A.    The majority of.  The vast majority
13 of.
14    Q.    What could you tell about ground cover
15 and vegetative ground cover from an overhead Google
16 photo?
17    A.    In looking at the photography
18 available on Google Earth that covers sometime
19 back into '90's to 2017, which you can look at
20 historically through the program, I looked at the
21 progression of revegetation, and based on the
22 recent photography there are very limited areas
23 that indicate unvegetated areas on top of the

Page 289

1 refuse pile.
2    Q.    In your opinion, which would be better
3 at stopping erosion:  Ground cover vegetation or
4 pine trees?
5    A.    Depends on the slope for one thing.
6    Q.    How about on a 45-degree slope?
7    A.    I really don't have an opinion.
8 Lots of variables.  Depends on the soil makeup.
9 I don't have an opinion on that.
10    Q.    Mr. Johnson at some point cited some
11 provisions from the Alabama Code about landfills
12 and prescribed methods for vegetation in those
13 areas.  Do you recall reviewing that material?
14    A.    I don't recall, no.
15    Q.    Do you know if that would be
16 applicable to the Maxine site in your -- do you
17 have an opinion about that?
18    A.    No, I don't.
19    Q.    Just to be clear about this, in the
20 bottom paragraph on that page you refer to upstream
21 and downstream samples.  I want to just make sure I
22 understand what you're referring to there.
23        I think it may be easiest to refer to

Page 290

1 the sampling map.  There's that one and there's one
2 other one before that that both shows the sampling
3 locations, whichever one you feel more comfortable
4 looking at.
5      A.      It would be SW15 and SW1.
6      Q.      And what Figure are you referencing?
7      A.      I'm sorry.  Figure 29 in Mr. Sisk's
8 Exhibit 8.  Mr. Brown's report of October 2017.
9      Q.      Thank you.  In that same paragraph you
10 say that the chemical character of, quote, "surface
11 water downstream does not exhibit impact."  What do
12 you mean by surface water?
13      A.      The water in the Locust Fork is
14 surface water.
15      Q.      You're referring to the water in the
16 river at that point?
17      A.      Yes, that's what was sampled.
18      Q.      I think we already talked about the
19 mixing zone that PELA established.
20      (Whereupon, a discussion was held off the
21       record.)
22      Q.      Let me ask you a little bit narrower
23 question again about the volumetrics now that we

Page 291

1 see the full back and forth.  And I understood your
2 testimony earlier about the difference in the
3 contour lines on the maps and the response was that
4 regardless of the display intervals the underlying
5 volumetric changes in Figures 14 and 15 that we
6 looked at is the same, so what is your response to
7 that; that the volumetrics are the same?
8      A.      Mr. Brown saying the volumetrics are
9 the same?
10      Q.      Yes.
11      A.      At certain points in time and that
12 time was adjusted based on my comment.
13      Q.      Well, first break it down.  Is he
14 correct that the underlying volumetrics are the
15 same?  The volumetric changes?  I'm sorry.
16      A.      I disagree with that statement.
17 Although we talked about, very early on, that the
18 net loss volume although comparing the basis of
19 two different maps could give you variability,
20 the net loss is a -- could be numerically derived
21 to show the difference in elevation between the
22 two maps.  And the use of that number may have
23 been where he started from, and then in order to

Page 292

1 shift the timeframes just made assumptions to get
2 to that point.
3      And that would be the same on the --
4 this graph Number 16, the differential between --
5 the numeric differential between two points can
6 be anywhere on that graph up and down, year by
7 year, and use that information to back calculate
8 and apply the erosion rate or the application
9 rate.  So again, I think it's speculative.
10      Q.      Do you know if the literature -- if
11 there's literature out there that supports the use
12 of the methodology that aquilogic used to derive
13 these figures?
14      A.      The ultimate volumetrics?
15      Q.      Yes.
16      MR. DAVIS:  Do you know?
17      A.      No.  No.
18      Q.      So as aquilogic concedes they assumed
19 constant rates of erosion and GOB placement in
20 connection with these calculations.  Are there any
21 other assumptions that you believe that they made?
22      MR. DAVIS:  Object to the form.
23      A.      Well, the area that was outlined in

Page 293

1 red was based on interpretation or assumptions
2 also.
3      Q.      So that's --
4      A.      I don't agree with.  Not that I can
5 determine, no, sir.
6      Q.      And so aquilogic compared pre-mining
7 information to the 1965 information and concluded
8 that the net addition of material was 3.35 million
9 cubic yards.  And that's quoted on page nine of
10 your report.
11      Do you believe that figure is
12 accurate?
13      MR. DAVIS:  Object to the form.
14      A.      I'm sorry.  Where are you on the
15 page?
16      Q.      It's in the box on the top of page
17 nine.
18      A.      The top part?
19      Q.      It's in the sentence that starts
20 "Regardless".  So I'm trying to break it down into
21 some smaller component parts.  And this is, the
22 first step is they're saying the net volume gain
23 from mining started in 1965 and the material is

Page 294

1  approximately 3.35 million cubic yards.  And I'm
2  asking if you dispute that figure.
3      A.    Yeah, I think it's based on the
4  assumptions.  I do dispute it.
5      Q.    For the reasons you've already
6  articulated?
7      A.    Yes, sir.
8      Q.    On page 10 near the bottom of the
9  page, the last paragraph, the previous question was
10 about the net volume gain.  This sentence was
11 during that same time period, '56 to 1965, they
12 calculated that approximately 4.18 million cubic
13 yards was deposited on the site.  Do you dispute
14 that figure?
15     A.    It was hiding.
16     Q.    For the record, which figure are you
17 looking at there?
18     A.    I'm looking at Figure 16 and the --
19 I'm looking at the 2017 report though.
20     Q.    Yeah, I think the figures in this box
21 on page 10 would be from the 2018 report.
22     A.    Again, whether we look at the
23 revised or the original, I think the numbers are

Page 295

1  based on assumptions.
2      Q.    Well, they do say approximately, so, I
3  mean, we understand they're not trying to be
4  precise.
5          MR. DAVIS:  Object to form.  I'm not
6  sure that was a question.
7      A.    I was going to offer the assumptions
8  that we talked about earlier.
9      Q.    The same assumptions you listed
10 earlier?
11     A.    Yes, sir.
12     Q.    Would that same response apply to the
13 last figure, the 7.58 million cubic yards, which
14 they have calculated as the approximate total
15 amount of material that was placed on a GOB pile?
16     A.    Yes.
17     Q.    So to summarize your testimony, you
18 question those, or you don't agree with those based
19 on assumptions they made, but you haven't made any
20 independent alternative calculations?
21     A.    I have not made any calculations.
22     Q.    Let me ask you a different question.
23 On page 11 and 12 you quoted from the section of

Page 296

1  Mr. Johnson's report where he's estimating the
2  amount of material that would have to be moved
3  under various remediation scenarios.
4          Have you made any independent
5  calculations, alternative calculations, to check
6  his numbers?
7          MR. DAVIS:  Object to the form and
8  foundation.
9      A.    No, I haven't.  And his numbers are
10 based on Mr. Brown's is my understanding with one
11 exception.
12     Q.    Specifically in that top box on page
13 12 he's saying that he estimates that approximately
14 half of the remaining material on the site would
15 have to be removed to uncover Tributary 1.  And I'm
16 just asking if you made any independent analysis
17 about that?
18     A.    No, I haven't.
19     Q.    Turn it over to page 14 where you are
20 addressing Dr. Dimova's work.
21     A.    Yes, sir.
22     Q.    Let me ask you as a general principle,
23 is analysis of grain size and water content a valid

Page 297

1  way to distinguish native from non-native material
2  on the river bottom?
3          MR. DAVIS:  Object to the form.
4      A.    Grain size analysis and water
5  content is a component of describing earth
6  materials.  That's specifically what's referred
7  to as GOB or sediments.
8      Q.    Is grain size and water content
9  analysis a valid way to determine if the material
10 is gravel as opposed to clay?
11     A.    Yes.
12     Q.    On page 15 of your report you cite
13 some aspects or components that you say are absent
14 from Dr. Dimova's report.
15     A.    Yes.
16     Q.    What's the source of that list of
17 items?
18     A.    Many years of experience.
19     Q.    You call that standard accepted
20 industry procedures and protocols?
21     A.    Yes, sir.
22     Q.    And that basically amounts to, you
23 just said, your experience?

Page 298

1    A.    I wasn't finished with my answer.

2    Q.    Okay.

3         MR. DAVIS:  He doesn't want to hear

4  your answer.

5    Q.    You stopped talking.  That's why I

6  assumed you were finished.

7    A.    I did?  I'm sorry.  I didn't think I

8  stopped.

9         There are many protocols that are

10  used for data gathering and data interpretation

11  and data reporting and standard formats.  They're

12  outlined in ADEM documents, some of the ADEM

13  documents we talked about before, EPA documents,

14  textbooks that discuss how to assess sites and

15  contamination and report them.  These are

16  standard procedures that are used by the oil and

17  gas industry for looking at what's underneath our

18  feet, the coal industry, any mineral industry,

19  just standard procedures that address the detail

20  that's needed to describe what you do in the

21  field, describe how you interpret the

22  information, and describe sufficiently how you

23  report the information.

Page 299

1    Q.    Let me ask a more narrow question.

2  This list of eight things that you listed here, did

3  those come out of your mind and you typed them down

4  or did they come from a secondary source?

5    A.    Both.

6    Q.    Okay.  What was the secondary source?

7    A.    The guidance documents that we were

8  referring to earlier from ADEM.  Also the

9  guidance sample examination manual, Swanson,

10  which is one of my references; Maher, which is

11  one of my references; Compton, Field Geology

12  Manual.

13    Q.    So, for example, looking at page 18 on

14  the references you said Maher, and this indicates

15  that this is a document about logging drill

16  cuttings in Oklahoma; is that right?

17    A.    It is -- it is a reference document

18  that is utilized by the consulting industry and

19  the oil and gas industry, and it describes how

20  you would retrieve and describe samples of land

21  surface and the subsurface.

22    Q.    And the Swanson material, what

23  relevance does that have to core sampling?

Page 300

1    A.    Oh, same thing.  It's even more

2  detailed than Mr. Maher's document.

3         MR. DAVIS:  During the pause here, I

4  sure don't want to slow anything down any more but

5  can you give me an idea about how much you've got

6  left because I may need to make a call.

7         MR. BROCK:  Not much.

8         MR. DAVIS:  More than ten minutes?

9  I'm not trying to press you.

10         MR. BROCK:  Yeah, that's pretty

11  specific.  Ten to 15, 15 to 20.  Not more than

12  that.

13         MR. DAVIS:  Let me make a call.

14    (Whereupon, a break was taken.)

15    Q.    (BY MR. BROCK) One aspect of your

16  report addressing Dimova is confusing to me.  I

17  want to see if we can figure it out.

18         So on the bottom of page 15 your

19  report says that the sample location coordinates

20  indicate that the sites were on the left bank of

21  the river facing downstream.  How did you determine

22  that?

23    A.    Based on the coordinates that were

Page 301

1  in her report and plotting them on Google Earth,

2  Maps, whatever.

3    Q.    I'm just going to show you -- I'm

4  going to mark it Exhibit 42 to this deposition.

5  That was a deposition -- an exhibit to Dr. Dimova's

6  deposition.  And my understanding, or I think she

7  testified, is this is a plot of the coordinates and

8  it shows the sample points on the opposite side of

9  the river from what is stated in your report.

10         MR. DAVIS:  Make sure you read the

11  whole sentence of what you said in your report.

12    (Whereupon, Plaintiff's Exhibit Number 42

13    was marked for identification.)

14    A.    That's true.  It should be right

15  bank.

16    Q.    Your report should say right bank?

17    A.    That's correct.

18    Q.    And all the analysis that follows

19  about morphological conditions along the banks and

20  everything, are you talking about the right bank of

21  the river facing downstream or the left bank?

22    A.    I'm talking about where the samples

23  were.

Page 302

1  Q.  How do you know -- how are you certain
2  about that, that you --
3  A.  Because --
4  Q.  -- are referring to the right bank
5  instead of the left bank?
6  A.  Because I was referring to where she
7  took her samples.  I was about to say, what I
8  wrote for the rest of it is not relevant to what
9  bank I referred to.
10  Q.  Okay.  So all of the information on
11  page 16 you're saying would be equally applicable
12  whether it was the right or the left bank?
13  A.  That's correct.
14  Q.  Have you been to those sample sites?
15  A.  No, I have not.
16  Q.  You indicate on page 16 you reviewed
17  some aerial photography.  Is that what you
18  reviewed?
19  A.  Yes, sir.  I have been at BW2, the
20  sample site close to the --
21  Q.  To the dam?
22  A.  Yes.
23  Q.  In the paragraph in the middle of that

Page 303

1  page you discuss some onshore commercial
2  development and activity in the proximity of the
3  sampling site BW5, right?
4  A.  Yes, sir.
5  Q.  Can you just explain how that
6  development or onshore activity would impact a core
7  sample?
8  A.  The facility I'm referring to is a
9  large land disturbance.  Vegetation was removed.
10  It has or has had waterfront activities, a barge
11  loading facility, and it is upstream of sample
12  BW5, and materials would travel downstream from
13  that waterfront to BW5 potentially, as would
14  sediments that are coming out of the tributary or
15  slough or whatever we want to call it that is
16  close to BW5.
17  Q.  Did you look at the photos of the core
18  samples?
19  A.  No, I didn't know there were any
20  photos of the core samples.
21  Q.  Do you know the depth of the core
22  samples in terms of how far below the river bottom
23  the samples extended?

Page 304

1  A.  Her report, I believe, said they
2  were approximately 2.3 feet or shorter.
3  Q.  So would this 20 acres of developed
4  land near a sampling spot -- I'm trying to
5  understand, how would that affect a core sample
6  that went down three feet below the river bottom?
7  A.  The facility has been there for a
8  number of years based on the aerial photography,
9  so that sediments being transported downstream
10  over a number of years could be deposited near
11  shore and comprise part of the thickness or all
12  of the thickness of that sample.
13  Q.  You haven't reviewed Dr. Dimova's
14  deposition, have you?
15  A.  No, I haven't.
16  Q.  You described already the potential
17  impact or relevance of the development.  What would
18  the potential impact on a core sample be from an
19  inflow feature near the sampling site?
20  A.  Again, it could be contributing
21  sediments that would drop out depending on the
22  size, their grain size, close to BW5 or at BW5
23  and be a component of the sample.

Page 305

1  Q.  What about at BW2?
2  A.  They might make it all the way
3  there.
4  Q.  Oh, no.  I'm just saying, is there any
5  inflow feature into the river at that point that
6  might affect the bottom sediments?
7  MR. DAVIS:  BW2?  I just didn't hear
8  you.
9  A.  I'm not really sure precisely where
10  that sample location is relative to the dam.
11  Q.  I thought you said you'd been there a
12  few seconds ago.
13  A.  Well, I plotted --
14  Q.  Go ahead.
15  A.  I've been on the dam and seen the --
16  the area -- the proximity where she sampled.
17  Q.  What does the term "gravel" mean in
18  term of sizing or classifying rock material?
19  A.  It's -- without looking at the
20  Wentworth scale or the grain size distribution,
21  it has a specific millimeter size associated with
22  it.
23  Q.  Okay.  With regard to BW5 you said

Page 306

1 that the aerial photography showed lateral bar and
2 bank deposits. What does that mean?
3    A.    Lateral deposits are deposits that
4 are parallel to the configuration of the stream,
5 like a sand bar. The historical photography
6 showed in the vicinity of the sampling that these
7 deposits are visible. It could depend on the
8 river level at the time of the aerial photography
9 but they do indicate that there's sediment
10 deposition close to the bank.
11    Q.    And what relationship would that have
12 or what relevance would that have to whether a core
13 sample was appropriate?
14    A.    It would depend --
15    Q.    Go ahead.
16    A.    It would depend on where the sample
17 was taken, whether it was taken actually in the
18 bar or at a deeper location where the sediments
19 could vary. They could have a different grain
20 size or a different composition.
21    Q.    So you're saying if the sample was
22 taken in the bar then it might not necessarily be
23 representative of typical river conditions in that

Page 307

1 area?
2    A.    No.
3    Q.    Is that the point?
4    A.    No, I'm not saying that. I'm saying
5 that one sample at a location particularly close
6 to the riverbank isn't representative of the
7 sediment of the Locust Fork, the natural sediment
8 of the Locust Fork.
9    Q.    What if the core sample is deep enough
10 to give you like a hundred-year picture of the
11 river bottom, it still wouldn't be an adequate
12 representation of the river bottom in that area?
13    A.    It would be a representation of the
14 sedimentation that occurred at that core
15 location, not necessarily a profile across the
16 river that you would look at all of them. That
17 one sample can't be representative of Locust
18 Fork.
19    Q.    How many would you need to establish
20 what was representative of that area of Locust
21 Fork?
22    A.    I haven't made that determination.
23    Q.    Do you have an estimation?

Page 308

1    A.    Not at this time.
2    Q.    Looks like in your reference list you
3 refer to the ASTM Standard 2487 and 2488?
4    A.    Yes, sir.
5    Q.    Are you familiar with the NIST
6 standards?
7    A.    I know what NIST means.
8    Q.    What is it?
9    A.    National Institute of Scientific
10 Testing, I believe is what it's called.
11    Q.    Are there one set of standards ASTM
12 versus NIST that would be preferable for this
13 application or the analysis that Dr. Dimova
14 performed?
15    A.    The ASTM standards are standards
16 that are typically used in describing subsurface
17 materials or surface materials.
18    Q.    Have either of those standards been
19 superseded or appealed to your knowledge?
20    A.    Well, they have a date of 2000 so
21 it's likely that they have been revised over
22 time.
23    Q.    I'm not going to go through each one

Page 309

1 of them, but in the reference list there were
2 several that we checked and couldn't find online
3 publically available. If we were to request that
4 you provide it to Richard so we could get it, would
5 you agree to do that?
6    A.    Sure.
7    Q.    Okay. I think that's all.
8       MR. DAVIS: All right. Thank you.
9    (Whereupon, the preceding deposition was
10 concluded at 5:36 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 310

ERRATA SHEET

PLEASE LIST ANY CORRECTIONS BELOW

PLEASE DO NOT WRITE ON THE
TRANSCRIPT

PAGE NO.  LINE NO.    CORRECTION

1._____

2._____

3._____

4._____

5._____

6._____

7._____

8._____

9._____

10._____

11._____

12._____

13._____

14._____

15._____

16._____

Page 311

DEPONENT'S CERTIFICATE

I, LOIS GEORGE, the witness herein,
have read the transcript of my testimony and the
same is true and correct, to the best of my
knowledge.  Any corrections and/or additions, if
any, are listed separately.

_____

LOIS GEORGE

NOTARY PUBLIC:

COMMISSION EXPIRES:

Dated: _____

Page 312

REPORTER'S CERTIFICATE

STATE OF ALABAMA  )
JEFFERSON COUNTY  )

I hereby certify that the above and foregoing
deposition was taken down by me in stenotype, and
the questions and answers thereto were transcribed
by means of computer-aided transcription, and that
the foregoing represents a true and correct
transcript of the testimony given by said witness
upon said hearing, to the best of my ability and
understanding.

I further certify that I am neither of
counsel, nor of kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.

/S/Kimberly B. Dowdy

Kimberly B. Dowdy, CCR, RPR
Alabama CCR #62
My Commission expires:
March 16, 2020

**WORD INDEX**

**< 1 >**
**1** 220:*11, 14*
221:*18* 227:*22*
236:*6* 244:*12, 14*
252:*21* 280:*21*
296:*15* 310:*8*
**1.9** 257:*9*
**10** 222:*4* 294:*8, 21*
310:*17*
**100** 215:*6* 217:*18*
219:*6*
**10-foot** 230:*9, 9*
**11** 222:*4* 295:*23*
310:*18*
**12** 222:*4* 224:*8*
295:*23* 296:*13*
310:*19*
**13** 268:*6* 310:*20*
**136p** 268:*14*
**14** 229:*13, 14*
230:*1* 231:*10, 15*
270:*6* 291:*5*
296:*19* 310:*21*
**15** 229:*14* 230:*14,*
*17, 18* 231:*10, 15*
291:*5* 297:*12*
300:*11, 11, 18*
310:*22*
**16** 292:*4* 294:*18*
302:*11, 16* 310:*23*
312:*20*
**17** 271:*19*
**18** 275:*4* 288:*9*
299:*13*
**1938** 234:*17, 18*
**1965** 229:*12* 293:*7,*
*23* 294:*11*
**1971** 229:*11*
234:*20*
**1975** 228:*9, 14*
**1980's** 247:*2, 4*
263:*16* 265:*11*
**1984** 248:*13* 258:*2*
259:*14* 260:*10, 14*
**1985** 253:*9*
**1987** 228:*9, 14*
**1988** 271:*12* 275:*4*

**1993** 268:*7*

**< 2 >**
**2** 214:*16* 310:*9*
**2.0** 273:*12*
**2.3** 304:*2*
**2:16-CV-01443-AK**
**K** 214:*5*
**2:23** 219:*8*
**20** 300:*11* 304:*3*
**2000** 308:*20*
**2016** 247:*13*
**2017** 237:*22*
240:*17* 244:*16*
247:*13* 288:*19*
290:*8* 294:*19*
**2018** 214:*17* 215:*8*
219:*8* 240:*17*
270:*22* 294:*21*
**2020** 312:*20*
**2031** 214:*22*
**20-foot** 230:*8*
**214-312** 214:*16*
**219** 218:*4*
**24,000** 234:*21*
**2487** 308:*3*
**2488** 308:*3*
**25** 270:*22*
**27** 214:*17*
**27th** 215:*7* 219:*8*
**282** 217:*7*
**2829** 217:*7*
**29** 290:*7*

**< 3 >**
**3** 240:*5, 9* 310:*10*
**3.35** 293:*8* 294:*1*
**3:33** 261:*13*
**31** 287:*20*
**310** 218:*11*
**311** 218:*11*
**312** 218:*11*
**32,000** 235:*14*
**35209** 217:*19*
**35216** 214:*23*
**35222-206** 217:*13*
**35233** 217:*8*
**36** 256:*18* 258:*9*
260:*6, 7*

**365** 239:*5*
**37th** 217:*12*

**< 4 >**
**4** 220:*11, 15* 240:*8*
241:*1* 244:*9*
270:*21* 310:*11*
**4.18** 294:*12*
**40** 229:*18, 22*
236:*5*
**40229** 218:*8*
**41** 279:*2, 5*
**41279** 218:*8*
**42** 301:*4, 12*
**42301** 218:*11*
**45-degree** 289:*6*

**< 5 >**
**5** 244:*6* 258:*2*
310:*12*
**5:36** 309:*10*
**501** 257:*9*
**56** 294:*11*

**< 6 >**
**6** 227:*22* 239:*11*
310:*13*
**62** 312:*18*
**62,000** 234:*19*
**65** 225:*9*

**< 7 >**
**7** 250:*12* 252:*19*
310:*14*
**7.58** 295:*13*
**700,000** 235:*22*
**712** 217:*12*
**7th** 215:*7* 217:*18*
219:*7*

**< 8 >**
**8** 221:*5* 222:*4, 5,*
*11* 224:*7, 10*
225:*10* 228:*1*
231:*3* 253:*2*
261:*16* 290:*8*
310:*15*
**80's** 239:*8, 10*
250:*4* 264:*2*

283:*18*

**< 9 >**
**9** 222:*4* 228:*9*
310:*16*
**90's** 288:*19*
**92** 235:*14*
**93,000** 235:*14*

**< A >**
**A-1** 285:*21* 287:*7*
**A-2** 280:*13* 285:*8*
286:*1, 12*
**ABC** 254:*14*
258:*11*
**ability** 312:*10*
**able** 221:*2* 222:*19*
243:*18, 21* 244:*3*
**absent** 297:*13*
**absolutely** 239:*12*
**accepted** 297:*19*
**accepts** 240:*16*
**account** 235:*9*
241:*8* 243:*8* 284:*2,*
*5*
**accuracy** 236:*17*
237:*2, 13*
**accurate** 230:*12*
238:*2* 286:*18*
293:*12*
**acreage** 237:*13*
**acres** 304:*3*
**Act** 259:*6, 15, 16*
260:*11, 15*
**acting** 219:*3*
**Action** 261:*20*
264:*10, 18* 312:*13*
**actions** 253:*3, 4*
254:*20*
**active** 284:*7*
**activities** 253:*5*
254:*2* 255:*6*
303:*10*
**activity** 303:*2, 6*
**actual** 238:*9* 264:*4*
**addition** 226:*18*
239:*18* 273:*16*
293:*8*

**additional** 222:8 226:20 262:16, 21 272:17

**additions** 311:7

**address** 246:3 254:21 255:9, 18 257:18 271:4 276:14, 21 277:22 281:4 298:19

**addressed** 232:19, 20 276:20 278:5, 6, 9

**addresses** 232:22

**addressing** 274:7 296:20 300:16

**ADEM** 266:21 267:14 274:7 277:13 298:12, 12 299:8

**adequate** 307:11

**adjacent** 246:14

**adjusted** 291:12

**administrative** 253:12 267:14

**adverse** 251:21

**Aerial** 218:11 221:20 222:22 223:1, 12 226:10 227:20, 23 248:18 288:1, 7 302:17 304:8 306:1, 8

**affect** 249:11 304:5 305:6

**age** 237:4

**agency** 255:21

**ages** 236:1 237:9

**ago** 253:21 272:16 305:12

**agree** 225:18 281:13, 16 283:6 284:3, 9, 21 293:4 295:18 309:5

**AGREED** 215:3, 10 216:4, 12

**agreement** 267:22

**ahead** 220:12 235:19 241:14 253:22 260:2 261:4 305:14 306:15

**ALABAMA** 214:2, 23 215:7 217:8, 13, 19 219:3, 4, 7 227:21 238:22 239:17 265:8 268:7 283:17 289:11 312:2, 18

**allow** 238:15

**allows** 223:11

**altered** 244:19 245:8

**alternative** 295:20 296:5

**alternatives** 274:3, 11

**Amec** 242:4

**amount** 235:7 242:20 295:15 296:2

**amounts** 297:22

**analysis** 234:5 236:8 241:2 243:8 257:6 296:16, 23 297:4, 9 301:18 308:13

**Analyst** 236:20

**Andreen** 217:6 287:12

**answer** 223:17 238:18 246:4 249:19 251:13 254:18 261:4 264:23 266:2, 3, 5, 8 276:17 278:1 282:6 298:1, 4

**answered** 231:22 232:3, 3 246:10 253:16 257:21 266:1 276:19 277:21 278:2

**answering** 231:12 244:18

**answers** 312:6

**Anthony** 220:23 221:6 236:6

**anywise** 312:14

**apologize** 219:22

**appealed** 308:19

**appear** 280:6

**APPEARING** 217:3, 15

**appears** 278:16

**appendices** 220:19 221:12

**applicable** 224:6 262:8 263:7, 8 274:13 275:10 289:16 302:11

**application** 224:20 236:17 237:1, 6 260:9 263:5 292:8 308:13

**apply** 239:4 292:8 295:12

**approach** 277:14

**approaches** 267:3

**approaching** 281:17

**appropriate** 306:13

**approximate** 295:14

**approximately** 227:16 294:1, 12 295:2 296:13 304:2

**aquilogic** 236:11 292:12, 18 293:6

**area** 224:11, 23 225:17 226:2 227:4 228:12, 22 229:2, 6, 10 230:21, 22 231:19 238:20 239:5, 13 247:6, 22 248:20 252:3 253:1, 6 254:10, 11 256:23 257:3 263:4, 18, 23 276:1 292:23 305:16 307:1, 12, 20

**areas** 225:5 226:9, 9, 13, 18, 21 227:4 232:16 237:18 238:22 249:2 263:9 286:7, 8 288:2, 22, 23 289:13

**arrive** 242:16

**arrows** 227:2 232:14

**articulated** 294:6

**asked** 219:22 231:14 237:23 254:19 259:2 263:13 274:15 278:2

**asking** 229:8 255:1 257:20 260:13 276:10, 21 277:17 282:4 283:6 294:2 296:16

**ASMC** 258:12, 21, 22 259:13 260:5

**aspect** 300:15

**aspects** 297:13

**assertions** 240:6

**assess** 298:14

**assessment** 246:12 262:17 267:2 275:11 277:12

**assign** 216:7

**assigned** 226:10

**assigning** 226:7

**assistance** 273:6, 8

**associated** 226:22 305:21

**assumed** 292:18 298:6

**assuming** 285:19 287:4

**assumption** 235:12 236:3 239:6 243:23 244:2

**assumptions** 235:6 244:1 292:1, 21 293:1 294:4 295:1, 7, 9, 19

**ASTM** 271:20 308:3, 11, 15

**attached** 221:11

**attachments** 220:18

**attempt** 237:21

**attempted** 286:4

**attention** 273:19

**Attorney** 217:10

**available** 238:12, 20 267:23 268:1, 3, 9 288:18 309:3

**Avenue** 217:7

aware 238:*21*

**< B >**
back 219:*18*  236:2
239:*8*  261:*14*
288:*19*  291:*1*
292:7
background 269:*23*
270:*3*
bank 232:*10*
245:*15*  300:*20*
301:*15, 16, 20, 21*
302:*4, 5, 9, 12*
306:*2, 10*
banks 301:*19*
bar 306:*1, 5, 18, 22*
barge 303:*10*
Barry 217:*5*
bars 245:*14*
based 229:*10, 11*
233:22  235:*11*
239:*21*  243:*9, 23*
244:2  248:7
249:*21*  250:*16*
251:*5, 6, 19*  252:22
254:*12*  263:*15*
264:*6, 23*  274:*20*
284:*23*  288:*1, 5, 21*
291:*12*  293:*1*
294:*3*  295:*1, 18*
296:*19*  300:*23*
304:*8*
basically 297:22
basin 269:*13*  270:*5*
basing 228:*8*
basis 227:*19*  232:*1*
248:*16, 17*  291:*18*
bedrock 249:*4*
beginning 219:*8*
BEHALF 217:*3, 15*
believe 221:*9*
222:*17*  223:*15, 19*
225:20  231:*6*
235:*13*  238:*11*
241:*3*  247:*12*
248:2  249:*13*
258:*17*  262:*15*
264:*8*  269:*19, 20*
270:*9*  275:22
276:*3*  277:*15, 21*

278:5  280:*4*
282:*18*  284:*13*
286:*16*  292:*21*
293:*11*  304:*1*
308:*10*
believed 254:*14*
bend 226:7
best 239:*9*  262:*20*
280:*18*  311:*6*
312:*10*
better 289:*2*
bigger 287:*12*
binoculars 223:*11*
Birmingham 215:7
217:*8, 13, 19*  219:7
bit 227:*4*  234:*15*
290:22
BLACK 214:7
217:*11*  285:*19*
block 280:*9*
blues 228:*17*
bold 233:*17, 22*
234:*5*
book 269:*8*  270:*14*
bottom 225:*16*
244:6  245:*11, 13,
17, 17*  246:*6, 13*
247:*11, 15, 21, 23*
253:*9*  280:*12*
285:7  289:*20*
294:*8*  297:*2*
300:*18*  303:22
304:*6*  305:*6*
307:*11, 12*
boundary 227:*14*
box 278:*16, 18, 23*
279:*7, 22*  280:*6, 10,
12, 16, 20*  281:*1, 4,
10*  283:*20*  284:*18*
287:*20*  293:*16*
294:*20*  296:*12*
boxes 278:*12*
279:*14*
break 233:22
248:*10*  261:*12, 13*
291:*13*  293:*20*
300:*14*
bring 220:*5*

Brock 217:*5*  218:*4*
219:*17*  253:*19*
300:*7, 10, 15*
Brookwood 215:*6*
217:*18*  219:*6*
Brown 222:*4, 17*
230:*1*  231:*19*
236:*2, 6*  238:*4*
241:*1, 3*  242:*15*
245:*4*  246:*1*
250:*18*  291:*8*
Brownfield 267:*15*
Brown's 218:*8*
220:*23*  221:7
229:*19*  230:*17*
232:*17*  235:*4*
237:*6*  240:*6, 11, 12,
19*  244:*11, 16*
252:*12*  271:*4*
279:*16*  287:*21*
290:*8*  296:*10*
bullet 274:*18*
275:*13*
BW1 218:*11*
BW2 218:*11*
302:*19*  305:*1, 7*
BW3 218:*11*
BW4 218:*11*
BW5 218:*11*  303:*3,
12, 13, 16*  304:22,
22*  305:*23*
By-Products
227:*21*  238:22
239:*17*  265:*8*
283:*18*

**< C >**
calculate 236:2
292:7
calculated 294:*12*
295:*14*
calculation 237:*17*
238:*3, 16*
calculations 234:*11*
235:*4*  239:*8, 10*
240:2, 7*  242:*3, 7,
17, 19*  243:7
292:20  295:*20, 21*
296:*5, 5*

call 276:*4*  297:*19*
300:*6, 13*  303:*15*
called 233:*15*
308:*10*
calling 227:*5*
calls 254:*10*
260:22  264:*21*
captured 256:*5*
CASE 214:*5*
253:*14*  262:*8*
267:22
Cassidy 269:7
cause 219:*9*  312:*15*
CCR 312:*18, 18*
CENTER 217:*4*
CERCLA 274:*6*
275:7  277:*1*
certain 230:*6*
253:*3*  258:*18*
263:*4*  266:*17, 17*
284:*1*  291:*11*
302:*1*
Certainly 223:*3*
237:*12*  259:*18*
264:*23*  283:*2*
284:*4*
CERTIFICATE
218:*11, 11*  311:*1*
312:*1*
certify 219:*3*
312:*4, 12*
change 229:*9*
237:*12*  245:*10, 11,
12, 13, 18*  246:7
changed 230:*4*
245:*9*  246:*20*
247:*3, 6*
changes 229:*16*
230:*14*  231:*13*
235:*5, 21*  291:*5, 15*
channel 250:*2*
character 242:22
290:*10*
characteristics
244:*23*  245:*5, 7, 8,
12, 19*  246:*8*
249:*11*
characterization
241:*23*  242:*20, 21*

check  296:5
checked  309:2
chemical  290:10
chemicals  241:21
chemistry  243:5, 17, 20  260:16  263:17 264:1  265:4
Christina  217:6
chronological  254:1
circle  224:15 226:19
circumstances 265:19
cite  223:2  297:12
cited  289:10
cites  236:20
citing  269:21
Civil  219:5
clarified  233:3, 11
classifying  271:18 305:18
clay  297:10
Clean  259:6, 15, 16 260:10, 15
cleaner  255:12
clear  233:8  238:13 289:19
cleared  222:10 280:7
clearly  285:18
clerk  217:21, 22
climatological 239:3  265:2 266:20
close  250:1  270:20 302:20  303:16 304:22  306:10 307:5
closest  225:1
coal  268:7  269:7, 13  270:5  298:18
Code  267:15 289:11
collective  224:3
collectively  222:14 224:3
color  228:15
colored  286:2
colors  228:16
combination  233:19

come  234:4 238:10  246:19 267:19  274:19 299:3, 4
comes  279:22
comfortable  290:3
coming  219:18 260:17  265:5 282:21  303:14
comment  222:16 224:4  231:2 291:12
comments  230:3 280:21
commercial  303:1
Commission  253:9 311:17  312:18
Commissioner 215:6  216:14 219:3
compaction  239:4
COMPANY  214:10
comparable  241:11 266:18
compared  293:6
comparing  229:10 234:16, 21  236:13, 14  248:5  256:22 291:18
comparison  235:3 286:4, 5
complete  220:17, 20  221:6  270:23
completed  247:12 252:15  253:5 254:3, 20, 20  255:7, 9, 21  258:11  263:1 265:8
compliance  215:14 275:19
component  237:8 293:21  297:5 304:23
components  297:13
composition  306:20
comprehensive 226:6
comprise  304:11
Compton  299:11

computations 231:20  235:12
computer  223:5
computer-aided 312:7
concedes  292:18
conceive  263:7, 11
concentration 241:21  243:4
conceptual  262:11 283:15
concern  280:4
concert  267:1
conclude  228:10 253:7  275:23
concluded  260:1, 3 293:7  309:10
concludes  280:20
conclusion  234:7 240:5  244:5, 10 260:22  262:20 276:7
conclusions  240:11, 14  273:11, 15
condition  267:13
conditions  239:3 241:18  243:10 247:3, 5  251:3 265:2  266:20 301:19  306:23
conductance  252:16
configuration 246:20  247:11 306:4
confined  252:19
confirm  220:13 221:9  256:23
confusing  279:13 300:16
connected  271:23
connection  240:1 252:18  259:6, 12 266:22  267:7, 16 277:3  292:20
consider  241:1 271:7
consideration 238:1  241:16

considered  251:11 259:21  275:14 276:4, 6, 12  277:3
considering  242:22
consistent  244:9 264:7
constant  292:19
consultants  242:5
consulting  299:18
contain  273:14
contained  228:4
contaminant  284:2
contamination 298:15
content  296:23 297:5, 8
Continued  216:2
contour  230:4, 5, 7, 8, 10, 15  234:16 237:5  291:3
contours  230:9 285:18  286:6, 19 287:5
contributing  304:20
control  288:1
controls  284:7
coordinates  249:22 300:19, 23  301:7
Copeland  270:7
copies  268:1  269:3, 5  270:10
copy  220:17, 21, 23 221:6  268:4, 11, 12 269:10, 14, 18, 20 270:8, 10, 14, 23 286:21, 22
core  299:23  303:6, 17, 20, 21  304:5, 18 306:12  307:9, 14
Correct  224:1 225:3, 4, 18  226:22 227:15  231:8 232:15  233:18 235:11  250:21 253:3  254:15 257:3  266:13 273:3  277:4 278:15  281:5 291:14  301:17

302:*13* 311:*6* 312:*8*

**Corrected** 261:*20*

**CORRECTION** 310:*6*

**CORRECTIONS** 310:*3* 311:*7*

**corrective** 264:*18*

**correspond** 230:*16* 285:*18*

**counsel** 215:*4* 216:*6* 219:*6* 312:*13*

**counter** 276:*19*

**COUNTY** 312:*2*

**couple** 271:*19*

**course** 243:*22*

**COURT** 214:*1, 21* 215:*15* 219:*2, 14*

**cover** 288:*14, 15* 289:*3*

**Covered** 234:*15* 285:*2*

**covers** 288:*18*

**Crest** 214:*22*

**criteria** 277:*14*

**criterion** 276:*4, 15* 277:*1, 18* 278:*4*

**criticism** 231:*2* 242:*10, 19* 244:*21* 285:*11*

**criticisms** 222:*11* 242:*14*

**critique** 235:*2* 276:*9*

**cross-section** 285:*20* 286:*8*

**crunch** 244:*1*

**CSR** 214:*20* 219:*1*

**cubic** 235:*15, 22* 237:*15* 293:*9* 294:*1, 12* 295:*13*

**current** 285:*5*

**currently** 248:*23*

**cuttings** 299:*16*

**< D >**

**dam** 239:*13, 14* 302:*21* 305:*10, 15*

**dams** 263:*9*

**Daniel** 272:*9, 11*

**data** 238:*15* 239:*22* 243:*22* 249:*13, 16, 17, 18* 250:*4, 5, 5, 16* 255:*23* 256:*3, 6* 257:*2* 260:*16* 262:*10, 16, 19, 21* 263:*15, 20, 21* 265:*14, 21* 268:*7* 271:*7* 298:*10, 10, 11*

**date** 219:*4* 239:*18* 308:*20*

**dated** 270:*22* 311:*21*

**David** 217:*22*

**DAVIS** 217:*16, 17* 219:*16* 222:*12* 238:*17* 242:*11* 245:*1, 20* 246:*9, 15* 251:*12* 253:*15, 18* 254:*7, 16* 255:*4, 13* 256:*8, 14* 257:*16* 259:*8, 17* 260:*18, 21* 261:*2, 10* 263:*19* 264:*11, 20* 265:*6, 16, 23* 266:*4, 10, 15* 268:*11* 275:*16* 276:*16* 277:*5, 19, 23* 281:*14, 22* 282:*12, 15* 283:*9* 284:*10, 22* 292:*16, 22* 293:*13* 295:*5* 296:*7* 297:*3* 298:*3* 300:*3, 8, 13* 301:*10* 305:*7* 309:*8*

**day** 215:*8*

**days** 239:*5*

**deal** 220:*6*

**deals** 221:*1* 273:*18*

**decisions** 255:*22* 262:*12*

**decreased** 247:*7* 248:*3*

**deep** 307:*9*

**deeper** 306:*18*

**Defendant** 214:*11* 217:*15*

**define** 246:*1* 274:*3* 288:*10*

**defined** 230:*15*

**defining** 274:*9*

**delineated** 228:*12* 231:*5*

**delineating** 227:*5*

**delineation** 225:*19* 229:*4* 230:*20* 231:*16* 232:*2*

**demonstrate** 232:*14*

**depend** 245:*22* 306:*7, 14, 16*

**dependent** 265:*2*

**depending** 246:*11* 304:*21*

**depends** 265:*18* 289:*5, 8*

**depicted** 226:*21*

**depicts** 227:*11* 286:*16*

**DEPONENT'S** 218:*11* 311:*1*

**deposit** 246:*5*

**deposited** 294:*13* 304:*10*

**DEPOSITION** 214:*13* 215:*5, 11, 13* 216:*9, 13* 219:*19* 221:*5* 229:*19* 301:*4, 5, 6* 304:*14* 306:*10* 309:*9* 312:*5*

**depositions** 215:*16*

**deposits** 245:*14, 16, 23* 246:*18, 19* 247:*15* 306:*2, 3, 3, 7*

**depth** 247:*10* 303:*21*

**derive** 292:*12*

**derived** 286:*11* 291:*20*

**describe** 298:*20, 21, 22* 299:*20*

**described** 223:*22* 236:*15* 249:*17*

304:*16*

**describes** 299:*19*

**describing** 271:*18* 297:*5* 308:*16*

**description** 271:*15, 17*

**design** 255:*8*

**designed** 255:*11* 284:*7*

**detail** 223:*22* 298:*19*

**detailed** 239:*16* 300:*2*

**determination** 307:*22*

**determinations** 238:*7, 23*

**determine** 293:*5* 297:*9* 300:*21*

**determining** 234:*23*

**developed** 283:*14* 304:*3*

**development** 303:*2, 6* 304:*17*

**Diab** 217:*22*

**diagrams** 247:*18*

**difference** 234:*23* 235:*22* 237:*4, 14* 256:*10, 12* 257:*10* 291:*2, 21*

**differences** 234:*22* 235:*15* 243:*8*

**different** 230:*17, 19* 234:*18* 235:*9* 236:*1, 15, 16* 237:*9* 239:*2, 3, 4* 241:*4* 256:*6* 259:*10* 267:*3* 286:*2* 291:*19* 295:*22* 306:*19, 20*

**differential** 238:*3* 292:*4, 5*

**digital** 270:*9*

**digitize** 237:*10*

**digitized** 223:*16*

**Dillard** 217:*10*

**dimension** 223:*14*

**Dimova** 249:*20* 272:*3* 300:*16* 308:*13*

Dimova's 249:20 250:5 271:23 296:20 297:14 301:5 304:13
direct 273:19 279:18
disagree 282:2 283:6 284:21, 23 291:16
discharge 241:22 243:5 252:9
discharges 251:22 263:23
discharging 241:6 243:3
discuss 298:14 303:1
discussed 220:6 222:18 224:19, 21 233:2
discussing 259:12
discussion 221:20 226:15 259:5, 7 273:12, 14 290:20
discussions 245:6 259:19
disparity 257:15
display 291:4
disposal 238:20 247:6 253:6
dispute 294:2, 4, 13
distinction 224:19 238:8
distinguish 297:1
distribution 305:20
DISTRICT 214:1, 2
disturbance 303:9
ditch 256:5
DIVISION 214:3
document 253:17 254:2 260:5, 6 267:3 268:16, 18 271:13 274:22 275:5, 7, 17 277:1, 12, 13 278:9 286:10 299:15, 17 300:2
documented 252:12, 14 260:4

documents 278:3 298:12, 13, 13 299:7
Dowdy 214:20 215:6 219:1 312:17, 18
downloaded 270:10
downstream 250:17 252:6 289:21 290:11 300:21 301:21 303:12 304:9
Dr 249:20, 20 250:5 296:20 297:14 301:5 304:13 308:13
draft 271:9
drafting 261:23 270:1
draw 227:16
drawing 227:2
drew 231:5 232:14
drill 239:19 299:15
drilling 238:9
Drive 214:22
drop 304:21
DRUMMOND 214:10 244:19 254:10 274:15
Drummond's 242:5
duly 219:12

< E >
earlier 232:14 254:12 270:22 291:2 295:8, 10 299:8
early 239:10 247:2 283:18 291:17
Earth 288:8, 8, 18 297:5 301:1
easier 221:2
easiest 289:23
east 256:5
edge 245:14
effect 215:13
efficient 219:21 249:10
eight 267:8 270:16 285:11, 14 299:2

either 246:18 279:16 285:15 308:18
Elements 269:7
elevation 229:9 231:13 234:22, 23 245:11, 13 287:6 291:21
elevations 229:5 239:15
else's 278:13, 17
endeavored 238:4
ends 227:13, 17
engage 283:22
entire 250:2 273:4 276:1
entirety 278:22
environment 251:18 275:19
ENVIRONMENTAL 217:4
EPA 271:12 274:21 298:13
equally 302:11
eroded 231:21 235:7 238:11 239:2
eroding 248:23
erosion 224:16 225:2, 2, 7, 13 226:2, 3, 3, 5, 7, 9, 11, 21 232:9 235:13 239:1, 5 247:7 248:2, 13 249:4, 5 284:20 289:3 292:8, 19
ERRATA 218:11 310:1
error 229:4
escarpment 232:10
essentially 244:8
establish 255:11 307:19
established 290:19
estimate 239:21
estimates 238:7 296:13
estimating 296:1
estimation 307:23

Eva 217:10
evaluate 262:11
evaluated 262:5
events 242:23 285:3
evidence 216:9
evident 282:19
exactly 233:8
EXAMINATION 218:3 219:9, 17 299:9
examined 219:13
example 299:13
exception 296:11
exchanging 267:23
excuse 258:21 273:7
Exhibit 218:8, 8, 11 220:11, 11, 14, 15 221:5, 18 227:22 229:18, 22 236:5 239:11 256:18 258:9 260:6, 7 270:21 279:2, 5 290:8, 11 301:4, 5, 12
Exhibits 231:10
existing 239:15 285:17 286:3, 12, 16
experience 222:1 274:21 297:18, 23
experiment 263:3
expert 220:11 221:7 251:15
expertise 222:1
EXPIRES 311:17 312:18
Explain 234:14 241:2 245:3 266:9 278:20 285:10 287:10 303:5
explained 277:11
explanation 232:17 287:17
exposed 249:4 285:4, 4
expressing 242:14
extended 303:23

**extent** 224:*11*
225:*19* 230:*6, 20*
260:*21* 264:*21*
274:*9* 275:*16*

**< F >**
**facility** 303:*8, 11*
304:*7*
**facing** 300:*21*
301:*21*
**fact** 241:*8* 251:*6*
254:*1* 262:*9* 280:*5*
281:*15* 282:*2*
**factual** 220:*5*
248:*17*
**fail** 276:*14*
**failed** 241:*1*
**fairly** 264:*7*
**familiar** 227:*7, 7*
262:*2* 282:*23*
308:*5*
**far** 225:*20* 227:*11*
303:*22*
**feasibility** 267:*5*
**feature** 304:*19*
305:*5*
**feel** 290:*3*
**feet** 237:*13* 298:*18*
304:*2, 6*
**felt** 241:*17*
**field** 272:*19, 22*
298:*21* 299:*11*
**Figure** 222:*5, 7, 11*
224:*10* 225:*9*
227:*22* 228:*1, 9*
229:*13* 230:*1, 14,*
*17, 18* 231:*3* 285:*8,*
*12, 21* 286:*1, 12, 20*
287:*7* 290:*6, 7*
293:*11* 294:*2, 14,*
*16, 18* 295:*13*
300:*17*
**figures** 221:*8, 8, 11*
222:*3* 224:*3, 7*
228:*5* 230:*23*
231:*10, 15* 257:*5*
291:*5* 292:*13*
294:*20*
**file** 265:*5*

**filing** 216:*13*
**fill** 241:*15*
**final** 267:*19*
**find** 221:*16* 268:*2*
309:*2*
**finding** 233:*20*
**Findings** 233:*15*
**fine** 220:*15*
**finish** 219:*19, 20*
**finished** 249:*19*
261:*7* 287:*16*
298:*1, 6*
**first** 219:*12, 20*
220:*11* 222:*16*
226:*1* 230:*8* 231:*2*
232:*7* 233:*7* 235:*1,*
*12* 237:*8* 261:*15*
268:*6* 270:*7*
272:*18* 273:*10, 18*
279:*22* 284:*1*
291:*13* 293:*22*
**fit** 236:*1*
**five** 224:*6* 237:*13*
240:*4* 287:*19*
**flat** 263:*9* 286:*8*
**flawed** 240:*12, 14*
**Floor** 215:*7*
217:*18* 219:*7*
**FLORIE** 217:*16*
**flow** 240:*6* 241:*4,*
*21, 22* 242:*16, 19*
243:*9, 16, 18*
244:*22* 245:*5, 7, 8,*
*12, 18* 246:*7*
249:*11*
**flows** 241:*9* 245:*10*
**focus** 220:*3*
**following** 219:*10*
**follows** 219:*13*
301:*18*
**follow-up** 249:*6*
**footprint** 231:*6, 17*
**force** 215:*13*
**foregoing** 219:*5*
312:*4, 8*
**Fork** 225:*11* 226:*8*
232:*10* 241:*7*
242:*2* 243:*3*
245:*18* 246:*7, 14,*
*21* 247:*11, 16*

248:*23* 249:*2*
250:*3* 251:*22*
252:*16, 20, 23*
290:*13* 307:*7, 8, 18,*
*21*
**form** 216:*6* 222:*12*
238:*17* 242:*11*
245:*1, 20* 246:*9, 15*
251:*12* 253:*15*
254:*16* 255:*4, 13*
256:*8, 14* 257:*16*
259:*8, 17* 260:*18*
263:*19* 264:*11, 20*
265:*16, 23* 266:*15*
281:*14, 22* 282:*12*
283:*9* 284:*10, 22*
292:*22* 293:*13*
295:*5* 296:*7* 297:*3*
**formats** 298:*11*
**formulating** 261:*22*
276:*7* 278:*11*
**formulations**
263:*13*
**forth** 258:*16* 291:*1*
**forward** 243:*23*
255:*17* 262:*3, 10*
275:*23*
**Foster** 242:*4*
**Foundation** 245:*21*
251:*13* 254:*17*
255:*5, 14* 256:*9, 15*
260:*19* 264:*12, 21*
265:*17* 266:*1, 16*
267:*17* 283:*10*
284:*11* 296:*8*
**four** 221:*18* 232:*6*
283:*20*
**fourth** 271:*2*
**frame** 253:*23*
**Freedom** 214:*21*
**front** 220:*10* 221:*4*
**fulfillment** 258:*12*
**full** 215:*14* 291:*1*
**fully** 232:*4*
**FURTHER** 215:*10*
216:*4, 12* 265:*7*
312:*12*
**future** 259:*5, 15, 19*
260:*15* 264:*9, 18*

282:*10* 283:*5*
**fuzzy** 227:*4*

**< G >**
**gain** 293:*22* 294:*10*
**gallons** 243:*16, 19*
**gas** 298:*17* 299:*19*
**gathered** 257:*18*
**gathering** 298:*10*
**general** 296:*22*
**Generically** 284:*12*
**Geologic** 270:*8*
**Geological** 268:*8*
**geologist** 253:*13*
**Geology** 299:*11*
**Geomorphology**
270:*13, 19*
**GEORGE** 214:*15*
215:*5* 218:*8, 10*
219:*8, 11, 18*
261:*14* 311:*4, 13*
**gesturing** 225:*15*
**give** 261:*3, 4*
268:*12* 291:*19*
300:*5* 307:*10*
**given** 238:*1*
249:*23* 260:*16*
312:*9*
**giving** 248:*12, 22*
**glad** 268:*10*
**glasses** 223:*9*
**go** 220:*4, 12*
221:*15* 235:*19*
237:*22* 241:*13*
253:*21* 260:*2*
261:*4* 278:*8*
305:*14* 306:*15*
308:*23*
**GOB** 224:*11, 16*
225:*3* 226:*2, 6, 10,*
*20, 23* 227:*5, 10, 17*
230:*20* 231:*6, 17*
232:*2* 234:*11*
237:*18* 256:*5, 7*
260:*17* 265:*5*
282:*21* 283:*23*
284:*20* 292:*19*
295:*15* 297:*7*
**goes** 225:*20* 230:*13*

going 220:10, 22
237:21 242:1
256:21 259:3
264:17 265:1, 4
274:8 278:21
283:22 295:7
301:3, 4 308:23
Good 280:8 286:9
Google 288:8, 8, 15,
18 301:1
grab 287:3
grain 296:23
297:4, 8 304:22
305:20 306:19
graph 292:4, 6
gravel 297:10
305:17
grays 228:17
Green 273:8
ground 238:9
288:14, 15 289:3
grounds 216:8
guess 226:14
230:22 244:18
250:11 253:1
268:3 282:16
283:11
Guidance 261:20
262:14 266:22
267:2 271:12
274:21 275:5
299:7, 9
guide 255:17
gullies 225:10, 13
232:8

< H >
half 296:14
halfway 269:12
hand 287:4
handing 279:4
handling 241:16
harm 252:20
heading 273:12
headings 233:23
health 275:19
hear 298:3 305:7
hearing 312:10
held 226:15 290:20

help 223:17
Henry 269:12
hiding 294:15
historical 306:5
historically 288:20
holes 239:19
hone 267:5
honest 256:3
Hoover 214:23
hope 221:14
human 275:18
hundred 237:14
243:19
hundred-year
307:10
hydrologic 240:6

< I >
idea 300:5
identification
229:23 279:3
301:13
identified 267:8
impact 243:19
251:7, 10, 21 252:6,
21 290:11 303:6
304:17, 18
implementation
277:2
implication 277:9
improve 264:9, 17
265:4
improved 263:17
264:2 265:14, 21
266:12
inaccurate 230:10
286:17
include 228:13
238:21 284:1
included 233:9
including 275:9
incorrect 232:3
incorrectly 231:4
increased 265:10,
22 266:12
increasing 265:15
independent
237:16 295:20
296:4, 16

indicate 227:1
228:16 229:5
246:23 247:19
248:19 269:22
288:23 300:20
302:16 306:9
indicated 223:16
239:19 252:7
254:2
indicates 244:16
246:17 251:7
275:6 299:14
Indicating 227:18
indication 285:3
indicative 250:2
individually 222:14
indulge 285:13
industry 297:20
298:17, 18, 18
299:18, 19
inflow 304:19
305:5
inform 253:13
information 235:20
236:7, 18 237:7, 20
238:12, 15, 20
244:3 246:2, 16
247:8 249:14
251:7, 14 252:4, 5,
6, 13, 23 257:17
269:23 270:3
271:8 274:14
275:22 278:11, 16,
22 279:14, 21
292:7 293:7, 7
298:22, 23 302:10
infrared 228:15
initial 224:22
230:12
initially 255:16
in-place 283:15
inshore 251:9
inside 278:12, 16
279:7, 22 280:6, 10,
16 281:1
instance 274:6
instances 279:20
Institute 308:9
instrument 223:9,

10
intended 233:21
interested 312:14
intern 272:15
interned 272:13
interpret 224:12
298:21
interpretation
221:20 229:15
235:23 293:1
298:10
interpretations
240:11, 13
interpreting 222:19
interval 230:4, 5,
10, 15 237:5
intervals 234:16
291:4
introduction 281:3
investigation
252:15 266:21
267:18 272:20
investigations
247:12 255:8, 10,
15, 16 267:4
iron 257:6, 8
issue 222:10
231:16 237:11
241:13, 20 253:14
issues 220:5 259:6
260:15
italics 278:19
279:17
item 261:19
items 274:19
276:3 297:17
its 239:7 240:1
242:21 278:22

< J >
JEFFERSON 312:2
job 261:7
Johnson 240:10
241:3 242:16
250:18 271:4
275:15, 20 277:16
279:16, 19 280:13
284:19 286:14
287:11 289:10

**Johnson's** 218:*10*
240:*13*, *20* 275:*17*
278:*23* 279:*9*, *23*
280:*5* 281:*11*
282:*14* 283:*21*
296:*1*
**Jorge** 217:*21*
**June** 214:*17* 215:*8*
219:*7*

**< K >**
**Key** 244:*11*, *14*, *17*
**Kimberly** 214:*20*
215:*6* 219:*1*
312:*17*, *18*
**kin** 312:*13*
**kind** 283:*15*
**knew** 259:*23*
260:*10*
**know** 222:*7*
229:*20* 245:*4*
249:*6*, *12* 258:*5*
259:*10* 267:*10*
272:*3*, *5*, *9*, *11*
274:*23* 276:*6*, *11*
286:*18* 289:*15*
292:*10*, *16* 302:*1*
303:*19*, *21* 308:*7*
**knowledge** 248:*8*
308:*19* 311:*7*

**< L >**
**labeled** 286:*7*
287:*5*
**laboratory** 257:*5*
**land** 286:*5* 287:*4*
299:*20* 303:*9*
304:*4*
**landfills** 289:*11*
**language** 232:*11*
241:*7* 283:*21*
**large** 303:*9*
**larger** 223:*10*
270:*11*
**lateral** 306:*1*, *3*
**latitude** 249:*22*
**LAW** 217:*4*, *21*, *22*
**laws** 215:*14*
**leading** 216:*6*

274:*9*
**leave** 257:*15*
**leaving** 252:*9*
260:*14*
**left** 300:*6*, *20*
301:*21* 302:*5*, *12*
**legal** 254:*13* 255:*2*,
*7* 257:*18* 260:*20*,
*22* 261:*3*
**legally** 254:*14*
**legend** 224:*13*
230:*16*
**level** 306:*8*
**liability** 260:*15*
**library** 269:*20*
**limited** 239:*11*
249:*2*, *21* 252:*3*
288:*22*
**line** 227:*16* 231:*18*
285:*17*, *19* 310:*6*
**lines** 224:*21*
225:*14*, *16* 286:*2*, *2*
291:*3*
**list** 261:*19* 267:*14*
274:*12*, *18* 275:*1*, *6*,
*9*, *12* 278:*9* 297:*16*
299:*2* 308:*2* 309:*1*
310:*3*
**listed** 268:*2*
275:*14* 277:*1*
278:*4* 295:*9* 299:*2*
311:*8*
**liter** 257:*8*
**literature** 292:*10*,
*11*
**little** 227:*3* 234:*15*
279:*12* 290:*22*
**live** 251:*18*
**LLP** 217:*16*
**loading** 303:*11*
**locate** 270:*7*
**location** 264:*14*
300:*19* 305:*10*
306:*18* 307:*5*, *15*
**locations** 225:*10*
249:*23* 266:*17*
290:*3*
**Locust** 225:*11*
226:*8* 232:*10*
241:*7* 242:*2* 243:*3*

245:*18* 246:*7*, *14*,
*20* 247:*11*, *16*
248:*23* 249:*2*
250:*2* 251:*22*
252:*16*, *19*, *23*
290:*13* 307:*7*, *8*, *17*,
*20*
**logging** 299:*15*
**LOIS** 214:*15*
215:*5* 219:*8*, *11*
311:*4*, *13*
**longitude** 249:*22*
**look** 220:*13*
221:*15* 223:*11*
225:*11* 229:*20*, *21*
236:*5* 238:*19*
242:*7* 252:*4*
256:*16* 258:*1*
270:*18* 286:*21*
288:*19* 294:*22*
303:*17* 307:*16*
**looked** 220:*14*
223:*4* 234:*4*
246:*16*, *22* 247:*8*
252:*8*, *11*, *12*
255:*23* 256:*19*
263:*15* 268:*20*
269:*22* 270:*22*
271:*12*, *13* 288:*20*
291:*6*
**looking** 221:*10*
224:*10* 228:*1*, *10*
231:*3* 232:*6*
249:*13* 258:*9*
268:*15* 271:*8*
288:*17* 290:*4*
294:*17*, *18*, *19*
298:*17* 299:*13*
305:*19*
**looks** 223:*10*
233:*16* 271:*16*, *19*
308:*2*
**loss** 235:*21* 291:*18*,
*20*
**lot** 248:*9* 255:*12*
259:*10*
**Lots** 289:*8*
**low** 263:*8*
**lower** 229:*1* 239:*13*

**Lynn** 247:*9*

**< M >**
**ma'am** 219:*16*
**macroinvertebrates**
251:*10*
**magnitude** 256:*13*
257:*11*
**Maher** 299:*10*, *14*
**Maher's** 300:*2*
**maintenance**
282:*10*, *13*, *16*, *19*
283:*4* 284:*8*
**majority** 248:*19*
288:*12*, *12*
**makeup** 289:*8*
**making** 268:*1*
**Manual** 261:*20*
262:*7* 266:*22*
299:*9*, *12*
**map** 224:*21*
228:*20* 229:*11*
230:*2*, *11* 234:*17*,
*18*, *20* 235:*10*
270:*8* 285:*16*, *20*
286:*6* 290:*1*
**mapping** 223:*20*
227:*20*, *21* 239:*16*
**maps** 221:*21*
222:*19*, *22* 223:*16*
229:*5*, *10* 230:*3*, *5*,
*7*, *8*, *8*, *12* 235:*23*
236:*14*, *15* 237:*2*, *3*,
*4*, *9* 239:*15* 291:*3*,
*19*, *22* 301:*2*
**March** 312:*20*
**mark** 226:*12*
229:*18* 301:*4*
**marked** 221:*5*
229:*17*, *23* 279:*3*, *5*
286:*22* 301:*13*
**material** 237:*18*
239:*20* 246:*6*
247:*15* 251:*3*
259:*4* 282:*9* 285:*5*
289:*13* 293:*8*, *23*
295:*15* 296:*2*, *14*
297:*1*, *9* 299:*22*
305:*18*

materials 245:*17*
246:*13, 22* 272:*18*
297:*6* 303:*12*
308:*17, 17*
**Maxine** 238:*19*
244:*19* 251:*22*
262:*16* 263:*7*
275:*11* 277:*3*
283:*16* 289:*16*
**McCalley** 269:*13*
**mean** 223:*7*
228:*20* 245:*3, 8*
249:*14* 263:*2*
268:*14, 15* 274:*3*
290:*12* 295:*3*
305:*17* 306:*2*
**means** 245:*5*
246:*2* 285:*11*
308:*7* 312:*7*
**meant** 224:*16*
225:*2* 233:*9*
282:*19*
**measure** 238:*9*
**measured** 247:*10,
23*
**measurements**
256:*11*
**measuring** 263:*23*
**memory** 271:*13*
276:*18*
**mention** 259:*15*
274:*2*
**met** 272:*4*
**method** 281:*17*
**methodical** 277:*14*
**methodologies**
222:*23*
**methodology** 222:*6,
17, 18* 236:*11, 12*
242:*10, 15* 243:*12*
292:*12*
**methods** 289:*12*
**Metzger** 269:*17*
**middle** 250:*12*
258:*1* 267:*12*
302:*23*
**migration** 284:*2*
**milligrams** 257:*8*
**millimeter** 305:*21*

**million** 293:*8*
294:*1, 12* 295:*13*
**mind** 286:*22* 299:*3*
**Mine** 244:*19*
246:*6, 14* 248:*22*
251:*23* 252:*9*
262:*16* 284:*14*
**mineral** 298:*18*
**minimize** 284:*7*
**Mining** 253:*8*
269:*7* 293:*23*
**minute** 243:*17, 19*
256:*21*
**minutes** 300:*8*
**mitigation** 251:*4*
**mixing** 252:*4*
290:*19*
**MO3** 239:*14*
**model** 243:*18*
262:*11*
**modeled** 243:*14*
**modeling** 237:*7*
243:*22*
**Monday** 220:*15*
253:*18, 19* 254:*7, 8*
255:*23* 256:*19*
261:*4* 273:*8*
**monitoring** 255:*19*
282:*13, 17, 20*
283:*5* 284:*8*
**month** 253:*21*
**months** 272:*15*
**Montiel** 272:*10*
**morning** 221:*6*
**morphological**
301:*19*
**move** 227:*11*
255:*17* 262:*3, 10*
270:*21* 275:*23*
**moved** 296:*2*
**moving** 230:*6*
240:*23*

**< N >**
**narrow** 299:*1*
**narrower** 274:*12*
290:*22*
**National** 308:*9*
**native** 297:*1*

**natural** 225:*13*
226:*3* 232:*9*
244:*20* 245:*23*
246:*18* 249:*4*
251:*2* 265:*3, 7*
267:*13* 307:*7*
**naturally** 264:*9*
**nature** 272:*21*
**near** 225:*16* 226:*7*
235:*21* 294:*8*
304:*4, 10, 19*
**near-shore** 251:*9*
**necessarily** 267:*21*
306:*22* 307:*15*
**necessary** 216:*5*
**need** 221:*13*
226:*12* 229:*20*
254:*8* 262:*10, 15*
284:*8* 287:*13*
300:*6* 307:*19*
**needed** 298:*20*
**neither** 312:*12*
**net** 235:*21* 291:*18,
20* 293:*8, 22*
294:*10*
**nine** 274:*19*
275:*13* 277:*1*
293:*9, 17*
**NIST** 308:*5, 7, 12*
**non-native** 297:*1*
**nonnatural** 245:*17*
246:*5*
**north** 227:*13*
**NORTHERN** 214:*2*
**Notary** 219:*2*
311:*16*
**notice** 216:*13*
258:*17*
**notices** 254:*21*
**NOV's** 255:*18*
**NUMBER** 214:*5*
229:*22* 234:*4, 6*
235:*9* 236:*1* 240:*5,
8, 9, 23* 244:*1, 6, 9*
249:*21* 250:*12*
252:*19* 253:*2*
267:*10* 268:*17*
271:*14* 279:*2*
291:*22* 292:*4*

301:*12* 304:*8, 10*
**numbered** 234:*6*
**numbers** 234:*3*
236:*3* 285:*15*
286:*19* 287:*14*
294:*23* 296:*6, 9*
**numeric** 237:*19*
292:*5*
**numerically** 291:*20*
**numerous** 240:*16*

**< O >**
**oath** 219:*12*
**Object** 222:*12*
238:*17* 242:*11*
245:*1, 20* 246:*9, 15*
251:*12* 253:*15*
254:*16* 255:*4, 13*
256:*8, 14* 257:*16*
259:*8, 17* 260:*18*
263:*19* 264:*11, 20*
265:*16, 23* 266:*15*
275:*16* 276:*16*
277:*5* 281:*14, 22*
282:*12* 283:*9*
284:*10, 22* 292:*22*
293:*13* 295:*5*
296:*7* 297:*3*
**objection** 261:*2, 5,
10* 277:*19* 278:*2*
282:*15*
**objections** 216:*5, 7*
265:*6*
**obligated** 254:*14*
**obligations** 259:*6,
16, 19*
**observations**
248:*18* 250:*7, 8, 9*
284:*23*
**obstruction** 249:*15*
**obstructions**
246:*17* 247:*19*
**obviously** 248:*7*
251:*17*
**occur** 241:*19*
260:*13, 23*
**occurred** 241:*18*
261:*9* 265:*8*
307:*14*

**October** 244:*16*
258:2 275:*4* 290:*8*
**offer** 295:7
**offered** 216:*9*
**offering** 234:8
**Oh** 269:*4* 300:*1*
305:*4*
**oil** 298:*16* 299:*19*
**Okay** 223:*21*
224:*23* 225:*23*
226:*17* 227:*1*
229:*17* 231:*1, 22*
233:*6, 21* 237:*21*
240:*15* 246:*4*
247:*20* 248:*11*
250:*15, 23* 252:*18*
257:*20* 267:*14*
268:*13* 269:*6*
279:*5, 9* 280:*8*
284:*6, 18* 285:*7, 23*
287:*16, 19* 298:*2*
299:*6* 302:*10*
305:*23* 309:*7*
**Oklahoma** 299:*16*
**old** 285:*11, 14*
**older** 229:*10*
285:*14*
**ones** 273:*16*
274:*12* 277:*22*
**ongoing** 284:*8*
**online** 268:*3* 309:*2*
**onshore** 303:*1, 6*
**opened** 244:*15*
**operations** 244:*18*
**opining** 252:*20*
**opinion** 227:*19*
230:*7* 233:*18, 20*
234:*7* 240:*5* 241:*8*
242:*12* 244:*5, 10,*
*11, 14, 17* 248:*12,*
*22* 250:*11, 16*
251:*19, 20* 252:*19,*
*22* 253:*2, 13* 261:*3*
267:*11* 276:*12*
281:*18, 23* 282:*7,*
*18* 283:*12* 284:*16*
287:*23* 289:*2, 7, 9,*
*17*
**Opinions** 233:*16*
240:*12, 13* 261:*23*

266:*23* 267:*8*
270:*17* 273:*11, 15*
275:*15*
**opposed** 255:*2*
283:*7* 297:*10*
**opposite** 301:*8*
**option** 280:*18*
**oral** 219:*9*
**order** 238:*23*
253:*8, 12, 23*
254:*21* 262:*3*
291:*23*
**orders** 256:*12*
257:*10*
**organisms** 251:*10,*
*18*
**original** 230:*18*
235:*4* 270:*10*
294:*23*
**outlined** 224:*11*
225:*6* 226:*8*
232:*23* 233:*1*
274:*6* 292:*23*
298:*12*
**outlines** 222:*20*
**outside** 225:*3*
226:*10, 19*
**overhead** 288:*15*
**overlaps** 223:*13*
**overlaying** 234:*21*

< P >
**p.m** 219:*8* 261:*13*
309:*10*
**PAGE** 218:*3*
221:*18, 19* 232:*6*
236:*6* 240:*4* 244:*6,*
*11, 15* 250:*12*
253:*10* 257:*22*
258:*1* 267:*11, 12*
268:*6, 15* 269:*12*
270:*6* 271:*2, 19*
275:*4* 278:*18*
280:*10, 12, 13, 21*
281:*3, 3, 5, 7, 10*
283:*20* 284:*19*
285:*7* 287:*19, 20*
288:*9* 289:*20*
293:*9, 15, 16* 294:*8,*
*9, 21* 295:*23*

296:*12, 19* 297:*12*
299:*13* 300:*18*
302:*11, 16* 303:*1*
310:*6*
**PAGES** 214:*16*
262:*7* 268:*16, 17*
287:*12*
**pair** 223:*9*
**pairs** 223:*12*
**paper** 223:*5*
270:*10*
**paragraph** 232:*7,*
*19, 20, 22* 258:*1*
271:*2* 273:*20*
289:*20* 290:*9*
294:*9* 302:*23*
**parallel** 225:*14, 15*
306:*4*
**paraphrase** 250:*21*
279:*19*
**paraphrasing**
250:*15*
**part** 223:*17*
225:*16* 236:*7*
240:*7* 258:*13*
267:*11* 269:*22*
273:*22* 279:*10*
280:*14* 282:*4*
293:*18* 304:*11*
**particular** 222:*3,*
*23* 228:*22* 262:*6*
267:*9* 270:*17*
279:*10*
**particularly** 228:*14*
307:*5*
**parties** 215:*4*
216:*7* 312:*13*
**parts** 270:*4* 293:*21*
**party** 267:*21*
**pathway** 284:*3*
**pathways** 284:*5*
**pause** 300:*3*
**peak** 241:*9*
**PELA** 239:*7* 240:*1*
247:*1* 248:*8*
249:*18* 256:*20*
259:*20* 269:*19*
270:*21* 272:*13*
290:*19*

**PELA's** 250:*4*
252:*14* 263:*16*
280:*1*
**perform** 239:*7*
**performed** 242:*4*
308:*14*
**period** 272:*14*
294:*11*
**permanent** 281:*12,*
*21* 282:*5*
**permit** 254:*22*
260:*8*
**Permitting** 258:*20,*
*23* 259:*1*
**personal** 269:*4*
**pertains** 253:*2*
**pertinent** 231:*10, 15*
**photo** 225:*17*
228:*1, 2* 235:*10*
288:*16*
**photograph** 225:*5*
227:*3* 228:*14, 15*
**photographs**
223:*23* 228:*3, 4, 8,*
*11* 250:*8* 288:*5*
**photography**
221:*21* 222:*22*
223:*2, 12, 12*
227:*20, 23* 248:*19*
288:*2, 7, 17, 22*
302:*17* 304:*8*
306:*1, 5, 8*
**photos** 222:*6*
303:*17, 20*
**physically** 244:*19*
**picture** 307:*10*
**pile** 224:*12, 16*
225:*3, 20* 226:*20,*
*23* 227:*10, 17*
228:*13, 16* 229:*1, 4*
230:*20* 231:*6, 17*
232:*2* 234:*11*
238:*4* 246:*19*
249:*3* 256:*6, 7*
260:*17* 263:*18*
264:*1, 4, 17* 282:*21*
283:*23* 284:*20*
289:*1* 295:*15*
**pilot** 262:*23* 263:*3,*
*10*

pine 285:2, 2, 4
289:4
pink 228:15
pinpoint 268:22
Place 215:7
217:18 219:7
282:22 283:7, 13,
23
placed 231:20
235:6 238:22
239:1 295:15
placement 292:19
Plaintiff 214:8
217:3
Plaintiff's 218:8, 8,
11 229:22 279:2
301:12
play 270:16
please 244:7
256:17 257:22
310:3, 4
plot 301:7
plotted 305:13
plotting 301:1
point 226:14
231:11 233:21
243:2 244:4 248:3,
5 274:18 289:10
290:16 292:2
305:5 307:3
pointing 279:6
285:21
points 264:7 266:6,
18, 19 275:13
291:11 292:5
301:8
pollution 282:21
pond 229:1
portion 235:1
259:4 280:17
portray 224:16
230:11
positive 280:2
possible 238:2
post-law 237:18
254:10 255:11
256:7, 23
potential 242:1
274:11 304:16, 18

potentially 239:1
303:13
potentials 241:4
Practical 269:7
preceding 309:9
precise 295:4
precisely 305:9
precision 234:22
preferable 308:12
pre-law 237:18
254:11 255:12
256:5 257:3
263:17, 21 264:17
265:5
pre-mining 293:6
prepare 273:4, 9
prepared 234:17,
19, 20
prescribed 289:12
PRESENT 217:21
presentation 230:9
presented 253:14
277:15
press 300:9
Pretty 267:1
300:10
previous 294:9
previously 229:18
principle 296:22
Principles 270:13
prior 216:9
Pro 288:8
probably 233:19
problem 274:9
problems 281:21
Procedure 219:5
243:12
procedures 274:5,
7, 8 297:20 298:16,
19
proceedings 219:10
process 223:17
267:18
processes 265:3
processor 273:7
Professor 272:3
profile 307:15
program 263:10
283:23 288:20

progress 260:8
progression 288:21
projects 272:7, 12
promise 220:1
property 282:11
proposal 283:15
protocols 297:20
298:9
provide 246:2
255:17 268:11
278:1, 2 309:4
provided 219:4
235:20 236:7
239:17 255:21
260:5 273:8
provision 267:15
provisions 289:11
proximity 303:2
305:16
Public 219:2
268:10 311:16
publically 309:3
publication 268:9
publicly 267:23
268:2
published 235:10
pull 279:1 287:13
purely 236:3 244:2
purpose 271:3
put 220:10, 22
226:4 234:3
243:23 262:10
276:8, 9 277:8, 10
279:6 280:10

< Q >
quality 241:5
247:9 251:16, 17,
19, 21 252:13
256:20
quantitatively
249:9, 12
quantity 249:10
question 220:1
223:18 231:12, 23
232:23 236:11, 12,
14 240:18 244:17
246:5 248:21
249:6, 20 257:21
259:9 260:23

264:15 265:21
266:3, 5, 11, 14
276:20 277:21
278:1, 10 290:23
294:9 295:6, 18, 22
299:1
questionable 235:1
questioned 222:5
questioning 236:19,
23 237:2, 5 244:22
questions 216:6
222:11 242:15
261:18 312:6
quick 261:12
quote 281:12
284:19 290:10
quoted 280:16
281:11 283:21
284:18 293:9
295:23
quotes 279:18
quoting 278:12, 17
279:11, 23 280:2

< R >
rain 241:10 285:3
rainfall 265:2
rate 235:13
241:22 248:2, 12
292:8, 9
rates 239:4 292:19
rationale 281:11
RCRA 274:7
read 219:15 234:2
244:21 258:5, 6
275:15 276:23
301:10 311:5
reading 215:11
236:10 247:17
257:7
really 220:3 238:1
239:6 254:12
262:9 265:20
266:3, 4 272:5
283:11 289:7
305:9
reason 257:13
264:8 277:7, 8, 10,
10

**reasons** 254:*13*
255:2, *3, 6, 7* 294:*5*
**rebuttal** 220:*16*
222:*21* 223:*15*
224:*18* 229:*14, 19*
233:*3, 11* 235:*5*
236:*4, 6* 270:*21*
271:*5, 9* 273:*2*
279:*1, 4, 10, 15, 23*
**Rebuttals** 218:*8, 10*
**recall** 222:*9* 227:*6*
239:*17* 247:*17*
261:*6* 289:*13, 14*
**reclamation** 255:*20*
**recognized** 223:*1*
**recollection** 239:*9*
259:*5, 22*
**recommend** 262:*22*
**recommendation**
275:*21*
**recommended**
250:*18*
**recommending**
281:*17*
**record** 223:*6*
226:*16* 228:*7*
261:*14* 290:*21*
294:*16*
**red** 224:*11, 15, 20*
225:*17* 226:*19*
227:*4* 228:*15*
230:*21* 231:*18*
232:*18* 233:*1, 2, 8*
293:*1*
**redevelopment**
267:*15*
**reduce** 282:*10*
283:*4*
**refamiliarize** 270:*4*
**refer** 221:*2* 224:*2*
229:*13* 239:*11*
280:*21* 285:*8*
286:2, *3* 287:*20*
289:*20, 23* 308:*3*
**reference** 223:*2*
230:*22* 231:*9*
253:*8* 254:*1* 259:*3*
272:*17* 275:*1, 6, 18*
277:*12, 18* 286:*9*

288:*9* 299:*17*
308:*2* 309:*1*
**References** 261:*16*
267:*20* 268:*1*
271:*14* 299:*10, 11,
14*
**referencing** 290:*6*
**referred** 221:*8*
241:*4* 297:*6* 302:*9*
**referring** 245:*6*
251:*1, 15, 16*
264:*13* 280:*13*
283:*3* 289:*22*
290:*15* 299:*8*
302:*4, 6* 303:*8*
**refers** 258:*8*
**reflect** 230:*2*
**reforested** 288:*3, 11*
**refresh** 271:*13*
**refuse** 225:*19*
228:*13, 16, 21, 23*
246:*19* 249:*3*
251:*3* 276:*1* 285:*5*
289:*1*
**regard** 229:*2*
285:*12* 305:*23*
**regarding** 222:*16*
230:*3* 242:*12*
247:*6* 259:*11*
267:*12* 270:*19*
271:*14* 273:*20*
281:*18*
**regardless** 291:*4*
293:*20*
**regraded** 286:*3*
**regulators** 259:*13*
**regulatory** 253:3, *4*
254:3, *13* 255:*19*
257:*18* 259:*7*
**reincorporating**
281:*9*
**reiterate** 254:*8*
**relate** 241:*5* 285:*16*
**relates** 234:*10*
244:*11*
**relating** 215:*15*
**relation** 286:*8*
**relationship** 306:*11*
**relative** 241:*16*
247:*21* 305:*10*

**relevance** 299:*23*
304:*17* 306:*12*
**relevant** 277:*9*
302:*8*
**relied** 240:*20*
**relies** 240:*10*
**rely** 270:*1*
**remaining** 296:*14*
**remedial** 264:*10*
274:*11*
**remediate** 262:*12,
20*
**remediation** 250:*18,
23* 262:4, *17, 18*
265:*9* 266:*21*
267:6, *6, 19* 281:*16*
296:*3*
**remedy** 274:*10*
277:*3*
**remember** 219:*23*
221:*10* 259:*18*
261:8, *11*
**removal** 251:*3*
280:*17* 281:*12*
282:3, *9* 283:*4*
**removed** 276:*1*
281:*20* 296:*15*
303:*9*
**removing** 284:*15*
**repeat** 220:*1*
**report** 218:8, *10*
220:*11, 16, 23*
221:*1, 7, 9, 10*
222:4, 8, *9* 223:*15*
224:*22* 229:*14, 19*
232:*7* 233:2, *4, 12,
14* 234:2 235:4, *5,
14* 236:4 238:*5*
240:5, *17, 17* 241:*7*
244:*16* 245:*6*
252:*12, 14* 253:*2*
256:*20* 257:*17, 23*
258:2, *8* 259:*4*
261:*15, 23* 262:*8*
266:*23* 267:*16*
269:*13* 270:2, *17,
21, 23* 271:*3, 9*
272:*1, 18, 19* 273:*2,
4, 9, 10* 276:*14, 16,
23* 277:*5* 278:*11,*

*13, 17, 23* 279:*1, 4,
10, 15, 16, 18, 23*
280:*1, 10, 17*
285:*16* 287:*19*
290:8 293:*10*
294:*19, 21* 296:*1*
297:*12, 14* 298:*15,
23* 300:*16, 19*
301:*1, 9, 11, 16*
304:*1*
**REPORTED**
214:*19*
**REPORTER**
218:*11* 219:2, *14*
**REPORTER'S**
312:*1*
**Reporting** 214:*21*
298:*11*
**reports** 220:4, *9*
251:*15* 260:*8*
271:*5, 8*
**represent** 226:*11*
**representation**
241:*18* 307:*12, 13*
**representative**
306:*23* 307:*6, 17,
20*
**represents** 231:*19*
312:*8*
**reprint** 269:*16*
**reproduction**
269:*15*
**request** 309:*3*
**require** 274:*10*
**required** 267:*4*
**requirement** 267:*18*
**requirements** 254:*4,
22* 255:*19* 257:*19*
258:*12, 15, 20*
259:*1, 7, 13* 283:*5*
**research** 272:*7*
**residence** 241:*9*
**respective** 215:*4*
**respects** 277:*17*
**response** 222:*9*
223:*3* 224:*19*
280:*23* 291:*3, 6*
295:*12*
**rest** 302:*8*

**restoration** 250:*13*
267:*13* 273:*19*
276:*13* 283:*22*
284:*4*
**Restoring** 251:*2*
**result** 232:*9* 242:*6*
312:*14*
**resulting** 236:*16*
237:*2, 3*
**results** 225:*6*
236:*14* 244:*2*
252:*8* 266:*12, 19*
267:*19*
**resumé** 220:*8*
**retention** 242:*23*
**retrieve** 299:*20*
**revegetation** 265:*7*
288:*12*
**review** 222:*6*
223:*1* 255:*22*
**reviewed** 223:*23*
251:*14* 302:*16, 18*
304:*13*
**reviewing** 289:*13*
**revised** 294:*23*
308:*21*
**revisions** 229:*15*
230:*2*
**Richard** 217:*17*
268:*5* 309:*4*
**ridge** 225:*12, 12*
226:*19*
**right** 221:*21* 224:*9*
227:*12* 231:*7*
233:*9* 234:*8, 14*
236:*8* 240:*23*
244:*12* 255:*1, 10,*
*12* 256:*1* 258:*9*
260:*11* 262:*19*
270:*20* 271:*5*
273:*12* 275:*7*
276:*23* 279:*6, 7, 21*
280:*18* 282:*8*
299:*16* 301:*14, 16,*
*20* 302:*4, 12* 303:*3*
309:*8*
**risk** 262:*4* 267:*2*
277:*12*
**Risk-Based** 261:*20*
**risks** 262:*11*

**river** 225:*1* 245:*15,*
*17* 290:*16* 297:*2*
300:*21* 301:*9, 21*
303:*22* 304:*6*
305:*5* 306:*8, 23*
307:*11, 12, 16*
**riverbank** 307:*6*
**RIVERKEEPER**
214:*7* 217:*11*
**riverside** 226:*20*
**rock** 247:*6* 253:*5*
271:*14* 305:*18*
**RPR** 214:*20* 219:*1*
312:*18*
**rules** 215:*15* 219:*4*
**runoff** 241:*2, 10*
254:*10* 255:*11, 12*
256:*4, 7, 22* 257:*2*
264:*4, 16* 265:*1, 1,*
*5*

**< S >**
**sample** 243:*1, 4, 9,*
*16* 249:*23* 299:*9*
300:*19* 301:*8*
302:*14, 20* 303:*7,*
*11* 304:*5, 12, 18, 23*
305:*10* 306:*13, 16,*
*21* 307:*5, 9, 17*
**sampled** 249:*21*
290:*17* 305:*16*
**samples** 251:*5*
265:*18* 289:*21*
299:*20* 301:*22*
302:*7* 303:*18, 20,*
*22, 23*
**sampling** 252:*8*
263:*16* 264:*6*
265:*14, 21* 266:*6,*
*12* 272:*20* 290:*1, 2*
299:*23* 303:*3*
304:*4, 19* 306:*6*
**Samuel** 269:*6*
**sand** 306:*5*
**satisfied** 254:*3, 23*
**satisfying** 255:*18*
**saw** 242:*6*
**saying** 223:*21*
226:*1, 18* 227:*10*
237:*10* 238:*14*

250:*16* 251:*4*
275:*10* 291:*8*
293:*22* 296:*13*
302:*11* 305:*4*
306:*21* 307:*4, 4*
**says** 232:*8* 240:*16*
245:*7* 258:*11*
268:*6, 14* 273:*12*
275:*23* 281:*12*
283:*21* 284:*6, 19*
300:*19*
**scale** 234:*18, 19, 20*
236:*16* 237:*9*
305:*20*
**scenarios** 283:*16*
296:*3*
**scientific** 248:*17*
253:*14* 255:*2, 8*
257:*13* 274:*13*
308:*9*
**scope** 274:*10*
**scoping** 274:*2*
**screen** 274:*11*
**screening** 274:*2*
**seams** 270:*5*
**Second** 217:*7*
220:*12* 230:*7*
231:*4* 232:*8* 234:*7*
235:*3, 14* 248:*21*
258:*4* 261:*19*
272:*19* 273:*20*
284:*6*
**secondary** 299:*4, 6*
**seconds** 305:*12*
**section** 232:*7*
233:*15, 16* 234:*5*
253:*7* 261:*15, 16*
262:*2, 13* 273:*12,*
*14, 18* 295:*23*
**sections** 262:*6*
**sediment** 248:*22*
249:*1, 15* 271:*17*
306:*9* 307:*7, 7*
**sedimentation**
307:*14*
**sediments** 297:*7*
303:*14* 304:*9, 21*
305:*6* 306:*18*
**see** 223:*13* 225:*1*
232:*11* 240:*7*

242:*3* 253:*10*
258:*13* 260:*16*
263:*4* 273:*22*
280:*14* 285:*8*
287:*14* 291:*1*
300:*17*
**seen** 305:*15*
**segregation** 254:*9*
**selection** 267:*6*
274:*14*
**sentence** 232:*8*
274:*2* 278:*19, 20*
279:*22* 280:*5*
293:*19* 294:*10*
301:*11*
**separate** 233:*18*
**separately** 311:*8*
**set** 258:*15* 271:*3*
308:*11*
**seven** 257:*22*
**Shady** 214:*22*
**shape** 247:*22*
**SHEET** 218:*11*
310:*1*
**shift** 292:*1*
**shore** 304:*11*
**shoreline** 250:*1*
**shorter** 304:*2*
**show** 225:*2* 256:*21*
291:*21* 301:*3*
**showed** 227:*22*
247:*10* 256:*4*
306:*1, 6*
**shown** 226:*18*
228:*17, 19* 231:*7*
286:*12*
**shows** 224:*13*
226:*2* 227:*14*
290:*2* 301:*8*
**side** 301:*8*
**sign** 219:*15*
**signature** 215:*11*
**significant** 229:*15*
**simply** 232:*1*
286:*15*
**single-spaced**
233:*17*
**sir** 221:*22* 222:*2*
233:*13* 234:*1, 9, 13*
244:*8, 13* 250:*14*

253:*4*, *11*  258:*7*
260:*12*  261:*6*, *11*,
*17*, *21*  271:*1*, *22*
273:*13*, *21*, *23*
275:*2*  279:*8*  280:*3*,
*11*, *15*, *22*  281:*2*, *8*
285:*9*  287:*8*, *22*
288:*4*  293:*5*  294:*7*
295:*11*  296:*21*
297:*21*  302:*19*
303:*4*  308:*4*
**Sisk** 221:*3*  247:*9*,
*14*
**Sisk's** 221:*5*
249:*18*  250:*5*
290:*7*
**site** 243:*2*  244:*19*
246:*6*, *14*  248:*8*, *14*,
*20*, *22*  249:*6*  250:*9*
251:*2*  252:*10*
256:*11*  257:*15*
260:*14*  265:*22*
267:*13*  268:*22*
273:*1*  274:*14*
275:*11*  281:*21*
282:*21*  283:*16*
284:*5*, *14*, *15*  288:*1*
289:*16*  294:*13*
296:*14*  302:*20*
303:*3*  304:*19*
**sites** 249:*21*, *23*
298:*14*  300:*20*
302:*14*
**six** 244:*11*  267:*12*
**size** 296:*23*  297:*4*,
*8*  304:*22*, *22*
305:*20*, *21*  306:*20*
**sizing** 305:*18*
**slope** 285:*17*  286:*3*,
*3*, *12*, *16*  289:*5*, *6*
**slopes** 239:*4*
284:*20*  285:*1*
**slough** 303:*15*
**sloughing** 284:*21*
**slow** 300:*4*
**smaller** 293:*21*
**software** 236:*20*
**soil** 289:*8*
**soils** 271:*18*
**Solis** 217:*21*

**solution** 281:*13*, *21*
282:*5*
**somebody** 278:*17*
279:*11*
**somewhat** 235:*1*
**sorry** 219:*19*
235:*19*  241:*13*
258:*23*  260:*2*, *7*
264:*3*  276:*22*
277:*20*  282:*22*
285:*22*  287:*1*, *2*
290:*7*  291:*15*
293:*14*  298:*7*
**sort** 243:*7*  262:*4*
263:*10*
**source** 230:*3*
297:*16*  299:*4*, *6*
**South** 217:*7*, *12*
225:*12*, *20*  227:*11*
231:*5*
**SOUTHERN** 214:*3*
217:*4*  231:*16*
232:*2*
**Spatial** 236:*20*
**speak** 275:*17*
276:*17*  277:*6*
278:*3*
**specific** 243:*6*
250:*23*  252:*15*
262:*1*, *2*  263:*12*
264:*6*, *14*  266:*20*
277:*18*  300:*11*
305:*21*
**specifically** 215:*12*
262:*13*  263:*21*
271:*4*  279:*15*
296:*12*  297:*6*
**specifics** 283:*13*
**specified** 266:*6*, *6*
**specifies** 267:*3*
**speculation** 264:*22*
**speculative** 234:*12*
292:*9*
**spot** 304:*4*
**stabilization** 284:*17*
**stabilize** 284:*14*
**stack** 228:*5*
**Staff** 217:*10*

**standard** 297:*19*
298:*11*, *16*, *19*
308:*3*
**standards** 271:*17*,
*20*  275:*20*  308:*6*,
*11*, *15*, *15*, *18*
**STARNES** 217:*16*
**start** 221:*19*
**started** 231:*3*
248:*8*  291:*23*
293:*23*
**starting** 279:*5*
**starts** 234:*5*  240:*5*
258:*2*  273:*20*
293:*19*
**State** 219:*2*  274:*8*
312:*2*
**stated** 301:*9*
**statement** 291:*16*
**STATES** 214:*1*
**steep** 232:*9*  284:*19*
285:*1*
**steeper** 286:*7*
**stenotype** 312:*5*
**step** 293:*22*
**steps** 267:*5*  277:*13*
**stereo** 223:*12*
**stereoscope** 223:*8*
**stereoscopically**
223:*5*, *7*
**STIPULATED**
215:*3*, *10*  216:*4*, *12*
**stipulation** 219:*5*
**stipulations** 219:*14*
**stopped** 298:*5*, *8*
**stopping** 289:*3*
**storm** 241:*1*
242:*23*
**straighten** 287:*11*
**straightforward**
240:*18*
**strata** 270:*5*
**straw** 285:*2*, *4*
**stream** 245:*10*, *14*
251:*8*  270:*19*
306:*4*
**streams** 244:*20*
**Street** 217:*12*
**strongly** 282:*2*

**structured** 233:*15*
**student** 272:*9*
**studies** 247:*1*
249:*18*, *19*, *20*
**subject** 261:*5*
**substantial** 270:*1*
**substantially**
265:*12*  288:*3*, *10*
**substantiating**
275:*22*
**subsurface** 299:*21*
308:*16*
**sufficient** 223:*22*
237:*20*  243:*22*
249:*14*, *14*  262:*10*
**sufficiently** 298:*22*
**Suite** 217:*7*
**summarize** 295:*17*
**superseded** 308:*19*
**supports** 292:*11*
**Sure** 222:*15*  225:*9*
229:*7*  242:*18*
249:*1*, *5*  254:*18*
256:*18*  259:*11*
263:*20*  273:*1*
274:*5*, *23*  286:*14*
287:*10*  289:*21*
295:*6*  300:*4*
301:*10*  305:*9*
309:*6*
**surface** 243:*2*
244:*20*  253:*8*
254:*9*  264:*16*
286:*5*  287:*4*
290:*10*, *12*, *14*
299:*21*  308:*17*
**Survey** 268:*8*
**susceptible** 284:*20*
**SW1** 290:*5*
**SW15** 290:*5*
**SW2** 256:*22*  257:*7*,
*9*
**SW3** 256:*4*  257:*2*,
*7*, *9*
**SW8** 263:*22*
**SW9** 263:*22*
**Swanson** 299:*9*, *22*
**sworn** 219:*12*
**system** 282:*20*

**Szabo** 270:7

**< T >**
**table** 270:11
**tables** 221:7
256:16
**take** 220:13
225:22 238:8
243:1, 15 258:4
261:12 276:17
**taken** 215:5
235:10 256:4, 6
261:13 264:10, 19
265:19 267:4
277:15 300:14
306:17, 17, 22
312:5
**talk** 222:13
**talked** 219:23
222:20, 21 254:5
259:10 273:17
290:18 291:17
295:8 298:13
**talking** 223:19
224:7 228:23
229:3, 3 234:16
259:14 263:22
264:3, 16 271:21
298:5 301:20, 22
**tasks** 260:3
**techniques** 223:1
**tell** 228:7 243:4
244:6 257:6
262:13 268:19
288:14
**telling** 232:13
**ten** 243:16 300:8,
11
**term** 227:6, 8
244:22 305:17, 18
**terminology** 270:19
283:1
**terms** 230:19
303:22
**test** 263:3 276:18
**tested** 241:12
**testified** 219:13
221:23 256:19
273:7 301:7

**testimony** 226:17
238:14 248:1
254:12 291:2
295:17 311:5
312:9
**testing** 250:17
252:11 272:20
308:10
**tests** 262:23
**textbook** 270:15
**textbooks** 298:14
**thank** 219:18
221:17 257:21
290:9 309:8
**theory** 263:4
**thereto** 216:10
312:6
**thickness** 238:10
239:19 245:22
246:11 304:11, 12
**thicknesses** 246:18
**thing** 226:1 231:4
246:1 284:6 289:5
300:1
**things** 220:5 222:7
259:10 267:22
269:21 271:20
279:19 284:1
286:23 299:2
**think** 219:23
220:18 221:1
227:17 229:11, 12,
17 230:2 231:23
232:5, 19 233:7
237:17 238:6
240:1, 3, 8 242:6
244:3 246:10
247:5 251:15, 16
253:16 256:19
257:14 258:19
259:2 260:20
262:7 266:1
267:17 272:23
273:7 276:19
277:11 279:13, 19
280:7 281:15
282:1 285:12
286:5, 22 287:18
288:2 289:23
290:18 292:9

294:3, 20, 23 298:7
301:6 309:7
**Thornbury** 270:13
**thought** 231:11
305:11
**thousand** 237:15
**three** 223:13
235:7 265:6
278:18 280:12
304:6
**time** 216:8, 8
219:20 220:9
225:22 228:13
233:7 239:2, 21
241:9 242:23
243:6 254:4
257:19 266:18, 19
272:14, 18 274:8
291:11, 12 294:11
306:8 308:1, 22
**timeframe** 259:14
**timeframes** 292:1
**times** 235:7 240:17
**today** 219:19
220:3 243:16
261:3
**tools** 237:1
**top** 244:11 268:6
278:18 283:20
288:23 293:16, 18
296:12
**topic** 257:23
**topographic** 221:21
222:22 223:20
229:5 230:5, 14
234:18, 20 235:21
236:8, 13, 15
239:15, 16
**topography** 229:11
**total** 257:6, 8
282:2 295:14
**toxic** 242:22
**transcribed** 312:6
**TRANSCRIPT**
310:4 311:5 312:9
**transcription** 312:7
**transported** 304:9
**travel** 303:12
**treat** 282:22 283:7,

13
**treating** 241:17
**treat-in-place**
282:20
**treatment** 275:21
283:15
**trees** 284:15 285:2
289:4
**trial** 216:8
**Tributary** 252:21
296:15 303:14
**true** 220:13
301:14 311:6
312:8
**try** 219:20 220:2
243:8 248:10
**trying** 231:1 287:3,
9 293:20 295:3
300:9 304:4
**turn** 221:19 222:5
240:4 257:22
296:19
**turned** 261:15
**two** 220:4 225:13,
15 228:11 234:6
236:6, 13, 15
239:18 244:15
251:5 263:9 270:6
271:20 272:15
281:6, 7, 10 286:1,
2 291:19, 22 292:5
**typed** 233:17 299:3
**typical** 262:4
306:23
**typically** 274:10
308:16

**< U >**
**ultimate** 292:14
**uncover** 296:15
**underlying** 291:4,
14
**underneath** 298:17
**understand** 224:10
226:17 227:9
229:7 231:1 233:5
235:17 240:19
259:11 266:14
272:13 283:12
285:15 286:11, 13

289:22  295:3
304:5

**understanding**
224:17  227:10
238:13  248:1
254:19  259:9
260:4  296:10
301:6  312:11

**understood**  231:2
235:8  254:12
291:1

**uniform**  247:21

**UNITED**  214:1

**unvegetated**  288:23

**upkeep**  282:10

**upper**  239:14

**upstream**  250:17
252:5  289:20
303:11

**use**  222:21  227:8
236:19  237:6
244:22  261:22
262:1  266:22
267:7, 16  274:13
275:22  291:22
292:7, 11

**USGS**  230:7
239:15

**Usual**  219:14

**utilized**  232:18
299:18

**< V >**

**valid**  296:23  297:9

**valley**  241:5, 15

**value**  238:10  239:5

**values**  230:16
252:16

**variability**  291:19

**variables**  289:8

**various**  296:3

**vary**  306:19

**vast**  235:5, 15
288:12

**vastly**  256:6

**vegetated**  248:20
285:1

**vegetation**  228:16,
18, 19  265:10, 14,
22  266:11  285:6

287:23  289:3, 12
303:9

**vegetative**  288:15

**versus**  232:18
233:1  257:7
308:12

**vicinity**  263:9
306:6

**view**  225:8  232:1

**viewing**  222:18
223:8

**vintage**  236:16

**violation**  254:21

**Violations**  258:18

**visible**  306:7

**visit**  248:20  273:1

**VOLUME**  214:16
235:18  237:17
238:3, 8, 21  239:20
242:1, 3  291:18
293:22  294:10

**volumes**  234:6

**volumetric**  231:20
234:10  239:7
240:2  291:5, 15

**volumetrics**  290:23
291:7, 8, 14  292:14

**vs**  214:9

**< W >**

**waived**  215:12
216:14

**want**  220:3  221:15
224:2  236:5  266:2,
3, 4  268:3  289:21
298:3  300:4, 17
303:15

**wanted**  268:4

**wants**  261:2

**warranted**  250:19
251:5

**WARRIOR**  214:7
217:11  269:13
270:4

**washed**  285:3

**waste**  263:18, 21
264:1, 4, 17  281:20
282:9  284:14

**water**  241:6, 10
242:21  243:2, 2, 4,

17, 20  244:20
245:10  247:9, 10
251:5, 16, 17, 19, 21
252:13  254:9
256:20  259:6, 15,
16  260:10, 15, 16
263:16, 17  264:1,
16  265:4  290:11,
12, 13, 14, 15
296:23  297:4, 8

**waterfront**  303:10,
13

**waters**  241:11

**way**  220:7  224:12
230:11  233:14, 22
245:10  254:18
257:15  259:21
262:20  267:2
270:1  276:2, 23
282:14  284:13
297:1, 9  305:2

**well**  227:7  235:17
238:19  239:23
243:1  245:4  248:7
255:16  262:9, 23
265:20  274:20
276:8  282:18
291:13  292:23
295:2  305:13
308:20

**went**  220:8, 9
222:7  304:6

**Wentworth**  305:20

**we're**  221:2  224:7
228:1, 23  230:6

**west**  232:10

**we've**  273:16

**whatsoever**  252:2

**Wheeler**  242:4

**whichever**  290:3

**William**  270:12

**witness**  215:12
219:9  311:4  312:9

**wondering**  242:9

**wooded**  228:13

**word**  273:6

**words**  233:4
243:15  254:13
268:23  279:12
280:5  282:14

**work**  258:11
263:5, 6  272:16
296:20

**worked**  272:6, 12,
13  283:18

**working**  248:8, 14
283:17

**world**  238:15

**WRITE**  310:4

**writing**  273:2
276:8, 9

**written**  252:22
276:14  286:23

**wrong**  240:19, 20

**wrote**  280:21  302:8

**< Y >**

**yards**  235:15, 22
237:15  293:9
294:1, 13  295:13

**Yeah**  227:3  233:7
294:3, 20  300:10

**year**  235:15
255:20  285:11
292:6, 7

**years**  235:9
238:23  247:8
272:16  285:14
297:18  304:8, 10

**yellow**  224:15, 20
225:2, 6  226:8, 18
232:17, 18, 23
233:3, 8

**yesterday**  227:6
253:16, 20  254:5
259:2

**younger**  285:13

**< Z >**

**zone**  252:4  290:19

# FREEDOM
# COURT REPORTING

2031 Shady Crest Drive
Hoover, AL 35216
205.397.2397   877.373.3660

## WITNESS CERTIFICATION

I, _____Lois D. George_____, said witness, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

_____
Witness Signature above:

Printed name: Lois D. George _____

Sworn to and subscribed before me, this
the __18__ day of ___July_____, 2018.

_____
    Gloria Goodin
Notary Public
My Commission expires:____June 17, 2019_____

Deposition of:      **Lois George-235563**
Taken:              **6/25/2018**
Court Reporter:     **Donna Winters**

## TRANSCRIPT ERRATA SHEET

Deposition of: **Lois George-235563**
Taken: **6/25/2018**
Court Reporter: **Donna Winters**

| Page #: | Line #: | Correction/Reason for change: |
|---|---|---|
| 31 | 7 | report s/b reports |
| 41 | 19 | DNPL s/b DNAPL |
| 62 | 5 | pine s/b pond |
| 62 | 16 | is the s/b and some |
| 66 | 10 | sufficiency s/b efficiency |
| 80 | 10 | older s/b in the |
| 82 | 14 | Lawyer s/b Moyer |
| 93 | 12 and 19 | pine s/b pond |
| 96 | 18 | ending s/b entering |
| 97 | 10 | photography s/b cartography |
| 103 | 19 | pipe s/b path |
| 126 | 8 | delete the word "in" |
| 134 | 14 | Doug s/b Bill (stated wrong name) |
| 139 | 7 | should s/b would |
| 163 | 10 | Not substance s/b(?) No recollection |
| 163 | 20 | sign s/b sonde |
| 164 | 10 | sign s/b sonde |
| 173 | 21 | twelve-foot s/b twelve-inch |

# FREEDOM
# COURT REPORTING, INC.

2031 Shady Crest Drive
Hoover, AL 35216
205.397.2397
877.373.3660
readandsign@freedomreporting.com

## WITNESS CERTIFICATION

      I, _____Lois D. George_____, said witness, do hereby acknowledge that I have read the foregoing transcript of my testimony and that it is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

Witness Signature above:

Printed name: Lois D. George

Sworn to and subscribed before me, this
the __18__ day of ____July____, 2018.

_____Gloria Goodin_____
Notary Public
My Commission expires:____June 17, 2019____

Deposition of:       **Lois George (Continuation) - #235564**
Taken:               **6/27/2018**
Court Reporter:      **Kimberly B. Dowdy**

# TRANSCRIPT ERRATA SHEET

Deposition of:      **Lois George (Continuation) - #235564**
Taken:      **6/27/2018**
Court Reporter:      **Kimberly B. Dowdy**


Page #:     Line #:     Correction/Reason for change:

237      19      Their s/b The

297      6      That's s/b What's