# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 2:16-cv-01443-AKK** |
| v. | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Black Warrior River-keeper's ("BWR") motion to strike untimely expert opinions, doc. 66, Drummond Company, Inc. submitted in response to BWR's motion for partial summary judgment ("MPSJ"). Apparently, rather than citing to the expert reports BWR produced during discovery, BWR submitted declarations from its experts instead in support of its MPSJ, and Drummond, in turn, also submitted declarations from its experts that address specific contentions in BWR's MPSJ. BWR contends that the Drummond declarations contain new, untimely expert opinions in violation of Federal Rule of Civil Procedure 26(a)(2), and asks the court to strike and exclude them pursuant to Federal Rule of Civil Procedure 37(c)(1). *Id*. The motion is fully briefed, docs. 66-1, 71, 72, and is due to be granted in part.

1

# I.    ANALYSIS

This case arises out of a dispute over alleged discharges of pollutants from the site of a former coal mine into the Locust Fork of the Black Warrior River and a tributary of the Locust Fork. Doc. 24. BWR filed suit against Drummond, which owns the Maxine Mine site ("the site"), alleging that Drummond has violated the Clean Water Act (CWA) and Resource Conservation and Recovery Act (RCRA) by discharging pollutants without a permit from point sources at the site into the Locust Fork and its tributaries. *See id.* The case has advanced to the dispositive motions stage. At issue in this pending motion is whether the court can consider declarations Drummond submitted from its experts in ruling on the pending motions for summary judgment.

Under Rule 26, a party seeking to introduce expert testimony must disclose a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). "A party must make these disclosures at the times and in the sequence the court orders." *Id.* 26(a)(2)(D). Furthermore, the disclosing party must supplement or correct its report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective

information has not otherwise been made known to the other parties during the discovery process or in writing[.]" *Id*. 26(e).

The expert disclosure rule is "designed to allow both sides in a case to prepare their cases adequately and to prevent surprise[.]" *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008). In light of this principle, Rule 37 provides that, "if a party fails to provide information or identify a witness as required under Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing [sic] party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009).

In determining whether a failure to disclose was "substantially justified or harmless," the court considers: "(1) the importance of the testimony; (2) the reason for the [offering party's] failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness [is] allowed to testify." *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.,* 389 F.3d 1339, 1353 (11th Cir. 2004). Contrary to Drummond's contention, a non-disclosing party does not have "an absolute due process right" to submit new and untimely expert opinions merely because they are "directly responsive" to its opponent's arguments and/or expert declarations. *See* doc. 71 at 6-9. However, a non-disclosing party may show that its

3

untimely expert opinion is "substantially justified" if its opponent has introduced a new argument or an untimely expert opinion, thereby potentially justifying a rebuttal expert opinion. *See Friends of Santa Fe Cty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1351 (D.N.M. 1995) (finding that defendants' new expert opinion was "substantially justified" where plaintiffs raised an argument for the first time on summary judgment).

BWR contends that portions of Drummond's new expert declarations allegedly contain new opinions that were disclosed after the deadlines for expert disclosures. Doc. 66. BWR argues further that certain portions of these declarations are "entirely speculative, constitute mere legal conclusions, or both . . .," or lack a sufficient basis. Doc. 66-1 at 4, 7, 8, 10. The court addresses each of the challenged declarations in turn.

A. **Maggie Weems's Declaration**

BWR moves to strike paragraphs 13 and 14 of Weems's declaration as purportedly new opinions. Doc. 66-1 at 5-6.

***Paragraph 13:*** In Paragraph 13, Weems criticizes BWR expert Barry Sulkin's reliance on a single sample "as a background comparative" for his analysis, quoting a standard from ADEM's *Alabama Environmental Investigation and Remediation Guidance (AEIRG)* document. Doc. 61-1 ¶ 13 (citing *AEIRG* (Revision 4.0, February 2017)). In response to the motion to strike, Drummond

contends generally that paragraphs 13 (as well as 14) responded to Sulkin's declaration, doc. 56-1, and that "Weems's criticism of Sulkin's supposed background samples is not new." Doc. 71 at 2-3. These contentions are unavailing because the Amec Foster Wheeler ("AFW") and Wood Environment & Infrastructure Solutions ("Wood") expert rebuttal reports that Drummond submitted during discovery fail to cite the AEIRG standard. *See* doc. 71 at 3; doc. 61-3 at 76, 77, 80.[1] Because Rule 26 requires disclosure of "all opinions . . . and the basis and reasons for them," Weems's reliance on this previously uncited standard in her declaration is an untimely disclosure and, thus, Paragraph 13 expresses a new opinion. *See* Fed. R. Civ. P. 26, 37(c)(1); *United States v. Alabama Power Co.*, 274 F.R.D. 686, 691 (N.D. Ala. 2011), *aff'd*, 730 F.3d 1278 (11th Cir. 2013) (striking as a "new opinion" portion of an expert's declaration that relied on previously uncited documents and formulas). Paragraph 13 is also due to be stricken because Drummond has not shown that this untimely opinion is responsive to a new and untimely opinion by Sulkin or otherwise substantially justified or harmless. *See* doc. 56-1; 56-2; *Mitchell*, 318 F. App'x at 824.

---

[1] Weems testified that she was the primary author for *Amec Foster Wheeler (AFW) Review of Report of Anthony Brown* and *AFW Review of Report of Barry Sulkin*. Doc. 61-30 at 16, 27; *see* doc. 61-1 at 11-30; 61-3 at 55-65. Additionally, Weems contributed to portions of *AFW Review of Report of Gordon Johnson*, *(Wood) Response to aquilogic, Inc. Report*, *(Wood) Response to Burgess Environmental Report*, and *(Wood) Response to Barry Sulkin Report*. Doc. 61-30 at 26-27, 29-32, 32-34, 34-37; *see* doc. 61-3 at 55-65, 66-82, 83-93, 94-100, 102-107. Weems is credited on the cover page of the AFW reports, but not the Wood reports. *See* doc. 61-1 at 11; 61-3 at 56, 67, 84, 94, 102.

***Paragraph 14:*** Weems uses Paragraph 14 of her declaration to respond to specific paragraphs of Sulkin's declaration. Doc. 61-1 ¶ 14. First, Weems attacks paragraphs 7, 9, and 11 of Sulkin's declaration by citing the previously uncited AEIRG standard. Doc. 61-1 at 5. Like her opinions in Paragraph 13, these sentences in Paragraph 14 express new and untimely opinions, and the late disclosure is not substantially justified or harmless. Thus, these sentences in Paragraph 14 are also due to be stricken.

Second, in response to paragraph 10 of Sulkin's declaration, Weems asserts that Sulkin's comparison of the background conductivity levels of "unimpacted sampling sites" from August 2017 are misleading because these samples were "collected directly from the river." Doc. 61-1 at 6 (citing doc. 56-1 ¶ 10). The court agrees with BWR generally that these sentences express a new opinion. As BWR notes, Sulkin made the same comparisons and conclusions in his previously-disclosed expert report, and Drummond did not address them in the AFW and Wood reports it provided previously. *See* doc. 56-2 at 6. However, one sentence in this section does not state a new opinion, as it was included in the AFW Sulkin rebuttal report. *See* doc. 61-3 at 73.[2] Accordingly, with the exception of this single sentence, the remaining sentences addressing paragraph 10 of Sulkin's declaration

---

[2] The sentence states: "In fact, the data Sulkin uses only serves to validate Wood's previous conclusion that stated "any contribution of water from the site into the Locust Fork . . . is able to be effectively buffered by the natural conditions of the Locust Fork, and these contributions are having no effect on the quality of the water in the Locust Fork." Doc. 61-1 at 7.

constitute an untimely disclosure of a new opinion that is not substantially justified or harmless, and are due to be stricken.

Third, Weems criticizes Sulkin for omitting the analytical results of two particular samples, SW1 and SW15, which indicate that water from the site flowing into Locust Fork has not impacted the water quality. Doc. 61-1 at 6-7 (citing doc. 56-1 ¶¶ 13, 15, 18, 20). The AFW Sulkin rebuttal report makes this same point. *See* doc. 61-3 at 72. Therefore, this criticism is not new and is not due to be stricken. *Miele v. Certain Underwriters at Lloyd's of London*, 559 F. App'x 858, 861-62 (11th Cir. 2014) (finding no Rule 37 violation where an expert's new declaration "stated essentially what he had said in [his expert] report").

Fourth, in the next three sentences, Weems claims that Sulkin's declaration mischaracterized the pH value ranges of on-site samples as "dangerously low" because "numerous foods and drinks have pH values in this range." *Id*. at 7 (citing doc. 56-1 ¶ 10). Although these sentences express a new opinion, *see* doc. 61-3 at 67- 82, 102-07, they are not due to be stricken because Sulkin's previously-disclosed expert reports do not characterize the pH values of his samples as "dangerously low." *Compare* doc. 56-1 at 5 ("I consider pH in these ranges to be dangerously low.") *with* doc. 56-2 at 5-6. Therefore, because Sulkin's declaration expresses a new opinion, Weems's new opinion is substantially justified as a direct response. *See Friends of Sante Fe Cty.*, 892 F. Supp. at 1351.

Fifth, Weems challenges Sulkin's contentions regarding purportedly jointly agreed upon sampling procedures. According to Weems, the August 2017 sampling was not "jointly agreed upon" by the parties' consultants, and BWR did not provide the sampling plan to Drummond's consultants until 2018. Doc. 61-1 at 7 (citing doc. 56-1 at 4). Sulkin's position was reflected, however, in his previously-disclosed report, which states, "Also, for the August 2017 sampling, procedures were agreed upon, followed, and observed in concert with Drummond representatives who were conducting Drummond's sampling." Doc. 56-2 at 3. By waiting until the summary judgment briefing to respond to this contention, instead of offering her opinion in the timely disclosed expert reports, Weems has stated a new opinion after the deadline. *See* doc. 61-1 at 11-109; 61-2; 61-3 at 1-82. Therefore, because Drummond has failed to show that Weems's new opinion is substantially justified or harmless, *see Mitchell*, 318 F. App'x at 824, these sentences are due to be stricken.

Finally, as further challenge to Sulkin's contention about the jointly agreed upon sampling procedures, Weems enumerates ten "elements" of a "defensible sampling plan." Doc. 61-1 at 7-8. As BWR notes, however, the AFW and Wood reports do not describe a so-called "defensible sampling plan" or mention several of the "elements" listed in Weems's declaration, such as the need for permanent monitoring wells, a conceptual site model, and "Shelby Tubes." *See* doc. 61-1 at 7-

8, 11-109; 61-2; 61-3 at 1-82. Therefore, the "defensible sampling plan" described in Paragraph 14 is a new opinion from Weems, and is due to be stricken in light of Drummond's failure to show that its late disclosure is substantially justified or harmless. *See Mitchell*, 318 F. App'x at 824.

## B. **Leslie Noble's Declaration**

BWR also moves to strike paragraphs 5 (second half only), 6, 8 and 9 of Noble's declaration. Doc. 66-1 at 6.

*Paragraph 5 (second half only, beginning at "To my knowledge . . ."):* The first sentence to which BWR objects—which states, "To my knowledge, none of BWR's consultants measured flow volume at a specific juncture of "T1" and the Locust Fork"—does not express a new opinion. The AFW and Wood reports contained a substantially similar criticism of the flow volume estimates and analysis of BWR experts Anthony Brown and Gordon Johnson.[3] Docs. 61-5 ¶ 5; 61-3 at 63, 88; *In re Stand 'N Seal Prod. Liab. Litig.*, 623 F. Supp. 2d 1355, 1362 (N.D. Ga. 2009) (finding no new opinion where expert declaration did "not differ substantially" from expert report). However, the remainder of paragraph 5 contains new estimates of the flow of "Tributary 1" or "T1," the flow volume of Locust

---

[3] Noble testified that she was the primary author of *AFW Review of Report of Gordon Johnson*. Doc. 61-31 at 25. She also contributed to portions of *AFW Review of Report of Anthony Brown*, *AFW Review of Report of Barry Sulkin*, *(Wood) Response to aquilogic, Inc. Report*, *(Wood) Response to Burgess Environmental Report*, and *(Wood) Response to Barry Sulkin Report*. *Id.* at 24-25, 32, 37-38, 40. She is credited on the cover page of each of these reports. *See* doc. 61-1 at 11; 61-3 at 56, 67, 84, 94, 102.

Fork, and the ratio of discharge of "T1" to total flow volume of Locust Fork, none of which were mentioned in the AFW or Wood reports. Docs. 61-5 ¶ 5; 61-1 at 11-109; 61-2; 61-3 at 1-107. Therefore, the portion of Paragraph 5 from the sentence, "However, on-site visual estimates can be made . . .," until the conclusion is due to be stricken.

*Paragraph 6:* BWR moves to strike Noble's statements that "T1" does not satisfy the U.S. Army Corps of Engineers (USACE) definition of "intermittent stream" and that "T1" is an ephemeral stream. *See* docs. 61-5 ¶ 6; 61-1 at 11-109; 61-2; 61-3 at 1-107. Drummond concedes that Noble's statements about the USACE's definition express a new opinion that is not contained in the AFW or Wood reports, and asserts that the court should allow this paragraph instead as it simply rebuts Brown's assertion. Doc. 71 at 3. The court declines to do so because Brown's expert report asserted that "T1" satisfied the USACE's definition. Doc. 53-6 at 28. To the extent Drummond wanted to rebut Brown's contention, it should have done so in a timely fashion through the AFW and Wood reports. However, Noble's assertion in the last sentence of this paragraph that "T1" is an ephemeral stream is not a new opinion. *See* docs. 61-5 ¶ 6; 71 at 3. The transcript of Noble's deposition indicates that BWR elicited Noble's opinion on this issue, and that the opinion Noble expressed in her deposition is substantially the same as the one in Paragraph 5. *See* doc. 61-31 at 21. Thus, BWR cannot claim any unfair surprise by

Noble's assertion in her declaration that "T1" is an ephemeral stream. *See Reese*, 527 F.3d at 1266 (noting the expert disclosure rule's purpose of "prevent[ing] surprise"); *Bearint,* 389 F.3d at 1353 (requiring consideration of prejudice to the moving party). Accordingly, Paragraph 6, with the exception of the last sentence in the paragraph, is due to be stricken.

**Paragraph 8:** Like Weems, Noble also disputes Sulkin's characterization of the August 2017 sampling visit as "jointly agreed upon." Doc. 61-5 ¶ 8. As stated previously, Sulkin's assertion is not new, and the untimely disclosure of Noble's new opinion is not substantially justified or harmless. Accordingly, Paragraph 8 is due to be stricken.

**Paragraph 9 (first sentence only):** BWR has moved to strike the first sentence of this paragraph, which states, "Comparison to a handful of upland 'background' samples does not constitute an appropriate background for the onsite samples, nor does comparison to the Locust Fork flowing at a higher volume than any of the puddles and seeps from which the samples cited by BWR were collected." Doc. 61-5 ¶ 9. Only the second half of this sentence ("nor does comparison to the Locust Fork . . .") expresses a new opinion. BWR is correct that Noble's criticism based on the Locust Fork's flow volume is not included in her expert reports, *see supra* **Paragraph 5**; docs. 61-1 at 11-109; 61-2; 61-3 at 1-107, and although Drummond is correct that Noble's criticism is "responsive" to

BWR's contention, this fact does not substantially justify or render harmless Noble's new opinion, as BWR's contention is based on Brown's previously-disclosed opinion and data. *See* docs. 71 at 4 (citing doc. 52 ¶ 30); 53-6 at 76, 91-99. Therefore, the second half of the first sentence of Paragraph 9 is due to be stricken.

### C. **Bruce Wielinga's Declaration**

BWR moves to strike paragraphs 5, 6 (last paragraph only), 7 (last two paragraphs only), 8, and 9 of Wielinga's declaration. Doc. 66-1 at 6-7.[4]

*Paragraph 5:* BWR has moved to strike Wielinga's assertion in Paragraph 5 that the acid based accounting results for the coarse coal residual samples analyzed by BWR expert Johnson "showed that sulfide sulfur was below the analytical detection limit," and, thus, does not support BWR's contention that "sulfide-bearing minerals" are creating acid mine drainage. Doc. 61-6 ¶ 5 (quoting doc. 52 ¶ 7). Drummond counters that Wielinga previously expressed this opinion in the AFW Johnson rebuttal report. Doc. 71 at 4. Although Drummond's contention is

---

[4] Wielinga testified that he only "reviewed" and did not make substantial edits to the *AFW Review of Report of Anthony Brown*, *AFW Review of Report of Gordon Johnson*, and the *AFW Review of Report of Barry Sulkin*, but that he contributed to portions of *(Wood) Response to aquilogic, Inc. Report*, *(Wood) Response to Burgess Environmental Report*, and *(Wood) Response to Barry Sulkin Report*. Doc. 61-32 at 17, 18, 19, 25. He is credited on the cover page of each of these reports. *See* docs. 61-1 at 11; 61-3 at 56, 84, 94, 102.

incorrect,[5] the transcript of Wielinga's deposition indicates that BWR elicited Wielinga's opinion on Johnson's acid-based accounting analysis, and that the opinion Wielinga expressed in his deposition is substantially the same as the one in Paragraph 5. *See* doc. 61-32 at 27-28. Thus, BWR cannot claim to be unfairly surprised by Wielinga's declaration. *See Reese*, 527 F.3d at 1266 (noting the expert disclosure rule's purpose of "prevent[ing] surprise"); *Bearint,* 389 F.3d at 1353 (requiring consideration of prejudice to the moving party). Therefore, the new opinion in this paragraph is substantially justified or harmless.

**Paragraph 6 (last paragraph only):** BWR has moved to strike the last section of paragraph 6, in which Wielinga states that BWR failed to show that Sulkin's background reference sampling site in September 2016 satisfied the Environmental Protection Agency's definition of a "background reference area," and that BWR failed to consult relevant scientific literature in selecting its reference site. Doc. 61-6 ¶ 6. Drummond contends in response that Wielinga "previously addressed this issue," and cites the AFW Sulkin rebuttal report to support this contention. Doc. 71 at 4. However, although the cover page of the AFW Sulkin rebuttal report includes Wielinga's name and signature, Wielinga testified that he did not draft or make substantial revisions or edits to this report,

---

[5] A review of the AFW Johnson rebuttal report shows that it contests Johnson's conclusion based on potential problems with BWR's measurements of pH in solid samples. Doc. 61-3 at 62. In contrast, Paragraph 5 does so based on the undetectable amounts of sulfide sulfur in the samples. Doc. 61-6 ¶ 5. The other AFW and Wood reports that Wielinga contributed also do not address the amounts of sulfide sulfur in the samples.

and he did not give any indication that the report reflected his opinion. Docs. 61-3 at 67; 61-32 at 18. Thus, to the extent that he is now offering his own opinions on the topics covered in the AFW Sulkin rebuttal report, Wielinga's opinions are new and due to be stricken.

*Paragraph 7 (last two paragraphs):* BWR moves to strike Wielinga's opinion, based on median pH and metal concentration values, that "mine waste acid generation potential" at the site "is decreasing with time." Doc. 61-6 ¶ 7. As BWR notes, the median values cited in Paragraph 7 do not appear in Wielinga's expert reports, and the basis for these values is unclear. *See* docs. 61-1 at 11-109; 61-2; 61-3 at 1-107. As such, the second-to-last paragraph in Paragraph 7 expresses a new opinion and fails to disclose the basis for that opinion. *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). However, the last paragraph of Paragraph 7 (with the exception of the last sentence) states substantially the same opinion as Paragraph 5 and, accordingly, does not state a new opinion. Therefore, the new opinion in Paragraph 7 concerning the decrease of "acid generation potential" based on median values over time is due to be stricken.

*Paragraph 8:* BWR has moved to strike Wielinga's opinion that data and observations do not support the conclusion that polluted groundwater is discharging from the mine site into the Locust Fork. Doc. 61-6 ¶ 8. To support this opinion, Wielinga cites findings from groundwater monitoring wells, installed by

Drummond consultants P.E. LaMoreaux & Associates ("PELA") in 1983, and BWR's drive-point piezometers (DPZ) in 2017. Specifically, Wielinga notes that, "of the 15 wells and DPZs installed to intercept groundwater, only 40% actually intercepted groundwater and only 20% contained sufficient groundwater consistently for a complete suite of analysis." *Id*. Although the AFW Brown rebuttal report contends that "groundwater data" from the 2017 DPZs "is limited to support Brown's interpretations" concerning concentrations of total dissolved solids (TDS), doc. 61-1 at 28, the AFW or Wood reports fail to cite Wielinga's calculations as a basis for disputing Brown's findings. *See* docs. 61-1 at 11-109; 61-2; 61-3 at 1-107. Thus, this paragraph expresses a new opinion. Moreover, Drummond's contention that this paragraph is "directly responsive to BWR's assertion that groundwater is flowing into Locust Fork" and to paragraph 5 of Johnson's declaration is unavailing, as neither BWR's assertion nor Johnson's declaration rely on untimely disclosures. *See* docs. 71 at 4; 54-2 ¶ 5; 54-3 at 5, 40. Accordingly, the court finds that this is an untimely disclosure of a new opinion, and is due to be stricken.

***Paragraph 9:*** BWR challenges Wielinga's assertion that Johnson's mine waste data indicates that the concentration of sulfide minerals is below the detectable limit and that the data in Table 9 of Brown's report reveals "no change in metals concentrations" from an upstream to a downstream sampling location.

Doc. 61-6 ¶ 9. Wielinga's statements about the concentration of sulfide minerals in the first paragraph of Paragraph 9 express essentially the same opinion as the one expressed in Paragraph 5 of his declaration. *See supra Paragraph 5*. Again, because BWR elicited this opinion from Wielinga in his deposition, it is substantially justified. *See Reese*, 527 F.3d at 1266 (noting the expert disclosure rule's purpose of "prevent[ing] surprise"); *Bearint,* 389 F.3d at 1353 (requiring consideration of prejudice to the moving party). Wielinga's assertions about Brown's Table 9 data in the remainder of his declaration echo the summary section of the AFW Brown rebuttal report, which asserts that Brown's data from the upstream and downstream sampling locations reflected no change in metals concentrations. *See* 61-1 at 16-17. However, as stated previously, Wielinga testified that the report contained "very, very few" of his opinions and he only reviewed and provided editorial suggestions to the report. *See* doc. 61-32 at 17-18.[6]

In light of Rule 26's purpose of allowing adequate preparation and preventing surprise, and given Drummond's failure to respond to BWR's motion with respect to Paragraph 9, the court finds that the statements in Paragraph 9 concerning

---

[6] Weems stated that Wielinga only contributed substantively to the report's "parts related to actual mining" and the "discussion of the remedy," which would not encompass the relevant statements in the summary section. *Id.*; doc. 61-30 at 17. Furthermore, Weems testified that the AFW Brown rebuttal report expresses her opinions and that she was its "primary author." Docs. 61-30 at 16-17. Noble testified that she "probably . . . revised or made some edits to or suggestions to" the summary, and that the entire report expresses her opinions. Doc. 61-31 at 17, 24.

Brown's data in Table 9 (the second paragraph of Paragraph 9) constitute an untimely disclosure that is not substantially justified or harmless, and is due to be stricken. *See Reese*, 527 F.3d at 1266; *Mitchell*, 318 F. App'x at 824 (noting the non-disclosing party's burden under Rule 37); *Abrams v. Ciba Specialty Chemicals Corp.*, No. 08-0068-WS-B, 2010 WL 779283 at *6 (S.D. Ala. 2010) (granting motion to exclude expert testimony that merely expressed another expert's opinions rather than his own).

### D. Lynn Sisk's Declaration

BWR moves to strike paragraphs 5 (last sentence only), 8, 9, and 13-15 of Sisk's declaration. Doc. 66-1 at 7-8.

*Paragraph 5 (last sentence only):* Sisk states in this sentence that the sedimentation basins at issue are excluded from the federal regulatory definition of "waters of the United States." Doc. 61-10 ¶ 5. As BWR notes, however, Sisk's expert reports do not discuss this exclusion. *See* docs. 61-10 at 8-18; 61-21 at 11-23. Furthermore, Drummond has not shown that this untimely disclosure is substantially justified or harmless, and has failed to respond to BWR's motion concerning this sentence. *See Mitchell*, 318 F. App'x at 824; *Transamerica Leasing, Inc.*, 267 F.3d at 1308 n.1. The last sentence of Paragraph 5 is therefore due to be stricken.

***Paragraphs 8 and 9:*** In Paragraph 8, Sisk states that an October 1984 report by PELA only validly reflects "conditions that existed 24 years ago." Doc. 61-10 ¶ 8. In Paragraph 9, Sisk asserts that, contrary to BWR's contention in its MPSJ, the designation of a "receiving water" as "an unnamed Tributary to Locust Fork" in Drummond's 1988 NPDES permit application was "not intended as a formal WOTUS reference or determination of stream designation or status." Doc. 61-10 ¶ 9 (quoting doc. 52 ¶ 22). As BWR notes, however, and as Drummond concedes, Sisk's expert reports do not address the October 1984 PELA report or the 1988 NPDES permit application. *See* docs. 61-10 at 8-18; 61-21 at 11-23. Drummond contends though that Paragraph 8 is "directly responsive to BWR's Exhibit L," which contains the October 1984 PELA report, and Paragraph 9 is "directly responsive" to BWR's argument in support of its MPSJ that the 1988 application indicates the lower west ditch is a tributary to Locust Fork. *See* docs. 71 at 4-5; 52 ¶ 22. BWR disputes these contentions and asserts that "it is beside the point because they were not disclosed in compliance with Rule 26." Doc. 72 at 5. However, in the absence of any of BWR's experts expressing an opinion concerning the October 1984 PELA report or the 1988 NPDES permit application, Drummond had no way of knowing their experts needed to respond. Therefore, the

court agrees with Drummond that furnishing this opinion at this juncture is substantially justified.[7]

*Paragraph 13:* Sisk contests in this paragraph BWR's assertion that whole effluent toxicity (WET) testing reveals that surface water on site is "acutely and chronically toxic to aquatic life." Doc. 61-10 ¶ 13; *see* doc. 52 ¶ 32. Contrary to BWR's contention that Sisk "has not previously opined on the WET test analysis," *see* doc. 66-1 at 8, Sisk states substantially the same opinion in his expert reports. Specifically, Sisk criticizes BWR's WET testing and BWR's experts' conclusions about toxicity to aquatic life, noting that "two samples collected from the Locust Fork . . . showed no toxicity," and highlights one of these samples in her declaration. *See* docs. 61-10 at 14-15; 61-21 at 20-21; 61-10 ¶ 13. Therefore, Paragraph 13 does not state a new opinion.

*Paragraph 14:* Sisk opines that BWR cannot show, based on Brown's report, that "the erosion of GOB to Locust Fork has changed its bed, flow characteristics, and chemistry" because Brown's report lacks "physical measurements and water sample analyses from this segment of Locust Fork" that predate the Maxine mine. Doc. 61-10 ¶ 14 (quoting doc. 52 ¶ 35). Because Sisk's expert reports do not criticize Brown's conclusion concerning the historical impact

_____

[7] BWR also contends that Sisk's opinion in Paragraph 8 "is not a proper subject for expert testimony," and that his opinion in Paragraph 9 is speculative and lacks a sufficient basis. However, BWR had not made the proper showing under Federal Rule of Evidence 702 and, therefore, the court declines to strike these opinions. *See*, *e.g.*, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

of erosion to Locust Fork, this paragraph constitutes a new opinion. *See* docs. 61-10 at 14-15; 61-21 at 20-21. Furthermore, Drummond has not shown that this untimely opinion is substantially justified or harmless, and has failed to respond to BWR's motion with respect to Paragraph 14. *See Mitchell*, 318 F. App'x at 824; *Transamerica Leasing, Inc.*, 267 F.3d at 1308 n.1. Therefore, Sisk's opinion is due to be stricken.

**Paragraph 15:** Sisk disputes BWR's argument in its MPSJ that the alleged "GOB pile" and various water sources are "point sources," asserting that state regulatory agencies would not have released Drummond from earlier obligations "if ongoing activities or discharges from the property warranted further or extended regulation." Doc. 61-10 ¶ 15. It is undisputed that this is a new opinion. *See* doc. 71 at 5; 66-1 at 8. Furthermore, Drummond's contention that this paragraph "directly addresses arguments based on water chemistry (old) and NPDES permitting (new) by BWR" is unavailing because Drummond fails to identify the specific "arguments," and the court is unable to infer this information from Sisk's declaration. *See* doc. 71 at 5; 52 at 7-8, 9-10 (stating various assertions based on the supplementary permit application and 1988 NPDES permit). Finally, Drummond's contention that BWR should have anticipated this untimely opinion on the significance of state agencies' actions merely because Sisk is a "water quality expert" who has worked on state regulatory issues also misses the mark.

*See Reese*, 527 F.3d at 1266 (noting Rule 26's purpose of allowing adequate preparation and preventing surprise); *Mitchell*, 318 F. App'x at 824. Accordingly, this is an untimely disclosure, and Paragraph 15 is due to be stricken.[8]

### E. Thomas Simpson's Declaration

BWR moves to strike paragraphs 7 (last sentence only), 8-10, 13, and 15-17 of Simpson's declaration. Doc. 66-1 at 8-10.

*Paragraph 7 (last sentence only):* The last sentence of this paragraph states:

> My personal observation on the site was that the "network" of ephemeral conveyances was shallow and had no substantive bed and bank so that water from these areas would likely flow laterally as much as downstream except for a large rainfall event, and would transport little, if any, flow downstream.

Doc. 61-24 ¶ 7. As BWR notes, Simpson's "personal observations" do not appear in his expert reports, and he explained in his deposition that references to "anecdotal data" and "available observations" in his reports did not include his personal observations. Doc. 56-7 at 21. Drummond responds that "Simpson can supplement his reports with personal observations developed thereafter— especially given that BWR also deposed Mr. Simpson *after* the very site visit in question." Doc. 71 at 5 (emphasis in original). Based on the record, BWR does appear to have elicited Simpson's opinion based on his personal observations, and

---

[8] BWR also contends that the opinion expressed in Paragraph 15 of Sisk's declaration should be excluded because it is "beyond the scope of [Sisk's] knowledge, not a valid subject for expert testimony, and purports to offer a legal analysis or conclusions." Doc. 66-1 at 8. Because the court strikes Paragraph 15 because it expresses an untimely opinion, the court does not reach this issue.

thus cannot claim to be unfairly surprised by Simpson's declaration.[9] *See Reese*,

527 F.3d at 1266 (noting the expert disclosure rule's purpose of "prevent[ing]

surprise"); *Bearint,* 389 F.3d at 1353 (requiring consideration of prejudice to the

moving party). Moreover, contrary to BWR's contention, Simpson's assertion that

the "ephemeral conveyances" on site were "shallow and had no substantive bed

---

[9] The transcript of Simpson's deposition reveals the following exchanges:

Q.   Okay. And prior to submitting that report, had you been to Maxine Mine site?
A.   I had not.
. . .
Q.   And you also in the same area refer to "Available observations" that supported that statement. What were the available observations?
A.   Again, I think I'm referring just to the anecdotal observations of other people, because I certainly had not been on the site at that time.
Q.   All right. Do you have an opinion now having been on the site about which streams that were sampled are ephemeral versus intermittent?
A.   Right now, I think, other than the stream that you all referred to I think as Tributary 1, that all of the streams up there appear to have such a gradient or such a shallowness associated with them that they probably are dry most year-round, and when they have a flow it's because of an immediate rain event. So I would say that most of the streams, without being quantitated, most of the surface areas where water collects is probably an ephemeral stream.
Q.   You say "without being quantitated"?
A.   In the sense I don't know how many there might be that might be called that number. I'm not sure how many, but – how many actual water bodies, if you will, or conveyances or areas where water might collect during a rainfall event there are, and so I don't know how many of these areas would or would not be ephemeral versus intermittent. And from what I see on observing the site, either the stream has such a – either the ditch or the channel has such a deep vertical drop, incline or decline in slope, that the water that hit that would disappear and run away right away during a rainfall event, or it's a very shallow area, would not hold very much water, and it would dissipate very quickly.
. . .
Q. Okay. With regard to ephemeral streams, are they chemically, physically, and biologically connected to downstream waters?
      MR. DAVIS: Object to the form.
A. No. As ephemeral streams, normally they're not connected. Only after rainfall would there be a connection, and that would be temporary.
Doc. 61-35 at 5, 21-22.

and bank" does not contradict his expert reports' description of these conveyances as "potentially dry stream channels" and "dried stream beds." *See* docs. 66-1 at 8-9; 61-24 ¶ 7; 61-26 at 5-6. However, BWR is correct that "Simpson has never opined that the water [in conveyances on site] would flow laterally on the site rather than downstream," either in his expert reports or deposition. *See* docs. 66-1 at 9; 61-24 at 6-11; 61-25; 61-26 at 1-3; 61-26 at 4-11; 61-27; 61-28 at 1-6; 61-35. Accordingly, a portion of the first sentence of Paragraph 7 expresses a new opinion, and the court strikes only this portion: ". . . would likely flow laterally as much as downstream except for a large rainfall event, and . . ." *See* doc. 61-24 ¶ 7.

**Paragraph 8:** Simpson criticizes BWR in this paragraph for drawing "broad conclusions from subsets of single grab samples" from October 2011, June 2015, and September 2016 because these samples were not "time and flow weighted," and so "may not reflect actual parameters." Doc. 61-24 ¶ 8 (responding to doc. 52 ¶¶ 26-27). Contrary to BWR's contentions, Simpson's expert reports criticize Sulkin's report, which analyzed the September 2016 samples, for failing to consider the "flow conditions" of sampling events, stating that "during periods of higher flows . . . data could overestimate the normal concentrations that may be in these intermittent runoffs." Doc. 61-25 at 11; 61-26 at 6-7; *see* doc. 56-2 at 6. Although Simpson's expert reports do not explicitly address the October 2011 and June 2015 samples, they state substantially the same criticism of BWR's samples

as paragraph 8. *See Miele*, 559 F. App'x at 861-62; *In re Stand 'N Seal*, 623 F. Supp. 2d at 1362. Accordingly, Paragraph 8 does not state a new opinion.

*Paragraph 9:* BWR takes issue with Simpson's disagreement over matters purportedly attributed to him. In particular, Simpson disputes BWR's assertion that Simpson "agrees that the water is toxic to aquatic life." Simpson states instead that BWR's reported conditions would be toxic if benthic invertebrates were present in the "ephemeral" streams referenced by BWR—SW3, SW4, SW8, and SW9—but because the streams are ephemeral they are unlikely to support aquatic life. Doc. 61-24 ¶ 9 (quoting doc. 52 ¶ 32). BWR contends that this paragraph conflicts with Simpson's deposition testimony "in which he agrees that the presence of aquatic invertebrates is a 'chicken or the egg issue,'" and that this paragraph gives an opinion on WET test sampling locations, SW8 and SW9, that Simpson never observed. Doc. 66-1 at 9 (citing doc. 56-7 at 41-42, 32). Contrary to BWR's contention, paragraph 9 does not conflict with Simpson's deposition testimony. *See* doc. 56-7 at 41-42.[10] Moreover, although Simpson did not observe SW8 and SW9,

_____

[10] The cited deposition testimony includes the following relevant exchange, which is consistent with Simpson's opinion in paragraph 9 that the temporary nature of the streams renders them unlikely to support aquatic life:

Q. . . . With regard to the other parameters that are shown in those boxes for the metals, would you agree that those would be harmful to aquatic life?
A. Yes, sir, they would be, assuming that aquatic life were there.
Q. Right. Well, it's sort of a chicken-or-egg situation—
A. It is.
Q. –isn't it?
A. Uh-huh.

Simpson's expert reports conclude that "much of the drainage conveyances [are] likely ephemeral" based on data from 1983 and 1984 and Johnson's report. *See* doc. 61-25 at 11, 10; 61-26 at 5. Furthermore, Simpson's reports conclude that "the ephemeral or intermittent flows on site are not adequate to support a balanced aquatic community," *see* doc. 61-25 at 9, an opinion that is consistent with the one expressed in the challenged Paragraph 9.[11] *See Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1239 (M.D. Ala. 2014) (denying motion to strike where opinions in new expert affidavits were "consistent with previously disclosed reports . . .").

**Paragraph 10:** BWR challenges Simpson's statement that, "There is no data to support the assertion that any 'GOB' or sediment 'altered' the ecology of the intermittent stream BWR refers to as T1," doc. 61-24 ¶ 10 (responding to doc. 52 ¶ 34), contending that Simpson had not previously addressed Brown's assertion regarding the altered ecology of "T1," doc. 66-1 at 9 (citing doc. 56-2 at 71-74). However, Simpson's November 2017 report reviews data from Sisk and BWR's experts, including Brown's report, and concludes that "the former mine site is having no impact on the river or on its biological communities." Doc. 61-25. Thus,

Q. And there may be no aquatic life because of those parameters; true?
A. It could be. But also because there's no water or nothing there for them to survive in.
Doc. 56-7 at 42.

[11] Moreover, to the extent BWR wishes to exclude this opinion for lacking a sufficient basis under Federal Rule of Evidence 702, they have not made the proper showing. *See*, *e.g.*, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

"[a]lthough the statements in [paragraph 9] are not identical to the statements in [the] expert report, they [do] not differ substantially." *In re Stand 'N Seal*, 623 F. Supp. 2d at 1362.

> **Paragraph 13:** BWR challenges Paragraph 13, which states:

> What BWR characterizes as 'ditches and channels' on site are, for the most part, ephemeral conveyances not 'discernable, confined, and discrete,' and are likely not transporting as much downstream as they are laterally before they dry up. There are also no hydrologic data to demonstrate the actual flow conditions on site."

Doc. 61-24 ¶ 13. BWR is correct that Simpson did not opine in his reports as to whether the "ditches and channels" on site are "discernable, confined, and discrete." *See* docs. 61-24 at 6-11; 61-25; 61-26 at 1-3; 61-26 at 4-11; 61-27; 61-28 at 1-6. Moreover, as noted above, Simpson's expert reports do not articulate any opinion that the conveyances on site would flow "laterally." *See id*. And, Drummond's contention that paragraph 13 is substantially justified as directly responsive "to BWR's MPSJ submission" is unavailing, as Drummond fails to specify what evidence it is referencing. *See* doc. 24 ¶ 52. Therefore, Paragraph 13 states a new opinion that is not substantially justified or harmless, and it is due to be stricken.

> **Paragraph 15:** Simpson simply asserts, "My understanding, based on my experience as a professional environmental consultant, is that ephemeral streams are not WOTUS." Doc. 61-24 ¶ 15. This understanding is not based on facts or

data or on Simpson's scientific, technical, or other specialized knowledge. *See* Fed. R. Civ. P. 702. Moreover, to the extent Simpson is offering his "understanding" as an expert opinion, it is a new opinion that is not contained in Simpson's expert reports, which do not address the definition for "waters of the United States" (WOTUS). *See* docs. 61-24 at 6-11; 61-25; 61-26 at 1-3; 61-26 at 4-11; 61-27; 61-28 at 1-6. Finally, Drummond's contention that this new "opinion" is "relevant and admissible" is unavailing as it fails to establish that the untimely disclosure is substantially justified or harmless. *See* doc. 71 at 5; *Dorell Juvenile Group, Inc.,* 389 F.3d at 1353. Thus, Paragraph 15 is due to be stricken.

**Paragraph 16:** BWR moves to strike Simpson's statement in this paragraph that, "No aquatic organisms could be supported by the ephemeral nature of the streams on the property." Doc. 61-24 ¶ 16. The court agrees with Drummond that this opinion is substantially similar to Simpson's expert report. The differences BWR notes, i.e., Simpson's reports do not go as far as paragraph 16 in excluding any possibility that aquatic organisms could exist in the ephemeral streams on site, *see* doc. 61-25 at 8 ("It is unlikely that a balanced aquatic community occurs in the temporary streams that are on site . . ."), 9, 11, and that the reports note that ephemeral streams *can* support "a limited number of species," doc. 61-25 at 9; *see* doc. 61-27 at 2, are matters for cross examination.

***Paragraph 17:*** Paragraph 17 objects to BWR's application of a Toxicity Reduction Evaluation (TRE) to its WET test results, contending that "the WET results cannot be related to any actual impact on aquatic life" and do not "indicate any substantial endangerment to these biota." Doc. 61-24 ¶ 17. It cites 40 C.F.R. 122.44(d)(1)(i), U.S.E.P.A. enforcement guidance (505-2-90-001), and the Alabama Administrative Code 335-6-6-.14(3)(e)(1) to support this contention. *Id.* This is a new opinion for two reasons: Simpson's expert reports do not address BWR's application of TRE to WET test results, and his reports do not cite any of the regulations or guidance cited in paragraph 17. Furthermore, Drummond has again failed to show that this untimely opinion is substantially justified or harmless, and failed to respond to BWR's motion with respect to this paragraph. *See Mitchell*, 318 F. App'x at 824; *Transamerica Leasing, Inc.*, 267 F.3d at 1308 n.1. Therefore, Paragraph 17 is due to be stricken.

## CONCLUSION AND ORDER

Because portions of Drummond's expert declarations violate Rule 37, BWR's motion to strike, doc. 66, is **GRANTED IN PART**. Therefore, in accordance with the foregoing opinion, the court **STRIKES** the untimely testimony from the declarations of Weems, Noble, Wielinga, Sisk, and Simpson. *See* Fed. R. Civ. P. 37(c)(1). The court will not consider the stricken testimony in ruling upon the pending motions for summary judgment.

**DONE** the 7th day of May, 2019.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE