## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 2:16-cv-01443-AKK** |
| v. | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Black Warrior Riverkeeper ("BWR"), an environmental advocacy organization, brings this citizen enforcement action against Drummond Company, a coal mining company, under the Clean Water Act ("CWA"), 33 U.S.C. § 1365, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), for alleged discharges of pollutants from an abandoned coal mining site into the Locust Fork of the Black Warrior River and an alleged tributary of the Locust Fork. BWR asserts three CWA claims for discharges of pollutants without a permit in violation of 33 U.S.C. § 1311(a) (Counts I-III) and a RCRA endangerment claim (Count IV). Doc. 24 at 17-26.

Before the court are Drummond's motion for summary judgment on all claims, doc. 48, and BWR's motion for partial summary judgment as to liability on

Counts I and, alternatively, IV, doc. 51. After careful consideration of the law and the parties' briefs, docs. 49, 52, 59, 60, 68, 69, the court finds that BWR's motion is due to be granted in part, and Drummond's motion is due to be denied.

Due to the length of this opinion, a brief roadmap may be helpful to the reader. Sections I and II, which do not address the specific contentions in this case, outline the standard of review and the statutory and regulatory framework, respectively. Section III outlines the factual and procedural background of this dispute. In section IV, the court turns to the parties' respective contentions, beginning in subsection A with BWR's contention that it has established that Drummond has engaged in unpermitted discharges in violation of § 402 of the CWA. After finding for BWR in part—specifically, as to the acid mine drainage ("AMD") discharges into Locust Fork and the point sources, the court addresses in subsections B – E Drummond's various arguments in support of its motion for summary judgment, beginning with the statute of limitations defense. Finally, subsections F and G address the parties' respective contentions in support of their motions on the RCRA claim. Ultimately, the court concludes in section V that only BWR's motion related to AMD discharges into Locust Fork is due to be granted.

## I.     STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). At summary judgment, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal quotations omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The simple fact that both sides have filed a motion for summary judgment does not alter the ordinary standard of review. *See Chambers & Co. v. Equitable*

*Life Assurance Soc.*, 224 F.2d 338, 345 (5th Cir. 1955) (explaining that cross-motions for summary judgment "[do] not warrant the granting of either motion if the record reflects a genuine issue of fact"). Rather, the court will consider each motion separately "'as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017) (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004)). "[C]ross motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Bricklayers, Masons & Plasterers Int'l Union v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).

## II.    STATUTORY AND REGULATORY FRAMEWORK

### A.    The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Towards that end, the CWA prohibits the discharge of any pollutant, including dredged or fill material, by any person into navigable waters unless authorized by an appropriate permit. *Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 309 F. App'x 355, 356 (11th Cir. 2009) (citing 33 U.S.C. § 1311(a)). Pursuant to section 402 of

the CWA ("CWA § 402"), parties that discharge pollutants to navigable waters must obtain a permit under the National Pollutant Discharge Elimination System (NPDES) program, which imposes effluent limitations and other water quality standards, from either the Environmental Protection Agency (EPA) or an EPA-approved state permit program. 33 U.S.C. § 1342. In Alabama, the Alabama Department of Environmental Management (ADEM) is authorized to administer and enforce the NPDES permit program. *See* ADEM Admin. Code 335-6-6-.01 *et seq.*[1] Under section 404 of the CWA ("CWA § 404"), dischargers of "dredged or fill material into navigable waters at specified disposal sites" must also obtain a permit, which may be issued by the U.S. Army Corps of Engineers ("the Corps"). 33 U.S.C. § 1344; *see Black Warrior Riverkeeper, Inc., v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1275 (11th Cir. 2015).

The CWA authorizes citizen enforcement actions against any person "alleged to be in violation" of an effluent limitation or standard under the CWA or an administrative order by the EPA or a state. 33 U.S.C. § 1365(a)(1). The Act requires plaintiffs to give notice of the alleged violations at least sixty days prior to commencing a citizen suit. *Id*. § 1365(b)(1). Courts in such actions may award civil penalties and grant equitable relief. *Id*. §§ 1365(a), 1319(d).

---

[1] *See also* Environmental Protection Agency, *NPDES State Program Information: State Program Authority*, EPA.gov (last updated Mar. 27, 2019), https://www.epa.gov/npdes/npdes-state-program-information (showing that Alabama is authorized to administer an NPDES permit program).

**B.     The Resource Conservation and Recovery Act**

The primary purpose of the RCRA "is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Mehrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). RCRA authorizes citizen enforcement actions against "any person . . . who has contributed or is contributing to the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Courts in RCRA citizen "endangerment" actions may grant equitable relief. *Id.* § 6972(a). Moreover, section 6972(a)(1)(B) "applies retroactively to past violations, so long as those violations are a present threat to health or the environment." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1014 (11th Cir. 2004). Finally, RCRA citizen plaintiffs must provide notice of the alleged violations at least ninety days prior to commencing their endangerment action. 42 U.S.C. § 6972(b)(2)(A).

**C.     The Surface Mining Control and Reclamation Act**

Congress enacted the Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. §§ 1201 *et seq.*, in part, to "strike a balance between protection of the environment and agricultural productivity and the Nation's need

for coal as an essential source of energy." 30 U.S.C. § 1202(f). The Act authorizes each state to submit a proposed regulatory program that is "in accordance with the Act's requirements." *Id*. § 1253(a). Upon approval from the U.S. Secretary of the Interior, the state assumes "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" subject to certain statutory exceptions. *Id*.; *see Citizens for Responsible Resource Development v. Watt*, 579 F. Supp. 431, 434 (M.D. Ala. 1983). The Alabama Surface Mining Commission (ASMC) was granted primacy under the SMCRA in May 1982. *See Watt*, 579 F. Supp. at 434; doc. 50-4 at 21.

SMCRA specifies that persons engaging in surface coal mining operations must obtain a permit from an approved state agency "no later than eight months from the date on which a State program is approved[.]" 30 U.S.C. § 1256(a). The Act further requires a permit applicant to file with the regulatory authority "an accurate map or plan" that reflects the "permit area," which is defined as "the area of land indicated on the approved map [in the application] . . . which area shall be covered by the operator's bond as required by section 1259 . . . ." *Id*. § 1291(17). The applicant must file this performance bond with the appropriate regulatory agency, and the bond covers "land within the permit area upon which the operator will initiate and conduct surface coal mining and reclamation operations within the initial term of the permit." *Id*. § 1259(a). The regulatory authority may fully release

the bond "[w]hen the operator has completed successfully all surface coal mining and reclamation activities" and "all reclamation requirements of this chapter are fully met." *Id.* § 1269(c)(3). Finally, compliance with the SMCRA does not shield a party from potential liability under the CWA. *See id.* at § 1292(a)(3) ("Nothing in this chapter shall be construed as superseding, amending, modifying or repealing . . . [t]he Federal Water Pollution Control Act [], as amended, the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality.").

## III.    FACTUAL AND PROCEDURAL BACKGROUND

In August 1953, the Maxine Mine began operation as an underground coal mine pursuant to a contract between the Alabama By-Products Corporation (ABC), and the Alabama, Georgia, and Gulf Power Companies. Doc. 50-3 at 41-42, 50-8 at 103-24. The surface portion of this mine was on land adjacent to the Locust Fork, a navigable-in-fact tributary of the Black Warrior River. Docs. 53-6 at 24; 53-2 ¶ 8. Over the course of its operation, the Maxine Mine site included multiple mining refuse and rock disposal areas. *See* doc. 50-1 at 69-73, 119. The mining refuse pile[2] at issue in this case was originally created in the early 1950s on a ridge adjacent to the Locust Fork. *See* doc. 53-6 at 24, 26; 50-1 at 119. The pile is composed of coarse rock refuse, coal fragments, sandstone, shale, and washer rock

_____

[2] This pile is referred to by various names: "coal processing waste disposal area," "rock disposal area," "refuse pile," and "GOB pile" (by BWR and its experts). *See*, *e.g.*, docs. 50-8 at 58-50; 55-17 at 2; 54-14 at 23; 53-6 at 24. For ease of reference, the court uses the "refuse pile."

removed and deposited by ABC during the course of its operations. *See* docs. 53-6 at 47; 55-2 at 16; 61-9 ¶ 13. The pile is either geologic overburden, hence the "GOB" or "GOB pile" reference, *i.e.*, consisting of rock above or below the mine coal seams, as defined by Gordon Johnson, doc. 53-6 at 26, or according to Drummond's expert Lois George, it is "inter-burden," doc. 61-9 ¶ 13; 54-14 at 18, which BWR's expert Johnson explains consists of rock "within the mined seams," doc. 53-6 at 26.

Over the course of the operation of Maxine Mine, ABC repeatedly worked with state regulators and environmental consultants to address the ongoing issue of acidic water that discharged from the refuse pile into the Locust Fork. *See* docs. 55-3 at 2; 55-4 at 2; 55-5 at 2; 55-1 at 28; 53-1 at 23; 55-21 at 5. For instance, in 1979, pursuant to the SMCRA, the Alabama Surface Mining Reclamation Commission (ASMRC, later known as ASMC) issued a notice of violation (NOV) to ABC concerning discharges of water with low pH and elevated iron and manganese levels from a portion of the refuse pile. Doc. 50-2 at 78-80. ABC subsequently retained environmental consultants P.E. LaMoreaux & Associates ("PELA") to address the NOV, doc. 50-2 at 115-17, which the ASMC ultimately vacated and referred instead to the Alabama Water Improvement Commission (AWIC) for action, doc. 50-3 at 77.

In 1982, ABC submitted an application to ASMC for a mining permit and a supplement to this permit application, which contained a supplemental permit map featuring a portion of the refuse pile. *See* docs. 50-1 at 119; 50-11 at 14-16. In February 1983, ASMC approved ABC's plan for reclamation of a western portion of the refuse pile, and ordered ABC to post a bond. Doc. 50-8 at 58. The plan involved covering the surface of this portion of the refuse pile with clay, planting vegetation, and constructing a "diversion ditch" to carry surface-runoff from the old refuse pile through a sediment basin and into the Locust Fork. *See* doc. 50-1 at 71-72. Subsequently, ABC reclaimed this portion of the refuse pile (referred to in ABC and Drummond documents as the "post-law" area because it post-dated the SMCRA) by capping it with clay, sloping it, and planting vegetation. Docs. 54-14 at 45; 55-1 at 45. However, the eastern portion of the refuse pile adjacent to the Locust Fork—referred to as the "pre-law" area—was never permitted or reclaimed by ABC or Drummond. *See* docs. 50-11 at 45; 54-14 at 45.[3]

_____

[3] BWR, citing the testimony of Dwight Hicks, Drummond's Director of Environmental Control and Reclamation, and David Muncher, Drummond's Vice President of Operations Support, contends that that the "pre-law" and "post-law" mining refuse pile were not within the permitted, bonded area of the site and were not subject to the bond reclamation requirements of the SMCRA. *See* doc. 60 at 25. Muncher testified, based on a review of the permit map in ABC's initial 1982 permit application, that the refuse pile was "outside the permit boundaries." Doc. 50-11 at 12. Hicks also testified, based on a review of the same initial map, that the "mine dump area" appeared to be outside the permit boundaries, but also admitted that he did not know if it was "ever within the permit boundaries." Doc. 53-1 at 26. However, ABC's supplement to its initial ASMC permit application included a supplementary permit map featuring the western portion (the "post-law" area) of the refuse pile, as well as proposed plans to reclaim that portion. *See* doc. 50-1 at 71-72, 119; 50-6 at 113; 50-11 at 14. Subsequent ASMC orders and contemporaneous documents indicate that ABC's reclamation plans were approved by ASMC,

During its operation of the mine, ABC installed or improved ditches that ran through the refuse pile, and constructed basins and dams, as part of a drainage system from the refuse pile. Doc. 61-9 ¶ 20. Specifically, ABC built two dams, one upstream of the other, and sediment basins upstream of each dam to capture sediment from the refuse area. Docs. 53-1 at 30-32; 54-14 at 24-25; *see* docs. 53-6 at 74; 55-11; 55-12. These dams and sediment basins were built over an intermittent stream that discharged into the Locust Fork, a stream that BWR refers to as "Tributary 1" or "T1." Doc. 53-6 at 74; *see* docs. 55-1 at 15, 17; 55-17 at 2; 54-14 at 24-25; 55-12. At least as far back as 1946, a slough existed at the confluence of this stream and Locust Fork and, by 1975, this stream had intermittent flow. *See* docs. 53-6 at 31; 54-1 at 21-22; 54-3 at 20; 61-9 ¶ 11; 54-3 at 20; 61-9 ¶ 11(b).

In September 1983, ABC ceased coal mining operations at Maxine Mine. Doc. 50-2 at 100. Thereafter, in March 1985, ASMC issued an order stating that ABC had "substantially completed reclamation" at the "old coal processing waste disposal area" and that ABC's "corrective action and reclamation activities have effectively eliminated any contribution of non-permissible effluent" from the area,

---

ABC posted a reclamation bond, and ABC ultimately completed reclamation of the permitted portion of the refuse pile and received bond release. *See* doc. 50-8 at 52-53, 58; 50-9 at 1-2; 50-4 at 29-30. Indeed, BWR admits that the "post-law" area, a portion of the refuse pile, was "reclaimed" by ABC. *See* doc. 52 at 11 (citing doc. 54-14 at 28, 44-45). Accordingly, BWR has failed to raise a genuine issue of material fact as to whether the so-called "post-law" portion of the refuse pile was permitted, reclaimed, and granted bond release under the SMCRA.

but that "there remains remedial corrective action necessary . . . on certain areas." Doc. 50-8 at 52. ABC subsequently merged with Drummond, making Drummond the permittee for the mine and the "post-law" portion of the refuse pile. *See* doc. 55-1 at 29, 31-32; 50-3 at 43, 68. Finally, ASMC approved a final bond release for Drummond's permit for the mine in May 1992. Doc. 50-9 at 2-3.

In 1988, ADEM reissued an existing NPDES permit to Drummond, which covered an outfall in the refuse pile that discharged to an "unnamed tributary of Locust Fork." Doc. 50-4 at 41; 55-24. In June 1992, ASMC granted final Phase II and III bond release for the permitted section of the mine site. Docs. 50-9 at 1-2; 50-4 at 29-30. Then, in July 1992, ADEM released Drummond from monitoring requirements under its NPDES permit. Doc. 50-4 at 27. In March 1993, ADEM inspected the mine and did not find any "deficiencies or violations," stating in its reports that the "site appears to be totally reclaimed," there was "no discharge at the time of inspection," and that "no deficiencies or violations were noted." Doc. 50-5 at 32-33. Since 1992, Drummond has not obtained a permit for the mine site, nor has it performed any maintenance or monitoring of the site. *See* doc. 53-1 at 39-40, 45. Since at least 2009, Drummond employees and other residents of the surrounding areas have used the site for hunting. Doc. 50-11 at 11.

The ditches, dams, and basins at the refuse pile ABC constructed still exist today. Doc. 53-6 at 73-76; *see* doc. 61-9 ¶ 20. Currently, the upper and lower

sediment basins above the lower dam contain sediment, some of which originated from the refuse area. *See* docs. 53-1 at 29, 33; 54-14 at 17, 24.[4] Each dam has an outlet or "spillway": the outlet of the upper dam allows surface water to move to the lower sediment basin, and the outlet of the lower dam allows surface water to discharge to the Locust Fork. Doc. 53-1 at 31, 32, 34; *see* doc. 55-1 at 17. Man-made ditches drain surface runoff from both the "post-law" and "pre-law" portions of the refuse pile. *See* doc. 53-6 at 73-74. Surface water also percolates into sediment in the basins and flows as groundwater, where it discharges to the Locust Fork via groundwater seeps. Doc. 53-6 at 74, 78.

This lawsuit's origins may trace back to May 2006, when Nelson Brooke, the "Riverkeeper" for BWR, first identified discolored riprap at the spillway of the lower dam to the Locust Fork and took readings that revealed acidic pH levels at the site. Doc. 50-10 at 3, 25. Brooke took no further action with these samples. *See* Doc. 53-2 ¶ 11. Instead, Brooke obtained additional samples of discharges at the lower dam spillway in February 2007, October 2011, and four years later in June 2015. Docs. 53-2 ¶¶ 13-15; 50-10 at 25-26. Thereafter, on June 29, 2016, BWR issued its notice of intent to sue Drummond for violations of the CWA and RCRA. Doc. 24, Ex. A. After the sixty-day notice period, BWR filed this citizen suit

---

[4] Hicks describes this material as "soil, spoil, coarse refuse," based on a May 24, 2006 photo and his own observations. Doc. 53-1 at 29, 33. George describes it as "eroded shale," based on photos from her site visit on June 7, 2018. Doc. 54-14 at 17; *see* doc. 55-14. Both agree that at least some of the material came from the refuse pile. *See* docs. 53-1 at 29, 33.

alleging CWA violations and, after the ninety-day notice period, amended its complaint to allege RCRA violations. Docs. 1; 21. As a result of the lawsuit, BWR conducted field investigations with Drummond representatives to obtain surface water, groundwater, and sediment samples in September 2016 and August 2017, and conducted a site inspection in June 2017. *See* docs. 56-1 ¶¶ 7-8; 56-3 at 44.

## IV.   ANALYSIS

The court turns now to the parties' respective contentions. Basically, BWR pleads four claims: (1) unpermitted discharges under CWA § 402 (Count I), (2) unpermitted discharges of dredged or fill material under CWA § 404 (Count II), (3) unpermitted discharges containing both "contaminated water" and dredged or fill material under CWA §§ 402 and 404 (Count III), and (4) a RCRA endangerment claim (Count IV). Presently before the court are Drummond's motion for summary judgment on all claims, doc. 48, and BWR's motion for partial summary judgment as to liability on its CWA § 402 claim (Count I) and RCRA claim (Count IV), doc. 51. The court addresses these motions, beginning with Count I on which both parties have moved for summary judgment.

### A.    Alleged Violation of CWA § 402—Count I

In Count I, BWR asserts that Drummond has violated CWA § 402 through unpermitted discharges to Locust Fork, "T1," and the "east" and "west" ditches. To prevail on this claim, BWR must show that Drummond (1) discharged; (2) a

pollutant; (3) into waters of the United States ("WOTUS"); (4) from a point source; (5) without a permit.[5] *See Parker*, 386 F.3d at 1008. As to these elements, the parties do not dispute that Drummond has not had an NPDES permit since at least 1993, *see* doc. 50-4 at 91, and that Locust Fork, a navigable-in-fact tributary of the Black Warrior River, qualifies as a WOTUS. *See* docs. 27 ¶ 23; 53-2 ¶ 8; 59 at 3; *SWANCC v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001) (holding that WOTUS includes waters that are or have been "navigable in fact, or which could reasonably be so made."). All other elements of the claim, including whether T1 is a WOTUS, are in contention.

---

[5] In its opposition to BWR's motion, Drummond tersely contends that BWR lacks standing, arguing that (1) there is no evidence that the Maxine Mine site is impacting or affecting the Locust Fork, and (2) that, because BWR and its members have no right to be on the Maxine site, there is no threat of "harm" from exposure to surface water or sediment on the site. Doc. 59 at 22. BWR has submitted numerous affidavits from its members which allege an "injury-in-fact 'by attesting that [they] use, or would use more frequently, an area affected by the alleged violations"—specifically, a former slough located at the Maxine Mine refuse area—"and that [their] aesthetic or recreational interests in the area have been harmed" by being offended by the "old mine waste" and "orange water" when they boat past the refuse pile. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1279 (11th Cir. 2015) (citation omitted); *see* docs. 53-2 ¶¶ 7-8, 13-15; 54-11 ¶¶ 7, 8, 11; 54-12 ¶¶ 2, 4, 6, 14-16; 56-12 ¶¶ 2, 4,5, 13-14. Although the refuse pile and former slough is on Drummond's private property, "[i]f an area can be observed and enjoyed from adjacent land, plaintiffs need not physically enter the affected area to establish an injury in fact." *Sierra Club v. Jewell*, 746 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 581 (9th Cir. 2001)). Moreover, because BWR has produced sufficient evidence to at least raise a genuine issue of material fact that the refuse pile is discharging polluted water and sediment into the Locust Fork, *see infra* pp. 19 n.10, 37, 48, 66, these injuries are fairly traceable to Drummond, and the injunctive and legal relief BWR seeks would likely redress these injuries. *See Black Warrior Riverkeeper*, 781 F.3d at 1280; *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000); docs. 52 at 20; 53-6 at 71, 73-76. Additionally, BWR has fulfilled the statutory notice and non-agency action requirements under CWA and RCRA for a citizen suit. *See* 33 U.S.C. § 1365(b)(1)(A), (B); 42 U.S.C. § 6972(b)(2)(A), (B).

1.    <u>Discharge of a pollutant</u>

The first element requires a showing of a discharge of a pollutant. *Parker*, 386 F.3d at 1008. The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). BWR contends that Drummond has discharged pollutants because "acid mine drainage" ("AMD")[6] and sediment flow from the refuse pile into Locust Fork, "T1," and the "east" and "west" ditches. Doc. 52 at 27. Although the Act's definition of "pollutant" does not explicitly include AMD, numerous courts have found that AMD is a pollutant and Drummond does not contest that proposition.[7] *See*, *e.g.*, *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993) (finding that AMD was a pollutant); *Beartooth Alliance v. Crown Butte Mines*, 904 F. Supp. 1168, 1172 (D. Mont. 1995) (finding that AMD was a pollutant because it was composed, in part, of copper and zinc); *W. Va. Highlands Conservancy, Inc. v. Huffman*, 651 F. Supp. 2d 512, 518 (S.D. W. Va. 2009) (finding AMD constituted "pollution" under the Act). Moreover,

---

[6] According to BWR's experts, "acid mine drainage" results from the oxidation of pyritic minerals in mining refuse and causes the dissolution of contaminants in coal and rock into surface water and groundwater. *See* docs. 53-6 at 26, 73; 54-3 at 35.

[7] The CWA defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C.A. § 1362(6). The Fifth Circuit has remarked that the Act's broad definition "appears to invite the inclusion of discharged substances that are not specifically listed in these broad categories." *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 565 (5th Cir. 1996).

sediment from the mining refuse pile appears to qualify as "rock" or "sand" and, therefore, is also a "pollutant" under the Act. *See, e.g., Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999) (finding that "sand and silt" from timber harvesting and land development were pollutants); *Rybachek v. U.S.E.P.A.*, 904 F.2d 1276, 1285-86 (11th Cir. 1990) (finding reasonable EPA's interpretation that excavated dirt was pollutant); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC.*, 278 F. Supp. 2d 654, 677 (E.D.N.C. 2003) (finding that sediment is a pollutant under the CWA).

BWR has produced extensive evidence of historical and ongoing discharges of AMD from the refuse pile into Locust Fork. This evidence includes, first, ABC's correspondence with state regulators and numerous reports produced by ABC's consultants, PELA, during the late 1970s and 1980s which describe acid water discharges from the refuse pile.[8] Second, according to BWR's expert, Gordon Johnson, the acid-based accounting analysis of his soil/sediment samples taken from various locations at the refuse pile indicate that "[a]ll mine waste

---

[8] For example, communications from 1979 and 1980 between ABC representatives and state regulators indicate that "acid water" and AMD was generated from the refuse pile. *See* docs. 55-3 at 2; 55-4 at 2; 55-5 at 2; 55-1 at 27; 53-1 at 23. In 1979, PELA consultants explained that "the acid-water problem existing at the . . . disposal area was considerably more involved that just surface runoff." Doc. 55-3 at 2. Moreover, in June 1985, PELA noted that sediment in the rock disposal area was "extremely acidic . . . and is actively eroding" to the "drainage system." Doc. 55-21 at 5. Additionally, PELA noted that "runoff waters" from the area "have a severe detrimental impact to water quality" by contributing to acid pH levels and "high levels of sulfate, iron, manganese and suspended solids." *Id.*

samples are acidic and acid-generating." Doc. 54-7 at 4. His conclusion is based, in part, on evidence showing that total sulfide concentrations in the samples were "below the method detection limit, which indicates the acidification process is either well progressed or complete in the samples that were collected." Doc. 54-3 at 35. Third, BWR collected numerous surface water, sediment, and groundwater samples in 2016 and 2017 from various locations at the site, which its experts, Johnson, Anthony Brown, and Barry Sulkin, contend reveal AMD discharges based on the elevated concentrations of numerous metals and low pH in the samples. *See* doc. 53-6 at 60-61, 76, 79; 54-3 at 25-30; 56-1 at 3-8.[9] In particular, samples of surface water taken below the lower dam that runs into Locust Fork on September 20, 2016, June 12, 2017, and August 1, 2017, contain elevated concentrations of metals and acidic pH levels that Brown and Johnson contend are associated with AMD. Doc. 53-6 at 76. Sulkin also opines that surface water samples, taken near the spillway of the lower dam in September 2016, reflect low pH and "elevated" levels of various metals "far in excess of what would be coming from the unpolluted stream that once flowed there." Doc. 56-2 at 6-8. Finally, the water samples taken from below the lower dam in 2016 and 2017 have higher metal concentrations and more acidic pH levels than the background samples from

---

[9] The sampling conducted in August 2017 involved surface water samples at 13 locations, groundwater samples at 4 locations, and soil/sediment/"GOB" samples at 10 locations at or near the refuse pile. *See* doc. 53-6 at 57-70.

Locust Fork. Doc. 53-6 at 75, 90, 94-96. This evidence is sufficient to establish that AMD discharged from the site into the Locust Fork in September 2016, June 2017, and August 2017.[10]

To no surprise, as one would expect when complex science matters are in issue, Drummond's experts Lynn Sisk, Bruce Wielinga, and Lois George disagree with BWR's experts, and contend that the data does not show AMD discharges. Specifically, Sisk contends that AMD is not discharging from the lower dam at the site because AMD "usually has some subsurface component associated with it," and she asserts that only "surface runoff" is discharging over the lower dam. Doc. 50-14 at 17-18. This contention does not alter the court's finding because Sisk

---

[10] BWR also alleges that Drummond violated CWA § 402 because sediment from the refuse pile continues to erode directly into Locust Fork. Docs. 24 at 20, 24; 52 at 25. Relying in part on topographic maps and aerial photographs, Brown estimates the volumes of "GOB waste" at the refuse pile that have eroded via a "central channel," or "east" ditch, in the refuse pile into the sediment basins contained in "T1" and into Locust Fork directly. Doc. 53-6 at 71-73. Brown contends that "[b]etween 2011 and 2017, [] 190,000 cubic yards of GOB waste was eroded and transported to Locust Fork," and that "[b]ased on a field inspection and subsequent field investigations, the erosion of GOB waste at the GOB pile, direct discharge of GOB waste to the Locust Fork, and discharge to the central channel (#1) and subsequent transport of GOB waste sediment to the Locust Fork continues today." *Id*. at 72. Another BWR expert, Gordon Johnson, contends, based on Brown's analysis and on his own site observations, that sediment from the refuse pile has eroded into the Locust Fork from the sediment basins and via gullies in the refuse pile. Doc. 54-3 at 25, 39, 40. However, Drummond's expert Lois George contests these conclusions, contending that Brown's analysis of the volumes of "GOB" placement and waste sediment is "speculative" and "erroneous," and that Brown's interpretations of aerial photography and topography in estimating the amount of eroded waste sediment are inaccurate. Doc. 61-9 at 21. Also, George contends that Johnson's descriptions of eroded "mine waste" based on Johnson's field inspection are unclear and speculative because Johnson fails to define the term "granular," and fails to recognize that natural soil lacks organic content and that not all "GOB" is rust-colored in the refuse pile. *Id*. These opinions refuting the evidence of sediment eroding from the refuse pile directly to Locust Fork establish the existence of disputed issues of material fact on this issue.

admits that she did not take any water or soil samples from the refuse pile to support her conclusion that AMD could not flow over the lower dam. *Id*. at 18. For his part, Wielinga contends that findings that sulfide was below the analytical detection limit in Johnson's soil/sediment samples means that there are no "sulfide-bearing minerals" in the "GOB [geologic overburden] waste" that could generate AMD. *See* docs. 61-6 ¶ 5; 61-32 at 27-28. Critically, however, Wielinga fails to contest Johnson's explanation that the lack of sulfide indicates the oxidation process that generates AMD is complete. Lastly, Drummond, through its expert George, contends that Brown cannot fairly and accurately testify that surface water "with elevated concentrations of pollutants associated with AMD" is ultimately discharged to Locust Fork, given that storm water runoff is "driven . . . by precipitation" and BWR's samples were taken from "essentially standing or stagnant points." Doc. 61-9 ¶ 28. This contention also does not alter the court's finding because George and Drummond's other experts do not dispute the validity of BWR's data showing the presence of elevated levels of metals and acidic pH in water samples taken at the lower dam where it discharges into Locust Fork and along the banks of the Locust Fork below the dam. In that respect, while Drummond's experts have shown general weakness in their counterparts' analyses on the issue of AMD, their showing is insufficient to create an issue of fact regarding the discharge of AMD into Locust Fork, a water of the United States.

*See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.").

### 2.    To waters of the United States

To prevail, BWR must also show that the discharge of a pollutant was to a WOTUS. As stated previously, Drummond concedes that the Locust Fork is a WOTUS. At issue as to this element is BWR's contention that Drummond also discharges alleged pollutants from the refuse pile to "T1," the "east" ditch, and the "west" ditch and that each of these water bodies are purportedly "navigable waters," or "waters of the United States," under the CWA. *See* 33 U.S.C. 1362(7). To address whether "T1" or the ditches qualify as a navigable water, the court turns to *Rapanos v. United States* for guidance. *Rapanos* involved wetlands that drained into navigable-in-fact waters, and the Supreme Court issued a fractured opinion construing the term "navigable waters." 547 U.S. 715 (2006). Justice Scalia's plurality opinion held that wetlands could only constitute "navigable waters" if (1) they are adjacent to a "relatively permanent, standing or continuously flowing [body] of water" and (2) if they maintained a "continuous surface connection" to that water. *Id*. at 739, 742 (plurality). Justice Kennedy's concurring opinion, however, held that the applicable test required a showing of a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be

made so." *Id.* at 759 (Kennedy, J., concurring). Subsequently, in *United States v. Robison*, the Eleventh Circuit determined that Justice Kennedy's concurring opinion was controlling for the purposes of determining whether a creek constituted "navigable waters" under the CWA. 505 F.3d 1208, 1219-22 (11th Cir. 2007). Thus, although *Rapanos* only involved wetlands, *Robison* indicates that Justice Kennedy's "significant nexus" test controls whether a "water or wetland" qualifies as waters of the United States, and that this is an issue for the factfinder. 505 F.3d at 1218, 1224 n.21.

As for what constitutes a "significant nexus," Justice Kennedy's opinion is instructive:

> Wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

547 U.S. at 781 (Kennedy, J., concurring). Furthermore, Justice Kennedy's opinion offered examples of the indicia of a "significant nexus," including considering a "measure of the significance of the connection for downstream water quality." *Id.* at 784. Accordingly, regardless of whether "T1," the "east" ditch, or the "west" ditch is or was a tributary of Locust Fork, the dispositive question is whether "T1"

or each ditch significantly affects the physical, chemical, and biological integrity of Locust Fork. *Id*. at 781; *see also Robison*, 505 F.3d at 1222.

The "significant nexus" test is a "flexible ecological inquiry into the relationship between the [waters] at issue and traditional navigable waters." *See Precon Dev. Corp. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 294 (4th Cir. 2011) (quoting *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring)). The requisite connection can be established by quantitative or qualitative physical evidence. *See id*. (deciding whether there was "enough physical evidence—quantitative or qualitative" to uphold a finding of a "significant nexus"); *United States v. Cundiff*, 555 F.3d 200, 210-11 (6th Cir. 2009). However, the Fourth Circuit has observed:

> [I]n announcing this test, [Justice Kennedy] clearly intended for some evidence of both a nexus and its significance to be presented. Otherwise, it would be impossible to engage meaningfully in an examination of whether a wetland had "significant" effects or merely "speculative or insubstantial" effects on navigable waters.

*Precon*, 633 F.3d at 294.

Justice Kennedy's concurrence left open the possibility that an intermittent stream can constitute a WOTUS, noting:

> [E]ven granting the plurality's preferred definition, . . . the dissent is correct to observe that an intermittent flow can constitute a stream, in the sense of a current or course of water or other fluid, flowing on the earth, while it is flowing. It follows that the Corps can reasonably interpret the Act to cover the paths of such impermanent streams.

23

*Rapanos*, 547 U.S. at 770 (Kennedy, J., concurring). Accordingly, courts applying the "significant nexus" test have found that intermittent streams may have a sufficient nexus to traditional navigable waters to constitute WOTUS. *See Wis. Res. Prot. Council, Ctr. for Biological Diversity v. Flambeau Min. Co.*, 903 F. Supp. 2d 690, 715 (W.D. Wis. 2012) (finding that a tributary with intermittent flow satisfied the "significant nexus" test); *United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1060-61 (C.D. Cal. 2018) (finding that non-perennial tributaries were "navigable waters"). Moreover, several courts considering whether waterways qualify as WOTUS have found that the downstream transport of pollutants from the water at issue into a traditional navigable water is indicative of a significant nexus. *See Cundiff*, 555 F.3d at 211 n.4 ("[I]f one dropped a poison into the [defendants'] wetlands, . . . it would find its way to the two creeks and the Green River, therefore indicating a significant chemical, physical, or biological connection between the wetlands and the nearby navigable-in-fact waters."); *United States v. Hubenka*, 438 F.3d 1026, 1034 (10th Cir. 2006) ("[T]he potential for pollutants to migrate from a tributary to navigable waters downstream constitutes a 'significant nexus' between those waters."); *Flambeau Min. Co.*, 903 F. Supp. 2d at 715 (finding "significant nexus" in part because intermittent stream delivered water containing pollutants to navigable-in-fact river); *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1172 (D. Idaho 2011), *aff'd*, 492 F. App'x 738 (9th

Cir. 2012) (finding "significant nexus" where canal and creek were "significant contributors of total suspended solids (sediment) and coliform bacteria to the Snake River"). With this background in mind, the court turns now to the parties' respective contentions about "T1" and the ditches.

a) <u>*"Tributary 1" or "T1"*</u>

The parties do not dispute that the so-called "T1" is a naturally-occurring stream to the south and west of the refuse pile that has a temporary physical connection to the Locust Fork. *See* doc. 53-6 at 28; doc. 61-5 ¶ 5. BWR advances several arguments for why "T1" is a water of the United States. First, based on declarations from BWR's members that they and their families used to fish in the slough, docs. 54-10 ¶ 7; 54-11 ¶ 7; 54-12 ¶ 5, BWR contends that part of "T1"—the slough—was once navigable-in-fact. *See SWANCC*, 531 U.S. at 172. However, waterways are navigable-in-fact only if "they are used, or are susceptible of being used" in interstate commerce. *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 407-08 (1940); *see Rapanos*, 547 U.S. at 760-761 (Kennedy, J., concurring) (citing *The Daniel Ball*, 77 U.S. 557 (1870)); 40 C.F.R. § 230.3; 33 C.F.R. § 328.3. In that respect, current or prior recreational use of the slough of "T1" does not establish that the slough is a navigable-in-fact waterway under the CWA. *See Jones Creek Investors, LLC v. Columbia County, Ga.*, 98 F. Supp. 3d 1279, 1306 (S.D. Ga. 2015) ("Recreational use . . . is not enough to make a body of

water 'navigable in fact' as that term is traditionally understood." (citing *PPL Montana, LLC v. Montana*, 565 U.S. 576, 600 (2012))).

Next, BWR contends "T1" was and is a tributary of Locust Fork. EPA and Army Corps regulations indeed state that "waters of the United States" include tributaries of traditional navigable waters. *See* 40 C.F.R. § 230.3(s)(5) (1993); 33 C.F.R. § 328.3(a)(5) (1993). These regulations are silent, however, as to what constitutes a tributary.[11] The EPA and Corps only provided guidance on this issue in response to the Supreme Court's ruling in *Rapanos v. United States*. In the guidance, a non-navigable-in-fact tributary is defined as "a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries."[12] Similarly, courts have defined a tributary as a "stream which contributes its flow to a larger stream or other body of

---

[11] The 2015 Clean Water Act Rule amended the regulatory definition of "tributary," "more precisely defin[ing] 'tributaries' as waters that are characterized by the presence of physical indicators of flow—bed and banks and ordinary high water mark—and that contribute flow directly or indirectly to a traditional navigable water." 80 Fed.Reg. 37054, 37058, 2015 WL 3930456 (June 29, 2015). The rule explains that "[t]he physical indicators of bed and banks and ordinary high water mark demonstrate that there is sufficient volume, frequency, and flow in such tributaries to a traditional navigable water . . . to establish a significant nexus." *Id.* On June 8, 2018, the Southern District of Georgia preliminarily enjoined enforcement of this rule in Alabama and ten other states. *See Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018). Although BWR's expert Anthony Brown contends that "T1" had and has a bed and banks, there is no evidence of an ordinary high water mark. Doc. 53-6 at 13, 28. Thus, it is not clear that "T1" would qualify as a "tributary" under the suspended 2015 Clean Water Act Rule.

[12] U.S. EPA and U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*, at 6 (Dec. 2, 2008), https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf [hereinafter "2008 EPA and Corps Guidance"].

water." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001) (quoting *Random House College Dictionary* 1402 (rev. ed. 1980)); *United States v. Brink*, 759 F. Supp. 2d 565, 577 (S.D. Tex. 2011) (citing *Headwaters*, 243 F.3d at 533). Under these definitions, because it contributes flow directly to the Locust Fork, a traditional navigable water, "T1" qualifies as a "tributary" under the CWA.

Whether "T1" constitutes WOTUS under the CWA, however, is dependent on the "significant nexus" test. In support of its position, BWR cites to one of its experts, Brown, who asserts that "T1" is and was physically and chemically connected to Locust Fork. Doc. 53-6 at 28. Based on site observations and calculations, Brown contends that "T1" satisfies the Corps' definition of an "intermittent stream," meaning it "has flowing water during certain times of the year, when groundwater provides water for stream flow. During dry periods, intermittent streams may not have flowing water. Runoff from rainfall is a supplemental source of water for stream flow." Doc. 53-6 at 28; *see* docs. 53-9 at 5; 53-10 at 6. Brown also contends that "T1" had and has a bed and banks. *See* doc. 53-6 at 28, 13.[13] To show a chemical connection, Brown contends that "elevated concentrations of chemicals, metals, and total dissolved solids are

---

[13] EPA and Corps guidance indicate that the presence of a "bed and banks" in a tributary is pertinent to the consideration of whether there is a significant nexus between the tributary and a navigable water. *See* 2008 EPA and Corps Guidance at 10.

discharged to Locust Fork" via "T1" and the sediment basins. Doc. 53-6 at 75-76. Brown relies, in part, on a surface water sample (SW3) taken from the course of "T1"—specifically, from surface water discharging into Locust Fork over the lower dam—which reflects elevated concentrations of contaminants indicative of acid mine drainage. *See* docs. 53-6 at 75; 53-10 at 6.

For its part, Drummond contends that there is no evidence of the "requisite 'chemical, physical, or biological effect' on the Locust Fork." Doc. 59 at 33. Although Drummond's experts Lois George and Thomas Simpson appear to concede that "T1" is an intermittent stream, Drummond's expert Leslie Noble contends that "T1" is only an "ephemeral stream," which she defines as having "less flow than intermittent streams" and having "flowing water only for brief periods in response to rainfall." *See* docs. 61-24 ¶ 6; 54-14 at 23-24; 61-5 ¶ 6. Noble also contends that the low levels of chemicals in surface water samples SW1 and SW15, collected downstream and upstream of the refuse pile, indicate that "T1" has no effect on the water quality of Locust Fork. Doc. 61-5 ¶ 9; *see* doc. 53-10 at 6. Moreover, Drummond's expert Lynn Sisk contends that the results from samples SW1 and SW15 are consistent with a water sample analysis of the Locust Fork she conducted in November 2016 and February 2017, further proof that "T1" has no effect on the water quality. *See* doc. 61-10 at 10.

Based on this record, even assuming BWR has shown a significant physical and chemical connection, it has not pointed to the evidence, if any, that indicates a significant biological connection between "T1" and the Locust Fork. *See Flambeau Min. Co.*, 903 F. Supp. 2d at 715 (noting that the tributary provided a "habitat for at least six species of fish that move between [the tributary] and the river"); *Jones Creek Inv'rs, LLC*, 98 F. Supp. 3d at 1305 (finding that plaintiff failed to show discharges from a lake and its tributaries into navigable waters had a significant effect on the ecology of the navigable waters). Therefore, genuine issues of material fact exist that must be resolved before the court can determine whether "T1" constitutes a water of the United States. *See Robison*, 505 F.3d at 1224 n.21 (noting that whether a creek satisfied the "significant nexus" test was "a question for the jury in the first instance.").

b)   *"East" and "West" Ditches*

BWR contends also that the east and west man-made ditches qualify as WOTUS. "[A]rtificial waterways may [indeed] be jurisdictional waters under the CWA." *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 468 (E.D. Pa. 2015); *see also Vierstra,* 803 F. Supp. 2d at 1168 (finding that a man-made canal could constitute "waters of the United States" because it had a significant nexus to a traditionally navigable waterway); *United States v. Holland*, 373 F. Supp. 665, 673 (M.D. Fla. 1974) (finding that canals connected to bayou were jurisdictional under

the CWA and "[t]he fact that these canals were man-made makes no difference"). Moreover, both ditches are tributaries of Locust Fork because they flow to Locust Fork via the lower dam. *See* 40 C.F.R. § 230.3(s)(5) (1993); 33 C.F.R. § 328.3(a)(5) (1993).[14] Still the court cannot make a WOTUS finding at this juncture because BWR has not directed the court to sufficient evidence of a significant physical, chemical, and biological connection between these ditches and the Locust Fork. *See Rapanos*, 547 U.S. at 784 (Kennedy, J., concurring) ("[M]ere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters."). Again, water quality data downstream in Locust Fork casts doubt on whether the chemical connection between these ditches and the Locust Fork is significant. *See* docs. 61-5 ¶ 9; 53-10 at 6. Furthermore, there is no data before the court about the duration and volume of flow in the east and west ditches, which is pertinent to the "significant nexus" analysis. *See United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1064 (C.D. Cal. 2018) (finding a genuine issue of material fact as to "significant nexus" where government's expert neglected to provide "any specific flow or volume data" about tributary). Accordingly, genuine issues of

---

[14] EPA and Corps guidance state that "[a] tributary includes natural, man-altered, or man-made bodies of water." *See* 2008 EPA and Corps Guidance at 6.

material fact preclude a finding on whether the east and west ditches are "waters of the United States." *See Robison*, 505 F.3d at 1224 n.21.

### 3. From a point source

Finally, to constitute a violation under the CWA, the discharge of pollutants into a water of the United States must be from a point source. *See Parker*, 386 F.3d at 1008. A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, . . . discrete fissure, container . . . from which pollutants are or may be discharged." 33 U.S.C.A. § 1362(14). A point source "need not be the original source of the pollutant; it need only convey the pollutant to navigable waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004). The Eleventh Circuit has instructed courts to "interpret the term 'point source' broadly." *Parker*, 386 F.3d at 1009 (citing *Dague v. City of Burlington*, 935 F.2d 1343, 1354-55 (2d Cir. 1991) ("The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States.")).

BWR contends that the various components of Drummond's drainage system—the ditches, channels, basins, dams, groundwater seeps, and the refuse pile itself—are "point sources." The record indicates that, during precipitation events, surface runoff carrying alleged pollutants from both the "pre-law" and

"post-law" portions of the refuse pile drain into man-made ditches and channels, which ultimately feed into either the so-called "east" or "west" ditch. *See* doc. 53-6 at 48-49. Runoff in the "east" ditch travels into an upper sediment basin and dam, through a "spillway" in the upper dam, to the lower sediment basin and dam, where it ultimately discharges into the Locust Fork over an outlet or "spillway" composed of rip-rap. *See* docs. 53-1 at 31, 32, 34, 47; 55-1 at 17; 53-6 at 49, 74. Runoff in the "west" ditch also ultimately flows into this outlet and discharges into Locust Fork. *See* doc. 53-6 at 74. Additionally, various gullies in the refuse pile drain surface runoff into the ditches, sediment basins, or directly to the Locust Fork. *See* doc. 53-6 at 31, 47, 75.

Whether a ditch or basin can qualify as a point source is a settled question of law. Indeed, this circuit addressed the issue forty years ago, when it considered whether "point source pollution" existed at another coal mining site. *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 43 (5th Cir. 1980).[15] The miners at that site built "spoil piles" from "overburden" rock material removed from above the coal, and had constructed sediment basins to catch rainwater runoff transporting "silt and acid materials" from the piles and mining pit to a tributary of the Black Warrior River. *Id.* The court explained that "surface runoff from rainfall, when

---

[15] This decision is binding as precedent in this circuit because it was rendered before October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

collected or channeled by coal miners in connection with mining activities, constitutes point source pollution." *Id.* at 47. The court elaborated further:

> Gravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the miner at least initially collected or channeled the water and other materials. A point source of pollution may also be present where miners design spoil piles from discarded overburden such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials. The ultimate question is whether pollutants were discharged from "discernible, confined, and discrete conveyance(s)" either by gravitational or nongravitational means. Nothing in the Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water. Conveyances of pollution formed either as a result of natural erosion or by material means, and which constitute a component of a mine drainage system, may fit the statutory definition and thereby subject the operators to liability under the Act.

*Id.* at 45. Finally, while the court noted that the "sediment basins and other devices" at the mine could constitute point sources, it remanded for further factual findings in light of conflicting testimony about the "precise nature of spoil basins" constructed by the miners. *Id.* at 47.

In light of *Abston Construction Co.* and the Eleventh Circuit's broad construction of the term "point source," the court finds that the ditches, channels, gullies, basins, and dams that form the drainage system at the site are indeed point sources. *See* 620 F.2d at 41; *Parker*, 386 F.3d at 1009. *See also Concerned Area*

*Residents for Env't v. Southview Farm*, 34 F.3d 114, 116-17 (2d Cir. 1994) (finding that combination of swale, pipe, and ditch that discharged liquid manure into navigable waters was a point source); *United States v. Earth Sci., Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) (finding that gold mine's "drainage system" of "sumps, ditches, hoses and pumps" was a point source). These conveyances channel pollutants into Locust Fork from a single identifiable source: the refuse pile. In addition, the Act explicitly lists "ditches" and "channels" as examples of point sources, indicating that the various ditches and drainage channels ABC built to "collect[] or channel[] the water and other materials" qualify as point sources of pollution. 33 U.S.C.A. § 1362(14); *Abston Constr. Co.*, 620 F.2d at 45; *see N.C. Shellfish Growers Ass'n*, 278 F. Supp. 2d at 679 (finding that manmade ditches that were "designed to serve as conveyances and do in fact convey [pollutants] from the site to waters of the United States" were point sources).

Likewise, the sediment basins and dams, constructed by ABC to impound sediment, and which discharge surface runoff containing pollutants via outlets, also qualify as conveyances and "containers . . . from which pollutants are or may be discharged." 33 U.S.C.A. § 1362(14); docs. 53-1 at 30-33; 53-6 at 70-74. *See also Abston Constr. Co.*, 620 F.3d at 44 (recognizing that "sediment basins dug by . . . miners and designed to collect sediment" can be point sources); *Comm. To Save Mokelumne River*, 13 F.3d at 308 (finding that mine dam's spillway and valve

were point sources); *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 n.22 (D.C. Cir. 1982) (finding that a dam's spillways and pipes that discharged into river were point sources); *Tri-Realty Co.*, 124 F. Supp. 3d at 427 (finding that an earthen basin and man-made channel could be point sources); *N.C. Shellfish Growers Ass'n*, 278 F. Supp. 2d at 679 (finding that "check dams" and "sediment traps" that discharged pollutants to navigable waters were point sources). Finally, the various gullies formed by the erosion of the refuse pile and that ultimately drain to the Locust Fork also constitute point sources under the CWA. *See Abston Constr. Co.*, 620 F.2d at 43.

Furthermore, the refuse pile itself is also a "point source" under the Eleventh Circuit's broad construction of the term. *See Parker*, 386 F.3d at 1009. Although the Eleventh Circuit has not yet addressed whether a mining refuse pile itself can be a "point source," the Circuit's opinion in *Parker* is instructive. In *Parker*, the Eleventh Circuit held that piles of industrial debris—comprised of "scrap metal, junked cars, old drums . . . and other metal objects"—constituted "point sources" because they "collected [storm] water, which then flowed into the stream," a WOTUS, via "erosion gullies." 386 F.3d at 1012, 1009, 1009 n.17 (citing *Abston Constr. Co.*, 620 F.2d at 45). Like the piles in *Parker*, during certain precipitation events, the mining refuse pile "collects" storm water that ultimately flows to the Locust Fork via various man-made channels and naturally-formed gullies. *See* doc.

53-6 at 31, 47, 75. In this respect, although the parties dispute the exact parameters of the refuse pile, *see* doc. 61-9 ¶ 19(d), the pile itself constitutes a "discernible, confined and discrete conveyance" of acid mine drainage into navigable waters, "even if . . . miners have done nothing beyond the mere collection of rock and other materials" to form the pile in the first place. 33 U.S.C.A. § 1362(14); *Abston Constr. Co.*, 620 F.2d at 45; *see Consolidation Coal Co. v. Costle*, 604 F.2d 239, 249-50 (4th Cir. 1979) (upholding EPA regulation of discharges from "coal preparation plants and associated areas" that defined "point source" to include "coal refuse piles").

Finally, BWR contends that groundwater seeps transport acid mine drainage to the Locust Fork. *See* doc. 53-6 at 48, 50-51. Based on sampling data and site observations, one of BWR's experts, Brown, contends that polluted groundwater discharges to the Locust Fork on the east side of the refuse pile, into surface water flowing in the sediment basins, and flows into the Locust Fork as "bed-seepage or at near-shore seeps." Doc. 53-6 at 70. Whether groundwater seeps constitute point sources or are otherwise subject to regulation under the CWA is an issue that the Eleventh Circuit has not addressed. *See*, *e.g.*, *Day, LLC v. Plantation Pipe Line Co.*, 315 F. Supp. 3d 1219, 1240 (N.D. Ala. 2018) (noting the Circuit has not addressed this issue and finding migration of gasoline through fractured rock was not a point source). Moreover, there is currently a circuit split on this issue, and the

Supreme Court has recently granted certiorari on an issue encompassing whether groundwater falls within the scope of the CWA. *See Hawai'i Wildlife Fund v. Cty. of Maui, Hawai'i*, 886 F.3d 737, 749 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 1164 (2019) (finding that discharge of pollutants from wells into groundwater connected to navigable waters constitutes a point source under the CWA); *Kentucky Waterways Alliance v. Kentucky Utilities Co.*, 905 F.3d 925, 933 (6th Cir. 2018) (finding that groundwater transporting pollutants to navigable waters was not a point source under the CWA). Accordingly, the court declines to resolve on summary judgment whether the groundwater seeps in the refuse pile constitute point sources under the CWA.

In summary, the court finds that BWR has established that Drummond has violated CWA § 402 by discharging AMD to the Locust Fork from the point sources in its drainage system. However, disputed issues of fact exist regarding if "T1," the "east" ditch, and the "west" ditch are waters of the United States.

Before finding that BWR is due summary judgment on the discharge of AMD, the court must first address Drummond's motion for summary judgment. Drummond contends that BWR's claims are barred by the statute of limitations, the equitable doctrine of laches, Drummond's compliance with the SMCRA, and the equitable doctrines of grandfathering and reliance. Doc. 49 at 17-33. Moreover, Drummond contends that BWR's RCRA claim is barred by the anti-duplication

provisions, and that BWR cannot demonstrate the requisite "imminent and substantial endangerment" necessary to establish its claim. *Id.* at 33-37. The court addresses each of these contentions in turn.

## B.      Whether BWR's Claims are Barred by the Statute of Limitations

Even if BWR can establish violations of the CWA (as well as RCRA), BWR must still show that its claims for legal, injunctive, and declaratory relief are not barred by the statute of limitations under 28 U.S.C. § 2462. Doc. 49 at 15. The relevant portion of the statute states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . .

28 U.S.C. § 2462. "[A] claim first accrues on the date that a violation first occurs." *Nat'l Parks and Conservation Ass'n, Inc. v. Tenn. Valley. Auth. (TVA)*, 502 F.3d 1316, 1322 (11th Cir. 2007) (citations omitted); *see Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (finding that a claim accrues under § 2462 "when the plaintiff has a complete and present cause of action."). However,

> Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period. In determining whether to characterize a violation as continuing, it is important to distinguish between the 'present consequences of a one-time violation,' which do not extend the limitations period, and 'a continuation of a violation into the present,' which does.

*Nat'l Parks*, 502 F.3d at 1322.

The parties agree that § 2462 applies to BWR's claims for civil penalties under the CWA, thereby imposing a five-year limitation "from the date when the claim[s] first accrued." 28 U.S.C. § 2462; *see* doc. 60 at 5-6; *United States v. Banks*, 115 F.3d 916, 918-19 (11th Cir. 1997) (finding that § 2462 applies to government actions for civil penalties under the CWA). They also agree that the "discovery rule" does not apply for the purposes of determining accrual of BWR's claims under § 2462. *See* docs. 49 at 17; 60 at 6; *Gabelli*, 568 U.S. at 448 (finding that the "discovery rule" does not apply to § 2462). The parties' disagreement stems instead from when the claims accrued, with Drummond contending that the claims "first accrued" over five years ago, *i.e.*, when the Maxine Mine closed in 1983, when ASMC granted final bond release in 1992, or when BWR's Riverkeeper Nelson Brooke obtained water samples in May 2006 that indicated acidic pH levels below the lower dam. Doc. 49 at 19; 69 at 8.

For its part, BWR asserts that its CWA § 402 claims serially accrued on each day that an unpermitted discharge occurred. Doc. 60 at 10. However, it does not cite any case that stands for this proposition, relying instead on cases calculating civil penalties for CWA violations "per day for each violation." *See* doc. 60 at 10-11 (citing *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1138 (11th Cir. 1990) (quoting 33 U.S.C. § 1319(d)); *Ecological Rights Found. v.*

*Pacific Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000)). These cases are not helpful in light of binding precedent that a claim accrues "on the date that a violation *first* occurs." *Nat'l Parks*, 502 F.3d at 1322 (emphasis added). Therefore, the court does not believe there is substantial support for BWR's contention.

Alternatively, BWR contends that Drummond's violations are ongoing. *See* doc. 60 at 15-20. Relevant here, the Supreme Court has interpreted the citizen suit provision of the CWA, which permits actions "against any person . . . alleged to be in violation of . . . an effluent standard or limitation," as precluding "wholly past" violations. *Gwaltney of Smithfield v. Chesapeake Bay Found. Inc.*, 484 U.S. 49, 64 (1987). Therefore, to establish subject matter jurisdiction, BWR must allege, and ultimately prove, "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id*. Because "continuing violations" also toll § 2462, the question of whether alleged CWA violations are "continuous or intermittent" for the purposes of subject matter jurisdiction informs whether a "continuing violation" has occurred for the purposes of tolling. *See United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996) (relying on cases applying *Gwaltney* to find that § 2462 "ha[d] not yet begun to run" on the CWA § 404 claim); *Stillwater of Crownpoint Homeowner's Ass'n, Inc. v. Kovich*, 820 F. Supp. 2d 859, 896 (N.D. Ind. 2011) (finding that CWA § 404 violation was continuing under *Gwaltney* and tolled § 2462). Thus, the court

disagrees with Drummond's contention that *Gwaltney* and its progeny interpreting 33 U.S.C. § 1365(a) are inapposite to the analysis of whether continuing violations toll the statute of limitations. *See* doc. 49 at 20 (citing *Friends of Warm Mineral Springs v. McCarthy*, 2015 WL 2169241, *3 n.6 (M.D. Fla. May 8, 2015)).

To establish continuing violations, BWR must show either: (1) violations that continue on and after the date it filed the complaint or (2) a "continuing likelihood of a recurrence in intermittent or sporadic violations." *Tyson Foods*, 897 F.2d at, 1134, 1134 n.12. Accordingly, to prevail on the statute of limitations defense, Drummond "must prove that BWR's allegations of a continuous or intermittent violation do not raise a genuine issue of material fact." *Carr v. Alta Verde Industries, Inc.*, 931 F.2d 1055, 1063 (5th Cir. 1991) (citing *Gwaltney*, 484 U.S. at 64). *See Tyson Foods*, 897 F.2d at 1135. In that respect, Drummond contends that the CWA violations, if any, are not ongoing because it has not discharged any pollutant "in the ordinary sense" of the word "discharge" at least "since the last reclamation work prescribed by authorities was completed." Doc. 49 at 21. However, Drummond's reclamation and bond release concerning the refuse pile do not, as a matter of law, preclude a finding of ongoing CWA violations. *See Huffman*, 625 F.3d at 167 (quoting 50 Fed. Reg. 41296, 41298 (Oct. 9, 1985) ("If a point source discharge occurs after bond release, then it must be regulated through an NPDES permit under [CWA §§ 301(a), 402].")).

Likewise, the dormant or inoperable status of the Maxine Mine is not dispositive. In *Sierra Club v. El Paso Gold Mines*, the Tenth Circuit held that the current owner of an inactive gold mine, who never operated the mine, was liable for discharges of pollutants to navigable waters from a mine shaft. 421 F.3d at 1143. The court explained:

> When [the CWA] is viewed as a whole, it is apparent the liability and permitting sections of the Act focus on the point of discharge, not the underlying conduct that led to the discharge. *See*, *e.g.*, 33 U.S.C. § 1311(e); *id.* at § 1342(a)(1); *see also id.* at § 1251(a)(3). Furthermore, . . . the Act consistently refers to the obligations of the 'owners and operators' of a point source, suggesting that successor land owners such as [the defendant] are covered by the Act's provisions if they are responsible for a functional point source. *See*, *e.g.*, *id.* at § 1311(g)(2); *id*. at § 1318(a). . . . Although we agree the term "addition" [in 33 U.S.C. § 1362(12)] implies affirmative conduct, such a requirement is satisfied by the contemporaneous introduction of polluted water from [the defendant]'s property, through a point source owned and maintained by [the defendant], to a navigable stream.

*Id*. at 1143-44. *See also Huffman*, 625 F.3d at 168 (quoting *El Paso Gold Mines*, 421 F.3d at 1144). As the Tenth Circuit noted, other courts have similarly found that discharges from inactive mines can violate the CWA. *El Paso Gold Mines*, 421 F.3d at 1144. *See also Comm. to Save Mokelumne River*, 13 F.3d at 308 (holding that channeling of surface runoff containing acid mine drainage from inactive mine is "discharge of pollutants"); *Beartooth Alliance*, 904 F. Supp. at 1172–74 (holding defendants liable for discharges from inactive mine). The Tenth Circuit also found that the defendant's violation was ongoing, noting that "the

discharge from the point source is occurring now . . ." *El Paso Gold Mines*, 421 F.3d at 1141. In light of the remedial purpose of the CWA, the court finds *El Paso Gold Mines* to be persuasive, and concludes that the completion of mining and reclamation activities does not establish that, as a matter of law, all CWA violations have ceased.

The court turns now to whether BWR has established, or at least raised a question of fact, that Drummond's alleged violations of the CWA are continuous.

1.    Whether BWR has shown a continuing violation of CWA § 402

As explained above, BWR has established that Drummond has discharged AMD from point sources into navigable waters, thereby establishing a violation under CWA § 402. Moreover, because BWR has shown, based on its sampling data from September 2016, June 2017, and August 2017, that violations occurred after the date it filed this lawsuit and that violations are reasonably likely to occur during rainfall events in the future, it has established a continuing violation. *See Gwaltney*, 484 U.S. at 64; *Tyson Foods, Inc.*, 897 F.2d at 1134, 1134 n.12.

2.    Whether BWR has shown a continuing violation of CWA § 404

BWR's section 404 claims present a slightly different issue, as BWR contends that Drummond violates CWA § 404 by continuously discharging sediment from the refuse pile into "T1," and that the continuing presence of the dams and sediment in "T1" constitutes an ongoing violation of § 404. *See* doc. 24

43

at 23; 60 at 19.[16] To establish a violation of CWA § 404, BWR must show that Drummond discharged dredged or fill material into a water of the United States without a permit issued by the Corps. *See* 33 U.S.C. §§ 1311, 1344. Under the Corps' regulations, "fill material" constitutes "material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e). Moreover, the term "discharge of fill material" includes placement of fill material in waters of the United States for the construction of "dams and dikes." *Id*. (f).

The parties do not dispute that ABC constructed dams across "T1" or that sediment from the refuse pile remains in "T1." At issue is whether those facts show a continuing violation. Doc. 69 at 8-9. In addressing the parties' respective contentions, the court notes that the Eleventh Circuit has not yet addressed whether *past* discharges of a pollutant into navigable waters constitute an ongoing violation while the pollutant remains in the water. Moreover, the numerous courts that have addressed this issue reached differing results, with some finding that the unpermitted discharge of dredged or fill material under § 404 constitutes an

---

[16] BWR also contends that sediment from the refuse pile has eroded and continues to erode into Locust Fork in violation of CWA § 404. Doc. 24 at 24. As discussed above, a question of fact exists regarding if sediment erodes directly from the pile into Locust Fork. *See*, pp.19 n.10, *supra*.

ongoing violation for as long as the material remains in protected waters,[17] and others finding that the mere continuing presence of previously discharged pollutants in navigable waters does not constitute an ongoing violation.[18]

Justice Scalia's concurrence in *Gwaltney*, joined by two other justices, is instructive in resolving this split. Analyzing the citizen suit provision of the CWA, Justice Scalia stated:

> When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation.

*Gwaltney*, 484 U.S. at 64 (Scalia, J., concurring) (citation omitted). Moreover, the broad remedial purpose of the CWA supports the conclusion that the ongoing presence of discharged fill material in navigable waters constitutes a continuing violation. *See Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210,

---

[17] *See, e.g.*, *Sasser v. Administrator, U.S. E.P.A.*, 990 F.2d 127, 129 (4th Cir. 1993) ("Each day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."); *City of Mountain Park, GA v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1296-97 (N.D. Ga. 2008) (finding that "deposited sediment and fill material" was an ongoing violation for as long as the material remained in navigable waters); *Informed Citizens United, Inc. v. USX Corp.*, 36 F. Supp. 2d 375, 377-78 (S.D. Tex. 1999) (fill in wetlands was a continuing violation); *Reaves*, 923 F. Supp. at 1534 (dredged material in canal was a continuing violation).

[18] *See, e.g.*, *Day, LLC*, 315 F. Supp. 3d at 1239-40 (finding no ongoing CWA violation where pipe had leaked petroleum onto plaintiff's property but the pipe was subsequently repaired and remediated); *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1311-13 (2d Cir. 1993) (finding no ongoing violation where defendant had stopped discharging lead shot and clay debris into navigable water by the time complaint was filed); *Friends of Santa Fe Cty. v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1354 (D.N.M. 1995) ("Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA].").

1225 (11th Cir. 2009) (noting the CWA's "broad and ambitious" purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." (quoting 33 U.S.C. § 1251(a))). In addition, as the Northern District of Georgia recognized in *City of Mountain Park*, unlike other pollutants in navigable waters, fill materials generally do not dissipate or dissolve over time and, therefore, "continue to have roughly the same net polluting effect years or even decades after the time of their deposit." 560 F. Supp. 2d at 1296. Thus, although alleged discharges of fill material—such as the dams and sediment that has accumulated in the sediment basins—may have occurred in the past, they may constitute ongoing violations "so long as [Drummond] has not put in place remedial measures that clearly eliminate the cause of the violation." *Gwaltney*, 484 U.S. at 64.

As discussed above, BWR has raised a genuine issue of material fact that "T1" is a water of the United States. *See supra* p. 29. Correspondence between ABC and AWIC suggest that ABC constructed the two dams in the course of "T1" at some point after March 1976, although the exact date is not clear, *see* docs. 50-8 at 25-30; 50-3 at 8, and the dams remain in "T1" today. Given that the Corps' regulation includes the construction of "dams and dikes" in its definition of "discharge of fill material," this is sufficient to show that Drummond's predecessor discharged fill material into "T1." *See* 33 C.F.R. § 323.2(f); *Minnehaha Creek*

*Watershed Dist. v. Hoffman*, 597 F.2d 617, 624-26 (8th Cir. 1979) (holding that construction of dams and riprap involved the placement of fill material in navigable waters and thus came within purview of CWA § 404); *N.C. Shellfish Growers Ass'n*, 278 F. Supp. 2d at 682-83 (finding that construction of check dams in ditches constituted CWA § 404 violation).

In addition, with respect to the discharge of sediment into "T1," BWR members testified that, over time, they witnessed the slough in the course of "T1" fill up with sediment. Docs. 54-10 ¶ 8; 54-12 ¶ 5. Furthermore, documents produced by Drummond from the 1979 and 1980 period describe an unidentified "tributary" and "estuary" filled with sediment from the refuse pile. *See* doc. 54-13 at 2-3; 54-15 at 2-3; 54-14 at 34. Finally, BWR's expert Anthony Brown also contends that "T1" has been buried and filled with waste from the refuse pile, relying on topographic maps and spatial analysis software to estimate that 60,000 cubic yards of waste has eroded into the sediment basins in which "T1" is located. Doc. 53-6 at 64. Drummond's experts Lois George and Michael Zanotti assert that Brown's "assumptions are purely speculative," and contend that some of the sediment in the basins eroded from unmined, natural areas. *See* docs. 61-9 ¶¶ 18-19; 61-7 ¶¶ 5-6. However, the evidence in the record is sufficient to raise a genuine issue of material fact as to whether sediment from the refuse pile has replaced a portion of "T1" with dry land or changed the bottom elevation of "T1," *see* 33

C.F.R. § 323.2(e), and consequently whether Drummond has engaged in a continuing violation of CWA § 404. Therefore, BWR has at least raised a question of fact regarding continuing violations of CWA §§ 402 and 404, to preclude a finding that its claims are time-barred under 28 U.S.C. § 2462.

### 3. Whether the Statute of Limitations Bars the RCRA Claim (Count IV)

Drummond contends that, under the concurrent remedy rule, § 2462 bars the RCRA endangerment claim for equitable relief because it bars BWR's "concurrent" claims for legal relief under the CWA. *See* doc. 69 at 10-11. The concurrent remedy rule provides that "where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred." *Nat'l Parks*, 502 F.3d at 1326-27. Here, however, BWR's claims for civil penalties under the CWA are not time-barred. Therefore, the rule does not operate to bar BWR's RCRA endangerment claim for equitable relief.

## C. **Whether BWR's Claims are Barred by the Doctrine of Laches**

Drummond also challenges BWR's claims on the equitable doctrine of laches. Doc. 49 at 26-27. To establish a laches defense, "[t]he defendant must show a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted." *Ecology Ctr. of La., Inc. v. Coleman,* 515 F.2d 860, 867 (5th Cir. 1975). Even assuming that, as

Drummond contends, BWR discovered the basis for its claims ten years ago when Brooke measured acidic pH levels in surface water below the lower dam, "[t]here is a strong presumption that [BWR's] suit is timely" because the statute of limitations has not yet run on any of BWR's claims. *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1286. Drummond's assertion that "[t]here is no legitimate excuse" for BWR's delay fails to rebut that "strong presumption." *See* doc. 69 at 11. Moreover, Drummond has not established that it was "made significantly worse off because [BWR] did not bring suit as soon as it had the opportunity to do so." *See Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1286 (noting that "[i]nexcusable delay and prejudice are both necessary elements of the defense of laches"). Drummond's general assertions that BWR's delay has resulted in faded memories, unavailable witnesses, and lost evidence, *see* doc. 69 at 11, are insufficient, without more, to establish the requisite prejudice. *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1287 (declining to apply laches where the defendant failed to show "specific and concrete" evidence of prejudice).

### D. Whether BWR's Claims are Barred by Drummond's Reliance or by Grandfathering

Drummond contends that, because it reasonably relied on ASMC's and ADEM's primary regulatory authority, directives, and bond and monitoring releases, holding it liable for alleged violations would constitute "manifest injustice." *See* doc. 49 at 28-31. Drummond asserts also that retroactive application

of the Corps' 2002 "fill material" definition is inequitable, and that the Corps' 1991 "grandfathering" provision should apply to preclude liability under CWA § 404. *Id*. at 32-33.

To support its contentions, Drummond relies on two Eleventh Circuit cases that held that plaintiffs were not required to obtain CWA § 404 permits for equitable reasons: *Buccaneer Point Estates, Inc. v. United States*, 729 F.2d 1297, 1299 (11th Cir. 1984), and *United States v. Context-Marks Corp.*, 729 F.2d 1294, 1295 (11th Cir. 1984). In *Buccaneer Point*, the plaintiffs stopped their development work when the Corps cautioned them against continuing the development of certain properties because the development may have been below the mean high tide line ("MHTL") and subject to Corps permitting requirements. 729 F.2d at 1298. Subsequently, the Corps informed the plaintiffs that they could resume work without a permit "as the property had been determined to be above the MHTL." *Id*. However, six months later, the Corps told the plaintiffs that they would, in fact, have to obtain a permit due to new regulations. *Id*. at 1299. Had the plaintiffs not ceased development pursuant to the Corps' initial advisement, "their project would have been completed prior to the change in regulations and would have been 'grandfathered' in." *Id*. at 1299. Noting that "[m]embers of the public are entitled to assume that public officials will act in accordance with [sic] law," the court held that requiring the plaintiff to obtain a § 404 permit for its work

"would be a retroactive application of the Corps regulations which would result in a 'manifest injustice.'" *Id.*

Similarly, in *Context-Marks Corp.*, the Corps issued a cease and desist order to plaintiffs engaged in a fill operation below the MHTL, even though the Corps had not previously required such a permit to fill below the MHTL in that area. 729 F.3d at 1295. The court found that, had the Corps not intervened, the plaintiffs could have developed the land above the MHTL before implementation of the Corps' new regulations requiring permits above the MHTL, and "thus would have been 'grandfathered' in." *Id.* at 1296. Again, the court held that retroactive application of the Corps' new regulations "would not be appropriate." *Id.*

Here, however, Drummond has not identified any regulations that would be retroactively applied if the court were to find for BWR on these claims. For that reason, this case—at least with respect to the § 402 and RCRA claims—is distinguishable from *Buccaneer* and *Context-Marks*. *See United States v. Cumberland Farms of Connecticut, Inc.*, 826 F.2d 1151, 1162 (1st Cir. 1987) (distinguishing *Buccaneer* and *Context-Marks* by noting that, in the case at bar, "[t]he Corps is not relying on a retroactive assertion of jurisdiction"). Drummond does not disagree with this general point. Rather, Drummond contends that, because it reasonably relied on state regulators' assurance that it did not need a permit for discharges to Locust Fork, a finding now by this court to the contrary

would result in a "manifest injustice." To support its contention, Drummond cites first to an internal ABC memo from November 1980 that indicates that, as part of a discussion about the "Maxine runoff problem," a representative from AWIC discussed with an ABC executive the possibility of "a filter dam and cutting a direct channel from the upper dam to the river." Doc. 50-2 at 52. Second, Drummond cites a July 12, 1983 inspection report from an ASMC inspector that appears to state:

> Water sample taken at rock filter dam <3.0. . . . Have had continuing meetings with legal division and ABC on this problem. Has also been referred to ADEM—this is not an NPDES discharge point.

Doc. 50-9 at 18. Third, Drummond references handwritten comments on an internal memo on July 26, 1983 from an ABC representative that state:

> Bill Gibson [an ADEM inspector] insinuated that NPDES permits may be required for the limestone filter and the diversion ditch (draining recent reclaimed area) at the No. 1 dam. As I understand it, this was not part of the agreement as signed by Joe Myers [of ADEM].

Doc. 50-8 at 42. Finally, Drummond points to handwritten notes from a meeting between ABC and ADEM representatives on September 2, 1983 that indicate that the parties discussed the "filter dam" at the refuse pile and an earlier meeting with AWIC, where the notes state, "filter structure to get away from point source." Doc. 50-8 at 54-57.

To begin, these instances are distinguishable from the Corps' communications in *Buccaneer* and *Context-Marks*. Moreover, the record is not as clear cut as Drummond contends on this point. For example, it is not clear that ADEM, the state agency with primary authority to issue NPDES discharge permits, informed ABC that it did not need to obtain an NPDES permit for discharges from the refuse pile into Locust Fork. The July 12, 1983 inspection report, which suggests that the dam "is not an NPDES discharge point," was written by an ASMC inspector with no regulatory authority under the CWA. It is also not clear what "agreement" is referred to in ABC's July 26, 1983 internal memo, but the fact that an ADEM inspector implied that NPDES permits might be required for the lower dam and "diversion ditch" in the refuse pile cuts against Drummond's reliance argument. Indeed, ADEM ultimately required ABC to obtain an NPDES permit for an outfall in the refuse pile that discharged into an "unnamed tributary of Locust Fork," i.e. the west ditch in the refuse pile, which also undermines the reliance argument. *See* doc. 55-24 at 34-35; 55-1 at 42-43. Accordingly, based on the record, Drummond has not established that it is entitled to summary judgment on the CWA § 402 and RCRA claims on a reasonable reliance theory.

Drummond has an arguably better argument with respect to the alleged discharges of "fill material" into "T1" and Locust Fork. Drummond points here to specific Corps regulations which, it contends, would be retroactively applied if this

court were to grant relief on BWR's section 404 claims. Under CWA § 404, the Corps' pre-2002 definition of "fill material" excluded unpermitted discharges that were for the "primary purpose" of waste disposal. 42 Fed.Reg. 37,122, 37,130 (July 19, 1977). Corps regulations indicate that "mine overburden" and "material such as soil, rock, and earth" constituted "waste" under this prior regulation. *See* 67 Fed.Reg. 31129, 31133 (May 9, 2002). Still, these facts do not establish, at this juncture of the case, a manifest injustice for multiple reasons. Unlike in *Buccaneer* and *Context-Marks*, Drummond has not cited to documents showing any communications with the Corps concerning the drainage system, nor have they provided evidence that any ABC or Drummond representative relied on the pre-2002 regulation. Rather, AWIC, the predecessor to ADEM, approved ABC's 1976 plans to construct ditches and a dam to "correct the siltation problem" at the refuse pile, referring to the siltation of Locust Fork from the refuse pile. Docs. 50-8 at 25-30; 50-3 at 8. ABC appears to have conceived its plans in response to a notice from AWIC that ABC was in violation of "AWIC permit conditions and Alabama's pollution control law," but there is no mention of the CWA in AWIC's notice. Doc. 50-8 at 31. Moreover, it was AWIC, rather than the Corps, that approved ABC's 1981 "pollution abatement" plan to construct and extend drainage ditches and channels. Doc. 50-2 at 19-20. Finally, as BWR notes, its CWA § 404 claim is for ongoing discharges of sediment from the refuse pile, as well as the continuing

presence of sediment and dams in "T1." *See* doc. 24 ¶ 68-69; *Scheerer v. U.S. Atty. Gen.*, 513 F.3d 1244, 1252 (11th Cir. 2008) ("A statute or administrative regulation does not operate retroactively merely because it applies to prior conduct . . ."). Accordingly, Drummond has not shown that application of the current regulation defining "fill material" would be retroactive in this case.

Finally, Drummond contends that the Corps' 1991 regulations, 33 C.F.R. § 330.3(b), "grandfathered" its discharges of fill material into "T1." The regulation states:

> The following activities were permitted by [nationwide permits] issued on July 19, 1977, and, unless the activities are modified, they do not require further permitting: . . . (b) Structures or work completed before December 18, 1968, or in waterbodies over which the DE had not asserted jurisdiction at the time the activity occurred, provided in both instances, there is no interference with navigation. Activities completed shoreward of applicable Federal Harbor lines before May 27, 1970 do not require specific authorization. (section 10).

33 C.F.R. § 330.3(b). As BWR notes, however, this so-called "unasserted jurisdiction" nationwide permit never applied to the CWA. *See United States v. Cumberland Farms*, 826 F.2d 1151, 1158-59 (1st Cir. 1987). This regulation was first promulgated in 1977 as 33 C.F.R. § 322.4(g), and the Corps indicated that this provision only applied to Section 10 of the Rivers and Harbor Act, although it acknowledged that certain activities might be "regulated under other authorities of the Department of the Army." 42 Fed.Reg. 37,122, 37,126 (July 17, 1977); *see*

*Cumberland Farms*, 826 F.2d at 1159; 33 C.F.R. § 322.4(g) (1977). Drummond has not cited any authority showing that this provision ever applied to fill activities under CWA § 404 and, thus, has failed to show that its discharges of sediment and construction of dams would be "grandfathered" under this provision. *See* doc. 49 at 33.

### E.    Whether SMCRA Compliance Precludes BWR's CWA Claims

Drummond contends that its compliance with ASMC's regulatory requirements under the SMCRA renders it immune from liability under the CWA. Doc. 49 at 28-31.[19] Specifically, Drummond asserts that ASMC's adjudication that ABC substantially completed reclamation in March 1985 and ABC's final bond release by ASMC in June 1992 bar liability under the CWA. This contention is contrary to the plain language of the SMCRA, which states that "nothing [under the SMCRA] shall be construed as superseding, amending, modifying, or repealing" the CWA. *See* 30 U.S.C. § 1292(a)(3), (5); 42 U.S.C. § 6901. This language indicates that enforcement under the CWA operates independently of the SMCRA. *See Am. Min. Cong. v. U.S. E.P.A.*, 965 F.2d 759, 766 (9th Cir. 1992) ("According to this statutory language, the existence of SMCRA's [Abandoned

---

[19]   Drummond cites no authority for its contention that its compliance with ADEM's requirements and releases under the CWA bar BWR's claims, and focuses instead exclusively on its compliance with SMCRA. *See* doc. 49 at 27-30. Consequently, Drummond has waived this argument. *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001)) (finding that the plaintiff waived claims he had the burden to prove at trial by failing to address them in his response to the motion for summary judgment).

Mine Lands] program does not limit EPA's authority to regulate mine discharges under the CWA."). Moreover, "where the Secretary's regulation of surface coal mining's hydrologic impact [under the SMCRA] overlaps EPA's, the [SMCRA] expressly directs the [CWA] and its regulatory framework are to control so as to afford consistent effluent standards nationwide." *In re Surface Min. Regulation Litig.*, 627 F.2d 1346, 1366-67 (D.C. Cir. 1980). Thus, compliance with SMCRA has no direct bearing on the CWA claims.

### F.   Whether SMCRA Compliance Precludes BWR's RCRA Claim

Drummond contends that its compliance with SMCRA—specifically, its reclamation of a portion of the refuse pile and bond release—bars any liability under the RCRA.[20] Drummond relies on RCRA's anti-duplication and integration provisions, which address integration with the SMCRA, stating:

> The Secretary of the Interior shall have exclusive responsibility for carrying out any requirement of subchapter III of this chapter with respect to coal mining wastes or overburden for which a surface coal mining and reclamation permit is issued or approved under [SMCRA]. The Secretary shall, with the concurrence of the Administrator, promulgate such regulations as may be necessary to carry out the purposes of this subsection and shall integrate such regulations with regulations promulgated under [SMCRA].

---

[20] RCRA excludes from regulation "solid or dissolved materials in . . . industrial discharges which are point sources subject to permits" under CWA § 402. 42 U.S.C. § 6903(27). Thus, in light of the court's finding that the ditches, channels, basins, dams, gullies, and refuse pile itself are point sources under the CWA, the court examines only whether RCRA could apply with respect to the groundwater seeps discharging acid mine drainage at the site. 40 C.F.R. § 261.4 (noting that "[t]his exclusion [under 42 U.S.C. § 6903(27)] applies only to the actual point source discharge.").

42 U.S.C. § 6905(c)(2). "Subchapter III" encompasses 42 U.S.C. §§ 6921 to 6939g, *i.e.*, "Subtitle C," *see Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 103 n. 22 (E.D.N.Y. 2001) (citing Pub.L. No. 94-580), which establishes the federal system for regulating hazardous wastes as a subset of solid waste, *see Am. Portland Cement All. v. EPA*, 101 F.3d 772, 774 (D.C. Cir. 1996).

Thus, to establish that RCRA's anti-duplication provision applies, Drummond must show that the mining refuse pile or acid mine discharges constitute "hazardous waste" that is regulated under RCRA subtitle C, as opposed to "solid waste" that is regulated under RCRA subtitle D. *See* 42 U.S.C. § 6903(5) (defining "hazardous waste"); 42 U.S.C. §§ 6921-6939g; docs. 49 at 34; 60 at 33-34. Drummond cannot make this showing because, since at least 1986, the EPA has found that coal mining wastes should be regulated as a solid waste under subtitle D. *See Environmental Defense Fund v. U.S.E.P.A.*, 852 F.2d 1309, 1213 (D.C. Cir. 1988) (finding that the EPA's decision to regulate mining wastes under subtitle D rather than subtitle C was reasonable); *W. Virginia Highlands Conservancy v. Johnson,* 540 F. Supp. 2d 125, 137-143 (D.D.C. 2008) (noting that, by 1986, the EPA "had decided not to regulate coal mining waste . . . under Subtitle C of RCRA."). Therefore, RCRA's anti-duplication and integration provisions do not bar BWR's RCRA claim.

Drummond further contends that the RCRA claim fails because BWR "seeks essentially to direct a 'reclamation' that has previously been completed in accordance with the law." Doc. 49 at 34. In support of this contention, Drummond cites a decision from the Eastern District of New York, in which the court held that the RCRA endangerment claim was "inappropriate" because the state environmental agency, working together with the plaintiffs, was supervising an ongoing remediation of the contaminated sites. *See Rococo Assocs., Inc. v. Award Packaging Corp.*, 803 F. Supp. 2d 184, 191-92 (E.D.N.Y. 2011). The court found that "ordering defendant to take over operation of the [state agency's] system . . . to ameliorate the effects of the spill would do nothing to improve [its] operation . . . ." *Id.* at 191 (quoting *87th St. Owners. Corp. v. Carnegie Hill-87th St. Corp.*, F. Supp. 2d 1215, 1221 (S.D.N.Y. 2002)). There is no ongoing remediation of the refuse pile here, however, because the ASMC-ordered remediation of the "post-law" portion of the refuse pile was completed nearly twenty-seven years ago. Docs. 50-9 at 1-2; 50-4 at 29-30. In that respect, to the extent BWR ultimately prevails, the court's remedy would not amount to a "take over" of a state's remediation process.

Finally, Drummond contends that the RCRA claim is an improper collateral attack on its previous ASMC and ADEM permits. Doc. 49 at 34 (citing *Greenpeace, Inc. v. Waste Technologies Ind.*, 9 F.3d 1174, 1176-78 (6th Cir.

1993); *Little v. Louisville Gas and Elec. Co.*, 33 F. Supp. 3d 791 (W.D. Ky. 2014)).

In *Greenpeace, Inc.*, the plaintiffs sought to enjoin trial burn operations at a waste treatment facility, even though the defendants' operations were already subject to RCRA permits by a state environmental agency. 9 F.3d at 1177. Similarly, in *Little*, the plaintiffs also sought to enjoin the release of coal-combustion by-products from a power plant, although the power plant was already subject to various state environmental permits. 33 F. Supp. 3d at 796-98, 813-14. In both of these cases, the court held that the RCRA claims were improper collateral attacks on the defendants' permits, and, therefore, the court did not have jurisdiction over the claims. *See Greenpeace, Inc.*, 9 F.3d at 1182; *Little*, 33 F. Supp. 3d at 814. By contrast, here, the Maxine Mine and refuse pile have not been permitted by ASMC or ADEM since at least 1993. Thus, BWR's RCRA claim is not a collateral attack on an existing permit. Moreover, because there is a genuine issue of material fact as to whether the refuse pile and acid mine discharges may present an "imminent and substantial endangerment" to the environment, *see infra* Section IV.G, the court does not believe that the RCRA claim is moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996) (noting that an action is moot where a court "cannot grant any effectual relief whatever in favor of the [plaintiff]" and that "even the availability of a partial remedy" is sufficient to prevent mootness). Consequently,

Drummond has not shown as a matter of law that the RCRA claim is a collateral attack on its previous permits.

## G.  Imminent and Substantial Endangerment—Count IV

In Count IV, BWR contends that mining waste at the refuse pile constitutes an "imminent and substantial endangerment" to the environment in violation of RCRA. 42 U.S.C. § 6972(a)(1)(B); *see* doc. 52 at 34. Both parties have moved for summary judgment on this claim. To establish a RCRA endangerment claim, BWR must show, among other things, "(3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment." *Parker*, 386 F.3d at 1014–15 (quoting *Cox v. City of Dallas*, 256 F.3d 281, 292 (5th Cir. 2001); *see* 42 U.S.C. § 6972(a)(1)(B). In construing "imminent and substantial endangerment," the Eleventh Circuit has explained that "imminent" means "threaten[ing] to occur immediately," and "substantial" means "serious." *Parker*, 386 F.3d at 1015. Thus, a plaintiff must be able to show "that there is a potential for an imminent threat of a serious harm to the environment or health." *Id*.

Drummond maintains that the evidence is insufficient to make this showing, asserting that the refuse pile does not pose an "imminent" threat because, first, BWR waited ten years to commence this lawsuit after Brooke obtained the initial samples. The timing of BWR's suit is irrelevant to whether there is "imminent" endangerment:

> Imminence . . . applies to the nature of the threat rather than identification of the time when the endangerment arose. The section, therefore, may be used for events which took place at some time in the past but which continue to present a threat to the public health or the environment.

*Cox*, 256 F.3d at 300 (quoting H.R. Comm. Print. No. 96-IFC 31, at 32 (1979)). Rather, the analysis of "imminence" focuses on whether there is "a threat which is present *now*, although the impact of the threat may not be felt until later." *Mehrig v. KFC Western, Inc.*, 516 U.S. 479, 485-86 (1996) (citation omitted).

Drummond contends next that BWR cannot establish a "substantial endangerment" because BWR has not produced a risk assessment to evaluate the degree of risk to humans and the environment or the seriousness of the risk. Drummond has not pointed to any authority to support its proposition. Rather, in two of the cases Drummond cites, the court found that no "imminent and substantial endangerment" existed, in part because the plaintiffs failed to conduct a risk assessment <u>despite</u> the plaintiff's own expert opining that such an assessment was necessary to evaluate the potential threat to the environment. *See Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009) (noting plaintiff's expert report concluded that a risk assessment was necessary "to evaluate the degree of risk to humans and wildlife"); *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 710 (W.D.N.Y. 2011). In contrast, here, BWR's experts do not contend that a risk assessment is necessary to evaluate the impact to the

environment. *See*, *e.g.*, doc. 61-3 at 81. BWR relies instead on the report of its aquatic toxicology expert, Carys Mitchelmore, which opines that surface runoff waters at the refuse pile "pose a significant threat to the nearshore environment and organisms in Locust Fork where these surface runoff waters drain into." Doc. 56-6 at 5. This conclusion is based on whole effluent toxicity (WET) testing conducted in August 2017 using samples from two streams at the site (SW8, SW9), and from surface water below the lower dam (SW3) and a groundwater seep (SW4).[21] *See* doc. 56-6 at 6.[22] Using laboratory organisms, Mitchelmore determined that "[t]hese waters are chronically toxic to water fleas and fathead minnows, commonly used test species, at dilutions of ~0.3% or less," doc. 56-6 at 4, and that the waters were still causing chronic toxicity in both species even after "diluting the waters over 330-fold," *id*. at 7.

Drummond counters that Mitchelmore's WET testing results are insufficient to establish that surface water at the refuse pile is acutely and chronically toxic to aquatic life. Doc. 61-10 ¶ 13. Specifically, Drummond's experts Sisk and Simpson contend that there is no threat to aquatic life because "aquatic communities" do not

---

[21] WET testing is used by the EPA "to identify effluents and receiving waters containing toxic materials in acutely toxic concentrations" to aquatic organisms. Environmental Protection Agency, *Methods for Measuring the Acute Toxicity of Effluents and Receiving Waters to Freshwater and Marine Organisms* at 1 (EPA-821-R-02, Oct. 2002).

[22] However, because the streams and the lower dam (SW8, SW9, SW3) are "point sources" under the CWA, and thereby excluded from regulation under RCRA, only the sample from the groundwater seep (SW4) is relevant to the court's analysis of whether there is an "imminent and substantial endangerment." *See* 42 U.S.C. § 6903(27); 40 C.F.R. § 261.4.

exist in the water bodies BWR's experts sampled. *See* docs. 61-24 ¶ 9; 61-10 ¶ 13. Moreover, Sisk points out that BWR has provided no evidence that this toxicity has eliminated aquatic life in the streams of the refuse pile. Doc. 61-10 ¶ 13.

Although the "mere presence" of contaminants in the environment "is alone not enough to constitute an imminent and substantial endangerment," *Smith v. Potter*, 187 F. Supp. 2d 93, 98 (S.D.N.Y.2001), Mitchelmore also contends that the surface runoff discharging into Locust Fork poses a threat to organisms in that river, explaining that "any aquatic ecosystems receiving this extremely toxic surface run-off water would be harmed." Doc. 56-6 at 5, 9. In response to Drummond's contention that this conclusion "substantially overstates the potential for toxicity, while ignoring the mitigating effects of mixing as a small stream enters a larger water body," doc. 61-10 at 14-15, and that the two samples from the Locust Fork (SW1 and SW15) did not demonstrate chronic toxicity from WET testing, doc. 61-10 ¶ 13; *see* doc. 56-6 at 10-11, Mitchelmore contends that this "does not mean that there will be no harm to resident species at the [test] site." Doc. 56-6 at 12. Mitchelmore cites EPA guidance, which explains that, "because of the potential temporal variability in the toxicity of effluents, a negative test result with a particular sample does not preclude the possibility that samples collected at some other time might exhibit acute (or chronic) toxicity." *See* 56-6 at 12; Environmental Protection Agency, *Methods for Measuring the Acute Toxicity*

*of Effluents and Receiving Waters to Freshwater and Marine Organisms* at 5 (EPA-821-R-02, Oct. 2002).

To succeed on its RCRA endangerment claim, BWR "need only demonstrate that the waste disposed of 'may present' an imminent and substantial threat." *Parker*, 386 F.3d at 1015 ("The operative word in the statute is the word 'may.'"). The Eleventh Circuit has explained that "'endangerment' means a threatened or potential harm, and does not require proof of actual harm." *Id.* (citing *Meghrig v. KFC Western, Inc.,* 516 U.S. 479 (1996)). Indeed, RCRA's "expansive" delegation of authority empowers courts to grant equitable relief "to the extent necessary to eliminate any risks posed by toxic wastes." *See United States v. Price*, 688 F.2d 204, 214 (3d Cir. 1982); *see Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) ("[I]f an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." (citation omitted)); *Parker*, 386 F.3d at 1015 (citing *Price*, 688 F.2d at 214). In light of these authorities, the court finds that there is a genuine issue of material fact as to whether groundwater discharging from the refuse pile presents an "imminent and substantial endangerment . . . to the environment." 42 U.S.C. § 6972(a)(1)(B). Therefore, both motions are due to be denied.

## V.    CONCLUSION AND ORDER

In light of the foregoing analysis, BWR's motion for partial summary judgment, doc. 51, is **GRANTED** solely as to liability on BWR's claim that Drummond violated CWA § 402 by discharging AMD from the refuse pile, ditches, channels, gullies, basins, and dams at the site into Locust Fork. In all other respects, BWR's motion is **DENIED**. Drummond's motion for summary judgment, doc. 48, is also **DENIED**.

Although this matter is ready to proceed to trial, in light of the appeal pending before the Supreme Court which concerns the issue of groundwater discharges, the court finds that a stay is warranted in this case. *See Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009) (noting that a stay may be warranted "to await a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case."). Accordingly, the motion for stay pending United States Supreme Court ruling, doc. 82, is **GRANTED**. This case is **STAYED** pending the disposition of *Hawai'i Wildlife Fund v. Cty. of Maui, Hawai'i*, 886 F.3d 737, 749 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 1164 (2019).

**DONE** the 7th day of May, 2019.


                                      **ABDUL K. KALLON**
                                      UNITED STATES DISTRICT JUDGE