FILED

2021 Aug-09  PM 06:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:16-cv-01443-AKK** |
| **v.** | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF BLACK WARRIOR RIVERKEEPER'S SUPPLEMENTAL MEMORANDUM OF LAW ON THE *MAUI* TEST AND GROUNDWATER DISCHARGE CLAIMS

Plaintiff Black Warrior Riverkeeper ("BWR") submits this supplemental memorandum of law relating to its claims of illegal discharges of pollutants through groundwater at the former Maxine Mine site (the "Maxine site"), in compliance with the Court's Order of February 11, 2021, Doc. 105. It is unclear to BWR whether the Court intended to revisit BWR's Motion for Partial Summary Judgment, Doc. 51, as to the groundwater claims of Count I of the Second Amended Complaint, Doc. 24, in light of the *Maui* decision. BWR asserts that the groundwater claims can and should be resolved on summary judgment, which would simplify the issues for trial, and BWR therefore welcomes the Court to treat

this submission as a renewed motion for summary judgment on the claims, and give Drummond an opportunity to respond on the merits.

## I.   Procedural Posture

BWR brought this citizen suit under the Clean Water Act ("CWA") § 505, 33 U.S.C. §1365, against Drummond Company Inc. ("Drummond"), to abate ongoing and continuous unpermitted discharges of acid mine drainage ("AMD") and other pollutants from the former Maxine Mine site into the Locust Fork of the Black Warrior River and a tributary on the site. Second Am. Compl. ¶¶ 1-2, 44-58, Doc. 24. BWR asserts that the mine waste pile at issue, referred to as the "GOB" (geologic overburden) pile, is leaching contaminated groundwater which is discharging pollutants to the Locust Fork through a direct hydrological connection between the GOB pile and the Locust Fork. *Id.* ¶ 43. BWR further alleges that such groundwater discharges violate § 301(a) and § 402 of the CWA. *Id.* ¶ 53.

After discovery, Drummond moved for summary judgment on all claims based on a plethora of legal arguments, Doc. 48, and BWR moved for partial summary judgment on Counts I and IV, Doc. 51. While summary judgment was pending, Drummond moved for a stay pending resolution of *County of Maui v. Hawai'i Wildlife Fund* (*Maui*) which was then pending at the United States Supreme Court. *See* Doc. 82.

This Court denied Drummond's Motion for Summary Judgment as to all counts and granted BWR's motion in part. Doc. 93. The Court ruled as a matter of law that AMD is discharging into waters of the United States (the Locust Fork) via point sources (the entire GOB pile), and, accordingly, that BWR's Motion for Partial Summary Judgment was due to be granted "as to liability on the claim that Drummond violated CWA § 402 by discharging AMD from the refuse pile, ditches, channels, gullies, basins, and dams at the site into the Locust Fork." *Id*. at 14-21, 31-37. The Court ruled that genuine issues of material fact remained as to some issues, including "whether groundwater discharging from the refuse pile presents an 'imminent and substantial endangerment . . . to the environment.'" *Id*. at 21-31, 36-37, 65. Further, the Court declined to resolve the groundwater discharge claims, as the pending appeal before the Supreme Court in *Maui* would likely have binding precedential effect on the Court's analysis of those claims. *Id*. at 36-37, 66. Accordingly, the Court ordered that the case be stayed, pending resolution of *Maui*. *Id*. at 66.

After the Supreme Court issued its *Maui* order in April 2020, the parties jointly moved to lift the stay, and on August 28, 2020, the Court granted the motion. Doc. 99 at 1. On February 11, 2021, the Court granted the parties' joint motion to continue, re-set the pretrial conference for August 31 and the trial for October 11, and set a deadline of August 9 for the parties to file supplemental

briefing related to the application of the *Maui* opinion and its new "functional

equivalent test" to BWR's groundwater claims. Doc. 105.

## II.     Statement of Facts Regarding the Groundwater Discharges

In its summary judgment brief, BWR cited data from a 2017 site assessment

and sampling program that demonstrated that groundwater contaminated with

AMD is discharging from the GOB pile to the Locust Fork and a (now buried)

tributary on the site referred to as Tributary 1 or T1:

> The 2017 data also show that groundwater discharging from the GOB
> pile to T1 and Locust Fork is contaminated with AMD. **Ex. C-1** at 58-
> 62. Groundwater-supported flow, originating from the GOB pile,
> moves through gullies and the east ditch/central channel. *Id.* at 39-40,
> 65-68. The polluted groundwater discharges directly to Locust Fork,
> and to the east ditch/central channel, then percolates through GOB
> waste accumulated in the sedimentation basins in T1, and flows into
> the Locust Fork as bed seepage or seeps. *Id.* at 69-70. Drummond's
> experts agree that such seeps discharge into Locust Fork. **Ex. RR**,
> Sisk Dep. at 144:11-146:6; **Ex. PP** at 150:20-151:20. Dissolved
> metals concentrations in groundwater samples taken during the joint
> sampling are at least ten times higher than those in unimpacted
> samples and are associated with AMD originating from the GOB pile.
> **Ex. C-1** at 70-71. These groundwater samples are corroborated by
> PELA's previous groundwater monitoring. *See* **Ex. L**, at
> BWR000477-493.

Pl.'s Summ. J. Br. ¶ 36, Doc. 52. BWR relied principally upon the findings and

conclusions expressed in the 2017 report of its expert hydrologist, Anthony Brown.

*Id.* at Ex. C-1 [hereinafter Brown Report].[1] Citing Brown's 2017 report, BWR showed that polluted groundwater penetrates the GOB waste accumulated in the drainage valley, particularly sedimentation basins constructed in T1 while the mine was active, and flows into the Locust Fork as bed seepage or seeps. *Id.* ¶ 36, Doc. 52. Two of Drummond's experts agreed that the groundwater seeps identified during the investigation and described by Brown discharge directly into the Locust Fork. *Id.*

As reflected in the Brown Report at pages 12-13, 68-72, Doc. 53-6, and reiterated in his Declaration attached as Exhibit 1 to this memorandum:

> The groundwater discharges from the Site are generated primarily by water penetrating and flowing through the mine wastes (geologic overburden [GOB] wastes) piled on the surface of the Site. The groundwater discharges flow along the same pathways as the surface water discharges to the Locust Fork of the Black Warrior River in a way that is very similar to the direct surface discharges to the Locust Fork . . . . Groundwater is discharging from the Site via two principal mechanisms: (1) through and under the Lower Dam *on the shore* of the Locust Fork, and (2) through seeps along the eastern slope of the Site extending northward from the Lower Dam.[2]

Ex. 1, Brown Decl. ¶ 8 (emphasis added.)

---

[1] The Brown Report is attached as Exhibit C-1 to BWR's Memorandum of Law in Support of its Motion for Partial Summary Judgment, Doc. 52. Exhibit C-1 is located at Docs. 53-6 through 53-14.

[2] As stated in paragraph 9 of Brown's Declaration, he did not provide an estimate of the volume of polluted groundwater discharging along the eastern slope in his 2017 report, so those discharges are not addressed in this brief in applying the *Maui* test.

### III.    The *Maui* Test

The Supreme Court held in *Maui* that the CWA prohibits the unpermitted discharge of pollutants "when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*." *County of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020) (emphasis in original). The Supreme Court stated that this rule would best capture "Congress' basic aim to provide federal regulation of identifiable sources of pollutants entering navigable waters without undermining the States' longstanding regulatory authority over land and groundwater." *Id*. "[C]ontext imposes natural limits as to when a point source can properly be considered the origin of pollution that travels through groundwater" and accordingly fall under the purview of the Clean Water Act. *Id*. "Whether pollutants that arrive at navigable waters after traveling through groundwater are 'from' a point source depends upon how similar to (or different from) the particular discharge is to a direct discharge." *Id*.

The Supreme Court provided guidance as to when there might be a "functional equivalent of a direct discharge," stating:

> Where a pipe ends a few feet from navigable waters and the pipe emits pollutants that travel those few feet through groundwater (or over the beach), the permitting requirement clearly applies. If the pipe ends 50 miles from navigable waters and the pipe emits pollutants that travel with groundwater, mix with much other material, and end up in navigable waters only many years later, the permitting requirements likely do not apply.

6

*Id*. at 1476.

The Supreme Court also specified seven non-exclusive factors that "may prove relevant (depending upon the circumstances of a particular case)" to determining whether a discharge is "the functional equivalent of a direct discharge:"

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id*. at 1476-77. "Time and distance will be the most important factors in most cases, but not necessarily every case." *Maui*, 140 S. Ct. at 1477.

On remand, in the first order of a federal district court to apply the *Maui* test and reach the merits, the *Maui* district court ruled that the defendant violated the CWA by failing to obtain a discharge permit for the discharges of its wastewater treatment plant to the Pacific Ocean via groundwater. *Hawai'i Wildlife Fund v. County of Maui*, No. 12-00198 SOM/KJM, 2021 WL 3160428, at *1 (D. Haw. July 26, 2021).

That court ruled that the discharges were the functional equivalent of direct discharges when: (1) studies established that the pollutants travel from the point source to the navigable water in 84 days at the fastest and at an average of 14 to 16

months; (2) the pollutants traveled a distance ranging from a minimum of about 0.3 miles to a maximum of about 1.5 miles; (3) the pollutants mixed with cleaner groundwater and flowed through rocks and other substances (this factor favored the Defendant); (4) significant changes in the wastewater (nitrogen removal) occurred during its passage to navigable waters (also favoring a determination of no violation); (5) 100% of the facility's polluted discharge ultimately arrived in the navigable water; (6) the manner by or area in which the pollutant enters the navigable water was unclear (and the court added no weight from it); (7) the wastewater changed in characteristics but was not devoid of pollutants when it reaches the navigable water; (8) the design and performance of the facility did not affect the court's balancing of factors; (9) even considering just the monitored seeps, from which 2% of tracer dye appeared, the discharges equaled "about 28,000 gallons a day . . . a raw volume so high that it is difficult to image why it should be allowed to continue without a NPDES permit"; and (10) the impacts of the pollution on the ecosystem were concerning but unclear (so the court added no weight from it). *Id*. at *12-17.

## IV.    Groundwater Discharges from the Maxine GOB Pile are the "Functional Equivalent" of Direct Discharges

### a.  Time and Distance Factors

"Time and distance will be the most important factors in most cases, but not necessarily every case." *Maui*, 140 S. Ct. at 1477. The Brown Report, the Brown

Declaration attached as Exhibit 1 to this brief (which highlights portions of the

Brown Report pertinent to the *Maui* test) and other evidence submitted in support

of BWR's Motion for Partial Summary Judgment, demonstrate that the time and

distance factors weigh heavily in favor of finding "the functional equivalent of a

direct discharge" at the Maxine site as the discharges are equivalent to the "few

feet from navigable waters" example the Supreme Court gave in which the Clean

Water Act "clearly applies." *See generally* Brown Report at 12-13, 68-72, Doc. 53-

6; Ex. 1, Brown Decl. ¶¶ 12-19.

Specifically, Exhibit EE to BWR's summary judgment brief, Doc. 55-19 at 2

(attached here for the Court's convenience as Exhibit 2), is a photograph taken

from the river showing a close up view of the lower dam and spillway (point

source) and its extremely close proximity to the Locust Fork. In fact, the small

trees growing out of the top of the dam are casting a shadow on the river. Another

photograph attached as Figure 17 to the Brown Report, Doc. 53-9 at 2 (attached

hereto as Exhibit 3), shows a similar view and the location of the lower dam

relative to the water's edge. Exhibit FF, Doc. 55-20 at 2 (attached hereto as Exhibit

4), is another view of the spillway with active discharge occurring that again

demonstrates that the dam is on the shoreline of the river, mere feet from the

navigable water. Attachment 6 to Brown's Declaration (attached hereto as Exhibit

1) is a photograph which shows sampling at seeps along the shoreline in 2017, with

the lower dam and the spillway in the background in close proximity. Exhibit Y, Doc. 55-13 at 3 (attached hereto as Exhibit 5), is an aerial photograph which gives a different perspective and demonstrates the location of the lower dam and spillway immediately adjacent to the Locust Fork. Finally, Attachment 4 to the Brown Declaration (which was also Figure 3 to the 2017 Brown Report, Doc. 53-6 at 105) is an aerial photograph which shows the extent of the GOB pile and the location of the lower dam at the confluence of Tributary 1 and the Locust Fork. These photographs present powerful visual evidence of the very short distance between the point source and the navigable receiving water and easily satisfy the *Maui* distance factor.

The Brown Report and Declaration also show that the distance the pollutants travel after leaving the point source is extremely short. The Report describes the site as "adjacent" to the Locust Fork and "on the west side of a ridge that defines the north and west banks of a sharp meander in the Locust Fork." Brown Report at 16, Doc. 53-6. Elsewhere, the Report describes the eastern side of the GOB Pile as sitting "immediately above the west bank of the Locust Fork." *Id.* at 19. The Report states that "Gob has been placed in a GOB pile on a bluff that forms the westerly bank of the Locust Fork. *Id.* at 37.

In his Declaration, Brown again explains: "The Lower Dam is located at the confluence of the former Tributary 1 and the Locust Fork, and forms part of the

westerly bank of the Locust Fork (see **Attachment 3** [Brown, 2017, Figure 29]).”
Ex. 1, Brown Decl. ¶ 10. Thus, the point source from which the discharges
originate is part of the bank of the river into which the contaminated groundwater
discharges. Brown estimates that the contaminated groundwater discharges to the
Locust Fork via seeps over a distance of only 10 to 30 feet; and approximately 30
to 100 feet to the Locust Ford as bed seepage. *Id.* ¶ 16.

The time that it takes the pollutants to make the journey to the Locust Fork is
also much shorter than the “many years later” scenario mentioned by *Maui* as
likely to be beyond the scope of the CWA’s permitting requirements. 140 S. Ct. at
1476. As Brown’s Declaration demonstrates, based upon calculations tied to
specific site conditions such as slope and the porosity of the material, the time the
polluted groundwater travels from the GOB pile to the Locust Fork through seeps
along the bank is approximately 1.5 to 4.4 days, while the travel time for polluted
groundwater to enter the Locust Fork beneath the dam as bed seepage is
approximately 4.4 to 14.6 days. Ex. 1, Brown Decl. ¶ 16.

The Brown Report further establishes that the GOB pile constitutes a “very
large source for . . . polluted groundwater discharge.” Brown Report at 7, Doc. 53-
6. The Report concludes that 2.48 million cubic yards of GOB waste remains in the
GOB pile, with 60,000 cubic yards of that amount having deposited into sediment
basins through which the groundwater plume flows. *Id.* at 13-14. Rain falls on the

GOB pile, and as it infiltrates into the pile, pollutants from the GOB waste dissolve into the water, creating the AMD that is carried by polluted surface runoff and groundwater to the Locust Fork. *Id.* at 12. This AMD passes through and under the Lower Dam and discharges as 1) seeps on the shore of the Locust Fork and 2) groundwater that passes through GOB waste sediments on the bed of the Locust Fork. *Id.* at 13. Again, the distance is only 10-30 feet for the first flow path and 30-100 feet for the second. Ex. 1, Brown Decl. ¶ 16.

In contrast, the pollutants in *Maui* traveled from their point source (the treatment plant) through groundwater to a navigable water at least a half mile away, or, where the groundwater didn't move in a straight line, it may have traveled a total distance that "does not exceed 1.5 miles." *Maui*, 2021 WL 3160428, at *4, *13. The *Maui* district court ruled that this distance "falls between the two examples set forth by the Supreme Court. The [point sources] are neither located just a few feet from the ocean nor 50 miles from the shore." *Id.* at *12. The first detection of discharges happened after 84 days, the average travel time was 14 to 16 months, and 90% of the pollutants had entered the navigable water by 600 days. *Id.* at *6, *12-13. The Court ruled that this factor weighed in favor of finding that the discharges constituted "the functional equivalent of a direct discharge," as "it makes sense to assume that the Supreme Court expected the parties to be dealing with transport time measured in months." *Id.* at *12.

In sum, the circumstances here are much more compelling than in *Maui* and match the Supreme Court's example of a pollution discharge just feet away from the navigable water, a situation to which the Clean Water Act "clearly applies." *Maui*, 140 S. Ct. at 1476. Further, as in the *Maui* district court decision, this issue is ripe for resolution on the evidence before the Court because a trial would not meaningfully change the factual record or the analysis. *Maui*, 2021 WL 3160428, at *13, *14. BWR's summary judgment submission, along with the Brown Report and Declaration, demonstrate that the time and distance factors are very close to the Supreme Court's example in which the Clean Water Act "clearly applies," and trial would not change the fact that the GOB pile is functionally a "discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14), like a pipe, discharging pollutants, above and below the surface, just feet away from the Locust Fork.

### b. Other Enumerated Factors

As discussed above, the Supreme Court in *Maui* concluded that time and distance would be "the most important factors in most cases, but not necessarily every case." 140 S. Ct. at 1467. The other non-exclusive factors the *Maui* Supreme Court enumerated are addressed individually below. The Brown Report and Declaration demonstrate that each of these factors favors a determination that the groundwater discharges in this case constitute "the functional equivalent of a direct discharge."

1. *The Nature of the Material Through Which the Pollutant Travels*

The material through which the AMD travels at the Maxine site is the GOB waste pile. As Brown explains, "[t]he GOB waste is permeable and highly porous. Based on the observed grain-size of the GOB waste sediments . . . , the hydraulic conductivity (K) of the eroded and settled mine waste is estimated to be about 500 gallons per day per square foot, which is equal to 66.8 feet per day." Ex. 1, Brown Decl. ¶ 21. Because of its highly permeable nature, the material allows infiltration of rainwater and flow of groundwater. *Id.* ¶ 22. Further, "[i]t is the geochemical nature of the GOB waste that allows the polluted groundwater to form"; that is, when water comes into contact with the GOB waste it "acidifies and becomes AMD." *Id.* ¶ 23. Thus, it is the GOB waste that interacts with water to create AMD and make the contamination worse.

This GOB waste is "'extremely acid with pH levels ranging from 3.6 to 2.3,'" and high levels of metals. Brown Report at 31, Doc. 53-6. Groundwater seeps observed and measured at the base of the lower dam pass through and are contaminated by exposure to GOB pile, which is the point source. *See id.* at 40 (describing flow from seeps at the base of the lower dam, made up of GOB waste). At a site visit documented in the Brown Report, "groundwater-supported flow was observed in gullies and the central channel (#1) that flow over GOB waste rather than native sediments/bedrock," where metals in the GOB waste dissolve directly

into the groundwater flowing through. *Id.* at 69. Sampling results indicate that "the neutralizing capacity of the GOB has been consumed." *Id.* at 50. Accordingly, much of the material through which the pollutants travel is *both* the point source and the cause the pollution.  *See* Ex. 1, Brown Decl. ¶ 23 ("It is the geochemical nature of the GOB waste that allows the polluted groundwater to form."). Therefore, this factor should weigh very heavily in favor of a finding that the discharge is "the functional equivalent of a direct discharge."

2. *The Extent to Which the Pollutant is Diluted or Chemically Changed as it Travels*

As water flows through the GOB waste pile, it is exposed to GOB and becomes polluted AMD. Thus, the groundwater continues to be polluted along the entire discharge flow path, all the way to the bank of the river. Extensive sampling of the Maxine site at multiple locations, from the upper part of the site to the lower parts in the "seepage zone," reveals the same basic chemical characteristics and AMD contamination, demonstrating that the pollutants are not diluted or chemically changed as they travel through groundwater across the site. Brown Report at 58-62, Doc. 53-6; Ex. 1, Brown Decl. ¶¶ 25-27.

In contrast, the wastewater at issue in *Maui* was diluted by fresh groundwater and other mitigating processes in its long journey to navigable waters. *Maui*, 2021 WL 3160428, at *14-15. Here, because the pollutants travel via groundwater through GOB waste that creates AMD, the pollutants are not diluted

15

but rather become *more* contaminated. This fact makes the case for a direct discharge much easier than in *Maui*, where the treated wastewater traveled up to 1.5 miles through groundwater and volcanic rock, materials that diluted and altered the wastewater to some degree.

3. *The Amount of Pollutant Entering the Navigable Waters Relative to the Amount of Pollutant that Leaves the Point Source*

As to the amount of pollutants entering the Locust Fork, Brown calculates, using Darcy's Law, that the volume of contaminated groundwater discharged to the Locust Fork from the site is approximately 49,500 gallons per day, and "one hundred percent of the groundwater at the Site flows into the Locust Fork,"[3] with approximately 10 gallons per minute discharging at seeps and 24 gallons per minute discharging as bed seepage. Ex. 1, Brown Decl. ¶¶ 30-31.  The quantity of the discharges at the lower dam to the Locust Fork account for greater than 50% of the total volume of groundwater discharging from the site.  Ex. 1, Brown Decl. ¶ 32.

In *Maui,* the district court ruled that an estimated 28,000 gallons per day of discharge of treated wastewater at seeps constitutes a "raw volume *so high that it is*

---

[3] The Brown Report states that, "[g]iven the [site's] hydrologic system, it is evident that *all runoff at the GOB Pile* either discharges directly to the Locust Fork (east), Sedimentation Basins (south), or central channel (#1) (west). The surface water from the west and south either flows to the Locust Fork, or percolates to groundwater at the Sedimentation Basins, and this groundwater then discharges at bank seeps or as bed-seepage to the Locust Fork." Brown Report at 41, Doc. 53-6 (emphasis added).

*difficult to imagine why it should be allowed to continue without a NPDES permit* just because the other 98 percent of wastewater from the wells has not been precisely tracked." *Maui*, 2021 WL 3160428, at *17 (emphasis added). The Court should judge roughly twice that volume being discharged at Maxine, to be "so large that it weighs in favor of requiring a NPDES permit," *id.,* and additional site remediation.

Further, Brown's analysis indicates that there is no change in composition of the discharges at the point of discharge.  He states that the "Site-wide acidification and AMD . . . are all generally within the same range of concentrations and pH values at any location on the Site, including points of discharge into the Locust Fork." Ex. 1, Brown Decl. ¶ 33. Even more specifically, "[t]he GOB material does not attenuate the concentrations of pollutants in the groundwater at the points of discharge." *Id.* ¶ 34.

In contrast, the *Maui* plaintiffs were able to establish by tracer dye tests that only 2% of the pollutants discharged from the facility reached the seeps into the Pacific Ocean, yet the court found that proof more than sufficient when the experts agreed that all of the wastewater eventually reached the ocean in some form or fashion. *Maui*, 2021 WL 3160428, at *17. Accordingly, since all of the pollutants contained in groundwater leaving the Maxine GOB pile (the point source) enter the Locust Fork, and more than half of those pollutants enter at the lower dam, this

factor should weigh strongly in favor of the Court finding that the discharges are "the functional equivalent of a direct discharge."

   4.  *The Manner by or Area in Which the Pollutant Enters the Navigable Water*

       As discussed above, the pollutants here enter the Locust Fork by precipitation contacting and chemically interacting with GOB waste and creating AMD, then discharging to the river. Clear evidence (groundwater samples taken adjacent to the Locust Fork and at seeps and a geophysical survey) demonstrates that the groundwater is contaminated, that it is migrating to the river in a plume following the slope of the drainage valley, and that the pollutants are entering the river through and under the lower dam. Ex. 1, Brown Decl. ¶¶ 35-37. The discharge pathways through and under the lower dam into the Locust Fork are illustrated by Attachment 2 attached to Brown's Declaration. The manner in which the AMD enters the river is very similar to the Supreme Court's example of a pipe that "ends a few feet from navigable waters and the pipe emits pollutants that travel those few feet through groundwater," in which the CWA "clearly applies" because the discharge is the functional equivalent of a direct discharge. *Maui*, 140 S. Ct. at 1476.

   5.  *The Degree to Which the Pollution (at that Point) has Maintained its Specific Identity*

       As discussed above, the AMD discharging through groundwater at the Maxine site is not susceptible to change or mitigation of its contaminated qualities.

18

Measures for pH and contaminants, including in the river downstream of the "seepage zone," exceed water quality standards, indicating that the pollutants maintain their specific identity as extremely low-pH acid mine drainage throughout its travel through groundwater. Brown Report at 44, Doc. 53-6. Accordingly, this factor also argues in favor of a finding by the Court that the discharges are "the functional equivalent of a direct discharge."

## V.     Conclusion

Application of the *Maui* decision and the factors identified by the Supreme Court to the facts established by BWR's Motion for Partial Summary Judgment and supporting memorandum of law and exhibits, as well as Brown's Declaration and attachments, clearly demonstrates that the polluted groundwater discharges at the Maxine site violate the Clean Water Act.

Respectfully submitted this the 9th day of August, 2021.

**s/Barry Brock**
Barry Brock (ASB-9137-B61B)
Christina Andreen Tidwell (ASB-9696-D10R)
Southern Environmental Law Center
2829 Second Avenue S., Ste. 282
Birmingham, AL 35233
tel: (205) 745-3060
fax: (205) 745-3064
bbrock@selcal.org
ctidwell@selcal.org

Hutton Brown (*admitted pro hac vice*)
Southern Environmental Law Center
Ten 10th Street NW #1050
Atlanta, GA 30309
tel: (404) 521-9900
fax: (404) 521-9909
hbrown@selcga.org

Eva L. Dillard (ASB-4118-A59E)
Black Warrior Riverkeeper, Inc.
710 37th Street South
Birmingham, AL 35222-3206
tel: (205) 458-0095
fax: (205) 458-0094
edillard@blackwarriorriver.org

James Hecker (*admitted pro hac vice*)
Public Justice
1620 L Street NW, Ste. 630
Washington, DC 20006
tel: (202) 797-8600
fax: (202) 232-7203
jhecker@publicjustice.net

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2021, the foregoing Plaintiff Black Warrior Riverkeeper's Supplemental Memorandum of Law on the *Maui* Test and Groundwater Discharge Claims was filed with the Clerk of Court using the CM/ECF system which will send notifications of such filing and service copies to the following:

William A. Davis, III
Richard E. Davis
Alfred H. Perkins, Jr.
H. Thomas Wells, III
Starnes Davis Florie, LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
tel: (205) 868-6000
fax: (205) 868-6099
RDavis@starneslaw.com
TDavis@starneslaw.com
APerkins@starneslaw.com
TWells@starneslaw.com
*Attorneys for Defendant*

**s/Barry Brock**
Of Counsel