FILED

2021 Oct-12  PM 05:00
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 2:16-cv-01443-AKK** |
| **v.** | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF BLACK WARRIOR RIVERKEEPER'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT ON GROUNDWATER DISCHARGE CLAIMS

## Introduction

In its Opposition Brief, Doc. 112, Defendant Drummond Company ("Drummond") mostly ignores Plaintiff Black Warrior Riverkeeper's ("BWR") factually-supported arguments addressing the *Maui* factors,[1] provides no factual or expert evidence to rebut BWR's evidence, and dwells on baseless arguments about its new definitions of groundwater and seeps, and the presence of groundwater on the site, which has already been adjudicated. But Drummond "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must show by competent evidence that there is a *genuine* issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This it has failed to do.

## I.      Groundwater Definition and Substantial Evidence of Violations

Drummond now argues that the water in the GOB pile is not "groundwater" because it is not below the surface of the earth. But this water *is* below the surface because the surface was altered when tons of mine waste were piled on top of it. Courts have broadly defined groundwater as "water found underground in spaces or pores between soil particles or rock," *Sierra Club v. Va. Elec. & Power Co.*, No. 2:15-cv-112, 2017 WL 1095039, at *2 (E.D. Va. 2017), *aff'd in part, rev'd in part on other grounds*, 903 F.3d 403 (4th Cir. 2018), and as "water . . . below the surface

---

[1] *County of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1476–77 (2020).

of the earth," *Tenn. Clean Water Network v. Tenn. Valley Auth.*, No. 3:15-cv-00424, 2017 WL 3476069, at *2 (M.D. Tenn. 2017), *rev'd on other grounds*, 905 F.3d 436 (6th Cir. 2018). The only hydrologist who has testified in this case, Anthony Brown, says the water below the surface of the pile satisfies those definitions and is groundwater. Doc. 53-6 at 30.

Drummond never contended in its prior summary judgment briefing, Docs. 48–49, 58–59, 69, that the water at issue is not groundwater, and this argument is too late and wrong.[2] This Court's Summary Judgment Order states: "Surface water also percolates into sediment in the basins and *flows as groundwater*, where it discharges to the Locust Fork via groundwater seeps." Doc. 93 at 13 (citing Brown Report, Doc. 53-6 at 74, 78) (emphasis added). This Court has correctly determined that the seeps are groundwater seeps, and that issue is therefore decided. *Id.* at 37.

Drummond's new argument is disingenuous and directly conflicts with its own filings. In support of its recent motion to continue the trial, Drummond filed declarations by its Vice President David Muncher and consultant Jim Gusek. Docs. 108-1 and 108-2. Muncher described groundwater monitoring work and installation of 24 monitoring wells and 6 "sumps" to assess sub-surface water quality in the

---

[2] In its prior briefing, Drummond argued that the *groundwater* data does not indicate a "robust groundwater flow regime" without defining "robust" or explaining how this negates the presence of contaminated groundwater and its discharge from the waste pile. Doc. 59 ¶ 36. Drummond previously attempted to rely on an untimely disclosure from its expert, Bruce Wielinga (who is not a hydrologist), to refute the evidence of discharges of polluted groundwater, but the Court struck his testimony, Doc. 92, leaving Drummond with no rebuttal evidence.

waste pile. Doc. 108-2 ¶ 5. Gusek described use of monitoring wells and moisture content probes in the waste pile to measure groundwater levels and saturation. Doc. 108-1 ¶ 8. Gusek said Drummond will "collect and analyze the water level and chemistry data from the new monitoring wells." *Id.* ¶ 16. Gusek explained that the investigation has identified 6 groundwater seeps in the pile. *Id.* ¶ 11. Gusek also described the remedial efforts as including "Groundwater diversion in the Sediment Basin area . . . ." *Id.* ¶ 12.[3] This testimony simply cannot be squared with Drummond's argument that the water in the pile is not groundwater.[4]

Historical evidence also strongly refutes Drummond's arguments. PELA told Drummond's predecessor ABC in writing that the "tributary to the Locust Fork" was "acting as a catchment area for recharge to a perched ground water reservoir system," and moving "as an underground component of flow" to the point of discharge at the river. Doc. 54-13 at 1. Drummond putative expert Lois George

---

[3] Consistent with the specific statements in the declarations, Drummond provided a work plan to BWR in 2020 detailing a groundwater characterization program including wells to analyze groundwater chemistry in the waste pile, and a report stating the groundwater wells referred to in the declarations were installed in April 2020, with a summary of groundwater sampling data from those wells showing presence of contaminated groundwater in the waste pile.

[4] Drummond's experts confirm that the sub-surface flow supporting the seeps is groundwater. PELA drilled wells into the waste pile to "define occurrence of groundwater and groundwater quality." Doc. 54-16 at 20; Doc. 54-17 at 15–17. PELA's report is replete with references to *groundwater* flow and quality and includes *groundwater* monitoring data, showing contamination with AMD. Doc. 54-16 at 34–38; Doc. 54-17 at 2–4. PELA noted that water quality in well MO-3 improved "because of dilution of the large quantity of ground water moving through the valley." Doc. 54-17 at 11–12. PELA's Lois George, who participated in the water quality study, has been proffered as an expert for Drummond in this case.

testified that the placement of the waste material created an aquifer[5] in the "hollow" (the Tributary 1 drainage area). Doc. 52 ¶ 10; Doc. 54-14 at 20–21.[6] A later PELA letter confirmed that "[a] perched aquifer system has been created above the existing ground-water system . . . by the placement of washer rock . . ."; that the material filling the area "provide[s] the avenue for the accumulation, storage and movement of ground water . . ."; and that the groundwater movement "conforms to the slope of the original valley, toward the southeast," culminating in a discharge via "springs" "from the lower pond to the river." Doc. 55-10 at 2–3.

The site's dynamics have not changed since PELA investigated the site. The waste material is in the same place. The propensity of the wastes to generate acid mine drainage (AMD) is the same. The topography, slope and flow paths are the same. The groundwater AMD contamination detected by PELA in its 1984 study is still present in sampling results in 2020.[7]

From pages 3-13, Drummond's Brief makes many assertions, but there is not

---

[5] The aquifer extended from the lower dam to slightly above the upper dam. Doc. 54-14 at 36.

[6] In a declaration filed after her deposition, George tried to explain away the groundwater aquifer saying that well testing later revealed that the groundwater aquifer system was not present at *all* well locations. Doc. 59 ¶ 10. Even so, this does not rebut the fact that contaminated groundwater in the pile was detected by PELA at many locations.

[7] As George testified in 2018, regarding percolation of rain water into the waste pile as groundwater, "the material is still there so . . . the lower part of the valley is much as it was." Doc. 54-14 at 36.

a single citation to rebuttal evidence from any of Drummond's experts.[8] The "argument" consists primarily of counsel's criticisms of Brown's disclosures, but counsel's musings are not competent rebuttal evidence. *See Matsushita*, 475 U.S. at 586.[9] *See Sun v. Girardot*, 237 F. App'x. 415, 417 (11th Cir. 2007) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment."); *S.E.C. v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014) ("Speculation or conjecture cannot create a genuine issue of material fact . . . .").

Drummond bemoans a supposed lack of "data" while citing the data supporting Brown's opinions, and ignoring the fact that this Court relied on similar surface water data, from the same 2017 site investigation, in finding Drummond liable for unpermitted surface water discharges. Doc. 93 at 17–19. The data is clear—it shows the presence of AMD-contaminated groundwater moving in a plume to seeps discharging along the shoreline into the Locust Fork. Brown based his opinion that contaminated groundwater is discharging to the Locust Fork on multiple lines of evidence: subsurface sampling data, sampling of groundwater where it

---

[8] Drummond contends that Brown's 2017 report is "directly opposed" by the reports of AMEC Foster Wheeler and CH2M, Doc. 112 at 6–7, but it cites nothing from either report that rebuts any fact or opinion by Brown pertinent to this motion. The cited reports barely mention groundwater. At most, the AMEC report refers to alleged issues with ERT testing, generally, but it never directly refutes Brown's interpretations or conclusions about the data.

[9] For example, Drummond asserts that Brown needed hydraulic head data to calculate flow in support of his opinions, Doc. 112 at 11, but Drummond offers no scientific evidence to support the assertion.

emerges as seeps, subsurface electromagnetic testing and imaging showing groundwater presence, contamination and flow, as well as his own personal observation of the site topography, his training and familiarity with principles of hydrology, and the composition of the mine waste materials.[10] All of this is scientifically sound and has not been rebutted. [11]

Addressing the calculations in Brown's 2021 declaration on the *Maui* factors, Drummond offers a boilerplate trope that the calculations (which speak for themselves) "are all based on insufficient actual data and are speculative assertions . . . ." This is not rebuttal evidence. Drummond had more than seven months after the Court ordered supplemental briefing to obtain calculations of the time and distance factors and it failed to do so. It cannot now successfully rely upon counsel's overheated prose to rebut scientific evidence.[12]

Drummond argues repeatedly that surface seeps supported by groundwater cannot be illegal discharges because they are not "groundwater as groundwater." Doc. 112 at 7, 21, 22–23, 25. Drummond insists that Clean Water Act (CWA) jurisdiction does not attach under *Maui* unless a discharge occurs visibly and directly

---

[10] Brown came to the same conclusion after his initial site visit that PELA did after visiting the site for a day. Doc. 54-13. The groundwater issues are not as complex as Drummond portrays, particularly to a trained hydrologist.

[11] For its groundwater claims, BWR is not relying on any of the testimony of Nelson Brooke, Barry Sulkin, or Gordon Johnson cited by Drummond. Doc. 112 at 13.

[12] In its Motion to Strike the Brown Declaration, Drummond relies heavily on the *Maui* factors rather than addressing the factors on the merits, Doc. 113, but as shown in BWR's Opposition to that Motion, filed with this Reply, the 2021 Declaration is timely and proper.

into a jurisdictional water from a source below the surface.[13] Drummond fundamentally misconstrues the *Maui* ruling. The functional equivalent test pertains to pollutants which "*arrive* at navigable waters after traveling through groundwater," and whether such discharges are from a point source in a manner similar to a direct discharge. *Maui*, 140 S. Ct. at 1476 (emphasis added). There is no requirement that the pollutants remain in the groundwater to the point of discharge if they are *conveyed* by groundwater, reach jurisdictional waters, and meet the test for functional equivalency. Nothing in *Maui* indicates that a discharge of pollutants via a surface seep, conveyed by groundwater to the seep, would not meet the test. The *Maui* Court gave the example of a point source which ends a few feet from navigable waters and "emits pollutants that travel through groundwater (or over the beach)" as a case where the CWA would clearly apply. *Id*. That example describes the discharges at Maxine where pollutants are being transported by groundwater to seeps discharging along the river shoreline.

## II.   The Groundwater Discharges are the "Functional Equivalent" of Direct Discharges Under the *Maui* Test.

When it finally reaches its discussion of the *Maui case,* Drummond mainly criticizes the Supreme Court's decision rather than pointing out evidence that would

---

[13] Drummond cites Maggie Weems' testimony that she does not consider the seeps (which are obviously visible and are on the surface) to be groundwater. Doc 112 at 8. The relevant question is not whether surface seeps are groundwater, but whether the seeps are point source discharges *supported* by groundwater flow and are discharging pollutants to jurisdictional surface waters in a manner similar enough to a direct discharge.

support its position. Despite that criticism, this Court is bound by *Maui* and must apply the seven factors listed in that decision.

Drummond's claim that BWR has presented "no evidence" relevant to the *Maui* groundwater test, Doc. 112 at 18, is demonstrably untrue. BWR briefed the seven *Maui* factors thoroughly, supported by a supplemental expert declaration directly addressing each factor, Doc. 106-1, based on pertinent <u>record evidence</u>. Once BWR came forward with probative evidence on each *Maui* factor, Drummond was required to present competent <u>evidence</u> in response, but its Brief does not contain a single sentence pointing to evidence that contradicts BWR's showing on the *Maui* factors. At best, Drummond argues that certain testing techniques used in *Maui* were not used at Maxine—but they were not necessary at Maxine and are not required to satisfy the *Maui* factors.[14]

To establish a groundwater to surface water connection, *Maui* does not require direct observations of visible subsurface groundwater flow into a river or dye test measurements of such a flow. Experienced hydrologists like Brown can make reliable inferences and conclusions based on their informed observations. "[N]o one denies that an expert might draw a conclusion from a set of observations based on

---

[14] Tracer analysis is unnecessary because water quality sampling shows that the GOB waste correlates chemically with the pollution in the groundwater flows so that Brown had no difficulty concluding that the groundwater discharges, which travel only a few feet from the point source, come from the GOB pile.

extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Id*. at 148 (citation omitted). Drummond does not question Brown's qualifications, the reliability of his methodology, or the accuracy of his hydrological data; it only argues in conclusory fashion that Brown's data are insufficient to form his opinions. But since courts are not equipped "to determine precisely which facts . . . are essential to the validity of the opinion reached," a party must offer a contrary expert opinion to question factual sufficiency, which Drummond has failed to do. *Centex-Rooney Const. Co., Inc. v. Martin Cty.*, 706 So. 2d 20, 27–28 (Fla. Dist. Ct. App. 1997) (quoting *Quinn v. Millard*, 358 So.2d 1378, 1382 (Fla. Dist. Ct. App. 1978)).

Drummond cites several post-*Maui* cases which it concedes have no precedential value in this case, seeming to imply that the Court should not apply *Maui. See* Doc. 112 at 20–21. But the Court must apply *Maui* and doing so is easy here. Few cases decided under *Maui* will so clearly satisfy the functional equivalency test. A mountain of highly permeable waste sits feet from a river so that rainfall courses through it to the sub-surface and then continues its short, quick path

downhill to the river while collecting additional GOB pollutants all along the way.[15]

Drummond suggests that it should not be liable for unpermitted discharges having no more than a *de minimis* impact on the receiving water. Doc. 112 at 22. This defense is completely unrelated to the *Maui* groundwater issue and has been continually rejected by the courts. The CWA states that "the discharge of <u>any</u> pollutant by any person" without an appropriate permit "shall be unlawful." 33 U.S.C. 1311(a). The cases have also rejected a *de minimis* exception. *See, e.g., Conn. Fund for the Env't v. Stewart-Warner Corp.*, 631 F. Supp. 1286, 1288 (D. Conn. 1986) (a violation is a violation no matter how statistically insignificant); *NRDC v. Outboard Marine Corp.*, 692 F. Supp. 801, 815 (N.D. Ill. 1988) (there is no statutory exemption for *de minimis* or "rare" violations).[16]

Based on the above, and Doc. 106 and supporting exhibits, Drummond failed to rebut BWR's prima facie case of liability under the CWA for illegal discharges supported and conveyed by groundwater, which are the functional equivalent of direct discharges and CWA violations under the *Maui* standard.

---

[15] Drummond argues that even if BWR meets the *Maui* test here, "such evidence is insufficient to support a judgment." Doc. 112 at 23–25. This argument is not clear but BWR assumes that Drummond means "insufficient to support a final judgment." BWR is only seeking partial summary judgment on the *Maui* issue, not a final judgment on all issues. The only issue before the Court now is whether the polluted groundwater discharges meet the *Maui* test for CWA jurisdiction.

[16] Thus, the CWA is focused upon the discharge itself, not on its impact. Consequently, to succeed on a CWA claim, "[t]here is no need to prove a defendant's discharge of pollutants into a tributary caused any deleterious effect on the navigable waters downstream." *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006).

Respectfully submitted this 12th day of October, 2021.

/s/ Barry Brock
Barry Brock (ASB-9137-B61B)
Christina Andreen Tidwell (ASB-9696-
D10R)
Southern Environmental Law Center
2829 Second Avenue S., Ste. 282
Birmingham, AL 35233
tel: (205) 745-3060
fax: (205) 745-3064
bbrock@selcal.org
ctidwell@selcal.org

Hutton Brown (*admitted pro hac vice*)
Southern Environmental Law Center
Ten 10th Street NW #1050
Atlanta, GA 30309
tel: (404) 521-9900
fax: (404) 521-9909
hbrown@selcga.org

Eva L. Dillard (ASB-4118-A59E)
Black Warrior Riverkeeper, Inc.
710 37th Street South
Birmingham, AL 35222-3206
tel: (205) 458-0095
fax: (205) 458-0094
edillard@blackwarriorriver.org

James Hecker (*admitted pro hac vice*)
Public Justice
1620 L Street NW, Ste. 630
Washington, DC 20006
tel: (202) 797-8600
fax: (202) 232-7203
jhecker@publicjustice.net

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 12th, 2021 the foregoing *Reply in Support of Plaintiff Black Warrior Riverkeeper's Renewed Motion for Summary Judgment on Groundwater Discharge Claims* was filed with the Clerk of Court using the CM/ECF system which will send notifications of such filing and service copies to the following:

William A. Davis, III
Richard E. Davis
Alfred H. Perkins, Jr.
H. Thomas Wells, III
Starnes Davis Florie, LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
tel: (205) 868-6000
fax: (205) 868-6099
RDavis@starneslaw.com
TDavis@starneslaw.com
APerkins@starneslaw.com
TWells@starneslaw.com

*Attorneys for Defendant*

/s/ Barry Brock
Of Counsel