## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | Civil Action Number |
| ) | **2:16-CV-01443-AKK** |
| **v.** ) | |
| ) | |
| **DRUMMOND COMPANY, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM OPINION AND ORDER

Pending before the court is Black Warrior River-Keeper's renewed motion for summary judgment on its groundwater CWA claims in light of the Supreme Court's decision in *Cty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462 (2020).  *See* docs. 106; 111.  Drummond Company opposes the motion, doc. 112, and BWR has filed a reply, doc. 114.  Having carefully examined the briefing and supporting materials in the record, the court finds that the motion is due to be granted.

### I.

Under the Federal Rules of Civil Procedure, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). The movant bears the initial burden of proving the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Cynergy, LLC v.*

*First Am. Title Ins. Co.*, 706 F.3d 1321, 1326 (11th Cir. 2013).  "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *Cynergy*, 706 F.3d at 1326 (quoting *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010)).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019).  A party asserting that a fact is genuinely disputed must support the assertion either by "citing to particular parts of materials in the record," including depositions, documents, or affidavits, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c).  A "mere scintilla of evidence" will not create a genuine issue of material fact.  *Hinson*, 927 F.3d at 1115 (quoting *Anderson*, 477 U.S. at 252).

At summary judgment, the court must construe the evidence and all factual inferences arising from it in a light most favorable to the nonmovant, and the court thus resolves "all reasonable doubts about the facts" in favor of the nonmovant. *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 483 F.3d 1265, 1268 (11th Cir. 2007).  Accordingly, at summary judgment, the court must not weigh the

evidence or make credibility determinations.  *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

## II.

In 2016, BWR, an Alabama nonprofit dedicated to the protection of the Black Warrior River, filed this lawsuit against Drummond under § 505 of the Clean Water Act.  Doc. 1 at 1.  BWR asserts that Drummond has engaged in "ongoing and continuous unpermitted discharges of acid mine drainage ('AMD') and/or other pollutants into the Locust Fork of the Black Warrior River and a tributary of the Locust Fork." Doc. 24 at 1.  These pollutants apparently flow from the Maxine Mine site ("the Site"), an abandoned underground mine formerly operated by Drummond. *Id.* at 2.  BWR asserts that AMD discharges occur continuously from "an enormous waste pile,[1] located on Drummond's property, on a ridge above the Locust Fork, via surface and groundwater connected to surface waters." *Id.*  BWR claims that the

---

[1] This waste pile, also referred to as the "coal processing waste disposal area," "rock disposal area," "refuse pile," and "GOB pile," was originally formed in the early 1950s by Alabama By-Products Corporation, which later merged with Drummond. *See* doc. 93 at 9–12.  As in its previous opinions and orders, the court uses the term "refuse pile" for ease of reference.

discharges flow both into the tributary, which in turn leads to the Locust Fork, and also directly into the Locust Fork. *Id.* At issue in the instant motion, Drummond apparently permits "seeps of pollution to escape from groundwater and the underground mine works" and to enter the Locust Fork. *Id.*[2]

In August 2018, Drummond moved for summary judgment, asserting a variety of defenses that included limitations, laches, compliance and release, and the doctrines of "grandfathering" and/or reliance. *See* doc. 48. BWR also moved for partial summary judgment as to Drummond's liability under the CWA and the RCRA. *See* doc. 52. After these cross-motions became ripe for review, but before the court ruled on them, Drummond filed a motion to stay pending the Supreme Court's decision in *Cty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462 (2020). *See* doc. 82 at 1–2. In support, Drummond stated that the *Maui* decision would resolve "a key issue" in this case: whether the CWA requires a permit when pollutants originate from a point source but are conveyed to navigable waters by groundwater. *Id.*

---

[2] Allegedly, Drummond also dammed the tributary to construct "a system of drainage ditches and instream sediment basins," and sediment "has completely filled the tributary which runs through the mine site, past the pile of mine waste to the Locust Fork." *Id.* at 3. BWR also pleads claims under the Resource Conservation and Recovery Act related to Drummond's past and current management of mine waste at the Site. *Id.* With respect to this RCRA claim, BWR asserts that mine waste filled a former stream, caused contamination of local surface and/or groundwaters, and threatens to cause further pollution. *Id.* The court previously denied BWR's motion for summary judgment as to these claims, which will proceed to trial. *See* doc. 93 at 65–66.

4

In May 2019, the court denied Drummond's motion for summary judgment in its entirety and granted BWR's partial motion only as to the CWA claim that Drummond was discharging AMD "from the refuse pile, ditches, channels, gullies, basins, and dams at the site into Locust Fork." Doc. 93 at 66. Regarding the groundwater CWA claims, the court noted that "whether groundwater seeps constitute point sources or are otherwise subject to regulation under the CWA" remained an open question because the Supreme Court had yet to rule on the issue. *See id.* Thus, the court denied BWR's partial motion for summary judgment "in all other respects" and granted Drummond's motion for a stay, doc. 82, pending the ruling in *Maui*. Doc. 93 at 66.

The Supreme Court decided *Maui* in April 2020, and the parties jointly moved to lift the stay thereafter. *See* doc. 98. After lifting the stay, the court ordered supplemental briefing on the application of *Maui*. *See* docs. 99; 105. BWR invited the court to treat its briefing as a renewed motion for summary judgment on its groundwater CWA claims. *See* doc. 106 at 1–2. The court accepted this invitation and ordered the parties to brief the motion. Doc. 111. BWR's renewed motion for summary judgment on its groundwater CWA claims is now ripe for review.

## III.

The court begins with the relevant statutory framework, as updated in *Maui*. To establish a CWA violation, a plaintiff must show (1) a discharge; (2) of a

5

pollutant; (3) into waters of the United States; (4) from a point source; (5) without a National Pollutant Discharge Elimination System permit. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1008 (11th Cir. 2004); *Maui*, 140 S. Ct. at 1468. Relevant here is the meaning of "from a point source." The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Prior to *Maui*, the courts of appeals had split on whether the CWA required a permit when pollutants originate from a point source but reach navigable waters via groundwater, a nonpoint source.[3] *See* 140 S. Ct. at 1468.

A.

In *Maui*, the Supreme Court held that the CWA "require[s] a permit if the addition of the pollutants through groundwater is the functional equivalent of a direct discharge from the point source into navigable waters." *Id.* In so holding, the Court rejected Maui County's "bright-line" argument that the CWA's permitting requirement did not apply to groundwater. *See id.* at 1470. The Court also rejected

---

[3] *See Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018) (finding CWA violation where groundwater carried pollutants from wells to ocean because "pollutants [were] *fairly traceable* from the point source to a navigable water") (emphasis added); *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 651 (4th Cir. 2018) (requiring "*direct hydrological connection* between ground water and navigable waters" to state groundwater CWA claim) (emphasis added); *Ky. Waterways All. v. Ky. Utils. Co.*, 905 F.3d 925, 933 (6th Cir. 2018) (finding that CWA's text "forecloses an argument that groundwater is a point source").

the environmental groups' view that the CWA required permitting where pollution was "'fairly traceable' to a point source even if it traveled long and far (through groundwater) before it reached navigable waters." *See id.* Instead, the Court struck a middle ground, recognizing "Congress' basic aim to provide federal regulation of identifiable sources of pollutants entering navigable waters without undermining the States' longstanding regulatory authority over land and groundwater." *Id.* at 1476.

The Court provided a non-exhaustive list of seven factors for courts to consider when determining whether there exists, via groundwater, "the functional equivalent of a direct discharge" of pollutants from a point source to navigable waters. *Id.* Acknowledging that "time and distance will be the most important factors in most cases," the Court provided "factors that may prove relevant":

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id.*

### B.

On remand, the District of Hawaii applied this "functional equivalent" test and found that Maui County's wastewater constituted the functional equivalent of a direct discharge of pollution into the Pacific Ocean, mandating an NPDES permit.

*Hawai'i Wildlife Fund v. Cty. of Maui*, No. 12-00198, 2021 WL 3160428, at *1 (D. Haw. July 26, 2021).  Though Maui County did not discharge polluted wastewater directly into the ocean, it "introduc[ed] the pollutants into injection wells" at a reclamation facility half a mile from the ocean. *Id.* at *1.  Once Maui County placed wastewater into these injection wells, the wastewater traveled about 200 feet underground into a "shallow groundwater aquifer" beneath the reclamation facility before mixing with groundwater and "flow[ing] horizontally and vertically into the ocean through the porous aquifer." *Id.* at *3.

Holding that this "indirect" introduction of pollutants functionally equaled a direct discharge,[4] the court underscored the factors of time and distance—that is, the time it took the wastewater to reach the ocean and the distance the wastewater had to travel to get there.  *See id.* at *12, *14.  The court cited a study in which dye placed in two wells reached the ocean in "as little as 84 days, with peak concentration of

---

[4] The court explained:

The parties . . . agree that millions of gallons of treated wastewater travel from those injection wells through groundwater, and that 100 percent of that wastewater finds its way into the ocean, although with certain components, like nitrogen, being reduced before the wastewater reaches the ocean. Monitors at a handful of small locations near the shoreline have detected less than 2 percent of the wastewater from two of the four wells. . . . While the court cannot point to the exact path of the rest of the wastewater or map every drop of that remaining 98 percent, it is likely that that remainder is entering the Pacific Ocean within a few miles at most of the LWRF. That less-than-2-percent is still an enormous amount of pollutant being put into the ocean in the functional equivalent of a direct discharge.

*Id.* at *1.

the dye occurring 9 to 10 months after placement" and an average transit time of 14 to 16 months.  *Id.* at *12.  The court noted that these wells were located "one-half mile or less from the Pacific Ocean" and that "even with diffuse flow, the wastewater likely travel[ed] a relatively short distance through groundwater."  *Id.* at *14.  These factors weighed in favor of requiring a permit.  *Id.*

The court also highlighted that "100 percent of the wastewater" was "discharged somewhere in the Pacific Ocean" and that the wastewater "maintain[ed] its specific identity as polluted water," even with less nitrogen by the time it reached the ocean.  *Id.* at *15.  These factors also weighed in favor of requiring a permit.  *See id.*  On the other hand, the court found that the wastewater mixed with other waters, flowed through rocks, and possibly became diluted, which weighed against requiring a permit.  *Id.*  The court acknowledged that "the precise manner by which all of the wastewater enter[ed] the ocean [was] unclear" but that this "may not add much to the other factors in the circumstances of this case" and therefore gave no additional weight to this factor in its analysis.  *Id.*  Balancing the seven *Maui* factors "as well as the additional volume factor that [the] court added," the court granted Hawai'i Wildlife Fund's motion for summary judgment on its CWA claim.  *Id.* at *18.

## IV.

In this case, the parties do not contest that the Locust Fork constitutes waters of the United States and that Drummond has not had an NPDES permit since at least

9

1993.  *See* doc. 93 at 15 (citing docs. 50-4 at 91; 27 at ¶ 23; 53-2 at 8; 59 at 3).  In addition, the court previously determined that AMD, a pollutant, has been discharged into the Locust Fork from point sources that include the refuse pile and the ditches, channels, gullies, basins, and dams that form the drainage system at the Site.  *See id.* at 20, 33–35.  Thus, the only remaining issue as to BWR's groundwater CWA claims is whether the groundwater discharges qualify as the functional equivalent of a direct discharge of AMD into the Locust Fork.  *See Parker*, 386 F.3d at 1008; *Maui*, 140 S. Ct. at 1468.  *See also* doc. 93 at 36.

With the benefit of the *Maui* case, BWR contends that its expert reports and data demonstrate that the AMD-contaminated groundwater flowing into the Locust Fork constitutes the functional equivalent of a direct discharge of pollutants.  *See* doc. 106 at 19.  Drummond proffers two rebuttals.  First, as a threshold matter, Drummond reiterates that the court should not consider BWR expert Anthony Brown's 2021 declaration, appended to BWR's renewed motion, because the declaration is untimely, inadmissible, speculative, and irrelevant.  *See* docs. 112 at 6–7, 9–11; 113.  Second, and more substantively, Drummond asserts that genuine issues of fact remain as to whether the groundwater constitutes the "functional equivalent of a direct discharge of pollutants from a point source" and, if yes, whether this is "sufficient to support a judgment."  *See id.* at 16.

The court has considered and rejected Drummond's first argument, finding that Drummond fails to adequately establish which statements, if any, in Brown's declaration warrant exclusion. *See* doc. 121. Thus, the disposition of BWR's summary judgment motion boils down to whether a reasonable jury could return a verdict for Drummond on BWR's groundwater CWA claims. *See Anderson*, 477 U.S. at 248. The court first walks through BWR's argument that no genuine issues of material fact remain as to its groundwater CWA claims. Concluding that BWR affirmatively makes its case for summary judgment, the court then turns to Drummond's rebuttals.

A.

BWR cites Brown's 2017 report and his related 2021 declaration as evidence demonstrating that the groundwater constitutes the functional equivalent of a direct discharge under the *Maui* factors. *See* docs. 106; 106-1.

1.

In his 2017 report, Brown noted the presence of pollutants in groundwater that discharged into the Locust Fork, explaining that "toxic pollutants" discharged to the Locust Fork via surface runoff or polluted groundwater and that these pollutants "have been detected in samples of the surface water and in groundwater seeps that discharge to the Locust Fork below the lower dam." Doc. 53-6 at 19 (internal citations omitted). Brown also described how groundwater seeps carry AMD into

the Locust Fork through the east side of the refuse pile as the polluted groundwater flows into surface water in the sediment basins and enters the Locust Fork as "bed-seepage or at near-shore seeps." *See* doc. 53-6 at 48, 50–51, 70–71.[5] *See also id.* at 13.[6]  As with the samples taken from the refuse pile and the surface water, Brown apparently detected "high iron and sulfate concentrations" in the groundwater samples and noted that "total Alkalinity, [total dissolved solids], Acidity, and Sulfate levels are at least ten times higher (TDS, acidity, sulfate) and ten times lower (alkalinity) in groundwater samples taken at the Site than in samples taken from the Locust Fork or locations not receiving runoff from the GOB Pile." *Id.* at 71.

In his 2021 declaration appended to BWR's motion, Brown focuses on the discharge of polluted groundwater at the lower dam and revisits data and observations from his 2017 report to analyze the groundwater under the *Maui* factors.  Doc. 106-1 at 4.  Because he previously observed "polluted" groundwater

---

[5] Brown explained that "a groundwater plume with elevated concentrations of [chemicals of concern] and [total dissolved solids] was evident in the surface EM31 data and land-based [electric resistance tomography] data" and that polluted groundwater "is present in the underlying bedrock and infill GOB waste" and in the "infilled sediments." Doc. 53-6 at 70.  He described a "plume with high TDS concentrations discharging to the Locust Fork . . . immediately below and above the lower dam" and stated that he observed "discharge at seeps" during site inspections and field investigations. *Id.* "Using Darcy's equation and parameter estimates for hydraulic conductivity, hydraulic gradient, and cross-sectional area of flow," Brown estimated that "the discharge of groundwater to the Locust Fork from the Sedimentation Basins" is 34 gallons per minute. *Id.*

[6] Brown stated that "polluted groundwater in the lower Sedimentation Basin discharges at seeps below the lower dam that flow into the Locust Fork" and that "[o]pposite the lower dam, polluted groundwater also discharges through GOB waste sediments on the bed of the Locust Fork (i.e., bed-seepage) into the river water." *Id.* at 13.

discharge "at seeps along the eastern slope" of the Site in 2017 but did not present "an estimate of the volume of polluted groundwater discharge along the eastern slope," his 2021 declaration focuses only on the lower dam "where such an estimate was provided in [his] expert report." *Id.*

On the *Maui* factors of time and distance, Brown notes that polluted groundwater flows "10 to 30 feet" through the lower dam before "discharging at surface seeps" under the lower dam to the Locust Fork. *Id.* at 7. Using Darcy's equation to calculate groundwater velocity, he estimates that the groundwater flows at a rate of 6.9 feet per day and that groundwater at the lower dam thus enters the Locust Fork from seeps in "approximately 1.5 to 4.4 days." *Id.* Turning to bed seepage, Brown states that the groundwater flows 30 to 100 feet through and under the lower dam and onto riverbed sediments before entering the Locust Fork. *Id.* Using the velocity rate of 6.9 feet per day, he calculates that groundwater at the lower dam enters the Locust Fork as bed seepage "in approximately 4.4 to 14.6 days." *Id.*[7] BWR argues that the refuse pile and groundwater discharges thus function "like a

---

[7] Regarding these time and distance factors, BWR also cites several photographs it previously filed, arguing they convey the "extremely close proximity" of "the lower dam and spillway (point source)" to the Locust Fork. Doc. 106 at 9–10 (citing docs. 55-19 at 2; 53-9 at 2; 55-20 at 2; 53-6 at 105). These photographs appear to depict front and aerial views of the lower dam that show the "spillway" adjacent to the Locust Fork, and the close proximity is evidenced in part by small trees casting a shadow over the dam and onto the river. *See* docs. 55-19 at 2; 53-9 at 2; 55-20 at 2; 55-13 at 3; 53-6 at 105. *See also* doc. 106 at 9–10.

13

pipe, discharging pollutants, above and below the surface, just feet away from the Locust Fork." *See* doc. 106 at 13.

As to the other *Maui* factors, Brown has asserted that the refuse pile is "permeable and highly porous," allowing "infiltration of rainwater and flow of groundwater." *Id.* at 14 (citing doc. 106-1 at 9). *See also* doc. 53-6 at 42 ("Based on the field observations, most of the contaminated groundwater beneath the GOB waste (graded, infill and Pile) flows through the GOB waste sediments in the Sedimentation Basins and thence discharges to the Locust Fork."); *id.* at 12.[8]  Put another way, groundwater apparently travels through the acidic refuse pile and becomes polluted by it, thence carrying AMD as the groundwater flows into the Locust Fork. *See* doc. 106 at 14 (citing doc. 53-6 at 12–14). Brown claims that when rainfall infiltrates the refuse pile, pollutants dissolve into the water, "creating the AMD that is carried by polluted surface runoff and groundwater to the Locust Fork." *Id.* at 11–12.  In sum, the groundwater both becomes polluted by the refuse waste and also furnishes the means by which AMD flows into the Locust Fork. *See id.* at 15.

---

[8] Brown also explained in his 2017 report: "Toxic pollutants in the GOB waste (GOB pile, graded GOB waste, and infill GOB waste) dissolve into infiltrating water that percolates through the GOB waste and recharges groundwater.  The groundwater within and beneath the GOB waste is polluted with AMD, and represents a large secondary source of toxic pollutant discharge to surface water." Doc. 53-6 at 12.

Because sampling data apparently reveal "the same basic chemical characteristics and AMD contamination" at multiple Site locations, including the upper parts and lower parts in the "seepage zone," BWR argues that the evidence demonstrates that groundwater only becomes more polluted, not diluted, as it travels to the Locust Fork. *See id.* (citing doc. 53-6 at 58–62).  BWR claims that this presents even stronger evidence of a functional equivalent of a direct discharge than the evidence in *Maui*, where fresh groundwater and volcanic rock diluted the wastewater at issue "in its long journey to navigable waters." *Id.* at 15–16 (citing *Maui*, 2021 WL 3160428, at *14–15).  In addition, Brown states that the discharges into the Locust Fork maintain their identity as polluted AMD because "[t]he GOB material does not attenuate the concentration of pollutants in the groundwater at the points of discharge." *Id.* at 17; doc. 106-1 at 13–14 (citing doc. 53-6 at 58–62).

BWR argues that this evidence, paired with Brown's calculation that approximately 49,500 gallons of polluted groundwater discharges to the Locust Fork each day and 100 percent of the groundwater at the Site flows into the Locust Fork, demonstrates that the groundwater flows violate the CWA under *Maui*. *See id.* at 16–17.  BWR again draws a comparison between the AMD-polluted groundwater flowing into the Locust Fork and the "example of a pipe that 'ends a few feet from navigable waters,'" where the "pipe emits pollutants that travel those few feet

15

through groundwater." *Id.* at 18 (citing *Maui*, 140 S. Ct. at 1476). Thus, BWR says, the CWA clearly applies to the groundwater at issue. *Id.*

2.

On this evidence, BWR has met its initial burden of establishing the absence of a genuine dispute regarding whether the groundwater discharges into the Locust Fork constitute the functional equivalent of a direct discharge of pollutants from a point source. *See Maui*, 140 S. Ct. at 1468, 1476. For one, BWR and its expert Brown sufficiently establish "the kind of time, distance, and dilution data that the [c]ourt would require for its *Maui* inquiry." *See Cottonwood Envtl. Law Ctr. v. Edwards*, No. 20-00028, 2021 WL 1102405, at *7 (D. Mont. March 23, 2021). BWR has presented evidence that contaminated groundwater from the lower dam reaches the Locust Fork in as little as 1.5 to 4.4 days, *see* doc. 106-1 at 7, and given the proximity of the lower dam and spillway to the Locust Fork, *see, e.g.*, docs. 55-19 at 2; 53-9 at 2, "the [AMD] likely travels a relatively short distance through groundwater." *See Maui*, 2021 WL 3160428, at *14. Indeed, the *Maui* Court emphasized that "time and distance will be the most important factors in most cases." 140 S. Ct. at 1476.

Additionally, BWR has provided evidence that polluted groundwater travels through "porous" GOB waste that exacerbates rather than dilutes the intensity of the

AMD.  *See* docs. 53-6 at 18, 30, 50–51, 58–62, 68–71; 106 at 14–15.[9]  Further still, BWR has presented evidence that the pollution maintains its identity as AMD as the AMD-laden groundwater discharges into the Locust Fork, bolstered by the finding that concentrations of chemicals and the pH of the groundwater seeps have "similar ranges" as the data observed for surface water.  *See* docs. 53-6 at 58–62; 106 at 15–17; 106-1 at 13–14.

Taking this evidence together and using *Maui* as guide, the court finds that BWR has "adequately support[ed] its motion" for summary judgment on its groundwater CWA claims.  *See Cynergy*, 706 F.3d at 1326.  Thus, "the burden shifts to [Drummond] to show that specific facts exist that raise a genuine issue for trial."  *See id.*

---

[9] Brown's 2017 report stated that "[t]he data confirm that some metals are present in the GOB waste at concentrations higher than the USEPA RSLs, as well as above nearby background concentrations in soils. These metals can be readily dissolved into water under the acidic conditions present in the mine waste." Doc. 53-6 at 50; *id.* at 59 (describing "eight dissolved metals with concentrations in groundwater samples collected at the Site significantly above the concentrations detected in the upstream sample from the Locust Fork").  Brown also noted the transport of AMD via groundwater in this report:

> [G]roundwater within GOB waste was present in monitoring wells installed by PELA in the early 1980's. Metals in the GOB waste then dissolved directly into the groundwater flowing through the waste. These toxic pollutants would discharge directly to the Locust Fork through river-bed sediments and at near-shore seeps, or discharge to Tributary 1 where they would be transported with surface water to the Locust Fork. In the new GOB waste areas, likely created from 1974 to 1982, even with improved grading, cover, revegetation, and drainage, some precipitation still infiltrated and percolated to groundwater.

*Id.* at 69 (internal citations omitted).

B.

Drummond essentially counters that (1) Brown's data is insufficient and his opinions are speculative, *see* doc. 112 at 4–5; (2) BWR's other experts fail to negate issues of fact, *see id.* at 5, 11; (3) BWR mischaracterizes Drummond's expert reports, which demonstrate that the evidence does not prove "the actual discharge of a pollutant by way of groundwater *as groundwater*," *id.* at 12–15, 20; and (4) even if the evidence establishes the functional equivalent of a direct discharge of pollution via groundwater, this evidence cannot support a judgment, *id.* at 20.

1.

Drummond first argues that the data Brown collected during field measurements cannot support his opinions and that his opinions constitute speculative interpretation. *See id.* at 4–5.  Drummond contends that BWR's "entire case" rests on "seven surface water 'field measurements' taken on August 1, 2017 using a portable hand-held pH and TDS/EC meter and on certain additional data obtained on August 16-18, 2017." *Id.*  These field measurements, Drummond claims, consist only of "minimal components" that include 10 soil samples, 15 water samples that Drummond calls "surface water samples" (although BWR calls them "groundwater seeps"), four groundwater samples, and "some electromagnetic readings of no conclusive significance." *Id.*

Drummond deems this an "obvious lack of data upon which Brown attempts to predicate his opinions." *Id.*[10] Relatedly, Drummond states that Brown "conflates surface water and groundwater" and that his "speculation and conjecture are not admissible evidence." *Id.* at 7. *See also id.* at 10. It is not obvious how or why Brown's data is lacking or that his opinions are purely speculative. Drummond says that Brown's samples "are not scientific evidence," that Brown admits certain instrument readings "are subject to interpretation," and that because Brown lacks particular data, his estimations are similarly rendered "speculative" and "inadmissible." *Id.* at 7–8.

However, merely stating that data is lacking does not make it so, and subsequently labeling expert conclusions as "speculative" does not necessarily raise a genuine dispute. As the Circuit put it, "[a] nonmoving party . . . cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1576 (11th Cir. 1991) (internal citation omitted). Rather, a party asserting that a genuine dispute exists "must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited

---

[10] *See also id.* at 5 ("The only undisputed facts regarding groundwater are the laboratory analytical results from these four piezometer samples. The analytics show what they show; they do not show what they do not show. Everything else is interpretation.").

do not establish the absence . . . of a genuine dispute." *See* FED. R. CIV. P. 56(c).  If Drummond, for example, cited expert testimony that particularly explained why Brown's data insufficiently supports his conclusions or that specifically identified where Brown veers into unmoored speculation, the court could determine that a genuine dispute persisted.  Without evidence buttressing these assertions, however, the court cannot simply take counsel's word for it that BWR's data is "obvious[ly]" lacking, *see* doc. 112 at 4–5, or accept counsel's own interpretations of Brown's opinions.[11]  Indeed, "[o]n summary judgment review, a court cannot simply accept counsel's *ipse dixit* for an unsupported factual statement in a brief."  *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1195 (S.D. Ala. 2018).

Drummond next asserts that AMEC Foster Wheeler's and CH2M's 2017 and 2018 reports "directly oppose[]" the "numerous deficiencies in Brown's 2017 report."  Doc. 112 at 4–5 (citing docs. 50-14; 50-16; 61-1; 61-3).  However, Drummond does not cite specific pages of these reports that refute Brown's

---

[11] Drummond also insists that Brown, "confounding the meaning of terms, also speaks of 'groundwater' seeps, but is really discussing surface water given that the water is *visible*."  Doc. 112 at 6.  *See also id.* at 7–8.  But contrary to Drummond's assertion, Brown rests his groundwater-related conclusions not solely on the observation of groundwater seeps but also on sampling data.  *See* doc. 53-6 at 48, 50–51.  Moreover, Drummond does not adequately explain why groundwater seeps do not indicate groundwater.  The only expert that Drummond cites for these conclusions is Maggie Weems, who stated that she "would consider the seep to be not groundwater."  *Id.* at 6 (citing doc. 61-30, 114:17–19).  Again, the court cannot accept counsel's unsupported statements as to the propriety or logic of Brown's observations and conclusions, and one expert's testimony that she "would consider the seep to be not groundwater," without more, fails to support the assertion that BWR's water samples "are not scientific evidence of the non-visible *movement of groundwater as groundwater* from the property into the Locust Fork by 'bed-seepage,' nor can such movement be established by dragging some wires behind a boat."  *See id.* at 7–8.

opinions, instead citing generally four documents totaling over 400 pages.[12]  To be sure, Drummond seems to argue that somewhere within these documents, which contain, among other things, these expert reports, lies a silver bullet.  But judges "are not like pigs, hunting for truffles buried in briefs," and courts "are not required to ferret out delectable facts buried in a massive record, like the one in this case." *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  Drummond must cite to "particular parts of materials in the record" or demonstrate that BWR's cited materials do not actually establish the absence of a genuine dispute.  FED. R. CIV. P. 56(c).  This it has failed to do.

In light of BWR's specific arguments and citations to expert opinions, Drummond's broad gesture to over 400 pages of evidentiary submissions "fails to properly address [BWR's] assertion[s] of fact."  *See id.* 56(e).  The court therefore agrees with BWR that Drummond "cites nothing from either report that rebuts any

---

[12]  Document 50-14 is a 130-page exhibit containing the deposition of Lynn Sisk of CH2M followed by "CH2M Response to Plaintiff's Reports Regarding the Former Maxine Mine Site Near Maxine, Jefferson County, Alabama" and over 70 pages of graphs, charts, and tables.  *See* doc. 50-14.  Likewise, document 50-16 is a 131-page exhibit containing various charts and tables, the 2017 Alabama Fish Consumption Advisories, and another CH2M report, *see* doc. 50-16, and document 61-1 is a 109-page exhibit beginning with the Weems declaration that introduces several reports by or for AMEC Foster Wheeler, *see* doc. 61-1.  Finally, document 61-3 is a 109-page exhibit with various laboratory results, additional opinions from AMEC Foster Wheeler, and rebuttal reports by Wood Environment & Infrastructure Solutions, Inc.  *See* doc. 61-3.

fact or opinion by Brown pertinent to this motion." *See* doc. 114 at 5 n.8.[13]  Because

the court may accordingly consider BWR's assertions "undisputed for purposes of

the motion," *see* FED. R. CIV. P. 56(e), Drummond's argument that Brown's data and

opinions are speculative and lacking fails to establish a genuine issue for trial.

## 2.

Drummond next argues that, after excluding Brown's opinions, BWR's

evidence rests only on the opinions of Nelson Brooke, Barry Sulkin, and Gordon

Johnson, and none of these opinions apparently negate issues of fact as to BWR's

groundwater claims.  *See* doc. 112 at 11.  Drummond fails to cite specific portions

of materials in the record, such as statements in depositions, affidavits, or

declarations, that explain why these experts' opinions are insufficient.  *See* FED. R.

---

[13] Later in its brief, Drummond cites several pages of AMEC Foster Wheeler's 2017 report, arguing they demonstrate "problems and shortcomings with the EM31 and ER data relied upon by Brown—including, particularly, his selective interpretation of that data."  Doc. 112 at 15 (citing doc. 61-1 at 18–19, 29–31).  For its part, BWR asserts that the "cited reports barely mention groundwater. At most, the AMEC report refers to alleged issues with ERT testing, generally, but it never directly refutes Brown's interpretations or conclusions about the data."  Doc. 114 at 5 n.8. After reviewing the cited pages of the AMEC Foster Wheeler report, the court disagrees with BWR that the report "barely mention[s] groundwater."  *Id.*  But the court does agree that these portions do not directly refute Brown's groundwater-related opinions.  The cited pages cast doubt on the *extent* to which the Locust Fork has become polluted but do not appear to rebut Brown's data- and observation-driven opinions that AMD infuses groundwater that flows from the refuse pile to the Locust Fork.  *See, e.g.*, doc. 61-1 at 19.  And Drummond's contention also ignores that the court underscored BWR's "extensive evidence of historical and ongoing discharges" of AMD from the refuse pile into the Locust Fork in its prior opinion and order, where the court noted that "BWR collected numerous surface water, sediment, and groundwater samples in 2016 and 2017 from various locations at the site" that its experts said revealed the presence of AMD.  Doc. 93 at 17–18 (citing docs. 55-3 at 2; 55-6 at 60–51, 76, 79; 54-3 at 25–30; 56-1 at 3–8).  This evidence led the court to conclude that the opinions of Drummond's experts "[were] insufficient to create an issue of fact regarding the discharge of AMD" into the Locust Fork.  *Id.* at 20.

CIV. P. 56(c).  And even setting this issue aside, a review of the briefing indicates that BWR does not rely on the opinions of Brooke, Sulkin, or Johnson to support its motion on the groundwater CWA claims.  *See generally* doc. 106 (relying only on Brown's materials); doc. 114 at 6 n.11 ("For its groundwater claims, BWR is not relying on any of the testimony of Nelson Brooke, Barry Sulkin, or Gordon Johnson cited by Drummond.").  Thus, this contention fails to raise a genuine issue for trial on the groundwater CWA claims.

### 3.

Drummond also asserts that, by claiming that Lynn Sisk and Thomas Simpson agree with BWR about the flow of polluted groundwater into the Locust Fork, BWR mischaracterizes Sisk's and Simpson's testimony, *see* doc. 112 at 12, and that Drummond's experts in fact highlight the relatively small amounts of groundwater present at the Site, *see id.* at 13–15.  These arguments drive at one conclusion: that "there is no evidence of groundwater being discharged as subterranean groundwater to the Locust Fork."  *Id.* at 13–14, 20.  In support, Drummond cites testimony from Sisk, who stated that Brown was "speculating" about the depth of groundwater; Leslie Noble, who noted that the area where the piezometers were set "is not going to produce a great deal of water"; Bruce Wielinga, who testified that the "data says to [him] that there is not a robust or very large groundwater flow system out there. . . . [and] that there's not a lot of groundwater"; and Dwight Hicks, who

testified that he saw "no indication that groundwater is moving to the river" because "[e]verything that [he] see[s] down there is more related to the surface."[14] *Id.* at 14–15.

That the groundwater flows are small in volume relative to the surface water system may weaken BWR's argument.  But accepting as true that the Site contains a relatively small groundwater system, as Drummond's experts opined, the court finds this assertion insufficient to raise a genuine dispute as to whether the groundwater discharges violate the CWA.  Even if data and observations indicate that "there is not a robust or very large groundwater flow system" at the Site, *see id.* at 14–15, this does not contradict the ultimate conclusion that the groundwater flows functionally equal a direct discharge of pollutants under *Maui*.[15]

On "the most important factors in most cases," time and distance, *Maui*, 140 S. Ct. at 1476, BWR has presented evidence that groundwater carrying AMD flows

---

[14] Hicks, however, also testified that he had not "looked for [groundwater] seeps along the bank" and did not know if groundwater seeps existed at the Site.  *See* doc. 53-1 at 62.

[15] *Compare Hawai'i Wildlife Fund v. Cty. of Maui*, No. 12-00198 SOM/KJM, 2021 WL 4898661, at *1 (D. Haw. Oct. 20, 2021) (denying defendant's motion for reconsideration of summary judgment) ("In determining that the . . . discharge is the functional equivalent of a direct discharge into navigable waters, this court examined each of the seven factors enumerated by the Supreme Court, paying particular attention to the time and distance factors . . . . In the course of its analysis, this court considered the volume of the discharge, a factor not listed by the Supreme Court. The massive volume was relevant to and informed this court's decision, but it was not essential to this court's determination.") *with Peconic Baykeeper, Inc. v. Harvey*, 13-CV-6261 (JMA) (SIL), 2021 WL 4755623, at *7 (E.D.N.Y. May 21, 2021) (holding that three of the seven *Maui* factors "remain[ed] sharply in dispute to such an extent that they outweigh[ed] the time and distance factors such that summary judgment should be denied").

into the Locust Fork in a matter of days, traveling a short distance from the refuse pile through and under the lower dam on the shore of the Locust Fork. *See* docs. 53-6 at 37 (describing "the GOB pile on a bluff that forms the westerly bank of the Locust Fork"); 106 at 11 ("Brown estimates that the contaminated groundwater discharges to the Locust Fork via seeps over a distance of only 10 to 30 feet; and approximately 30 to 100 feet to the [Locust Fork] as bed seepage."); 106-1 at 4. BWR has also presented evidence that the groundwater discharges satisfy the remaining five factors relevant to the functional-equivalent test under *Maui*. *See* doc. 106 at 14–19. The only factor arguably weakened by Drummond's assertion that the groundwater system is "small" or "not robust" is the fifth factor, "the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source." However, the other six factors, including the two most important factors, do not appear sharply disputed based on the evidence Drummond cites. Applying *Maui*, the court is unpersuaded that a reasonable jury could find for Drummond on the issue of whether the groundwater constitutes a functional equivalent of a direct discharge under the CWA.

4.

Finally, Drummond argues that even if evidence establishes the functional equivalent of a direct discharge of pollution to the Locust Fork, this evidence is insufficient to support a judgment. Doc. 112 at 20. In support, Drummond asserts

25

that the groundwater discharges have no more than a *de minimis* impact on the Locust Fork. *See id.* at 16 n.15, 20. However, Drummond does not cite legal authority squarely supporting this position, and Drummond acknowledges that the *Maui* Court failed to address the issue. *Id.* at 16 n.15.

The CWA states that absent statutory compliance, *i.e.*, the requisite permit, "the discharge of *any* pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a) (emphasis added). Interpreting this "zero-discharge" provision, the Circuit held that where a developer could not obtain an NPDES permit, the developer made "every good-faith effort" to comply with the CWA and relevant pollution control measures, and the stormwater discharges at issue "pose[d] no threat to human health, and [] much of the damage [caused by the discharges would] be reversed with the passage of a relatively short amount of time," the zero-discharge rule did not apply. *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996). But *Hughey* cautioned that "[t]he facts of this case necessarily limit[ed] [its] holding to situations in which the stormwater discharge is minimal." *Id.*[16]

The Circuit later explained that *Hughey* "staked out a path [that] developers wishing to avoid liability can follow where no [NPDES] permit is available and

---

[16] Specifically, in *Hughey*, a Georgia homeowner sued a residential developer for discharging stormwater without an NPDES permit, but NPDES permits covering stormwater were not available in the state at the time. *Id.* at 1524. The Circuit also noted that "nothing [the developer] could do would prevent all rain water discharge" and that the developer obtained a county permit, suggesting the developer "would have been able to obtain an NPDES permit" if one had been available. *Id.* at 1530.

where it would otherwise be impossible to develop their land without causing some discharge" by requiring the developer to "be in good-faith compliance with all state and local requirements prior to any discharge" and to "reduce the discharge to a minimum." *Driscoll v. Adams*, 181 F.3d 1285, 1289 (11th Cir. 1999). The Circuit held that "but for the limited exception recognized in [*Hughey*], '[t]he amended CWA absolutely prohibits the discharge of any pollutant by any person, *unless* the discharge is made according to the terms of [an NPDES] permit.'" *Id.* Because the facts of this case do not resemble the scenarios referenced in *Hughey* and *Driscoll*, Drummond cannot claim this limited exception to CWA liability.

Additionally, the *Maui* Court recognized that "[t]he underlying statutory objectives" of the CWA would "provide guidance" to courts determining whether groundwater discharges violate the CWA. *See* 140 S. Ct. at 1477. The CWA "was designed to prevent pollutants from harming navigable waters and their ecosystems or, at least, to limit that harm by limiting the amount of pollutant being discharged pursuant to a permit." *Maui*, 2021 WL 3160428, at *17; *see* 33 U.S.C. § 1251(a).[17] To achieve that end, the CWA does not mandate "some minimum amount" of pollution to trigger its permitting requirement; the CWA straightforwardly prohibits "the discharge of any pollutant." *Maui*, 2021 WL 3160428, at *17; 33 U.S.C.

---

[17] For example, "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1).

§ 1311(a).  *See also Patronas v. Marshall Durbin Food Corp.*, No. CV-03-J-749-J, 2005 WL 8158435, at *11 (N.D. Ala. Mar. 17, 2005).[18]

Therefore, whether the polluted groundwater flowing from the refuse pile into the Locust Fork significantly contributes to ecological damage at the Locust Fork does not bear on the question of whether the CWA requires Drummond to have a permit to discharge the polluted groundwater in the first instance.  Drummond has thus failed to raise a genuine issue of material fact as to its liability under the CWA for discharging AMD into the Locust Fork via groundwater.

## V.

In sum, BWR has established the absence of a genuine dispute regarding whether the groundwater discharges carrying AMD into the Locust Fork constitute the "functional equivalent of a direct discharge" of pollution under the CWA. Because this represented the only remaining element in dispute as to BWR's groundwater CWA claims, *see* doc. 93, BWR is entitled to summary judgment on its groundwater CWA claims.  BWR's renewed motion for summary judgment, doc. 106, is **GRANTED**.

---

[18] In *Patronas*, Judge Inge Johnson rejected the defendant's argument that the plaintiff could not prove that NDPES permit violations caused harm to certain waterways. *Id.* at *11.  Relevant here, Judge Johnson found "sufficient proof of causation in the record for a finding of liability" under the CWA and quoted language stating that the CWA "recognizes neither a good faith nor a *de minimis* defense."  *Id.* (emphasis added) (quoting *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., AFL-CIO v. Amerace Corp.*, 740 F. Supp. 1072, 1081–82 (D.N.J. 1990)).

**DONE** the 12th day of January, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE