
FILED
2022 Apr-25  PM 06:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **BLACK WARRIOR RIVER-** ) <br> **KEEPER, INC.,** ) <br>  ) <br> **Plaintiff,** ) <br>  ) <br> v. ) <br>  ) <br> **DRUMMOND COMPANY, INC.,** ) <br>  ) <br> **Defendant.** ) | Case No. 2:16-cv-01443-AKK |

## BWR's PRETRIAL BRIEF

Barry Brock (ASB-9137-B61B)
Eva L. Dillard (ASB-4118-A59E)
Hutton Brown (*admitted pro hac vice*)
Christopher J. Bowers *(admitted pro hac vice)*
James Hecker (*admitted pro hac vice*)

*Attorneys for Plaintiff Black Warrior Riverkeeper, Inc.*

# Table of Contents

Table of Contents………………………………………………………………… ii

I. The Court's Remedial Power Under the CWA Is Broad ....................................1

II. The Court Should Enjoin Drummond to Comply with Alabama's Water Quality Standard for Acidity at the Point of Discharge ......................................2

III. The Court Should Enjoin Drummond on an Interim Basis to Comply with the Limits in its Expired NPDES Permit Unless and Until a New Permit Is Issued...........................................................................................................4

IV. Drummond Has Discharged Fill Material Without a Required CWA § 404 Permit.............................................................................................................5

V. BWR Is Entitled to Injunctive Relief.................................................................8

    A. Regardless of the Traditional Equitable Factors, the Court Must, at a Minimum, Issue an Order Requiring Drummond to Comply Promptly with Water Quality Standards ................................8

    B. Alternatively, Traditional Equitable Factors Support Injunctive Relief ..........................................................................................................9

        1. BWR Has Suffered Irreparable Injury for which Legal Remedies Are Inadequate ..........................................................9

        2. The Balance of Equities and the Public Interest Favor an Injunction. .....................................................................................11

    C. BWR's Requested Injunctive Relief Is Feasible...............................12

    D. Drummond's "Adaptive Management" Approach Is Not Authorized by the CWA..................................................................13

    E. The Injunction Should Require Drummond to Submit a Compliance Plan, Promptly Comply by a Fixed Deadline, Monitor Its Discharges on a Weekly Basis, and File Monthly Status Reports...............................................................................13

VI. The Court Should Assess Civil Penalties for Past Violations ..........................14

This Court has ruled in BWR's favor on its § 402 claim, finding that Drummond is in violation of the Clean Water Act ("CWA") for unpermitted discharges of acid mine drainage (AMD) in surface water and groundwater flows from its Maxine Mine site. ECF 93, 122. Accordingly, this Court has discretion to "order relief that will achieve compliance with the Act." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982). The CWA authorizes the Court to "enforce . . . an effluent standard or limitation…," 33 U.S.C. § 1365(a), which is defined to include "an unlawful act under subsection (a) of section 301" of the CWA. *Id.*, § 1365(f)(1). The unpermitted discharge of a pollutant is an unlawful act under § 301(a). *Id.*, §1311(a); *Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 559 (5th Cir. 1996).

## I. The Court's Remedial Power Under the CWA Is Broad

The word "enforce" must be construed broadly as invoking this Court's full equitable and injunctive powers. Courts "presume the availability of all appropriate remedies [to enforce a statute] unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 66 (1992). The Court's CWA remedial authority "is more than the authority to declare that the requirement exists and repeat that it must be followed. So long as the district court's equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an abuse of discretion." *NRDC v. Southwest Marine, Inc.*, 236 F.3d 985, 1000 (9th

Cir. 2000).

Furthermore, traditional principles of equitable relief cannot override the Congressional mandate for CWA compliance. The Court's choice, absent explicit language to the contrary, "is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement should be preferable to no enforcement at all." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 497-98 (2001). Thus, "courts have discretion about how and when compliance is to be achieved, but not about whether it should be achieved." Johnston, *Ensuring Compliance: Equitable Relief in the Face of Violations of Substantive Environmental Standards*, 49 Envtl. L. 793, 795 (2019).

## II. The Court Should Enjoin Drummond to Comply with Alabama's Water Quality Standard for Acid Mine Drainage Pollutants at the Point of Discharge

A federal court's equitable discretion "must be exercised in light of the large objectives of the" statute. *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975). Achievement of water quality standards is "one of the [CWA's] central objectives." *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992). Congress mandated that all dischargers must comply with these standards. 33 U.S.C. § 1311(b)(1)(C); *see also* 40 C.F.R. § 122.44(d)(1). Consequently, this Court must exercise its equitable discretion to

prohibit Drummond from continuing to discharge its polluted surface water and groundwater to Tributary 1 and Locust Fork in violation of Alabama water quality standards.

These standards include those designed to control acid mine discharge pollutants. ADEM has classified the segment of Locust Fork into which Drummond discharges, which is between Highway 61 and Highway 31, as protected for both Swimming uses and Fish and Wildlife uses. ADEM Admin. Code § 335-6-11-.02(14). These designated uses are subject to eight "specific criteria," including pH. The pH criterion provides that "sewage, industrial wastes or other wastes *shall not cause* the pH to deviate more than one unit from the normal or natural pH*, nor be less* than 6.0, nor greater than 8.5." *Id.*, §§ 335-6-10-.09(3)(c)2 and (5)(e)2 (emphasis added).

Thus, the pH standard contains an absolute minimum prohibition that pH must not be less than 6.0 in the industrial wastes themselves prior to discharge. "Industrial wastes" include Drummond's AMD from the development of its coal mine, because ADEM defined those wastes to mean "liquid or other wastes resulting from . . . the development of natural resources." *Id.,* § 335-6-10-.02(5). The pH in the wastes that Drummond discharges to Tributary 1 and Locust Fork therefore cannot, under any circumstances, be less than 6.0 Standard Units (SU). The evidence will show that Drummond continually discharges water with pH in

3

the 3's and 4's, which is highly acidic.

The Alabama pH standard requires Drummond to comply with the minimum 6.0 pH standard at the point of discharge to Tributary 1[1] and Locust Fork, not after mixing or dilution.  That is, compliance must be measured prior to discharge of Drummond's surface runoff and groundwater flows into Tributary 1 and Locust Fork.[2]  To remedy Drummond's ongoing unlawful discharges, BWR requests that the Court issue an order compelling Drummond to control its discharges to comply with Alabama's water quality standard for minimum pH.

**III.     The Court Should Enjoin Drummond on an Interim Basis to Comply with the Limits in its Expired NPDES Permit Unless and Until a New Permit Is Issued**

Plaintiff's expert Bob Hedin will testify that compliance with the pH standard will reduce, but not eliminate harmful AMD, and that compliance with the limits in Drummond's expired permit is also needed to remove non-pH

---

[1] This Court has found that Tributary 1 "is a naturally-occurring stream to the south and west of the refuse pile that has a temporary physical connection to the Locust Fork." Doc. 93 at 25.  In 1975, the stream had intermittent flow. *Id*. at 11. BWR's hydrologist, Anthony Brown, will testify that Tributary 1 has the characteristics of a jurisdictional water of the United States under the CWA, because prior to its burial with unauthorized discharges of mine waste, it had an upland source, a terminus at Locust Fork, a bed and banks, periodic flow, and a significant physical and chemical nexus with that river. Those findings alone should be sufficient to determine that Tributary 1 is a water of the United States under Supreme Court and this Circuit's precedents relating to adjacent tributaries connected to navigable waters. Alternatively, the courts and EPA which have applied  the significant nexus test to streams require a significant effect on any one form of chemical, physical, or biological integrity of a downstream traditional navigable water. *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1217 (D. Or. 2009); 86 Fed. Reg. 69372, 69431 (Dec. 7, 2021). "[U]nauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States." 33 C.F.R. § 323.2(d)(4) Note.  *See United States v. Moses*, 496 F.3d 984, 989 (9th Cir. 2007) (concluding "however long ago undertaken," man-made diversions cannot change "a water of the United States into something else"); *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1218 (D. Or. 2009) ("a man-made structure cannot eliminate the CWA's jurisdiction over a water of the United States").

[2] EPA defines acid mine drainage ("AMD") as "mine drainage which, before any treatment, either has a pH of less than 6.0 or a total iron concentration equal to or greater than 10 mg/l."  40 C.F.R. § 434.11(a).

constituents like iron and manganese. This Court can grant that relief. The Court's equitable discretion is constrained by the anti-backsliding provision in the CWA and ADEM regulations, which provide that that no permit can be reissued unless it contains limits that are at least as stringent as those in the previously issued permit. 33 U.S.C. § 1342(o)(1); ADEM Reg. 336-6-6-14(l)1. In the interim, this Court should impose discharge limits on an interim basis that are at least as stringent as the limits for iron, total suspended solids and manganese in the expired permit, because those are the minimum limits that any new permit **must** contain. The 1988 permit also required Drummond to measure compliance "at the nearest accessible location just prior to discharge and after final treatment." ECF 55-22 at 6, ¶ I.B.2. The Court's order should therefore require Drummond to meet the pH standard and 1988 permit limits at that same location.

IV. **Drummond Has Discharged Fill Material Without a Required CWA § 404 Permit**

Drummond has violated § 301 and § 404 of the CWA, 33 U.S.C. § 1344, by placing (through 1982) and/or discharging (continuously through the present) fill material in the form of coal refuse and mine waste from the GOB pile into Tributary 1 and Locust Fork without a required permit under § 404. BWR has proved the five elements of a § 404 claim, in that (1) Drummond is a person; (2) who discharged fill material; (3) from a point source; (4) into streams or wetlands that qualify as jurisdictional "waters of the United States;" (5) without a permit or

5

other statutory authorization for such discharge. *United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006). The first, third, and fourth elements are the same for § 404 as those that were set out above for § 402. Elements one, three, and five have been established through the 2019 summary judgment ruling.

As to the second element, a "discharge of fill material" means "the addition of fill material into waters of the United States." 33 C.F.R. § 323.2(f). Until May 3, 2002, fill material was defined to mean "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." 33 C.F.R. § 323.2(m) (1977). The regulation also provided that "[t]he term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402" of the CWA. *Id*.

The waste exclusion does not apply here. The U.S. Army Corps of Engineers has interpreted "waste" to include only "waste materials such as sludge, garbage, trash, and debris in water." 42 Fed. Reg. 37122, 37130 (July 19, 1977). It has also consistently interpreted "waste" to exclude "discharges of soil, rock and vegetation (i.e., overburden) that is excavated in order to access coal reserves and then placed in waters of the United States." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 445 (4th Cir. 2003). "[S]uch discharges have only been authorized by permits issued under section 404 of the CWA by the Army Corps of Engineers." *Id*. Thus, under the 1977 regulation, Drummond discharged fill

6

material within the meaning of § 404, and discharges of those materials require a § 404 permit. The same conclusions apply under the 2002 regulation, because that regulation explicitly defines "fill material" to include "rock, …, soil, …[and] overburden from mining or other excavation activities." 33 C.F.R. § 323.2(e)(2).

Drummond's predecessor, ABC, placed large quantities of fill material, in the form of mine wastes, in Tributary 1 until 1982 without a required § 404 permit. Drummond is liable for ABC's violations because ABC merged with and "was absorbed into" Drummond in 1985. *Neal v. Alabama By-Products Corp.*, 1990 WL 109243, at *1 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991); Ala. Code 1975 § 10A-2A-11.07(a)(4). From 1985 to the present, Drummond allowed additional rock and mining wastes from the GOB pile to erode and raise the bottom elevation of Tributary 1. In 2020 and 2021, Drummond placed additional fill material, including soil and alkaline materials, in the lower basin and Tributary 1 as part of its remediation efforts. Drummond's fill activities since 1985 required a § 404 permit.

The illegal discharge of fill material is an ongoing violation of the CWA as long as the fill remains in the stream. *E.g., Benham v. Ozark Materials River Rock, LLC*, 885 F.3d 1267, 1275 (10th Cir. 2018). The continuing presence and erosion of illegal fill material in Tributary 1 and Locust Fork are ongoing violations of § 404 of the CWA. To remedy these violations, the Court should order Drummond

to restore the site to its natural, pre-filled condition. Restoration of a § 404 "violation site to its pre-violation condition is the preferred remedy." *United States v. Smith*, 2014 WL 3687223, at *3 (S.D. Ala. July 24, 2014).

V.     **BWR Is Entitled to Injunctive Relief**

   A. **Regardless of the Traditional Equitable Factors, the Court Must, at a Minimum, Issue an Order Requiring Drummond to Comply Promptly with Water Quality Standards**

Since Congress has mandated that water quality standards be achieved, and that prior permit limits cannot be relaxed, the only question is how Drummond can comply with those limits, not whether it must comply. In *Romero-Barcelo,* the Court noted that the district court found that the Navy's unpermitted discharges were not harming the environment. 456 U.S. at 309-10 ("the Navy's 'technical violations' were not causing any 'appreciable harm' to the environment"). Nevertheless, the Court repeatedly stated that compliance with the CWA would still need to be achieved. *Id.* at 314-15, 318, 320. Similarly, in *Oakland Cannabis*, the Court stated that, in weighing the balance of equities, the Court "may not consider the advantages and disadvantages of nonenforcement of the statute." 532 U.S. at 498; *accord Pickett v. IBP, Inc.*, 2001 WL 34886460, No. Civ. 96-A-1103-N at *6 (M.D. Ala. Dec. 26, 2001). The choice "is simply whether a particular means of enforcing the statute should be chosen over another permissible means," and "not whether enforcement is preferable to no enforcement at all." *Oakland*

8

*Cannabis Buyers' Co-op*, *supra* at 497-98.  As to means of enforcement, Congress provided in the CWA that the courts may enforce CWA violations by issuing an injunction.  33 U.S.C. §§ 1365, 1319(d).

### B. Alternatively, Traditional Equitable Factors Support Injunctive Relief

To obtain a permanent injunction based on the traditional equitable factors,

> [A] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted and (4) that the public interest would not be disserved by an injunction.

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Alternatively, BWR satisfies each of those factors.

#### 1. BWR Has Suffered Irreparable Injury for which Legal Remedies Are Inadequate

Injunctive relief is the usual remedy in environmental cases because "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987).  That is true here. BWR's evidence of irreparable harm is Drummond's repeated and longstanding violations of the pH standard and the expired permit limits.  "Any violation of water quality based effluent limits causes some degree of harm to the water quality" of the receiving waters.  *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.

9

Supp. 1158, 1162 (D.N.J. 1989), *aff'd in relevant part*, 913 F.2d 64 (3d Cir. 1990); *accord, PIRG v. Rice*, 774 F. Supp. 317, 328 (D.N.J. 1991). Such violations are sufficient to demonstrate both irreparable harm and the inadequacy of monetary damages. *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1160 (D. Idaho 2012) (violations of arsenic water quality criteria "are more than sufficient to demonstrate that irreparable harm to the environment will occur if the illegal discharges continue"); *W.V. Highlands Conservancy v. Lexington Coal Co., LLC*, CV 3:19-0573, 2021 WL 5889963 at *4 (S.D. W.Va. Dec. 13, 2021) ("discharging high levels of ionic pollution that results in violations of water quality standards constitute irreparable harm that cannot be adequately remedied by money damages"). In any event, BWR's toxicity expert, Dr. Mitchelmore, will testify that Drummond's AMD discharges pose a significant threat to the nearshore environment and aquatic life in Locust Fork.

Drummond's defense is that, based on measurements taken in Locust Fork upstream and downstream from its AMD discharges, those discharges do not cause significant harm to Locust Fork as a whole. This argument fails for three reasons. First, those discharges cause significant harm to Tributary 1, which is a protected water of the United States by itself. See n. 2 above. The pH of the water in that buried stream is consistently and severely acidic with high conductivity. Second, Drummond's argument assumes that it is entitled to a mixing zone, so that it can

measure harm only after its discharges are diluted by the much larger flow in Locust Fork. As shown above, Drummond has no right to a mixing zone. Its 1988 permit did not grant one, and Drummond could obtain a new mixing zone only through the permitting process. Third, if accepted, Drummond's argument would mean that each discharger could avoid accountability if its discharges were individually minimal, even though the combined effects of all discharges into a waterway were cumulatively significant. This is "an absurd result" that is inconsistent with the CWA. *Int'l Union v. Amerace Corp., Inc.*, 740 F. Supp. 1072, 1087 (D.N.J. 1990). "The Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible." *Student Pub. Interest Research Grp. of New Jersey, Inc. v. Georgia-Pac. Corp.*, 615 F. Supp. 1419, 1424 (D.N.J. 1985). Furthermore, "any argument that toxic discharges fail to make the receiving waters measurably worse frustrates the Act's intent to improve the quality of our nation's waters." *Powell Duffryn*, 720 F. Supp. at 1167.

### 2. The Balance of Equities and the Public Interest Favor an Injunction.

The Supreme Court in *Amoco* directed that, in considering the balance of equities, a district court should focus "on the underlying substantive policy the [statutory] process was designed to effect. . ." 480 U.S. at 544. As noted above, compliance with water quality standards is "one of the Act's central objectives."

11

*Arkansas v. Oklahoma*, 503 U.S. at 106.  An injunction here would serve that purpose.  "Harm to [the] environment outweighs a defendant's financial interests, particularly where the violations are of a longstanding and continual nature." *Atlanta Gold*, 879 F. Supp. 2d at 1161.  Protecting water quality is "a critical public interest that profoundly outweighs a company's bottom line." *Id.* at 1162.  "[T]here is no exception to permit compliance because such compliance is expensive."  *OVEC v. Apogee Coal Co., LLC*, 555 F. Supp. 2d 640, 649 (S.D. W. Va. 2008).  BWR has therefore met all four requirements for injunctive relief.

### C. BWR's Requested Injunctive Relief Is Feasible

BWR will present expert testimony at trial that treatment of Drummond's AMD is feasible at this specific site.  EPA so found when it imposed limits on AMD discharges almost forty years ago.  47 Fed. Reg. 45382, 45395 (Oct. 13, 1982); 40 C.F.R. § 434.32. Drummond's expired permit contains those limits.

Achieving compliance may ultimately require Drummond to excavate and remove or neutralize some or all of the mine waste at the site.  Such a remedy is available in a CWA citizen suit for an unpermitted discharge. *United States Pub. Interest Research Group v. Atl. Salmon of Me.*, 339 F.3d 23, 31 (1st Cir. 2003) ("Nothing in [the CWA] language precludes, as part of this enforcement authority, measures remediating the harm caused by an existing violation, nor have we been cited to any legislative history or circuit precedent imposing such a limitation.");

*see also United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061 (S.D. Ind. 2008) ("Both *Atlantic Salmon* and *[U.S. v.] Deaton*[, 332 F3d 698, 714 (4th Cir. 2003),] indicate that, unless otherwise specified by statute, a court has the equitable authority to order a full and complete remedy for harms caused by a past violation, and in doing so may go beyond what is necessary for compliance with the statute").

### D. Drummond's "Adaptive Management" Approach Is Not Authorized by the CWA

The CWA contains an absolute prohibition on the unpermitted discharge of pollutants. 33 U.S.C. § 1311(a). An NPDES permit is "the only means by which a discharger from a point source may escape the total prohibition of § 301(a)." *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977). The CWA does not authorize adaptive management as a substitute for strict statutory compliance.[3] Drummond's adaptive management approach is merely a euphemism for "some improvement is better than none." It is not a compliance plan.

### E. The Injunction Should Require Drummond to Submit a Compliance Plan, Promptly Comply by a Fixed Deadline, Monitor Its Discharges on a Weekly Basis, and File Monthly Status Reports

As to the form of the injunction, BWR proposes injunctive relief with three main elements. First, the Court should require Drummond to design and submit an

---

[3] The U.S. EPA has applied adaptive management to Superfund sites under CERCLA, 40 U.S.C. § 9601, et seq., but the Maxine Mine site is not a Superfund site.

13

effective compliance plan within 30 days. This plan must set forth all remedial options for reaching compliance, including excavation or neutralization of the AMD-producing materials, and the order in which Drummond intends to implement such remedial technologies in achieving compliance. *See Atlanta Gold*, 879 F. Supp. 2d at 1164; *Apogee,* 555 F. Supp. 2d at 649. Second, the Court should order Drummond to implement the plan and achieve prompt compliance within 36 months. *Weinberger v. Romero-Barcelo,* 456 U.S. at 320 (the CWA "permits the district court to order that relief it considers necessary to secure prompt compliance with the Act."). Third, the Court should order Drummond to monitor its discharges at least once a week and provide monthly progress reports on its compliance status. *See e.g., United States v. Municipality of Penn Hills*, 6 F. Supp. 2d 432, 435 (W.D. Pa. 1998); *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001).

**VI.      The Court Should Assess Civil Penalties for Past Violations**

Section 309(d) of the Act provides that "[a]ny person who violates . . . any permit condition or limitation . . . shall be subject to a civil penalty . . . for each violation." 33 U.S.C. § 1319(d). Hence, "once a violation has been established, some form of penalty is required." *United States v. Brace*, 41 F.3d 117, 129 (3d Cir. 1994) (citation omitted). Section 309(d) lists six specific factors a court must consider when it determines an appropriate civil penalty: "the seriousness of the

violation or violations, the economic benefit (if any) resulting from the violations, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

Drummond's violations are numerous and serious.  BWR and Drummond have sampled discharges on numerous days since 2016 when the pH was less than 6.[4]  Dr. Hedin will testify that the AMD is the worst AMD he has ever seen in his 35 years of work.  Drummond's economic benefit is large.  Hedin will testify that it would require approximately $11 million[5] to treat the AMD by neutralization—an amount that Drummond has delayed spending since at the least the beginning of the five-year limitations period in September 2011, a period of nearly eleven years. Drummond's compliance efforts did not begin until 2020, and they were only designed to improve water quality marginally, not to eliminate the AMD. Drummond is a large mining company with substantial assets.  The Court should therefore impose a substantial civil penalty.

---

[4] Drummond is liable for a maximum of $37,500 in civil penalties for each day of violation before November 2, 2015 and $56,460 in civil penalties for each day of violation thereafter. 40 C.F.R. § 19.4; Civil Monetary Penalty Inflation Adjustment, 85 Fed. Reg. 83,818 (Dec. 23, 2020).

[5] On April 8, 2022, a few weeks before trial, Drummond disclosed new documents relating to the total amount of GOB at the site that had been requested but not produced in discovery. Plaintiff intends to file a motion in limine relating to such a prejudicial and untimely disclosure and also reserves its rights to modify its costs estimates accordingly.

Respectfully submitted this 25th day of April, 2022.

/s/ Barry Brock
Barry Brock (ASB-9137-B61B)
Southern Environmental Law Center
2829 Second Avenue S., Ste. 282
Birmingham, AL 35233
tel: (205) 745-3060
fax: (205) 745-3064
bbrock@selcal.org

Hutton Brown (*admitted pro hac vice*)
Christopher J. Bowers *(admitted pro hac vice)*
Southern Environmental Law Center
Ten 10th Street NW #1050
Atlanta, GA 30309
tel: (404) 521-9900
fax: (404) 521-9909
hbrown@selcga.org
cbowers@selcga.org

Eva L. Dillard (ASB-4118-A59E)
Black Warrior Riverkeeper, Inc.
710 37th Street South
Birmingham, AL 35222-3206
tel: (205) 458-0095
fax: (205) 458-0094
edillard@blackwarriorriver.org

James Hecker (*admitted pro hac vice*)
Public Justice
1620 L Street NW, Ste. 630
Washington, DC 20006
tel: (202) 797-8600
fax: (202) 232-7203
jhecker@publicjustice.net

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2022, the foregoing **BWR's Pretrial Brief** was filed with the Clerk of Court using the CM/ECF system which will send notifications of such filing and service copies to the following:

Richard E. Davis
William A. Davis, III
Alfred H. Perkins, Jr.
H. Thomas Wells, III
Starnes Davis Florie, LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
tel: (205) 868-6000
fax: (205) 868-6099
RDavis@starneslaw.com
WDavis@starneslaw.com
APerkins@starneslaw.com
TWells@starneslaw.com

*Attorneys for Defendant*

                                                  /s/ Barry Brock
                                                  Of Counsel