# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **BLACK WARRIOR RIVER-KEEPER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action Number |
| | ) | **2:16-CV-01443-AKK** |
| **v.** | ) | |
| | ) | |
| **DRUMMOND COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CONSENT DECREE

## RECITALS

WHEREAS, on September 1, 2016, after sending notice of the violations alleged herein and their intent to sue on the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of Region 4 of the U.S. Environmental Protection Agency, the Director of the Alabama Department of Environmental Management, and Defendant Drummond Company, Inc. ("DCI"), in accordance with § 505(b)(1)(A) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b)(1)(A), and § 7002(b)(2)(A) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b)(2)(A), Plaintiff Black Warrior Riverkeeper, Inc. ("BWR") commenced this action alleging that DCI has violated the CWA and RCRA by discharging acid mine drainage ("AMD"), sediment, mine waste, and/or other pollutants from DCI's Maxine Mine Site ("the Site") into the Locust Fork of the Black Warrior River and  tributaries

of the Locust Fork;

WHEREAS, BWR's Complaint and amendments seek declaratory and injunctive relief, the imposition of civil penalties, and the award of costs, including attorney's and expert witness fees;

WHEREAS, DCI answered the Complaint, including amendments, and denied BWR's allegations, asserted numerous defenses, and denied liability and BWR's entitlement to the relief, penalties, costs, and fees sought;

WHEREAS, in May 2019, the Court granted BWR's motion for partial summary judgment "solely as to liability on BWR's claim that DCI violated CWA § 402 by discharging AMD from the refuse pile, ditches, channels, gullies, basins, and dams at the site into Locust Fork." Doc. 93 at 66. In January 2022, the Court granted BWR's motion for partial summary judgment on BWR's groundwater claims under CWA § 402, ruling that "the groundwater discharges carrying AMD into the Locust Fork constitute the 'functional equivalent of a direct discharge' of pollution under the CWA." Doc. 122 at 28;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that the Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

WHEREAS, pursuant to 33 U.S.C. § 1365(c)(3), this Consent Decree is being

forwarded to the United States Department of Justice ("DOJ") and EPA for the statutorily-mandated forty-five-day review period; and

WHEREAS, the Parties consent to the entry of this Consent Decree without trial of any issues;

NOW, THEREFORE, without this Consent Decree constituting any evidence or admission by any party with respect to any issue of fact or law herein, and upon consent of the parties hereto, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 33 U.S.C. § 1365(a), and 42 U.S.C. § 6972(a)(1)(B).

Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b), 33 U.S.C. § 1365(c)(1), and 42 U.S.C. § 6972(a).

For purposes of this Decree, or any action to enforce this Decree, the Parties consent to the Court's continuing jurisdiction over the Decree.

## II.    APPLICABILITY

The provisions of this Decree apply to and are binding on BWR and DCI and their successors and/or assigns.

No transfer of ownership of the Site shall relieve DCI of its obligations to ensure that the terms of this Consent Decree are implemented.

3

## III.   INJUNCTIVE RELIEF

DCI shall achieve "Compliance," defined as meeting the discharge limits in paragraph 9 (the "Discharge Limits") and the other requirements in paragraphs 7, 10, and 24, by whatever scientifically proven and environmentally sound technologies it chooses, as to discharges from OLC 3, seep 3, and seep 6 at the Site (as more specifically identified in Exhibit A) by October 15, 2027 (the "Compliance Date").  Samples collected to monitor compliance with the Discharge Limits shall be collected at the nearest accessible location just prior to discharge and after final treatment.

Compliance requires that the Discharge Limits be met during flow conditions up to the 90th percentile flow rate (or the equivalent in inches of rain in a 24-hour period) ("Flow Conditions") and any flow which bypasses the treatment system(s) will be mixed with the treated effluent prior to discharge to the receiving waters. Flow Conditions will be computed from data collected twice per month from October 15, 2025, to the Compliance Date.

If DCI applies for any NPDES permit for discharges from the Site, and any permit is issued, DCI will remain bound by the Discharge Limits and compliance points for OLC 3, seep 3 and seep 6.  DCI will provide prompt and advance notice to BWR if it intends to alter the site in such a way that will change or alter the discharge and compliance points for OLC 3, seep 3 and seep 6.   If those

compliance/discharge points are changed, the Discharge Limits specified herein will transfer to and be applicable to the new discharge points and the new discharge points will become the new compliance points under this Decree.

The terms of this Decree will control over any effluent limit(s) contained in any permit which are less stringent, numerically, than the following Discharge Limits:

Iron -- 3.0 mg/l daily average/6.0 mg/l daily maximum;

Manganese -- 2.0 mg/l daily average/4.0 mg/l daily maximum;

Aluminum--1.0 mg/l daily average/2.0 mg/l daily maximum;

Total Suspended Solids-- 35.0 mg/l daily average/70.0 mg/l daily maximum;

pH --daily minimum 6.0 s.u.; daily maximum 8.5 s.u.; and

Toxicity—Pass/Fail.

Compliance also requires meeting the water quality standards at Ala. Admin. Code § 335-6-10-.06, including those requiring lack of floating debris, oil, scum and other floating materials in the discharge from the site that would interfere directly or indirectly with any classified water use.

Compliance must be documented by sampling for the Discharge Limits at OLC 3, seep 3, and seep 6, or any new discharge/compliance points created by alteration of the site, which receive flow previously discharged through OLC 3, seep 3 or seep 6, to be conducted by DCI and submitted to a certified, independent

laboratory for analysis.  This sampling will begin immediately upon entry of this Decree and the frequency will be twice per month, on the first and third Wednesday, for all Discharge Limits at the agreed sampling locations/compliance points. DCI will take date and location-stamped photographs of the effluent and sampling location for each sample and shall maintain the chain of custody forms for all samples submitted to the independent laboratory.

DCI will also conduct whole effluent toxicity (WET) tests for acute and chronic toxicity, pursuant to U.S. EPA methods (EPA 2002 Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Waters to Freshwater Organisms), at the same compliance points described in paragraph 11, once per month for the same sampling locations.  If the results of any WET test are a "fail," DCI will have the right to make a re-test to determine whether there was a cause for the result other than toxicity, but such re-testing can only be conducted once and must be conducted within 3 days of the "fail" result.

DCI will sample at the compliance points described in paragraph 11 once per month on the first Wednesday for the following metals: arsenic, cadmium, copper, lead, nickel, selenium, chromium, mercury, thallium, and zinc. If a NPDES permit is issued, this sampling requirement will terminate. In the event no NPDES permit is issued, DCI may request that this sampling requirement be terminated after all treatment systems for the site are in operation and effluent has been sampled for a

12-month period and the sampling does not indicate elevated levels of the above-listed metals.

DCI will also sample at the compliance points described in paragraph 11 once per month on the first Wednesday for five-day biological oxygen demand ($BOD_5$), chemical oxygen demand (COD), dissolved oxygen, conductivity, sulfate, total dissolved solids, nitrate, nitrogen, phosphorus, chloride, and sodium. DCI may request that this sampling requirement be terminated after all  treatment systems for the site are in operation and effluent has been sampled for a 12-month period and the sampling does not indicate elevated levels of any of the parameters listed in this paragraph.

After every three months of sampling and data collection pursuant to paragraphs 11-14, BWR shall have the right to exercise an option to request a meeting with DCI if BWR in good faith has a concern with one or more of the sampling results. The parties will then meet and work in good faith to seek a mutually agreeable solution to satisfy BWR's concerns.

DCI shall provide a quarterly report to BWR of all sampling activity and results.

**Milestone 1.** Within 24 months of the date of entry of this Decree, DCI will design, locate, and install a cutoff wall (or other physical method) in the vicinity of MW-21 or MW-22 to redirect the groundwater where it can be treated or otherwise

resolved to meet discharge criteria.

If DCI fails to reach Milestone 1, it will incur a time extension payment in the amount of $500 per day for each day the milestone is not met, to be paid quarterly to the SEP recipient in paragraph 30.

**Milestone 2.** After installation of the groundwater redirection system in paragraph 17, monitoring of the flow and concentration data from groundwater intercepted will be used to develop a "basis of design" report for a source control and/or passive treatment system for OLC 3 and seep 3 that will be provided to BWR by 36 months from the date of entry of this Decree, and which system will be in operation by the Compliance Date.

If DCI fails to reach Milestone 2, it will incur a time extension payment in the amount of $500 per day for each day the milestone is not met, to be paid quarterly to the SEP recipient in paragraph 30.

**Milestone 3.** On or before 24 months from the date of entry of this Decree, DCI will complete all bench, pilot, and field testing needed for technologies it intends to use to remediate discharges at seeps 1, 2 and 6, and will provide a "basis of design" report to BWR, along with data and test results, for a source control and/or passive treatment system for seep 6 that will be operational by 48 months from the date of entry of this Decree.  DCI will endeavor to direct the flow from seeps 1 and 2 to the seep 6 system, but if such redirection is not physically or feasibly attainable,

DCI shall include in its basis of design report any alternate remediation methods DCI intends to employ at seeps 1 and 2.

If DCI fails to meet Milestone 3, it will incur a time extension payment in the amount of $500 per day for each day this milestone is not met, to be paid quarterly to the SEP recipient in paragraph 30.  In no event shall DCI pay more than $500 a day for failure to meet any milestone(s).

DCI will send BWR a quarterly report of all site activity and remediation activities until remediation work is completed.  DCI will give site access to BWR and/or its consultants, on a regular monthly schedule during the remediation stage, to verify and document the work and, if necessary, conduct its own sampling.

Compliance will also require that DCI meet the Discharge Limits in paragraph 9 (or for toxicity, achieve "pass") on the regularly scheduled sampling dates after the Compliance Date.  If sampling indicates that discharges from OLC 3, seep 3, and seep 6 are not in compliance on any regularly scheduled date after the Compliance Date, DCI will have the right to immediately conduct additional sampling but will pay $1750 per day for each day that the discharge is out of Compliance, to be paid on a quarterly basis to the SEP recipient named in paragraph 30. The $1750 per day payment will run from the date of receipt of the lab results indicating non-Compliance until lab results demonstrating Compliance are obtained.

If Compliance is reached by the Compliance Date or earlier, DCI will provide

written notice of Compliance to BWR within 30 days and as part of the notice will submit to BWR a detailed report documenting all remedial measures which have been implemented to achieve Compliance, along with complete drawings or design documents, if requested, detailing such remedial measures.  DCI will also allow site access to BWR and its consultants at that point to verify the work, and BWR may conduct its own sampling of discharges.

If DCI reaches Compliance by use of bactericides and passive treatment or any technology or means other than excavation and removal of the mine wastes/GOB pile or complete neutralization of the AMD-producing mine wastes, then DCI will document the capital and operating costs of the remedial measures it has implemented and will provide a long-term Operations and Maintenance Plan ("O&M Plan") which describes the anticipated maintenance of the passive system for its life, the cost of such operation and maintenance, and an identification of who will administer the O&M Plan.  In addition, DCI will provide financial assurance to fund the O&M Plan for a period of 30 years in the form of an escrow account, bond, letter of credit, or other reasonably comparable or equivalent financial assurance. After 30 years, the O&M plan will be evaluated to assess performance, maintenance, and future funding requirements. DCI commits itself and its successors, assigns, or contractors working on its behalf, to complying with the O&M Plan and to following the funding mechanism required under this Decree.

If DCI reaches Compliance by use of bactericides and passive treatment or any technology or means other than excavation and removal or complete neutralization, DCI shall sample for the parameters iron, manganese, aluminum, total suspended solids, and pH at seep 3, seep 6, and OLC 3, or other discharge/compliance points created to replace those discharge/compliance points by altering the site, to ensure ongoing compliance with the discharge limits as to those parameters.  This sampling shall be conducted once a month, on the first Wednesday of each month or as close to that date as possible if weather or site conditions require delaying sampling to the next available date, and the monthly sampling reports shall be provided to BWR quarterly.  Upon request and 5-days' notice, BWR shall be entitled to attend the sampling and take split samples.

If DCI is unable to reach Compliance by use of bactericides and passive treatment or any technology or other means not involving excavation by October 15, 2027, then DCI will be charged time extension payments, calculated at $1750 per day starting on the first day following the Compliance Date until it reaches Compliance, payable quarterly to the SEP recipient in paragraph 30. The time extension payment amount of $500 for failure to meet a milestone and $1750 for failure to reach Compliance are not cumulative on a daily basis.  In no event shall DCI pay more than $1750 a day in time extension payments.   If there is any dispute regarding whether DCI is continuing to pursue Compliance after the Compliance Date, such dispute will be subject to the Dispute Resolution provisions in Part X of

this Decree.

## IV.   CIVIL PENALTIES

Within 30 days of the entry of this Decree, DCI shall pay $10,000 as a civil penalty to the U.S. Treasury for the Clean Water Act violations cited by the Court in its rulings. That payment shall be made by check or money order to the United States Treasury and should be sent to the following address:

> Alicia Kolaian
> Litigation Support Specialist
> Environment & Natural Resources Division
> Office of Litigation Support
> P.O. Box 7611
> Ben Franklin Station
> Washington, DC 20044-7611

The check or money order shall reference *Black Warrior Riverkeeper v. Drummond Company*, Civil No. 2:16-cv-01443-AKK, and payment shall be considered paid upon mailing or direct delivery to the specified address. A copy of the check or money order and cover letter shall be sent to BWR at the time payment is made and shall state that the payment is being made pursuant to this Decree.

## V.   SUPPLEMENTAL ENVIRONMENTAL PROJECTS

Within 30 days of entry of this Decree, DCI shall fund a supplemental environmental project (SEP) in the amount of $1,000,000 to be provided to the recipient Freshwater Land Trust.  The SEP will address an area or areas of concern within the Locust Fork watershed, with SEP projects to be decided upon by

Freshwater Land Trust after consultation with BWR. Alternatively, DCI may elect to donate to Freshwater Land Trust all or a portion of a property it owns at the confluence of the Locust and Mulberry forks of the Black Warrior River, located at 33°33´56´´N, 87°11´27.9´´W, that is valued at $1,000,000 or more. This property is of unique conservation value because it is a forested waterfront peninsula at the confluence of the Mulberry and Locust forks where they form the Black Warrior River, so this is an important location geographically within the watershed. Its preservation and protection would also enhance water quality in a sensitive part of the Black Warrior River watershed, since its conservation would prevent it from being mined, logged or developed.  There are also water quality, wildlife habitat, and conservation values inherent to preserved property. Drummond may also identify and offer to donate other property it owns in the Black Warrior River watershed with similar high conservation value, which offer must be mutually agreed upon by DCI, BWR, and Freshwater Land Trust.  If DCI elects the land donation option, and if BWR and Freshwater Land Trust agree to accept the donation of property in lieu of cash, the conservation property will be appraised by a licensed appraiser and if the appraised value is less than $1,000,000, then DCI will pay the difference between the appraised value and $1,000,000 to the SEP recipient after donation of the property.

## VI.   ATTORNEYS' FEES AND COSTS

Within 30 days of entry of this Decree, DCI will pay the amount of $2,000,000

for BWR's attorney's fees, $650,334.54 for Southern Environmental Law Center's (SELC's) expert and consultant expenses, and $6,900 for Public Justice's litigation expenses. DCI shall remit these amounts by check made payable to the Southern Environmental Law Center (SELC,) which shall be wholly responsible for the proper distribution of any portions of the delivered sums to any and all attorneys, experts, or other entities who may be entitled thereto.

The amounts set forth in paragraph 31 above shall be a complete settlement of BWR's claims for costs and fees incurred in this case, and the sum shall be the total costs and fees up to date of lodging of this Decree.

BWR does not waive, and expressly reserves, the right to move for additional fees and costs incurred by BWR after the entry of this Decree to seek and obtain the Court's enforcement of the terms of this Decree. Likewise, DCI does not waive, and expressly reserves, the right to oppose such motions for additional fees and costs.

## VII.   EFFECT OF SETTLEMENT, RELEASES BY BWR, AND RESERVATION OF RIGHTS BY THE PARTIES

This Decree resolves the civil claims of BWR as alleged in the Complaint, as amended [Docs. 1, 12, and 24], through the Effective Date (as defined herein).

In exchange for DCI's agreement to and compliance with the terms of this settlement of a contested matter, to which DCI agrees without admission of any fact or of any wrongdoing or liability, BWR hereby releases and forever discharges DCI and its shareholders; any divisions, subsidiaries, affiliates, or related entities and

persons, including officers, directors, and shareholders; any partners, predecessors, successors, representatives, insurers, assignees, agents, employees, attorneys, executors, administrators, and heirs; and any and all persons acting by, through, or in any way on behalf of DCI of and from any and all claims alleged by BWR in the complaint, as amended, as well as from any violations that may have occurred prior to the Effective Date (as defined herein) of this Decree.

## VIII.  EFFECTIVE DATE

This Decree shall become effective on the date of its entry by the Court following any required time period for notification and consideration by the United States (the "Effective Date").

## IX.    FORCE MAJEURE

"Force Majeure," for purposes of this Decree, is defined as any event arising from causes beyond the control of DCI or of DCI's consultants and/or contractors that delays or prevents the performance of any obligation under this Decree despite DCI's best, good faith efforts to fulfill the obligation.  The requirement that DCI exercise "best efforts to fulfill the obligation" includes using best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include DCI's financial inability to perform any obligation under this Decree.  If a delay or anticipated delay is attributable to a Force Majeure event,

the time for performance of the obligations under this Decree that are affected by the Force Majeure event will be only extended for the length of such delay.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other independent obligation.

The actions or inaction of any regulatory authority in reviewing and granting any permit for which application has timely been made by DCI are beyond DCI's control.

DCI shall have the burden of demonstrating that a Force Majeure event occurred and that it used its best, good faith efforts to comply with the Decree.

## X.    DISPUTE RESOLUTION

Unless otherwise expressly provided for in this Decree, the dispute resolution procedures of this section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Decree regarding Part III of this Decree. Either Party's failure to seek resolution of a dispute under this section shall preclude the Party from raising any such issue to enforce any obligation of the other Party arising under this Decree.

(1)    *Informal Dispute Resolution*.  Any dispute subject to Dispute Resolution under this Decree shall first be the subject of informal negotiations between the Parties.  A dispute shall be considered to have arisen when a Party sends

the other Party a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 14 days from service of the Notice of Dispute unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then either Party or both Parties may invoke formal dispute resolution procedures with the Court.

(2)     *Formal Dispute Resolution*. Either party may invoke formal dispute resolution procedures with the Court, within the time period provided in the preceding paragraph, by filing a written Statement of Position regarding the matter in dispute. The initiating party's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the filing party's position and any supporting documentation. The other party shall file its Statement of Position within 21 days of its receipt of the initiating Party's Statement of Position. This party's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation. The initiating party may, but is not required to, submit a reply within 7 days thereafter.

(3)     In invoking formal dispute resolution, the Parties are seeking judicial determination of the dispute. Except as otherwise provided in this Decree, in any dispute initiated for formal dispute resolution, the initiating party shall bear the burden of demonstrating that its position is correct and complies with this Decree.

The Court shall determine, in its discretion, whether to hold a hearing to take testimony from witnesses on any issue or whether to resolve the dispute on the papers, including any declarations, submitted.  The Court may also elect to refer any dispute to a magistrate judge for determination by hearing or on the papers through a report and recommendation.

(4)    The invocation of dispute resolution procedures under this section shall not, by itself, extend, postpone, or affect in any way any obligation of DCI under this Decree, unless and until final resolution of the dispute so provides.

## XI.    INFORMATION COLLECTION AND RETENTION

DCI will provide BWR with monthly reports of actions taken and completed pursuant to Part III of this Decree, including any sampling and/or other data developed and tabulated and any other documentary evidence, including, but not limited to, photographs and video of remediation work.  This Decree in no way limits or affects any duty or obligation of DCI to maintain documents, records, or other information imposed by state or federal laws, regulations, or permits.

DCI will provide BWR with access to the Property at a mutually agreeable date and time at regular intervals of not to exceed once per quarter to inspect the work performed pursuant to Part III of this Decree.  This Decree in no way limits or affects any duty or obligation of DCI to provide access to the Property for properly credentialed agents and employees of state or federal governmental agencies in

18

accordance with state or federal laws, regulations, or permits.

## XII.   REGULATORY APPROVALS/PERMITS

This Decree in no way affects or relieves DCI of its responsibility to comply with federal, state, and local laws, regulations, and applicable permits.  DCI shall perform the work required by the Decree in compliance with the requirements of all applicable federal, state, and local laws, regulations, and any applicable permits.  This Decree shall not, in and of itself, be considered a permit issued pursuant to any state, federal, or local statute, regulation, or ordinance.  Where any compliance obligation under this section requires DCI to obtain a federal, state, or local permit or approval, DCI shall timely request such approval, submit substantially complete permit applications, and take all other actions necessary to obtain any such approvals or permits, but shall not be deemed non-compliant or in violation of this Decree or otherwise penalized for any delay in the review and/or issuance of any permit by any regulatory authority.

## XIII.  COSTS OF WORK

DCI   shall bear all costs associated with the investigation, development, planning, design, construction, and implementation of all of the work elements of the injunctive relief prescribed in this Decree.

## XIV.  BWR AGREEMENT TO HONOR PROPERTY BOUNDARIES

BWR acknowledges that the Property is located on property owned by DCI

and that neither BWR nor its members have any right to cross the boundaries of the Property for any reason without the express and specific permission of DCI, as owner of the Property.  BWR, for itself and for its employees, agents and attorneys, agrees that it will not enter the Property—with entry defined as crossing a boundary of the Property—for any reason without express written permission of a duly authorized person extending such permission on behalf of DCI.  Pursuant to Part XI, above, DCI has agreed to provide BWR such access as is reasonably necessary for the Parties' to fulfill the terms of this Decree.

## XV.   RETENTION OF JURISDICTION AND TERMINATION OF DECREE

The Court shall retain jurisdiction for the purposes of modifying or enforcing this Decree and of adjudicating any disputes between the Parties that may arise under this Decree until termination of this Decree.

## XVI.  TERMINATION

After DCI has completed all requirements and made all payments due under Parts III, IV, V, and VI, and maintained Compliance (as defined above) for a period of five years, either Party may file a Motion for Termination of this Decree ("Motion for Termination"); provided, however, that the bond requirement in paragraph 26 shall continue regardless of the termination and shall remain an enforceable requirement subject to the jurisdiction of the Court.

Any such Motion for Termination shall state that DCI has satisfied each of

the stated requirements and shall include all necessary supporting documentation.

Following the filing by either Party of a Motion for Termination, the Parties shall confer informally concerning the Motion and any disagreement that the Parties may have as to whether DCI is in Compliance. If both sides agree that the Decree may be terminated, the parties shall submit, for the Court's approval, a joint stipulation terminating all requirements of the Decree.

Notwithstanding paragraphs 47-49 above, either party shall have the right to request termination of this Decree for noncompliance or other good cause shown on or after ten (10) years from entry of this Decree by filing a Motion for Termination

## XVII.  INTEGRATION AND SEVERABILITY

This Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning this agreement.  Other than documents that are subsequently provided pursuant to this Decree in conjunction with Part III, no other document nor any representation, inducement, agreement, understanding, or promise constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

The provisions of this Decree shall be severable.  If any provisions are declared by a court of competent jurisdiction to be unenforceable, the remaining

provisions shall nevertheless remain in full force and effect.

## XVIII.  MODIFICATION

The terms of this Decree may be modified only by a subsequent written agreement signed by all Parties.  Where the modification constitutes a material change to the Decree, such modification shall be effective only upon approval by the Court.

Any disputes concerning modification of this Decree shall be resolved pursuant to Part X; provided, however, that instead of the burden of proof required for dispute resolution, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX.  LODGING AND APPROVAL OF DECREE

Pursuant to § 505(c)(3) of the CWA, 33 U.S.C. § 1365(b)(3), this Decree will be lodged with the Court and presented to the United States for its review for a period of forty-five (45) days.  After the statutory period expires, this Decree may be entered by the Court as a final judgment of the Court.  If this Decree is not entered by the Court, the Parties shall retain all rights they had in this litigation before lodging of this Decree.  In the event the United States proposes modifications to this Decree, the Parties agree to confer and undertake good faith efforts to resolve any disputes that may arise out of the proposed modifications by the United States of the Decree;

however, the Parties reserve and shall retain all rights to object to any modification proposed by the United States, ADEM, or any other person or entity, whether during the comment period or otherwise.

## XX.   NOTICES, SUBMISSIONS, AND COMMUNICATIONS

Except as otherwise specified, when BWR or DCI transmits any written notification, submission, or communication required by the terms of this Decree, the notification, submission, or communication shall be addressed as follows both to the stated physical address and the email address of counsel as follows:

To BWR:

Eva Dillard, Esq. Staff Attorney
Black Warrior Riverkeeper, Inc.
712 37th Street South
Birmingham, Alabama 35222-3206
edillard@blackwarriorriver.org

With a copy to:

Barry Brock, Esq.
Southern Environmental Law Center
2829 Second Avenue South
Suite 282
Birmingham, Alabama 35233
bbrock@selcal.org

To DCI:

Blake D. Andrews, Esq.
Vice President and General Counsel
Drummond Company, Inc.
P.O. Box 10246
Birmingham, Alabama 35202
Bandrews@drummondco.com

With a copy to:

Richard E. Davis, Esq.
H. Thomas Wells, III, Esq.
Starnes Davis Florie LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
rdavis@starneslaw.com
twells@starneslaw.com.

BWR and DCI agree to accept service by U.S. Mail and email with respect to all matters arising under or relating to this Decree and to waive any formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable local rules of the Court.

The Parties shall immediately notify one another of any change of designated recipients and/or any change of address, whether of physical or email address.

## XXI.      SIGNATORIES

The undersigned representatives of the Parties certify that they are fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such party to this document.

24

## XXII. EXECUTION IN COUNTERPARTS

This Decree may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

**DONE** the 10th day of August, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

FOR PLAINTIFF BLACK WARRIOR RIVERKEEPER, INC.

Charles Scribner, Executive Director
Black Warrior BWR, Inc.
712 37th Street South
Birmingham, Alabama 35222-3206
(205) 458-0095

Approved as to form:

Eva L. Dillard, Staff Attorney ASB-4118-A59E
Black Warrior BWR, Inc.
712 37th Street South
Birmingham, Alabama 35222-3206
(205) 458-0095

Attorney for Black Warrior Riverkeeper, Inc.



Barry Brock ASB-9137-B61B
Southern Environmental Law Center
2829 Second Avenue South
Suite 282
Birmingham, Alabama 35233
(205) 745-3060

Attorney for Black Warrior Riverkeeper, Inc.

FOR DEFENDANT DRUMMOND COMPANY,
INC.

Drummond Company, Inc.

By: _____
     Blake D. Andrews
     Vice President and General Counsel

Approved as to form:

_____
Richard E. Davis
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209
(205) 868-6000

Attorney for Drummond Company, Inc.